THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

ANNIE TUMMINO, *et al*.,

                        Plaintiffs,

v.

ANDREW C. VON ESCHENBACH, in his official capacity as
Acting Commissioner of the Food and Drug
Administration,

                        Defendant.

-----------------------------------------------------------------------X

**No. 05-CV-366 (ERK/VVP)**

(Korman, C.J.)
(Pohorelsky, M.J.)

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR A PROTECTIVE ORDER

Simon Heller
Nan E. Strauss
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3600
(917) 637-3666 (fax)

Andrea Costello*
Shelbi Day*
Southern Legal Counsel
1229 N.W. 12th Avenue
Gainesville, FL 32601
(352) 271-8890
(352) 271-8347 (fax)

*Admitted Pro Hac Vice

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

I.      The Need for Expanded Access to Plan B. ............................................................ 2

II.     History of the FDA's Continuing Undue Delay and Denial of Full OTC
        Status for Plan B ................................................................................................... 4

III.    Plaintiffs' Efforts to Conduct Discovery in Accordance with the Federal
        Rules of Civil Procedure. ..................................................................................... 11

ARGUMENT ..................................................................................................................... 12

I.      Defendant's Motion for a Protective Order Should Be Denied Because
        Discovery Beyond the Agency Record Is Authorized in Cases Raising
        Claims Under the United States Constitution. ...................................................... 12

        A.      The Standard for Granting a Protective Order ........................................... 12

        B.      To The Extent That Plaintiffs' Discovery Requests Seek Information
                That Is Not Contained in the Agency's Administrative Record, Such
                Discovery Is Permitted in This Action. ..................................................... 13

II.     Defendant's Motion for a Protective Order Should Be Denied Because Plaintiffs
        Can Also Satisfy the "Bad Faith" Exception Which Permits Discovery Beyond
        the Agency's Administrative Record. ................................................................... 18

III.    Defendant's Motion for a Protective Order Should Be Denied Because
        Plaintiffs Can Also Satisfy Other Exceptions Which Permit Discovery Beyond
        the Agency's Administrative Record. ................................................................... 20

IV.     The Doctrine of Sovereign Immunity Does Not Bar Plaintiffs From Conducting
        Discovery Beyond the Administrative Record.. ................................................... 22

V.      Plaintiffs' Discovery Requests Are Not Premature, Not Unduly Burdensome,
        and Seek Information Relevant to Supporting Plaintiffs' Claims. ....................... 26

        A.      Plaintiffs' Discovery Requests Are Not Premature. .................................. 26

                1.      The Initiation of Discovery Has Been Contemplated by the
                        Court. ............................................................................................... 26

                2.      The Parties Need Not Confer Further Before Initiating
                        Discovery. ........................................................................................ 27

3.      The Existence of a Pending Dispositive Motion Is Not Alone
        Sufficient to Result in a Stay of Discovery..............................................28

B.      Plaintiffs' Discovery Requests Ought Not Be Quashed Based on the
        Government's Blanket Assertions That They Are Irrelevant and
        Unduly Burdensome. ...................................................................................30

        1.      Plaintiffs' Discovery Requests Are Relevant to Claims of
                Improper, Outside Influence and Differential Treatment. .........................31

        2.      Plaintiffs' Discovery Requests Are Not Unduly Burdensome,
                and the Government's Refusal to Confer Precludes Plaintiffs
                from Narrowing These Requests. ..............................................................32

C.      Sanctions Are Not Appropriate Because Plaintiffs' Requests for
        Discovery Are Substantially Justified.................................................................33

CONCLUSION........................................................................................................................34

CERTIFICATE OF SERVICE ...............................................................................................36

ii

## TABLE OF AUTHORITIES

**Cases**                                                                                                                                  **Page**

*Allick v. Lujan*, No. 89-2269, 1990 WL 108999 (D.D.C. Jul. 17, 1990)...............................15, 16

*Amfac Resorts v. U.S. Dep't of the Interior*, 143 F.Supp.2d 7 (D.D.C. 2001)..............................19

*Ass'n Fe y Allegria v. Ecuador*, No. 98 Civ. 8650, 1999 WL 147716
    (S.D.N.Y. Mar. 16, 1999) ...........................................................................................28, 29

*Atkinson v. Goord*, No. 01 Civ. 0761, 2002 WL 1997887 (S.D.N.Y. Aug. 28, 2002).................29

*Bar MK Ranches v. Yuetter*, 994 F.2d 735 (10th Cir. 1993)..........................................................19

*B.K. Instrument, Inc. V. U.S.*, 715 F.2d 713 (2d Cir. 1983)...........................................................24

*Blassingame v. Sec'y of the Navy*, 811 F.2d 65 (2d Cir. 1987) .....................................................24

*Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996)...............................24

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971),
    *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977) ........................18

*Compagnie Francaise D'Assurance Pour Le Commerce Exterieur v.*
    *Phillips Petroleum Co.*, 105 F.R.D. 16 (S.D.N.Y.1984) .............................................30, 32

*Cmty. for Creative Non-Violence v. Lujan*, 908 F.2d 992 (D.C. Cir. 1990)...........................18, 19

*Doe v. D.C.*, 230 F.R.D. 47 (D.D.C. 2005)....................................................................................13

*Dotson v. Griesa*, 398 F.3d 156 (2d Cir. 2005) .............................................................................24

*Envirosafe Servs. Inc. v. Envirosure Mngmt. Co.*, No. 88-28E, 1988 WL 62876
    (W.D.N.Y. Jun. 9, 1988).................................................................................................33

*Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989).............................................................................21

*Fla.. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985)...............................................................14

*Fleming v. Dep't of Justice*, No. CV-90-0896, 1992 WL 151900
    (E.D.N.Y. Jun 17, 1992) .................................................................................................28, 29

*Howard v. Galesi*, 107 F.R.D. 348 (S.D.N.Y. 1985)......................................................................28

*In re Agent Orange Prod. Liab. Litig.*, 821 F.2d 139 (2d Cir. 1987) .............................................28

*In re Chase Manhattan Corporation Securities Litigation*, No. Civ. 6092,
    1991 WL 79432 (S.D.N.Y. May 7, 1991) ......................................................................28

*Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949) ........................................23

*Liffiton v. Keuker*, 850 F.2d 73 (2d Cir. 1988) ........................................................................23

*McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991) ...................................................15

*Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7 (2d Cir. 1997) .....................................................18

*Nat'l Med. Enters., Inc. v. Shalala*, 826 F. Supp. 558 (D.D.C. 1993) ..........................................14

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978) .........................................................31

*Pickering v. Bd. of Educ. of Township High School District 205*, 391 U.S. 563 (1968) ..............15

*Porter v. Califano*, 592 F.2d 770 (5th Cir. 1979) ......................................................16, 23, 25

*Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534
     (9th Cir. 1993)........................................................................................................19, 21

*Rofail v. United States*, 227 F.R.D. 53 (E.D.N.Y. 2005) ............................................................13

*Rydeen v. Quigg*, 748 F. Supp. 900 (D.D.C. 1990) .......................................................15, 16, 22, 25

*Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225 (10th Cir. 2005)........................................23, 24

*United States v. Hooker Chems. & Plastics Corp.*, 90 F.R.D. 421
     (W.D.N.Y. 1981) ..................................................................................................................28

*Waltzer v. Conner*, No. 83 Civ. 8806, 1985 WL 2522 (S.D.N.Y. Sept. 12, 1985) .......................29

## Federal Statutes, Rules and Regulations

5 U.S.C. §§ 701 *et seq*...............................................................................................................24

5 U.S.C. § 702...............................................................................................................23, 24, 25

5 U.S.C. § 706(2)(B) ......................................................................................................14, 22, 25

21 U.S.C. § 355(c)(1)......................................................................................................................8

Fed. R. Civ. P. 16(b) .....................................................................................................................12

Fed. R. Civ. P. 26(a)(1)..................................................................................................................11

Fed. R. Civ. P. 26(b)(1)............................................................................................................12, 31

Fed. R. Civ. P. 26(c) ......................................................................................................................13

Fed. R. Civ. P. 26(c)(1).................................................................................................13

Fed. R. Civ. P. 26(c)(4).................................................................................................13

Fed. R. Civ. P. 26(f).....................................................................................11, 26, 27, 28

Fed. R. Civ. P. 26(g).....................................................................................................33

Fed. R. Civ. P. 26(g)(3)................................................................................................33

**Other Authorities**

A. J. J. Wood et al., *A Sad Day for Science at the FDA*, 353 New England J. of Med.,
    1197-99 ................................................................................................................10

Marc Kaufman, *FDA Official Quits Over Delay on Plan B: Women's Health
    Chief Says Commissioner's Decision on Contraceptive Was Political*,
    Wash. Post, Sept. 1, 2005, at A8.........................................................................9

Buck Rinker, *Plan B Casualties*, Hartford Courant, Oct. 2, 2005 .................................32

H.R. Rep. No 94-1656 (1976).........................................................................................24

## **PRELIMINARY STATEMENT**

This case seeks judicial review under the Administrative Procedure Act (APA) and the United States Constitution of the failure of the United States Food and Drug Administration (FDA) to approve the emergency contraceptive (EC) drug Plan B for over-the-counter (OTC) use.[1]  The Complaint alleges that this failure is not the result of appropriate medical or scientific evidence that requires Plan B to be available only as a prescription drug, but is instead the result of the FDA's improper reliance upon ideological and other factors that are beyond the statutory role assigned to the agency.  Because of this improper agency action, the statutory and constitutional rights of Plaintiffs and of all women who seek to avoid unwanted pregnancy by using Plan B are violated on a continuing and ongoing basis.  These violations inflict injury on women who need EC by increasing their risk of becoming pregnant and, therefore, of undergoing an abortion or carrying an unwanted pregnancy to term.

The agency filed this motion for a protective order arguing that discovery beyond the agency's administrative record should be prohibited in this case.  The FDA largely bases its arguments on the premise that, in a run-of-the-mill APA case, discovery is not permitted beyond the administrative record.  However, this is not a run-of-the-mill APA case.  To the contrary, where, as here, constitutional rights are at stake, judicial review of agency action is more searching and discovery is permissible.  The agency further claims that discovery is not authorized in this case despite Plaintiffs' constitutional claims and despite claims that the FDA has exceeded its statutory mandate, to consider factors other than scientific and medical evidence – at its core, a claim that the agency has acted in bad faith.  Yet the information already gathered by Plaintiffs prior to commencing discovery strongly supports their allegations of bad faith – a

---

[1] In this memorandum, the terms "Plan B" and "EC" are used interchangeably.

1

circumstance where even the Government concedes that discovery is permitted under the APA. (Def.'s Mem. at 15.)  The Government also asserts that Plaintiffs' discovery requests are both improper and premature, and should either be quashed or precluded until the pending dispositive motion has been ruled upon by Chief Judge Korman.  However, to permit the agency to prevail on these arguments would be to allow them to profit from their own lack of cooperation in Plaintiffs' efforts to confer regarding discovery.  Because the Government's arguments improperly characterize Plaintiffs' claims, are not supported by precedent, and would wrongfully deny Plaintiffs discovery to which they are entitled, their motion should be denied.  Finally, because the Government's arguments above are without merit, the Government's request for sanctions should also be denied.

**STATEMENT OF FACTS**[2]

**I.       The Need for Expanded Access to Plan B.**

Unintended pregnancy is a significant public health problem in the United States.  (First Am. Compl. ¶ 24.)  Indeed, the United States has one of the highest rates of unintended pregnancy compared to other developed countries.  (*Id*. at ¶ 24.)  The rate of teen pregnancy in the United States is also one of the highest among developed countries.  (*Id.*).  Plan B is an emergency contraceptive drug in tablet form that can be used to prevent pregnancy following an act of intercourse in which no contraceptive was used or the contraceptive method used failed.  (*Id*. ¶ 26.)  Plan B is, therefore, a drug used only by women, and every woman of childbearing age is a potential user of Plan B.  (*Id*. ¶ 50.)

---

[2] Because the facts of this case are crucial to understanding the substance of Plaintiffs' claims, the significance of delay in this case, and the very substantial harm that further delay will cause, Plaintiffs have set forth those facts here at length.

When taken within 72 hours of unprotected intercourse, Plan B reduces the risk of pregnancy by approximately 89 percent after a single act of unprotected sex. (*Id*. ¶ 27.) The earlier within this time period Plan B is taken, the more effective it is. In other words, as the interval between intercourse and the start of treatment increases, Plan B's effectiveness declines, and the risk of pregnancy increases. (*Id*. ¶ 27.) Therefore, rapid access to Plan B is essential in order to avoid pregnancy.

Plan B meets all the requirements for OTC status. Switching Plan B to OTC status will promote public health because Plan B is only effective for a short time after unprotected sex, and it works most effectively if used within twenty-four hours of unprotected sex. (*Id*. ¶ 28.) Because contacting a physician and obtaining and filling a prescription hinder women from obtaining Plan B in a timely fashion, making Plan B available OTC will allow more women to use the treatment and to use it more quickly, and thus enable more women to prevent unwanted pregnancies, to the benefit of public health. (*Id*.)

By contrast, limiting Plan B to prescription use is not necessary for the protection of public health. (*Id*. ¶ 29.) Plan B is safe for self-medication because it is not toxic to the woman (or to an embryo or fetus if a pregnancy had been previously established in the woman). (*Id*. ¶ 30.) Plan B has a low risk of abuse or overdose, and if overdose occurs, it is unlikely to lead to serious consequences. (*Id*. ¶ 31.) Plan B's side effects are well-known and minor. (*Id*. ¶ 32.) Plan B is effective when self-administered. (*Id*. ¶ 33.) Its administration is simple and relies only on assessments as to time elapsed since sexual intercourse that can be independently made by the woman, and any interaction between Plan B and other drugs would be nonfatal and unlikely to affect seriously Plan B's efficacy. (*Id*.) The condition Plan B treats — contraceptive failure or failure to use contraception during intercourse — is one that is readily diagnosable by a

3

woman.  (*Id*. ¶ 34.)  Plan B has no contraindications that would pose a danger to the patient.  The existing patient labeling for Plan B is tailored to self-administration in that it is simple, clear, comprehensive and easy to follow. [3]  (*Id*. ¶ 36.)

**II.     History of the FDA's Continuing Undue Delay and Denial of Full OTC Status for Plan B.**

In 1999, during a presidential administration sympathetic to expanded access to reproductive health care for women, the FDA approved Plan B as a prescription drug.  (*Id*. ¶ 38.) Since that date, Plan B has been prescribed many thousands of times.  (*Id*.)

Shortly after President Bush was inaugurated, on February 14, 2001, a group of citizen organizations, including Plaintiff Association of Reproductive Health Professionals, filed a petition with the FDA asking the agency to switch Plan B to OTC status. (*Id*. ¶ 39.)  In violation of its own regulations requiring a response to a citizen's petition within 180 days of filing, and displaying extraordinary delay and inaction, (*see Id*. ¶ 21), the FDA has failed as of this date – approximately four and a half years later – to either approve or deny the citizen's petition, thus constructively denying the petition.[4]  (*Id*. ¶ 39.)

Similar efforts by the manufacturers of EC pills have met the same fate: consignment to oblivion.  On April 16, 2003, Women's Capital Corporation, the former owner of Plan B, filed a supplemental new drug application (SNDA) asking the agency to approve Plan B for OTC sale. (*Id*. ¶ 40.)  Plan B was subsequently sold to Barr Laboratories, which maintained the SNDA.  (*Id*.

---

[3] Because of these facts, both the American Medical Association and the American College of Obstetricians and Gynecologists support switching Plan B to OTC status.  *See* Dec. 5, 2000 Statement of American Medical Association; December 13, 2001 Statement of the American College of Obstetricians & Gynecologists (cited in First Am. Compl. ¶ 37.)

[4] After the 180 day period, the FDA gave a tentative response on September 6, 2001, claiming that "the issues raised . . . require[] extensive review and analysis by Agency officials."  (*See* Def.'s Mem. at 5.)  Since that date the FDA has not communicated further with the petitioners, and the Government has given the Court no indication that *any* "review or analysis" was conducted by the FDA. (First Am. Compl. ¶ 37).

¶ 40.)  As set forth below, over two years later, the FDA, ignoring the uniform advice of its own medical and scientific staff, has decided to employ inaction and procrastination as its response to this application.

On December 16, 2003, FDA's Non-prescription Drugs Advisory Committee and Advisory Committee for Reproductive Health Drugs held a joint session to discuss possible OTC status for Plan B.  (*Id.* ¶ 41.)  The advisory committees, comprised of 28 members, voted as follows:

> **(1) Does the Actual Use Study (AUS) demonstrate that consumers used [Plan B] as recommended in the proposed labeling?**
>
> Yes – 27        No – 1
>
> **(2) Are the AUS data generalizable to the overall population of potential non-Rx users of Plan B?**
>
> Yes – 27        No – 1
>
> **(3) Based on the AUS and literature review, is there evidence that non-Rx availability of Plan B leads to substitution of emergency contraception for the regular use of other methods of contraception?**
>
> Yes – 0        No – 28
>
> **(4) Do the data demonstrate that Plan B is safe for use in the non-prescription setting?**
>
> Yes – 28        No – 0

(*Id.* ¶ 42.)

In addition, upon information and belief, all division chiefs within the Center for Drug Evaluation and Research (CDER) who reviewed the OTC switch application expressed the view to CDER that, based on scientific and medical data, the OTC switch should be approved.  (*Id.* ¶ 43.)  By memorandum dated April 22, 2004 and signed electronically on April 28, 2004, John Jenkins, M.D., the Director of the FDA's Office of New Drugs, wrote a memorandum summarizing his "review, conclusions, and recommendations regarding" the OTC switch for

5

Plan B (attached to First Am. Compl. as Ex. 1) ("the Jenkins memorandum").  (*Id.* ¶ 44.)  This memorandum states: "[The FDA] has not heretofore distinguished the safety and efficacy of Plan B and other forms of hormonal contraception among different ages of women of childbearing potential and I am not aware of any compelling scientific reason for such a distinction in this case."  (*Id.* ¶ 44 (citing Ex. 1 at 2).)  After a review of the record evidence supporting OTC use by women of all ages, the Jenkins memorandum accordingly concludes "that the available data clearly support a conclusion that Plan B meets the statutory and regulatory requirements for availability without a prescription for all age groups.  Such a conclusion is consistent with how the Agency has made determinations for other OTC products, including other forms of contraception available without a prescription."  (*Id.* ¶ 44 (citing Ex. 1 at 3).)

The Jenkins memorandum further states that "[o]ther senior officials within the Agency, including the former Commissioner (Dr. McClellan) and the Acting Center Director (Dr. Galson) have expressed concerns about the potential for unsafe, ineffective, or inappropriate use of Plan B by adolescents if it were to be made available without a prescription.  These concerns appear to have been based primarily on the limited number of adolescent women included in the sponsor's label comprehension and actual use studies."  (First Am. Compl. ¶ 45 (citing Ex. 1 at 1).)  Though Jenkins said that he "[is] sensitive to and respect[s] the concerns that some may have regarding non-prescription access to Plan B by adolescents," (*Id.* ¶ 45 (citing Ex. 1 at 2)), he stated that "[p]roducts that are indicated for uses related to sexual activity in adolescents raise concerns for some people that go beyond a finding based on clinical trial data that the product is safe and effective for its intended use in adolescents.  These concerns derive from individual views and attitudes about the morality of adolescent sexual behavior and also overlap with concerns about the role of parents and health care professionals in decisions about contraceptive

6

use in adolescents." (*Id.* ¶ 45 (citing Ex. 1 at 2-3).) He concluded: "While OTC access to Plan B for adolescents may be controversial from a societal perspective, I cannot think of any age group where the benefit of preventing unplanned pregnancies and abortion is more important and more compelling." (*Id.* ¶ 45 (citing Ex. 1 at 3).)

Likewise, Dr. Jonca Bull, Deputy Director of the Office of Drug Evaluation V, submitted a memorandum stating that "the issues cited [regarding concerns over adolescents' access to Plan B] spuriously raise the review standard for approval of this product and indeed any contraceptive product. The issues are speculative and unbalanced in their proposition" and are neither supported by data nor the medical literature. (Mem. of Jonca Bull, M.D., at 2-3 (copy attached to Pls.' Opp. to MJOP as Ex. 1, ("the Bull memorandum").)[5] The Bull memorandum asserts that to impose additional requirements on Plan B, unrelated to the safety and effectiveness of the drug, would be to "in effect propose[] a new and unusual regulatory standard for contraceptive drug products." (*Id.* at 3.)

Despite the nearly unanimous support from professional organizations and from FDA scientists for the OTC switch, on May 6, 2004, CDER Acting Director Steven Galson issued a "non-approvable" letter (attached to First Am. Compl. as Ex. 2) ("the Galson letter") to Barr rejecting the OTC switch for Plan B. (First Am. Compl. ¶ 47 (citing to Ex. 2).) That action also constructively denied the citizen's petition. (*Id.* ¶ 47.)[6] The Galson letter asserts that Barr's SNDA could not be approved because Barr had "not provided adequate data to support a conclusion that Plan B can be used safely by young adolescent women for emergency

---

[5] For the convenience of the Court, Plaintiffs' Opposition to Defendant's Motion for Judgment on the Pleadings and the accompanying exhibits ("Pls.' Opp. to MJOP") are attached hereto as Exhibit A. This memorandum of law was served on the Government on September 30, 2005, but has not yet been filed with the Court in compliance with Chief Judge Korman's "bundle rule."

contraception without the professional supervision of a practitioner licensed by law to administer the drug." (First Am. Compl. ¶ 48 (Ex. 2 at 1).) This assertion is not supported by the agency record. (*Id*. ¶ 48.)

On July 22, 2004, Barr filed an amended SNDA seeking the OTC switch only for women aged 16 and older. (*Id*. ¶ 49.) By statute, the defendant was required to act on Barr's amended SNDA within 180 days after it was filed. (*See* 21 U.S.C. § 355(c)(1); First Am. Compl. ¶ 49.) On January 21, 2005, the FDA announced a delay of its decision on Barr's application beyond this statutory time limit. (First Am. Compl. ¶ 49.)

Subsequently, despite repeated assurances to the public, the United States Congress, and this Court that FDA action on the SNDA was imminent, the FDA has continued to delay. On July 13, 2005, the Secretary of Health and Human Services Michael O. Leavitt assured Senator Michael Enzi that "the FDA will act on this application [regarding OTC status for Plan B] by September 1, 2005." (*See* Letter from M. O. Leavitt attached to Def.'s Letter to the Court, dated July 25, 2005, at 5.) In a letter to this Court dated July 25, 2005, counsel for the Government submitted the Leavitt letter to the Court and requested that the Court delay the judicial proceedings: "[g]iven the agency's commitment to take action on the pending Plan B application within the next 45 days, we respectfully submit that the most appropriate course of action would be to suspend the current briefing schedule and stay this case until the FDA takes the anticipated action. . . ." (Def.'s Letter to the Court, dated July 25, 2005, at 2.) Instead of the promised action, on August 26, the FDA issued a letter to Joseph A. Carrado, stating that "the Agency is unable at this time to reach a decision on the approvability of the application because of unresolved issues that relate to your NDA . . . ." (*See* Def.'s MJOP, Ex. C (Letter signed by

---

[6] The Galson letter signaled that the FDA was terminating its review of Plan B for full OTC access. Thus, the letter constituted final agency action on the Citizen's Petition, which sought full OTC access to Plan B for women of all

Lester Crawford, then Commissioner of FDA, dated August 26, 2005, at 1)).  The letter indicated that the agency is only considering approving Plan B for OTC use by women who are 17 years of age and older, and that before reaching a decision on this curtailed OTC status, it would seek public comments on "whether we should initiate a rulemaking to codify our interpretation of section 503(b) regarding when an active ingredient can be simultaneously marketed in both a prescription drug product and an OTC drug product."  (*Id.* at 2.)

On August 31, 2005, Dr. Susan F. Wood, assistant FDA commissioner for women's health and director of the Office of Women's Health announced that she was resigning from her post in reaction to the agency's decision to continue to limit access to Plan B, stating: "I can no longer serve as staff when scientific and clinical evidence, fully evaluated and recommended for approval by the professional staff here, has been overruled."  *See* Marc Kaufman, *FDA Official Quits Over Delay on Plan B: Women's Health Chief Says Commissioner's Decision on Contraceptive Was Political*, Wash. Post, Sept. 1, 2005, at A8, (quoting Susan F. Wood) *also available at http://www.washingtonpost.com/wp-dyn/content/article/2005/08/31/ AR2005083101271.html* (copy attached to Pls.' Opp. to MJOP as Ex. 2).

On September 27, Dr. Wood appeared on the ABC television news program Nightline to discuss the failure of the agency to act in accordance with the scientific consensus in favor of approving Plan B for OTC use.  *See* "Nightline The Morning After," ABC News Transcripts September 27, 2005, at 4-6, available on Lexis. (citing "consensus . . . amongst the scientists and health professionals there that it should be approved," and the fact that "all of the scientific and professional staff who normally are the part of the decision-making at the agency . . .  were cut out of the decision.") (copy of transcript attached to Pls.' Opp. to MJOP as Ex. 3).  Dr. Wood

---

ages.

also expressed her concern for the lengthy delay that she anticipated as a result of the upcoming rule-making:

> Dr. Wood: . . . But I would argue that the decision to delay approval of this product over-the-counter is, in fact, a denial.  And this is, again, in part why I resigned.  Because by couching it as a delay and a non-decision, in fact denied women of all ages, not just teens but women of all ages access to timely use of this product.
>
> Ted Koppel: (Off Camera) If you had thought that it was a brief delay, in other words, if you thought it was only going to be a delay of a couple of months, you wouldn't have resigned.
>
> Dr. Wood:  Probably not.
>
> Ted Koppel:  (Off Camera) So, you obviously think that what we're talking about here is not really a delay but a way of shelving it and not dealing with the issue.
>
> Dr. Wood: Right.  The mechanism is a rather bureaucratic one to potentially open it up to rulemaking.  Which, to make a long story short, means opening up to a process that usually takes many months to years, if in fact that's the way they go.

(*See id.* at 6-7.)

The history described above and the allegations in the Complaint show that the FDA applied a different and higher standard to Plan B's OTC switch than it has applied to OTC switches of other drugs.  (*Id.* ¶ 51; *see also* A. J. J. Wood et al., *A Sad Day for Science at the FDA*, 353 New England J. of Med., 1197-99, at 1, 3 (copy attached to Pls.' Opp. to MJOP as Ex. 4 (hereinafter "NEJM Article") ("This decision [to postpone issuing a decision about making EC available OTC] – or nondecision – deserves serious scrutiny, since it appears to reflect political meddling in the drug-approval process . . . . The recent actions of the FDA leadership have made a mockery of the process of evaluating scientific evidence, disillusioned many of the participating scientists both inside and outside the agency, squandered the public trust, and tarnished the agency's image.")).

10

Moreover, there is no medical or scientific basis for the FDA's application of a different and higher standard to Plan B's OTC switch.  (First Am. Compl. ¶ 52; *see also*  Ex. 4 at 2 (NEJM Article))  Instead, the FDA's application of a different and higher standard to Plan B's OTC switch was the result of factors that fall outside the FDA's statutory mandate, (*Id*. ¶ 53), and the FDA's rejection of the OTC switch for women of all ages and its constructive rejection of the citizen's petition for the OTC switch are not supported by medical or scientific evidence and are not supported by the agency record. (*Id*. ¶ 54).

**III.    Plaintiffs' Efforts to Conduct Discovery in Accordance with the Federal Rules of Civil Procedure.**

As reflected in the attached Declaration of Simon Heller, since the commencement of the instant litigation, Plaintiffs have held a good faith belief that discovery outside the administrative record is appropriate.  Accordingly, since the early stages of this case, Plaintiffs have consistently attempted to conduct discovery in accordance with the requirements set forth in the Federal Rules of Civil Procedure.  On March 23, 2005, as required by Federal Rule of Civil Procedure 26(f), Plaintiffs attempted to discuss discovery issues with opposing counsel, including a proposed joint plan for discovery.  At that time, counsel for the Defendant informed Plaintiffs that the government would oppose any and all discovery requests.  Thereafter, Judge Pohorelsky issued an order noticing the initial scheduling conference, and reminding the parties of their obligations under Rule 26.  On June 7, 2005, pursuant to Rule 26(a)(1), Plaintiffs served counsel for the Defendant with their initial disclosures.

Due to a subsequent motion by the government to stay the proceedings in light of alleged supervening events (which never occurred), Chief Judge Korman held a telephone conference with the parties on August 2, 2005.  During that conference, discovery issues were discussed and the Chief Judge set initial discovery deadlines.  In light of this conference, Judge Pohorelsky

11

canceled the previously set scheduling conference. Accordingly, the Plaintiffs, in good faith, believed that the telephone conference with Chief Judge Korman on August 2, 2005, was the initial scheduling conference required by Fed. R. Civ. P. 16(b). As such, Plaintiffs continued with discovery, and served the defendant with interrogatories and a request for production of documents. The Defendant has refused to participate in discovery and he has held to his position that discovery is not permissible in this case. Plaintiffs have attempted to resolve the parties differing views of permissible discovery in a collegial and efficient manner, however the Defendant has been adamant in his mischaracterization of the present litigation and the law governing discovery in this case. Defense counsel's only attempts to resolve the present discovery dispute have been repeated requests that Plaintiffs withdraw their discovery and accept the government's position. The parties have, therefore, been unable to reach a compromise on their discovery dispute.

## ARGUMENT

**I.    Defendant's Motion for a Protective Order Should Be Denied Because Discovery Beyond the Agency Record Is Authorized in Cases Raising Claims Under the United States Constitution.**

**A.    The Standard for Granting a Protective Order.**

Plaintiffs are entitled to discovery of any non-privileged matter that is relevant to a claim made in this case. Fed. R. Civ. P. 26(b)(1). "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* The Government bears the burden of proving why a protective order is necessary.

Under Federal Rule of Civil Procedure 26(c), for good cause shown, the court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." To show good cause, "particular and specific facts must be established rather than conclusory assertions." *Rofail v. United States*, 227 F.R.D. 53, 54 (E.D.N.Y. 2005) (citations omitted). *See also Doe v. D.C.*, 230 F.R.D. 47, 50 (D.D.C. 2005) ("good cause" is demonstrated by specific evidence of the harm that would result from disclosure; the movant must articulate specific facts and "cannot rely on speculative or conclusory statements"). "If the movant establishes good cause for protection, the court may balance the countervailing interests to determine whether to exercise discretion and grant the order." *Rofail*, 227 F.R.D. at 55 (citation omitted). In its discretion, the court may, *inter alia*, issue an order that a disclosure or discovery not be had, or, that certain matters not be inquired into, or that the scope of the disclosure or discovery be limited to certain matters. Fed. R. Civ. P. 26 (c)(1), (4).

The Government has failed to meet its burden of demonstrating why a protective order should issue barring Plaintiffs from conducting discovery of information that is not contained within the agency's production of the administrative record. Accordingly, the motion for a protective order should be denied.

**B.    To The Extent That Plaintiffs' Discovery Requests Seek Information That Is Not Contained in the Agency's Administrative Record, Such Discovery Is Permitted in This Action.**

The Government's entire premise for its motion for a protective order misstates the applicable legal standard, as well as the allegations made by Plaintiffs in this case. The Government argues that this Court should enter a protective order precluding Plaintiffs "from ever propounding discovery in this case" because this case only involves "judicial review of

13

agency action under the APA" and "the only relevant information in this case is the administrative record."  Defendant's Memorandum in Support of Defendant's Motion for a Protective Order at 7-10. ("Def.'s Mem.").  This argument misses the mark and mischaracterizes the nature of Plaintiffs' claims.

Plaintiffs agree that if this case involved *only* claims under the APA that the Defendant's actions are "arbitrary and capricious," then discovery and the scope of judicial review would be limited to the administrative record absent bad faith.  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985).  However, Plaintiffs' case is not limited to an "arbitrary and capricious" claim.  (First Am. Compl.  ¶¶ 63-64 & 65-66.)  The First Amended Complaint makes clear that Plaintiffs claim not only that the agency's actions are arbitrary and capricious in violation of the APA, but also that the agency's actions violate the rights to privacy and equal protection under the Fifth Amendment to the United States Constitution.  (*Id*).[7]

It is well established that a challenge – like Plaintiffs' – to agency action based on constitutional violations entitles Plaintiffs to judicial review of facts which are not contained in the agency's record and, therefore, that discovery of such facts is permitted.  *Nat'l Med. Enters., Inc. v. Shalala*, 826 F. Supp. 558, 565, n.11 (D.D.C. 1993) ("While it is generally true that the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court, there are a number of exceptions to this rule. Chief among these is a court's review of a constitutional claim.") (internal quotations and

---

[7]Specifically, the First Amended Complaint states:  "FDA's denial of the OTC switch for persons of all ages violates the Fifth Amendment to the United States Constitution and 5 U.S.C. § 706(2)(b) in that it infringes the right to privacy of women who need EC without serving any compelling, significant, or legitimate governmental interest . . . ."  and  "FDA's denial of the OTC switch for persons of all ages violates the Fifth Amendment to the United States Constitution and 5 U.S.C. § 706(2)(b) in that it discriminates on the basis of sex without serving any compelling, significant, or legitimate government interest."  (First Am. Compl. ¶¶ 64, 66) (emphasis added).

14

citations omitted); *Rydeen v. Quigg*, 748 F. Supp. 900, 906 (D.D.C. 1990) ("When reviewing constitutional challenges to agency decision-making, courts make an independent assessment of the facts and the law. Thus, [the court] may consider . . . additional affidavits . . . even though they were not before the agency upon administrative review. Furthermore, [the court] need not accord deference to the agency's decisions in regard to plaintiff's constitutional challenges because the courts, not agencies, are experts on constitutional issues.") (citations omitted); *Allick v. Lujan*, No. 89-2269, 1990 WL 108999, at *1 (D.D.C. Jul. 17, 1990) (finding that "it is by no means unique or unprecedented for a court, in an effort to satisfy its responsibility to conduct a substantial inquiry, to permit discovery and allow the record to be supplemented," especially where otherwise it would be "required to take the agency's word that it considered all relevant matters") (internal quotations and citations omitted). *See also Pickering v. Bd. of Educ. of Township High School District 205*, 391 U.S. 563, 580, n.2 (1968) (review of state court action not limited to state court findings); *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 493 (1991) (review of INS proceedings not limited to agency record). That the APA provides the waiver of sovereign immunity under which Plaintiffs bring their constitutional claims does not render those claims "APA claims."

Thus, contrary to Defendant's assertions, (Def.'s Mem. at 7.), when reviewing constitutional claims brought pursuant to the APA's waiver of sovereign immunity, the Judiciary *does* act as a fact-finder. *See Pickering*, 391 U.S. at 578-79. In reviewing action which allegedly violates constitutional rights, "an independent examination of the record will be made in order that the controlling legal principles may be applied to the actual facts of the case." *Pickering*, 391 U.S. at 580 n.2 (citations omitted). The Court noted that such review may include a "completely independent[]" examination of the evidence and "afford[s] little weight to the

15

factual determinations made by the [other body]." *Id.* Whether federal courts are reviewing a

decision by a state court, a federal agency, or decisions by other bodies, they always adjudicate

constitutional claims based upon an independent assessment of the facts unconstrained by the

record created by the other body. "Independent of any power of review that Congress granted to

this Court under the APA, this Court has the authority to examine and rule on any actions of a

federal agency that allegedly violate the Constitution." *Rydeen*, 748 F. Supp. at 905 (citation

omitted). Therefore, a court can consider additional evidence even though it was not before the

agency upon administrative review. *Rydeen*, 748 F. Supp. at 906; *see also Allick*, 1990 WL

108999, at *1-2 (plaintiff's due process and equal protection challenges to the agency's policy

entitled plaintiff to discovery beyond the agency's administrative record). Common sense

dictates that this information can only be obtained through discovery if it is not included within

the agency's production of the administrative record. Without such information, Plaintiffs are at

a serious disadvantage in proving their constitutional claims.

The distinction between Plaintiffs' APA claims and those alleging constitutional

violations is indeed unambiguous in the APA itself. As one Court has observed, the

Congressional intent expressed in the APA is that:

> [C]ourts should make an independent assessment of a citizen's claim of
> constitutional right when reviewing agency decision-making. Whereas section
> 706(2) authorizes reviewing courts to overturn agency findings and actions
> involving *[n]on-constitutional claims* only when the agency has abused its
> discretion, . . . acted arbitrarily and capriciously, . . . or made findings
> unsupported by substantial evidence, . . . section 706(2)(B) explicitly authorizes
> the court to set aside any agency action 'contrary to constitutional right . . . .

*Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979) (emphasis added). "Judicial deference to

agency fact-finding and decision-making is generally premised on the existence of agency

16

expertise in a particular specialized or technical area.  But in general, courts, not agencies, are expert on [constitutional rights]." *Id.* at n.15.

All of Plaintiffs' discovery requests seek information in support of their constitutional claims concerning the agency's treatment of the application for the OTC switch for Plan B (a drug which can only be used by women) in a discriminatory manner.  Such discriminatory treatment violates the rights to equal protection and privacy of plaintiffs and of the women whose interests they represent by imposing an unjustified barrier to their access to the only drug available to be taken after sexual intercourse to prevent unwanted pregnancy.  To present evidence of this discrimination to the Court for review and judicial determination on the merits, Plaintiffs must first obtain the information through discovery.  Plaintiffs' discovery requests seek information relevant to the intent, deliberations, decisions, action and inaction of the agency which are based on unlawful discrimination.  (*See e.g.,* Plaintiffs' First Set of Document Requests and Plaintiffs' First Set of Interrogatories at nos. 25-26) (attached hereto as Exhibits B and C respectively).  Since the information requested is relevant to Plaintiffs' claims, Defendants have failed to show why production, as a matter of law, should be prohibited or limited.[8]

In sum, Defendant seeks to have this Court improperly limit, or entirely preclude, discovery based on a mischaracterization of Plaintiffs' claims and a misunderstanding of the law governing discovery in cases involving constitutional challenges against agency action.  There is therefore no "good cause" for granting a protective order to prevent Plaintiffs from discovering information relevant to their case.

---

[8] It is difficult for Plaintiffs to discern which discovery requests, in particular, the Government objects to as outside the agency's record and which requests the Defendant finds objectionable on other grounds because Defendant has not responded or raised specific objections to specific discovery requests.  To permit Plaintiffs to defend against a motion for protective order to prevent the disclosure of certain information based on a privilege or other objection, Defendants should be required to provide such specific objections.

**II.      Defendant's Motion for a Protective Order Should Be Denied Because Plaintiffs Can Also Satisfy the "Bad Faith" Exception Which Permits Discovery Beyond the Agency's Administrative Record.**

As indicated above, Plaintiffs are entitled to conduct discovery beyond the agency record in order to prosecute their constitutional claims.  In addition to this basis for discovery, Plaintiffs are also entitled to conduct discovery beyond the scope of the agency's record because they have alleged that the agency acted in bad faith in denying approval of OTC status for Plan B for women of all ages.  (First Am. Compl.  ¶¶ 1, 39, 42-48, 51-55, 60, 62, 64 & 66.)  Plaintiffs' allegations in the First Amended Complaint satisfy the exception to limitations on discovery which allows discovery concerning the agency's thought process, beyond the record, where the agency has acted in "bad faith."  (First Am. Compl. ¶¶ 1, 39, 42-48, 51-55, 60, 62, 64 & 66.) Defendant incorrectly argues that the "complaint itself contains no claims of agency bad faith." (Def.'s Mem. at 15.)  The facts in the First Amended Complaint and reasonable inferences from them show otherwise.  (First Am. Compl. ¶¶ 1, 39, 42-48, 51-55, 60, 62, 64 & 66.)

Generally, a court reviewing an agency decision as violative of non-constitutional legal rights is confined to the administrative record compiled by that agency when it made the decision.  *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997), citing *Fla. Power & Light Co.*, 470 U.S. at 743-44.  Despite this general rule, discovery of the agency decision-making process and "an extra-record investigation by the reviewing court may be appropriate when there has been a strong showing in support of a claim of bad faith or improper behavior on the part of the agency decision makers."  *Nat'l Audubon Soc'y*, 132 F.3d at 14.  *See also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *Cmty. for Creative Non-Violence v. Lujan*, 908 F.2d 992, 997 (D.C. Cir. 1990).  Where there is an allegation of bad faith on the part of the agency, "the good faith behind it can only be grasped by looking beyond the record itself."

18

*Amfac Resorts v. U.S. Dep't of the Interior*, 143 F.Supp.2d 7, 12 (D.D.C. 2001). "[T]he only way a non-agency party can demonstrate to a court the need for extra-record judicial review is to first obtain discovery from the agency." *Id. See also Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993); *Cmty. for Creative Non-Violence*, 908 F.2d at 997; *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993). Plaintiffs seek to do so here.

Plaintiffs have more than met the showing that the agency acted in bad faith and engaged in improper conduct concerning its consideration of the Citizen's Petition and Barr's SNDA for approval of Plan B as an OTC drug for women of all ages. (First Am. Compl. ¶¶ 1, 39, 42-48, 51-55, 60, 62, 64 & 66.) The FDA's failure to approve Plan B for OTC use is not the result of appropriate medical or scientific evidence that requires it to be available only as a prescription drug. (*Id.* ¶¶ 1, 41-46, 48-55, 60, 62, 64 & 66.) Rather, it is the result of the FDA's improper reliance upon ideological and other factors that are beyond the statutory role assigned to the agency. (*Id.*) Because of this improper agency action, the statutory and constitutional rights of Plaintiffs, and of all women, who seek to avoid unwanted pregnancy by using Plan B are violated on a continuing and ongoing basis. (*Id.* ¶ 1, 57-58.) The agency's actions have imposed an unlawful barrier (the prescription requirement) to access to a particular drug which Plaintiffs allege has been put in place for ideological, rather than legitimate or scientific reasons. (*Id.* ¶¶ 1, 41-46, 48-55, 60, 62, 64 & 66.) The agency, in its failure to approve Plan B OTC for all women, has acted in a manner contrary to the views of its own Non-prescription Drugs Advisory Committee and Advisory Committee for Reproductive Health Drugs, which unanimously voted (28-0) that Plan B is safe for use as a non-prescription drug. (*Id.* ¶ 42.) Moreover, the FDA's own Director of the Office of New Drugs also recommended the OTC switch, stating that it met

19

all statutory and regulatory requirements for availability without a prescription for all age groups. (*Id.* ¶ 44.)  The FDA's Deputy Director of the Office of Drug Evaluation V also noted that the issues raised by FDA political appointees concerning adolescents' access to Plan B "spuriously raise the review standard for approval of this product and indeed any contraceptive product," and are not supported by the data nor the medical literature.  (*See supra* at 7.)  Further, as noted by Dr. Susan F. Wood, former assistant FDA commissioner for women's health and director of the Office of Women's Health, when she resigned on August 31, 2005, "This decision [to postpone issuing a decision about making EC available OTC] – or nondecision – deserves serious scrutiny, since it appears to reflect political meddling in the drug-approval process . . . The recent actions of the FDA leadership have made a mockery out of the process of evaluating scientific evidence, disillusioned many of the participating scientists both inside and outside the agency, squandered the public trust, and tarnished the agency's image."  (*Id.* at 10.)

The facts described above, which are uncontroverted by the Defendant in his motion, as well as reasonable inferences from them, more than suffice to create a strong showing that the agency acted in bad faith in its denial of the OTC status application for Plan B and the Citizen's Petition for unrestricted OTC access for women of all ages.  Thus, even as to Plaintiff's non-constitutional claims, Plaintiffs are entitled through discovery to gather evidence of the agency's improper and bad faith actions.

**III.    Defendant's Motion for a Protective Order Should Be Denied Because Plaintiffs Can Also Satisfy Other Exceptions Which Permit Discovery Beyond the Agency's Administrative Record.**

In addition to the "bad faith" exception which allows Plaintiffs to conduct discovery beyond the agency record, Plaintiffs are also entitled to discovery beyond the record because: (1)

20

the agency considered evidence which it failed to include in the record,[9] and (2) the agency is being sued for a failure to take action.  *See Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989).  Both of these exceptions also permit Plaintiffs to obtain discovery beyond the record.

Plaintiffs are entitled to discovery beyond the agency record if the agency considered evidence which it failed to include in the record.  For example, Plaintiffs have alleged that there is no medical or scientific basis for the FDA's application of a different and higher standard to Plan B's OTC switch, (First Am. Compl. ¶ 52.), and that the FDA's rejection of the OTC switch for women of all ages and its constructive rejection of the Citizen's Petition for the OTC switch are not supported by medical or scientific evidence and are not supported by the record.  (*Id.* ¶ 54.)  Instead, Plaintiffs allege that the FDA's application of a different and higher standard to Plan B's OTC switch was the result of factors that fall outside of the FDA's statutory mandate.  (*Id.* ¶ 53.)  Each of these allegations supports the assertion that information outside of the record was considered by the agency and requires supplementation of that record as requested in portions of Plaintiffs' discovery requests.

Plaintiffs are also entitled to discovery beyond the record because the agency is sued for a failure to take action.  Plaintiffs have alleged that the FDA has not followed its own regulations and failed to either approve, deny, or give a tentative response to the Citizen's Petition within 180 days of its filing, thus constructively denying the petition.  (*Id.* ¶ 39.)  Plaintiffs have also alleged that this is a failure to act on the part of the agency which entitles Plaintiffs to conduct discovery beyond the administrative record.  *Esch*, 876 F.2d at 991.

---

[9] For example, to the extent that Plaintiffs' discovery requests seek improper *ex parte* contacts between decision makers at the FDA and outside parties, such discovery is also permitted.  *See Portland Audubon Soc'y.*, 984 F.2d at 1548-49.

**IV.**    **The Doctrine of Sovereign Immunity Does Not Bar Plaintiffs From Conducting Discovery Beyond the Administrative Record.**

The Government suggests that Plaintiffs are not entitled to discovery beyond the agency's record because the only waiver of sovereign immunity for Plaintiffs' constitutional claims is in the APA, and thus Plaintiffs' claims are only APA claims.[10]  (Def.'s Mem. at 12-14.) Defendant's argument is incorrect as a matter of law.  Plaintiffs brought their constitutional claims *both* directly under the constitution *and* under 5 U.S.C. § 706(2)(b).  *See supra* n.7 (quoting First Amended Complaint).  As explained below, Plaintiffs' constitutional claims are not barred by sovereign immunity in either respect.  Whether brought under the APA or under the Constitution itself, the Court's independent fact-finding role is the same, and discovery outside of the administrative record is permissible.

Sovereign immunity does not preclude Plaintiffs from bringing their constitutional claims directly under the Constitution because Congress expressly waives sovereign immunity in actions against federal agencies.  "Independent of any power of review that Congress granted to this Court under the APA, this Court has the authority to examine and rule on any actions of a federal agency that allegedly violate the Constitution."  *Rydeen*, 748 F. Supp. at 905 (noting that the plaintiff brought his constitutional claims against the Commissioner of Patents and Trademarks directly, even though he could have brought the claims under the APA).  It is well established that "[s]overeign immunity does not bar a suit which seeks to prevent an official of the United States from acting in excess of his statutory authority, from exercising his statutory authority in an unconstitutional manner, or from exercising statutory authority which is itself

---

[10] To the extent that the Government is asking the Court to make a determination on the merits of Plaintiffs' constitutional claims under the APA or the Constitution, it is inappropriate for the Court to do so on a motion for protective order. (Def.'s Mem. at 12-14.)  Such an argument should only be considered in a dispositive motion.  For that reason, Plaintiffs respectfully request that this argument be stricken from this motion.  Assuming *arguendo* that the Court considers Defendant's argument in the context of this motion, the Court may review Plaintiffs' constitutional claims for the reasons explained herein.

22

unconstitutional." *Liffiton v. Keuker*, 850 F.2d 73, 78 (2d Cir. 1988) (internal quotations and citations omitted) (finding that plaintiff's claims for injunctive relief were not barred by the doctrine of sovereign immunity, because "the complaint alleges that the federal defendants acted outside of the scope of their statutory authority and outside constitutional limits"); *Porter*, 592 F.2d at 781 (finding that "[the plaintiff] would of course have a right to sue directly under the constitution to enjoin her supervisors and other federal officials from violating her constitutional rights").  Plaintiffs' constitutional claims fall within this well-established rule and were properly brought directly under the Constitution.

Although, as the Defendant points out, the Supreme Court has limited the applicability of this general principle to injunctions prohibiting illegal action (as opposed to those requiring officials to act), *see Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949), Congress has since enacted legislation waiving sovereign immunity in most suits for non-monetary relief.  *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1233 (10th Cir. 2005). Specifically, in 1976, Congress enacted an amendment to the APA, 5 U.S.C. § 702, which provides in part:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702.

The legislative history and subsequent case law support the application of this general waiver of sovereign immunity to *all* nonmonetary relief, including injunctive relief that requires

23

officials to act.[11] *See Simmat*, 413 F.3d 1225, 1233 (10th Cir. 2005) (finding that Congress'

general waiver of sovereign immunity applies to affirmative injunctive relief).

The Second Circuit and the District of Columbia Circuit have interpreted the waiver of

sovereign immunity in 5 U.S.C. § 702 to apply to constitutional claims brought under the federal

question statute as well as those brought under rubric of the APA. *See Blassingame v. Sec'y of*

*the Navy*, 811 F.2d 65, 69 (2d Cir. 1987) ("§ 702 of the Administrative Procedure Act (APA), 5

U.S.C. §§ 701 *et seq.*, removes the defense of sovereign immunity in actions brought under the

federal question statute.") (citation omitted); *Chamber of Commerce of the United State. v.*

*Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("The APA's waiver of sovereign immunity applies

to any suit whether under the APA or not (citation omitted); *Simmat*, 413 F.3d at 1233

(concluding that the waiver of sovereign immunity in 5 U.S.C. § 702, "is not limited to suits

under the Administrative Procedures Act."). In recognizing such, neither Circuit held that the

waiver did not apply to affirmative injunctive relief.[12]

---

[11] The amendment to 5 U.S.C. § 702 was enacted "to remove the defense of sovereign immunity as a bar to judicial review of Federal administrative action otherwise subject to judicial review." H.R. Rep. No 94-1656, at 1 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6121. The House Report stated that the amendment "would eliminate the defense of sovereign immunity as to any action in a Federal court seeking relief other than money damages and stating a claim based on the assertion of unlawful official action by an agency or by an officer or employee of the agency." *Id.* at 3, *reprinted in* 1976 U.S.C.C.A.N. at 6123.

[12] The Second Circuit has not directly ruled on whether the APA's general waiver of sovereign immunity applies to claims seeking affirmative injunctive relief, but has implicitly accepted the validity of such remedies where sought. For instance, in *Blassingame* and *B.K. Instrument*, the Second Circuit recognized the general waiver of sovereign immunity in 5 U.S.C. § 702 in cases where the plaintiffs sought reaffirmative injunctive relief. *See Blassingame*, 811 F.2d at 68 (seeking judicial review of an agency decision and "the equitable relief of an upgrade of his discharge [from the military] from undesirable to honorable"); *B.K. Instrument, Inc. v. U.S.*, 715 F.2d 713, 716-17 (2d Cir. 1983) (seeking "an order declaring [plaintiff] to be a responsive bidder, enjoining the Government from relying on its determination of non-responsiveness, declaring [plaintiff] to have been the lowest responsive, responsible bidder . . . and directing the award of any contract thereunder to [plaintiff], vacating the award to Am Kal, and, presumably in the alternative, awarding [plaintiff] its bid preparation costs").

Moreover, in *Dotson v. Griesa*, 398 F.3d 156 (2d Cir. 2005), the Second Circuit confirmed that, under *Larson*, affirmative injunctive relief is prohibited in actions against *non-agency* government officials and entities, but it suggested that such relief would be permissible in actions against an agency. The court explicitly acknowledged the "United State's broad waiver of sovereign immunity in the Administrative Procedure Act, *see* 5 U.S.C. § 702" that applies to claims against an agency. *Id.* at 177 n.15. The court found that the waiver did not apply in *Dotson v. Griesa*, because the defendant (the federal judiciary), is not an agency. *See id.* Accordingly, the

24

It is undisputed that 5 U.S.C. § 706(2)(B) also waives sovereign immunity with regard to Plaintiffs' constitutional claims. Section 706(2)(B) authorizes courts to "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity." 5. U.S.C. § 706(2)(B). The government's assertion that the Plaintiffs' "so-called 'constitutional' claims are really just another variety of APA claim" if brought under the waiver of sovereign immunity embodied in § 706(2)(B), is erroneous. (Def.'s Mem. at 14.)

As explained above, Plaintiffs' constitutional claims were properly brought both directly under the Constitution and under § 706(2)(B). These claims remain traditional constitutional claims, regardless of the source of waiver of sovereign immunity. "Whether [the Plaintiffs'] sue[] directly under the constitution to enjoin agency action, or instead ask[] a federal court to 'set aside' the agency actions as 'contrary to [their] constitutional right(s)' under § 706(2)(B), the role of the district court is the same." *See Porter*, 592 F.2d at 781. *See also Rydeen*, 748 F.Supp. at 905 n.8 (finding that the role of the court is the same "whether [the Plaintiffs] sue[] directly under the Constitution or under § 706(2)(B)"). Plaintiffs' constitutional claims do not become diminished *quasi*-constitutional or statutory claims even if the Congressional waiver of sovereign immunity for such claims is located in 5 U.S.C. § 706(2)(B) or § 702. The Court should consider Plaintiffs' constitutional claims as it would any other constitutional claim (for example, a claim against a state official under section 1983 of Title 42 of the United States Code), and not as a species of "APA claim" laden with the restrictions on the Court's fact-finding which that label suggests.

---

Second Circuit has recognized that affirmative injunctive relief may be sought where an action is brought against an agency via the APA's broad waiver of sovereign immunity.

**V.    Plaintiffs' Discovery Requests Are Not Premature, Not Unduly Burdensome, and Seek Information Relevant to Supporting Plaintiffs' Claims.**

**A.    Plaintiffs' Discovery Requests Are Not Premature.**

Plaintiffs' discovery requests, initiated approximately seven months after filing the complaint, are not premature. First, such requests were contemplated by the Court, as indicated by Chief Judge Korman's statement in the conference call on August 2, 2005. (*See* Heller Decl. ¶ 6). Second, such requests are not premature under Rule 26 of the Federal Rules of Civil Procedure. Third, further delay in this case would cause continuing and irreparable harm, because the reproductive rights of Plaintiffs and the women whose interests they represent are being abrogated on an ongoing basis.

**1.    The Initiation of Discovery Has Been Contemplated by the Court.**

On August 2, 2005, the Court held a telephone conference with counsel for the Government and the Plaintiffs in order to hear the parties on Government's request for a stay of proceedings pending indeterminate action the Defendant alleged he would take by September 1, 2005. (Heller Decl. ¶ 6.) During this conference, the Plaintiffs' counsel indicated that they would be seeking discovery, and the Government's counsel indicated its intent to oppose discovery. (*Id.*) The Chief Judge responded to the effect that although the Government was free to file a motion for a protective order, that Plaintiffs could initiate the discovery process. (*Id.*) Because the Court was apprised of Plaintiffs' intent to commence discovery, and contemplated that the next step would be for the Government to formally oppose such discovery, Plaintiffs reasonably understood that the Court did not intend to require Plaintiffs to initiate a 26(f) "meet and confer," nor for Plaintiffs to move the Court for further permission before initiating discovery.

26

### 2.    The Parties Need Not Confer Further Before Initiating Discovery.

The Government claims that any request for discovery is improper because the parties have not yet conferred as required by Rule 26(f).  (Def.'s Mem. at 17-18.)  The Government persists in its contention that Plaintiffs are not entitled to discovery and has "advised the Court, and the plaintiffs," that the Plaintiffs will not be given the opportunity to obtain any discovery. (Amanat Cert. ¶ 5).  As a result of this position, counsel for the Government has neither agreed to participate in a 26(f) conference, nor to negotiate in an attempt to reach some agreement regarding the substance of the discovery requests.

As noted by the Government, counsel for Plaintiffs sought to confer with opposing counsel in March of 2005, two months after filing the complaint in this case, in order to discuss the upcoming discovery process.  (Amanat Cert. ¶¶3-4; Heller Decl. ¶ 3).  At the conference, counsel for Plaintiffs' indicated that they would be seeking discovery, outlined some basic categories of discovery that Plaintiffs were contemplating seeking, and attempted to reach some agreement as to the discovery the Government would be willing to provide and the time-frame for discovery.  (Heller Decl. ¶ 3; Amanat Cert. ¶ 4) As stated in his certification, counsel for the Government clearly indicated that he would not agree that the conference qualified as a Rule 26(f) "meet and confer."  (*Id*.)  Nor would he discuss whether Plaintiffs could conduct any limited discovery which the government might agree to produce.

Now, the Government contends that Plaintiffs' requests are premature, in part because "'a party may not seek discovery from any source before the parties have conferred as required by Rule 26(f).'" (Def.'s Mem. at 17 (quoting Fed. R. Civ. P. 26(d)).)  As indicated above, Plaintiffs sought to proceed with a Rule 26(f) "meet and confer," but the Government refused to concede that the conference that took place constituted such a "meet and confer."  The Government ought not be permitted to have it both ways.  If a party were permitted unilaterally to refuse to

27

participate in a Rule 26(f) "meet and confer," and then subsequently complain that discovery is premature because no 26(f) conference has taken place, a party could use this tactic to evade or at least delay discovery in any case. It is simply illogical that the Government argues that discovery is premature based on the fact that a discovery conference has not taken place, when the Government has refused all efforts to confer regarding a discovery plan.

> **3.    The Existence of a Pending Dispositive Motion Is Not Alone Sufficient to Result in a Stay of Discovery.**

The Government also seeks to stay discovery pending resolution of the motion for judgment on the pleadings. Under Rule 26, such relief is discretionary and "should not be granted routinely" simply because a preliminary dispositive motion is pending. *In re Chase Manhattan Corporation Securities Litigation*, No. 90 Civ. 6072, 1991 WL 79432, at *1 (S.D.N.Y. May 7, 1991). "'Had the Federal Rules contemplated that [a preliminary dispositive motion] would stay discovery, they would contain such a provision.'" *Id.* (quoting *Moss v. Hollis*, 1990 Fed. Sec. L. Rep. (CCH) ¶ 95,443 at 97260 (D. Conn. June 29, 1990). Moreover, it is not appropriate to grant a protective order "on the assumption that such a motion will be granted." *Fleming v. Dep't of Justice*, No. CV-90-0896, 1992 WL 151900, at *6 (E.D.N.Y. Jun 17, 1992) (citing *Howard v. Galesi*, 107 F.R.D. 348, 350 (S.D.N.Y. 1985)).

A motion for a protective order will only be granted upon a "strong showing of "good cause.'" *Howard v. Galesi*, 107 F.R.D. 348, 350 (S.D.N.Y. 1985) (citing *Wyatt v. Kaplan*, 686 F.2d 276, 283 (5th Cir. 1982)). Moreover, in order to prevail, the party seeking the protective order bears the burden of establishing "good cause." *Id. See also In re Agent Orange Prod. Liab. Litig.*, 821 F.2d 139, 145 (2d Cir. 1987); *Ass'n Fe y Allegria v. Ecuador*, No. 98 Civ. 8650, 1999 WL 147716, at *1 (S.D.N.Y. Mar. 16, 1999). This is a more stringent standard than "a mere balancing of equities." *United States v. Hooker Chemicals & Plastics Corp.*, 90 F.R.D.

421, 425 (W.D.N.Y. 1981).   Rather, the party seeking the order must set forth particularized and specific facts in order to demonstrate the existence of "good cause." *Waltzer v. Conner*, No. 83 Civ. 8806, 1985 WL 2522, at *1 (S.D.N.Y. Sept. 12, 1985) (citations omitted).  The court will also consider whether "a stay of discovery would be prejudicial to the plaintiffs," *Ass'n Fe y Allegria*, 1999 WL 147716, at *1, and whether the application to stay discovery appears to be merely a stalling tactic.  *Atkinson v. Goord*, No. 01 Civ. 0761, 2002 WL 1997887, at *1-2 (S.D.N.Y. Aug. 28, 2002) (where defendants sought wholesale stay of discovery without carefully tailoring its objections, application to stay discovery was perceived as a stalling tactic and was rejected).

In this case, the Government fails to demonstrate good cause for staying discovery.  First, it has failed to set forth any specific facts as to why discovery should be stayed.    Rather, contrary to what is required by precedent, *Fleming*, 1992 WL 151900, at *6, the Government relies merely on the *existence* of the dispositive motion, and assumes that it will be granted. Moreover, the Government fails to assert specific contentions or supporting facts to argue in favor of delaying discovery.  (Def.'s Mem. at 18-19).

Second, a stay of discovery will certainly be prejudicial to the Plaintiffs and the women whose interests they represent.  Plaintiffs in this case are complaining of the ongoing denial of their constitutionally protected reproductive and equal protection rights by the Government's failure to approve Plan B for OTC status, despite the advice of its medical and scientific experts. Unlike in a case concerning merely commercial or financial interests, delaying discovery here will result in the delay of the adjudication of these constitutionally protected rights, and thus expose women throughout the country to continuing and ongoing irreparable harm.

Third, in this case, the Court has ample reason to be concerned that the Government is

29

seeking a stay in order to further delay adjudication of the substantive issues.  Plaintiffs have asserted that the FDA has already wrongfully withheld approval of Plan B for full OTC status, and the agency's steps to delay approval have been set forth in both the First Amended Complaint and the Plaintiffs' Opposition to Defendant's Motion for Judgment on the Pleadings. (*See supra* at 4-11.)  Moreover, in its letter dated July 25, 2005, the Government sought to stay proceedings in this case until after September 1, 2005, a request that was denied by Chief Judge Korman during the telephone conference that took place on August 2, 2005.  (See Heller Decl. ¶ 5.)  Because this attempt to delay discovery is but the most recent in a series of actions calculated to delay at each stage in the proceedings, the application to stay discovery should be rejected as an improper stalling tactic.

> **B.      Plaintiffs' Discovery Requests Ought Not Be Quashed Based on the Government's Blanket Assertions That They Are Irrelevant and Unduly Burdensome.**

The Government seeks to quash all discovery requested by Plaintiffs on the basis that it is unduly burdensome and seeks irrelevant information.  (Def.'s Mem. at 20-21).  In order to prevail on an objection of this sort, however, the objecting party must do more than "simply intone [the] familiar litany that the [questions] are burdensome, oppressive or overly broad." *Compagnie Francaise D'Assurance Pour Le Commerce Exterieur v. Phillips Petroleum Co.,* 105 F.R.D. 16, 42 (S.D.N.Y.1984) (quotations and citations omitted).  The burden lies with the objecting party to demonstrate "specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [question] is not relevant or how each question is overly broad, [unduly] burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden." *Id.* (internal citations omitted).  Here, the Government's broad, unsupported allegations are insufficient to support their demand that discovery be quashed

in its entirety.  One searches the Government's papers in vain for any detailed list of objections to Plaintiffs' discovery requests.

> **1.      Plaintiffs' Discovery Requests Are Relevant to Claims of Improper, Outside Influence and Differential Treatment.**

A discovery request qualifies as "relevant" if it "appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).  This rule has been construed broadly "to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (citation omitted).

The Government suggests that because Plaintiffs seek information about drugs other than Plan B – "wholly unrelated drug products" – these requests are irrelevant.  (Def.'s Mem. at 20.) However, this argument ignores the central core of Plaintiffs' complaint: that Plan B was treated differently from other drugs and that the process for reviewing Plan B for full OTC access was subject to improper influences in contravention of the statutory mandate of the FDA.  (First Am. Compl. ¶¶ 51-55, 60; *see also supra* at 4-11.)

The Plaintiffs seek information about other, unrelated drug applications in order to compare the process of SNDA review for those drugs to the process followed with regard to Plan B.  (*See* Def.'s Mem. at 4-5.)  The information sought is clearly pertinent to Plaintiffs' claims that the review process for Plan B differed from that applied to other drugs for improper ideological reasons.  (*See* First Am. Compl. ¶¶ 51, 53; *supra* 10-11.)

Likewise, Plaintiffs are seeking information about communications regarding Plan B between members of FDA and other political officials.  (*See* Def.s' Mem. at 5.)  This information is relevant to Plaintiffs' claims that factors other than the scientific and medical information

31

before the FDA influenced the FDA's decision to withhold full OTC status for Plan B. (*See* First Am. Compl. ¶¶ 52-54; *supra* 5-7, 9-11.) *See also* Plan B Casualties, Hartford Courant (Oct. 2, 2005) (quoting letter of resignation of Dr. Frank Davidoff from FDA Nonprescription Drugs Advisory Committee: "I can no longer associate myself with an organization that is capable of making such an important decision so flagrantly on the basis of political influence, rather than the scientific and clinical evidence.") (attached hereto as Exhibit D). Because the information sought is relevant to Plaintiffs' claims, their discovery requests should not be precluded on the basis of irrelevance.

> **2.      Plaintiffs' Discovery Requests Are Not Unduly Burdensome, and the Government's Refusal to Confer Precludes Plaintiffs from Narrowing These Requests.**

The Government's argument that no discovery should proceed because the discovery sought is unduly burdensome is not persuasive. (Def.'s Mem. at 20-22.) Although the burden falls upon the party resisting discovery "to clarify and explain its objections and to provide support therefor," *Compagnie Francaise D'Assurance Pour Le Commerce Exterieur*, 105 F.R.D. at 42, the Government has failed to do so here. In addition, the Government's wholesale rejection of Plaintiffs' longstanding efforts to conduct a discovery conference has prevented Plaintiffs from more narrowly tailoring their requests, and thus the Government ought not be permitted to profit from their refusal to cooperate.

In fact, Plaintiffs have, as counsel for the Government notes, sought to confer in order to reach agreement as to what discovery the Government would agree to produce. (Amanat Cert. ¶¶ 3-4.) However, the Government refused to confer regarding discovery, and it is impossible for Plaintiffs to intuit, without conferring with opposing counsel, whether the requests would be unduly burdensome to FDA. For instance, Plaintiffs do not know whether the response to a

given request would yield zero, five, or many thousands of documents. Without meaningful consultation with counsel on these matters, Plaintiffs are unable to better tailor their discovery requests.

Moreover, the Government has still offered no specific facts to support its contention that Plaintiffs' requests are unduly burdensome, beyond the bald assertion that "[m]any of the administrative records for the other products implicated by plaintiffs' interrogatories are equally voluminous," as the extensive record for Plan B. (Def.'s Mem. at 21.) In addition, in order to respond to the Government's concerns regarding trade secret and confidential commercial information is protected, (Def.'s Mem. at 21-22), Plaintiffs would, if given the opportunity, be willing to cooperate with the Government to ensure that these interests are protected. Finally, if the Government is concerned that the discovery sought is unduly burdensome, then the most appropriate next step is to attempt to reach a compromise between the parties as to what discovery can reasonably be produced, yet would also provide sufficient information to the Plaintiffs. Thus, charges of unduly burdensome discovery do not suffice as a reason for precluding or delaying all discovery in the case.[13]

### C. Sanctions Are Not Appropriate Because Plaintiffs' Requests for Discovery Are Substantially Justified.

Sanctions are only appropriate where the party's action violates the Federal Rules and is without "substantial justification." Fed. R. Civ. P. 26(g)(3). The Government seeks sanctions under Rule 26(g) because, it alleges, the requests are "patently unreasonable, abusive, and

---

[13] To the extent that the Government bases its allegations of unduly burdensome discovery on the assertion that the document requests are duplicative of the administrative record, (Def.'s Mem. at 22-23), the Government's own memorandum of law disposes of the argument. Plaintiffs made clear in the instructions to the document requests that they were *not* seeking documents already provided as part of the administrative record. (*See* Def.'s Mem. at 23.) Moreover, "[i]t is ordinarily not sufficient grounds for a protective order that information sought [in discovery] might be duplicative of some other discovery." *Envirosafe Servs. Inc. v. Envirosure Mngmt. Co.*, No. 88-28E, 1988 WL 62876, at *1 (W.D.N.Y. Jun. 9, 1988).

33

unduly burdensome, and [were] interposed solely to harass the government and to needlessly increase the cost of the present litigation." (Def.'s Mem. at 24.)  Under the circumstances, these are perplexing charges to level at the Plaintiffs.  First, Plaintiffs are seeking to resolve matters in this case as expeditiously as possible, due to the fact that the reproductive rights of hundreds of thousands of women are being infringed, and their health damaged, by the continuing failure to approve Plan B for full OTC status.  Unlike in a case where it may be in a party's interest to seek to delay, it would be contrary to Plaintiffs interest in prompt adjudication of the case to seek irrelevant or needless discovery.  Second, the appropriate response to unduly burdensome discovery requests would be to confer and to exchange information in order to enable Plaintiffs to more narrowly tailor their discovery requests, yet the Government has repeatedly refused to meaningfully seek to reach an agreement as to even limited discovery.  Third, Plaintiffs first sets of document requests and interrogatories should not be considered "abusive," particularly given the lack of opportunity to better tailor its requests in consultation with the Government.  *See* Exs. B and C.

In response to the Government's contention that the Plaintiffs requests are "unduly burdensome," Plaintiffs would welcome the chance to negotiate directly with the government to reach a compromise as to the scope of discovery.  However, because the Government is holding fast to its position that it will refuse any discovery, it has thus far been unwilling to discuss what discovery it would not consider unduly burdensome.  *See supra* at 32-33.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion for a Protective Order.

Dated: October 7, 2005

Respectfully submitted,

s/Simon Heller
SIMON HELLER (SH-8760)
NAN E. STRAUSS (NS-3501)
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3600

ATTORNEYS FOR PLAINTIFFS

ANDREA COSTELLO (AC-6197)*
SHELBI D. DAY (SD-2627)*
Southern Legal Counsel
1229 N.W. 12th Avenue
Gainesville, FL 32601
(352) 271-8890

ATTORNEY FOR PLAINTIFFS
TUMMINO, MAHONEY,
GIARDINA, MANGAN, SEGUIN,
TINNEY, BROWN, CHURCHILL,
AND HUNT

*Admitted Pro Hac Vice

35

## CERTIFICATE OF SERVICE

I, Simon Heller, hereby certify that on October 7, 2005, I electronically filed Plaintiffs'

Memorandum in Opposition to Defendant's Motion for a Protective Order, accompanying

exhibits to Plaintiffs' Memorandum, and Declaration of Simon Heller with the Clerk of the Court

using the CM/ECF system.  Plaintiffs also served a copy of all documents via electronic mail on

the following:

> F. Franklin Amanat,
> Assistant U.S. Attorney, EDNY
> 147 Pierrepont Street
> Brooklyn, NY 11201
> 718-254-6024
> Franklin.Amanat@usdoj.gov

Dated: October 7, 2005                  Respectfully submitted,

/s Simon Heller
SIMON HELLER (SH-8760)
NAN E. STRAUSS (NS-3501)
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3600

ATTORNEYS FOR PLAINTIFFS

ANDREA COSTELLO (AC-6197)*
SHELBI D. DAY (SD-2627)*
Southern Legal Counsel, Inc.
1229 N.W. 12th Avenue
Gainesville, FL 32601
(352) 271-8890

ATTORNEY FOR PLAINTIFFS
TUMMINO, MAHONEY, GIARDINA,
MANGAN, SEGUIN, TINNEY, BROWN,
CHURCHILL AND HUNT

*Admitted pro hac vice

36