# Exhibit A

Case 1:05-cv-00366-ERK-VVP   Document 45-2   Filed 10/07/05   Page 1 of 98 PageID #: 299

THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

ANNIE TUMMINO, *et al.*,

                            Plaintiffs,

v.

ANDREW C. VON ESCHENBACH, in his official capacity as
Acting Commissioner of the Food and Drug
Administration,

                            Defendant.

-------------------------------------------------------------------------X

**No. 05-CV-366 (ERK/VVP)**

(Korman, C.J.)
(Pohorelsky, M.J.)


## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS


Simon Heller
Nan E. Strauss
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3600
(f) (917) 637-3666

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

PRELIMINARY STATEMENT............................................................................................. 1

BACKGROUND ....................................................................................................................... 3

STATEMENT OF FACTS ....................................................................................................... 4

I.      The Need for Expanded Access to Plan B. .................................................................. 4

II.     History of the FDA's Continuing Undue Delay and Denial of Full OTC
Status for Plan B. ...................................................................................................................... 6

ARGUMENT.............................................................................................................................. 13

I.      The Final Agency Action Requirement of the APA is Satisfied by the FDA's
        Decision to Consider Only Limited OTC Status of Plan B, its Unreasonable
        Delay, and its Persistent Inaction......................................................................... 13

        A.      Because the FDA is No Longer Considering Plan B for Full OTC Access,
        the Agency's Actions Are Sufficiently Final to Warrant Judicial Review.................. 15

        B.      The FDA's Prolonged and Wrongful Inaction Constitutes Final
        Agency Action ............................................................................................................ 16

        C.      The FDA's Delay in Approving Plan B for Full OTC Access is
        Unreasonable and Satisfies the Requirement for Final Agency Action........................ 18

II.     Plaintiffs' Claims Are Ripe for Judicial Review. ..................................................... 21

        A.      Standard for Determining Ripeness of Claims...................................................... 22

        B.      Plaintiffs' Claims Are Fit for Judicial Review....................................................... 23

                1.      No Issues Are Currently Under Consideration by the FDA that
                        Will Affect the Adjudication of Plaintiffs' Claims................................. 23

                2.      Plaintiffs Claims under 5 U.S.C. 706(2) are Ripe for Review Because
                        They Constitute Improper Procedural Matters Already Concluded........... 25

                3.      Plaintiffs' Claims of Unreasonable Delay Are Ripe for Review. ............. 26

        C.      The Hardship to the Plaintiffs and the Women Whose Interests and
        Rights They Assert Supports Immediate Judicial Review. ............................................ 27

III.    Plaintiffs Have Stated Constitutional Claims Upon Which Relief May Be Granted. .......27

    A.    The Right to Privacy ........................................................................................28

    B.    Sex Discrimination..........................................................................................32

CONCLUSION ...............................................................................................................37

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967), rev'd on other grounds, *Califano v. Sanders*, 430 U.S. 99 (1977)..................................................14, 15, 22

*Abigail Alliance v. McClellan*, No. 03-1601 (RMU), slip op. (D.D.C. Aug. 30, 2004)...........14, 31

*Anderson v. Babbitt*, 230 F.3d 1158 (9th Cir. 2000).................................................17

*Andrews v. HHS*, No. 04-0307 (JR) (D.D.C. Mar. 31, 2005).................................................31

*Auburn Housing Authority v. Martinez*, 277 F.3d 138 (2d Cir. 2002).................................................16

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003).................................................14

*Bellotti v. Baird*, 443 U.S. 622 (1979).................................................32

*Benten v. Kessler*, 505 U.S. 1084 (1992).................................................30

*Brock v. Pierce County*, 476 U.S. 253 (1986).................................................14

*Burlington Northern and Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771 (D.C. Cir. 2005).................................................32

*Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977).................................................28, 29

*Carnohan v. United States*, 616 F.2d 1120 (9th Cir. 1980).................................................31

*Connecticut v. United State Dep't of the Interior*, 228 F.3d 82 (2d Cir. 2000).................................................16

*Continental Air Lines, Inc. v. Civil Aeronautics Board*, 522 F.2d 107 (D.C. Cir. 1975).................................................22, 23, 24

*Cooley v. DaimlerChrysler Corp.*, 281 F. Supp. 2d 979 (E.D. Mo. 2003).................................................35

*DeMuria v. Hawkes*, 328 F.3d 704 (2d Cir. 2003).................................................13

*Eagle-Picher Indus. v. EPA*, 759 F.2d 905 (D.C. Cir. 1985).................................................22

*Environmental Defense Fund, Inc., v. Hardin*, 428 F.2d 1093 (D.C. Cir. 1970).................................................17, 19

*Franklin v. Massachusetts*, 505 U.S. 788 (1992).................................................20

*Goldberg v. Whitman*, 743 F. Supp. 943 (D. Conn. 1990).................................................35

*Hodgson v. Minnesota*, 497 U.S. 417 (1990).................................................32

*Hsu v. Roslyn Union Free School Dist. No. 3*, 85 F.3d 839 (2d Cir. 1996)..................................33

*In re Barr Laboratories*, 930 F.2d 72 (D.C. Cir. 1991)..........................................14, 15, 20

*J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) ...................................................35

*Kulsar v. Ambach*, 598 F.Supp. 1124 (W.D.N.Y. 1984) ..........................................31, 32

*Latrieste Restaurant v. Village of Port Chester*, 188 F.3d 65 (2d Cir. 1999).................33

*Laub v. U.S. Dept. of Interior*, 342 F.3d 1080 (9th Cir. 2003) ...................................25

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094 (D.C. Cir. 2003).............18

*Midwestern Gas Transmission Co. v. Federal Energy Regulatory Commission,*
589 F.2d 603 (D.C. Cir. 1978)..........................................................23, 27

*Mitchell v. Clayton*, 995 F.2d 772 (7th Cir. 1993)...................................................31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29 (1983) ..................31

*Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423 (D.C. Cir. 1996)...........22

*New York v. Ferber*, 458 U.S. 747 (1982) ...............................................................32

*New York National Org. for Women v. Terry*, 886 F.2d 1339 (2d Cir. 1989) ..................19

*New York State Ophthalmological Soc'y v. Bowen*, 854 F.2d 1379 (D.C. Cir. 1988)..........23

*Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726 (1998) ..................................25

*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) .................................32, 33, 34

*Planned Parenthood of Central Mo. v. Danforth*, 428 U.S. 52 (1976) ...........................30

*Planned Parenthood of Southwest Pennsylvania v. Casey*, 505 U.S. 833 (1992) .........30, 33

*Public Citizen Health Research Group v. Comm'r, FDA*, 740 F.2d 21
(D.C. Cir. 1984).....................................................................17, 19, 23

*Regions Hospital v. Shalala*, 522 U.S. 448 (1998) .................................................14

*Roe v. Wade*, 410 U.S. 113 (1973)........................................................................33

*Rutherford v. United States*, 616 F.2d 455 (10th Cir. 1980).......................................30

*S. Utah Wilderness Alliance v. Norton*, 301 F.3d 1217 (10th Cir. 2002),
*rev'd on other grounds, Norton v. S. Utah Wilderness Alliance,*
542 U.S. 55 (2004) ...........................................................16, 17, 26

iv

*St. Regis Mohawk Tribe, New York v. Brock*, 769 F.2d 37 (2d Cir. 1985) ...........................14

*Sierra Club v. Thomas*, 828 F.2d 783 (D.C. Cir. 1987) ..........................................17, 26

*Simmonds v. I.N.S.*, 326 F.3d 351 (2d Cir. 2003) ..............................................24, 27

*Smith v. Shalala*, 954 F.Supp. 1 (D.D.C. 1996) ......................................................31

*Stenberg v. Carhart*, 530 U.S. 914 (2000) .............................................................30

*Telecommunications Research and Action Center v. FCC*, 750 F.2d 70
 (D.C. Cir. 1984) ................................................................................14, 18, 26

*Top Choice Distributors v. United States Postal Serv.*, 138 F.3d 463 (2d Cir. 1998) ...........29

*United States v. Burzynski Cancer Research Inst.*, 819 F.2d 1301 (5th Cir. 1987) ...............31

*United States v. Virginia*, 518 U.S. 515 (1996) .....................................................35

*United States v. Vital Health Prods.*, 786 F.Supp. 761 (E.D. Wis. 1992) ...........................31

*Wyoming Outdoor Council v. United States Forest Serv.*, 165 F.3d 43 (D.C. Cir.1999) .............25

*Village of Arlington Heights v. Metro Housing Dev. Corp.*, 429 U.S. 252 (1977) ..................36

*Washington v. Davis*, 426 U.S. 229 (1976) ............................................................35

*Zalewska v. County of Sullivan*, 316 F.3d 314 (2d Cir. 2003) .......................................32

**STATUTES**

5 U.S.C. § 551(13) .......................................................................................16

5 U.S.C. § 555(b) ........................................................................................16

5 U.S.C. § 706(1) .................................................................................2, 15, 16

5 U.S.C. § 706(2) ........................................................................................25

21 U.S.C. § 355(c) ....................................................................................3, 14

21 U.S.C. § 355(c)(1) ...............................................................................10, 19

**OTHER AUTHORITIES**

A. J. J. Wood et al., *A Sad Day for Science at the FDA*, 353 New England J. of Med.
 1197-99 ...............................................................................................12

v

Marc Kaufman, *FDA Official Quits Over Delay on Plan B: Women's Health Chief Says Commissioner's Decision on Contraceptive Was Political*, Wash. Post, Sept. 1, 2005, A8 ................................................................................................11

Trent Baker, *Judicial Enforcement of Forest Plans In The Wake Of Ohio Forestry*, 21 PUB. LAND & RESOURCES L. REV. 81 ...............................................................25

Marc Kaufman, *Memo May Have Swayed Plan B Ruling: FDA Received 'Minority Report' From Conservative Doctor on Panel*, Wash. Post, May 12, 2005, A2 ................36

## PRELIMINARY STATEMENT

This case seeks judicial review under the Administrative Procedure Act (APA) and the United States Constitution of the failure of the United States Food and Drug Administration (FDA) to approve the emergency contraceptive (EC) drug Plan B for over-the-counter (OTC) use.[1] This failure is not the result of appropriate medical or scientific evidence that requires Plan B to be available only as a prescription drug, but is instead the result of the FDA's improper reliance upon ideological and other factors that are beyond the statutory role assigned to the agency. Because of this improper agency action, the statutory and constitutional rights of Plaintiffs and of all women who seek to avoid unwanted pregnancy by using Plan B are violated on a continuing and ongoing basis. These violations inflict injury on women who need EC by increasing their risk of becoming pregnant and, therefore, of undergoing an abortion or carrying an unwanted pregnancy to term.

The Government argues that the FDA's actions do not constitute final agency action, and are therefore not ripe for review under the APA. (*See* Def.'s Mem. at 11.)[2] This defense ignores the well-established body of law, founded in the text of the APA itself, that: 1) prolonged agency inaction constitutes final agency action, and 2) an allegation that final action has not yet taken place is not relevant to refuting a claim of unreasonable delay. As to ripeness, the Government's defense fails to explain what additional meaningful agency action or process could occur that would render Plaintiffs' claims any more ripe than they are now. Plaintiffs seek OTC status for persons of all ages. Since the FDA has improperly demanded further evidence supporting full

---

[1] In this Memorandum of Law, "Plan B" and "EC" are used interchangeably.

[2] The Government's Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings is cited as "Def.'s Mem."

1

OTC status (*see* Def.'s Mem. at 7-9),[3] and since the FDA is currently only considering OTC status for women 17 or older, (*see* Def.'s Mem. at 8), Plaintiffs' case is ripe for review because it is this improper demand and its attendant consequences that violate the APA, Plaintiffs' constitutional rights, and the constitutional rights of the women whose interests they represent.

The Government also argues that Plaintiffs cannot establish that the FDA has unreasonably delayed the decision on OTC status because 1) Plaintiffs did not explicitly include in the complaint a claim under 5 U.S.C. § 706(1) asserting unreasonable delay; 2) an unreasonable delay claim would fail with regard to Barr's supplemental new drug application (SNDA); and 3) there is no unreasonable delay with regard to the Citizen's Petition because there is no formal deadline for issuing a decision on a citizen's petition and because the FDA cannot reach a decision on the Citizen's Petition without also deciding on Barr's SNDA. However, the Government's argument is fact-dependent, and is thus inappropriate to raise at this stage of litigation. The Citizen's Petition has languished before the FDA since 2001, and there is no indication that it has received any consideration whatsoever after September 6, 2001, the date of FDA's "tentative response" to petitioners stating that the FDA had not yet reached a decision on the matter. Since that date the FDA has not communicated any further with the petitioners, and therefore the petition has been constructively denied. Moreover, whether or not the Citizen's

---

[3] As described in the Government's memorandum, on or about May 6, 2004, the FDA offered the manufacturer of Plan B two options under which the OTC switch might still be approved: "(1) submit data demonstrating that the product could be used safely by women under 16 years of age without professional supervision by a licensed practitioner, or (2) provide information in support of its revised pharmaceutical indication, to allow for dual marketing of the drug, with non-prescription access to the drug available only to women age 16 and older." (Def.'s Mem. at 7.) The FDA's requirement that the manufacturer meet one or the other of these two alternatives is not justified by scientific or medical evidence because data supporting the OTC use of Plan B by women under age 16 was adequate. (*See* First Am. Compl. ¶¶ 48, 54.)

2

Petition can be considered separately from Barr's application is also a matter of fact to be explored during the course of litigation.[4]

In addition, the Government seeks dismissal of Plaintiffs' constitutional claims for failure to state a claim upon which relief may be granted. The Government's arguments, however, incorrectly seek to apply cases concerning the denial of a particular drug or treatment to Plaintiffs' constitutional claims. The Government's arguments fail to recognize that what Plaintiffs challenge is not a denial of OTC status for a particular drug or treatment, but the imposition of a barrier (the prescription requirement) to access to a particular drug which Plaintiffs allege has been put in place for ideological rather than legitimate medical or scientific reasons. Furthermore, the cases cited by the Government are inapplicable to drugs or treatments protected by the Constitution and, moreover, do not address drugs that represent the sole available treatment for a particular condition. The Government also misapplies equal protection doctrine to argue that denial of OTC status for Plan B is not sex discrimination. Because every woman is a potential user of Plan B and no male can use Plan B, and even the FDA's own documents concede that Plan B is a drug used only by women, this argument is meritless.

## BACKGROUND

Plaintiffs generally agree with the Government's description of the relevant statutory and regulatory scheme for approval of new drugs and for switching drugs to OTC status. However, the Government fails to include the statutory time limit for the FDA to act on OTC switch applications: 180 days from the filing of the application. 21 U.S.C. § 355(c) (2005). The

---

[4] It must be noted that since July 22, 2004, when Barr Labs modified their SNDA to seek only limited OTC access – access for women over 16 – the Citizen's Petition and the Barr SNDA have sought different outcomes. Thus, final agency action on the Citizen's Petition, which seeks full OTC status, need not be delayed until the FDA issues a final decision on Barr's SNDA seeking limited OTC status.

3

Government also fails to state that dispensing a prescription drug other than by prescription is a federal crime which could subject some of the Plaintiffs to imprisonment of not more than 1 year or a fine up to $1,000 or both. (*See* First Am. Compl. ¶ 23.) Moreover, none of the Government's recitation of the statutory and regulatory scheme authorizes the FDA to rely upon non-scientific or non-medical reasons for its decisions on new drug applications, including OTC switch applications.

## STATEMENT OF FACTS

### I.     The Need for Expanded Access to Plan B.

Unintended pregnancy is a significant public health problem in the United States. (First Am. Compl. ¶ 24.) Indeed, the United States has one of the highest rates of unintended pregnancy compared to other developed countries. (*Id.* ¶ 24.) The rate of teen pregnancy in the United States is also one of the highest among developed countries. (*Id.*). One means of reducing unintended pregnancies, including among teenagers, is to expand access to Plan B (Levonorgestrel), an emergency contraceptive drug in tablet form that can be used to prevent pregnancy following an act of intercourse in which no contraceptive was used or the contraceptive method used failed. (*Id.* ¶ 26.) Plan B is, therefore, a drug used only by women, and every woman of childbearing age is a potential user of Plan B. (*Id.* ¶ 50.)

When taken within 72 hours of unprotected intercourse, Plan B reduces the risk of pregnancy by approximately 89 percent after a single act of unprotected sex. (*Id.* ¶ 27.) The earlier within this time period Plan B is taken, the more effective it is. In other words, as the interval between intercourse and the start of treatment increases, Plan B's effectiveness declines, and the risk of pregnancy increases. (*Id.* ¶ 27.) Therefore, rapid access to Plan B is essential in order to avoid pregnancy.

4

Plan B meets all the requirements for OTC status. Switching Plan B to OTC status will promote public health because Plan B is only effective for a short time after unprotected sex, and it works most effectively if used within twenty-four hours of unprotected sex. (*Id.* ¶ 28.) Because contacting a physician and obtaining and filling a prescription hinder women from obtaining Plan B in a timely fashion, making Plan B available OTC will allow more women to use the treatment and to use it more quickly, and thus enable more women to prevent unwanted pregnancies, to the benefit of public health. (*Id.*)

By contrast, limiting Plan B to prescription use is not necessary for the protection of public health. (*Id.* ¶ 29.) Plan B is safe for self-medication because it is not toxic to the woman (or to an embryo or fetus if a pregnancy had been previously established in the woman). (*Id.* ¶ 30.) Plan B has a low risk of abuse or overdose, and if overdose occurs, it is unlikely to lead to serious consequences. (*Id.* ¶ 31.) Plan B's side effects are well-known and minor. (*Id.* ¶ 32.) Plan B is effective when self-administered. (*Id.* ¶ 33.) Its administration is simple and relies only on assessments as to time elapsed since sexual intercourse that can be independently made by the woman, and any interaction between Plan B and other drugs would be nonfatal and unlikely to affect seriously Plan B's efficacy. (*Id.*) The condition Plan B treats — contraceptive failure or failure to use contraception during intercourse — is one that is readily diagnosable by a woman. (*Id.* ¶ 34.) Plan B has no contraindications that would pose a danger to the patient. The existing patient labeling for Plan B is tailored to self-administration in that it is simple, clear, comprehensive and easy to follow. [5] (*Id.* ¶ 36.)

---

[5] Because of these facts, both the American Medical Association and the American College of Obstetricians and Gynecologists support switching Plan B to OTC status. *See* Dec. 5, 2000 Statement of American Medical Association; December 13, 2001 Statement of the American College of Obstetricians & Gynecologists; (cited in First Am. Compl. ¶ 37.)

5

**II.    History of the FDA's Continuing Undue Delay and Denial of Full OTC Status for Plan B.**

In 1999, during a presidential administration sympathetic to expanded access to reproductive health care for women, the FDA approved Plan B as a prescription drug. (*Id.* ¶ 38.) Since that date, Plan B has been prescribed many thousands of times. (*Id.*)

Shortly after President Bush was inaugurated, on February 14, 2001, a group of citizen organizations, including Plaintiff Association of Reproductive Health Professionals, filed a petition with the FDA asking the agency to switch Plan B (and another drug, Preven, that has since been removed from the market for reasons unrelated to safety and effectiveness) to OTC status. (*Id.* ¶ 39.) In violation of its own regulations requiring a response to a citizen's petition within 180 days of filing, and displaying extraordinary delay and inaction, (*see Id.* ¶ 21), the FDA has failed as of this date – approximately four and a half years later – to either approve or deny the citizen's petition, thus constructively denying the petition.[6] (*Id.* ¶ 39.)

Similar efforts by the manufacturers of EC pills have met the same fate: consignment to oblivion. On April 16, 2003, Women's Capital Corporation, the former owner of Plan B, filed a supplemental new drug application (SNDA) asking the agency to approve Plan B for OTC sale. (*Id.* ¶ 40.) Plan B was subsequently sold to Barr Laboratories, which maintained the SNDA. (*Id.* ¶ 40.) As set forth below, over two years later, the FDA, ignoring the uniform advice of its own medical and scientific staff, has decided to employ inaction as its response to this application.

On December 16, 2003, FDA's Non-prescription Drugs Advisory Committee and Advisory Committee for Reproductive Health Drugs held a joint session to discuss possible OTC

---

[6] After the 180 day period, the FDA gave a tentative response on September 6, 2001, claiming that "the issues raised . . . require[] extensive review and analysis by Agency officials." (*See* Def.'s Mem. at 5.) Since that date the FDA has not communicated further with the petitioners, and the Government has given the Court no indication that *any* "review or analysis" was conducted by the FDA. (First Am. Compl. ¶ 37)

6

status for Plan B. (*Id.* ¶ 41.) The advisory committees, comprised of 28 members, voted as follows:

**(1) Does the Actual Use Study (AUS) demonstrate that consumers used [Plan B] as recommended in the proposed labeling?**

Yes – 27        No – 1

**(2) Are the AUS data generalizable to the overall population of potential non-Rx users of Plan B?**

Yes – 27        No – 1

**(3) Based on the AUS and literature review, is there evidence that non-Rx availability of Plan B leads to substitution of emergency contraception for the regular use of other methods of contraception?**

Yes – 0        No – 28

**(4) Do the data demonstrate that Plan B is safe for use in the non-prescription setting?**

Yes – 28        No – 0

(*Id.* ¶ 42.)

In addition, upon information and belief, all division chiefs within the Center for Drug Evaluation and Research (CDER) who reviewed the OTC switch application expressed the view to CDER that, based on scientific and medical data, the OTC switch should be approved. (*Id.* ¶ 43.) By memorandum dated April 22, 2004 and signed electronically on April 28, 2004, John Jenkins, M.D., the Director of the FDA's Office of New Drugs, wrote a memorandum summarizing his "review, conclusions, and recommendations regarding" the OTC switch for Plan B (attached to First Am. Compl. as Ex. 1) ("the Jenkins memorandum"). (*Id.* ¶ 44.) This memorandum states: "[The FDA] has not heretofore distinguished the safety and efficacy of Plan B and other forms of hormonal contraception among different ages of women of childbearing potential and I am not aware of any compelling scientific reason for such a distinction in this

7

case." (*Id.* ¶ 44 (citing Ex. 1 at 2).) After a review of the record evidence supporting OTC use by women of all ages, the Jenkins memorandum accordingly concludes "that the available data clearly support a conclusion that Plan B meets the statutory and regulatory requirements for availability without a prescription for all age groups. Such a conclusion is consistent with how the Agency has made determinations for other OTC products, including other forms of contraception available without a prescription." (*Id.* ¶ 44 (citing Ex. 1 at 3).)

The Jenkins memorandum further states that "[o]ther senior officials within the Agency, including the former Commissioner (Dr. McClellan) and the Acting Center Director (Dr. Galson) have expressed concerns about the potential for unsafe, ineffective, or inappropriate use of Plan B by adolescents if it were to be made available without a prescription. These concerns appear to have been based primarily on the limited number of adolescent women included in the sponsor's label comprehension and actual use studies." (First Am. Compl. ¶ 45 (citing Ex. 1 at 1).) Though Jenkins said that he "[is] sensitive to and respect[s] the concerns that some may have regarding non-prescription access to Plan B by adolescents," (*Id.* ¶ 45 (citing Ex. 1 at 2)), he stated that "[p]roducts that are indicated for uses related to sexual activity in adolescents raise concerns for some people that go beyond a finding based on clinical trial data that the product is safe and effective for its intended use in adolescents. These concerns derive from individual views and attitudes about the morality of adolescent sexual behavior and also overlap with concerns about the role of parents and health care professionals in decisions about contraceptive use in adolescents." (*Id.* ¶ 45 (citing Ex. 1 at 2-3).) He concluded: "While OTC access to Plan B for adolescents may be controversial from a societal perspective, I cannot think of any age group where the benefit of preventing unplanned pregnancies and abortion is more important and more compelling." (*Id.* ¶ 45 (citing Ex. 1 at 3).)

8

Likewise, Dr. Jonca Bull, Deputy Director of the Office of Drug Evaluation V, submitted a memorandum stating that "the issues cited [regarding concerns over adolescents' access to Plan B] spuriously raise the review standard for approval of this product and indeed any contraceptive product. The issues are speculative and unbalanced in their proposition" and are neither supported by data nor the medical literature. (Mem. of Jonca Bull, M.D., at 2-3, attached hereto as Ex. 1 ("the Bull memorandum").) The Bull memorandum asserts that to impose additional requirements on Plan B, unrelated to the safety and effectiveness of the drug, would be to "in effect propose[] a new and unusual regulatory standard for contraceptive drug products." (*Id.* at 3.)

Despite the nearly unanimous support from professional organizations and from FDA scientists for the OTC switch, on May 6, 2004, CDER Acting Director Steven Galson issued a "non-approvable" letter (attached to First Am. Compl. as Ex. 2) ("the Galson letter") to Barr rejecting the OTC switch for Plan B. (First Am. Compl. ¶ 47 (citing to Ex. 2).) That action also constructively denied the citizen's petition. (*Id.* ¶ 47.)[7] The Galson letter asserts that Barr's SNDA could not be approved because Barr had "not provided adequate data to support a conclusion that Plan B can be used safely by young adolescent women for emergency contraception without the professional supervision of a practitioner licensed by law to administer the drug." (First Am. Compl. ¶ 48 (Ex. 2 at 1).) This assertion is not supported by the agency record. (*Id.* ¶ 48.)

On July 22, 2004, Barr filed an amended SNDA seeking the OTC switch only for women aged 16 and older. (*Id.* ¶ 49.) By statute, the defendant was required to act on Barr's amended

---

[7] The Galson letter signaled that the FDA was terminating its review of Plan B for full OTC access. Thus, the letter effectively constituted final agency action on the Citizen's Petition, which only sought full OTC access to Plan B for women of all ages.

9

SNDA within 180 days after it was filed. (*See* 21 U.S.C. § 355(c)(1); First Am. Compl. ¶ 49.) On January 21, 2005, the FDA announced a delay of its decision on Barr's application beyond this statutory time limit. (First Am. Compl. ¶ 49.)

Subsequently, despite repeated assurances to the public, the United States Congress, and this Court that FDA action on the SNDA was imminent, the FDA has continued to delay. On July 13, 2005, the Secretary of Health and Human Services Michael O. Leavitt assured Senator Michael Enzi that "the FDA will act on this application [regarding OTC status for Plan B] by September 1, 2005." (*See* Letter from M. O. Leavitt attached to Def.'s Letter to the Court, dated July 25, 2005, at 5.) In a letter to this Court dated July 25, 2005, counsel for the Government submitted the Leavitt letter to the Court and requested that the Court delay the judicial proceedings: "[g]iven the agency's commitment to take action on the pending Plan B application within the next 45 days, we respectfully submit that the most appropriate course of action would be to suspend the current briefing schedule and stay this case until the FDA takes the anticipated action . . ." (Def.'s Letter to the Court, dated July 25, 2005, at 2.) Instead of the promised action, on August 26, the FDA issued a letter to Joseph A. Carrado, stating that "the Agency is unable at this time to reach a decision on the approvability of the application because of unresolved issues that relate to your NDA . . . ." (*See* Def.'s Mem., Ex. C (Letter signed by Lester Crawford, then Commissioner of FDA, dated August 26, 2005, at 1)). The letter indicated that the agency is only considering approving Plan B for OTC use by women who are 17 years of age and older, and that before reaching a decision on this curtailed OTC status, it would seek public comments on "whether we should initiate a rulemaking to codify our interpretation of section 503(b) regarding when an active ingredient can be simultaneously marketed in both a prescription drug product and an OTC drug product." (*Id.* at 2.)

10

On August 31, 2005, Dr. Susan F. Wood, assistant FDA commissioner for women's health and director of the Office of Women's Health announced that she was resigning from her post in reaction to the agency's decision to continue to limit access to Plan B, stating: "I can no longer serve as staff when scientific and clinical evidence, fully evaluated and recommended for approval by the professional staff here, has been overruled." (*See* Marc Kaufman, *FDA Official Quits Over Delay on Plan B: Women's Health Chief Says Commissioner's Decision on Contraceptive Was Political*, Wash. Post, Sept. 1, 2005, at A8, (quoting Susan F. Wood) *also available at http://www.washingtonpost.com/wp-dyn/content/article/2005/08/31/ AR2005083101271.html*) (copy attached hereto as Ex. 2).

On September 27, Dr. Wood appeared on the ABC television news program Nightline to discuss the failure of the agency to act in accordance with the scientific consensus in favor of approving Plan B for OTC use. (*See* "Nightline The Morning After," ABC News Transcripts September 27, 2005, at 4-6, available on Lexis.) (citing "consensus . . . amongst the scientists and health professionals there that it should be approved," and the fact that "all of the scientific and professional staff who normally are the part of the decision-making at the agency . . . were cut out of the decision.") (copy of transcript attached hereto as Ex. 3; copy of videocassette recording attached hereto as Ex. 3a). Dr. Wood also expressed her concern for the lengthy delay that she anticipated as a result of the upcoming rule-making:

DOCTOR SUSAN WOOD:

> . . . But I would argue that the decision to delay approval of this product over-the-counter is, in fact, a denial. And this is, again, in part why I resigned. Because by couching it as a delay and a non-decision, in fact denied women of all ages, not just teens but women of all ages access to timely use of this product.

TED KOPPEL

11

(Off Camera) If you had thought that it was a brief delay, in other words, if you thought it was only going to be a delay of a couple of months, you wouldn't have resigned.

DOCTOR SUSAN WOOD

Probably not.

TED KOPPEL

(Off Camera) So, you obviously think that what we're talking about here is not really a delay but a way of shelving it and not dealing with the issue.

DOCTOR SUSAN WOOD

Right. The mechanism is a rather bureaucratic one to potentially open it up to rulemaking. Which, to make a long story short, means opening up to a process that usually takes many months to years, if in fact that's the way they go.

(*See id.* at 6-7.)

The history described above and the allegations in the Complaint show that the FDA applied a different and higher standard to Plan B's OTC switch than it has applied to OTC switches of other drugs. (*Id.* ¶ 51; *see also* A. J. J. Wood et al., *A Sad Day for Science at the FDA*, 353 New England J. of Med., 1197-99, at 1, 3 (attached hereto as Ex. 4 (hereinafter "NEJM Article") ("This decision [to postpone issuing a decision about making EC available OTC] – or nondecision – deserves serious scrutiny, since it appears to reflect political meddling in the drug-approval process . . . . The recent actions of the FDA leadership have made a mockery of the process of evaluating scientific evidence, disillusioned many of the participating scientists both inside and outside the agency, squandered the public trust, and tarnished the agency's image.")).

Moreover, there is no medical or scientific basis for the FDA's application of a different and higher standard to Plan B's OTC switch. (First Am. Compl. ¶ 52.; *see also* Ex. 4 at 2 (NEJM Article)) Instead, the FDA's application of a different and higher standard to Plan B's

12

OTC switch was the result of factors that fall outside the FDA's statutory mandate, (*Id.* ¶ 53), and the FDA's rejection of the OTC switch for women of all ages and its constructive rejection of the citizen's petition for the OTC switch are not supported by medical or scientific evidence and are not supported by the agency record. (*Id.* ¶ 54).

## ARGUMENT

In order to prevail on its motion for judgment on the pleadings, the Government must show that, "accepting as true the complaint's factual allegations and drawing all inferences in the plaintiff[s'] favor. . . 'it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief.'" *DeMuria v. Hawkes*, 328 F.3d 704, 706 (2d Cir. 2003) (quoting *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)). The Government has failed to meet this standard. Accordingly, its motion for judgment on the pleadings should be denied.

**I.      The Final Agency Action Requirement of the APA is Satisfied by the FDA's Decision to Consider Only Limited OTC Status of Plan B, its Unreasonable Delay, and its Persistent Inaction.**

The Government asserts that Plaintiffs' complaint should be dismissed for lack of a final agency action on either Barr's SNDA or on Plaintiffs' Citizen Petition. (*See* Def.'s Mem. at 13.) This argument is incorrect. The action that Plaintiffs challenge is the FDA's insistence upon additional evidence that Plan B can be used safely by persons of all ages as an OTC drug, and that the prescription requirement must be preserved for younger women, because this insistence has no medical or scientific basis, but is instead motivated by improper ideological factors. This action is both final and ripe for review, because no subsequent agency action will modify this agency demand.

13

Even the FDA's alleged ongoing consideration of limited OTC status for Plan B is not insolated from judicial review, because the FDA has delayed this action as well in an unreasonable manner. As one Court of Appeals has explicitly held, "the finality requirement does not preclude us from reviewing claims of unreasonable agency delay." *Telecommunications Research and Action Center v. FCC*, 750 F.2d 70, 75 n.27 (D.C. Cir. 1984) ("*TRAC*") (citing *Public Citizen Health Research Group v. Comm'r, FDA*, 740 F.2d 21, 30 (D.C. Cir. 1984)). Such unreasonable delay is present here. Moreover, the Supreme Court has instructed that the finality requirement be applied in a manner that is both "pragmatic" and "flexible," so that where "conformity to [agency regulations] causes injury cognizable by a court of equity, they are appropriately the subject of attack." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149-50 (1967), *rev'd on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977). Indeed, one of the unreported cases cited by the Government reiterates this instruction, *Abigail Alliance v. McClellan*, No. 03-1601 (RMU), slip op. at 8 (D.D.C. Aug. 30, 2004) (cited in Def.'s Mem. at 45), and holds that an informal letter from the FDA constitutes final agency action because it "conclusively rejected" the relief Plaintiffs sought. *Id.* at 13.

Plaintiffs allege both that the FDA's delay in approving Barr's OTC application and in acting on the citizen's petition is unreasonable,[8] and that the denial of OTC access to persons of all ages has been unlawfully withheld. (*See* First Am. Compl. ¶ 39, 52-54.)[9]

---

[8] The Government argues that "because 21 U.S.C. § 355(c) does not establish a consequence for not complying with the 180-day time frame set forth in the statute, case law has established that none will be implied," (Def.'s Mem. at 35), yet the cases it cites are uniformly inapposite. The cases cited for this proposition all address the unrelated matter of whether, as a consequence of missing a relevant statutory deadline, an agency loses its jurisdiction over a case or issue. *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003); *Regions Hosp. v. Shalala*, 522 U.S. 448, 457 (1998); *St. Regis Mohawk Tribe v. Brock*, 769 F.2d 37 (2d Cir. 1985); *Brock v. Pierce County*, 476 U.S. 253 (1986). In essence, the cases cited by the Government simply stand for the proposition that the court will not find that the agency lacks authority to act at all, simply because the statutory deadline has passed. *See cases cited supra*; *see also In re Barr Labs.*, 930 F.2d 72, 74 (D.C. Cir. 1991) (explicitly finding that the issue of whether an agency loses its jurisdiction after missing a statutory deadline is irrelevant to the question of "whether an agency acts lawfully in ignoring a facially mandatory statutory deadline," and citing cases including *Brock v. Pierce County*, 476

14

**A.    Because the FDA is No Longer Considering Plan B for Full OTC Access, the Agency's Actions Are Sufficiently Final to Warrant Judicial Review.**

The FDA has rejected full OTC status for Plan B and is no longer considering such status. It is this final agency action which Plaintiffs challenge. Even assuming *arguendo* that the FDA's record regarding Plan B could somehow be construed as leaving open the possibility of full OTC status at some undetermined time in the future, that possibility is insufficient to preclude judicial review. In *Abbott Laboratories v. Gardner*, the Supreme Court emphasized that the finality requirement be applied in a manner that is both "pragmatic" and "flexible," so that where "'conformity to [agency regulations] causes injury cognizable by a court of equity, they are appropriately the subject of attack.'" 387 U.S. at 149, 150 (quoting *Columbia Broadcasting System v. United States*, 316 U.S. 407, 419 (1942)).

Because the constitutional rights of Plaintiffs and the women whose interests they represent are being abrogated by the FDA's wrongful withholding of full OTC status for Plan B,

---

U.S. 253 (cited in Def.'s Mem. at 35-36)) Plaintiffs do not challenge the FDA's authority to act after the statutory deadline. *Barr Labs.*, also cited by Defendant (*see* Def.'s Mem. at 37-38), is not to the contrary for the reasons explained further below. *See infra*, section I.C., at 20.

In addition, the Government argues that the agency is simply unable to complete its review more expeditiously because of "the huge volume of materials FDA" has reviewed in connection with the application, the novelty and complexity of the issues involved . . . and the many other applications to which FDA must also allocate resources," and because the SNDA for Plan B is "simply too involved" to abide by the 180-day deadline. (Def.'s Mem. At 37-38). Such an argument makes no sense, however, where, as here, the relevant experts have conducted and concluded their review of the application. In this case, the delay is being interposed after the review process has been completed, not in response to the asserted "complexity" of the review process.

[9] Despite Defendant's protestations that Plaintiffs did not explicitly bring a claim under Section 706(1) in the complaint expressly alleging unreasonable delay, the Government has had notice of Plaintiffs' arguments since they initially served the Government with their Opposition to Defendant's Motion to Dismiss on June 14, 2005. Since the Government elected to withdraw its motion to dismiss and re-file it after having the benefit of considering Plaintiffs' arguments, the Government has not been prejudiced by any failure to cite to Section 706(1) in the complaint or having expressly included an unreasonable delay claim in the complaint. However, the facts cited in the complaint, (First Am. Compl. ¶¶ 20, 39, 40, 49), as well as subsequent delays (*see* Def.'s Mem. Ex. C (Crawford Letter)), support a claim of unreasonable delay, and the Government has fully briefed the matter in its Motion for Judgment on the Pleadings. (See Def's. Mem. at 32-40). Because the Government has had a full opportunity to address the matter of the FDA's inaction and delay, it has in no way been prejudiced by Plaintiffs' failure to cite Section 706(1) explicitly in its complaint. Moreover, because Rule 15 of the Federal Rules of Civil Procedure requires that leave to amend the pleadings be freely granted and generally suggests a liberal approach to construing the allegations in the complaint as long as the litigants are not thereby prejudiced, at most Defendant's argument suggests that Plaintiffs might amend the complaint to add explicit allegations of unreasonable delay.

15

they are suffering ongoing injury of the sort contemplated in *Abbott Laboratories. See id.* at 150-51. Moreover, to the extent that the FDA has imposed unique burdens on the approval of OTC status of EC, the FDA's decision is not intermediate or tentative. The FDA implies that Plaintiffs' case will be moot upon a decision by the FDA approving Plan B for behind the counter sale to women 16 or 17 and over. (*See* Def.'s Mem. at 14-16.)  While it is true that Plaintiffs do not know what precise limits on access the Government is contemplating imposing in the indefinite future, the FDA has clearly ruled out OTC access to EC for persons of all ages. (*See* Def.'s Mem., Ex. C.)  At a minimum, the FDA is requiring Barr Labs to meet additional requirements regarding the use by women under 16 or 17 that it has not previously imposed on manufacturers of other drugs.  Because the Government's decision arbitrarily and unconstitutionally to require additional evidence is not tentative, Plaintiffs appropriately challenge that decision as a final determination.

**B.      The FDA's Prolonged and Wrongful Inaction Constitutes Final Agency Action.**

The APA itself recognizes that prolonged agency delay constitutes final agency action, and defines "agency action" to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, *or failure to act.*"  5 U.S.C. § 551(13) (2005) (emphasis added).  Moreover, the APA explicitly grants the Judiciary power to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1) (2005), and requires the FDA to conclude matters presented to it "within a reasonable time."  5 U.S.C. § 555(b) (2005).[10]

---

[10] If final agency action were required without exception, as the FDA suggests (*see* Def.'s Mem. at 13-16), then this language of the APA would be rendered meaningless.  Under well-established principles of statutory construction, the court must not, if reasonably possible, interpret a statute in such a way as to render provisions superfluous or meaningless.  *Connecticut v. United States Dep't of the Interior,* 228 F.3d 82, 88 (2d Cir. 2000); *Auburn Housing Auth. v. Martinez,* 277 F.3d 138, 145-46 (2d Cir. 2002) (listing cases).

Accordingly, courts have not hesitated to review agency "inaction," noting that "the APA treats an agency's inaction as 'action.'" *S. Utah Wilderness Alliance v. Norton*, 301 F.3d 1217, 1229 (10th Cir. 2002) ("*SUWA*"), *rev'd on other grounds*, *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004) ("Where, as here, an agency has an obligation to carry out a mandatory, nondiscretionary duty and either fails to meet an established statutory deadline for carrying out that duty or unreasonably delays in carrying out the action, the failure to carry out that duty is itself 'final agency action.'") Moreover, when agency action has been "unreasonably prolonged," federal courts have jurisdiction "even in the absence of final agency action." *Anderson v. Babbitt*, 230 F.3d 1158, 1165 (9th Cir. 2000) (citations omitted). *See also Public Citizen Health Research Group v. Comm'r, FDA*, 740 F.2d 21, 32 (D.C. Cir. 1984) ("*PCHRG*"). As courts have made clear, where an agency "is under an unequivocal statutory duty to act, failure to so act constitutes, in effect, an affirmative act that triggers 'final agency action' review." *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987). *See also SUWA*, 301 F.3d at 1229-30 ("the failure of an agency to carry out its mandatory, nondiscretionary duty either by an established deadline or within a reasonable time period may be considered final agency action, even if the agency might have hypothetically carried out its duty through some "non-final" action"); *id.* at 1230 n.9 ("Courts have implicitly recognized that unlawfully withheld actions are considered final under § 704."); *PCHRG*, 740 F.2d at 34 (remanding to district court for determination on whether FDA's time frame constituted "unreasonable delay").

"[W]hen administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief." *Environmental Defense Fund, Inc., v. Hardin*, 428 F.2d 1093, 1099 (D.C. Cir. 1970). *See also SUWA*, 301 F.3d at 1229 ("Once

17

the agency's delay in carrying out the action becomes unreasonable, or once the established statutory deadline for carrying out that duty lapses, the agency's inaction under these circumstances is, in essence, the same as if the agency had issued a final order or rule declaring that it would not complete its legally required duty.").

In this case, the FDA has failed to approve Plan B for full OTC status, in contravention of the conclusions reached by its experts who completed their review of the SNDA. FDA has further indicated that, against the advice of its medical and scientific experts, it is no longer considering full OTC status for the drug, but is contemplating only limited access for women over 17. Despite the fact that FDA continues to contemplate increasing access to Plan B in some limited form, the result of the agency's inaction on Barr's SNDA is the same as if it had issued a denial: Plan B continues to be available only by prescription. Additionally, the agency has apparently taken no action in reviewing the Citizen Petition since 2001. Because of FDA's continued inaction on that petition, the matter of full OTC access for Plan B is no longer under consideration by the agency. Thus, FDA's prolonged and continuing inaction has precisely the same effect as if it had denied the Citizen Petition outright.

## C.   The FDA's Delay in Approving Plan B for Full OTC Access is Unreasonable and Satisfies the Requirement for Final Agency Action.

In cases involving claims of unreasonable delay, the court will consider a number of factors, including: 1) whether the delay is satisfactory under a "rule of reason"; 2) whether the agency has exceeded a statutory deadline; 3) whether the delay affects merely economic regulation or the more critical realm of human health and welfare; 4) competing agency priorities; 5) "the nature and extent of the interests prejudiced by delay"; and 6) impropriety is not a factor in finding an agency action "unreasonably delayed." *TRAC*, 750 F.2d at 79-80

18

(citations omitted). *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003).

These factors weigh in Plaintiffs' favor. Under the first and second factors, the FDA's actions have far exceeded the statutory deadline of 180 days set forth in 21 U.S.C. § 355(c)(1).[11] The delay is also unreasonable. More than four years have passed since Plaintiff ARHP and others submitted the citizen's petition seeking OTC status for EC. The FDA last communicated with the petitioners on September 6, 2001. The FDA has also exceeded that statutory deadline of 180 days for responding to Barr's SNDA and has not provided any time frame for making a decision on that application.

The third and fifth factors also weigh in Plaintiffs' favor because OTC access to Plan B affects health and human welfare, (*see* First Am. Compl. ¶ 28), rather than economic concerns. Indeed, the nature of the interests prejudiced by the delay – the constitutional rights and health of women – are unquestionably of great importance, and are always viewed by courts as involving the threat of irreparable injury. *See, e.g., New York National Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989) ("The irreparable harm flowing from defendants' activities – including the medical risks and the denial of constitutionally guaranteed rights – is real and threatens to continue."). Particularly where, as here, Plaintiffs allege that agency delay is causing irreparable harm, courts have found such claims ripe for review. *Environmental Defense Fund*, 428 F.2d at 1098 ("In light of the urgent character of petitioners' claim, and the allegation that delay itself

---

[11] Because a statutory deadline will provide the content for a rule of reason, the first and second factors are combined here. *PCHRG*, 740 F.2d at 34-35.

19

inflicts irreparable injury, the controversy is as ripe for judicial consideration as it can ever be.").[12]

The cases cited by the Government are not to the contrary. For instance, in *Top Choice Distributors v. United States Postal Serv.*, 138 F.3d 463 (2d Cir. 1998), no delay in agency action was asserted, nor were statutory deadlines exceeded. In *Barr Laboratories*, 930 F.2d 72, 74-75 (D.C. Cir. 1991), the D.C. Circuit determined that mandamus ordering the agency to act was not appropriate under *TRAC* despite the FDA's violation of the statutory time limit for deciding applications. However, the Court explicitly relied on the fact that there was no evidence that the agency had improperly "singled ... out [the plaintiff] for mistreatment," or that its treatment of the plaintiff was "egregious ... [which] especially shabby treatment of one applicant would [indicate]." *Id.* The Court further emphasized that this factor was relevant to the question of legitimacy of agency priorities:

> Where the agency has manifested bad faith, as by singling someone out for bad treatment or asserting utter indifference to a congressional deadline, the agency will have a hard time claiming legitimacy for its priorities. Accordingly, the absence of bad faith, as here, is relevant to the appropriateness of mandamus.

*Id.* at 76. Plaintiff's allegations that the FDA treated the Plan-B petitions differently than it has other applications or petitions and delayed action on the petitions for purely ideological reasons clearly supports a finding of arbitrary mistreatment and bad faith. As *Barr Laboratories* clearly indicates, court action *is* appropriate where, as here, there are allegations of bad faith or mistreatment of a particular applicant.

In *Franklin v. Massachusetts*, 505 U.S. 788, 797-98 (1992), the court found that a report by the secretary of commerce to the President did not constitute final agency action because that

---

[12] The fourth prong is not at issue at this point because discovery has not yet commenced and Plaintiffs have no knowledge of the FDA's competing priorities. Likewise, the sixth prong need not be addressed, because it specifies

20

report had no direct effects, and only the President's orders which had not yet issued, possibly based on recommendations included in the report, would carry direct consequences. This is unlike the situation here, where Plaintiffs assert that the FDA's non-approvable letter was wrongfully issued because it exceeded the agency's statutorily mandated power. Moreover, the consequence of the non-approvable letter was to wrongfully delay the approval of Plan B for OTC use by persons of all ages, thus causing ongoing harm to the health of women across the United States. (*See* First Am. Compl. ¶ 28.) Likewise, Plaintiffs filed a citizen's petition requesting OTC status for EC for all women, and the FDA has failed to issue a final determination on that citizen's petition for more than four years. *Id.* ¶ 39. Such lengthy delay, at the very least, establishes a colorable claim of unreasonable delay which can only be rejected based on evidence, not on the pleadings.

## II.   Plaintiffs' Claims Are Ripe for Judicial Review.

Plaintiffs have stated valid claims that the FDA's action is arbitrary and capricious and exceeds its statutory mandate. As set forth in greater detail below, Plaintiffs' claims are ripe for review. First, the FDA is not now considering OTC access to EC for women of all ages, (*see* First Am. Compl. at ¶¶ 48, 49; *see also* Def.'s Mem., Ex. C), and so delay of judicial proceedings will not result in any enlargement of the record or any additional application of agency expertise to the matter. Second, the wrongful agency action that Plaintiffs complain violated both statutory authority and the constitution – i.e., the FDA's application of a different and higher standard to Plan B's OTC switch, *see id.* ¶ 51-53 – has already taken place. Third, Plaintiffs' claims based on the FDA's unreasonable delay in reaching a final decision on the citizen's petition are ripe because after more than four years of inaction and no indication of any ongoing proceedings on

---

that impropriety need *not* be considered in the court's analysis of unreasonable delay.

the matter, no additional events or actions would assist the Court in reviewing the FDA's

inaction. Thus, ongoing agency process will not improve the Court's ability to adjudicate this

matter at some future point in time. Since OTC access to EC is being withheld contrary to the

statutory guidelines imposed on the FDA, Plaintiffs and the women whose rights and interests

they assert who need EC are suffering ongoing harm because they are being deprived of the

opportunity to prevent unwanted pregnancies.

## A.    Standard for Determining Ripeness of Claims.

In *Abbott Laboratories*, the Supreme Court set forth a two-pronged inquiry regarding

ripeness. A court should examine "both the fitness of the issues for judicial decision and the

hardship to the parties of withholding court consideration." 387 U.S. at 149. The rationale

behind the ripeness doctrine is to avoid premature adjudication of abstract issues that have not

yet developed into a tangible controversy between the parties, and to protect the agency decision-

making process from premature interference, that is, until the effects of the administrative action

are "felt in a concrete way by the challenging parties." *Id.* at 148-49; *see also Nat'l Treasury*

*Employees Union v. United States,* 101 F.3d 1423, 1431 (D.C. Cir. 1996) ("Prudentially, the

ripeness doctrine exists to prevent the courts from wasting our resources by prematurely

entangling ourselves in abstract disagreements. . . ."). The "primary focus" of the prudential

aspect of the ripeness doctrine is to balance "the petitioner's interest in prompt consideration of

allegedly unlawful agency action against the agency's interest in crystallizing its policy before

that policy is subjected to judicial review and the court's interests in avoiding unnecessary

adjudication and in deciding issues in a concrete setting." *Eagle-Picher Indus. v. EPA,* 759 F.2d

905, 915 (D.C. Cir. 1985).

Evaluation of ripeness is "very much a matter of practical common sense," rather than a rigid process requiring inflexible adherence to rules. *Continental Air Lines, Inc. v. Civil Aeronautics Board*, 522 F.2d 107, 124 (D.C. Cir. 1975). Hence, the two factors articulated in *Abbott Laboratories*, the appropriateness of judicial review and the hardship to the parties, are balanced against each other, and if the interests of those seeking review outweigh the interests of the agency in postponing review, the matter is considered ripe for review. *Id.* at 124.

Under the *Abbott Labs* test, a court should seek first to determine whether the agency action is "sufficiently final or definitive so that [the court] would have no interest in postponing review until the issues are more concrete." *Midwestern Gas Transmission Co. v. Federal Energy Regulatory Comm'n*, 589 F.2d 603, 618 (D.C. Cir. 1978). Yet, even where the court is "disinclined to find finality, '[it] must then weigh this consideration against the immediate impact of the actions on the challengers, and whether that impact is so harmful that present consideration is warranted." *PCHRG*, 740 F.2d at 30 (citation omitted). Even in the absence of final agency action, if the "interest of those who seek relief from the challenged action's 'immediate and practical impact' upon them," outweighs the Government's interest in postponing review, then judicial review is proper. *Continental*, 522 F.2d at 125.

## B.      Plaintiffs' Claims Are Fit for Judicial Review.

### 1.      No Issues Are Currently Under Consideration by the FDA that Will Affect the Adjudication of Plaintiffs' Claims.

"A controversy is ripe if further administrative process will not aid in the development of facts needed by the court to decide the question it is asked to consider." *New York State Ophthalmological Soc'y v. Bowen*, 854 F.2d 1379, 1386 (D.C. Cir.1988). By contrast, if the agency's position is "likely to be abandoned or modified before it is actually put into effect," and

23

the agency position will likely change, then the concern for judicial economy will render judicial review premature. *See Continental*, 522 F.2d at 125. In this case, additional administrative process will not further illuminate the decision already made by the FDA to treat Plan B differently from other drugs. Nor is the FDA presently considering OTC access to Plan B for persons of all ages.[13]

Even if FDA were to act tomorrow to grant Barr Lab's renewed application for OTC access for women 16 or 17 and older, Plaintiffs' complaint would still constitute an actual controversy to be properly adjudicated by the court.[14] If OTC access is limited to women 16 and older, Plaintiffs' constitutional and statutory claims remain in effect as stated for women under 16 or 17. Moreover, even if the FDA approves OTC access for women 16 or 17 and older, certain restrictions on access will be necessary in order to enforce that age limit. The imposition of such barriers will interfere with access to the drug for persons of all ages and create a new category of drug access falling somewhere in between OTC and prescription status, thus denying Plan B full OTC status.

Contrary to the Government's allegations, this is not a situation where the court should defer adjudication of a matter because the issues are "contingent on future events or may never occur." *Simmonds v. I.N.S.*, 326 F.3d 351, 359 (2d Cir. 2003), *quoting Isaacs v. Bowen*, 865 F.2d 468, 478 (2d Cir. 1989). The fact that the FDA continues to consider diminished OTC

---

[13] Where, as here, an agency decision will not go into effect until a later time, that decision may be challenged if it will not be altered. Where an agency position creates a regulation that is enforceable based on certain conditions, that conditionality does not require further delay in judicial review. *See Continental*, 522 F.2d at 126 (finding that where an agency position is only enforceable based on certain conditions being satisfied, the conditional nature of the policy does not affect its finality, but rather are elements of the policy itself, and determining "[s]ince we will be confronted by this same question whether we grant review now or later, we conclude that the challenged Board policy is, in the appropriate sense, final.").

[14] *See supra* at 9.

access for some women does not influence its past determination to deny full OTC access against the overwhelming advice of their scientists and contrary to the scientific evidence before them. There is no indication that the relevant agency positions will be modified, and the first prong of the *Abbott Labs* inquiry is satisfied.

### 2.   Plaintiffs Claims under 5 U.S.C. 706(2) are Ripe for Review Because They Constitute Improper Procedural Matters Already Concluded.

Where an agency improperly follows mandated procedures, a claim to challenge that action is immediately ripe for review. Once the agency has failed to comply with its own compulsory procedures, future agency action will not alter the already completed improper action. *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998) (stating that in the context of National Environmental Policy Act claims that a party "injured by a failure to comply with the [agency] procedure may complain of that failure at the time the failure takes place, for the claim can never get riper"); *see also Laub v. U.S. Dept. of Interior*, 342 F.3d 1080, 1089 (9th Cir. 2003) (listing other cases finding the same). "[A]gency decisions to ignore their own regulations are reviewable under the APA as final agency actions or failures to act." Trent Baker, *Judicial Enforcement of Forest Plans In The Wake Of Ohio Forestry*, 21 PUB. LAND & RESOURCES L. REV. 81, 107 (quoted in *SUWA*, 301 F.3d at 1235 n.15); *see also Wyoming Outdoor Council v. United States Forest Serv.*, 165 F.3d 43, 51 (D.C. Cir.1999).

In this case, the FDA has missed statutory deadlines for action on the citizen's petition and on Barr's SNDA. (*See* First Am. Compl. ¶ 39, 49.) In addition, Plaintiffs have alleged that the FDA improperly followed mandated procedures by considering factors outside its statutory authority. (*Id.* ¶ 53; *see also* Ex. 3 (Wood Transcript at 6); Ex. 1 (Bull Memo at 2-3); Ex. 4 (NEJM Article at 1-2).) Thus, Plaintiffs claims are appropriately before the court at this time.

25

### 3.    Plaintiffs' Claims of Unreasonable Delay Are Ripe for Review.

The general ripeness concern that agency proceedings conclude before judicial review begins cannot logically be applied to claims of unreasonable delay or inaction. Just as in the context of the finality requirement, such a requirement would operate to bar such claims from judicial review, despite the fact that this type of claim is explicitly authorized under the APA and subsequent judicial precedent.[15] Moreover, if the Court were to apply this sort of requirement unbendingly, then an agency could evade judicial review simply by characterizing any decision to deny a petition or to decline to take action as inaction. This result is not supported by the text of the APA which authorizes judicial review in these situations. *See supra* at 10.

The Government seeks dismissal of the complaint in part because the Citizen's Petition has not been fully adjudicated and thus lacks the "final agency action" required to bring a claim under the APA. This assertion is problematic. First, no action has been taken on the Citizen's Petition since September 6, 2001 (First Am. Compl. ¶ 39). Moreover, no other petition or application before the FDA is currently seeking the same result as the Citizen's Petition, i.e., full OTC access to Plan B for women of all ages. Thus, there is no indication from the agency that the Citizen's Petition will *ever* receive further consideration.[16] Whether this lengthy period of inaction constitutes unreasonable delay or constructive denial is an issue of fact to be determined by the Court, but it seems unlikely that any claim based on the Citizen's Petition could ripen further. Moreover, the Government's assertion that the agency "cannot fully adjudicate the Citizen Petition independently from its consideration of the SNDA" (*see* Def.'s Mem at 26-28),

---

15 Indeed, where courts have considered claims of unreasonable delay, they often do not separately address ripeness concerns. *See, e.g., TRAC*, 750 F.2d 70; *Sierra Club v. Thomas*, 828 F.2d 783; *SUWA*, 301 F.3d 1217.

16 The Government optimistically implies that the agency is still "evaluating the merits" of the Citizen's Petition, based on the fact that the FDA has received over 17,750 comments and over 89,800 form letters relating to the

26

is a factual one which has no support in the record, and is certainly not supported by the

pleadings.

> **C.     The Hardship to the Plaintiffs and the Women Whose Interests and Rights They Assert Supports Immediate Judicial Review.**

Even assuming *arguendo* that the Court were to find that there are reasons for postponing

review until the issues are more concrete, *Midwestern Gas*, 589 F.2d at 618, the Court must

balance this interest against the hardship to the parties that would result from postponing review.

Where delayed review would cause hardship to the plaintiff, immediate consideration may be

warranted. *Id.*; *see also Simmonds v. I.N.S.*, 326 F.3d 351, 357 (2d Cir. 2003) ("[W]hen a court

declares that a case is not prudentially ripe, it means that the case will be *better* decided later and

that the parties will not have constitutional rights undermined by the delay.")

Here, Plaintiffs, and the women whose interests they assert, are injured on a continuing

and ongoing basis by the FDA's rejection of the OTC switch for women of all ages and the

FDA's constructive rejection of the citizen's petition for the OTC switch.  As a result of the

FDA's rejection of the OTC switch, Plaintiffs and the women whose interests they represent are

denied access to the only drug available to be taken after sexual intercourse to prevent unwanted

pregnancy, abrogating their constitutional rights.  Clearly, the hardship to the Plaintiffs weighs

strongly in favor of judicial review at this time.

## III.     Plaintiffs Have Stated Constitutional Claims Upon Which Relief May Be Granted.

In the Third and Fourth Causes of Action, Plaintiffs claim that the denial of the OTC

switch for persons of all ages violates the Fifth Amendment to the United States Constitution in

---

petition  (*See* Def's. Mem. at 16).  However, it fails to cite to a single entry in the index, the administrative record or elsewhere suggesting that any action is taking place with respect to that petition.

two respects. First, it "infringes the right to privacy of women who need EC without serving any compelling, significant, or legitimate governmental interest." (First Am. Compl. ¶ 64.) Second, "it discriminates on the basis of sex without serving any compelling, significant, or legitimate governmental interest." (*Id.* ¶ 66.) Assuming all facts alleged in the complaint are true, both of these causes of action are claims upon which relief may be granted.

## A.     The Right to Privacy

The Government properly observes that decisions of the United States Supreme Court "applied strict scrutiny to laws broadly restricting access to contraception." (Def.'s Mem. at 46.) The Government contends that strict scrutiny should not be applied to the Defendant's ongoing prescription requirement for EC because "the alleged decision of FDA which is at issue in this case relates only to whether a single drug product may be marketed without a prescription and does not comprise a comprehensive set of general restrictions or prohibitions to access to contraceptives, such as those challenged in the cases" applying strict scrutiny, in part because "many forms of birth control [are] available to the general public." (*Id.*) This argument misses the mark in several ways.

First, under the reasoning of *Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977), even a government restriction short of a "total ban" on contraception must be analyzed under strict scrutiny. *See id.* at 688-89. On this motion the Court must accept as true Plaintiffs' allegations that "contacting a physician and obtaining and filling a prescription hinder women from obtaining Plan B in a timely fashion," so that "making Plan B available OTC will allow more women to use the treatment, and enable more women to prevent unwanted pregnancies, to the

28

benefit of public health." (First Am. Compl. ¶ 28.)[17]  This allegation of a government-imposed barrier to contraceptive use suffices to withstand the motion to dismiss.  As the Supreme Court wrote in *Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977):

> Limiting the distribution of nonprescription contraceptives to licensed pharmacists clearly imposes a significant burden on the right of individuals to use contraceptives if they choose to do so.  The burden is, of course, not as great as that under a total ban on distribution.  Nevertheless, the restriction of distribution channels to a small fraction of the total number of possible retail outlets renders contraceptive devices considerably less accessible to the public, reduces the opportunity for privacy of selection and purchase, and lessens the possibility of price competition.

*Id.* at 689 (citations and footnotes omitted).

Moreover, Plan B is the only *emergency* contraceptive available in the United States.  It differs from all other forms of birth control available to the public precisely because it can be used after sexual intercourse when other forms of contraception were not used or failed.  (First Am. Comp. ¶ 26.)  To take one example, it is the only approved method of preventing pregnancy that can be used by a woman who is not using some form of hormonal birth control and has been raped.  It is a *sui generis* drug that is obviously not fungible with other contraceptives, all of which must be used before or during sexual intercourse.  (*See* Def.'s Mem. Ex. A) (listing approved contraceptives, all of which (aside from Plan B) must be used before or during intercourse).  The Government's catalog of other contraceptives does not help those women whose regular method of contraception fails or who have had intercourse without using

---

[17] That Plaintiffs assert that Plan B has been prescribed many thousands of times since its approval by FDA as a prescription drug, (*see* First Am. Compl. ¶ 38; Def.'s Mem. at 4), does not mean that the prescription requirement is not a barrier to its use.

contraception. For these women, only Plan B can prevent pregnancy (and possibly a subsequent abortion), and the FDA's ongoing prescription requirement imposes a significant obstacle.[18]

Second, in the realm of reproductive decision-making, directly contrary to the line of cases cited by the Government, courts have consistently recognized that the right to privacy does equate to a constitutional right of access to the best available treatment. Most notably, in *Stenberg v. Carhart*, 530 U.S. 914, 936-38 (2000), the Supreme Court held that a woman seeking an abortion has a constitutional right to have the abortion performed by a particular method that is most medically appropriate for her, even though other, less appropriate methods are available to end the pregnancy. *See also Planned Parenthood of Central Mo. v. Danforth*, 428 U.S. 52, 77-79 (1976) (right to privacy protects access to saline amniocentesis method of abortion although other methods of abortion are available); *Benten v. Kessler*, 505 U.S. 1084, 1085-86 (1992) (Stevens, J., dissenting from denial of application to vacate stay) (right to privacy protects both decision to exercise right and method of doing so). *A fortiori*, because Plan B is the *only* method of emergency contraception, the right to privacy protects access to it.

---

[18] The Government's citation of the Supreme Court's remark in *Carey* that "[t]he business of manufacturing and selling contraceptives may be regulated in ways that do not infringe protected individual choices," 431 U.S at 686 (quoted in Def.'s Mem. at 46-47), obviously begs the question. Plaintiffs assert that FDA's ongoing prescription requirement is *precisely* a regulation that "infringe[s] protected individual choices." Nor did *Carey* explicitly or otherwise hold that the FDA's actions in regulating drugs is per se immune from scrutiny when those actions infringe fundamental rights.

The Government also missteps when it suggests in a footnote, *see* Def.'s Mem. at 47 n.9, that the "undue burden" standard for regulation of abortion enunciated by the joint opinion of Justices O'Connor, Kennedy and Souter ("joint opinion") in *Planned Parenthood of Southeast Pennsylvania v. Casey*, 505 U.S. 833, 874 (1992), is applicable to contraception. The "undue burden" standard was specifically crafted to allow greater state regulation of abortion in the service of the interests in potential life and maternal health. *Casey*, 505 U.S. at 870-76. The "undue burden" standard has never been, and was not intended to be, applied to regulation of contraception. Moreover, here Plaintiffs' allegations encompass the inference that, indeed, the FDA's ongoing requirement of a prescription for Plan B is "designed to strike at the right [to contraception] itself," *Casey*, 505 U.S. at 874 (joint opinion), by keeping the prescription requirement in place for ideological rather than scientific or medical reasons. *See Planned Parenthood of Central Mo. v. Danforth*, 428 U.S. 52, 78-79 (1976) (concluding that where medical evidence showed that regulation barred abortion method that was "safer, with respect to maternal mortality, than even continuation of the pregnancy until normal childbirth," the regulation "comes into focus . . . as an unreasonable

None of the cases cited by the Government is relevant here. The Government presents a litany of cases involving drugs that were either unapproved or misbranded, whose safety and effectiveness had not yet been established,[19] none of which was integral to the exercise of constitutional right to use contraception. The Government's cases are therefore all inapposite.

Third, having selected the wrong line of cases to examine, the Government erroneously concludes that this Court should apply "rational basis review." (Def.'s Mem. at 47.) That this conclusion is wrong is made clear by relevant reproductive rights cases cited above, most especially *Carey* and *Stenberg*, which apply heightened judicial scrutiny to a barrier on contraception (*Carey*) and even to a prohibition on a single method of abortion (*Stenberg*). But even if the Government's assertion regarding the standard of review were assumed *arguendo* to

---

or arbitrary regulation designed to inhibit . . . the vast majority of abortions after the first 12 weeks. As such, it does not withstand constitutional challenge").

[19] All the Government's cases involve drugs or treatments whose safety and effectiveness *had not yet been established*. *Rutherford v. United States*, 616 F.2d 455 (10th Cir. 1980), involved an assertion of the right to privacy of patients seeking access to the drug Laetrile as a treatment for cancer even though the drug had not been shown to be safe or effective. Similarly, *Andrews v. HHS*, No. 04-0307 (JR) (D.D.C. Mar. 31, 2005), involves an effort to import prescription drugs from Canada for treatment unrelated to reproductive decision-making, where the FDA asserted its interest in "shielding the public from reimported drugs that may be adulterated or otherwise unsafe." Slip. op. at 7. *Abigail Alliance v. McClellan*, No. 03-1601 (RMU) (D.D.C. Aug. 30, 2004), involved an effort to obtain investigative drugs for terminally ill patients, not approved drugs used by patients seeking to effectuate their reproductive rights. *United States v. Vital Health Prods.*, 786 F. Supp. 761 (E.D. Wis. 1992), involved a government effort to prevent the sale by a company of various misbranded "natural remedies," none of which were used by women in effectuating their reproductive rights. *Mitchell v. Clayton*, 995 F.2d 772 (7th Cir. 1993), was a challenge by acupuncturists to a state medical practice statute, and the plaintiffs explicitly conceded that rational basis review was appropriate because no fundamental right or suspect classification was involved. *Id.* at 774. *United States v. Burzynski Cancer Research Inst.*, 819 F.2d 1301 (5th Cir. 1987), was an action by the government against health care providers for use of unapproved cancer treatment drugs, not drugs used by women in effectuating their reproductive rights. *Carnohan v. United States*, 616 F.2d 1120 (9th Cir. 1980), like *Rutherford*, was a case involving use of the drug Laetrile for cancer prevention. *Smith v. Shalala*, 954 F. Supp. 1 (D.D.C. 1996), involved an unapproved treatment for Hodgkin's lymphoma, not approved drugs used by women in effectuating their reproductive rights. *Kulsar v. Ambach*, 598 F. Supp. 1124 (W.D.N.Y. 1984), involved a proposed treatment for hypoglycemia which the FDA had ordered removed from the market as "obsolete." *Id.* at 1125.

In addition, none of the cases cited by the Government involved an allegation, as does the instant case, which the FDA had acted improperly. As the court in *Kulsar* observed: "[P]laintiffs have not named the FDA as a defendant, have not alleged that the FDA's removal of [the drug at issue] from the market had been in any way improper, or that there has been any inordinate delay or impropriety with respect to the FDA's processing of the California entity's application to test [the drug's] effectiveness." 598 F. Supp. at 1126. Here, Plaintiffs allege precisely that the FDA's actions constitute "inordinate delay [and] impropriety."

be correct, the motion for judgment on the pleadings should be denied, because Plaintiffs have alleged as a matter of fact that the FDA's failure to approve Plan B for OTC use by persons of all ages is "not supported by medical or scientific evidence and . . . not supported by the agency record." (First Am. Compl. ¶ 54.) Assuming this fact to be true, as must be done on this motion for judgment on the pleadings, this factual allegation establishes that FDA's actions are irrational. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) (stating that where agency's determination agency lacks a rational basis or was not based on consideration of the relevant factors, it is arbitrary and capricious); *Burlington Northern and Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005) ("Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld.").[20]

The motion to dismiss Plaintiffs' privacy cause of action should therefore be denied.

## B.    Sex Discrimination

The Government urges dismissal of Plaintiffs' Fourth Cause of Action (sex discrimination), relying on two cases, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979), and

---

[20] The Government's reference to a quotation from *New York v. Ferber*, 458 U.S. 747, 756-57 (1982) (cited in Def.'s Mem. at 49), a case concerning child pornography, is particularly misplaced. Plaintiffs' allegations here, which must be taken as true, encompass the inference that the FDA's requirement of a prescription for Plan B, even for women under age 16 or 17, harms rather than safeguards minors' health. The Supreme Court has not hesitated to strike down statutes that purportedly protect minors in the face of evidence that they in fact harm minors. *See, e.g., Hodgson v Minnesota*, 497 U.S. 417, 450-51 (1990) (holding that statute mandating notification of two parents prior to performance of an abortion on a minor would be unconstitutional if it lacked an alternative method of obtaining authorization for the procedure, because evidence demonstrated that the statute "[n]ot only ... fail[ed] to serve any state interest with respect to functioning families," but also "proved positively harmful" to minors in dysfunctional families); *Bellotti v. Baird*, 443 U.S. 622, 642-44 (1979) (holding unconstitutional a statute mandating consent of parents prior to performance of an abortion on a minor because the statute failed to allow a minor the opportunity to obtain an abortion free from parental interference where she was sufficiently mature to make that decision on her own or where an abortion would be in her best interests, in light of potentially "grave and indelible" consequences of denying the minor's ability to obtain an abortion).

*Zalewska v. County of Sullivan*, 316 F.3d 314 (2d Cir. 2003).[21]  Neither case forecloses

Plaintiffs' sex discrimination claim.

In *Feeney*, the Supreme Court considered a Massachusetts statute giving "absolute

preference to veterans" in state civil service positions. 442 U.S. at 271. The plaintiff argued that

this preference constituted sex discrimination, because few women were veterans. The Court

noted that the plaintiff did not dispute that the statute was gender-neutral on its face, 442 U.S. at

274; the next step in the Court's inquiry was to determine whether "the distinction [drawn in the

statute] is not a pretext for gender discrimination," *id.* at 275, i.e., whether it was nevertheless

"gender-based," *id.* at 274. Only if "the classification itself, covert or overt, is *not* based upon

gender," *id.* (emphasis added), does the Plaintiff have to show evidence of purpose to

discriminate.

Here, the FDA's action affects access to a drug used *exclusively* by women, (First Am.

Compl. ¶ 50), and that could be needed by any woman at some point in her life. *Id.*[22]  Indeed, the

_____

[21] The *Zalewska* case relied upon by the Government is readily distinguishable. An important component of the Second Circuit's rejection of heightened scrutiny was its view that the prohibition at issue (on wearing a preferred article of clothing) was an "incidental burden." 316 F.3d at 323. Here, by contrast, the burden of the prescription requirement is a greater risk of unwanted pregnancy, childbirth and motherhood, a burden the Supreme Court has characterized as follows:

> The mother who carries a child to full term is subject to anxieties, to physical constraints, to pain that only she must bear. That these sacrifices have from the beginning of the human race been endured by woman with a pride that ennobles her in the eyes of others and gives to the infant a bond of love cannot alone be grounds for the State to insist she make the sacrifice. Her suffering is too intimate and personal for the State to insist, without more, upon its own vision of the woman's role, however dominant that vision has been in the course of our history and our culture.

*Planned Parenthood v. Casey*, 505 U.S. 833, 852 (1992); *see also Roe v. Wade*, 410 U.S. 113, 153 (1973) ("Specific and direct harm medically diagnosable even early in pregnancy may be involved. Maternity, or additional offspring, may force upon the woman a distressful life and future. Psychological harm may be imminent. Mental and physical health may be taxed by child care."). These burdens are sufficiently "non-incidental" to require heightened scrutiny, especially where, as here, the action itself is gender-based and there is evidence from which invidious purpose may be inferred.

[22] The Government contends, in response to Plaintiffs' allegations related to sex discrimination but without citation to any authority and without even any reasoning, that "[i]t cannot be the case that every time FDA reviews a drug application for [a drug used exclusively by one gender or other population sub-groups], it is potentially violating the

proposed carton labeling for Plan B reflects this fact: "Any woman who considers using Plan B should understand the benefits and risks." *Carton Text*, Plan B (levonorgestrel) tablets, 0.75 mg, *available at* http://www.fda.gov/cder/foi/label/1999/21045lbl.pdf ; *see also*, FDA's Decision Regarding Plan B: Questions and Answers, *available at* http://www.fda.gov/cder/drug/infopage/planB/planBQandA.htm (copy attached hereto as Ex. 5) ("Plan B can reduce a woman's risk of pregnancy when taken as directed if she has had unprotected sex."). Thus, the FDA's action rejecting OTC status does not *overtly* state "*women* may not use Plan B without a prescription," because only women *would* use Plan B; any explicit limitation to women would be ludicrous and obviously unnecessary. The absence of the explicit use of the word "women" does not make the FDA's action "gender-neutral." Rather, unlike *Feeney*, where the plaintiff conceded that the classification at issue was "not a pretext for gender discrimination," 442 U.S. at 275, the FDA's action is gender-based because the class of people who use Plan B consists of only women. Accordingly, as the *Feeney* Court explained, the Massachusetts law "is not a law that can plausibly be explained only as a gender-based classification," because:

> Veteran status is not uniquely male. Although few women benefit from the preference the nonveteran class is not substantially all female.

*Id.*

Here, by contrast, only women "are placed at a disadvantage" by the FDA's action; no men are affected by it at all, because no men are potential users of EC. Thus, here the inference

---

equal protection rights of the class of citizens who use the drug." Def.'s Mem. at 50. But it absolutely can be the case. Anytime the government -- whether the FDA or some other segment of the government -- acts in a manner that affects only one gender (or only one protected class, such as a racial or religious group), its actions are subject to heightened scrutiny, and those actions are "invidious" if the government applies a different standard in its actions related to the protected group. *See, e.g., Hsu v. Roslyn Union Free School Dist. No. 3*, 85 F.3d 839, 868 (2d Cir. 1996) ("use of heightened scrutiny for all cases of racial and sex discrimination implements both the suspicion that such discrimination is almost always invidious, and the policy that only the strongest reasons justify advantages based on race or sex."); *Latrieste Restaurant v. Village of Port Chester*, 188 F.3d 65, 70 (2d Cir. 1999) (a plaintiff "ordinarily cannot establish an equal protection violation *unless* it shows that [government] consciously applied *a different standard of enforcement* to similarly situated establishments.") (emphasis added).

*is* permissible that the FDA's action is gender-based. Indeed, one federal district court has reached just this conclusion in the context of an employment discrimination case under Title VII:

> The employer has implemented a facially neutral policy, denying prescription contraceptives to all employees. . . . *[A]s only women have the potential to become pregnant, denying a prescription medication that allows women to control their reproductive capacity is necessarily a sex-based exclusion.*

*Cooley v. DaimlerChrysler Corp.*, 281 F. Supp. 2d 979, 984 (E.D. Mo. 2003) (emphasis added). The same reasonable inference may be made here: because the FDA's action relates to a drug tied directly to the capacity of women to become pregnant, its action is gender-based.

Even if the FDA's action were *not* sex-based, Plaintiffs' allegations are sufficient to withstand a motion for judgment on the pleadings. The Court may reasonably infer an allegation of purposeful discrimination from Plaintiffs' allegations in several ways.

First, the FDA's action was based on "individual views and attitudes about the morality of adolescent sexual behavior." (First Am. Compl. ¶ 46.) It may reasonably be inferred that these "views and attitudes" encompass views about the proper sexual conduct and reproductive decision-making of young adolescent women, since only such young women (and not young men) are directly disadvantaged by the FDA's action, and this inference must be made on a motion for judgment on the pleadings. Such views likely impermissibly "perpetuate the legal, social, and economic inferiority of women," *United States v. Virginia*, 518 U.S. 515, 534 (1996), and are direct evidence of purpose to discriminate. In addition, a similar inference must be drawn from Plaintiffs' allegation that the FDA's action was based on factors other than appropriate medical and scientific evidence. (First Am. Compl. ¶ 51-54.)

Moreover, purpose may be inferred from the impact of the FDA's action. *E.g.*, *Washington v. Davis*, 426 U.S. 229, 241-42 (1976); *Goldberg v. Whitman*, 743 F. Supp. 943 (D. Conn. 1990). Here, the impact of the FDA's action is alleged to be a diminution in the ability of

women to prevent unwanted pregnancies. Causing women to become pregnant by denying them wider access to EC clearly perpetuates outmoded stereotypes of women as childbearers, something government is barred from doing. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 131 (1994). Based on Plaintiffs' allegation that the FDA's action has no medical or scientific basis, (First Am. Compl. ¶ 53-54), the Court may reasonably infer that the intended purpose of the FDA's action is to disadvantage women.

Impermissible purpose may also be inferred from departures from the normal procedural sequence the agency follows. *Village of Arlington Heights v. Metro Housing Dev. Corp.*, 429 U.S. 252, 267-68 (1977). The FDA itself acknowledges that Dr. Galson, Director of the FDA's Center for Drug Evaluation and Research, does not usually sign regulatory action letters. "FDA's Decision Regarding Plan B: Questions and Answers," answer to Question 12, *available at* http://www.fda.gov/cder/drug/infopage/planB/planBQandA.htm (Ex. 5). According to one member of the advisory committee on Reproductive Health Drugs, the FDA's rejection of its advisory committee recommendations and review staff recommendations is nearly unprecedented. *See* Marc Kaufman, *Memo May Have Swayed Plan B Ruling: FDA Received 'Minority Report' From Conservative Doctor on Panel*, WASH. POST, May 12, 2005, at A2 (quoting W. David Hager), *also available at* http://www.washingtonpost. com/wp-dyn/content/article/2005/05/11/AR2005051101812_pf.html ("For only the second time in five decades, the FDA did not abide by its advisory committee opinion") (copy attached hereto as Ex. 6). These departures from normal agency process are indicators of invidious purpose.

In sum, the FDA's action is gender-based. Even if it is not, plaintiffs have alleged facts from which inferences can be drawn showing that the purpose of the FDA's action is to discriminate against and disadvantage women by depriving them of access to a means of

preventing pregnancy. Thus, the motion to for judgment on the pleadings as to Plaintiffs' Fourth

Cause of Action should also be denied.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's

Motion for Judgment on the Pleadings.

Dated: September 30, 2005                                Respectfully submitted,

                                                        s/Simon Heller_____
                                                        SIMON HELLER (SH-8760)
                                                        NAN E. STRAUSS (NS-3501)
                                                        Center for Reproductive Rights
                                                        120 Wall Street, 14th Floor
                                                        New York, NY 10005
                                                        (917) 637-3600

                                                        ATTORNEYS FOR PLAINTIFFS

                                                        ANDREA COSTELLO (AC-6197)*
                                                        SHELBI D. DAY (SD-2627)*
                                                        Southern Legal Counsel
                                                        1229 N.W. 12th Avenue
                                                        Gainesville, FL 32601
                                                        (352) 271-8890

                                                        ATTORNEY FOR PLAINTIFFS
                                                        TUMMINO, MAHONEY,
                                                        GIARDINA, MANGAN, SEGUIN,
                                                        TINNEY, BROWN, CHURCHILL,
                                                        AND HUNT

                                                        *Admitted Pro Hac Vice

# Exhibit 1

Office Director Memorandum
Office of Drug Evaluation V
Office of New Drugs
Center for Drug Evaluation and Research


Subject :   NDA 21-045, Plan B (levonorgestrel) proposing Rx to OTC switch
Applicant: Barr Laboratories/Women's Capital Corporation
Date:       January 21, 2004

Purpose: This memorandum provides for concurrence with the reviews of Dr.
Rosebraugh and Dr. Leonard Segal and non concurrence with the recommended
regulatory action by Dr. Chen. This is not a summary but serves to articulate my
regulatory review concerns.

Regulatory History and Background
Over the Counter (OTC) availability of contraception is a well established and long
standing regulatory category of products. Monographs promulgated pursuant to the
provisions of 21CFR 330.5 provide for a category of "Contraceptive Products". The
Advisory Panel Report (published  45 FR 82014, December 12, 1980) on OTC
Contraceptives and Other Vaginal Drug Products (the Panel) placed nonoxynol 9 in
category I (safe and effective).

The panel noted strong consumer interest in labeling communicating product
effectiveness and clearly supported contraceptives as an appropriate category of product
for widespread availability. There were no concerns cited in the report as to use by
teenagers.

In addition, the current edition of the Code of Federal Regulations, 21 CFR 310.545(28),
lists OTC vaginal contraceptive drug products approved as of October 22, 1998. These
include dodecaethylene glycol monolaurate (polyethylene glycol 600 monolaurate),
Laureth 10S, methoxypolyoxyethyleneglycol 550 laurate, phenylmercuric acetate,
phenylmercuric nitrate, and approved as of  November 5, 2002, octoxynol 9.  These
additional regulatory examples are cited as evidence of a consistent and unquestioned
record of regulatory precedent of contraception as an appropriate and established OTC
product category.

Emergency Contraception Regulatory History
Based on extensive medical literature, on February 25, 1997, FDA announced in a
Federal Register (FR) notice that certain combined oral contraceptives are safe and
effective for emergency contraception and requested the submission of NDAs for this
use. Of relevance to the concerns of this memo, this FR notice by the agency did address
any need for data specific to use in teenagers. The agency has subsequently approved
New Drug Applications (NDAs) for Preven and for Plan B in 1998 and 1999,
respectively.

A citizen's petition requesting Rx to OTC switch of emergency contraception products was submitted to the Agency by the Center for Reproductive Law and Policy on February 14, 2001. The agency has not issued a final response to this petition.

NDA 21-045 for Plan B, is the first NDA submitted for an oral contraceptive product for the indication of emergency contraception for OTC marketing.

Overview of Submission
NDA 21-045, Plan B, Rx to OTC switch NDA application
Emergency contraception is defined as a method of pregnancy prevention to be started within 72 hours after a contraceptive failure or unprotected intercourse. Plan B (levonorgestrel) was approved in 1999 for this indication as an Rx product. For the purposes of this submission for the switch to OTC marketing, there are no outstanding efficacy concerns given that the proposed dose is the same as that approved for the prescription product. The labeling comprehension and actual use studies submitted have been extensively reviewed by FDA reviewers in the OTC and Reproductive Drugs divisions as well as in a public advisory committee in December 2003.

Regarding safety, the NDA database, ODS review, medical literature, as well as data from foreign marketing evidence a high level of safety for use of this product and that the product has an acceptable risk to benefit for its proposed OTC use.

Discussion
Concern has been raised by Dr. Chen of the following:
> 1. That the contraceptive behavior evaluation in the Plan B Actual Use Study is insufficient to assess whether OTC accessibility of Plan B may be associated with the risky (or unsafe) sexual behaviors over the long-term, particularly in the teenage population.
>
> 2. The behavior study literature does not provide strong evidence to address the inadequacy of the actual use study in assessment of risky sexual behaviors in the target OTC populations.
>
> 3. Some behavior studies in literature suggest that the advance provision of emergency contraception tends to prompt unsafe sexual behaviors in study populations.

The issues cited spuriously raise the review standard for approval of this product and indeed any contraceptive product. The issues are speculative and unbalanced in their proposition for the following reasons. The totality of data submitted has demonstrated an acceptable level of benefit to risk. There is no basis on which to assume that young women of child bearing potential would suddenly become promiscuous because of this product. Indeed, the data submitted evidenced a decrease in sexual activity short term. Conversely, there is also no basis on which to assume that minimizing available

contraceptive options will lead to a decrease in sexual activity by young women of child bearing potential.

The reviewer does not define what the risky sexual behaviors of concern are. Does the reviewer take into account that high risk sexual behavior could include sexual intercourse without recourse for pregnancy prevention? In this instance, the lack of emergency contraception as an option could conceivably be viewed as increasing the risk of high risk sexual activity.

The reviewer, particularly given the focus on teenagers, also does not take into account the following: the societal benefit based on the reduction of abortions and unwanted pregnancies as well as the societal cost of the higher morbidity associated with pregnancy at a young age to both the mother and the fetus, or more broadly, the costs to society due to parents who are not prepared for the responsibilities of child rearing.

I am unable to identify evidence in the medical literature to support the assertion that the availability of contraception directly increases high risk sexual behavior. It is however well documented that high risk sexual behavior is largely rooted in a history of child abuse, partner violence and abuse, and societal complexities of poverty and circumstances of inadequate parental involvement. Plan B nor any contraceptive can address these issues but clearly, from a public health perspective, do have a place in minimizing unplanned pregnancies and abortions resulting from these tragic circumstances. Indeed the agency's regulatory mandate is not to regulate behavior or morality but to serve the public by ensuring that safe and effective products are made available for prescriber and patient choice.

With regard to sexually transmitted infections (STIs), again, the logic is flawed and speculative. The reviewer fails to address relevant issues ranging from condom failure to drug resistance. Furthermore, from a public health perspective, there is far graver consequence to a lack of pregnancy prevention options, as evidenced by HIV fetal transmission during pregnancy, than the hypothetical concern proposed by the reviewer.

The reviewer has in effect proposed a new and unusual regulatory standard for contraceptive drug products. Based on this standard, should the agency undertake a call for data requesting that all contraceptive products, OTC and Rx, must demonstrate that use of their product does not increase high risk sexual behavior by teenagers or STIs? How the agency would credibly work with sponsors to develop a Phase 4 study to address these issues in light of privacy concerns, for the individual and legally, defies conceptualization.

As to the findings of the actual use study, it is noted that the actual use data submitted is consistent with prior Agency findings of acceptability for OTC switch determination. Specific to Agency concerns on teenagers, the findings of the study did provide a sufficient representation of subjects in the lower age groups of women of childbearing potential who are sexually active. It is noted that incorrect use was <u>lower</u> among subjects 16 years and younger (13.6%) than in those 17 years and older (26.4%). There was also a

higher percentage of subjects in this age group who changed to a more effective contraception (28.6% vs. 10.5%). Although a difference was found in taking of the protocol specified timing for the second dose (75.9% vs. 93%) there was no evidence that the difference in timing of the second dose adversely impacted efficacy and the reduction of the risk of pregnancy in the study population for this subgroup.

In conclusion, the sponsor has adequately demonstrated that women of reproductive potential across relevant age subgroups can use the product appropriately. The data submitted by the sponsor meets statutory requirements for safe and effective use in an OTC setting. Given that conditions of safe and effective use for this product optimally require ease of availability, there is a compelling rationale that OTC availability is imperative to better ensure proper use of the product.

I am in agreement with the overwhelmingly favorable assessment and the majority votes to agency questions by the Joint Advisory Committee (Reproductive Drug Products and the Non-Prescription Drug Products, December 2003) that adequate data has been submitted to approve Plan B for OTC marketing with product labeling modifications added to address concerns raised at this advisory committee meeting and in the Agency reviews.

This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.

/s/

Jonca Bull
1/21/04 01:07:44 PM
MEDICAL OFFICER

# Exhibit 2

**washingtonpost.com**

# FDA Official Quits Over Delay on Plan B

Women's Health Chief Says Commissioner's Decision on Contraceptive Was Political

By Marc Kaufman
Washington Post Staff Writer
Thursday, September 1, 2005; A08

Advertisement



Save up to 75% on Last-Minute Cruises
CLICK HERE

The top Food and Drug Administration official in charge of women's health issues resigned yesterday in protest against the agency's decision to further delay a final ruling on whether the "morning-after pill" should be made more easily accessible.

Susan F. Wood, assistant FDA commissioner for women's health and director of the Office of Women's Health, said she was leaving her position after five years because Commissioner Lester M. Crawford's announcement Friday amounted to unwarranted interference in agency decision-making.

"I can no longer serve as staff when scientific and clinical evidence, fully evaluated and recommended for approval by the professional staff here, has been overruled," she wrote in an e-mail to her staff and FDA colleagues.

Crawford said last week that unresolved regulatory issues made it impossible to approve expanded use of the emergency contraceptive. Wood said the decision was widely seen in the FDA as political.

"Many colleagues have made it known that they are deeply concerned about the direction of the agency," she said in an interview.

Wood also said other FDA officials who are typically involved in important matters were kept in the dark about the contraceptive, called Plan B, until Crawford announced his decision, which she believed was made at higher levels in the administration. Wood said that when she asked a colleague in the commissioner's office when the decision would be made, the answer was, "We're still awaiting a decision from above; it hasn't come down yet."

In a statement, the FDA said Wood's resignation "is unfortunate as we work toward solving the complex policy and regulatory issues related to Plan B. . . . The FDA is committed to protecting and advancing women's health, and under Susan Wood's leadership, the agency has made significant strides."

Before coming to the FDA in 2000 in a civil service position, Wood was the director for policy and program development at the Department of Health and Human Services' Office on Women's Health, where she led the development of policy for the office, and recommended initiatives for the secretary and assistant secretary for health. She has also worked as a research scientist specializing in the biochemistry of smell at Johns Hopkins University.

Her FDA job description was to "be a champion for women's health."

The Plan B issue has become an emotional one both for advocates who believe that the contraceptive will reduce the number of unwanted pregnancies and abortions, and for opponents who believe that it will encourage teenage promiscuity and that, in some cases, its mode of action constitutes abortion.

The FDA and mainstream medical associations say Plan B, which is generally effective in preventing pregnancy if taken within 72 hours of a contraceptive failure or unprotected sex, prevents a pregnancy rather than ends one.

Religious conservatives and some members of Congress say that pregnancy begins with the fertilizing of the egg. They argue that anything that harms the resulting embryo amounts to abortion. Although Plan B generally works by preventing fertilization, researchers believe that in some cases it might keep a fertilized egg from implanting in the uterus.

Wendy Wright, policy director for Concerned Women for America and a critic of easier access to Plan B, welcomed Wood's resignation.

"Thank goodness there is now one less political activist at the FDA who puts radical feminist ideology above women's health," she wrote in a statement. "Now that Susan Wood has some free time on her hands, she can look at the studies from countries that have made the morning-after pill available without a prescription. She'll find it creates a public health hazard, with no decrease in pregnancies, no decrease in abortion, but a substantial increase in sexually transmitted diseases."

Plan B has been available as a prescription-only drug since 1999, and distributor Barr Laboratories Inc. applied in 2003 for permission to sell it over the counter. An FDA expert advisory panel voted 23 to 4 in favor of the switch, which agency staff members believe would significantly cut the number of abortions and unintended pregnancies.

The FDA rejected the application last year, however, saying it did not have enough information about the possible consequences on teenagers younger than 16. At the suggestion of FDA officials, Barr Labs filed a new application that would allow over-the-counter sales for women 17 and older and prescription-only sales for those younger than 17. Crawford said Friday that the proposed division by age poses "unique" regulatory problems that cannot be resolved without a formal rule-making, which could take years.

Crawford also said FDA scientists and executives had concluded that the drug could be safely sold over the counter.

Many supporters of the Plan B application -- including Sens. Hillary Rodham Clinton (D-N.Y.) and Patty Murray (D-Wash.) -- accused Crawford of making a political decision that ignored science and public health. The two senators were especially angry at Crawford's ruling because they had lifted a hold on his pending nomination based on promises, relayed by HHS Secretary Mike Leavitt, that the Plan B issue would be resolved by Sept. 1.

Clinton and Murray have accused the administration of breaking its promise, but Leavitt has disagreed. "The commitment was they would act," he told Reuters on Monday. "Sometimes action isn't always yes and no. Sometimes it requires additional thought."

© 2005 The Washington Post Company

Advertising Links                                                    What's this?

Save on All Your Calls with Vonage
When looking for local regional and long distance calling, use Vonage to make calls to all 50 states and Canada. Get voicemail, great international rates and more. Sign up today.
www.vonage.com

Refinance Rates Fall Again
Get $150,000 loan for $720 per month. Refinance while rates are low.
www.lowermybills.com

Compare Mortgage Offers
Up to four free mortgage, refinance or home equity offers - one easy form.
www.nextag.com

# Exhibit 3

NIGHTLINE THE MORNING AFTER ABC News Transcripts September 27, 2005 Tues

88 of 100 DOCUMENTS

Copyright 2005 American Broadcasting Companies, Inc.
ABC News Transcripts

**SHOW:** NIGHTLINE (11:35 PM ET) - ABC

September 27, 2005 Tuesday

**LENGTH:** 3670 words

**HEADLINE:** NIGHTLINE THE MORNING AFTER

**BODY:**

TED KOPPEL, ABC NEWS

September 27th, 2005. I'm Ted Koppel and this is "Nightline." Tonight, a small pill sets off a big debate.

DOCTOR, MALE

There's no doubt, there's no question about the safety of Plan-B.

DOCTOR DAVID HAGER, FDA ADVISORY PANEL,

My concern is for the women and unborn children in this country.

TED KOPPEL

In the battle over emergency contraception, did politics trump science?

DOCTOR

This is an example of political influence that's hijacked the FDA.

TED KOPPEL

At least one FDA official agrees. That's why she quit.

DOCTOR SUSAN WOOD,

FORMER FDA DIRECTOR OF WOMEN'S HEALTH OFFICE

This is contraception. It is not abortion. The only connection it has with abortion is that it can prevent them.

TED KOPPEL

Tonight, "the morning after," fighting over birth control.

graphics: the morning after

TED KOPPEL

(Off Camera) Perhaps because it's been called the morning-after pill, there's some genuine confusion as to what it does and does not do. So, let's begin by explaining what Plan-B, the other name by which the pill is known, let's begin by explaining what it is not. It is not the same thing at all as RU-486. I can see some of your eyes glazing over already. But a few years back, RU-486, which was developed in Europe and ultimately approved only by prescription here in the United States, was a raging political debate. It was, quite simply, a chemical abortion pill. Plan-B is not. In reality, it works just like a high-test birth control pill. But if taken as soon as possible, within 72 hours after intercourse, it prevents pregnancy by stopping the release of an egg from the ovary, or -and this is the controversial part, by preventing the implantation of a fertilized egg in the uterus. Plan-B has actually been available by prescription since 1999. Controversy arose four years later in 2003, when the drug's distributor tried to get the Food and Drug Administration to approve Plan-B for sale over the counter. A few weeks ago, and the event got lost in the Hurricane Katrina story, back at the end of August, the director of the FDA's office of women's health, resigned over the agency's decision to keep Plan-

NIGHTLINE THE MORNING AFTER ABC News Transcripts September 27, 2005 Tues

B from being sold over the counter. Susan Wood will be giving her first television interview tonight. But first, some more background from ABC News correspondent Lisa Stark.

LISA STARK, ABC NEWS

(Voice Over) In December 2003, two FDA advisory committees met to decide whether Plan-B, the morning-after pill, should be sold without a prescription. The vote was overwhelmingly in favor. 23-4.

LISA STARK

(Voice Over) The pill must be taken within 72 hours after intercourse to be effective. That's why advocates say it's important it be made over the counter, so a woman doesn't have to wait for her doctor to prescribe it.

DOCTOR DAVID HAGER

I am opposed, vote no.

LISA STARK

(Voice Over) Dr. David Hager is one of the four on the advisory panel who voted against Plan-B. An OB/GYN from Kentucky, Dr. Hager describes himself as pro-life.

DOCTOR DAVID HAGER

I did not feel comfortable at the time indicating that I favored over- the-counter sale with no age limitation whatsoever. A nine, 10-year- old could purchase the medication as easily as a 25-year-old.

LISA STARK

(Voice Over) After the vote, Dr. Hager said he was asked, he won't say by whom, to write a letter to the head of the FDA.

DOCTOR DAVID HAGER

I wrote a letter to the commissioner, just explaining my -my concerns to make sure that those had been conveyed to the commissioner's office.

LISA STARK

(Off Camera) In May 2004, the FDA, in essence, sided with Hager. In a rare move, it rejected the advice of both its panel and senior staff, citing concerns about usage among younger girls. The FDA told the manufacturer, Barr Pharmaceuticals, to reapply. Barr did that, asking the drug be made available over the counter for females 16 or over. Those younger would still need a doctor's prescription.

LISA STARK

(Voice Over) Five months later, speaking at a Christian college, Dr. Hager took some credit for that.

DOCTOR DAVID HAGER

I argued it from a scientific perspective. And God took that information and he used it through this minority report to influence a decision. You don't have to wave your bible to have an effect as a Christian in the public arena.

WENDY WRIGHT, CONCERNED WOMEN FOR AMERICA

I'm Wendy Wright with Concerned Women for America. And we're very disturbed by Plan-B's promoters emphasis on access, but not on women's safety.

LISA STARK

(Voice Over) Wendy Wright is with Concerned Women for America. Its mission is to bring "biblical principles into all levels of public policy." Her organization played a lead role in fighting to keep the drug prescription-only.

WENDY WRIGHT

This will end up making particularly minor girls more vulnerable to statutory rapists. A 40-year-old man can go in and buy this drug, give it to a 13-year-old girl in order to cover up and continue his sexual abuse of that girl.

NIGHTLINE THE MORNING AFTER ABC News Transcripts September 27, 2005 Tues

LISA STARK

(Voice Over) The FDA promised it would make a decision by January 2005. The deadline passed. At that point, Senators Hillary Rodham Clinton and Patty Murray decided to play hard-ball politics.

SENATOR PATTY MURRAY, DEMOCRAT, WASHINGTON

We said, the Senate will not approve Lester Crawford as FDA commissioner until he gives us a timeline for an answer on whether Plan-B will be approved as an over-the-counter drug.

SENATOR, MALE

The FDA has a very broad and critical mission in protecting the public health.

LISA STARK

(Voice Over) A deal was struck. Crawford was confirmed as FDA commissioner in July, after the FDA promised a decision on Plan-B by September 1st, more than two years after the original application was submitted. Meantime, Wendy Wright and her group kept up the pressure on the FDA.

WENDY WRIGHT

The FDA staff and the advisory committee did not look at the overall effect that making this drug easily available can end up having.

LISA STARK

(Off Camera) Is that their job? Or is their job to determine if a drug is safe and effective?

WENDY WRIGHT

When we are at an epidemic rate in the United States of STDs, we as a society need to be taking a more serious look at it.

DOCTOR DAVID HAGER

If a young woman chose to use emergency contraception, then would she not come in to see her physician for regular contraception prescription, to be screened for sexually transmitted infections, to have her pap smear?

LISA STARK

(Voice Over) On the last Friday in August, at 4:00 PM, the FDA made its announcement. It decided not to decide.

LESTER CRAWFORD, FDA COMMISSIONER

The agency is unable at this time to reach a decision on the approvability of the application because of these unresolved regulatory and policy issues that relate to the application we were asked to evaluate.

LISA STARK

(Voice Over) The FDA asked for another 60 days for public comment. Senator Murray was furious.

SENATOR PATTY MURRAY

Rather, it's been delayed and delayed and delayed. We are only left to wonder why. And the only answer I can come up with is politics.

WENDY WRIGHT

The FDA has shown that it's sensitive to the concerns of our society. And they have rightly looked beyond some ideologues within the medical community to see, how the public will be affected by this decision.

LISA STARK

(Off Camera) The final decision on Plan-B will be in the hands of a new FDA commissioner. Just last week, Lester Crawford resigned as head of the FDA. This is Lisa Stark for "Nightline," in Washington.

TED KOPPEL.

NIGHTLINE THE MORNING AFTER ABC News Transcripts September 27, 2005 Tues

(Off Camera) When we come back, I'll talk with Dr. Susan Wood, who headed the FDA's office of women's health, and who resigned from that post in protest.

graphics: abc news: nightline

ANNOUNCER

This is ABC News "Nightline." Brought to you by ...

commercial break

TED KOPPEL

(Off Camera) Susan Wood headed the office of women's health at the Food and Drug Administration for five years, until her resignation just about a month ago. She previously worked as a biochemist at Johns Hopkins University. And just to be sure that there's no confusion, why did you quit?

DOCTOR SUSAN WOOD

I quit because I felt that science was being overruled at FDA and women's health was being damaged.

TED KOPPEL

(Off Camera) Let's start with the first part. You're saying science was being -overruled. By whose definition?

DOCTOR SUSAN WOOD

I think by the definition of all the ways we've always done business at FDA, where science and the scientists and medical professionals at FDA are the ones who review the evidence and make a decision about whether a drug should be approved or not approved.

TED KOPPEL

(Off Camera) What's the question? What's the issue that was resolved?

DOCTOR SUSAN WOOD

Right. Well, in that case, it was about emergency contraception. It has been approved by prescription use for women of all ages. And has been caught up in delay after delay, even though there's consensus at the -amongst the scientists and health professionals there that it should be approved. Not just for prescription status, but more importantly for over-the-counter the status -over-the-counter status, so that women can have access to it when it's most effective to prevent an -unintended pregnancy and ultimately to prevent abortions.

TED KOPPEL

(Off Camera) What would you say are the main reasons that - and you, you call it the consensus. So, clearly, there were some scientists who did not agree. But the preponderance of scientists who voted on this did agree.

DOCTOR SUSAN WOOD

Well -I would actually still call it a consensus. Because the scientists you're referring to who didn't agree were part -were the few of the advisory committee made up of outside experts. They voted, a preponderance, to bring it over the counter and that it was safe and effective for women to use over the counter. What then happened ...

TED KOPPEL

(Off Camera) Do you remember what the vote was?

DOCTOR SUSAN WOOD

It was 23-4, I believe, in favor. And unanimous that it was safe for women to use over the counter.

TED KOPPEL

(Off Camera) And within the FDA?

DOCTOR SUSAN WOOD

NIGHTLINE THE MORNING AFTER ABC News Transcripts September 27, 2005 Tues

Within the FDA -FDA does overturn its advisory committees on occasion. And sometimes -and usually when they do so, it's for good reason. In this case, the FDA staff, at every level within the agency, multiple levels, agreed that it should be approved for over- the-counter status. And agreed that it was appropriate for women to have access in a timely manner, so it would actually work more effectively.

TED KOPPEL

(Off Camera) You keep saying women. I gather that some of the controversy has to do with girls. If I have to go or if my daughter has to go to our physician, to her physician and the physician has to write a prescription, there is at least a -a barrier between her using it recklessly and using it in the way that it should be used.

DOCTOR SUSAN WOOD

I don't -this product is very safe. There's not much concern that it will cause -as a safety issue. The question that was raised, by a very small part of the agency, was whether or not they could understand the label and use it properly. But we've never asked that question about any other product. We don't ask it about pain medication. We don't ask it about cold medication. We don't ask it about condoms or any other contraceptive method that's available over the counter. This is very, very safe. There's no question about its safety. There's no question that it's more effective if it's used within hours not within days.

TED KOPPEL

(Off Camera) Clearly, there is a -there is a distinction between a normal contraceptive, I mean, a pill that can be used as a contraceptive, which has to be taken before the act of sex and Plan-B, which is designed to be taken after.

DOCTOR SUSAN WOOD

And that's, that's really the central difference, is the timing. It works in a mechanism very similar to many other birth control pills. The mechanism is very similar, it just has to be taken after. And the sooner you take it after, the more effective. If you need it on Saturday morning, waiting until you get to a physician, either by phone or in person, to get a prescription by Monday morning, it's too late and it doesn't work. And the worst thing that can happen is that you would have an unintended pregnancy.

TED KOPPEL

(Off Camera) You can understand that those who are concerned about it on moral grounds would argue that by making a pill like this available to an underage teenager, 15, 16-year-old, you could be encouraging reckless sex. The knowledge that even after you've had sex, it is still possible, then, to take a pill that will prevent a pregnancy is likely to make the sexual act more not less likely.

DOCTOR SUSAN WOOD

Actually there's no evidence to that effect. And in fact, there's evidence to the contrary. That it doesn't change your contraceptive behavior. It doesn't change sexual behavior, even in teens.

TED KOPPEL

(Off Camera) How -how do we know?

DOCTOR SUSAN WOOD

There are studies that have been reviewed not just by me but by, again, all of the outside experts on the advisory committee and all of the staff within FDA. And they examined that issue very carefully and came to the conclusion that there is no good evidence to be concerned about that. And in fact, what you want to do is prevent an unintended pregnancy and prevent the abortions, which is, again, common ground. I think the issue around teens and sexual behavior, we have to look at what's already available. There are other contraceptive methods on the market. We know that increased access to contraception doesn't change behavior. What it does change is the risk of an unintended pregnancy.

TED KOPPEL

(Off Camera) All right. There are political consequences to making this drug available over the counter. And I get the sense that political pressure may have been behind what happened or at least that you perceive it that way. Let's take a short break. When we come back, we'll talk about that. Back with Dr. Wood in a moment.

NIGHTLINE THE MORNING AFTER ABC News Transcripts September 27, 2005 Tues

commercial break

TED KOPPEL,

(Off Camera) And I'm back again with Dr. Susan Wood. Would it be fair to say that you felt that the decision the FDA made was not on the basis of science, but made on the basis of political pressure?

DOCTOR SUSAN WOOD

I have to agree with the first half of your sentence. I can only tell you what I observed. And that was, it was not made on the basis of the scientific and medical evidence. And not just me but all of the scientific and professional staff who normally are the part of the decision-making at the agency, because they're the ones who review the evidence and evaluate it and make the recommendations, they also were cut out of the decision. People who should have known and should have been part of the decision-making, were not in the room and were not aware of what the decision was until very late in the process.

TED KOPPEL

(Off Camera) Forgive me, I think you're being a little coy. If it - if it wasn't made on the basis of scientific evidence, other than political pressure, what can you think of as having been a reason that would have caused the FDA to make the decision it made?

DOCTOR SUSAN WOOD

And I'm -I'm really trying not to be coy. But my problem is, is I don't really understand why we couldn't see this as common ground. I honestly was very hopeful that this would get approved in one fashion or another. Either through having prescription status for younger women and nonprescription for older. But some way it would be approved because the science was so compelling and the evidence is so clear. And it's common ground. This is contraception. It is not abortion. The only connection it has with abortion is that it can prevent them. So, honestly, and perhaps I'm na<ve, but honestly, I was hopeful that the science would win out and the health of women and families would win out. And so, when it didn't, I can only say what I saw, which we were out of it. And I'm - and I'm still surprised.

TED KOPPEL.

(Off Camera) No, I get that. I understand that. What other possible reason can there have been then that someone brought pressure to bear, which I describe as political. But if you have some other description, tell me what it is.

DOCTOR SUSAN WOOD

Well, I won't disagree with you on that point. 'Cause I honestly don't know where it came from, either. And so, it must have come from somewhere. But because I'm a scientist, I tend to try to say, what do I know? And I honestly don't know but I won't disagree with you that it must have come from somewhere else.

TED KOPPEL

(Off Camera) Wasn't there nearly -or indeed, I think that Senator Kennedy - I mean, Senator Clinton, in particular, believed that there was a deal, that a deal had been made? What was the nature of that deal? And do you have any, any understanding as to why that deal collapsed?

DOCTOR SUSAN WOOD

Well, it sounded like semantics to me. I mean, I know as much about the deal as -from what I read in the newspapers. Was that Secretary Leavitt and Commissioner Crawford had agreed to take an action. And they did take an action. So, technically, they were correct. They took an action, which was a delay.

TED KOPPEL.

(Off Camera) Clearly not the action that Senator Clinton suspected.

DOCTOR SUSAN WOOD

Not the action suspected, which was a decision. And there was no decision made here, technically. But I would argue that the decision to delay approval of this product over-the-counter is, in fact, a denial. And this is, again, in part why I resigned. Because by couching it as a delay and a non-decision, in fact denied women of all ages, not just teens but women of all ages access to timely use of this product.

NIGHTLINE THE MORNING AFTER ABC News Transcripts September 27, 2005 Tues

TED KOPPEL

(Off Camera) If you had thought that it was a brief delay, in other words, if you thought it was only going to be a delay of a couple of months, you wouldn't have resigned.

DOCTOR SUSAN WOOD

Probably not.

TED KOPPEL

(Off Camera) So, you obviously think that what we're talking about here is not really a delay but a way of shelving it and not dealing with the issue.

DOCTOR SUSAN WOOD

Right. The mechanism is a rather bureaucratic one to potentially open it up to rulemaking. Which, to make a long story short, means opening up to a process that usually takes many months to years, if in fact that's the way they go.

TED KOPPEL

(Off Camera) And you're saying that insofar as health is concerned, insofar as the impact of this physically and psychologically is concerned, there's no difference between this and a rubber condom?

DOCTOR SUSAN WOOD

It's -I would have to compare it to oral contraceptives or in terms of its availability, to a condom, or spermicides or the today sponge.

TED KOPPEL

(Off Camera) Right. Are oral contraceptives - just help me out, are they available over the counter?

DOCTOR SUSAN WOOD

No. And there's an ongoing debate about that. But they're not needed on an emergency basis. They're effective on chronic use, over long periods of time. For emergency contraception, we're talking about single use of a product that's very, very safe and needs to be taken very, very quickly. Within hours to make it most effective.

TED KOPPEL

(Off Camera) Else the young lady will be pregnant?

DOCTOR SUSAN WOOD

She certainly will be at-risk of that, yes.

TED KOPPEL

(Off Camera) But you can understand how certain people who are worried about the moral impact of this will say, look, the next step then is going to be these same people who are pushing Plan-B are gonna also be pushing oral contraceptives as also being available over the counter because the same logic that apply applies, not exactly but the same logic, you want to prevent pregnancy, you want to prevent the consequences of unwanted pregnancy, let's have contraception all around.

DOCTOR SUSAN WOOD

I think at this point, the focus is on emergency use. When you need it right away and can't wait for prescription. And there are many women and girls who don't have regular access to a physician or place of regular health care. Look at the uninsured, just as a start. And we have to make sure that they are not the ones put at-risk simply because of the barrier of getting to a physician, getting a prescription, and then getting it filled, all within a window of time that will be essentially closing on them, in terms of making sure it's effective.

TED KOPPEL

(Off Camera) What are you doing now?

DOCTOR SUSAN WOOD

NIGHTLINE THE MORNING AFTER ABC News Transcripts September 27, 2005 Tues

Well, when I left the agency, I didn't have a plan. And I certainly didn't expect this kind of attention from national and international media. So, what I'm doing now is, is thinking about talking to people. Because I feel so strongly about the importance of science being what drives our health decisions. It's so important to people in their everyday lives. So, I'm continuing to try and figure out a way to tell people about that, as well as to keep working in, in health policy, to help women and families.

TED KOPPEL

(Off Camera) Dr. Wood, good of you to come in. Enjoyed having you here, thank you.

DOCTOR SUSAN WOOD

Thank you.

TED KOPPEL

(Off Camera) I'll be back in a moment with a word about tomorrow's "Nightline."

graphics: nightline: abcnews.com

ANNOUNCER

To receive a daily e-mail about each evening's "Nightline" and a preview of special broadcasts, log on to the "Nightline" page at Abcnews.com.

commercial break

TED KOPPEL

(Off Camera) Tomorrow on "Nightline," do you know what your kids are eating in school these days? The naked chef puts on some clothes, crosses the Atlantic and starts another revolution.

CHEF, MALE

If you truly love your kid, it doesn't matter where I come from or who I am. Because, you know, you should be trying to do the best of your kids.

TED KOPPEL

That's "Nightline" tomorrow. And that's our report for tonight. I'm Ted Koppel in Washington. For all of us here at ABC News, good night.

LANGUAGE: ENGLISH

LOAD-DATE: September 28, 2005

# Exhibit 4

Case 1:05-cv-00366-ERK-VVP    Document 45-2    Filed 10/07/05    Page 65 of 98 PageID #: 363



# The NEW ENGLAND JOURNAL of MEDICINE

HOME | SEARCH | CURRENT ISSUE | PAST ISSUES | COLLECTIONS | HELP

Access via PAY PER ARTICLE | Subscribe

---

**PERSPECTIVE**

◄ Previous   Volume 353:1197-1199   September 22, 2005   Number 12   Next ►

# A Sad Day for Science at the FDA

*Alastair J.J. Wood, M.D., Jeffrey M. Drazen, M.D., and Michael F. Greene, M.D.*

The Food and Drug Administration (FDA) has again postponed issuing a decision about making emergency contraception available to women without a prescription. This decision — or nondecision — deserves serious scrutiny, since it appears to reflect political meddling in the drug-approval process.

Emergency contraception in the form of Plan B has been available by prescription in the United States since 1999, but its manufacturer, Barr Laboratories, has proposed that it be sold over the counter. Plan B consists of two 0.75-mg levonorgestrel tablets to be taken 12 hours apart as soon as possible, and within 72 hours, after an act of unprotected or inadequately protected intercourse. Time is of the essence, since the contraceptive efficacy decreases over time even within the recommended 72 hours after intercourse. The risk of pregnancy increases from 0.4 percent if contraception is initiated within 24 hours to 2.7 percent if it is initiated 48 to 72 hours after intercourse.

Currently, after an episode of unprotected intercourse, contraceptive failure, or rape, a woman has to recognize the availability of emergency contraception, find and make contact with an available physician who is willing and able to prescribe Plan B, obtain a prescription for the drug, find a pharmacy that stocks and will dispense it (not a trivial consideration in some parts of the country), fill the prescription at the pharmacy, and ingest the drug — all while the time window for efficacy is closing. Unprotected intercourse may occur at times — for instance, weekends — when it is likely to be difficult to reach a physician, particularly for women who do not have an ongoing relationship with a particular doctor. It therefore seemed logical to consider making Plan B available over the counter, as it is in many other countries.

After the manufacturer requested over-the-counter status, the FDA convened an advisory committee meeting in December 2003. The committee, made up of experts both in obstetrics–gynecology and in over-the-counter drug availability, voted overwhelmingly (23 to 4) that emergency contraception should be made available to

THIS ARTICLE

► PDF
► PDA Full Text

TOOLS & SERVICES

► Add to Personal Archive
► Add to Citation Manager
► Notify a Friend
► E-mail When Cited
► E-mail When Letters Appear

MORE INFORMATION

► Find Similar Articles
► PubMed Citation

Case 1:05-cv-00366-ERK-VVP    Document 45-2    Filed 10/07/05    Page 66 of 98 PageID #: 364

U.S. women over the counter. Even the small number who voted against over-the-counter status acknowledged at the time that they did so for reasons other than concern about its demonstrated efficacy or safety. Yet these are the only legitimate considerations for FDA approval. The committee reviewed the world literature, heard presentations of all points of view, and came to a conclusion, which under normal circumstances would have been accepted by the FDA. Subsequently, the FDA's own professional staff endorsed that conclusion and recommendation.

However, FDA management rejected the application in May 2004, citing concerns about the effects of over-the-counter availability on the sexual behavior of young teenagers. Data demonstrating that ready access to Plan B by adolescents as young as 15 did not lead to increased irresponsible sexual behavior were available in December 2003 and had been reviewed by the advisory committee. Moreover, the agency was conspicuously unable, then or later, to cite any data to support different safety or efficacy profiles in different age groups — a damning indictment of the basis for their disapproval.

After the May 2004 decision, a dual marketing plan was suggested: the drug could be made available over the counter to women over 16 and only by prescription below that age. In a surreal twist, however, the FDA commissioner seems to have belatedly discovered that the FDA has never before allowed two identical dosage formulations to be sold simultaneously over the counter and by prescription. Owing to his apparent ignorance of this problem, the approval has again been delayed to allow a 60-day comment period so that the dual-status issue can be addressed. It is, frankly, not credible to us that the commissioner and his staff did not recognize this problem when they initially floated the idea of age-restricted over-the-counter marketing. The problem was widely recognized and has been a major strategic issue for pharmaceutical companies that are switching drugs from prescription to over-the-counter status.

Why is the FDA considering age-based restrictions on the over-the-counter availability of emergency contraception? The stated reason is that there is uncertainty about the drug's safety in younger women. But the FDA has not pointed to any data to support that position, nor has the agency demanded such evidence in the case of other drugs that have been switched to over-the-counter status. All involved acknowledge that Plan B is extraordinarily safe. Even the advisory committee members who subsequently voted against its over-the-counter availability had acknowledged its appropriate safety earlier at the December 2003 meeting, when the committee voted 28 to 0 that the drug was safe.

In contrast, other over-the-counter drugs, such as acetaminophen and aspirin, can cause death when taken inappropriately. At a meeting of a similar FDA advisory committee, data were presented indicating that acetaminophen ingestion results in 56,680 emergency-department visits, 26,256 hospitalizations, and 458 deaths in the United States every year; a large number of these events affect persons younger than 17 years of age.[1] The FDA has shown no inclination to restrict the availability of these drugs to young people by requiring them to have a prescription. Why not?

Studies presented to the advisory committee at its meeting about Plan B and additional studies published more recently demonstrate clearly that women given ready access to emergency contraception do not

Case 1:05-cv-00366-ERK-VVP Document 45-2 Filed 10/07/05 Page 67 of 98 PageID #: 365

routinely use less effective regular contraception, do not engage more often in high-risk sexual behavior, do not become more promiscuous, and do not have increased rates of pregnancy or sexually transmitted diseases — all findings that contradict claims made by those outside the FDA who oppose wider availability of emergency contraception.

Although the real reason behind the attempts to introduce an age restriction on Plan B are at best unclear, the effect would be to intimidate women of all ages. The only way to enforce such a restriction would be to insist that all those attempting to purchase emergency contraception provide proof of age — that they be "carded," or required to produce a driver's license or other government-issued identification. The provision of such identification to a store clerk, who might be the customer's peer, could be humiliating, and in destroying any semblance of privacy, such a requirement would deter women from purchasing emergency contraception.

Imagine the scene at the checkout counter: with a line of impatient customers waiting behind you, you must show an identification card to a sales clerk in order to purchase a product that clearly reveals your exposure to unprotected intercourse during the past few hours. If chain pharmacies followed the rules they have used for beer and cigarettes (whose sales are currently subject to similar age restrictions), only clerks over a certain age would be allowed to authorize sales — which would delay the purchase even longer and expose the purchaser to further embarrassment. Moreover, many potential users of all ages — particularly poor women and those from inner-city neighborhoods — have no driver's licenses. Such women would not be able to obtain emergency contraception even if they were older than the arbitrary age limit set by the FDA.

Finally, it is likely that because of the age restrictions, many pharmacies would choose to hold their entire stock of Plan B "behind the counter" to ensure that all purchasers had to document their eligibility. American women should not have to explain their need for such a product in public, in front of their neighbors and friends, at such a painful, frightening, and vulnerable time.

This is a sad day for American women and for the FDA. In the absence of data to support their original decision to reject the advice of their advisory committee and their own staff analysts, one can only speculate about the real reason for the actions of the agency's leadership. Their subsequent delays, dissembling, and shifting justifications of their regulatory maneuvering and manipulation have resulted in the resignation of Susan F. Wood, the assistant FDA commissioner for women's health and director of the agency's Office of Women's Health. Wood's departure is a statement of protest against the decision by the FDA management to bow to political pressure at the expense of women's health.

The FDA has, on occasion, been criticized for being too bureaucratic and slow to approve important new drugs, too quick to approve new drugs to please the corporate patrons who provide much of its budget, and too slow to withdraw drugs that seem to pose a danger to public health. But the agency has previously resisted political pressure to reflect a particular social policy or ideology. The recent actions of the FDA leadership have made a mockery of the process of evaluating scientific evidence, disillusioned many of the participating scientists both inside and outside the agency, squandered the public trust, and tarnished the agency's image. American women and the dedicated professionals at the FDA deserve better. Will we ever

again be able to believe in the FDA's independence?

## Source Information

Dr. Wood is a professor of medicine and pharmacology at Vanderbilt University School of Medicine, Nashville, and was a member of the FDA Advisory Committee on Nonprescription Drugs; Dr. Drazen is the editor-in-chief of the *Journal*; and Dr. Greene is an associate editor of the *Journal* and was a member of the FDA Advisory Committee on Reproductive Health Drugs.

## References

1. Nonprescription Drugs Advisory Committee. (Accessed September 1, 2005, at http://www.fda.gov/ohrms/dockets/ac/cder02.htm#NonprescriptionDrugs.)

# This article has been cited by other articles:

- Tanne, J. H. (2005). FDA official resigns over emergency contraception decision. *BMJ* 331: 532-532 [Full Text]

**THIS ARTICLE**

► PDF
► PDA Full Text

**TOOLS & SERVICES**

► Add to Personal Archive
► Add to Citation Manager
► Notify a Friend
► E-mail When Cited
► E-mail When Letters Appear

**MORE INFORMATION**

► Find Similar Articles
► PubMed Citation

HOME | SEARCH | CURRENT ISSUE | PAST ISSUES | COLLECTIONS | HELP

Comments and questions? Please contact us.

The New England Journal of Medicine is owned, published, and copyrighted © 2005 Massachusetts Medical Society. All rights reserved.

# Exhibit 5



FDA Home Page | CDER Home Page | CDER Site Info | Contact CDER | What's New @ CDER

| CDER Home | About CDER | Drug Information | Regulatory Guidance | CDER Calendar | Specific Audiences | CDER Archives |

Search [          ] GO | powered by Google™

## FDA's Decision Regarding Plan B: Questions and Answers

### 1. What is emergency contraception?

Emergency contraception is a method of preventing pregnancy to be used after a contraceptive fails or after unprotected sex. It is not for routine use. Drugs used for this purpose are called emergency contraceptive pills, post-coital pills, or morning after pills. Emergency contraceptives contain the hormones estrogen and progestin (levonorgestrel), either separately or in combination. FDA has approved two products for prescription use for emergency contraception – Preven (approved in 1998) and Plan B (approved in 1999).

### 2. What is Plan B?

Plan B is emergency contraception, a backup method to birth control. It is in the form of two levonorgestrel pills (0.75 mg in each pill) that are taken by mouth after unprotected sex. Levonorgestrel is a synthetic hormone used in birth control pills for over 35 years. Plan B can reduce a woman's risk of pregnancy when taken as directed if she has had unprotected sex. Plan B contains only progestin, levonorgestrel, a synthetic hormone used in birth control pills for over 35 years. It is currently available only by prescription

### 3. How does Plan B work?

Plan B works like other birth control pills to prevent pregnancy. Plan B acts primarily by stopping the release of an egg from the ovary (ovulation). It may prevent the union of sperm and egg (fertilization). If fertilization does occur, Plan B may prevent a fertilized egg from attaching to the womb (implantation). If a fertilized egg is implanted prior to taking Plan B, Plan B will not work.

### 4. What steps did FDA take in considering switching Plan B from prescription to nonprescription (over-the-counter (OTC)) status?

FDA received an application to switch Plan B from prescription to nonprescription status. FDA staff reviewed the scientific data contained in the application which included among other data, an actual use study and a label comprehension study.

On December 16, 2003, we held a public advisory committee meeting with a panel of medical and scientific experts from outside the federal government. The members of the Nonprescription Drugs Advisory Committee and the Advisory Committee for Reproductive Health, met jointly to

consider the safety and effectiveness data of nonprescription use of Plan B. Although the joint committee recommended to FDA that this product be sold without a prescription, some members of the committee, including the Chair, raised questions concerning whether the actual use data were generalizable to the overall population of nonprescription users, chiefly because of inadequate sampling of younger age groups.

Following the advisory committee meeting, FDA requested additional information from the sponsor pertaining to adolescent use. The sponsor submitted this additional information to FDA in support of their pending application to change Plan B from a prescription to an over-the-counter product. This additional information was extensive enough to qualify as a major amendment to the NDA. Under the terms of the Prescription Drug User Fee Act (PDUFA) performance goals, major amendments such as this may trigger a 90-day extension of the original PDUFA deadline.

Now FDA has completed its review of the supplemental application and concluded that the application could not be approved at this time because 1) adequate data were not provided to support a conclusion that young adolescent women can safely use Plan B for emergency contraception without the professional supervision of a licensed practitioner and 2) a proposal from the sponsor to change the requested indication to allow for marketing of Plan B as a prescription-only product for women under 16 years of age and a nonprescription product for women 16 years and older was incomplete and inadequate for a full review. Therefore, FDA concluded that the application was not approvable.

### 5. Why didn't FDA follow the recommendation of the Advisory Committees?

The recommendations of FDA advisory committees are advisory in nature and the Agency is not bound to follow their recommendations. FDA makes a decision on whether a product should be approved after evaluating all data and considering the recommendations of the advisory committee.

### 6. Why did FDA issue a Not Approvable letter?

The agency issued a Not Approvable letter because the supplemental application did not meet the criteria for approval in that it did not demonstrate that Plan B could be used safely by young adolescent women for emergency contraception without the professional supervision of a licensed practitioner. The issuance of a Not Approvable letter does not mean that a supplemental application cannot be approved. The Not Approvable letter describes what the applicant would need to do to obtain approval for the supplemental application. In this case, the applicant would have to either provide additional data demonstrating that Plan B can be used safely by women under 16 years of age without the professional supervision of a practitioner licensed by law to administer the drug or provide additional support for the revised indication to allow for marketing Plan B as prescription-only for women under the age of 16 and as nonprescription for women 16 years of age and older  Not Approvable Letter.

### 7. Was there a difference of opinion within the Center for Drug Evaluation (CDER) and Research regarding the final decision?

Yes, there was a difference of opinion within CDER. The scientific interchange of ideas is widely encouraged during the review process to ensure a thorough vetting of the issues. However,

ultimately, a final decision must be made based on the evaluation of the data, taking into account all of the views expressed.

**8. Is this FDA's final decision regarding the availability of Plan B for OTC use?**

No. The Not Approvable letter to the sponsor outlines what the sponsor must do to obtain approval of the supplemental application.

Wide availability of safe and effective contraceptives is important to public health. We look forward to working with the sponsor if they decide to pursue making this product available without a prescription.

**9. Oral contraceptives have been used for four decades, and this product has been approved and used safely since 1999. How could FDA turn it down?**

Oral contraceptives as a class of drugs are only available by prescription. This product has been used safely by prescription only and for the reasons already stated, it is not being made available for OTC use at this time.

**10. The sponsor has talked about making the product over-the-counter for young women over a certain age and behind-the-counter for younger girls. Is there evidence to support such a scheme? Does FDA have the authority to carry it out?**

The sponsor has submitted a plan and the FDA is examining its regulatory authority to approve a product marketed in this manner.

**11. Did the FDA bow to political pressure in making this decision?**

No. This decision was made within the Center for Drug Evaluation and Research.

**12. Dr. Steven Galson signed the letter FDA sent to the sponsor. Does Dr. Galson usually sign such letters? Why did Dr. Galson sign the letter?**

No, Dr. Galson does not usually sign regulatory action letters. However, his opinion of the adequacy of the data in young adolescents differed from that of the review staff. He believes that additional data are needed and for that reason he made the decision to take final action within the Office of the Center Director.

⬆ Back to Top    ↖ Back to Plan B

Date created: May 7, 2004

_____

CDER Home Page | CDER Site Info | Contact CDER | What's New @ CDER
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility | HHS Home Page

FDA/Center for Drug Evaluation and Research

# Exhibit 6

washingtonpost.com
# Memo May Have Swayed Plan B Ruling
FDA Received 'Minority Report' From Conservative Doctor on Panel

By Marc Kaufman
Washington Post Staff Writer
Thursday, May 12, 2005; A02

Soon after the Food and Drug Administration overruled its advisory panel last year and rejected an application to make an emergency contraceptive more easily available, critics of the agency said it had ignored scientific evidence and yielded to pressure from social conservatives.

The agency denied the charge, but an outspoken evangelical conservative doctor on the panel subsequently acknowledged in a previously unreported public sermon that he was asked to write a memo to the FDA commissioner soon after the panel voted 23 to 4 in favor of over-the-counter sales of the contraceptive, called Plan B. He said he believes his memo played a central role in the rejection of that recommendation.

The new information comes from a videotaped sermon in October by W. David Hager. On the tape, he said he was asked to write a "minority report" that would outline why over-the-counter sales should be rejected.

Speaking at the Asbury College chapel in Wilmore, Ky., Hager said, "I was asked to write a minority opinion that was sent to the commissioner of the FDA. For only the second time in five decades, the FDA did not abide by its advisory committee opinion, and the measure was rejected."

Hager told the group that he had not written his report from an "evangelical Christian perspective," but from a scientific one -- arguing that the panel had too little information on how easier availability of Plan B would affect girls younger than 16. The FDA later cited that lack of information as the reason it rejected the application.

"I argued from a scientific perspective, and God took that information, and he used it through this minority report to influence the decision," Hager said. "Once again, what Satan meant for evil, God turned into good."

The videotape of Hager's sermon was first obtained by the magazine the Nation, which published a story about the doctor today.

In an e-mail to The Washington Post, Hager said the request for the report came from "outside the agency," but he had previously told two other journalists -- in one case in an e-mail that the recipient saved -- that the request came from an FDA staff member.

An FDA spokeswoman said yesterday that the agency did not ask Hager to write a report and that Hager sent what she called a "private citizen letter" to Commissioner Mark McClellan. "We don't ask for minority reports and opinions," she said. "I've been advised that nobody from the FDA asked him to write the letter."

Hager has been a highly controversial figure because of his strong views against abortion and emergency contraception and in favor of abstinence education. In his October sermon, he said that Christians such as himself were at "war" with

people who would take faith and values out of medical care.

Hager was appointed by the FDA to the Reproductive Health Drugs Advisory Committee in 2002 and reappointed last year. A prominent Kentucky obstetrician and gynecologist, he has written numerous books on women's health -- generally from an evangelical Christian perspective.

In his October sermon, Hager said that White House officials called him in June 2001 and asked him to serve in some capacity -- initially as a candidate for surgeon general and later as a member of two advisory boards. After one month, Hager said, he was called by the White House and asked to resign from those committees and join the FDA's reproductive drugs panel instead because "there are some issues coming up we feel are very critical, and we want you to be on that advisory board."

While the FDA sometimes rejects the recommendations of its expert panels, the Plan B case was highly unusual in that the vote was so lopsided in favor of over-the-counter sales and its own science staff had also strongly favored approval.

Plan B has been available with a prescription since 1999. Barr Laboratories, its manufacturer, applied for permission to sell it without a prescription in 2003, arguing that it could reduce the number of abortions from unintended pregnancies. Emergency contraception generally works if it is used within 72 hours of unprotected sex.

Social conservatives in Congress, and many others opposed to abortion, have spoken out against the Plan B application, saying it would encourage unsafe sexual behavior.

Barr submitted a modified application in July 2004, and the agency was supposed to announce its decision in January. Instead, it said it needed more time.

© 2005 The Washington Post Company

THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

ANNIE TUMMINO, et al.

                      Plaintiffs,

v.

ANDREW C. VON ESCHENBACH, in his official capacity as
acting commissioner of the Food and Drug Administration,

                      Defendant.

-----------------------------------------------------------------------X

**No. 05-CV-366 (ERK/VVP)**

(Korman, C.J)
(Pohorelsky, M.J.)

## CERTIFICATE OF SERVICE

I, Simon Heller, hereby certify that on September 30, 2005, Plaintiffs served a copy of

Opposition to Defendant's Motion for Judgment on the Pleadings and accompanying exhibits via

electronic mail and Federal Express on the following:

F. Frank Amanat
Assistant U.S. Attorney
Eastern District of New York
147 Pierrepont Street
Brooklyn, NY 11201
718-254-6024
Franklin.Amanat@usdoj.gov

I also certify that Plaintiffs served two copies of the videocassette exhibit, designated as

Exhibit 3a, on Mr. Amanat at the above address via Federal Express. An additional copy of

Exhibit 3a was sent to opposing counsel and will be filed with the Court by Mr. Amanat when

the briefing is completed.

\\

\\

Dated: September 30, 2005                      Respectfully submitted,

                                               s/ Simon Heller
                                               SIMON HELLER (SH-8760)
                                               NAN E. STRAUSS (NS-3501)
                                               Center for Reproductive Rights
                                               120 Wall Street, 14th Floor
                                               New York, NY 10005
                                               (917) 637-3600

                                               ATTORNEYS FOR PLAINTIFFS

                                               ANDREA COSTELLO (AC-6197)*
                                               SHELBI D. DAY (SD-2627)*
                                               Southern Legal Counsel, Inc.
                                               1229 N.W. 12th Avenue
                                               Gainesville, FL 32601
                                               (352) 271-8890

                                               ATTORNEY FOR PLAINTIFFS
                                               TUMMINO, MAHONEY, GIARDINA,
                                               MANGAN, SEGUIN, TINNEY, BROWN,
                                               CHURCHILL AND HUNT

                                               *Admitted Pro Hac Vice

# Exhibit B

THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

ANNIE TUMMINO, et al.

Plaintiffs,

v.

LESTER M. CRAWFORD, in his official capacity as
acting commissioner of the Food and Drug
Administration,

Defendant.

---------------------------------------------------------------X

**No. 05-CV-366 (ERK/VVP)**

(Korman, C.J.)
(Pohorelsky, M.J.)

## Plaintiffs' First Set of Interrogatories

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure Plaintiffs hereby propound the following interrogatories to be answered by Defendant in writing and under oath not later than September 16, 2005, and the answers are to be signed by the person making them.

## Definitions and Instructions

1. The "Uniform Definitions in Discovery Requests" set forth in Local Rule 26.3 are hereby incorporated by reference.

2. "Including" shall mean including but not limited to.

3. The term "agency" means the United States Food and Drug Administration.

4. The term "Citizen's Petition" means the Citizen's Petition filed on February 14, 2001, under docket number 001P-0075/CP 1.

5.  Your answer must include all information concerning the matters inquired about available to you, your attorney or attorneys or other agents, and to investigators or other agents for you and your attorney or attorneys.

6.  If you cannot answer these interrogatories fully and completely after exercising due diligence to make inquiry and secure the information necessary to do so, please so state and answer each such interrogatory to the fullest extent possible, specify the portion of the interrogatory that you claim to be unable to answer fully and completely, state the facts upon which you rely to support your contention that you are unable to answer the interrogatory fully and completely, and state what knowledge, information or belief you have concerning the unanswered portion of each such interrogatory.

7.  If you object to these interrogatories, or any part thereof, based on the claim of privilege or any other claim, describe the nature and basis of your claim and the information withheld in a manner sufficient to:  (a) disclose facts upon which you rely in asserting your claim; (b) permit the grounds and reasons for withholding the information to be unambiguously identified; and (c) unambiguously identify the information to be withheld.

8.  These interrogatories shall be deemed to be continuing in nature pursuant to Rules 26(e)(1) and (2) of the Federal Rules of Civil Procedure, requiring you to supplement your answers promptly after you have acquired additional knowledge or information relating to these interrogatories in any way.

2

## Interrogatories

1. Please state the name of each drug which the agency has switched from prescription to over-the-counter (OTC) use during the past ten years.

2. For each drug identified in response to Interrogatory 1, please state the name and address of the entity that applied for the OTC switch.

3. For each drug identified in response to Interrogatory 1, please state the reasons why the switch was approved.

4. For each drug identified in response to Interrogatory 1, please provide the age range of individuals who were participants in the applicants' actual use studies.

5. For each drug identified in response to Interrogatory 1, please provide the age range of individuals who were participants in the applicants' label comprehension studies.

6. For each drug identified in response to Interrogatory 1, please state whether any age restriction was placed by the agency on OTC availability.

7. For each drug identified in response to Interrogatory 1, if the applicant's actual use study included individuals under the age of 16, please state the percentage of individuals who participated in the actual use study who were under the age of 16.

8. For each drug identified in response to Interrogatory 1, if the applicant's actual use study included individuals under the age of 16, please state the percentage of individuals who participated in the actual use study who were under the age of 14.

9. For each drug identified in response to Interrogatory 1, if the applicant's actual use study included individuals under the age of 16, please state the percentage of individuals who participated in the actual use study who were under the age of 12.

10. For each drug identified in response to Interrogatory 1, if the applicant's label comprehension study included individuals under the age of 16, please state the percentage of individuals who participated in the label comprehension study who were under the age of 16.

11. For each drug identified in response to Interrogatory 1, if the applicant's label comprehension study included individuals under the age of 16, please state the percentage of individuals who participated in the label comprehension study who were under the age of 14.

12. For each drug identified in response to Interrogatory 1, if the applicant's label comprehension study included individuals under the age of 16, please state the percentage of individuals who participated in the label comprehension study who were under the age of 12.

13. For each drug identified in response to Interrogatory 1, state whether the Commissioner or Acting Commissioner of the agency was involved in deliberations on whether to approve the drug, and if so, indicate the nature of such involvement, including the role of the Commissioner or Acting Commissioner in the decision-making process, and any findings or objections made by the Commissioner or Acting Commissioner.

14. Please state the name of each drug as to which the agency has rejected an application for a switch from prescription to OTC use during the past ten years.

15. For each drug identified in response to Interrogatory 13, please state the name and address of the entity that applied for the OTC switch.

4

16. For each drug identified in response to Interrogatory 13, please provide the age range of individuals who were participants in the applicants' actual use studies.

17. For each drug identified in response to Interrogatory 13, please provide the age range of individuals who were participants in the applicants' label comprehension studies.

18. For each drug identified in response to Interrogatory 13, please state whether any age restriction was placed by the agency on OTC availability.

19. For each drug identified in response to Interrogatory 13, if the applicant's actual use study included individuals under the age of 16, please state the percentage of individuals who participated in the actual use study who were under the age of 16.

20. For each drug identified in response to Interrogatory 13, if the applicant's actual use study included individuals under the age of 16, please state the percentage of individuals who participated in the actual use study who were under the age of 14.

21. For each drug identified in response to Interrogatory 13, if the applicant's actual use study included individuals under the age of 16, please state the percentage of individuals who participated in the actual use study who were under the age of 12.

22. For each drug identified in response to Interrogatory 13, if the applicant's label comprehension study included individuals under the age of 16, please state the percentage of individuals who participated in the label comprehension study who were under the age of 16.

23. For each drug identified in response to Interrogatory 13, if the applicant's label comprehension study included individuals under the age of 16, please state the

5

percentage of individuals who participated in the label comprehension study who were under the age of 14.

24. For each drug identified in response to Interrogatory 13, if the applicant's label comprehension study included individuals under the age of 16, please state the percentage of individuals who participated in the label comprehension study who were under the age of 12.

25. For each drug identified in response to Interrogatory 13, state whether the Commissioner or Acting Commissioner of the agency was involved in deliberations on whether to approve the drug, , and if so, indicate the nature of such involvement, including the role of the Commissioner or Acting Commissioner in the decision-making process, and any findings or objections made by the Commissioner or Acting Commissioner.

26. Please identify every meeting, telephone call, teleconference, or other discussion conducted by the agency or with the participation of agency employees, concerning the application of Barr Labs for OTC status for Plan B and the Citizen's Petition, by specifying the date, time, duration, attendance list, and subject matter for each such identified event. Each person in attendance should be identified by name, title, and employer.

Dated: August 17, 2005.                                    Respectfully submitted,

                                                           /s Simon Heller
                                                           SIMON HELLER (SH-8760)
                                                           NAN STRAUSS (NS-3501)
                                                           Center for Reproductive Rights
                                                           120 Wall Street, 14th Fl.
                                                           New York, NY 10005

6

Telephone: (917) 637-3600
Facsimile: (917) 637-3666

ATTORNEYS FOR PLAINTIFFS

ANDREA COSTELLO (AC-6197)*
Southern Legal Counsel
1229 N.W. 12th Avenue
Gainesville, FL 32601
(352) 271-8890

ATTORNEY FOR PLAINTIFFS
TUMMINO, MAHONEY,
GIARDINA, MANGAN, SEGUIN,
TINNEY, BROWN, CHURCHILL
AND HUNT

*Admitted pro hac vice*

# Exhibit C

THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

ANNIE TUMMINO, et al.

                            Plaintiffs,

v.

LESTER M. CRAWFORD, in his official capacity as
acting commissioner of the Food and Drug
Administration,

                            Defendant.

-------------------------------------------------------------------X

**No. 05-CV-366 (ERK/VVP)**

(Korman, C.J)
(Pohorelsky, M.J.)

## Plaintiffs' First Set of Document Requests

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiffs

hereby request that Defendant produce to Nan Strauss, Center for Reproductive Rights,

120 Wall Street, 14th Floor, New York, NY 10005, by September 15, 2005, for

inspection and copying all documents described herein that are within Defendant's

possession, custody or control in accordance with the definitions and instructions set

forth below.  Requests will be deemed appropriately responded to by providing legible

copies of the requested documents.

## Definitions and Instructions

1. The "Uniform Definitions in Discovery Requests" set forth in Local Rule 26.3

are hereby incorporated by reference.

2. "Including" means including but not limited to.

3. The term "agency" means the United States Food and Drug Administration.

4. The term "Citizen's Petition" means the Citizen's Petition filed on February 14, 2001, under docket number 001P-0075/CP 1.

5. The term "members of the United States Congress" has the definition given by Title 5, Appendix 4, Section 109(12) of the United States Code.

6. The term "employees of members of the United States Congress" has the definition given by Title 5, Appendix 4, Section 109(13) of the United States Code.

7. The term "officials of the United States government" means "officer or employee of the United States or any agency thereof, acting in his official capacity or under color of legal authority."

8. You shall produce all documents in the manner in which they are maintained in the usual course of your business and/or you shall organize and label the documents to correspond with the categories in this request. A request for a document shall be deemed to include a request for any and all file folders within which the document was contained transmittal sheets, cover letters, exhibits, enclosures, or attachments to the document in addition to the document itself.

9. Documents attached to each other should not be separated.

10. In producing documents, you are requested to furnish all documents or things in your possession, custody or control, regardless of whether such documents are possessed directly by you or your agents, employees, representatives, accountants, investigators, or by your attorneys or their agents, employees, representatives or investigators. Without limiting the term "control" as used in the preceding sentence, a person is deemed to be in control of a document if the person has the right to secure the document or a copy thereof from another person having actual possession thereof.

2

11. If you object to any part of any request, based on the claim of privilege or any other claim, describe the nature and basis of your claim and the information withheld in a manner sufficient to: (a) disclose facts upon which you rely in asserting your claim; (b) permit the grounds and reasons for withholding the information to be unambiguously identified; and (c) unambiguously identify the information to be withheld. Notwithstanding any objections, you shall nonetheless comply fully with the other parts of the request not objected to.

12. If any document within the scope of this request has been destroyed, that document shall be identified, including identification of its author(s), intended or unintended recipient(s), addressee(s), intended or unintended recipients of blind copies, date, and subject matter. The circumstances of such destruction shall be set forth, and any documents relating to such destruction shall be produced.

13. You are specifically instructed not to produce any document in response to this Document Request that is included in the itemization of the administrative record which the defendant is required to serve upon plaintiffs by the August 2, 2005 order of the court.

14. These requests shall be deemed to be continuing in nature pursuant to Rules 26(e)(1) and (2) of the Federal Rules of Civil Procedure, requiring you to produce such further responses and documents promptly after you have acquired additional knowledge or information relating to those requests in any way.

3

**Document Requests:**

1. Please produce all documents concerning the Barr Labs application for OTC status for Plan B or the Citizen's Petition received by the agency from officials of the United States government who are not employees of the agency.

2. Please produce all documents concerning the Barr Labs application for OTC status for Plan B or the Citizen's Petition received by the agency from members of the United States Congress or from employees of members of the United States Congress.

3. Please produce all documents concerning the Barr Labs application for OTC status for Plan B or the Citizen's Petition received by the agency from officials of the states of New York and Massachusetts.

4. Please produce all documents concerning the Barr Labs application for OTC status for Plan B or the Citizen's Petition seeking OTC status for Plan B that were sent by the agency to officials of the United States who are not employees of the agency.

5. Please produce all documents concerning the Barr Labs application for OTC status for Plan B or the Citizen's Petition seeking OTC status for Plan B that were sent by the agency to members of the United States Congress or to employees of members of the United States Congress.

6. Please produce all documents concerning the Barr Labs application for OTC status or the Citizen's Petition sent by the agency to officials of the states of New York and Massachusetts.

4

7. Please produce all documents concerning the Barr Labs application for OTC status for Plan B or the Citizen's Petition seeking OTC status for Plan B that indicate the existence of, memorialize, or otherwise record meetings, telephone calls, teleconferences, email correspondence, or other discussions (both planned and unplanned) between or among agency employees and officers of the United States government that are not employees of the agency, whether or not such meetings, telephone calls, teleconferences, or other discussions were actually conducted. Such documents shall include, but not be limited to, telephone log entries, agency employee calendars, meeting agendas and minutes, email correspondence, and telephone message slips.

8. Please produce all documents concerning the Barr Labs application for OTC status for Plan B or the Citizen's Petition seeking OTC status for Plan B that indicate the existence of, memorialize, or otherwise record meetings, telephone calls, teleconferences, email correspondence, or other discussions (both planned and unplanned) between or among agency employees and members of Congress and their staffs, whether or not such meetings, telephone calls, teleconferences, or other discussions were actually conducted. Such documents shall include, but not be limited to, telephone log entries, agency employee calendars, meeting agendas and minutes, email correspondence, and telephone message slips.

9. Please produce all documents concerning the Barr Labs application for OTC status for Plan B or the Citizen's Petition seeking OTC status for Plan B that indicate the existence of, memorialize, or otherwise record meetings, telephone calls, teleconferences, email correspondence, or other discussions (both planned

5

and unplanned) between or among agency employees and officials of the states of New York and Massachusetts, whether or not such meetings, telephone calls, teleconferences, or other discussions were actually conducted. Such documents shall include, but not be limited to, telephone log entries, agency employee calendars, meeting agendas and minutes, email correspondence, and telephone message slips.

Dated: August 17, 2005.                    Respectfully submitted,


                                           /s Simon Heller
                                           SIMON HELLER (SH-8760)
                                           NAN STRAUSS (NS-3501)
                                           Center for Reproductive Rights
                                           120 Wall Street, 14th Fl.
                                           New York, NY 10005
                                           Telephone: (917) 637-3600
                                           Facsimile: (917) 637-3666

                                           ATTORNEYS FOR PLAINTIFFS

                                           ANDREA COSTELLO (AC-6197)*
                                           Southern Legal Counsel
                                           1229 N.W. 12th Avenue
                                           Gainesville, FL 32601
                                           (352) 271-8890

                                           ATTORNEY FOR PLAINTIFFS
                                           TUMMINO, MAHONEY,
                                           GIARDINA, MANGAN, SEGUIN,
                                           TINNEY, BROWN, CHURCHILL
                                           AND HUNT

                                           *Admitted pro hac vice

# Exhibit D

Case 1:05-cv-00036-ERK-VVP    Document 45-2    Filed 10/07/05    Page 94 of 98 PageID #: 392

# PLAN B CASUALTIES
*[STATEWIDE Edition]*

Hartford Courant - Hartford, Conn.
Author:           RINKER BUCK
Date:             Oct 2, 2005
Start Page:       3
Section:          NORTHEAST
Text Word Count:  3145

**Document Text**

*(Copyright The Hartford Courant 2005)*

Dr. Frank Davidoff is a gray-haired and erudite internist who lives quietly in a modest Tudor-style house just off the historic district in Wethersfield. At 71, genial and fit, he would strike most people as central casting's choice for the role of editor emeritus of a distinguished medical journal, which in fact he is.

As he discusses his career -- Harvard College, Columbia Medical School, then teaching stints at Harvard and the University of Connecticut before becoming editor of the Annals of Internal Medicine -- a well-behaved corgi sits at the foot of the couch in his living room, which is as spotless and well-appointed as an Ethan Allen furniture ad. From the kitchen, the sweet scent of the bread he is baking wafts through the house.

A month ago, however, Davidoff joined that select if historic list of public servants who would rather rebel than stand by while their professional standards are violated by the government of the United States. If letters of resignation can be considered an art form, the spare, five-paragraph missive that Davidoff sent to the U.S. Food and Drug Administration set a standard for minimalist impact.

"I can no longer associate myself with an organization that is capable of making such an important decision so flagrantly on the basis of political influence, rather than the scientific and clinical evidence," Davidoff wrote, resigning as a consultant and former member of the FDA's influential Nonprescription Drugs Advisory Committee. "I'm truly sorry it has come to this, since the agency serves an extraordinarily important function, and I generally respect the staff and the work they do."

The object of Davidoff's disappointment is the FDA's foot-dragging over Plan B, the emergency contraceptive that has been on the American market, by prescription only, since 1999. For the past 18 months, the FDA has repeatedly delayed a request by Plan B's manufacturer, Barr Laboratories, to make it available over-the-counter -- a move widely supported by a broad array of professional medical groups, two FDA advisory panels and even the agency's own staff.

The FDA's delay has nothing to do with practicality, safety or even common sense. Even critics of the drug concede it might cut down on the number of abortions by averting pregnancy after the failure of contraceptive devices or unprotected sex.

Instead, Plan B's tortuous path to over-the-counter approval has been obstructed by Bush administration policies substituting conservative morality for science -- politicizing an agency that Davidoff and other doctors had always revered for the impartiality of its proceedings.

Davidoff was pleased in 2001 when the FDA invited him to serve a four-year term on the Nonprescription Drugs Advisory Committee, an influential body that makes recommendations to the agency on a broad array of drugs. The manufacturers of a variety of antihistamines, antacids and analgesics that have enjoyed successful and safe runs as prescription drugs want to convert them to profitable over-the-counter brands. At the time, Davidoff was only a few months away from retirement after six years as the editor of the American College of Physicans' Annals of Internal Medicine, one of the nation's most influential medical journals.

The FDA panel seemed like a productive if relatively undemanding way to keep an oar in medicine while he decided his future after the medical journal. Four or five times a year, Davidoff traveled to Washington to spend two days poring over research and listening to testimony with the 15 other members of the committee, most of them

distinguished pharmacologists or internists with postings at top medical schools.

Davidoff thrived on the FDA work because it required him to examine the record of clinical trials, the scientific record, and a prescription drug's history -- work that challenged his experience as an academician and teaching doctor.

"I learned a huge amount about drugs just being on the committee, because you don't often serve at that intersection of medicine, pharmacology and the public," Davidoff says. "It made me feel tremendously useful, but also blessed by a new learning curve."

For a doctor-writer like Davidoff, there were other joys, too.

"Our chief focus when considering a drug for conversion from prescription to over-the-counter wasn't simply safety, efficacy, or weighing the enormous amounts of scientific data we had to consider," Davidoff says. "We also spent an enormous amount of time on label comprehension, a very important dimension. What would the label say? Could we get it down to language that was straightforward to the consumer but accurately reflected the drug's benefits or possible drawbacks? This, too, was enormously rewarding because you were dealing with the borders of science and plain language. I loved it."

The work was satisfying, as well, because the FDA almost universally followed the committee's advice. During Davidoff's four years on the committee, the antihistamine Claritin and the antacid Prilosec were approved for over-the-counter sales. The statin class of cholesterol-lowering drugs, however, was not recommended for over-the-counter approval by the committee.

Davidoff was impressed by the professionalism and collegiality of the FDA salaried staff, which worked months in advance of the advising committee, preparing scientific data, clinical literature and pharmacy studies as new drugs were proposed for over-the- counter conversion.

"The level of science was very high, and the FDA almost always followed the recommendations of the committee," Davidoff says. "There was a real satisfaction that staff and professional advisers were working very hard to assure that every possible angle was explored to protect the consumer and deliver to everyday users the best possible outcome."

Initially, in the fall of 2003, there was no intimation that anything would be different when the FDA scheduled hearings for December on the conversion of Barr's Plan B. Davidoff had received a huge file on the drug -- the complete record weighed 18 pounds on his bathroom scale -- and was notified that the drug's conversion would be considered jointly with another FDA expert panel, the Advisory Committee for Reproductive Health Drugs. That's standard procedure when a drug overlapped the assigned area of two committees.

The joint committee hearings on Plan B that December followed the usual, exhaustive protocol of advisory panels, considering the history, safety and chemistry of the drug. Plan B, often confused with the French RU-486 abortion pill, is officially considered a contraceptive. Consisting of two doses of the synthetic hormone levonorgestrel taken orally after unprotected sex, the medication prevents ovulation or fertilization, and it may also deter implantation of a fertilized egg in the womb. The pill will not abort a pregnancy once a fertilized egg has implanted, and Barr Laboratories' literature states that Plan B is "not effective if the women is already pregnant."

"It's an important principle of medicine that we don't always know why a drug works, even highly common ones," Davidoff says. "So what you have to do on a panel of this nature is weigh the preponderance of evidence. ... And the evidence was pretty strong that [Plan B] is a pill that prevents fertilization."

The committees also studied evidence that showed that Plan B is probably only effective within 72 hours of unprotected sex. The panel also considered the logic of arguments that Plan B be converted to over-the-counter status to enhance its availability and, hence, effectiveness for women.

"There are real medical reasons why Plan B should be over-the- counter," says Dr. Alastair Wood, the assistant vice chancellor at the Vanderbilt University School of Medicine who served on the advisory committee with Davidoff. "A great deal of

Case 1:05-cv-00366-ERK-VVP    Document 45-2    Filed 10/07/05    Page 96 of 98 PageID #: 394

unprotected sex happens on a Friday or a Saturday night, exactly when you can't reach a doctor for a prescription."

The joint committee also heard concerns that teenage girls would be more likely to engage in unprotected sex and then rely on Plan B as a regular backup if the "morning after" pill were readily available in drug stores. But both Wood and Davidoff say the committee was presented with studies showing that women did not engage in more promiscuous behavior simply because Plan B was available.

And requiring a proof of age for the drug, Wood says, might simply subject all young women to the embarrassment of "carding" by a store clerk when they felt they needed Plan B.

"For the most part, all the feared behaviors [suggested by opponents of the drug] weren't happening," Davidoff says. "One of the standards that the committee takes very seriously is: 'will over- the-counter lead to abuse of the drug?' ... We didn't see any evidence that the availability of Plan B led to more unprotected sex."

At the conclusion of its December 2003 hearings, the joint committee voted 24-3 to approve the conversion of Plan B to over- the-counter status, concluding that the drug was both extremely safe and that it provided clear benefits if offered more widely.

This aroused conservative members of Congress and right-to-life groups, who labeled the drug an "abortion pill" and began lobbying the agency to reject both its advisory committees and staff advice.

FDA management did exactly that in May 2004 saying that Barr Labs had neglected to provide enough data about whether girls under 16 would engage in unprotected sex if the drug were more widely available. The agency's management also questioned whether girls 16 or younger could comprehend the labeling on the drug.

Barr was encouraged by the FDA to resubmit its application on a two-tier level that would make Plan B available to women 16 years and older as a non-prescription drug, while requiring younger women to receive the drug only under a doctor's prescription.

This lead to further complications at the FDA, which eventually concluded that it had never addressed the issue of approving dual uses for the same packaged drug -- a prescription-only for one age group, but over-the-counter status for another age group.

On Aug. 26, in a press release remarkable for its confused language, FDA Commissioner Lester M. Crawford announced a 60-day comment period inviting "all interested parties" to weigh in on the question of whether a drug could be marketed as both a prescription and non-prescription product.

"What we are saying today is that the Agency is unable at this time to reach a decision on the approvability of the application because of these unresolved regulatory and policy issues that relate to the application we were asked to evaluate," the FDA press release stated.

The confusing public signals being sent by the FDA, however, didn't seem mysterious to many advisory committee members, who had begun to get the point. Despite both committee and staff recommendations that Plan B be approved as an over-the-counter drug, the FDA management appeared to be using almost any stalling tactic to avoid making a decision, bowing to pressure to restrict use of the drug.

"Conservatives are doing the same thing to Plan B that they are doing on the issues of global climate change and evolution," says Kirsten Moore, the president of the Reproductive Health Technologies Project in Washington, D.C. "They are using uncertainty and confusion to prevent us moving forward. The evidence is overwhelming that Plan B is safe, but the opponents hold it up by saying that we haven't dotted all the I's and crossed all the T's yet, because they know they can't oppose the drug by ideology alone."

"We knew that political influence was being applied to the decision on Plan B," says Wood. "But the real issue here is not about the politics of Plan B itself but the dangers of politicizing the drug-approval process. You, as the consumer, have to know that this was the right decision-making based only on the data, the science, and the way

Case 1:05-cv-00366-ERK-VVP    Document 45-2    Filed 10/07/05    Page 97 of 98 PageID #: 395

the law was set up. If that process isn't happening it's not a decision made in the best interest of patients."

But doctors who raised serious questions about Plan B at the FDA hearings deny that they went beyond science in opposing over-the- counter approval. Dr. W. David Hager, a gynecologist who teaches at the University of Kentucky, served on the joint panel that reviewed Plan B in 2003.

"As a gynecologist, I was concerned that the major reason women come to us is for access to contraceptives, and then we can screen them for other diseases and other care," Hager says. "I felt that there wasn't enough evidence about whether young women who would come to rely on Plan B without a prescription would therefore not be visiting doctors and getting appropriate medical care. It wasn't a moral question for me so much as an issue of woman's health."

To Davidoff, the FDA's obstruction of Plan B's conversion doesn't seem to serve the interests of even the staunch pro-life groups.

"I keep trying to think about the opposition that came in after we voted on Plan B," he says. "Why would you oppose a pill that could dramatically cut back on abortions? It makes absolutely no sense."

The FDA's interminable delays on approving Plan B made little sense to others as well, and by early September, the agency had begun to implode. One week after Commissioner Crawford's call for the 60-day comment period, the FDA's assistant commissioner and director of its Office of Women's Health, Susan F. Wood, resigned in protest, causing an uproar within the agency and professional health community. In an e-mail message, Susan Wood told FDA staffers that she could not remain at the agency "when scientific and clinical evidence, fully evaluated and recommended for approval by the professional staff here, has been overruled."

Three weeks later, Crawford abruptly resigned, reportedly under pressure by a White House dismayed by his performance and plummeting morale at the FDA. It is considered doubtful that a final decision on Plan B will be made this year as the FDA struggles to regain its stability and reputation.

Davidoff had considered resigning in May, 2004, when the FDA first disapproved the drug for over-the-counter distribution, but he felt strongly that he might be more effective continuing to work with the agency. He abandoned that thinking, however, when Crawford once more delayed action in August.

Davidoff says his decision to resign his FDA advisory position was not that difficult -- a 45-year professional career devoted to careful scientific evaluation obviously couldn't be squared with the politicization of the agency he had been asked to serve. But the Plan B meltdown at the FDA has taken its casualties beyond the millions of women that Davidoff feels a compromised federal agency has failed to serve. The agency itself is in disarray, and Davidoff wonders how long it will take for it to recover its reputation.

"I can tell you quite definitely that the FDA staff is more than upset," he says. "I got an e-mail today from a prominent FDA official saying that the staff is demoralized and depressed. It's quite a benefit that the American people have, trusting the reliability and safety of their drugs. But for that to continue, people have to believe in the FDA's science. The record of decisions on Plan B could well shred that credibility."

The history of the so-called "morning after pill" has been fraught with conflict and controversy. Here are some points along the way to the most recent spate of resignations and disputes.

Feb. 24, 1997: The FDA declares common regimens of emergency contraception safe and effective. It also says it would accept applications to manufacture and market emergency contraceptives without requiring expensive new drug trials because the safety and efficacy of emergency contraception has already been demonstrated.

Sept. 2, 1998: The FDA approves the application of Gynetics, Inc. of Belle Mead, N.J., to market America's first dedicated emergency contraceptive product, the PREVEN Emergency Contraceptive Kit.

July 29, 1999: The FDA approves Plan B, the first progestin-only emergency

contraceptive available by prescription in the U.S.

December 1999: The French government makes the morning-after pill available to teenage girls at schools, triggering fierce debate in that predominantly Roman Catholic nation. A court eventually overturns the decision.

October 2000: The French Parliament approves a new amendment allowing school nurses to dispense emergency contraception. Also, NorLevo, an emergency contraceptive product, is made available over the counter in Norway. This is the first time that an emergency contraceptive is available to women without contact with a clinician or pharmacist.

Feb. 14, 2001: The Center for Reproductive Rights files a petition with the FDA to grant over-the-counter status to emergency contraceptives. No decision is ever issued.

Feb. 21, 2001: The Virginia Senate approves a measure to let women receive the "morning-after"' pill without a doctor's prescription.

Dec. 16, 2003: An FDA advisory panel votes 23-4 in favor of dropping the prescription requirement, but the one-sided vote does not reflect the heated disagreements among some panel members about whether the pill's action amounts to abortion and whether wider availability would encourage couples to engage in casual unprotected sex.

May 6, 2004: In a rare move, Dr. Steven K. Galson, director of the FDA's Center for Drug Evaluation and Research, signs a "not approvable" letter for Plan B, opposing the advisory panel's recommendations. The FDA typically follows the advice of its staff and committees.

July 23, 2004: Barr Pharmaceuticals Inc. reapplies to the FDA to sell Plan B over the counter for women age 16 and older, requiring younger girls to get a prescription.

Jan. 21, 2005: The FDA is scheduled to issue its ruling on Barr Pharmaceuticals, Inc.'s request over-the-counter status for Plan B for women 16 and older, but does not meet this deadline.

June 17, 2005: New Hampshire Gov. John Lynch signs a bill allowing pharmacists to dispense emergency contraception without a doctor's prescription. The law will apply only to pharmacists who voluntarily participate in a training session sponsored by the state.

June 24, 2005: The New York legislature approves a measure allowing over-the-counter dispensing of emergency contraception.

July 26, 2005: Massachusetts Gov. Mitt Romney vetoes a bill allowing over-the-counter distribution of emergency contraception, saying the so-called "morning after pill" can cause an abortion. The veto is subsequently overridden.

Aug. 26, 2005: The FDA defers any decision on Plan B, saying it needs more time to gauge public reaction and decide how to monitor Plan B sales in order to make sure that girls aged 16 and younger don't buy it without a prescription.

Aug. 31, 2005: Susan Wood, director of FDA's Office of Women's Health, resigns saying the August 26 ruling is "contrary to my core commitment to improving and advancing women's health."

Sept. 23, 2005: FDA chief Lester Crawford resigns.

THE HARTFORD COURANT

[Illustration]
COVER ILLUSTRATION: COLOR, BY VADA CROSBY AND WES RAND PHOTO 1: COLOR, PHOTOGRAPH BY JOHN LONG PHOTO 2: (B&W) MUG; Caption: PHOTO 1: Dr. Frank Davidoff, a Wethersfield internist and former medical-journal editor, was so aghast at political influence exerted on the "morning-after pill" decision that he resigned in protest from a key FDA advisory position. PHOTO 2: Lester Crawford

Reproduced with permission of the copyright owner. Further reproduction or distribution is prohibited without permission