EXHIBIT A

Case 1:05-cv-00366-ERK-VVP    Document 47-2    Filed 10/17/05    Page 2 of 71 PageID #: 461



FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA

---

| *FDA Consumer magazine* <br> April 1997 Issue | This article originally appeared in the April 1997 *FDA Consumer* and contains revisions made in August 2002 and December 2003. |
| --- | --- |

Email this Page
To a Friend

# Birth Control Guide

[This information is also available in a handy chart format (22K PDF)]

*Updated December 2003*

The Food and Drug Administration has approved a number of birth control methods. The choice of birth control depends on factors such as a person's health, frequency of sexual activity, number of sexual partners, and desire to have children in the future. Failure rates, based on statistical estimates, are another key factor. The most effective way to avoid both pregnancy and sexually transmitted disease is to practice total abstinence (refrain from sexual contact).

**Failure Rates** in this chart are based on information from clinical trials submitted to the FDA during product reviews. This number represents the percentage of women who become pregnant during the first year of use of a birth control method. For methods that the FDA does not review, such as periodic abstinence, numbers are estimated from published literature. For comparison, about 85 out of 100 sexually active women who wish to become pregnant would be expected to become pregnant in a year.

Serious medical risks from contraceptives, such as stroke related to oral contraceptives, are relatively rare. This chart is a summary of important information, including risks, about drugs and devices approved by the FDA for contraception and sterilization. It is not intended to be used alone, and a health professional should be consulted regarding any contraceptive choice. Review product labeling carefully for more information on use of these products.

---

### Male Condom, Latex/Polyurethane

**FDA Approval Date:** Latex: Use started before premarket approval was required. Polyurethane: cleared in 1989; available starting 1995.
**Description:** A sheath placed over the erect penis blocking the passage of sperm.
**Failure Rate** (number of pregnancies expected per 100 women per year): 11 (a, b)
**Some Risks:** Irritation and allergic reactions (less likely with polyurethane)
**Protection from Sexually Transmitted Diseases (STDs):** Except for abstinence, latex condoms are the best protection against STDs, including gonorrhea and AIDS.
**Convenience:** Applied immediately before intercourse; used only once and discarded. Polyurethane condoms are available for those with latex sensitivity.
**Availability:** Nonprescription

Case 1:05-cv-00366-ERK-VVP    Document 47-2    Filed 10/17/05    Page 3 of 71 PageID #: 462

## Female Condom

**FDA Approval Date:** 1993
**Description:** A lubricated polyurethane sheath shaped similarly to the male condom. The closed end has a flexible ring that is inserted into the vagina.
**Failure Rate** (number of pregnancies expected per 100 women per year): 21
**Some Risks:** Irritation and allergic reactions
**Protection from Sexually Transmitted Diseases (STDs):** May give some STD protection; not as effective as latex condom
**Convenience:** Applied immediately before intercourse; used only once and discarded.
**Availability:** Nonprescription

## Diaphragm with Spermicide

**FDA Approval Date:** Use started before premarket approval was required.
**Description:** A dome-shaped rubber disk with a flexible rim that covers the cervix so that sperm cannot reach the uterus. A spermicide is applied to the diaphragm before insertion.
**Failure Rate** (number of pregnancies expected per 100 women per year): 17 (b, d, e)
**Some Risks:** Irritation and allergic reactions, urinary tract infection. (c) Risk of toxic shock syndrome, a rare but serious infection, when kept in place longer than recommended.
**Protection from Sexually Transmitted Diseases (STDs):** None
**Convenience:** Inserted before intercourse and left in place at least six hours after; can be left in place for 24 hours, with additional spermicide for repeated intercourse.
**Availability:** Prescription

## Lea's Shield

**FDA Approval Date:** 2002
**Description:** A dome-shaped rubber disk with a valve and a loop that is held in place by the vaginal wall. Covers the upper vagina and cervix so that sperm cannot reach the uterus. Spermicide is applied before insertion.
**Failure Rate** (number of pregnancies expected per 100 women per year): 15
**Some Risks:** Skin irritation, spotting, discomfort (female and male partners), urinary tract infection. Theoretical risk of toxic shock syndrome.
**Protection from Sexually Transmitted Diseases (STDs):** None
**Convenience:** Inserted before intercourse and left in place at least 8 hours after; can be left in place for up to 48 hours, with additional spermicide for repeated intercourse.
**Availability:** Prescription

## Cervical Cap with Spermicide

**FDA Approval Date:** Prentiff Cap--1988; FemCap--2003
**Description:** A soft rubber cup with a round rim, which fits snugly around the cervix.
**Failure Rate** (number of pregnancies expected per 100 women per year): Prentiff Cap--17; FemCap--23 (b, d, e)
**Some Risks:** Irritation and allergic reactions, abnormal Pap test. (c) Risk of toxic shock syndrome, a rare but serious infection, when kept in place longer than recommended.
**Protection from Sexually Transmitted Diseases (STDs):** None
**Convenience:** May be difficult to insert; can remain in place for 48 hours without reapplying spermicide for repeated intercourse.
**Availability:** Prescription

## Sponge with Spermicide

**FDA Approval Date:** 1983 (Not currently marketed)
**Description:** A disk-shaped polyurethane device containing the spermicide nonoxynol-9.
**Failure Rate** (number of pregnancies expected per 100 women per year): 14-28 (d, e)
**Some Risks:** Irritation and allergic reactions, difficulty in removal. (c) Risk of toxic shock

Case 1:05-cv-00366-ERK-VVP    Document 47-2    Filed 10/17/05    Page 4 of 71 PageID #: 463

syndrome, a rare but serious infection, when kept in place longer than recommended.
**Protection from Sexually Transmitted Diseases (STDs):** None
**Convenience:** Inserted before intercourse and protects for repeated acts of intercourse for 24 hours without additional spermicide; must be left in place for at least six hours after intercourse; must be removed within 30 hours of insertion. Is discarded after use.
**Availability:** Nonprescription; not currently marketed

## Spermicide Alone

**FDA Approval Date:** Use started before premarket approval was required. Since November 2002, only one active ingredient has been allowed.
**Description:** A foam, cream, jelly, film, suppository, or tablet that contains nonoxynol-9, a sperm-killing chemical
**Failure Rate** (number of pregnancies expected per 100 women per year): 20-50 (studies have shown varying effectiveness rates)
**Some Risks:** Irritation and allergic reactions, urinary tract infections (c)
**Protection from Sexually Transmitted Diseases (STDs):** None
**Convenience:** Instructions vary; check labeling. Inserted between 5 and 90 minutes before intercourse and usually left in place at least six to eight hours after.
**Availability:** Nonprescription

## Oral Contraceptives--combined pill

**FDA Approval Date:** First in 1960; most recent in 2003
**Description:** A pill that suppresses ovulation by the combined actions of the hormones estrogen and progestin. A chewable form was approved in November 2003.
**Failure Rate** (number of pregnancies expected per 100 women per year): 1-2
**Some Risks:** Dizziness; nausea; changes in menstruation, mood, and weight; rarely, cardiovascular disease, including high blood pressure, blood clots, heart attack, and strokes
**Protection from Sexually Transmitted Diseases (STDs):** None
**Convenience:** Must be taken on daily schedule, regardless of frequency of intercourse. Women using the chewable tablet must drink 8 oz. of liquid immediately after taking.
**Availability:** Prescription

## Oral Contraceptives--progestin-only minipill

**FDA Approval Date:** 1973
**Description:** A pill containing only the hormone progestin that reduces and thickens cervical mucus to prevent the sperm from reaching the egg.
**Failure Rate** (number of pregnancies expected per 100 women per year): 2
**Some Risks:** Irregular bleeding, weight gain, breast tenderness, less protection against ectopic pregnancy
**Protection from Sexually Transmitted Diseases (STDs):** None
**Convenience:** Must be taken on daily schedule, regardless of frequency of intercourse.
**Availability:** Prescription

## Oral Contraceptives--91-day regimen (Seasonale)

**FDA Approval Date:** 2003
**Description:** A pill containing estrogen and progestin, taken in 3-month cycles of 12 weeks of active pills followed by one week of inactive pills. Menstrual periods occur during the 13th week of the cycle.
**Failure Rate** (number of pregnancies expected per 100 women per year): 1-2
**Some Risks:** Similar to oral contraceptives--combined pill
**Protection from Sexually Transmitted Diseases (STDs):** None
**Convenience:** Must be taken on daily schedule, regardless of frequency of intercourse. Since users will have fewer periods, they should consider the possibility that they might be

Case 1:05-cv-00366-ERK-VVP     Document 47-2     Filed 10/17/05     Page 5 of 71 PageID
#: 464

pregnant if they miss scheduled periods. May have more unplanned bleeding and spotting between periods than with 28-day oral contraceptives.
**Availability:** Prescription

## Patch (Ortho Evra)

**FDA Approval Date:** 2001
**Description:** Skin patch worn on the lower abdomen, buttocks, or upper body that releases the hormones progestin and estrogen into the bloodstream.
**Failure Rate** (number of pregnancies expected per 100 women per year): 1-2 (Appears to be less effective in women weighing more than 198 pounds.)
**Some Risks:** Similar to oral contraceptives--combined pill
**Protection from Sexually Transmitted Diseases (STDs):** None
**Convenience:** New patch is applied once a week for three weeks. Patch is not worn during the fourth week, and woman has a menstrual period.
**Availability:** Prescription

## Vaginal Contraceptive Ring (NuvaRing)

**FDA Approval Date:** 2001
**Description:** A flexible ring about 2 inches in diameter that is inserted into the vagina and releases the hormones progestin and estrogen.
**Failure Rate** (number of pregnancies expected per 100 women per year): 1-2
**Some Risks:** Vaginal discharge, vaginitis, irritation. Similar to oral contraceptives--combined pill
**Protection from Sexually Transmitted Diseases (STDs):** None
**Convenience:** Inserted by the woman; remains in the vagina for 3 weeks, then is removed for 1 week. If ring is expelled and remains out for more than 3 hours, another birth control method must be used until ring has been used continuously for 7 days.
**Availability:** Prescription

## Post-Coital Contraceptives (Preven and Plan B)

**FDA Approval Date:** 1998-1999
**Description:** Pills containing either progestin alone or progestin plus estrogen
**Failure Rate** (number of pregnancies expected per 100 women per year): Almost 80 percent reduction in risk of pregnancy for a single act of unprotected sex
**Some Risks:** Nausea, vomiting, abdominal pain, fatigue, headache
**Protection from Sexually Transmitted Diseases (STDs):** None
**Convenience:** Must be taken within 72 hours of having unprotected intercourse.
**Availability:** Prescription

## Injection (Depo-Provera)

**FDA Approval Date:** 1992
**Description:** An injectable progestin that inhibits ovulation, prevents sperm from reaching the egg, and prevents the fertilized egg from implanting in the uterus.
**Failure Rate** (number of pregnancies expected per 100 women per year): less than 1
**Some Risks** (serious medical risks from contraceptives are rare): Irregular bleeding, weight gain, breast tenderness, headaches
**Protection from Sexually Transmitted Diseases (STDs):** None
**Convenience:** One injection every three months.
**Availability:** Prescription

## Injection (Lunelle)

**FDA Approval Date:** 2000
**Description:** An injectable form of progestin and estrogen

Case 1:05-cv-00366-ERK-VVP     Document 47-2     Filed 10/17/05     Page 6 of 71 PageID
#: 465

**Failure Rate** (number of pregnancies expected per 100 women per year): less than 1
**Some Risks:** Changes in menstrual cycle, weight gain. Similar to oral contraceptives--combined.
**Protection from Sexually Transmitted Diseases (STDs):** None
**Convenience:** Injection given once a month.
**Availability:** Prescription

## Implant (Norplant)

**FDA Approval Date:** 1990
**Description:** Six matchstick-sized rubber rods that are surgically implanted under the skin of the upper arm, where they steadily release the contraceptive steroid levonorgestrel.
**Failure Rate** (number of pregnancies expected per 100 women per year): less than 1
**Some Risks:** Irregular bleeding, weight gain, breast tenderness, headaches, difficulty in removal
**Protection from Sexually Transmitted Diseases (STDs):** None
**Convenience:** Implanted and removed by health-care provider in minor outpatient surgical procedure; effective for up to five years.
**Availability:** Prescription. In July 2002, Norplant's manufacturer announced that it will no longer distribute the Norplant system. Women using the system should contact their doctors about what their contraceptive options will be after the five-year expiration date of their Norplant systems.

## IUD (Intrauterine Device)

**FDA Approval Date:** 1976 (f)
**Description:** A T-shaped device inserted into the uterus by a health professional.
**Failure Rate** (number of pregnancies expected per 100 women per year): less than 1
**Some Risks:** Cramps, bleeding, pelvic inflammatory disease, infertility, perforation of uterus
**Protection from Sexually Transmitted Diseases (STDs):** None
**Convenience:** After insertion by physician, can remain in place for up to one or 10 years, depending on type.
**Availability:** Prescription

## Periodic Abstinence

**FDA Approval Date:** N/A
**Description:** To deliberately refrain from having sexual intercourse during times when pregnancy is more likely.
**Failure Rate** (number of pregnancies expected per 100 women per year): 20
**Some Risks:** None
**Protection from Sexually Transmitted Diseases (STDs):** None
**Convenience:** Requires frequent monitoring of body functions (for example, body temperature for one method).
**Availability:** Instructions from health-care provider

## Trans-abdonimal Surgical Sterilization--female (Falope Ring, Hulka Clip, Filshie Clip)

**FDA Approval Date:** Early 1970s (g)
**Description:** The woman's fallopian tubes are blocked so the egg and sperm can't meet in the fallopian tube, preventing conception. (h)
**Failure Rate** (number of pregnancies expected per 100 women per year): less than 1
**Some Risks:** Pain, bleeding, infection, other post-surgical complications, ectopic (tubal) pregnancy.
**Protection from Sexually Transmitted Diseases (STDs):** None
**Convenience:** One-time surgical procedure that requires an abdominal incision.

Case 1:05-cv-00366-ERK-VVP     Document 47-2     Filed 10/17/05     Page 7 of 71 PageID
#: 466

**Availability:** Surgery

## Sterilization Implant--female (Essure System)

**FDA Approval Date:** 2002
**Description:** Small metallic implant that is placed into the fallopian tubes. The device works by causing scar tissue to form, blocking the fallopian tubes and preventing conception. (h)
**Failure Rate** (number of pregnancies expected per 100 women per year): less than 1
**Some Risks:** Mild to moderate pain after insertion, ectopic (tubal) pregnancy.
**Protection from Sexually Transmitted Diseases (STDs):** None
**Convenience:** Minor surgical procedure, permanent sterilization. Device is inserted through the vagina using a catheter. Women must rely on another birth control method during the first three months, until placement is confirmed with an X-ray procedure.
**Availability:** Prescription

## Surgical Sterilization--male

**FDA Approval Date:** N/A
**Description:** Sealing, tying, or cutting a man's vas deferens so that the sperm can't travel from the testicles to the penis. (h)
**Failure Rate** (number of pregnancies expected per 100 women per year): less than 1
**Some Risks** (serious medical risks from contraceptives are rare): Pain, bleeding, infection, other minor postsurgical complications
**Protection from Sexually Transmitted Diseases (STDs):** None
**Convenience:** One-time surgical procedure.
**Availability:** Surgery

---

(a) Projected from six-month study and adjusted for use of emergency contraception.

(b) If spermicides are used with barrier methods, be sure that the spermicide is compatible with the condom or diaphragm (won't cause it to weaken or break). Oil-based lubricants (such as petroleum jelly or baby oil) will cause latex to weaken and should not be used with these methods.

(c) Spermicides used alone, with barrier devices, or with condoms can cause irritation to the skin lining the vagina, especially when the spermicide is used frequently. There is a possibility that spermicide might increase the risk of acquiring some sexually transmitted diseases because of disruption of the vaginal skin. Spermicide has not been proven to be effective against bacteria and viruses in people. Therefore, there is no reason to use spermicide during pregnancy.

(d) Medications for vaginal yeast infections may decrease effectiveness of spermicides.

(e) Less effective for women who have had a baby because the birth process stretches the vagina and cervix, making it more difficult to achieve a proper fit.

(f) First approval date of currently marketed IUDs. Some IUDs were sold before premarket approval was required. Those products are no longer on the market.

(g) Sold before premarket approval was required (1976).

(h) A contraceptive option for people who don't want children. Considered permanent because reversal is typically unsuccessful.

Case 1:05-cv-00366-ERK-VVP     Document 47-2     Filed 10/17/05     Page 8 of 71 PageID #: 467

*(Source: Food and Drug Administration 12/03)*

Return to Main Article

FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility

FDA Office of Public Affairs
FDA Consumer Magazine

EXHIBIT B



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
Rockville MD 20857

SEP   6 2001

Bonnie Scott Jones
Simon Heller
The Center for Reproductive Law & Policy
120 Wall Street, 14th FL
New York, NY 10005

Docket No.: 01P-0075/CP1

Dear Ms. Jones and Mr. Heller,

This letter responds to your Citizen Petition (Petition) submitted on February 14, 2001 by the Center for Reproductive Law and Policy on behalf of a number of family planning and health care organizations. You request that the FDA exempt from prescription-dispensing requirements (i.e., switch to over-the-counter (OTC) status) two emergency contraceptive drugs -- Preven, marketed by Gynetics, Inc. and Plan B, marketed by Women's Capital Corporation -- as well as any new drug eligible for filing an abbreviated new drug application (ANDA) listing Preven or Plan B.

I am writing to inform you that the Food and Drug Administration (FDA) has not yet resolved the issues raised in your Citizen Petition because it raises significant issues requiring extensive review and analysis by Agency officials. This interim response is provided in accordance with FDA regulations on citizen petitions (21 CFR 10.30(e)(2)). We will respond to your petition as soon as we have reached a decision on your request.

Sincerely yours,

Janet Woodcock, M.D.
Director
Center for Drug Evaluation and Research

01P-0075                                                              LET 2

# EXHIBIT C



**U.S. Food and Drug Administration**

Department of Health and Human Services

**Department of Health and Human Services**

Public Health Service
Food and Drug Administration
Rockville, MD 20587

**NDA 21-045/S-011**

Duramed Research, Inc.
Attention: Joseph A. Carrado, M.Sc., R.Ph.
Senior Director, Regulatory Affairs
One Belmont Ave, 11 th floor
Bala Cynwyd, PA 19004

Dear Mr. Carrado:

Please refer to your supplemental new drug application dated April 16, 2003, received April 22, 2003, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act (the Act) for Plan B ® (levonorgestrel) Tablets, 0.75 mg.

We acknowledge receipt of your submissions dated April 16, July 25 (3), and 31, August 8 (2), September 4, 8, 9, and 15, October 6, 10, 15 (2), 17, 21, 24, 29, 30, and 31, December 3, and 9, 2003, January 9, and 30, February 6, 10, 13, 20, and 24, March 11 and 26, May 6 and 11, June 30, July 21, 2004, and January 6, 12, 13, 14, 18, 19 and 21, 2005.

Your submission of July 21, 2004 constituted a complete response to our May 6, 2004 Not Approvable action letter.

The resubmitted supplemental new drug application provides for a switch from Rx only status to Over the Counter (OTC) status for women ages sixteen years and older. Plan B would remain Rx only for women under sixteen years of age. In addition, you have proposed that both the Rx and OTC version of Plan B be marketed in a single package.

The Center for Drug Evaluation and Research (CDER) has completed its review of this application, as amended, and has concluded that the available scientific data are sufficient to support the safe use of Plan B as an OTC product, but only for women who are 17 years of age and older. However, the Agency is unable at this time to reach a decision on the approvability of the application because of unresolved issues that relate to your NDA discussed below.

Your application has presented us with three difficult and novel issues. Specifically, you have proposed that Plan B be marketed in a single package, and sold either as Rx or OTC, depending on the age of the patient. While the Agency has allowed the same active ingredient to be marketed both Rx and OTC based on indication, strength, dosage form and route of administration, the Agency has never determined whether a drug may be both Rx and OTC based on the age of the individual using the drug. A related concern is how, as a practical matter, an age-based distinction could be enforced. In addition, we have never been confronted with whether the Rx and OTC versions of the same active ingredient may be marketed in a single package.

As you may be aware, questions have arisen over the years about whether there are any conditions under which an active ingredient may be simultaneously marketed in both a prescription drug product and an OTC drug product. Notwithstanding our having allowed the practice in those rare instances where there is a meaningful difference in the indication, strength, dosage form or route of administration of the two products, we recognize that FDA's interpretation of section 503(b) of the Act has not been explicitly set forth in any of the regulations that discuss the process by which FDA classifies (or re-classifies) drugs as OTC or prescription. See 21 CFR 310.200 and 310.201.

In this case, we have decided that the appropriate course is to ask for public comments on whether we should initiate a rulemaking to codify our interpretation of section 503(b) regarding when an active ingredient can be simultaneously marketed in both a prescription drug product and an OTC drug product. To this end, we have decided to publish an advance notice of proposed rulemaking in the Federal Register. In addition, the notice will seek public comments on questions related to the marketing of Rx and OTC versions of the same active ingredient in a single package.

At this time, the drug product may not be legally marketed OTC. In the future, you will be notified in writing regarding changes in the status of your application.

Under 21 CFR 314.102(d), you may request an informal meeting or telephone conference to discuss what steps need to be taken before the application may be approved .

Sincerely,

Lester M. Crawford, DVM, PhD
Commissioner of Food and Drugs

---

# EXHIBIT D

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**

**21 CFR Part 310**

**[Docket No. 2005N–0345]**

RIN 0910–AF72

**Drug Approvals: Circumstances Under Which an Active Ingredient May Be Simultaneously Marketed in Both a Prescription Drug Product and an Over-The-Counter Drug Product**

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Advance notice of proposed rulemaking.

---

**SUMMARY:** The Food and Drug Administration (FDA) is issuing this advance notice of proposed rulemaking to request comment on whether to initiate a rulemaking to codify its interpretation of section 503(b) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 301, *et seq.*), regarding when an active ingredient may be simultaneously marketed in both a prescription drug product and an over-the-counter (OTC) drug product.

**DATES:** Submit written or electronic comments by November 1, 2005.

**ADDRESSES:** You may submit comments, identified by Docket No. 2005N–0345 and/or RIN number 0910–AF72, by any of the following methods:

*Electronic Submissions*

Submit electronic comments in the following ways:

• Federal eRulemaking Portal: *http://www.regulations.gov*. Follow the instructions for submitting comments.

**2**

- Agency Web site: *http://www.fda.gov/dockets/ecomments.* Follow the instructions for submitting comments on the agency Web site.

*Written Submissions*

Submit written submissions in the following ways:

- FAX: 301–827–6870.

- Mail/Hand delivery/Courier [For paper, disk, or CD-ROM submissions]: Division of Dockets Management, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852

To ensure more timely processing of comments, FDA is no longer accepting comments submitted to the agency by e-mail. FDA encourages you to continue to submit electronic comments by using the Federal eRulemaking Portal or the agency Web site, as described in the *Electronic Submissions* portion of this paragraph.

Instructions: All submissions received must include the agency name and Docket No. or Regulatory Information Number (RIN) for this rulemaking. All comments received will be posted without change to *http://www.fda.gov/ ohrms/dockets/default.htm*, including any personal information provided. For detailed instructions on submitting comments and additional information on the rulemaking process, see the ''Comments'' heading of the **SUPPLEMENTARY INFORMATION** section of this document.

*Docket*: For access to the docket to read background documents or comments received, go to *http://www.fda.gov/ohrms/dockets/default.htm* and insert the docket number, found in brackets in the heading of this document, into the ''Search'' box and follow the prompts and/or go to the Division of Dockets Management, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852.

**3**

**FOR FURTHER INFORMATION CONTACT:** For further information contact the FDA at 301–827–0002 or by e-mail at *pcomments@fda.gov*. This phone number and this e-mail account have been set-up to address questions relating to this notice.

**SUPPLEMENTARY INFORMATION:**

## I. Background

Since Congress first enacted the Federal Food, Drug, and Cosmetic act (the act) in 1938, there has been a great deal of discussion about when drug products should be sold as prescription drugs as opposed to OTC drugs.

Until 1951, the act did not contain criteria for determining when to limit a drug's approval to prescription use. Consequently, different manufacturers made different decisions about whether to market a drug as prescription or OTC. This resulted in confusion and uncertainty for pharmacists and consumers, and made it difficult for FDA to ensure that the only drugs available OTC were those that were safe for use without the supervision of a licensed medical practitioner.

To eliminate this confusion and uncertainty, and to protect the public health, Congress enacted the Durham-Humphrey Amendments in 1951 (Public Law 82–215, 65 Stat. 648). Congress had two primary objectives in enacting the Amendments: (1) To protect the public from abuses in the sale of potent Rx drugs; and (2) to relieve retail pharmacists and the public from burdensome and unnecessary restrictions on the dispensing of drugs that are safe for use without the supervision of a physician. See S. Rep. No. 946, at 1 (1951), reprinted in 1951 U.S.C.C.A.N. 2454. To this end, the new legislation codified a statutory definition of prescription drug in section 503(b) of the act.

**4**

Section 503(b) of the act sets forth the Federal standard used to classify drugs as prescription or OTC, and it describes when and how to switch a drug from prescription to OTC status. Section 503(b)(1) of the act defines a prescription drug as:

(1) A drug intended for use by man which—

(A) because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug; or

(B) is limited by an approved application under section 505 to use under the professional supervision of a practitioner licensed by law to administer such drug.

The act does not define ''OTC drug,'' but the term has been adopted to refer to any drug that does not meet the definition of prescription drug in section 503(b) of the act.

Given this dichotomy between prescription and OTC drugs, questions have arisen over the years about whether there are any conditions under which an active ingredient may be simultaneously marketed in both a prescription drug product and an OTC drug product. FDA has interpreted the language in 503(b)(1) of the act to allow marketing of the same active ingredient in products that are both prescription and OTC, assuming some meaningful difference exists between the two that makes the prescription product safe only under the supervision of a licensed practitioner. Examples of such drugs include: Meclizine (prescription for vertigo/OTC for nausea with motion sickness); Clotrimazol (prescription for candidiasis/OTC for athlete's foot, ring worm, jock itch); Loperamide (prescription for chronic diarrhea/OTC for acute diarrhea); Nicotine products (prescription for administration through inhalers and nasal sprays/OTC in gums, lozenges and patches); ibuprofren (prescription

5

at 400mg+ for arthritis/OTC at 400mg and below for aches and pains); and H2 blockers (prescription at 300mg+ for ulcers/OTC at 200mg for heartburn). The key distinction in these examples is that there is some meaningful difference between the two products (e.g., indication, strength, route of administration, dosage form) that makes the prescription product safe only under the supervision of a licensed practitioner. To date, FDA has not allowed marketing of the same active ingredient in a prescription product for one population and in an OTC product for a subpopulation.

## II. Agency Request for Information

Despite the preceding examples, we recognize that FDA's interpretation of section 503(b) of the act has not been explicitly set forth in any of the regulations that discuss the process by which FDA classifies (or re-classifies) drugs as OTC or prescription. See, e.g., 21 CFR 310.200 and 310.201.

To address this concern, we therefore ask for comments on the following questions:

1.

A. Should FDA initiate a rulemaking to codify its interpretation of section 503(b) of the act regarding when an active ingredient can be simultaneously marketed in both a prescription drug product and an OTC drug product?

B. Is there significant confusion regarding FDA's interpretation of section 503(b) of the act?

C. If so, would a rulemaking on this issue help dispel that confusion?

2.

A. If FDA limited sale of an OTC product to a particular subpopulation, e.g., by making the product available to the subpopulation by prescription only, would FDA be able to enforce such a limitation as a matter of law?

**6**

B. If it could, would it be able to do so as practical matter and, if so, how?

3.

A. Assuming it is legal to market the same active ingredient in both a prescription and OTC product, may the different products be legally sold in the same package?

B. If the two products may be lawfully sold in a single package, under what circumstances would it be inappropriate to do so?

**III. Comments**

Interested persons may submit to the Division of Dockets Management (see **ADDRESSES**) written or electronic comments regarding this document. Submit a single copy of electronic comments or two paper copies of any mailed comments, except that individuals may submit one paper copy. Comments are to be identified with the docket number found in brackets in the heading of

**7**

this document. Received comments may be seen in the Division of Dockets

Management between 9 a.m. and 4 p.m. Monday through Friday.

Dated: August 26, 2005.

**Jeffrey Shuren,**

*Assistant Commissioner for Policy.*

[FR Doc. 05–????? Filed ??–??–05; 8:45 am]

**BILLING CODE 4160–01–S**

# EXHIBIT E

Case 1:05-cv-00366-ERK-VVP    Document 47-2    Filed 10/17/05    Page 23 of 71 PageID #: 482

U.S. Food and Drug Administration

# TEXT OF THE JUNE 4, 2002 LETTER TRANSMITTING THE PDUFA III PERFORMANCE GOALS AND PROCEDURES

As you are aware, the Prescription Drug User Fee Act of 1992 (PDUFA), as reauthorized by the Food and Drug Administration Modernization Act of 1997, expires at the end of Fiscal Year 2002. Under PDUFA, the additional revenues generated from fees paid by the pharmaceutical and biological prescription drug industries have been used to expedite the process for the review of prescription drugs, in accordance with performance goals that were developed by the Food and Drug Administration (FDA) in consultation with PDUFA stakeholders.

FDA has worked with various stakeholders, including representatives from consumer, patient, and health provider groups, and the pharmaceutical and biological prescription drug industries, to develop a reauthorization proposal for PDUFA that would build upon and enhance the success of the program. Title 5, Subtitle A, of the Public Health Security and Bioterrorism Preparedness and Response Act of 2002, as passed by the House on May 22, 2002, and by the Senate on May 23, 2002, reflects the fee mechanisms and other improvements developed in these discussions. The performance goals referenced in Section 502 are specified in the enclosure to this letter, entitled "PDUFA Reauthorization Performance Goals and Procedures." I believe they represent a realistic projection of what FDA can accomplish with industry cooperation and both the additional resources identified in the bill and annual FDA appropriations that fully cover the costs of pay and inflation increases for the drug and biologics review process each year.

This letter and the enclosed goals document pertain only to Title 5, Subtitle A (Prescription Drug User Fees) of H.R. 3448, the Public Health Security and Bioterrorism Preparedness and Response Act of 2002. OMB has advised that there is no objection to the presentation of these views from the standpoint of the Administration's program. We appreciate the support of you and your staffs, the assistance of other Members of the Committee, and that of the Appropriations Committees, in the reauthorization of this vital program.

Sincer

Tomm

Thompson

Enclosure

Identical Letters to the Chairman and Ranking Minority Members of:
Committee on Health, Education, Labor, & Pensions, United States Senate
Committee on Energy and Commerce, House of Representatives

Case 1:05-cv-00366-ERK-VVP    Document 47-2    Filed 10/17/05    Page 24 of 71 PageID #: 483



# ENCLOSURE
# PDUFA REAUTHORIZATION PERFORMANCE GOALS AND PROCEDURES

The performance goals and procedures of the FDA Center for Drug Evaluation and Research (CDER) and the Center for Biologics Evaluation and Research (CBER), as agreed to under the reauthorization of the prescription drug user fee program in the [cite statute] are summarized as follows:

## I. REVIEW PERFORMANCE GOALS - FISCAL YEAR 2003 THROUGH 2007

### A. NDA/BLA Submissions and Resubmissions:

**Review and act on 90 percent of standard original NDA and BLA submissions filed during fiscal year within 10 months of receipt.**

1. Review and act on 90 percent of priority original NDA and BLA submissions filed during fiscal year within 6 months of receipt.
2. Review and act on 90 percent of Class 1 resubmitted original applications filed during fiscal year within 2 months of receipt.
3. Review and act on 90 percent of Class 2 resubmitted original applications filed during fiscal year within 6 months of receipt.

### Original Efficacy Supplements:

1. Review and act on 90 percent of standard efficacy supplements filed during fiscal year within 10 months of receipt.
2. Review and act on 90 percent of priority efficacy supplements filed during fiscal year within 6 months of receipt.

### Resubmitted Efficacy Supplements:

### Fiscal Year 2003:

1. Review and act on 90 percent of Class 1 resubmitted efficacy supplements filed during fiscal year 2003 within 6 months of receipt and review and act on 30 percent within 2 months of receipt.
2. Review and act on 90 percent of Class 2 resubmitted efficacy supplements filed during fiscal year 2003 within 6 months of receipt.

### Fiscal Year 2004:

1. Review and act on 90 percent of Class 1 resubmitted efficacy supplements filed during fiscal year 2004 within 4 months and review and act on 50 percent within 2 months of receipt.
2. Review and act on 90 percent of Class 2 resubmitted original applications filed during fiscal year 2004 within 6 months of receipt.

Case 1:05-cv-00366-ERK-VVP    Document 47-2    Filed 10/17/05    Page 25 of 71 PageID #: 484

**Fiscal Year 2005:**

1.  Review and act on 90 percent of Class 1 resubmitted efficacy supplements filed during fiscal year 2005 within 4 months of receipt and review and act on 70 percent within 2 months of receipt.
2.  Review and act on 90 percent of Class 2 resubmitted efficacy supplements within 6 months of receipt.

**Fiscal Year 2006:**

1.  Review and act on 90 percent of Class 1 resubmitted efficacy supplements filed during fiscal year 2006 within 4 months of receipt and review and act on 80 percent within 2 months of receipt.
2.  Review and act on 90 percent of Class 2 resubmitted efficacy supplements within 6 months of receipt.

**Fiscal Year 2007:**

1.  Review and act on 90 percent of Class 1 resubmitted efficacy supplements filed during fiscal year 2007 within 2 months of receipt.
2.  Review and act on 90 percent of Class 2 resubmitted efficacy supplements within 6 months of receipt.

**Original Manufacturing Supplements:**

1.  Review and act on 90 percent of manufacturing supplements filed during fiscal year within 6 months of receipt and review and act on 90 percent of manufacturing supplements requiring prior approval within 4 months of receipt.

These review goals are summarized in the following tables:

### ORIGINAL and RESUBMITTED NDAs/BLAs:

| SUBMISSION COHORT | STANDARD | PRIORITY |
|---|---|---|
| Original Applications | 90% IN 10 MO | 90% IN 6 MO |
| Class 1 Resubmissions | 90% IN 2 MO | 90% IN 2 MO |
| Class 2 Resubmissions | 90% IN 6 MO | 90% IN 6 MO |

### ORIGINAL and RESUBMITTED EFFICACY SUPPLEMENTS:

| SUBMISSION COHORT | STANDARD | PRIORITY |
|---|---|---|
| Original Efficacy Supplements | 90% In 10 MO | 90% IN 6 MO |

### RESUBMITTED EFFICACY SUPPLEMENTS

| | | |
|---|---|---|

Case 1:05-cv-00366-ERK-VVP    Document 47-2    Filed 10/17/05    Page 26 of 71 PageID
#: 485

| SUBMISSION COHORT | CLASS 1 | CLASS 2 |
|---|---|---|
| FY 2003 | 90% IN 6 MO/30% IN 2 MO | 90% IN 6 MO |
| FY 2004 | 90% IN 4 MO/50% IN 2 MO | 90% IN 6 MO |
| FY 2005 | 90% IN 4 MO/70% IN 2 MO | 90% IN 6 MO |
| FY 2006 | 90% IN 4 MO/80% IN 2 MO | 90% IN 6 MO |
| FY 2007 | 90% IN 2 MO | 90% IN 6 MO |

**MANUFACTURING SUPPLEMENTS**

| SUBMISSION COHORT | MANUFACTURING SUPPLEMENTS NO PRIOR APPROVAL ("CHANGES BEING EFFECTED" OR "30-DAY SUPPLEMENTS") | MANUFACTURING SUPPLEMENTS THAT DO REQUIRE PRIOR APPROVAL |
|---|---|---|
| FY 2003 – 2007 | 90% IN 6 MO | 90% IN 4 MO |

## II. NEW MOLECULAR ENTITY (NME) PERFORMANCE GOALS

A.  The performance goals for standard and priority original NMEs in each submission cohort will be the same as for all of the original NDAs (including NMEs) in each submission cohort but shall be reported separately.

B.  For biological products, for purposes of this performance goal, all original BLAs will be considered to be NMEs.

## III. MEETING MANAGEMENT GOALS

### A. Responses to Meeting Requests

1.  Procedure: Within 14 calendar days of the Agency's receipt of a request from industry for a formal meeting (i.e., a scheduled face-to-face, teleconference, or videoconference) CBER and CDER should notify the requester in writing (letter or fax) of the date, time, and place for the meeting, as well as expected Center participants.

2.  Performance Goal: FDA will provide this notification within 14 days for 90% in FY 2003 - 2007.

### B. Scheduling Meetings

1.  Procedure: The meeting date should reflect the next available date on which all applicable Center personnel are available to attend, consistent with the component's other business; however, the meeting should be scheduled consistent with the type of meeting requested. If the requested date for any of these types of meetings is greater than 30, 60, or 75 calendar days (as

Case 1:05-cv-00366-ERK-VVP    Document 47-2    Filed 10/17/05    Page 27 of 71 PageID #: 486

appropriate) from the date the request is received by the Agency, the meeting date should be within 14 calendar days of the date requested.

Type A Meetings should occur within 30 calendar days of the Agency receipt of the meeting request.

Type B Meetings should occur within 60 calendar days of the Agency receipt of the meeting request.

Type C Meetings should occur within 75 calendar days of the Agency receipt of the meeting request.

2. Performance goal: 90% of meetings are held within the timeframe (based on cohort year of request) from FY 03 to FY 07.

### C. Meeting Minutes

1. Procedure: The Agency will prepare minutes which will be available to the sponsor 30 calendar days after the meeting. The minutes will clearly outline the important agreements, disagreements, issues for further discussion, and action items from the meeting in bulleted form and need not be in great detail.
2. Performance goal: 90% of minutes are issued within 30 calendar days of date of meeting (based on cohort year of meeting) in FY 03 to FY 07.

### D. Conditions

For a meeting to qualify for these performance goals:

1. A written request (letter or fax) should be submitted to the review division; and
2. The letter should provide:

   a. A brief statement of the purpose of the meeting;
   b. A listing of the specific objectives/outcomes the requester expects from the meeting;
   c. A proposed agenda, including estimated times needed for each agenda item;
   d. A listing of planned external attendees;
   e. A listing of requested participants/disciplines representative(s) from the Center;
   f. The approximate time that supporting documentation (i.e., the "backgrounder") for the meeting will be sent to the Center (i.e., "x" weeks prior to the meeting, but should be received by the Center at least 2 weeks in advance of the scheduled meeting for Type A meetings and at least 1 month in advance of the scheduled meeting for Type B and Type C meetings); and
   g. The Agency concurs that the meeting will serve a useful purpose (i.e., it is not premature or clearly unnecessary). However, requests for a "Type B" meeting will be honored except in the most unusual circumstances.

## IV. CLINICAL HOLDS

A. Procedure: The Center should respond to a sponsor's complete response to a clinical hold within 30 days of the Agency's receipt of the submission of such sponsor response.
B. Performance goal: 90% of such responses are provided within 30 calendar days of the Agency's receipt of the sponsor's response in FY 03 to FY07 (cohort of date of receipt).

## V. MAJOR DISPUTE RESOLUTION

Case 1:05-cv-00366-ERK-VVP    Document 47-2    Filed 10/17/05    Page 28 of 71 PageID #: 487

A. **Procedure:** For procedural or scientific matters involving the review of human drug applications and supplements (as defined in PDUFA) that cannot be resolved at the divisional level (including a request for reconsideration by the Division after reviewing any materials that are planned to be forwarded with an appeal to the next level), the response to appeals of decisions will occur within 30 calendar days of the Center's receipt of the written appeal.

B. **Performance goal:** 90% of such answers are provided within 30 calendar days of the Center's receipt of the written appeal in FY 03 to FY 07.

C. **Conditions:**

1. Sponsors should first try to resolve the procedural or scientific issue at the Division level. If it cannot be resolved at that level, it should be appealed to the Office Director level (with a copy to the Division Director) and then, if necessary, to the Deputy Center Director

2. Responses should be either verbal (followed by a written confirmation within 14 calendar days of the verbal notification) or written and should

3. If the decision is to deny the appeal, the response should include reasons for the denial and any actions the sponsor might take in order

4. In some cases, further data or further input from others might be needed to reach a decision on the appeal. In these cases, the "response" should be the plan for obtaining that information (e.g., requesting further information from the sponsor, scheduling a meeting with the sponsor, scheduling the issue for discussion at the next scheduled available advisory committee).

5. In these cases, once the required information is received by the Agency (including any advice from an advisory committee), the person to whom the appeal was made, again has 30 calendar days from the receipt of the required information in which to either deny or grant the appeal.

6. Again, if the decision is to deny the appeal, the response should include the reasons for the denial and any actions the sponsor might take in order to persuade the Agency to reverse its decision.

7. N.B. If the Agency decides to present the issue to an advisory committee and there are not 30 days before the next scheduled advisory committee, the issue will be presented at the following scheduled committee meeting in order to allow conformance with advisory committee administrative procedures.

## VI. SPECIAL PROTOCOL QUESTION ASSESSMENT AND AGREEMENT

A. **Procedure**: Upon specific request by a sponsor (including specific questions that the sponsor desires to be answered), the agency will evaluate certain protocols and issues to assess whether the design is adequate to meet scientific and regulatory requirements identified by the sponsor.

1. The sponsor should submit a limited number of specific questions about the protocol design and scientific and regulatory requirements for which the sponsor seeks agreement (e.g., is the dose range in the carcinogenicity study adequate, considering the intended clinical dosage; are the clinical endpoints adequate to support a specific efficacy claim).

2. Within 45 days of Agency receipt of the protocol and specific questions, the Agency will provide a written response to the sponsor that includes a succinct assessment of the protocol and answers to the questions posed by the sponsor. If the agency does not agree that the protocol design, execution plans, and data analyses are adequate to achieve the goals of the sponsor, the reasons for the disagreement will be explained in the response.

3. Protocols that qualify for this program include: carcinogenicity protocols, stability protocols, and Phase 3 protocols for clinical trials that will form the primary basis of an efficacy claim. (For such Phase 3 protocols to qualify for this comprehensive protocol assessment, the sponsor must have had an end of Phase 2/pre-Phase 3 meeting with the review division so that the

Case 1:05-cv-00366-ERK-VVP    Document 47-2    Filed 10/17/05    Page 29 of 71 PageID #: 488

division is aware of the developmental context in which the protocol is being reviewed and the questions being answered.)

4. N.B. For products that will be using Subpart E or Subpart H development schemes, the Phase 3 protocols mentioned in this paragraph should be construed to mean those protocols for trials that will form the primary basis of an efficacy claim no matter what phase of drug development in which they happen to be conducted.

5. If a protocol is reviewed under the process outlined above and agreement with the Agency is reached on design, execution, and analyses and if the results of the trial conducted under the protocol substantiate the hypothesis of the protocol, the Agency agrees that the data from the protocol can be used as part of the primary basis for approval of the product. The fundamental agreement here is that having agreed to the design, execution, and analyses proposed in protocols reviewed under this process, the Agency will not later alter its perspective on the issues of design, execution, or analyses unless public health concerns unrecognized at the time of protocol assessment under this process are evident.

B. **Performance goal**: 90% of special protocols assessments and agreement requests completed and returned to sponsor within timeframes (based on cohort year of request) from FY 03 to FY 07.

## VII. CONTINOUS MARKETING APPLICATION

To test whether providing early review of selected applications and additional feedback and advice to sponsors during drug development for selected products can further shorten drug development and review times, FDA agrees to conduct the following two pilot programs:

A. **Pilot 1 – Discipline Review Letters for Pre-Submitted "Reviewable Units" of NDAs/BLAs**

1. This pilot applies to drugs and biologics that have been designated to be Fast Track drugs or biologics, pursuant to section 112 of the FDA Modernization Act (21 U.S.C. 506), have been the subject of an End-of-Phase 2 and/or a Pre-NDA/BLA meeting, and have demonstrated significant promise as a therapeutic advance in clinical trials.

2. For drugs and biologics that meet these criteria, FDA may enter into an agreement with the sponsor to accept pre-submission of one or more "reviewable units"of the application in advance of the submission of the complete NDA/BLA.

3. If following an initial review FDA finds a "reviewable unit" to be substantially complete for review (i.e., after a "filing review" similar to that performed on an NDA/BLA), FDA will initiate a review clock for the complete review of the "reviewable unit" of the NDA/BLA. The review clock would start from the date of receipt of the "reviewable unit."

4. To be considered fileable for review under paragraph 3, a "reviewable unit" must be substantially complete when submitted to FDA. Once a "reviewable unit" is "filed" by FDA, except as provided in paragraph 5 below, only minor information amendments submitted in response to FDA inquiries or requests and routine stability and safety updates will be considered during the review cycle.

5. Major amendments to the "reviewable unit" are strongly discouraged. However, in rare cases, and with prior agreement, FDA may accept and consider for review a major amendment to a "reviewable unit." To accommodate these rare cases, a major amendment to a "reviewable unit" submitted within the last three months of a 6-month review cycle may, at FDA's discretion, trigger a 3-month extension of the review clock for the "reviewable unit" in question. In no case, however, would a major amendment be accepted for review and the review clock for the "reviewable

Case 1:05-cv-00366-ERK-VVP     Document 47-2     Filed 10/17/05     Page 30 of 71 PageID #: 489

unit" extended if the extended review clock for the "reviewable unit" exceeded the review clock for the complete NDA/BLA. (See paragraph 10 below).

6. After completion of review of the "reviewable unit" of the NDA/BLA by the appropriate discipline review team, FDA will provide written feedback to the sponsor of the review findings in the form of a discipline review letter (DRL).

7. The DRL will provide feedback on the individual "reviewable unit" from the discipline review team, and not final, definitive decisions relevant to the NDA/BLA.

8. If an application is to be presented to an advisory committee, the final DRL on the "reviewable unit" may be deferred pending completion of the advisory committee meeting and internal review and consideration of the advice received.

9. The following performance goals will apply to review of "reviewable units" of an NDA/BLA for Fast Track drugs and biologics that are submitted in advance of the complete NDA/BLA under this pilot program: a. Discipline review team review of a "reviewable unit" for a Fast Track drug or biologic will be completed and a DRL issued within 6 months of the date of the submission for 30% of "reviewable units" submitted in FY04; b. Discipline review team review of a "reviewable unit" for a Fast Track drug or biologic will be completed and a DRL issued within 6 months of the date of the submission for 50% of "reviewable units" submitted in FY05; c. Discipline review team review of a "reviewable unit" for a Fast Track drug or biologic will be completed and a DRL issued within 6 months of the date of the submission for 70% "reviewable units" submitted in FY06, and d. Discipline review team review of a "reviewable unit: for a Fast Track drug or biologic will be completed and a DRL letter issued within 6 months of the date of the submission for 90% of "reviewable units" submitted in FY07.

10. If the complete NDA/BLA is submitted to FDA while a 6-month review clock for a "reviewable unit" is still open, FDA will adhere to the timelines and performance goals for both the "reviewable unit" and the complete NDA/BLA. For example, if a "reviewable unit" is submitted in January and the complete NDA/BLA is submitted in April, the review goal for the "reviewable unit" will be July and the review goal for the complete NDA/BLA will be October.

11. Any resubmission or amendment of a "reviewable unit" submitted by the sponsor in response to an FDA discipline review letter will not be subject to the review timelines and performance goals proposed above. FDA review of such resubmissions and amendments in advance of submission of the complete NDA/BLA will occur only as resources allow.

12. This pilot program is limited to the initial submission of an NDA/BLA and is not applicable to a resubmission in response to an FDA complete response letter following the complete review of an NDA/BLA.

13. Guidance: FDA will develop and issue a joint CDER/CBER guidance on how it intends to implement this pilot program by September 30, 2003. The guidance will describe the principles, processes, and procedures that will be followed during the pilot program. The guidance also will define what subsections of a complete technical section would be considered an acceptable "reviewable unit" for pre-submission and review and how many individual "reviewable units" from one or more technical sections of an NDA/BLA can be pre-submitted and reviewed subject to separate review clocks under this program at any given time. The pilot program will be implemented in FY 2004, after the final guidance is issued and will continue through FY 2007.

B. **Pilot 2 – Frequent Scientific Feedback and Interactions During Drug Development**

1. This pilot applies to drugs and biologics that have been designated to be Fast Track drugs or biologics pursuant to section 112 of the FDA

Case 1:05-cv-00366-ERK-VVP    Document 47-2    Filed 10/17/05    Page 31 of 71 PageID #: 490

Modernization Act (21 U.S.C. 508), that are intended to treat serious and/or life-threatening diseases, and that have been the subject of an end-of-phase 1 meeting. The pilot program is limited to one Fast Track product in each CDER and CBER review division over the course of the pilot program.

2. For drugs and biologics that meet these criteria, FDA may enter into an agreement with the sponsor to initiate a formal program of frequent scientific feedback and interactions regarding the drug development program. The feedback and interactions may take the form of regular meetings between the division and the sponsor at appropriate points during the development process, written feedback from the division following review of the sponsor's drug development plan, written feedback from the division following review of important new protocols, and written feedback from the division following review of study summaries or complete study reports submitted by the sponsor.

3. Decisions regarding what study reports would be reviewed as summaries and what study reports would be reviewed as complete study reports under this pilot program would be made in advance, following discussions between the division and the sponsor of the proposed drug development program. In making these decisions, the review division will consider the importance of the study to the drug development program, the nature of the study, and the potential value of limited (i.e., based on summaries) versus more thorough division review (i.e., based on complete study reports).

4. Guidance: FDA will develop and issue a joint CDER/CBER guidance on how it intends to implement this pilot program by September 30, 2003. The guidance will describe the principles, processes, and procedures that will be followed during the pilot program. The pilot program will be implemented in FY 2004, after the final guidance is issued and will continue through FY 2007. The full (unredacted) study report will be provided to the FDA Commissioner and a version of the study report redacted to remove confidential commercial information or other information exempt from disclosure, will be made available to the public.

C. **Evaluation of the Pilot Programs**

1. In FY 2004, FDA will contract with an outside expert consultant(s) to evaluate both pilot programs.

2. The consultant(s) will develop an evaluation study design that identifies key questions, data requirements, and a data collection plan, and conduct a comprehensive study of the pilot programs to help assess the value, costs, and impact of these programs to the drug development and review process. A preliminary report will be generated by the consultant by the end of FY06.

## VIII. PRE- AND PERI-NDA/BLA RISK MANAGEMENT PLAN ACTIVITIES

a. **Submission and Review of pre-NDA/BLA meeting packages:**

A pre-NDA/BLA meeting package may include a summary of relevant safety information and industry questions/discussion points regarding proposed risk management plans and discussion of the need for any post-approval risk management studies. The elements of the proposal may include:

1. assessment of clinical trial limitations and disease epidemiology
2. assessment of risk management tools to be used to address known and potential risks
3. suggestions for phase 4 epidemiology studies, if such studies are warranted
4. proposals for targeted post-approval surveillance (this would include attempts to quantify background rates of risks of concern and thresholds for actions) The pre-NDA/BLA meeting package will be reviewed and discussed by the review divisions as well as the appropriate safety group in CDER or CBER.

Case 1:05-cv-00366-ERK-VVP   Document 47-2   Filed 10/17/05   Page 32 of 71 PageID #: 491

b. **Pre-NDA/BLA meeting with industry:** This meeting may include a discussion of the preliminary risk management plans and proposed observational studies, if warranted, as outlined above. Participants in this meeting will include product safety experts from the respective Center. The intent of these discussions will be for FDA to get a better understanding of the safety issues associated with the particular drug/biologic and the proposed risk management plans, and to provide industry with feedback on these proposals so that they can be included in the NDA/BLA submission. It is the intent of this proposal that such risk management plans and the discussions around them would focus on specific issues of concern, either based on already identified safety issues or reasonable potential focused issues of concern.

c. **Review of NDA/BLA:** The NDA/BLA submitted by industry may include the proposed risk management tools and plans, and protocols for observational studies, based on the discussions that began with the pre-NDA/BLA meeting, as described above, and may be amended as appropriate to further refine the proposal. These amendments would not normally be considered major amendments. Both the review division and the appropriate safety group will be involved in the review of the application and will try to communicate comments regarding the risk management plan as early in the review process as practicable, in the form of a discipline review letter. Items to be included in the risk management plan to assure FDA of the safety and efficacy of the drug or biologic are to be addressed prior to approval of an application. The risk management plan may contain additional items that can be used to help refine the risks and actions (e.g., background rates and observational studies) and these items may be further defined and completed after approval in accordance with time frames agreed upon at the time of product approval.

d. **Peri-Approval Submission of Observational Study Reports and Periodic Safety Update Reports (PSURs):** For NDA/BLA applications, and supplements containing clinical data, submitted on or after October 1, 2002, FDA may use user fees to review an applicant's implementation of the risk management plan for a period of up to two years post-approval for most products and for a period of up to three years for products that require risk management beyond standard labeling (e.g., a black box or bolded warning, medication guide, restricted distribution). This period is defined for purposes of the user fee goals as the peri-approval period. Issues that arise during implementation of the risk management plan (e.g., whether the plan is effective) will be reported to FDA either in the form of a PSUR or in a periodic or annual report (21 CFR 314.80 and 314.81) (ICH Guidance E2C, Clinical Safety Data Management: Periodic Safety Update Reports for Marketed Drugs) and addressed during the peri-approval period through discussions between the applicant and FDA. PSURs may be submitted and reviewed semi-annually for the first two or three years post approval to allow adequate time for implementation of risk management plans.

For drugs approved under PDUFA III, FDA may use user fees to independently evaluate product utilization for drugs with important safety concerns, using drug utilization databases, for the first three years post approval. The purpose of such utilization evaluations is to evaluate whether these products are being used in a safe manner and to work pro-actively with companies during the peri-approval period to accomplish this. FDA will allocate $70,900,000 in user fees over 5 years to the activities covered in this section. FDA will track the specific amounts of user fees spent on these activities and will include in its annual report to Congress an accounting of this spending.

e. **Guidance Document Development:** By the end of Fiscal Year 04, CDER and CBER will jointly develop final guidance documents that address good risk assessment, risk management, and pharmacovigilance practices.

## IX. INDEPENDENT CONSULTANTS FOR BIOTECHNOLOGY CLINICAL TRIAL PROTOCOLS

Case 1:05-cv-00366-ERK-VVP    Document 47-2    Filed 10/17/05    Page 33 of 71 PageID #: 492

A. **Engagement of Expert Consultant:** During the development period for a biotechnology product, a sponsor may request that FDA engage an independent expert consultant, selected by FDA, to participate in the Agency's review of the protocol for the clinical studies that are expected to serve as the primary basis for a claim.

B. **Conditions**

   1. The product must be a biotechnology product (for example, DNA plasmid products, synthetic peptides of fewer than 40 amino acids, monoclonal antibodies for in vivo use, and recombinant DNA-derived products) that represents a significant advance in the treatment, diagnosis or prevention of a disease or condition, or have the potential to address an unmet medical need;

   2. The product may not have been the subject of a previously granted request under this program;

   3. The sponsor must submit a written request for the use of an independent consultant, describing the reasons why the consultant should be engaged (e.g., as a result of preliminary discussions with the Agency the sponsor expects substantial disagreement over the proposed protocol); and

   4. The request must be designated as a "Request for Appointment of Expert Consultant" and submitted in conjunction with a formal meeting request (for example, during the end-of-Phase II meeting or a Type A, meeting).

C. **Recommendations for Consultants:** The sponsor may submit a list of recommended consultants for consideration by the Agency. The selected consultant will either be a special government employee, or will be retained by FDA under contract. The consultant's role will be advisory to FDA and FDA will remain responsible for making scientific and regulatory decisions regarding the clinical protocol in question.

D. **Denial of Requests**: FDA will grant the request unless the Agency determines that engagement of an expert consultant would not serve a useful purpose (for example it is clearly premature). FDA will engage the services of an independent consultant, of FDA's choosing, as soon as practicable. If the Agency denies the request, it will provide a written rationale to the requester within 14 days of receipt.

E. **Performance Goal Change:** Due to the time required to select and screen the consultant for potential conflicts of interest and to allow the consultant sufficient time to review the scientific issues involved, the performance goals for scheduling the formal meeting (see section III) may be extended for an additional sixty (60) days.

F. **Evaluation:** During FY 2006, FDA will conduct a study to evaluate the costs and benefits of this program for both sponsors and the Agency.

## X. FIRST CYCLE REVIEW PERFORMANCE PROPOSAL

A. **Notification of Issues Identified during the Filing Review**

   1. Performance Goal: For original NDA/BLA applications and efficacy supplements, FDA will report substantive deficiencies identified in the initial filing review to the sponsor by letter, telephone conference, facsimile, secure e-mail, or other expedient means.

   2. The timeline for such communication will be within 14 calendar days after the 60 day filing date.

   3. If no deficiencies were noted, FDA will so notify the sponsor.

   4. FDA's filing review represents a preliminary review of the application and is not indicative of deficiencies that may be identified later in the review cycle.

   5. FDA will provide the sponsor a notification of deficiencies prior to the goal date for 50% of applications in FY 2003, 70% in FY 2004, and 90% in FY 2005, FY2006, and FY 2007.

B. **Good Review Management Principles Guidance:** FDA will develop a joint

Case 1:05-cv-00366-ERK-VVP    Document 47-2    Filed 10/17/05    Page 34 of 71 PageID #: 493

CDER-CBER guidance on Good Review Management Principles (GRMPs), and publish final guidance by the end of FY 2003. The Good Review Management Principles will address, among other elements, the following:

1. The filing review process, including communication of issues identified during the filing review that may affect approval of the application.
2. Ongoing communication with the sponsor during the review process (in accordance with 21 CFR 314.102(a)), including emphasis on early communication of easily correctable deficiencies (21 CFR 314.102(b)).
3. Appropriate use of Information Request and Discipline Review letters, as well as other informal methods of communication (phone, fax, e-mail).
4. Anticipating/planning for a potential Advisory Committee meeting.
5. Completing the primary reviews – allowing time for secondary and tertiary reviews prior to the action goal date.
6. Labeling feedback – planning to provide labeling comments and scheduling time for teleconferences with the sponsor in advance of the action goal date

C. **Training**: FDA will develop and implement a program for training all review personnel, including current employees as well as future new hires, on the good review management principles.

D. **Evaluation**: FDA will retain an independent expert consultant to undertake a study to evaluate issues associated with the conduct of first cycle reviews.

1. The study will be designed to assess current performance and changes that occur after the guidance on GRMPs is published. The study will include collection of various types of tracking data regarding actions that occur during the first cycle review, both from an FDA and industry perspective (e.g., IR letters, DR letters, draft labeling comments from FDA to the sponsor, sponsor response to FDA requests for information).
2. The study will also include an assessment of the first cycle review history of all NDAs for NMEs and all BLAs during PDUFA 3. This assessment will include a more detailed evaluation of the events that occurred during the review process with a focus on identifying best practices by FDA and industry that facilitated the review process.
3. The study will also include an assessment of the effectiveness of the training program implemented by FDA.
4. FDA will develop a statement of work for the study and will provide the public an opportunity to review and comment on the statement of work before the study is implemented. The consultant will prepare annual reports of the findings of the study and a final study report at the end of the 5-year study period. The full (un-redacted) study reports will be provided to the FDA Commissioner and a version of the study reports redacted to remove confidential commercial information or other information exempt from disclosure, will be made available to the public.
5. Development and implementation of the study of first cycle review performance will be a component of the Performance Management Plan conducted out of the Office of the Commissioner (see section X).
6. Administrative oversight of the study will rest in the Office of the Commissioner. The Office of the Commissioner will convene a joint CDER/CBER review panel on a quarterly basis as a mechanism for ongoing assessment of the application of Good Review Management Principles to actions taken on original NDA/BLA applications.

## XI. IMPROVING FDA PERFORMANCE MANAGEMENT

A. **Performance Fund:**The Commissioner will use at least $7 million over five years of PDUFA III funds for initiatives targeted to improve the drug review process.
1. Funds would be made available by the Commissioner to the Centers based both on identified areas of greatest need for process improvements as well as on achievement of previously identified objectives.

Case 1:05-cv-00366-ERK-VVP    Document 47-2    Filed 10/17/05    Page 35 of 71 PageID #: 494

2. Funds also could be used by the FDA Commissioner to diagnose why objectives are not being met, or to examine areas of concern.
3. The studies conducted under this initiative would be intended to foster:

   a. Development of programs to improve access to internal and external expertise
   b. Reviewer development programs, particularly as they relate to drug review processes,
   c. Advancing science and use of information management tools
   d. Improving both inter- and intra-Center consistency, efficiency, and effectiveness
   e. Improved reporting of management objectives
   f. Increased accountability for use of user fee revenues
   g. Focused investments on improvements in the process of drug review
   h. Improved communication between the FDA and industry

4. In deciding how to spend these funds, the Commissioner would take into consideration how to achieve greater harmonization of capabilities between CDER and CBER.

B. **First Two Initiatives:** Two specific initiatives will begin early in PDUFA III and supported from performance management initiative funds 1) evaluation of first cycle review performance, and 2) process review and analysis within the two centers.

   1. First Cycle Review Performance See the First Cycle Review Performance (See section X. for details on this proposed study).
   2. Process Review and Analysis

      a. In FY 2003, FDA will contract with an outside consultant to conduct a comprehensive process review and analysis within CDER and CBER. This review will involve a thorough analysis of information utilization, review management, and activity cost.
      b. The review is expected to take from 18-24 months, although its duration will depend on the type and amount of complexity of the issues uncovered during the review.
      c. The outcome of this review will be a thorough documentation of the process, a re-map of the process indicating where efficiencies can be gained, activity-based project accounting, optimal use of review tools, and a suggested path for implementing the recommendations.
      d. FDA would anticipate delivery of a report of the consultant's findings and recommendations in FY 2004-2005. The agency would consider these recommendations in planning any redesign or process reengineering to enhance performance.

   3. Further Studies

In subsequent years of PDUFA III, FDA may develop other study plans that will focus on further analysis of program design, performance features and costs, to identify potential avenues for further enhancement. Future studies would be likely to include a comprehensive re-analysis of program costs following the implementation of new PDUFA III review initiatives and the adoption of any process changes following the recommendations of the year 1 and 2 studies.

## XII. ELECTRONIC APPLICATIONS AND SUBMISSIONS - GOALS

a. The Agency will centralize the accountability and funding for all PDUFA Information Technology initiatives/activities for CBER, CDER, ORA and OC under the leadership of the FDA CIO. The July 2001 HHS IT 5-year plan states that infrastructure consolidation across the department should be achieved, including standardization. The Agency CIO will be responsible for ensuring that all PDUFA

Case 1:05-cv-00366-ERK-VVP    Document 47-2    Filed 10/17/05    Page 36 of 71 PageID #: 495

    III IT infrastructure and IT investments support the Agency's common IT goals, fit into a common computing environment, and follow good IT management practices.

b. The Agency CIO will chair quarterly briefings on PDUFA IT issues to periodically review and evaluate the progress of IT initiatives against project milestones, discuss alternatives when projects are not progressing, and review proposals for new initiatives. On an annual basis, an assessment will be conducted of progress against PDUFA III IT goals and, established program milestones, including appropriate changes to plans. A documented summary of the assessment will be drafted and forwarded to the Commissioner A version of the study report redacted to remove confidential commercial or security information, or other information exempt from disclosure, will be made available to the public. The project milestones, assessment and changes will be part of the annual PDUFA III IT report.

c. FDA will implement a common solution in CBER, CDER, ORA and OC for the secure exchange of content including secure e-mail, electronic signatures, and secure submission of, and access to application components.

d. FDA will deliver a single point of entry for the receipt and processing of all electronic submissions in a highly secure environment. This will support CBER, CDER, OC and ORA. The system should automate the current electronic submission processes such as checking the content of electronic submissions for completeness and electronically acknowledging submissions.

e. FDA will provide a specification format for the electronic submission of the Common Technical Document (e-CTD), and provide an electronic review system for this new format that will be used by CBER, CDER and ORA reviewers. Implementation should include training to ensure successful deployment. This project will serve as the foundation for automation of other types of electronic submissions. The review software will be made available to the public. .

f. Within the first 12 months, FDA will conduct an objective analysis and develop a plan for consolidation of PDUFA III IT infrastructure and desktop management services activities that will assess and prioritize the consolidation possibilities among CBER, CDER, ORA and OC to achieve technical efficiencies, target potential savings and realize cost efficiencies. Based upon the results of this analysis, to the extent appropriate, establish common IT infrastructure and architecture components according to specific milestones and dates. A documented summary of the analysis will be forwarded to the Commissioner. A version of the study report redacted to remove confidential commercial or security information, or other information exempt from disclosure, will be made available to the public.

g. FDA will implement Capability Maturity Model (CMM) in CBER, CDER, ORA and OC for PDUFA IT infrastructure and investments, and include other industry best practices to ensure that PDUFA III IT products and projects are of high quality and produced with optimal efficiency and cost effectiveness. This includes development of project plans and schedules, goals, estimates of required resources, issues and risks/mitigation plans for each PDUFA III IT initiative.

h. Where common business needs exist, CBER, CDER, ORA and OC will use the same software applications, such as eCTD software, and COTS solutions.

i. Within six months of authorization, a PDUFA III IT 5-year plan will be developed. Progress will be measured against the milestones described in the plan.

## XIII. ADDITIONAL PROCEDURES

A. Simplification of Action Letters

To simplify regulatory procedures, CBER and CDER intend to amend their regulations and processes to provide for the issuance of either an "approval" (AP) or a "complete response" (CR) action letter at the completion of a review cycle for a marketing application.

Case 1:05-cv-00366-ERK-VVP    Document 47-2    Filed 10/17/05    Page 37 of 71 PageID
#: 496

B.  Timing of Sponsor Notification of Deficiencies in Applications

To help expedite the development of drug and biologic products, CBER and CDER
intend to submit deficiencies to sponsors in the form of an "information
request" (IR) letter when each discipline has finished its initial review of its section
of the pending application.

## XIV. DEFINITIONS AND EXPLANATION OF TERMS

A.  The term "review and act on" is understood to mean the issuance of a complete
action letter after the complete review of a filed complete application. The action
letter, if it is not an approval, will set forth in detail the specific deficiencies and,
where appropriate, the actions necessary to place the application in condition for
approval.

B.  A major amendment to an original application, efficacy supplement, or
resubmission of any of these applications, submitted within three months of the
goal date, extends the goal date by three months. A major amendment to a
manufacturing supplement submitted within two months of the goal date extends
the goal date by two months.

C.  A resubmitted original application is a complete response to an action letter
addressing all identified deficiencies.

D.  Class 1 resubmitted applications are applications resubmitted after a complete
response letter (or a not approvable or approvable letter) that include the following
items only (or combinations of these items):
1.  Final printed labeling
2.  Draft labeling
3.  Safety updates submitted in the same format, including tabulations, as the
original safety submission with new data and changes highlighted (except
when large amounts of new information including important new adverse
experiences not previously reported with the product are presented in the
resubmission)
4.  Stability updates to support provisional or final dating periods
5.  Commitments to perform Phase 4 studies, including proposals for such
studies
6.  Assay validation data
7.  Final release testing on the last 1-2 lots used to support approval
8.  A minor reanalysis of data previously submitted to the application
(determined
9.  Other minor clarifying information (determined by the Agency as fitting the
Class 1 category)
10.  Other specific items may be added later as the Agency gains experience
with the scheme and will be communicated via guidance documents to
industry.

E.  Class 2 resubmissions are resubmissions that include any other items, including
any item that would require presentation to an advisory committee.

F.  A Type A Meeting is a meeting which is necessary for an otherwise stalled drug
development program to proceed (a "critical path" meeting).

G.  A Type B Meeting is a 1) pre-IND, 2) end of Phase 1 (for Subpart E or Subpart H
or similar products) or end of Phase 2/pre-Phase 3, or 3) a pre- NDA/BLA meeting.
Each requestor should usually only request 1 each of these Type B meetings for
each potential application (NDA/BLA) (or combination of closely related products,
i.e., same active ingredient but different dosage forms being developed
concurrently).

H.  A Type C Meeting is any other type of meeting.

I.  The performance goals and procedures also apply to original applications and
supplements for human drugs initially marketed on an over-the-counter (OTC)
basis through an NDA or switched from prescription to OTC status through an
NDA or supplement.

# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RAY ANDREWS,<br>    and<br>GAYLEE ANDREWS, | : <br> : <br> : <br> : |
| Plaintiffs, | : <br> : |
| v. | : Civil Action No. 04-0307 (JR) <br> : |
| U.S. DEPARTMENT OF HEALTH AND<br>HUMAN SERVICES, *et al.*, | : <br> : <br> : |
| Defendants. | : |

<u>**MEMORANDUM**</u>

In this case, citizen plaintiffs bring a challenge to provisions of the Federal Food, Drug & Cosmetic Act (FDCA), 21 U.S.C. §§ 301-397, and the Medicare Prescription Drug, Improvement, and Modernization Act (MPDMA), 21 U.S.C. § 384, that prohibit the reimportation of prescription drugs from Canada by consumers.  The complaint fails to state a claim upon which relief can be granted, and it will be dismissed.

**Background**

Plaintiffs Ray and Gaylee Andrews allege that they are a married couple residing in Chicago; that they are both 75 years old; that they take prescription drugs for arthritis, asthma, diabetes, emphysema, high blood pressure and replaced hips; that these drugs cost them about $1,100 per month; that they have almost depleted their life savings in order to pay for the prescription drugs they need; that they have both begun to work

again to supplement their retirement and Social Security incomes and in order to qualify for health care benefits; that at some time in the future they will be forced to choose between purchasing medications and purchasing food or other essentials; that if they could buy their medications from Canada, they would save about $400 - $500 per month; that if it were lawful, they would purchase their medications from Canada; but that because it would be unlawful they have never done so.

The Andrews seek a declaratory judgment that the statutory prohibition on the reimportation of prescription drugs by consumers, 21 U.S.C. § 381(d)(1), violates their substantive due process rights under the Fifth Amendment. They also challenge, as arbitrary, capricious, and contrary to law, 5 U.S.C. § 706(2)(A), the refusal of the Secretary of Health and Human Services to issue the certifications to Congress under 21 U.S.C. § 384(l) that would be necessary to trigger certain waivers of the reimportation ban.

The government moves to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction and, alternatively, pursuant to Rule 12(b)(6) for failure to state a claim on which relief can be granted.

On a motion to dismiss, all facts, and all inferences drawn from those facts, are "liberally construe[d] . . . in the plaintiff's favor."  Andrx Pharm. Inc. v. Biovail Corp. Int'l,

- 2 -

256 F.3d 799, 805 (D.C. Cir. 2001).  "'However, the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint.  Nor must the court accept legal conclusions cast in the form of factual allegations.'"  Id. (quoting Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).

Article III Standing

When their standing to sue is challenged, as it has been here, the plaintiffs must demonstrate they have suffered an injury in fact, that the injury is traceable to the defendants' conduct, and that there is a likelihood that this court may redress the injury.  Bhd. of Locomotive Eng'rs v. United States, 101 F.3d 718, 723 (D.C. Cir. 1996).  The injury must be "'concrete and particularized and actual or imminent, not conjectural or hypothetical.'"  Flynt v. Rumsfeld, 355 F.3d 697, 702 (D.C. Cir. 2004) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  It may either be current and actual, or threatened to occur in the near future.  Northwest Airlines v. FAA, 795 F.2d 195, 201 (D.C. Cir. 1986).

These plaintiffs plead present injury.  They claim that they are currently deterred from purchasing more affordable medicines from Canada.  They claim that, if they were to purchase their medications from Canada and if those medications were seized as other medications have been seized in the past, Second

- 3 -

Am. Compl. ¶ 28; Mot. Dismiss 10 n. 3; Pl. Resp. Ex. A (in "blitz" seizures conducted by U.S. Customs at postal facilities), they could not afford to purchase substitute medicines.  They allege -- and their allegation must be taken as true for purposes of the instant motion -- that the current statutory scheme prohibiting the reimportation of prescription medications deters them from purchasing drugs from Canada and thus injures them by requiring them to pay more than they otherwise would.  Second Am. Compl. ¶ 28.

Economic injury may amount to injury-in-fact for standing purposes.  National Rifle Ass'n of America v. Magaw, 132 F.3d 272, 282 (6th Cir. 1997) ("'economic injury which is traceable to the challenged action' satisfies the requirements of Article III standing") (citing Lipton v. Comm'r of Health and Env't, State of Tenn., 973 F.2d 1311, 1316 (6th Cir. 1992)).  Citing Brotherhood of Locomotive Engineers, 101 F. 3d 718 (D.C. Cir. 1996), plaintiffs allege that the defendants' policies "impose substantial, unrecoverable financial losses on them." Id. at ¶¶ 17, 19.  Union members in that case were held to have shown injury from the loss of job protections even without evidence that any union member would actually lose his job.  Just so, the Andrews need not order medications, have them seized, and then forego either their prescription medications or other basic necessities in order to demonstrate injury sufficient for

- 4 -

standing purposes.  Their allegation of injury is sufficiently current, particularized, and actual to meet the requirements of Article III.[1]

Substantive Due Process Claim

The scrutiny a court employs to test a statute or regulation's validity under the due process clause depends on whether or not that statute or regulation implicates a fundamental right.  Fundamental rights recognized under Fifth Amendment jurisprudence receive the strictest scrutiny, requiring proof that the statute or regulation is narrowly tailored to further a compelling state interest.  Troxel v. Granville, 530 U.S. 57, 65 (2000); Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997).  If a statute implicates no fundamental right, the court considers only whether the law is rationally related to furthering a legitimate government interest, and the government is granted much more deference.  Glucksberg, 521 U.S. at 766

---

[1] I have also considered whether the issues plaintiffs present are ripe, that is, whether they are fit for judicial resolution and what hardships the Andrews would suffer if the court withheld its consideration.  Village of Bensenville v. FAA, 376 F.3d 1114, 1119 (D.C. Cir. 2004).  The Andrews are senior citizens working in their retirement years and struggling financially to pay domestic prices for their prescriptions.  They have gone on record to say they want to purchase cheaper drugs from Canada and have inquired at Canadian pharmacies about doing so, but that they are unwilling and unable to break the law.  The issues the plaintiffs present are legal in nature and may be decided without further factual development.  Nuclear Energy Institute, Inc. v. EPA, 373 F.3d 1251, 1313 (D.C. Cir. 2004). The hardship they suffer is real, and would continue if the court postponed its review.

(Souter, J. concurring) (rational basis test presumes constitutionality).

The right to purchase drugs from a preferred source or at a preferred price--if there is such a right at all -- is not fundamental.  Many courts have held that there is no fundamental right to choose a particular medical treatment.  Eg. Rutherford v. United States, 616 F.2d 455, 456-57 (10th Cir. 1980) (no privacy right to access drugs not approved by the FDA); Carnohan v. United States, 616 F.2d 1120, 1122 (9th Cir. 1980) (same); Garlic v. FDA, 783 F. Supp. 4, 5 (D.D.C. 1992) (same).  Certain rights pertaining to health-related and medical choices are protected by the Constitution, eg. Roe v. Wade, 410 U.S. 113 (1973), Carey v. Population Servs. Int'l, 431 U.S. 678 (1977), Cruzan v. Director, Mo. Dep't of Health, 497 U.S. 261 (1990), but the plaintiffs' argument for extending constitutional protection to the rights they assert is unsupported.  See Glucksberg, 521 U.S. at 720 (Supreme Court reluctant to expand rights protected under substantive due process); Dronenburg v. Zech, 741 F.2d 1388, 1396 (D.C. Cir. 1984) (lower courts should not "freely create new constitutional rights").

The reimportation ban easily withstands rational basis scrutiny.  The FDA's interest in ensuring the safety of prescription medications is a legitimate governmental interest. The statutory scheme of which plaintiffs complain reasonably

- 6 -

furthers this legitimate interest by shielding the public from reimported drugs that may be adulterated or otherwise unsafe. The plaintiffs make no point that requires a response when they argue that a prohibition on drug reimportation also prevents access to safe and unadulterated medications.  The reimportation ban implicates no fundamental interest and the government is under no duty to tailor its regulation more narrowly.

APA Claim

The plaintiffs' Administrative Procedure Act claim is that the Secretary's refusal to make the certifications necessary to trigger § 384 of the MPDMA is arbitrary and capricious and contrary to law.  Section 384 provides that the Secretary may waive the prohibition on reimportation of drugs from Canada for certain groups and individuals, but the section does not become law until the Secretary certifies that its implementation would "pose no additional risk to the public's health and safety" and "result in a significant reduction in the cost of covered products to the American consumer."[2]  The fact that the Secretary

---

[2] "The Secretary, after consultation with the United States Trade Representative and the Commissioner of Customs, shall promulgate regulations permitting pharmacists and wholesalers to import prescription drugs from Canada into the United States." 21 U.S.C. § 384(b).  "Waiver authority . . .  The Secretary may grant to individuals, by regulation or on a case-by-case basis, a waiver of the prohibition of importation of a prescription drug or device or class of prescription drugs or devices, under such conditions as the Secretary determines to be appropriate."  21 U.S.C. § 384(j)(2)(A).  "This section shall become effective only if the Secretary certifies to the Congress that the

- 7 -

has not made these certifications does not constitute reviewable final agency action.

The Secretary has not refused to issue a § 384 certification in response to a citizen petition, an adjudicatory decision, or as part of a rulemaking.  He has only stated in response to a letter signed by sixteen United States Senators that he was "unable to make the determination[s]" Congress required to trigger the MPDMA's waiver provisions.  A response to a senatorial inquiry is not final agency action reviewable under the APA.  See Indep. Equipment Dealers Ass'n v. EPA, 372 F.3d 420, 427 (D.C. Cir. 2004) (term "agency action" not so broad to authorize review of every agency action) (citing Hearst Radio Inc. v. FCC, 167 F.2d 225, 227 (D.C. Cir. 1948)).

Since the Secretary's response to the senatorial inquiry the FDA has rejected citizen petitions from several states requesting waivers under the MDMA, but those actions are not final agency action either.  The MPDMA prohibits the Secretary from making a § 384 certification: "The Secretary shall not submit a certification under subparagraph (A) unless," "after a hearing on the record," he makes a series of findings as outlined in the statute.  21 U.S.C. § 384(l)(2)(B).  Thus, in its

---

implementation of this section will– (A) pose no additional risk to the public's health and safety; and (B) result in a significant reduction in the cost of covered products to the American consumer."  21 U.S.C. § 384(l)(1).

written response to the petition of Governor Blagojevich of Illinois for a waiver of the FDA reimportation ban, the agency stated it had no choice but to deny the request for waiver because drug reimportation was still illegal under the law, see Indep. Equipment Dealers, 372 F.3d at 427 (agency's expression of its view of what the law requires not reviewable), and informed the Governor that Secretary Thompson had created a task force to address the required certifications and was still evaluating whether he could make the them.  Letter from Thompson to Jeffords, Second Am. Comp. ¶ 19.  See Barrick Goldstrike Mines Inc. v. Browner, 215 F.3d 45, 48 (D.C. Cir. 2000) (final agency action is neither tentative nor interlocutory).  The denial of this and other states' petitions for waivers was required under the law of the MPDMA, and does not constitute a refusal by Secretary Thompson to make the certifications necessary to trigger § 384's waiver authority.  See Indep. Equipment Dealers, 372 F.3d at 427 (EPA letter response that is informational in nature and does not announce a new interpretation or effect change in regulations is not reviewable agency action).

Even if the FDA's denials of the states' petitions was final agency action, the Andrews have no standing to litigate the states' claims.  Powers v. Ohio, 499 U.S. 400, 411 (1991) (litigant bringing claim on behalf of third party must show

- 9 -

injury in fact, close relation to third party, and hindrance to third party's ability to protect its own interests).

The parties have discussed a theoretical APA claim for unreasonable delay that is not found in plaintiffs' second amended complaint.  It will not be addressed.  An appropriate order accompanies this memorandum.


                              JAMES ROBERTSON
                    United States District Judge

# EXHIBIT G

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| ABIGAIL ALLIANCE FOR BETTER ACCESS TO DEVELOPMENTAL DRUGS *et al.*, | : : : : | | |
| Plaintiffs, | : : | Civil Action No.: | 03-1601 (RMU) |
| v. | : : | Document Nos.: | 4, 7 |
| MARK B. McCLELLAN, *et al.*, | : : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION**

**GRANTING THE DEFENDANTS' MOTION TO DISMISS; DENYING THE PLAINTIFFS'**
**CROSS-MOTION FOR SUMMARY JUDGEMENT**

**I. INTRODUCTION**

This matter comes before the court on defendants Mark B. McClellan, Commissioner of the Food and Drug Administration and Tommy G. Thompson, Secretary of Health and Human Services' (collectively "the defendants") motion to dismiss or in the alternative for summary judgment and plaintiffs Abigail Alliance for Better Access to Developmental Drugs ("Abigail Alliance") and Washington Legal Foundation's (collectively "the plaintiffs") Cross-Motion for Summary Judgment. Plaintiff Abigail Alliance is a non-profit organization comprised of terminally ill patients and their supporters that advocates for access to developmental drugs. Plaintiff Washington Legal Foundation is a public-interest law and policy center. The plaintiffs challenge as unconstitutional a United States Food and Drug Administration ("FDA") policy barring the sale of investigative drugs to terminally ill patients. The defendants argue that (1) the

1

court lacks subject matter jurisdiction because the claim is not yet ripe, the plaintiffs did not challenge a final agency action, and the plaintiffs did not exhaust all administrative remedies; and (2) the plaintiffs failed to state a claim upon which relief can be granted because there is no constitutional right of access to unapproved drugs.  Because the plaintiffs do not articulate a fundamental constitutional right and Congress' action is rational, the court grants the defendants' motion to dismiss.[1]

## II. BACKGROUND

### A. Factual Background

In 1938, Congress enacted the Food, Drug, and Cosmetic Act ("FDCA") in part to regulate the sale of manufactured drugs.  Compl. at 3; 21 U.S.C. §§ 301 *et seq*.  The FDCA mandated that no "new drugs" enter interstate commerce without approval by the FDA.  21 U.S.C. § 355(a).  But Congress exempted new drugs intended for research from the ban on unapproved drugs.  21 U.S.C. § 355(i).

Pursuant to its authority under the FDCA, the FDA promulgated rules to regulate the use of investigational drugs.  21 C.F.R. § 312.21.  During the later phases of testing, the FDA allows drug sponsors to sell certain drugs to those in desperate need through "compassionate use"

---

[1] Although the court has considered extrinsic evidence in the form of a letter from FDA Associate Commissioner For External Relations Peter J. Pitts to Frank Burroughs and Steven T. Walker, the court proceeds to decide the case under Rule 12(b)(6).  When deciding a motion to dismiss, a court may consider extrinsic documents "whose terms and effect are relied upon by the plaintiff in drafting the complaint." *Gryl ex rel. Shire Pharms. Group PLC v. Shire Pharms. Group PLC*, 298 F.3d 136, 140 (2d Cir. 2002); *accord Pryor v. National Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002) (noting that a court may consider extrinsic documents if the contents of the documents are alleged in the complaint and authenticity is undisputed).  Here, the plaintiff refers to the contents of the letter in its complaint and the defendant does not dispute the letter's authenticity.  Compl. ¶ 26.

programs, but only at a cost-recovery price.  Compl. ¶ 15; 21 C.F.R. § 312.7 (d).  FDA

regulations forbid the commercial distribution of an investigational drug.  21 C.F.R. § 312.7 (b).

In January 2003, Abigail Alliance submitted a proposal to the FDA for new legislation

that would make investigational drugs available for purchase at the earliest stages of testing,

labeling the proposal "Tier 1 Initial Approval."  Defs.' Mot. at 9.  In March 2003 it submitted a

revised proposal without reference to new legislation.  *Id.*  On April 25, 2003, FDA Associate

Commissioner Peter J. Pitts wrote to Abigail Alliance regarding its proposal, stating "[w]e have

concluded that your 'Tier 1 Initial Approval' proposal would upset the appropriate balance that

we are seeking to maintain[]."  Compl. ¶ 26; Letter from Pitts to Frank Burroughs and Steven T.

Walker dated April 25, 2003 at 5.

In June 2003, Abigail Alliance filed with the FDA a Citizen's Petition, which expanded

its initial "Tier 1 Initial Approval" proposal.[2]  Compl. ¶ 27, Def's Mot. at 10.  Subsequently, the

plaintiffs filed suit in this court.

**B. Procedural Background**

The plaintiffs filed this action on July 28, 2003 to enjoin the defendants from enforcing

the FDA's policy of barring unapproved drugs from interstate commerce, insofar as it has the

effect of prohibiting terminally ill patients with no other treatment options from purchasing

investigational drugs.  Compl. ¶¶ 1, 2.  Specifically, the plaintiffs challenge the policy of barring

the sale of investigational drugs "showing initial evidence of safety and efficacy in clinical

---

[2]  A Citizen's Petition is a mechanism for formally asking the agency to take a particular action. 21 C.F.R. § 10.25.  By law the FDA has 180 days to respond to a Citizen's Petition.  21 C.F.R. § 10.30(e)(2).

3

trials." *Id.* ¶ 2.  The plaintiffs claim that because of the FDA's prohibition on for-profit sale of

drugs in "compassionate use" programs, drug sponsors are disinclined to participate sufficiently

to meet the demands of more than just "a fraction of those in desperate need." *Id.* ¶ 15.  The

plaintiffs assert that this policy violates terminally ill patients' constitutional privacy and liberty

rights, as well as their due process rights to life.  *Id.* ¶ 1.

The defendants responded with a motion to dismiss pursuant to Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6), or in the alternative for summary judgment.  Defs.' Mot. at 1.

The defendants assert that there is no constitutional right of access to investigational drugs, and

that the suit should therefore be dismissed under Rule 12(b)(6).  *Id.* at 2.  The defendants claim,

moreover, that the court does not have subject matter jurisdiction over the case because it is not

yet ripe, the agency action challenged is not final, and the plaintiffs failed to exhaust all

administrative remedies.  *Id.* at 2-3.  The plaintiffs opposed this motion with a cross-motion for

summary judgment.  Pls.' Cross-Mot.  The court now turns to the parties' motions.

## III. ANALYSIS

### A.  A Brief Discussion of the Reviewability Doctrines' Legal Standards: Ripeness, Finality, and Exhaustion

The overlapping doctrines of ripeness, finality, and exhaustion each play a role in

ensuring that courts do not unnecessarily and untimely interfere with the administrative

processes.  *Ticor Title Ins. Co. v. Fed. Trade Comm'n*, 814 F.2d 731, 735 (D.C. Cir. 1987).

(Edwards, J., separate opinion).  In this circuit the three doctrines have met with some confusion

in their application.  For example, in one circuit case all three judges disagreed about which of

the three doctrines should be employed to deny review to a single claim – one circuit judge held the claim failed exhaustion, one that it failed ripeness, and the other that it failed finality. *Ticor*, 814 F.2d at 732. Courts have occasionally treated finality as an aspect of exhaustion. *Marine Mammal Conservancy, Inc. v. Dept. of Agric.*, 134 F.3d 409, 411 (D.C. Cir. 1998) (explaining that unexhausted remedies suspend finality of administrative decisions). Sometimes courts have applied finality merely as a factor of ripeness. *Ciba-Geigy Corp. v. Envtl. Prot. Agency*, 801 F.2d 430, 435 (D.C. Cir. 1986); *Wash. Legal Found. v. Kessler*, 880 F. Supp. 26, 34 (D.D.C. 1995). Other times courts analyze ripeness, finality and exhaustion as independent concepts. *Darby v. Cisneros*, 509 U.S. 137, 144 (1993); *Fox Television Stations, Inc. v. Fed. Communications Comm'n*, 280 F.3d 1027, 1037 (D.C. Cir. 2002); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726 (D.C. Cir 2003). Because the defendants have raised all three doctrines in their brief, Def.'s Mot. at 19, and because the jurisprudence on this subject is unclear, the court examines ripeness, finality, and exhaustion as distinct requirements.

### 1. Ripeness

The ripeness doctrine lays on the foundation of Article III of the Constitution, which limits the jurisdiction of federal courts to cases or controversies. U.S. CONST. ART. III, § 2, cl. 1; *Ticor*, 814 F.2d at 735 (Edwards, J., separate opinion). The case-or-controversy requirement reflects the "common understanding of what it takes to make a justiciable case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). More generally, the ripeness doctrine is among the various prudential doctrines developed by the courts to test the fitness of controversies for judicial resolution. *Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 47-48 (D.C.

Cir. 1999). In the agency review context, ripeness "is concerned primarily with the institutional relationships between courts and agencies, and the competence of the courts to resolve disputes without further administrative refinement of the issues." *Ticor*, 814 F.2d at 735 (Edwards, J., separate opinion).

The ripeness doctrine asks "whether the case has been brought at a point so early that it is not yet clear whether a real dispute to be resolved exists between the parties." 15 FED. PRAC. 3d § 101.70[2]. Reflecting both constitutional and prudential considerations, the doctrine "is designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)); *see also Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993) (stating that "[the] ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction").

Toward that end, a court must examine whether a dispute is fit for judicial review and whether withholding court consideration would cause hardship to the parties. *Ohio Forestry*, 523 U.S. at 733; *Wyoming Outdoor Council*, 165 F.3d at 48. To measure fitness, the court looks to "whether [the issue] is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Atl. States Legal Found. v. Envtl. Prot. Agency*, 325 F.3d 281, 284 (D.C. Cir. 2003). If a claim "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all," it is not ripe for

adjudication.  *Id.*  As for hardship, the court looks to see whether the party can show that it will suffer injury in the interim.  *Id.*  Importantly, "[c]ourts confronted with close questions of ripeness are appropriately guided by the presumption of reviewability[]."  *Ciba-Geigy*, 801 F.2d at 434 (citing *Cont'l Air Lines, Inc. v. Civil Aeronautics Board*, 522 F.2d 107, 125 (D.C. Cir 1974)).

### 2.  Finality Of Agency Action Under the APA

Finality, a factor in the two-pronged ripeness balancing test, can also stand on its own as a distinct legal doctrine.  *Darby*, 509 U.S. at 144; *Ticor*, 814 F.2d at 745-46.  The finality requirement is expressed in section 704, of the Administrative Procedure Act ("APA").  5 U.S.C. §§ 551, *et seq*.  Section 702 of the APA creates a cause of action against agencies by granting a general right of judicial review of agency actions, section 704 narrows the scope of reviewability to "final agency action" only.  5 U.S.C. § 704.  The finality requirement has several purposes including the protection of agency rulemaking from judicial interference, which hinges on separation of powers concerns, as well as conserving judicial resources by allowing the agency to correct any error there may be in its action.  *Reliable*, 324 F.3d at 732.

For agency action to be final and subject to review under the APA, the action (1) must mark the consummation of the agency's decisionmaking process, rather than merely being tentative or interlocutory in nature, and the action (2) must be one by which rights or obligations have been determined or from which legal consequences will flow.  *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997).  "Agency action is considered final to the extent that it imposes an obligation, denies a right, or fixes some legal relationship."  *Reliable*, 324 F.3d at 731 (citing *Role Models Am., Inc. v. White*, 317 F.3d 327, 331-32 (D.C. Cir. 2003).

The finality requirement, however, must be applied in a "flexible and pragmatic way." *Ciba-Geigy*, 801 F.2d at 435 (internal quotation omitted).  Rather than relying on some formal regulatory definition of final agency action, the court "look[s] primarily to whether the agency's position is 'definitive' and whether it has a 'direct and immediate . . . effect on the day-to-day business' of the parties challenging the action."  *Ciba-Geigy*, 801 F.2d at 436 (quoting *Fed. Trade Comm'n v. Standard Oil*, 449 U.S. 232, 239 (1980)); *see also Wash. Legal Found.*, 880 F. Supp. at 34.

### 3.  Exhaustion of Administrative Remedies Under the APA

Related to ripeness and finality is the notion that a plaintiff challenging agency action must exhaust all administrative remedies before seeking judicial review.  The exhaustion requirement is also found in section 704 of the APA.  5 U.S.C. § 704 ; *Darby*, 506 U.S. at 138.  The exhaustion requirement serves four purposes: (1) it ensures that persons do not flout legally established administrative processes; (2) it protects the autonomy of agency decisionmaking; (3) it aids judicial review by permitting factual development of issues relevant to the dispute; and (4) it promotes judicial economy by avoiding repetitious administrative and judicial factfinding and by resolving some claims without judicial intervention.  *Pub. Citizen Health Research Group v. Comm'r, Food & Drug Admin.*, 740 F.2d 21, 29 (D.C. Cir. 1984).  But, "the exhaustion doctrine is not jurisdictional in nature and should not be applied blindly when the interests that the doctrine protects would not be served."  *Id*. at 33.  Moreover, the Supreme Court has made clear that courts have no discretion to require exhaustion of remedies beyond those clearly mandated by congressional statute or agency regulation.  *Darby*, 509 U.S. at 146.

## B.  The Plaintiffs' Claim is Reviewable

The defendants argue that because the plaintiffs brought suit before the FDA was required to respond to the plaintiffs' Citizen's Petition, their claim cannot be sustained under the APA insofar as it failed to satisfy the ripeness, finality, and exhaustion requirements.  Defs.' Mot. at 21.  Because the FDA received the plaintiffs' petition in June 2003, it was required under the 180-day response period allowed by 21 C.F.R. § 10.30(e)(2) to respond by December 2003.   The complaint in this action was filed on July 28, 2003, well before the required deadline for agency response.  The defendants assert that the Citizen's Petition is a prerequisite to judicial review of an agency policy, Defs.' Mot. at 10, 19, 22 (citing 21 C.F.R. §§ 10.25, 10.30, 10.45; *Garlic v. Food & Drug Admin.*, 783 F. Supp. 4, 5 (D.D.C. 1992)), an assertion that the plaintiffs flatly deny.  Pls.' Statement of Genuine Issues at 2.

## 1.  The Plaintiff's Are Exempted From the Exhaustion Requirement

The plaintiffs respond to the reviewability arguments by pointing out that their claim is constitutional in nature and is not, as misidentified by the defendants, an "arbitrary and capricious" claim arising under the APA.  Pls.' Reply at 10.   The plaintiffs fail to cite any authority to support their unstated presumption that constitutional claims against agency actions need not satisfy the requirements of ripeness, finality, and exhaustion.  But a constitutional claim, just like any other claim challenging agency action, must challenge final agency action and must be ripe for adjudication. *See e.g., Ticor*, 814 F.2d 731 (holding that a constitutional claim failed either ripeness, finality, or exhaustion); *Wash. Legal Found.*, 880 F.Supp. 26 (holding that the plaintiff satisfied exhaustion and that the constitutional claim was ripe because it challenged a

final agency action).

Constitutional claims are sometimes exempted only from the exhaustion requirement, but this is not a bright-line rule. *Marine Mammal*, 134 F.3d at 413. The basis for this exception is that agencies do not have the expertise or competence to rule on constitutional issues. *Califano v. Sanders*, 430 U.S. 99, 109 (1977). But courts can and do dismiss constitutional claims for failure to exhaust all administrative remedies. *See e.g., Marine Mammal*, 134 F.3d at 413-414 (dismissing claim of deprivation of property without due process where exhaustion would promote many of the policies typically underlying exhaustion doctrine); *see also Ticor*, 814 F.2d at 741 (Edwards, J., separate opinion).

In this case, several of the purposes of the exhaustion requirement – "giving agencies the opportunity to correct their own errors, affording parties and courts the benefits of agencies' expertise, compiling a record adequate for judicial review, [and] promoting judicial efficiency" – apply even though the claim is constitutional in nature. *Marine Mammal*, 134 F.3d at 414. Moreover, the importance of avoiding premature adjudication may even be heightened in constitutional cases, as courts are not to unnecessarily decide constitutional questions when those cases may be resolved on some other grounds. *Ticor*, 814 F.2d at 211 (Edwards, J., separate opinion) (citing e.g. *Jean v. Nelson*, 472 U.S. 846, 854 (1985)). Thus, the court concludes that the fact that the plaintiffs' claim is constitutional does not excuse them from the exhaustion requirement.

Alternatively, the plaintiffs suggest that their petition was not a necessary step toward obtaining judicial review of their claim because the April 25 letter definitively stated the FDA's position on the challenged policy. Pls.' Cross-Mot. at 11. The court interprets this suggestion as

10

an argument for application of the futility exception to the exhaustion requirement.  This exception applies "when following the administrative remedy would be futile because of certainty of an adverse decision."  *Randolph-Shepard Vendors of America v. Weinberger*, 795 F.2d 90, 105 (D.C. Cir. 1986) (quoting 3 K. Davis, *Administrative Law Treatise* § 20.07 (1958)). An adverse decision can be certain if the agency has articulated a very clear position on the issue which it has demonstrated it would be unwilling to reconsider.  *Randolph-Sheppard.*, 795 F.2d at 105; *see also Fox Television*, 280 F.3d at 1040 (holding that where the agency had "just determined" in a report "that the rules in question were still necessary to the public interest, it would obviously have been futile for the petitioners to have petitioned the agency for a rulemaking to repeal them.").  A request for an administrative remedy is not futile just because it will "probably fail," because "most appeals fail."  *Randolph-Sheppard.*, 795 F.2d at 106; *Health Equity Res. Urbana, Inc. v. Sullivan*, 927 F.2d 963, 966 (7th Cir. 1991).  Rather, the appeal must be "clearly useless" and denial of relief must be a "certainty" to excuse failure to exhaust administrative remedies.  *Marine Mammal*, 134 F.3d at 413; *Shoshone Bannock Tribes v. Reno*, 56 F.3d 1469, 1476 (D.C. Cir. 1995); *Randolph-Sheppard*, 795 F2d at 105.

The FDA unequivocally rejected the initial Tier 1 Approval proposal in the April 25, 2003 letter from Associate Commissioner Pitts.  The letter indicated that "several senior FDA officials have now carefully reviewed and considered [the plaintiff's] concept paper and numerous letters" and that officials had  "concluded" that the proposal would "upset the appropriate balance [the FDA] is trying to maintain."  Letter from Pitts to Burroughs and Walker dated April 25, 2003 at 1, 5.  By rejecting the proposal, the FDA served notice that it was not receptive to the idea of allowing the commercial sale of investigative drugs in the early stages of

11

testing.  Given this FDA proclamation, any further administrative procedure, like a Citizen's Petition, was "clearly useless," because it made clear that the agency had a "preconceived" and "unyielding" stance on the issue.  *Randolph-Sheppard*, 795 F.2d at 107.  Without ruling on the question of whether FDA regulations *require* an aggrieved party to file a petition before gaining judicial review, Defs.' Mot. at 10, 19, 22, the court concludes that the plaintiffs are exempted from the exhaustion requirement because further recourse to the FDA would clearly have been futile.

## 2.  The Plaintiffs Meet the Finality Requirement

The finality issue is likewise resolved by the April 25 letter.  While the FDA asserts that its policy of barring sale of investigational drugs could not be final until the Citizen's Petition was answered, "[t]he label an agency attaches to its action is not determinative." *Wash. Legal Found.*, 880 F. Supp. at 34 (citing *Cont'l Air Lines*, 522 F.2d at 124).  The D.C. Circuit in *Ciba-Geigy* held that an informal letter from an agency constituted a final agency action, because it amounted to an unequivocal statement of the agency's position and had a direct effect on the regulated party.  801 F.2d at 437-439.  *See also Wash. Legal Found.*, 880 F. Supp. at 34 (concluding that because an agency's informal threat of enforcement had the effect of regulating the industry, it was a final agency action).  Furthermore, in *Fox Television*, the D.C. Circuit determined that an FCC report in which the Commission voiced its "last word" that the challenged policy was "necessary in the public interest" constituted a final agency action, even though the agency claimed it was not.  280 F.3d at 1038.

In light of the D.C. Circuit's pronouncement that finality must be applied in a "flexible and pragmatic way," the court may consider whether the April 25 letter, although an informal

action, constituted a final agency action. *Ciba-Geigy*, 801 F.2d at 435 (internal quotation omitted). In the letter, the FDA conclusively rejected the notion that investigational drugs should be available for commercial sale. Letter from Pitts to Burroughs and Walker dated April 25, 2003 at 5 (rejecting the idea of "giving almost total weight to the goal of early availability and giving little recognition to the importance of marketing drugs with reasonable knowledge for patients and physicians of their likely clinical benefit and their toxicity"). The last page of the letter includes a handwritten note from Mr. Pitts, apologizing for the delay in responding to Abigail Alliance's proposal stating – "I wanted to be complete and thoughtful." *Id.* at 6. The letter, six pages long with four additional pages of attachments, was clearly the result of a reasoned thought processes. As noted, "several senior FDA officials" were involved in the consideration of and rejection of Abigail Alliance's proposal. *Id.* at 1. The rejection represented the consummation of the agency's decisionmaking, was definitive and had a direct and immediate effect on the plaintiffs – it barred them from access to potentially life-saving investigational drugs. *Ciba-Geigy*, 801 F.2d at 436. Accordingly, the court holds that the finality requirement has been met.

### 3. The Plaintiffs Satisfy the Ripeness Requirement

This case also satisfies the ripeness requirements of fitness for review and hardship to the parties. As for fitness, the issue raised by the plaintiff – whether the FDA's prohibition on the sale of investigational drugs to terminally ill patients violates the Constitution – is purely legal. *Atl. States Legal Found.*, 325 F.3d at 284. The alleged injury does not rest on some contingent future events; rather it has already occurred and continues to occur. Accordingly, the dispute is fit for review. *Id*.

13

In terms of hardship, although the plaintiffs allege no specific acts of enforcement by the FDA resulting in injury, such an allegation is unnecessary in this instance. The challenged policy is of such a nature that it need not be enforced against those in the class of the plaintiffs, that is, terminally ill patients, to affect their rights. Because the policy prohibits drug companies from selling investigational drugs, it bars patients access even without any particular enforcement or threat against them directly. Thus, the plaintiffs need not challenge a specific instance of enforcement against them. Furthermore, the defendants do not question the plaintiffs' assertion that the FDA's policy has had the effect of denying investigational drugs to members of the plaintiffs. For these reasons, the case would benefit little if at all from the development of a particular factual setting. *See e.g.*, *Wash. Legal Found.*, 880 F. Supp. at 36 (holding that whether an FDA policy violates the First Amendment is primarily a legal rather than a factual inquiry). Whatever minor benefit might emerge from a more concrete setting is more than offset by the alleged hardship the plaintiffs face upon delay of review – further denial of potentially life-saving drugs.

In light of the discussions above, the fact that the defendants do not challenge the plaintiffs' assertion that the April 25 letter constituted final agency action and made exhaustion of administrative remedies futile, and the presumption in favor of judicial reviewability, the court holds that the challenged policy is a final agency action and further exhaustion of administrative remedies would be futile. *Ciba-Geigy*, 801 F.2d at 434. Thus, the suit is now ripe for review on its merits.

### C. Legal Standard for Motion to Dismiss

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint. *Browning v.*

*Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  The complaint need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests.  *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003) (citing FED R. CIV. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  "Such simplified notice pleading is made possible by the liberal opportunity for discovery and the other pre-trial procedures established by the Rules to disclose more precisely the basis of both claim and defense to define more narrowly the disputed facts and issues."  *Conley*, 355 U.S. at 47-48 (internal quotation marks omitted).  It is not necessary for the plaintiff to plead all elements of his prima facie case in the complaint, *Swierkiewicz v. Sonoma N.A.*, 534 U.S. 506, 511-14 (2002), or "plead law or match facts to every element of a legal theory."  *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000) (internal quotation marks and citation omitted).

Accordingly, "the accepted rule in every type of case" is that a court should not dismiss a complaint for failure to state a claim unless the defendant can show beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.  *Warren v. District of Columbia*, 353 F.3d 36, 37 (D.C. Cir. 2004); *Kingman Park*, 348 F.3d at 1040.  Thus, in resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations – including mixed questions of law and fact – as true and draw all reasonable inferences therefrom in the plaintiff's favor.  *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003); *Browning*, 292 F.3d at 242.  While many well-pleaded complaints are conclusory, the court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations.  *Warren*, 353 F.3d at 39; *Browning*, 292 F.3d at 242.

15

**D. The Plaintiffs Fail to State a Recognized Due Process Claim**

The plaintiffs allege that the FDA's ban on the sale of investigational drugs violates their members' privacy and liberty rights, as well as their rights to life, pursuant to the due process clause of the 5th Amendment.  Compl. ¶ 1.  The "substantive component" of due process "forbids the government to infringe certain 'fundamental' liberty interests *at all* . . . unless the infringement is narrowly tailored to serve a compelling state interest."  *Reno v. Flores*, 506 U.S. 292, 302 (1993) (emphasis in original).  Fundamental rights are rights that are "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319, 325-36 (1937), or "deeply rooted in this Nation's history and tradition." *Flores*, 507 U.S. at 303; (internal quotations omitted).  If the implicated right is not a fundamental right, substantive due process requires only that the challenged government action be rationally related to a legitimate state interest.  *Flores*, 507 U.S. at 305.

The plaintiffs seem to argue that there is a fundamental right of access to investigational drugs by analogizing this "right" with fundamental rights recognized by the Supreme Court, such as: (1) privacy rights as applied to contraceptives, Pls.' Cross-Mot. at 7 (citing *Griswold v. Connecticut*, 381 U.S. 470 (1965); *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972)); and (2) liberty rights as applied to the right to refuse medical treatment, Pls.' Cross-Mot. a 8-9 (citing *Washington v. Glucksberg*, 521 U.S. 702, 723 (1997); *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 279 (1990)).

The D.C. Circuit has admonished lower courts against creating "new constitutional rights" without "guidance from the Constitution or . . . from articulated Supreme Court principle." *Dronenburg v. Zech*, 741 F.2d 1388, 1396 (D.C. Cir. 1984).  The plaintiffs claim that

16

they seek no "new" right, but only "recognition and enforcement of a right that is explicitly stated on the face of the Due Process Clause." Pls.' Reply at 1-2.

The court is not persuaded that the plaintiffs seek a recognized right. While the due process clause clearly states the rights of life and liberty, and courts have recognized the right to privacy, the plaintiffs propose a novel interpretation of the due process clause. It is telling that the plaintiffs rely on cases they consider to be analogous, rather than citing any cases directly on point. No court whose authority binds this court has ever extended the due process clause to cover a terminally ill patient's right to *receive* medical treatment.

The plaintiffs note that the Supreme Court in *Griswold* invoked the right of marital privacy to strike down a state law regulating access to contraceptives and subsequently expanded that right beyond the marital context in *Eisenstadt*. Pls.' Cross-Mot. at 7 The plaintiffs then argue that the due process clause has been used to recognize a "right to die" in *Cruzan* and *Glucksberg*. *Id.* at 8. The plaintiffs seek to connect these holdings to their own case, asserting that "deeply personal decision[s]" are protected by the due process clause against government intrusion. *Id.* (quoting *Cruzan*, 497 U.S. at 281). Like the choice of whether to die by refusing needed medical treatment, the right to choose to sustain one's life by obtaining needed medical treatment is, the plaintiffs claim, a "deeply personal decision" worthy of due process protection. *Id.*, Pls.' Reply at 5.

The plaintiffs fail to note, however, that the Supreme Court in *Glucksberg* distinguished some "personal" decisions from others. Although "many of the rights and liberties protected by the Due Process Clause sound in personal autonomy [that] does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected." 521

17

U.S. at 727.  The Court recognized *Cruzan*'s right to refuse medical treatment, but did not extend that freedom to the right to an assisted suicide.  "The decision to commit suicide with the assistance of another may be just as personal and profound as the decision to refuse unwanted medical treatment, but it has never enjoyed similar legal protection."  *Id.* at 725.

Instead, the Court protects only those rights are "identified as so deeply rooted in our history and traditions, or so fundamental to our concept of ordered liberty, that they are protected by the Fourteenth Amendment."  *Id.* at 727.   The plaintiffs argue that their case involves such a historically recognized right because "the Nation's longstanding legal tradition has been to attempt to *preserve life*."  Pls.' Cross-Mot. at 9 (emphasis in original).  But, like assisted suicide in *Glucksberg*, the plaintiffs here cannot possible claim that the specific right claimed has a longstanding tradition.  *Glucksberg*, 521 U.S. at 711.  In fact, the plaintiffs themselves acknowledge, for the sake of ripeness and finality, that the challenged policy of prohibiting access to unapproved drugs is a "longstanding policy."  Pls.' Cross-Mot. at 11.

The plaintiffs also contend that *Cruzan* and *Glucksberg*, which they interpret as recognizing a right to choose death by refusing medical treatment, imply a right to choose life by obtaining investigational drugs.  Pls.' Reply at 5.  A fair reading of those cases has *Cruzan* establishing a freedom from government-imposed medical treatment and *Glucksberg* denying the extension of that freedom to assisted suicide.  *Glucksberg*, 521 U.S. at 720 (citing *Cruzan* for the proposition that due process "protects the traditional right to refuse unwanted lifesaving medical treatment."); *Blouin ex. rel. Estate of Poulit v. Spitzer*, 356 F.2d 348, 360 (2d Cir. 2004) (explaining that in *Glucksberg* and other cases, "[t]he Supreme Court has taken pains to avoid expanding *Cruzan* beyond the context of a competent person to refuse lifesaving treatment").

18

Moreover, the court is not persuaded by the plaintiffs' suggestion that the freedom to refuse medical treatment and the freedom to access medical treatment are "opposite sides of the same coin," and thus that one implies the other. Pls.' Reply at 5. First, the plaintiffs cite no authority for the idea that recognition of one "side of the coin" implies the legal validity of the "opposite side," nor for the particular application of that idea to this case. Second, the court is not convinced that the metaphor is apt. *Cruzan* recognized a right of freedom against government imposition, namely the imposition of unwanted medical treatment. The plaintiffs in the instant case seek recognition of an entirely different sort of right – not freedom from government imposition, but an affirmative right of access to medical treatment. Such a right neither flows naturally from the holdings in *Glucksberg* and *Cruzan* nor has been recognized by higher courts in this context.

Neither the Supreme Court nor the D.C. Circuit has "created a right which, fairly defined, covers the case before us." *Dronenburg*, 241 F.2d at 1396. Nor have they "defined a mode of analysis, a methodology, which, honestly applied, reaches the case we must now decide." *Id.* The plaintiffs have stated the holdings of *Glucksberg*, *Cruzan*, and *Griswold* too broadly in their attempt to apply the privacy and liberty rights to the instant case. Likewise, the plaintiffs cite no authority for the proposition that the due process right to life extends to requiring affirmative access by terminally ill patients to investigational drugs.

### E. The FDA Policy is Rationally Related to a Legitimate State Interest

Because there is no recognized fundamental right involved, the court must undertake a rational basis analysis. *Glucksberg*, 521 U.S. at 727. Under the rational basis test, the

challenged action "need not be in every respect logically consistent with its aims to be constitutional, and it is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."  *Williamson v. Lee Optical of Okla.*, 348 U.S. 483, 487-88 (1955).  The plaintiff bears the burden of showing that there is no rational connection between the FDA actions and the interests it asserts.  *Harrah Indep. Sch. Dist. v. Martin*, 440 U.S. 194, 198 (1979).

In *United States v. Rutherford*, 442 U.S. 544 (1979), the Supreme Court suggested that the prohibition on the sale of insufficiently tested drugs would pass a rational basis test. Specifically, the court noted that the vast "historical evidence" of exploitation of vulnerable cancer patients by "resourceful entrepreneurs" with claims of false cures "suggest[s] why Congress could reasonably have determined to protect the terminally ill, no less than other patients, from the vast range of self-styled panaceas that inventive minds can devise."  *Id.* at 558. On remand in *Rutherford*, the Tenth Circuit concluded that the FDCA's requirement of testing before marketing drugs is "within the area of governmental interest in protecting public health." *United States v. Rutherford*, 616 F.2d 455, 457 (10th Cir.), *cert. denied*, 449 U.S. 937 (1980).

If the court understands the plaintiffs correctly, they appear to argue that the challenged policy's effect of prohibiting the sale of investigational drugs to terminally ill patients without other treatment options is *not* rationally related to public health.  Pls.' Cross-Mot. at 3-4.  The plaintiffs believe the FDA policy actually hinders public health by dramatically reducing access to potentially helpful drugs.  *Id.* (stating that investigational drugs are generally available only to those who are accepted in a clinical trial, leaving a large number of patients who cannot get into a clinical trial are left without investigational drug access).

As noted, the challenged action "need not be in every respect logically consistent with its aims to be constitutional." *Lee Optical*, 348 U.S. at 487-88. The policy need not be the best way imaginable of solving a particular problem, but must be a reasonable solution to that problem. *Flores*, 507 U.S. at 305 (concluding that a policy that impairs an interest that is "lesser" than a fundamental right need not be narrowly tailored, but need only be a "reasonable fit" with the government purpose). The plaintiffs have failed to demonstrate that the challenged policy is in no way rationally related to the FDA's public health purpose. In fact, the record contains solid evidence that the policy at issue is indeed rationally related to public health. The FDA, for example, notes that revocation of the challenged policy may have a negative impact on the clinical trial system. Letter from Pitts to Burroughs and Walker dated April 25, 2003 at 4. If the court were to grant the plaintiffs' requested relief, the testing required for investigational drugs would have to be performed subsequent to their release into the market. *Id.* at 5. The FDA has found from experience "that it has often been difficult to obtain [studies of drugs after their release into the market], which would mean that a product approved on the basis of almost no data would have prolonged distribution without knowledge of who is likely to benefit and how to manage toxicity." *Id.* Furthermore, untested drugs may have adverse side effects that can have dramatic consequences for a patient's remaining quality of life. *Id.* at 4. The plaintiffs have not denied the validity of these concerns.

The plaintiffs have failed to demonstrate that the challenged FDA policy is not a rational method of addressing the foregoing concerns. The court therefore concludes that the policy of barring all potentially unsafe and ineffective drugs from interstate commerce until proven by a rigorous testing process, even when it has the effect of barring access to investigational drugs by

terminally ill patients with no other treatment options, is rationally related the legitimate state interest of protecting public health.

While the court understands the appeal of the plaintiffs' motives, it is bound by the law as it currently exists and does not have the authority to create new policy. The plaintiffs do not invoke a recognized constitutional right and the challenged FDA policy is rationally related to a legitimate state purpose. Accordingly, the court dismisses the complaint for failure to state a claim. *Browning*, 292 F.3d at 242.

## IV. CONCLUSION

For the foregoing reasons, the court grants the defendants' motion to dismiss and denies the plaintiffs' cross-motion for summary judgment. An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 30th day of August, 2004.

RICARDO M. URBINA
United States District Judge

22