THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

ANNIE TUMMINO, *et al.*,

                       Plaintiffs,

v.

ANDREW C. VON ESCHENBACH, in his official capacity as
Acting Commissioner of the Food and Drug
Administration,

                       Defendant.

-------------------------------------------------------------------X

**No. 05-CV-366 (ERK/VVP)**

(Korman, C.J.)
(Pohorelsky, M.J.)

## PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER

Simon Heller
Nan E. Strauss
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3600
(917) 637-3666 (fax)

Andrea Costello*
Shelbi Day*
Southern Legal Counsel
1229 N.W. 12th Avenue
Gainesville, FL 32601
(352) 271-8890
(352) 271-8347 (fax)

*Admitted Pro Hac Vice

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 2

I.      The Need for Expanded Access to Plan B. ........................................................ 2

II.     History of the FDA's Continuing Undue Delay and Denial of Full OTC
        Status for Plan B. .............................................................................................. 3

ARGUMENT ................................................................................................................. 13

I.      All the Discovery Propounded Thus Far By Plaintiffs, as well as Additional
        Contemplated Discovery, Is Relevant to Plaintiffs' Claim that the FDA
        Has Engaged in "Unreasonable Delay." ........................................................... 16

II.     Plaintiffs Also Satisfy the "Bad Faith" Exception Which Permits Discovery
        Beyond the Agency's Administrative Record. ................................................... 18

III.    Defendant's Motion for Protective Order Should Also Be Denied Because
        the Agency's Administrative Record Is Incomplete. ......................................... 22

IV.     Plaintiffs' Discovery Requests Ought Not Be Quashed Based on the
        Government's Blanket Assertions That They Are Irrelevant and Unduly
        Burdensome. ..................................................................................................... 24

        A.      Plaintiffs' Discovery Requests Are Relevant to the Claim of
                Unreasonable Delay. ............................................................................ 25

        B.      Plaintiffs' Discovery Requests Are Not Unduly Burdensome, and the
                Government's Refusal to Confer Precludes Plaintiffs from Narrowing
                These Requests ..................................................................................... 27

CONCLUSION ............................................................................................................. 29

CERTIFICATE OF SERVICE ...................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page**

*Amfac Resorts v. U.S. Dep't of the Interior*, 143 F. Supp. 2d 7 (D.D.C. 2001)............................18

*Animal Def. Council v. Hodel*, 840 F.2d 1432 (9th Cir. 1988)................................................14, 15

*Bar MK Ranches v. Yuetter*, 994 F.2d 735 (10th Cir. 1993)..................................................... 18-19

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971),
        *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977) .............15, 18, 22

*Cmty. for Creative Non-Violence v. Lujan*, 908 F.2d 992 (D.C. Cir. 1990) ...........................15, 18

*Compagnie Francaise D'Assurance Pour Le Commerce Exterieur v.
        Phillips Petroleum Co.,* 105 F.R.D. 16 (S.D.N.Y.1984) .............................................24, 27

*Confederated Tribes of Umatilla Indian Reservation v. Bonneville Power Admin.*,
        342 F.3d 924 (9th Cir. 2003)  .......................................................................................15

*Envirosafe Servs. Inc. v. Envirosure Mngmt. Co.*, No. 88-28E, 1988 WL 62876
        (W.D.N.Y. Jun. 9, 1988)...............................................................................................28

*Esch v. Yeutter*, 876 F. 2d 976 (D.C. Cir. 1989)............................................................. 13-14, 22

*Exxon Corp. v. Dep't of Energy*, 91 F.R.D. 26 (N.D. Texas 1981)........................................ 14-15

*Hall v. Sullivan*, 231 F.R.D. 468 (D. Md. 2005)...................................................................24

*Kimbro v. I.C. System, Inc.,* No. 01-CV1676, 2002 WL 1816820
        (D. Conn. July 22, 2002)................................................................................................24

*Lloyd v. Ill. Reg'l Transp. Auth.*, 548 F. Supp. 575 (N.D. Ill. 1982) ....................................14

*Morin v. Nationwide Credit Union*, 229 F.R.D. 364 (D. Conn. 2005) .........................................24

*Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7 (2d Cir. 1997) ...........................................15, 18, 22

*Natural Res. Def. Council, Inc. v. Train*, 519 F.2d 287 (D.C. Cir. 1975)....................................22

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978)....................................................... 25-26

*Porter v. Califano*, 592 F.2d 770 (5th Cir. 1979) .................................................................. 15-16

*Portland Audubon Soc'y v. Endangered Species Comm.,* 984 F.2d 1534
        (9th Cir. 1993)..................................................................................................... 19, 22-23

*Pub. Power Council v. Johnson*, 674 F.2d 791 (9th Cir. 1982)...................................................15

*San Francisco BayKeeper v. Whitman*, 297 F.3d 877 (9th Cir. 2002) ..........................................15

*Sierra Club v. U.S. Army Corps of Engineers*, 772 F.2d 1043 (2d Cir. 1985) .............................13

*State of N.Y. Dep't of Soc. Servs. v. Shalala*, 876 F. Supp. 29 (S.D.N.Y. 1994)..........................22

*Tenneco Oil Co. v. Dept. of Energy*, 475 F. Supp. 299 (D. Del. 1979) ........................................15

### Federal Statutes, Rules and Regulations

5 U.S.C. § 706(2) ..............................................................................................................................15

5 U.S.C. § 706(2)(A)..........................................................................................................................15

5 U.S.C. § 706(2)(B)..........................................................................................................................15

5 U.S.C. § 706(2)(E)..........................................................................................................................15

21 U.S.C. § 355(c)(1)...........................................................................................................................8

Fed. R. Civ. P. 26(b)(1)......................................................................................................................25

### Other Authority

"Food and Drug Administration Decision Process to Deny Initial Application for
Over-the-Counter Marketing of the Emergency Contraceptive Drug Plan B
Was Unusual," GAO Report 06-190, November 2005.......................................... 12-13, 20

## PRELIMINARY STATEMENT

This case seeks judicial review under the Administrative Procedure Act (APA) and the United States Constitution of the failure of the United States Food and Drug Administration (FDA) to approve the emergency contraceptive (EC) drug Plan B for over-the-counter (OTC) use.[1]  The Complaint alleges that this failure is not the result of appropriate medical or scientific evidence that requires Plan B to be available only as a prescription drug, but is instead the result of the FDA's improper reliance upon ideological and other factors that are beyond the statutory role assigned to the agency.  Because of this improper agency action, the statutory and constitutional rights of Plaintiffs and of all women who seek to avoid unwanted pregnancy by using Plan B are violated on a continuing and ongoing basis.  These violations inflict injury on women who need EC by increasing their risk of becoming pregnant and, therefore, of undergoing an abortion or carrying an unwanted pregnancy to term.

The agency originally filed this motion for a protective order arguing that discovery beyond the agency's administrative record should be prohibited altogether in this case, and at a minimum until the district court rules on the agency's then-pending motion for judgment on the pleadings (MJOP).  In light of the Court's express authorization that Plaintiffs may conduct discovery related (at least) to whether the agency has unreasonably delayed issuing a final decision, and in light of the Court's denial of the agency's MJOP, we address only the agency's argument that the discovery Plaintiffs have propounded should be quashed because it is "premature and objectionable."[2]

---

[1] In this memorandum, the terms "Plan B" and "EC" are used interchangeably.

[2] We also do not respond further to the government's motion for sanctions, which has already been denied by  the Court.

1

**STATEMENT OF FACTS[3]**

**I.    The Need for Expanded Access to Plan B.**

Unintended pregnancy is a significant public health problem in the United States. (Second Am. Compl. ¶ 24.)  Indeed, the United States has one of the highest rates of unintended pregnancy compared to other developed countries.  (*Id.* at ¶ 24.)  The rate of teen pregnancy in the United States is also one of the highest among developed countries.  (*Id.*).  Plan B is an emergency contraceptive drug in tablet form that can be used to prevent pregnancy following an act of intercourse in which no contraceptive was used or the contraceptive method used failed. (*Id.* ¶ 26.)  Plan B is, therefore, a drug used only by women, and every woman of childbearing age is a potential user of Plan B.  (*Id.* ¶ 50.)

When taken within 72 hours of unprotected intercourse, Plan B reduces the risk of pregnancy by approximately 89 percent after a single act of unprotected sex.  (*Id.* ¶ 27.)  The earlier within this time period Plan B is taken, the more effective it is.  In other words, as the interval between intercourse and the start of treatment increases, Plan B's effectiveness declines, and the risk of pregnancy increases.  (*Id.* ¶ 27.)  Therefore, rapid access to Plan B is essential in order to avoid pregnancy.

Plan B meets all the requirements for OTC status.  Switching Plan B to OTC status will promote public health because Plan B is only effective for a short time after unprotected sex, and it works most effectively if used within twenty-four hours of unprotected sex.  (*Id.* ¶ 28.) Because contacting a physician and obtaining and filling a prescription hinder women from obtaining Plan B in a timely fashion, making Plan B available OTC will allow more women to

---

[3] Because the facts of this case are crucial to understanding the substance of Plaintiffs' claims, the significance of delay in this case, and the very substantial harm that further delay will cause, Plaintiffs have set forth those facts here at length.

2

use the treatment and to use it more quickly, and thus enable more women to prevent unwanted pregnancies, to the benefit of public health.  (*Id*.)

By contrast, limiting Plan B to prescription use is not necessary for the protection of public health.  (*Id*. ¶ 29.)  Plan B is safe for self-medication because it is not toxic to the woman (or to an embryo or fetus if a pregnancy had been previously established in the woman).  (*Id*. ¶ 30.)  Plan B has a low risk of abuse or overdose, and if overdose occurs, it is unlikely to lead to serious consequences.  (*Id*. ¶ 31.)  Plan B's side effects are well-known and minor.  (*Id*. ¶ 32.) Plan B is effective when self-administered.  (*Id*. ¶ 33.)  Its administration is simple and relies only on assessments as to time elapsed since sexual intercourse that can be independently made by the woman, and any interaction between Plan B and other drugs would be nonfatal and unlikely to affect seriously Plan B's efficacy.  (*Id*.) The condition Plan B treats — contraceptive failure or failure to use contraception during intercourse — is one that is readily diagnosable by a woman.  (*Id*. ¶ 34.)  Plan B has no contraindications that would pose a danger to the patient.  (*Id*. ¶ 35.)  The existing patient labeling for Plan B is tailored to self-administration in that it is simple, clear, comprehensive and easy to follow. [4]  (*Id*. ¶ 36.)

## II.     History of the FDA's Continuing Undue Delay and Denial of Full OTC Status for Plan B.

In 1999, during a presidential administration sympathetic to expanded access to reproductive health care for women, the FDA approved Plan B as a prescription drug.  (*Id*. ¶ 38.) Since that date, Plan B has been prescribed many thousands of times.  (*Id*.)

---

[4] Because of these facts, both the American Medical Association and the American College of Obstetricians and Gynecologists support switching Plan B to OTC status.  *See* Dec. 5, 2000 Statement of American Medical Association; December 13, 2001 Statement of the American College of Obstetricians & Gynecologists (cited in Second Am. Compl. ¶ 37.)

Shortly after President Bush was inaugurated, on February 14, 2001, a group of citizen organizations, including Plaintiff Association of Reproductive Health Professionals, filed a petition with the FDA asking the agency to switch Plan B to OTC status. (*Id*. ¶ 39.)  In violation of its own regulations requiring a response to a citizen's petition within 180 days of filing, and displaying extraordinary delay and inaction, (*see Id*. ¶ 21), the FDA has failed as of this date – approximately four and a half years later – to either approve or deny the citizen's petition, thus constructively denying the petition.[5]  (*Id*. ¶ 39.)

Similar efforts by the manufacturers of EC pills have met the same fate: consignment to oblivion.  On April 16, 2003, Women's Capital Corporation, the former owner of Plan B, filed a supplemental new drug application (SNDA) asking the agency to approve Plan B for OTC sale. (*Id*. ¶ 40.)  Plan B was subsequently sold to Barr Laboratories, which maintained the SNDA.  (*Id*. ¶ 40.)  As set forth below, over two years later, the FDA, ignoring the uniform advice of its own medical and scientific staff, has decided to employ inaction and procrastination as its response to this application.

On December 16, 2003, FDA's Non-prescription Drugs Advisory Committee and Advisory Committee for Reproductive Health Drugs held a joint session to discuss possible OTC status for Plan B.  (*Id*. ¶ 41.)  The advisory committees, comprised of 28 members, voted as follows:

**(1) Does the Actual Use Study (AUS) demonstrate that consumers used [Plan B] as recommended in the proposed labeling?**

Yes – 27          No – 1

---

[5] After the 180 day period, the FDA gave a tentative response on September 6, 2001, claiming that "the issues raised . . . require[] extensive review and analysis by Agency officials."  (*See* Def.'s Mem. at 5.)  Since that date the FDA has not communicated further with the petitioners, and the Government has given the Court no indication that *any* "review or analysis" was conducted by the FDA regarding the Citizen's Petition. (Second Am. Compl. ¶ 37).

4

**(2) Are the AUS data generalizable to the overall population of potential non-Rx users of Plan B?**

Yes – 27     No – 1

**(3) Based on the AUS and literature review, is there evidence that non-Rx availability of Plan B leads to substitution of emergency contraception for the regular use of other methods of contraception?**

Yes – 0     No – 28

**(4) Do the data demonstrate that Plan B is safe for use in the non-prescription setting?**

Yes – 28     No – 0

(*Id*. ¶ 42.)

In addition, all division chiefs within the Center for Drug Evaluation and Research (CDER) who reviewed the OTC switch application expressed the view to CDER that, based on scientific and medical data, the OTC switch should be approved. (*Id*. ¶ 43.) By memorandum dated April 22, 2004 and signed electronically on April 28, 2004, John Jenkins, M.D., the Director of the FDA's Office of New Drugs, wrote a memorandum summarizing his "review, conclusions, and recommendations regarding" the OTC switch for Plan B ("the Jenkins memorandum") (*Id*. ¶ 44 & App. at 20-23 (AR 30897-900).)[6] This memorandum states: "[The FDA] has not heretofore distinguished the safety and efficacy of Plan B and other forms of hormonal contraception among different ages of women of childbearing potential and I am not aware of any compelling scientific reason for such a distinction in this case." (Second Am. Compl. ¶ 44 & App. at 21 (AR 30898).) After a review of the record evidence supporting OTC use by women of all ages, the Jenkins memorandum accordingly concludes "that the available data clearly support a conclusion that Plan B meets the statutory and regulatory requirements for availability without a prescription for all age groups. Such a conclusion is consistent with how

5

the Agency has made determinations for other OTC products, including other forms of

contraception available without a prescription." (Second Am. Compl. ¶ 44 & App. at 22 (AR

30899).)

The Jenkins memorandum further states that "[o]ther senior officials within the Agency,

including the former Commissioner (Dr. McClellan) and the Acting Center Director (Dr. Galson)

have expressed concerns about the potential for unsafe, ineffective, or inappropriate use of Plan

B by adolescents if it were to be made available without a prescription. These concerns appear

to have been based primarily on the limited number of adolescent women included in the

sponsor's label comprehension and actual use studies." (Second Am. Compl. ¶ 45 & App. at 20

(AR 30897).) Though Jenkins said that he "[is] sensitive to and respect[s] the concerns that

some may have regarding non-prescription access to Plan B by adolescents," (Second Am.

Compl. ¶ 46 & App. at 21 (AR 30898)), he stated that "[p]roducts that are indicated for uses

related to sexual activity in adolescents raise concerns for some people that go beyond a finding

based on clinical trial data that the product is safe and effective for its intended use in

adolescents. These concerns derive from individual views and attitudes about the morality of

adolescent sexual behavior and also overlap with concerns about the role of parents and health

care professionals in decisions about contraceptive use in adolescents." (Second Am. Compl. ¶

46 & App. at 21-22 (AR 30898-99).) He concluded: "While OTC access to Plan B for

adolescents may be controversial from a societal perspective, I cannot think of any age group

where the benefit of preventing unplanned pregnancies and abortion is more important and more

compelling." (Second Am. Compl. ¶ 45 & App. at 22 (AR 30899).)

---

[6] Citations to the Administrative Record will be cited as "AR _" and the cited portions are attached hereto as pages 1 through 54 of the Appendix.

6

Likewise, Dr. Jonca Bull, Deputy Director of the Office of Drug Evaluation V, submitted a memorandum stating that "the issues cited [regarding concerns over adolescents' access to Plan B] spuriously raise the review standard for approval of this product and indeed any contraceptive product. The issues are speculative and unbalanced in their proposition" and are neither supported by data nor the medical literature. ("the Bull memorandum") (Mem. of Jonca Bull, M.D., at 2-3 & App. at 74-75.) The Bull memorandum asserts that to impose additional requirements on Plan B, unrelated to the safety and effectiveness of the drug, would be to "in effect propose[] a new and unusual regulatory standard for contraceptive drug products." (Bull Mem., at 3 & App. at 75.)

Despite the nearly unanimous support from professional organizations and from FDA scientists for the OTC switch, on May 6, 2004, CDER Acting Director Steven Galson issued a "non-approvable" letter to Barr rejecting the OTC switch for Plan B ("the Galson letter") (Second Am. Compl. ¶ 47 & App. at 2 (AR 10797).) That action also constructively denied the citizen's petition. (Second Am. Compl. ¶ 47.)[7]

The Galson letter asserts that Barr's SNDA could not be approved because Barr had "not provided adequate data to support a conclusion that Plan B can be used safely by young adolescent women for emergency contraception without the professional supervision of a practitioner licensed by law to administer the drug." (Second Am. Compl. ¶ 48 & App. at 1 (AR 10796).) This assertion is not supported by the agency record. (Second Am. Compl. ¶ 48.) Seeking support for his concerns, Dr. Galson sent an eleventh-hour e-mail to a colleague requesting information as to "whether studies of adult behavior can be extrapolated to adolescent behavior. I think not, but want to make sure my statements in this regard are correct." The

several-paragraph response is contained in a two-page email exchange from May of 2004, and took place just days before he signed the non-approvable letter.  (App. at 25-26 (AR 30909-10)).  In contrast, numerous agency review staff stated that the evidence demonstrates that adolescents use Plan B in a way that is similar to that of older age groups, that concerns over whether Plan B is safe for use by adolescents are speculative and unsupported by the scientific evidence, and that evidence does not support claims that adolescents will engage in riskier behavior if Plan B is available OTC.  (App. at 10-12, 13, 14-15, 16-17 (AR 30757-59, 30829, 30830-31, 30876-77).)

On July 22, 2004, Barr filed an amended SNDA seeking the OTC switch only for women aged 16 and older.  (Second Am. Compl. ¶ 49.)  By statute, the defendant was required to act on Barr's amended SNDA within 180 days after it was filed.  (*See* 21 U.S.C. § 355(c)(1); Second Am. Compl. ¶ 49.)  On January 21, 2005, the FDA announced a delay of its decision on Barr's application beyond this statutory time limit.  (Second Am. Compl. ¶ 49.)

Reviewing divisions and offices of FDA "carefully examined" the concerns raised by "senior FDA and CDER management to support their decision for nonapproval" of Plan B for OTC use, but found that scientific evidence did not support these concerns.  (App. at 36 (AR 31033).)  Instead, the FDA review staff again overwhelmingly agreed that despite Barr's application for limited OTC status for Plan B for women 16 and older, that the drug was suitable for and thus should be approved for full OTC access for women of all ages.  (App. at 28, 29-30, 34-35, 37-39 (AR 31020, 31026-27, 31031-33, 31096-98); *see also* App. at 42 (AR 31214) (noting that "[a]lthough Barr did not propose to switch the Rx status of Plan B for women under 16 years of age in its July 21, 2004 resubmission, the CDER reviewers in the Divisions of Reproductive and Urologic Drug Products and the Division of Over-the-Counter Drug Products

---

[7] The Galson letter signaled that the FDA was terminating its review of Plan B for full OTC access. Thus, the letter constituted final agency action on the Citizen's Petition, which sought full OTC access to Plan B for women of all

(the review divisions), the Deputy Directors of the Offices of Drug Evaluation (ODE) III and V, and the Director of the Office of New drugs recommended that Plan B should be switched OTC for the entire population of women who might use the product, including women under age 16."))).) Moreover, the Director and Deputy Director of the Division of OTC Drug Products and the Director of the Office of Drug Evaluation V stated that Plan B meets the criteria for unrestricted OTC access, that data to the contrary was lacking, and moreover that because of the strength of the data before the agency, it is "unclear what additional data could be provided on adolescent use that would be sufficient to lift the age restriction in the future." (App. at 29-33 (AR 31026-30).)

Subsequently, despite repeated assurances to the public, the United States Congress, and this Court that FDA action on the SNDA was imminent, the FDA has continued to fail to approve Plan B for OTC use. On July 13, 2005, the Secretary of Health and Human Services Michael O. Leavitt assured Senator Michael Enzi that "the FDA will act on this application [regarding OTC status for Plan B] by September 1, 2005." (*See* Letter of M. O. Leavitt, attached to Def.'s Letter to the Court, dated July 25, 2005.) Counsel for the Government submitted the Leavitt letter to the Court and requested that the Court delay the judicial proceedings: "[g]iven the agency's commitment to take action on the pending Plan B application within the next 45 days, we respectfully submit that the most appropriate course of action would be to suspend the current briefing schedule and stay this case until the FDA takes the anticipated action. . . ." (Def.'s Letter to the Court, dated July 25, 2005, at 2.)

Instead of the promised action, on August 26, the FDA issued a letter to Joseph A. Carrado, stating that "the Agency is unable at this time to reach a decision on the approvability

---

ages.

9

of the application because of unresolved issues that relate to your NDA . . . ." (*See* (App. at 5)

(AR 10813)). The letter indicated that "[t]he Center for Drug Evaluation and Research (CDER)

has completed its review of this application, as amended, and has concluded that the available

scientific data are sufficient to support the safe use of Plan B as an OTC product, but only for

women who are 17 years of age and older." (*Id.*) Despite this determination, and despite the fact

that Barr had been invited by FDA to submit an amended application for split-label access, FDA

now stated that age-restricted OTC access would not be available for Plan B before the agency

reaches a decision on "unresolved issues" regarding the feasibility of approving split-label

access. (*Id.*) Rather, FDA sought public comment on "whether we should initiate a rulemaking

to codify our interpretation of section 503(b) regarding when an active ingredient can be

simultaneously marketed in both a prescription drug product and an OTC drug product." (App.at

6 (AR 10814).)

On August 31, 2005, Dr. Susan F. Wood, assistant FDA commissioner for women's

health and director of the Office of Women's Health announced that she was resigning from her

post in reaction to the agency's decision to continue to limit access to Plan B, stating: "I can no

longer serve as staff when scientific and clinical evidence, fully evaluated and recommended for

approval by the professional staff here, has been overruled." *See* App. at 78 (quoting Susan F.

Wood).

On September 27, Dr. Wood appeared on the ABC television news program Nightline to

discuss the failure of the agency to act in accordance with the scientific consensus in favor of

approving Plan B for OTC use. *See* App. at 83-85 (citing "consensus . . . amongst the scientists

and health professionals there that it should be approved," and the fact that "all of the scientific

and professional staff who normally are the part of the decision-making at the agency . . . were

10

cut out of the decision.").  Dr. Wood also expressed her concern for the lengthy delay that she anticipated as a result of the upcoming rule-making:

> Dr. Wood: . . . But I would argue that the decision to delay approval of this product over-the-counter is, in fact, a denial.  And this is, again, in part why I resigned.  Because by couching it as a delay and a non-decision, in fact denied women of all ages, not just teens but women of all ages access to timely use of this product.

> Ted Koppel: (Off Camera) If you had thought that it was a brief delay, in other words, if you thought it was only going to be a delay of a couple of months, you wouldn't have resigned.

> Dr. Wood:  Probably not.

> Ted Koppel:  (Off Camera) So, you obviously think that what we're talking about here is not really a delay but a way of shelving it and not dealing with the issue.

> Dr. Wood: Right.  The mechanism is a rather bureaucratic one to potentially open it up to rulemaking.  Which, to make a long story short, means opening up to a process that usually takes many months to years, if in fact that's the way they go.

(*See* App. at 85-86.)

The history described above and the allegations in the Complaint show that the FDA applied a different and higher standard to Plan B's OTC switch than it has applied to OTC switches of other drugs.  (Second Am. Compl. ¶ 51; *see also* "the NEJM article" (App. at 88, 90 (This decision [to postpone issuing a decision about making EC available OTC] – or nondecision – deserves serious scrutiny, since it appears to reflect political meddling in the drug-approval process . . . . The recent actions of the FDA leadership have made a mockery of the process of evaluating scientific evidence, disillusioned many of the participating scientists both inside and outside the agency, squandered the public trust, and tarnished the agency's image.").)

Moreover, there is no medical or scientific basis for the FDA's application of a different and higher standard to Plan B's OTC switch.  (Second Am. Compl. ¶ 52; *see also* App. at 89.)

11

Instead, the FDA's application of a different and higher standard to Plan B's OTC switch was the

result of factors that fall outside the FDA's statutory mandate, (Second Am. Compl. ¶ 53), and

the FDA's rejection of the OTC switch for women of all ages and its constructive rejection of the

citizen's petition for the OTC switch are not supported by medical or scientific evidence and are

not supported by the agency record.  (Second Am. Compl. ¶ 54; *see also* App. at 55-72).

On November 14, 2005, the Government Accountability Office issued a report to

members of Congress examining the FDA's May 6, 2004 issuance of a "non-approvable" letter

with regard to Barr Laboratory's SNDA request that Plan B be made available over-the-counter.

(Report filed with the Court on November 18, 2005, also available at

http://www.gao.gov/new.items/d06109.pdf).

The report, titled "Food and Drug Administration Decision Process to Deny Initial

Application for Over-the-Counter Marketing of the Emergency Contraceptive Drug Plan B Was

Unusual," found that FDA's review process was "unusual" in four aspects:

> First, the Directors of the Offices of Drug Evaluation III and V, who would
> normally have been responsible for signing the Plan B action letter, disagreed
> with the decision and did not sign the not-approvable letter for Plan B. The
> Director of the Office of New Drugs also disagreed and did not sign the letter.
> Second, FDA's high-level management was more involved in the review of Plan
> B than in those of other OTC switch applications. … Third, … there are
> conflicting accounts of whether the decision to not approve the application was
> made before the reviews were completed. Fourth, the rationale for the Acting
> Director of CDER's decision was novel and did not follow FDA's traditional
> practices. Specifically, the Acting Director was concerned about the potential
> impact that the OTC marketing of Plan B would have on the propensity for
> younger adolescents to engage in unsafe sexual behaviors because of their lack of
> cognitive maturity compared to older adolescents. He also stated that it was
> invalid to extrapolate data from older to younger adolescents in this case. FDA
> review officials noted that the agency has not considered behavioral implications
> due to differences in cognitive development in prior OTC switch decisions and
> that the agency has considered it scientifically appropriate to extrapolate data
> from older to younger adolescents.

(GAO Rept. at 5).  In summary, the GAO found that the decision-making process was "not typical," was unlike all of the 67 other OTC switch applications filed between 1994 and 2004, and that the Plan B OTC switch application was the only one during that 10 year time period that "was not approved after the joint committee voted to recommend approval of the application." *Id.*  The GAO Report concludes that the FDA's decision-making process was unusual and that high-level officials were reported to be involved in the decision-making process.

## ARGUMENT

The district court has authorized Plaintiffs to conduct discovery related to their claim that the agency, assuming *arguendo* that it has not finally rejected OTC status for Plan B, has unreasonably delayed in reaching a final decision on whether to switch Plan B to OTC status.  In addition to this basis for the discovery propounded by Plaintiffs, *see* Point I *infra*, Plaintiffs' discovery is justified because (1) the agency has engaged in improper behavior and bad faith, *see* Point II *infra*, and (2) because the administrative record produced by the agency is incomplete, *see* Point III *infra*.

Although judicial review under the APA is typically conducted upon the administrative record, the Government is mistaken in claiming that review is always limited to the record as the Government has compiled it.  Particularly where an administrative record is "inadequate, incomplete or . . . inconsistent," a court will undertake a probing search beyond the record. *Sierra Club v. U.S. Army Corps of Engineers*, 772 F.2d 1043, 1052 (2d Cir. 1985); *see also id.*, at 1057 (Mansfield, J., concurring in part and dissenting in part) (judicial scrutiny is not limited to the record, but rather a court "considers how the administrative record was developed, and whether, once developed, it was complete)).  "[C]ourts have developed a number of exceptions countenancing [the] use of extra-record evidence" in order to ensure effective judicial review.

*Esch v. Yeutter*, 876 F. 2d 976, 991 (D.C. Cir. 1989). Recognized exceptions where evidence beyond the administrative record is considered include:

> 1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Id.* (citing Stark & Wald, Setting No Records: The Failed Attempts to Limit the Record in Review of Administrative Action, 36 Admin. L. Rev. 333, 345 (1984), other citations omitted.)

In this case, Plaintiffs invoke three of these exceptions – the first, third, and sixth examples noted above. First, the unreasonable delay in approving (or denial of approval of) OTC access to Plan B, is not adequately explained in the record before the Court. In order to ensure that the record contains all information directly or indirectly considered by the agency decision-makers, the court will look outside the administrative record "when necessary to explain the agency's action." *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988) (citation omitted); *see also Lloyd v. Ill. Reg'l Transp. Auth.*, 548 F. Supp. 575, 590 (N.D. Ill. 1982). Second, because the agency record does not provide adequate support either for the May 2004 non-approvable letter or the August 26, 2005 letter requiring public comment on a potential proposed rulemaking process, the record is incomplete and thus there is either no basis for the action or the agency considered evidence which it failed to include in the record. When determining what constitutes the administrative record, "the Court must look to *all* the evidence that was before the decision-making body," not only "those documents that the agency has compiled and submitted as 'the' administrative record." *Exxon Corp. v. Dep't of Energy*, 91

14

F.R.D. 26, 32-33 (N.D. Texas 1981) (emphasis added); *Tenneco Oil Co. v. Dep't of Energy*, 475 F. Supp. 299, 317 (D. Del. 1979).  Third, this case includes a claim against the agency for its failure to take action on the OTC applications.  In a challenge to agency inaction, courts may rely on documents outside the administrative record, because judicial review "cannot logically be limited to the record."  *Confederated Tribes of Umatilla Indian Reservation v. Bonneville Power Admin.*, 342 F.3d 924, 930 (9th Cir. 2003) (*citing San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 886 (9th Cir. 2002)).

Moreover, it is also well established that judicial review must go beyond the administrative record where Plaintiffs bring a claim of bad faith or improper behavior by agency decision-makers and can make a strong preliminary showing in support of such claims.  *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997).  *See also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *Comty. for Creative Non-Violence v. Lujan*, 908 F.2d 992, 997 (D.C. Cir. 1990); *Animal Def. Council*, 840 F.2d at 1437; *Pub. Power Council v. Johnson*, 674 F.2d 791, 795 (9th Cir. 1982).

Thus, because Plaintiffs' claims implicate four separate exceptions to the general principle that APA cases are reviewed primarily on the basis of the administrative record, and because the administrative record provided by the Government appears to be incomplete, discovery is appropriate in this case. [8]

---

[8] In addition, Plaintiffs continue to believe that their good-faith constitutional claims, asserted via section 706(2)(B) of Title 5, entitle them to discovery beyond the administrative record.  *See Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979) ("In setting aside the lower court's cursory rejection of Porter's constitutional claim, we note the possibility that the court may have relied on agency findings or deferred to agency rulings in making its decision. This too would be error. The intent of Congress in 5 U.S.C. § 706(2)(B) was that courts should make an independent assessment of a citizen's claim of constitutional right when reviewing agency decision-making. Whereas § 706(2) authorizes reviewing courts to overturn agency findings and actions involving Non-constitutional claims only when the agency has abused its discretion, § 706(2)(A), acted arbitrarily and capriciously, § 706(2)(A), or made findings unsupported by substantial evidence, § 706(2)(E), section 706(2)(B) explicitly authorizes the court to set aside any

I.      **All the Discovery Propounded Thus Far By Plaintiffs, as well as Additional Contemplated Discovery, Is Relevant to Plaintiffs' Claim that the FDA Has Engaged in "Unreasonable Delay."**

The District Court held at oral argument on December 22, 2005 that Plaintiffs are entitled to discovery beyond the record, because they sued the agency for a failure to take action. All of Plaintiffs' discovery requests are relevant to the claim that the agency has unreasonably delayed action on Plan B. For example, the FDA claims that agency action is not possible because of inadequate evidence of safety of OTC use by adolescents under the age of 16 (or, more recently, 17). *See* App. at 1-4 (AR 10796-10799); App. at 42 (AR 31214); App. at 5-7 (AR 10813-10815). Numerous, detailed memoranda by agency scientists repeatedly reject that rationale for not approving Plan B for OTC use. *Supra* at 5-9; *see also* App. at 55-72. The agency's failure (or refusal) to "decide" the issue appears to be an effort to avoid scrutiny of a record that does not support the actual result. Plaintiffs' Interrogatories are directly relevant to determining whether the alleged lack of data about adolescent use of Plan B is reasonable. If it were reasonable, surely other prescription drugs with risks comparable to those of Plan B would also not have been switched to OTC status without more extensive evidence of safe OTC use by adolescents. Conversely, repeated approval of OTC switches by the FDA for drugs with risks comparable to those of Plan B, despite lack of study of OTC use of such drugs by younger adolescents, would tend to show that FDA's failure to take action was unreasonable and a pretext.

---

agency action "contrary to constitutional right . . . ." ); *id.* at n.15 ("Judicial deference to agency fact-finding and decision-making is generally premised on the existence of agency expertise in a particular specialized or technical area. But in general, courts, not agencies, are expert on [constitutional rights]."). Because, however, all the discovery Plaintiffs have propounded is relevant to Plaintiffs' claim of unreasonable delay, is justified by agency bad faith, and is justified by serious gaps in the agency record, the Court need not rely on the Plaintiffs' constitutional claims to grant discovery. As the District Court noted at the hearing on the MJOP, "It's not a crime if you take relevant discovery to a particular cause of action if it also has a bearing on the other cause of action, you know, so it has -- it simply has that bearing. It doesn't mean that there's something wrong with doing that." Transcript of Argument before Chief Judge Korman on December 22, 2006 at 94.

16

Plaintiffs' document requests are all relevant to determining whether the agency has engaged in unreasonable delay. The requests seek to disclose evidence bearing on whether the reasons for the agency delay are the ones actually stated by Dr. Galson and others (as indicated in the agency documents so far produced) or are instead pretext for other, improper reasons for deferring a formal decision.

Plaintiffs also seek to conduct limited depositions which they believe fall within the District Court's authorization to take discovery on unreasonable delay claims, (*see* Transcript of Argument before Chief Judge Korman on December 22, 2006 ("Tr. at __"), at 82-83), and also within the exceptions allowing discovery in APA claims based on bad faith and where there is an incomplete record. Initially, Plaintiffs will seek to depose Susan F. Wood, former Assistant Commissioner for Women's Health and Director of the Office of Women's Health at the FDA, and Dr. Steven Galson, Director of the Center for Drug Evaluation and Research (CDER) at FDA. In addition, it is apparent that the Office of the Commissioner played a significant role in FDA's failure to approve Plan B for OTC use. Plaintiffs anticipate that they will also seek to depose former FDA commissioners Mark B. McClellan (currently the Chief Administrator at the Center for Medicare & Medicaid Services) and Lester M. Crawford, Jr., and FDA's Deputy Commissioner for Operations, Janet Woodcock.

Such depositions are relevant to determining whether the agency has unreasonably delayed approval of Plan B for OTC use. Although the administrative record compiled by the agency contains repeated references to the fact that the Commissioner's Office expressed concerns about making Plan B available OTC for adolescent women, the record does not include documents that demonstrate any scientific support for these concerns. (App. at 8 (AR 30745) ("Dr. McClellan expressed concern about adolescent behavior, although he did not articulate the

17

exact nature of his concern, what ages were included in his concern, what data was lacking or a path forward for the sponsor.")).  Discovery on the existence – or not – of support for these concerns is relevant to whether the reasons for the agency's delay can be justified or is pretextual.

The depositions would allow exploration of the vague, cursory statements in the record concerning the positions taken by those officials, and of whether the officials were instructed to take a particular position on the approval of the OTC switch application for Plan B.  For example, Dr. Woodcock expressed concern at a meeting that perhaps making Plan B available OTC would result in "the medication taking on an 'urban legend' status that would lead adolescents to form sex based cults centered around the use of Plan B.  Dr. Galson indicated that he shared Dr. Woodcock's concerns."  (App. at 8-9 (AR 30745-46).)

## II.     Plaintiffs Also Satisfy the "Bad Faith" Exception Which Permits Discovery Beyond the Agency's Administrative Record.

In addition to this basis for discovery, Plaintiffs are also entitled to conduct discovery beyond the scope of the agency's record because it strongly signals that the FDA has acted improperly and in bad faith.  Discovery of the agency decision-making process and "an extra-record investigation by the reviewing court may be appropriate when there has been a strong showing in support of a claim of bad faith or improper behavior on the part of the agency decisionmakers." *Nat'l Audubon Soc'y*, 132 F.3d at 14.  *See also Citizens to Preserve Overton Park, Inc.,* 401 U.S. at 420; *Cmty. for Creative Non-Violence*, 908 F.2d at 997.  Where there is an allegation of bad faith on the part of the agency, "the good faith behind it can only be grasped by looking beyond the record itself." *Amfac Resorts v. U.S. Dep't of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001).  "[T]he only way a non-agency party can demonstrate to a court the need for extra-record judicial review is to first obtain discovery from the agency." *Id.  See also Bar*

*MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993); *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993).  Plaintiffs seek to do so here.

As the district court recently observed, "There is a serious issue here as to whether they [the FDA] are acting in good faith." (Tr. at 23.)  Defendant incorrectly argues that the "complaint itself contains no claims of agency bad faith."  (Mem. of Law in Suppt. of Def's Mot. for Protective Order (Def.'s Mem.")  at 15.)  The facts in the Second Amended Complaint and reasonable inferences from them show otherwise.  (Second Am. Compl. ¶¶ 1, 39, 42-48, 51-55, 60, 62, 64 & 66.)  The recently disclosed internal agency documents do so as well.

Documents suggest that as early as January 15, 2004, four months before the non-approvable letter was issued, and before the scientific reviews of the OTC switch application were completed, "senior CDER management informed the Divisions and Offices that this application is not approvable." (App. at 36 (AR 31033).)  Given that the scientific reviews had not yet been completed, it appears that the senior management based this decision not to approve the Plan B application on something other than scientific evidence.  These documents contradict the public statements made by FDA that it "did not bow to political pressure in making," its May 2004 decision issuing a non-approvable letter regarding Barr's application for an OTC switch for Plan B, and that "This decision was made within the Center for Drug Evaluation and Research [CDER]."  App. at 94.

The record as complied by the government strongly suggests agency bad faith.  (*See* App. at 57, 62-63, 64, 67-68, 70, 72.)  For instance, documents show that both the Commissioner of the FDA and the Deputy Commissioner of Operations played an unusually active role in the decision to issue a non-approvable letter, as well as in subsequent agency action on Plan B.  *See, e.g.,* App. at 13 (AR 30829) ("The Divisions and Offices were told that the Commissioner and

19

senior CDER management believed that the number of adolescents in the actual use study was inadequate, that there were inadequate data to show that adolescents could use the product correctly, and that adolescents needed a learned intermediary involved in their access to emergency contraception."); App. at 8-9 (AR 30745-46) (describing concerns expressed by the FDA Commissioner and the Deputy Commissioner of Operations, regarding impact on adolescents of OTC access to Plan B); *see also* GAO Report at 5, 8-10, 19-20.  The  Office Directors of Drug Evaluation III and V told GAO investigators that they were asked by high level management to draft and sign a non-approvable letter for Plan B, but that they declined to do so because they did not agree with that action.  GAO Rept. at 19.  The Director of the Office of New Drugs was then asked to review the Plan B application.  Involving the Office of New Drugs in issuing such a letter is "very, very rare," and, according to FDA policy and procedure manuals is limited to situations where there is disagreement between the two reviewing offices.  GAO Rept. at 20.  The Director of the Office of New Drugs also declined to sign a non-approvable letter based on his disagreement with the decision.  *Id..*  The fact that upper-level management at FDA removed the decision of whether to approve Plan B's OTC application from the hands of the professional review staff, that upper-level management dictated the outcome of the review process, and that upper-level management deviated from the standard practices and policies set forth in their own manuals and handbooks, suggests bad faith interference in the scientific review process.

The FDA's Deputy Director of the Office of Drug Evaluation V also noted that the issues raised by FDA political appointees concerning adolescents' access to Plan B "spuriously raise the review standard for approval of this product and indeed any contraceptive product," and are not supported by the data nor the medical literature.  (*See supra* at 6-7.)  The non-approvable

20

letter in May 2004 and the recent decision to further withhold approval of Plan B for OTC use was opposed by the scientific review staff that would normally be responsible for making decisions approving drugs for OTC use. (*See* App. at 15 (AR 30831) ("Placing a greater than usual emphasis on the label comprehension study for this product compared to the actual use study is not appropriate or usual review practice in evaluating a prescription to non-prescription switch.").) Dr. Galson recognized that he was overriding the overwhelming consensus of his staff: "CDER reviewers in the Divisions of Reproductive and Urologic Drug Products and the Division of Over-the-Counter Drug Products (the review divisions), the Deputy Directors of the Offices of Drug Evaluation (ODE) III and V, and the Director of the Office of New drugs recommended that Plan B should be switched OTC for the entire population of women who might use the product, including women under age 16." App. at 42 (AR 31214). Further, as noted by Dr. Susan F. Wood, former assistant FDA commissioner for women's health and director of the Office of Women's Health, when she resigned on August 31, 2005, "This decision [to postpone issuing a decision about making EC available OTC] – or nondecision – deserves serious scrutiny, since it appears to reflect political meddling in the drug-approval process . . . The recent actions of the FDA leadership have made a mockery out of the process of evaluating scientific evidence, disillusioned many of the participating scientists both inside and outside the agency, squandered the public trust, and tarnished the agency's image." (*supra* at 11). Making a "mockery out of the process of evaluating scientific evidence" constitutes bad faith and improper behavior by an agency dedicated to promoting and protecting public health.

The facts described above, as well as reasonable inferences from them, make a strong showing that the agency acted in bad faith in its refusal to approve the OTC switch for Plan B and the Citizen's Petition for unrestricted OTC access for women of all ages.

21

**III.    Defendant's Motion for Protective Order Should Also Be Denied Because the Agency's Administrative Record Is Incomplete.**

Courts reviewing agency actions may consider evidence outside the administrative record where the record is incomplete. *See Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 420 (recognizing that "the bare record may not disclose the factors that were considered" by the agency and remanding with permission to "require the administrative officials who participated in the decision to give testimony explaining their action"); *Nat'l Audubon Soc'y*, 132 F.3d at 14-15 (permitting consideration of extra-record evidence where "gaps in the agency-compiled record effectively prevented the district court" from determining whether the Forest-service had adequately considered the relevant evidence); *Esch v. Yeutter*, 876 F.2d 976, 991-93 (D.C. Cir. 1989) (allowing farmers challenging Department of Agriculture's suspension from certain programs to supplement the administrative record with documentary evidence where agency had violated its own procedures and record failed to reveal the basis for decisionmakers' determinations). This includes instances where, as here, the agency has failed to include in the record evidence that it considered in taking the challenged action. *Esch*, 876 F.2d at 991; *see also Natural Res. Def. Council, Inc. v. Train*, 519 F.2d 287, 292 (D.C. Cir. 1975) (ordering district court to permit supplementation of the record where documents properly part of the record had been improperly withheld); *State of N.Y. Dep't of Soc. Servs. v. Shalala*, 876 F. Supp. 29, 31 (S.D.N.Y. 1994) (permitting supplementation of record with documents that "were the subject of attention throughout the administrative process" but were not included in the official record). Moreover, to the extent that Plaintiffs' discovery requests seek information regarding improper *ex parte* contacts between decision makers at the FDA and outside parties, such discovery is also permitted. *Portland Audubon Soc'y*, 984 F.2d at 1548-49 (permitting discovery on improper *ex parte* communications between agency officials and third parties and stating that

"[i]f such *ex parte* communications occurred, then the record must be supplemented to include those contacts so that proper judicial review may be conducted.").

Documents contained in the administrative record do not support the agency's decision to withhold approval of OTC status for Plan B. That there was overwhelming and emphatic support for unrestricted OTC access for Plan B by the scientific reviewers routinely responsible for making such decisions regarding OTC access, suggests that the decision to withhold approval was made at the highest levels of the agency, and was not based on the scientific and medical evidence before the agency. *See supra* at 5-9, 19-20. Plaintiffs are entitled to discover whether the agency considered evidence which it failed to include in the record. For example, Plaintiffs have received, among the many thousands of pages of the administrative record, a total of *two* pages of internal agency e-mails, and a total of *two* pages of agency employee calendars annotating meetings related to Plan B. (App. at 25-26, 40-41 (AR 30909-910, 31212-213).) It is simply beyond belief that these are the only agency e-mails and agency employee calendar records related to Plan B. Plaintiffs should be allowed to discover all such records, as requested in Plaintiffs' First Set of Document Requests. It is also apparent from the General Accounting Office report and the letter of Congressman Waxman (App. at 95-97) that former FDA Commissioner McClellan improperly and possibly illegally deleted agency e-mail messages related to Plan B.[9] Plaintiffs should therefore be permitted to depose Dr. McClellan about his communications related to Plan B.

---

[9] It is quite possible that other agency employees preserved e-mails they received or sent to the Office of the Commissioner related to Plan B that are not contained in the administrative record complied by the agency. Indeed, after the November 8, 2005, hearing on the Government's motion for a protective order, counsel for the FDA requested the Office of the Commissioner and CDER staff to preserve all such e-mails, in accordance with the Court's reminder to counsel of the obligation to preserve documents responsive to the pending discovery requests. Plaintiffs are entitled to review all such e-mails that have been preserved by agency employees.

23

**IV.    Plaintiffs' Discovery Requests Ought Not Be Quashed Based on the Government's Blanket Assertions That They Are Irrelevant and Unduly Burdensome.**

The Government seeks to quash all discovery requested by Plaintiffs on the basis that it is unduly burdensome and seeks irrelevant information.  (Def.'s Mem. at 20-21).[10]  In order to prevail on an objection of this sort, however, the objecting party must do more than "simply intone [the] familiar litany that the [questions] are burdensome, oppressive or overly broad." *Compagnie Francaise D'Assurance Pour Le Commerce Exterieur v. Phillips Petroleum Co.,* 105 F.R.D. 16, 42 (S.D.N.Y.1984) (quotations and citations omitted).  The burden lies with the objecting party to demonstrate "specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [question] is not relevant or how each question is overly broad, [unduly] burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden." *Id.* (internal citations omitted).  Here, the Government's broad, unsupported allegations are insufficient to support their demand that discovery be quashed in its entirety.  One searches the Government's papers in vain for any detailed list of objections to Plaintiffs' discovery requests.

Indeed, the Government has filed a supporting declaration that proves that at least some of Plaintiffs' Interrogatories are *not* unduly burdensome.  The Declaration of Jane A. Axelrad avers that "[i]n the last ten years, there have been a total of 66 OTC switch applications, 58 of

---

[10] In a footnote, the Government seeks to reserve its "right to identify additional objections at a future time, if need be," Def.'s Mem. at 20, n.8, presumably beyond those identified in its memorandum in support of its motion for a protective order.  This proposed piecemeal litigation of discovery should be rejected out of hand by the Court. *See, e.g., Morin v. Nationwide Credit Union*, 229 F.R.D. 364, 367-68 (D. Conn. 2005) ("a party 'is not free to raise in its brief almost as an afterthought-entirely new objections which it did not assert earlier.' *Kimbro v. I.C. Sys. Inc.,* No. 01-CV1676, 2002 WL 1816820, at *1, 2002 U.S. Dist. LEXIS 14599, at *3 (D. Conn. July 22, 2002). Instead, 'a party which fails to object to a discovery request waives any objections it otherwise might have made.' *Id.*"); *Hall v. Sullivan*, 231 F.R.D. 468, 473 (D. Md. 2005) ("Moreover, there are strong policy reasons favoring a requirement that a party raise all existing objections to document production requests with particularity and at the time of answering the request, so that counsel may meet and confer once to try to resolve the objections and, if unsuccessful, present the dispute to the court for prompt resolution.  No benefit is achieved by allowing piecemeal objections to producing requested discovery, as this adds unnecessary expense to the parties and unjustified burden on the court.").  The Government's misplaced bravado in assuming that its motion to preclude all discovery would be granted should not be rewarded by further delays in resolving the permissibility of Plaintiffs' discovery requests.

24

which have been approved." [11]   Axelrad Decl. at ¶ 4.  Plaintiffs do not, as the Axelrad

Declaration suggests, *see id*., seek documents related to these 66 applications or analysis of the

data contained therein.  Plaintiffs have only asked whether these applications contain certain type

sof supporting data (related to label comprehension and actual use studies for persons of certain

ages), and the basis for the approval of denial of the OTC switch.  Answering these questions

does not require analysis of data.  Rather, each such application presumably contains a medical

memorandum, similar to that produced by the agency for Plan B, *See*, *e.g.*, AR 30829-880

(Deputy Division Director Summary Review of New Drug Application, Donna Griebel, April

16, 2003) (first two pages including list of topics covered by the report are attached, App. at

30881-882, about the label comprehension and actual use studies submitted by each applicant.

The Government needs only to examine that sort of summary document to determine whether

label comprehension and actual use studies were submitted for the ages specified in the

Interrogatories.  Moreover, as with Plan B, there are presumably final agency memoranda

approving or denying the OTC switch, with reasons, from which the Government can answer the

remaining Interrogatories.

> **A.**     **Plaintiffs' Discovery Requests Are Relevant to the Claim of Unreasonable Delay.**

A discovery request qualifies as "relevant" if it "appears reasonably calculated to lead to

the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).  This rule has been construed

broadly "to encompass any matter that bears on, or that reasonably could lead to other matter that

---

[11] Plaintiffs note that on January 4, 2006, the Government provided Plaintiffs with a chart that it had already prepared for, and produced to, the GAO Investigators, which contains very limited information regarding the other OTC switch applications considered by FDA.  This chart appears to contain the information sought by Interrogatory No. 1, but not information sought by the remaining interrogatories.  If this is correct, Plaintiffs will of course withdraw Interrogatory No.1, assuming that the defendant will verify the truth of the information contained in the chart.  Plaintiffs intend to confer with counsel for the Government in order to clarify what the chart's data means before assessing the chart's responsiveness to Plaintiffs' interrogatories.

could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (citation omitted).

The Government suggests that because Plaintiffs seek information about drugs other than Plan B – "wholly unrelated drug products" – these requests are irrelevant. (Def.'s Mem. at 20.) However, this argument ignores the central core of Plaintiffs' complaint: that Plan B was treated differently from other drugs and that the process for reviewing Plan B for full OTC access was subject to improper influences in contravention of the statutory mandate of the FDA. (Second Am. Compl. ¶¶ 51-55, 60; *see also supra* at 4-11.) This contention, if true, would tend to demonstrate that the FDA's failure to approve Plan B for OTC use has been unreasonably delayed. Plaintiffs seek information about other OTC switch applications in order to compare the process of SNDA review for those drugs to the process followed with regard to Plan B. (*See* Def.'s Mem. at 4-5.) The information sought is clearly pertinent to Plaintiffs' claims that the review process for Plan B has been unreasonably delayed when compared to the process followed for other drugs. (*See* Second Am. Compl. ¶¶ 51, 53; *supra* 10-11.)

Likewise, Plaintiffs are seeking information about communications regarding Plan B between members of FDA and other political officials. (*See* Def.'s Mem. at 5.) This information is relevant to Plaintiffs' claims that factors other than the scientific and medical information before the FDA influenced the FDA's decision to withhold full OTC status for Plan B. (*See* Second Am. Compl. ¶¶ 52-54; *supra* 5-7, 9-11.) *See also* App. at 98 (quoting letter of resignation of Dr. Frank Davidoff from FDA Nonprescription Drugs Advisory Committee: "I can no longer associate myself with an organization that is capable of making such an important decision so flagrantly on the basis of political influence, rather than the scientific and clinical evidence."). Such information would also tend to show that the agency delay has been

26

unreasonable, because delay due to certain political factors (e.g., political opposition to enhanced access to contraception; political opposition to adolescent access to contraception without parental involvement; or concern about political response to agency action approving Plan B for unrestricted OTC use) is *per se* unreasonable for an agency charged with making science-based decisions to promote public health. Because the information sought is relevant to Plaintiffs' claims, and is likely to lead to the discovery of other admissible evidence, their discovery requests should not be precluded on the basis of irrelevance.

**B.      Plaintiffs' Discovery Requests Are Not Unduly Burdensome, and the Government's Refusal to Confer Precludes Plaintiffs from Narrowing These Requests.**

The Government's argument that no discovery should proceed because the discovery sought is unduly burdensome is not persuasive. (Def.'s Mem. at 20-22.) Although the burden falls upon the party resisting discovery "to clarify and explain its objections and to provide support therefor," *Compagnie Francaise D'Assurance Pour Le Commerce Exterieur*, 105 F.R.D. at 42, the Government has failed to do so here. In addition, the Government's wholesale rejection of Plaintiffs' longstanding efforts to conduct a discovery conference has prevented Plaintiffs from more narrowly tailoring their requests, and thus the Government ought not be permitted to profit from their refusal to cooperate.

In fact, Plaintiffs have repeatedly sought to confer in order to reach agreement as to what discovery the Government would agree to produce. However, despite the Court's request that the parties agree to some discovery, the Government continues to take the position that it will not provide or acquiesce to any discovery whatsoever beyond that initially designated by the agency as the "Administrative Record" and the nine-page spread-sheet provided on January 4, 2006. *See supra* n.11 (describing chart). It is impossible for Plaintiffs to intuit, without meaningful negotiations with opposing counsel, whether the requests would truly be unduly burdensome to

FDA.  Without meaningful consultation with counsel on these matters, Plaintiffs are unable to better tailor their discovery requests.

Moreover, the Government has still offered no specific facts to support its contention that Plaintiffs' requests are unduly burdensome, beyond the bald assertion that "[m]any of the administrative records for the other products implicated by plaintiffs' interrogatories are equally voluminous," as the extensive record for Plan B.  (Def.'s Mem. at 21.)  In addition, in order to respond to the Government's concerns regarding the disclosure of trade secrets and confidential commercial information, (Def.'s Mem. at 21-22), Plaintiffs would, if given the opportunity, be willing to cooperate with the Government to ensure that these interests are protected.  Finally, if the Government is concerned that the discovery sought is unduly burdensome, then the most appropriate next step is to attempt to reach a compromise between the parties as to what discovery can reasonably be produced, yet would also provide sufficient information to the Plaintiffs.  Thus, charges of unduly burdensome discovery do not suffice as a reason for precluding or delaying all discovery in the case.[12]

Despite the Government's refusal to agree to any discovery, and in light of the recently disclosed administrative record, Plaintiffs voluntarily offer the following limitations on their discovery requests, without prejudice to later renewal of these or similar requests:

*Document Requests:*

We withdraw Document Requests No. 3 and 6.

---

[12] To the extent that the Government bases its allegations of unduly burdensome discovery on the assertion that the document requests are duplicative of the administrative record, (Def.'s Mem. at 22-23), the Government's own memorandum of law disposes of the argument.  Plaintiffs made clear in the instructions to the document requests that they were *not* seeking documents already provided as part of the administrative record.  (*See* Def.'s Mem. at 23.)  Moreover, "[i]t is ordinarily not sufficient grounds for a protective order that information sought [in discovery] might be duplicative of some other discovery."  *Envirosafe Servs. Inc. v. Envirosure Mngmt. Co.*, No. 88-28E, 1988 WL 62876, at *1 (W.D.N.Y. Jun. 9, 1988).

*Interrogatories*:

We withdraw Interrogatory No. 3.

We agree to limit Interrogatories Nos. 4-25 to a shorter time period (e.g., five years rather than ten).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion for Protective Order.


Dated: January 6, 2005.                              Respectfully submitted,


                                                     s/Simon Heller_____
                                                     SIMON HELLER (SH-8760)
                                                     NAN E. STRAUSS (NS-3501)
                                                     Center for Reproductive Rights
                                                     120 Wall Street, 14th Floor
                                                     New York, NY 10005
                                                     (917) 637-3600

                                                     ATTORNEYS FOR PLAINTIFFS

                                                     ANDREA COSTELLO (AC-6197)*
                                                     SHELBI D. DAY (SD-2627)*
                                                     Southern Legal Counsel
                                                     1229 N.W. 12th Avenue
                                                     Gainesville, FL 32601
                                                     (352) 271-8890

                                                     ATTORNEY FOR PLAINTIFFS
                                                     TUMMINO, MAHONEY,
                                                     GIARDINA, MANGAN, SEGUIN,
                                                     TINNEY, BROWN, CHURCHILL,
                                                     AND HUNT

                                                     *Admitted Pro Hac Vice

29

## CERTIFICATE OF SERVICE

I, Nan Strauss, hereby certify that on January 6, 2006, I electronically filed Plaintiffs'

Supplemental Memorandum of Law in Opposition to Defendant's Motion for Protective Order

and accompanying Appendix with the Clerk of the Court using the CM/ECF system. Plaintiffs

also served a copy of all documents via electronic mail on the following:

F. Franklin Amanat,
Assistant U.S. Attorney, EDNY
147 Pierrepont Street
Brooklyn, NY 11201
718-254-6024
Franklin.Amanat@usdoj.gov

Dated: January 6, 2005                          Respectfully submitted,

/s Nan Strauss
SIMON HELLER (SH-8760)
NAN E. STRAUSS (NS-3501)
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3600

ATTORNEYS FOR PLAINTIFFS

ANDREA COSTELLO (AC-6197)*
SHELBI D. DAY (SD-2627)*
Southern Legal Counsel, Inc.
1229 N.W. 12th Avenue
Gainesville, FL 32601
(352) 271-8890

ATTORNEY FOR PLAINTIFFS
TUMMINO, MAHONEY, GIARDINA,
MANGAN, SEGUIN, TINNEY, BROWN,
CHURCHILL AND HUNT

*Admitted pro hac vice

30