THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

ANNIE TUMMINO, *et al.*,

                        Plaintiffs,

v.

ANDREW C. VON ESCHENBACH, in his official capacity as
Acting Commissioner of the Food and Drug
Administration,

                        Defendant.

-------------------------------------------------------------------X

**No. 05-CV-366 (ERK/VVP)**

(Korman, C.J.)
(Pohorelsky, M.J.)

## APPENDIX TO PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR A PROTECTIVE ORDER

Simon Heller
Nan E. Strauss
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3600
(917) 637-3666 (fax)

Andrea Costello*
Shelbi Day*
Southern Legal Counsel
1229 N.W. 12th Avenue
Gainesville, FL 32601
(352) 271-8890
(352) 271-8347 (fax)

*Admitted Pro Hac Vice

<u>**Index to Appendix to Plaintiffs' Supplemental Memorandum of Law in Opposition to Defendant's Motion for Protective Order**</u>

<u>**Document**</u>                                                                                          <u>**Page**</u>

Letter of Steven Galson, dated May 6, 2004, AR 10796-799 .................................................1

Letter of Lester M. Crawford, dated August 26, 2005, AR 10813-815...............................5

Memorandum Addendum of Curtis J. Rosebraugh, dated March 23, 2004,
    AR 30745-746, 30757-759 (excerpts) ..........................................................8

Summary Review by Donna J. Griebel, dated April 1, 2004,
    AR 30829-831, 30876-877 (excerpts) ...........................................................13

Memorandum of Julie Beitz, dated April 2, 2004, AR 30881-882 (excerpt) ....................18

Memorandum of John K. Jenkins, dated April 22, 2004, AR 30897-900 .......................20

Email exchange between Steven Galson and Dianne Murphy, dated May 2-9, 2005,
    AR 30908-911...........................................................................24

Review of Complete Response by Daniel Davis dated January 12, 2005,
    AR 31020 (excerpt)......................................................................28

Memorandum Addendum of Curtis J. Rosebraugh dated January 12, 2005,
    AR 31026-030............................................................................29

Memorandum of Donna J. Griebel dated January 12, 2005, AR 31031-033
    (excerpt) ...............................................................................34

Memorandum of John K. Jenkins dated January 14, 2005, AR 31096-098
    (excerpt) ...............................................................................37

Page from Calendar of Lester M. Crawford dated August 24, 2005, AR 31212...............40

Page from Calendar of Pat Ronan dated August 24, 2005, AR 31213.........................41

Memorandum of Steven Galson dated August 26, 2005, AR 31214-226 .....................42

Chart of Excerpts from FDA's Administrative Record Regarding OTC
    Application for Plan B ...................................................................55

Memorandum of Jonca Bull, M.D., January 21, 2004.......................................73

Marc Kaufman, *FDA Official Quits Over Delay on Plan B: Women's Health
    Chief Says Commissioner's Decision on Contraceptive Was Political,*
    <u>The Washington Post</u>, September 1, 2005 ...................................................78

"Nightline The Morning After," Interview with Susan F. Wood,
September 27, 2005 ...............................................................................80

A. J. J. Wood et al., *A Sad Day for Science at the FDA*, New England Journal of
Medicine, September 22, 2005 .............................................................88

*FDA's Decision Regarding Plan B: Questions and Answers,* available at
http://www.fda.gov/cder/drug/infopage/planB/planBQandA.htm............92

Letter of Congressman Waxman to Chairman of Committee on
Government Reform, November 15, 2005 ...............................................95

Buck Rinker, *Plan B Casualties*, (quoting letter of resignation of Dr. Frank
Davidoff from FDA Nonprescription Drugs Advisory Committee),
Hartford Courant, October 2, 2005 .......................................................98

Case 1:05-cv-00366-ERK-VVP    Document 80-2    Filed 01/06/06    Page 4 of 127 PageID #: 1298

# Letter of Steven Galson

# May 6, 2004

# AR 10796-799



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

Food and Drug Administration
Rockville, MD 20857

NDA 21-045/S-011

Barr Research, Inc.
    Attention: Joseph A. Carrado, M.Sc., Ph.D.
    Senior Director, Regulatory Affairs
One Bala Plaza, Suite 324
Bala Cynwyd, PA 19004-1401

Dear Dr. Carrado:

Please refer to your supplemental new drug application dated April 16, 2003, received April 22, 2003, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Plan B® (0.75mg levonorgestrel) tablets.

We acknowledge receipt of your submissions dated July 25 (3) and 31, August 8 (2), September 4, 8, 9, and 15, October 6, 10, 15 (2), 17, 21, 24, 29, 30 and 31, December 3 and 9, 2003; and January 9 and 30, February 6, 10, 13, 20 and 24, and March 11 and 26, 2004.

This supplemental new drug application proposes nonprescription (over-the-counter (OTC)) availability of Plan B (0.75mg levonorgestrel) tablets for emergency contraception to reduce the chance of pregnancy after unprotected sex (if a contraceptive failed or if birth control was not used).

We have completed our review of this supplement and, for the reasons described below, find that the supplemental application is not approvable at this time under section 505(d) of the Act and 21 CFR 314.125(b).

You propose OTC status for Plan B for both adults and children based primarily on an actual use study in 585 subjects. Only 29 of the 585 subjects enrolled in the study were 14-16 years of age, and none was under 14 years of age.

In a December 16, 2003 joint meeting, the Nonprescription Drugs Advisory Committee and the Reproductive Health Drugs Advisory Committee considered your proposal to switch Plan B to nonprescription status. Although the Joint Committee recommended that your proposal to switch Plan B be approved, some members of the Joint Committee, including the Chair, raised questions concerning whether the actual use data were generalizable to the overall population of nonprescription users, chiefly because of inadequate sampling of younger age groups.

Based on a review of the data, we have concluded that you have not provided adequate data to support a conclusion that Plan B can be used safely by young adolescent women for emergency contraception without the professional supervision of a practitioner licensed by law to administer the drug. In your March 11, 2004, amendment, you proposed to change the indication to allow for marketing of Plan B as a prescription-only product for women

TUMMINO-10796

NDA 21-045/S-011
Page 2

under 16 years of age and a nonprescription product for women 16 years and older. This preliminary proposal did not include draft product labeling to demonstrate how you propose to comply with both the prescription and nonprescription labeling requirements in a single packaging configuration. Because of the preliminary and incomplete nature of the proposal, we did not conduct a complete review of this amendment during this review cycle.

Before this application can be approved, you would have to provide data demonstrating that Plan B can be used safely by women under 16 years of age without the professional supervision of a practitioner licensed by law to administer the drug. Alternatively, you could supply additional information in support of the revised indication to allow for marketing of Plan B as a prescription-only product for women under the age of 16 years and a nonprescription product for women 16 years and older, including draft product labeling. If you take the latter approach, your response to this letter would have to include details of how you propose to implement simultaneous prescription and nonprescription marketing of Plan B for women of different ages in a single packaging configuration while complying with all relevant statutory and regulatory requirements for labeling and marketing of this product. We will have to assure ourselves that your proposed approach is consistent with our statutory authority. If you pursue the alternative approach, we also would request details of your proposed program to educate consumers, pharmacists, and physicians about the dual marketing of Plan B as both a prescription and nonprescription product, as well as your proposed program to monitor implementation of this novel approach.

Wide availability of safe and effective contraceptives is important to public health. We look forward to continuing to work with you if you decide to pursue either of these options.

When you respond to the above deficiencies, include a safety update as described at 21 CFR 314.50(d)(5)(vi)(b). The safety update should include data from all non-clinical and clinical studies of the drug under consideration regardless of indication, dosage form, or dose level.

1. Describe in detail any significant changes or findings in the safety profile.

2. When assembling the sections describing discontinuations due to adverse events, serious adverse events, and common adverse events, incorporate new safety data as follows:

   - Present new safety data from the studies for the proposed indication using the same format as the original NDA submission.
   - Present tabulations of the new safety data combined with the original NDA data.
   - Include tables that compare frequencies of adverse events in the original NDA with the retabulated frequencies described in the bullet above.
   - For indications other than the proposed indication, provide separate tables for the frequencies of adverse events occurring in clinical trials.

3. Present a retabulation of the reasons for premature study discontinuation by incorporating the drop-outs from the newly completed studies. Describe any new trends or patterns identified.

**TUMMINO-10797**

NDA 21-045/S-011
Page 3

4. Provide case report forms and narrative summaries for each patient who died during a clinical study or who did not complete a study because of an adverse event. In addition, provide narrative summaries for serious adverse events.

5. Describe any information that suggests a substantial change in the incidence of common, but less serious, adverse events between the new data and the original NDA data.

6. Provide a summary of worldwide experience on the safety of this drug. Include an updated estimate of use for drug marketed in other countries.

7. Provide English translations of current approved foreign labeling not previously submitted.

Within 10 days after the date of this letter, you are required to amend the supplemental application, notify us of your intent to file an amendment, or follow one of your other options under 21 CFR 314.120. If you do not follow one of these options, we will consider your lack of response a request to withdraw the application under 21 CFR 314.65. Any amendment should respond to all the deficiencies listed. We will not process a partial reply as a major amendment nor will the review clock be reactivated until all deficiencies have been addressed.

Under 21 CFR 314.102(d), you may request an informal meeting or telephone conference with the Divisions of Over-the-Counter Drugs and Reproductive and Urologic Drug Products to discuss what steps need to be taken before the application may be approved.

This product may be considered to be misbranded under the Federal Food, Drug, and Cosmetic Act if it is marketed with this change before approval of this supplemental application.

If you have any questions, call the Regulatory Project Manager at (301) 827-4260.

Sincerely,

*{See appended electronic signature page}*

Steven Galson, M.D., M.P.H.
Acting Director
Center for Drug Evaluation and Research

TUMMINO-10798

3

4

---

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

---

/s/

----------------------

Steven Galson
5/6/04 04:56:02 PM

TUMMINO-10799

# Letter of Lester M. Crawford

# August 26, 2005

# AR 10813-815

DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

Food and Drug Administration
Rockville, MD 20857

August 26, 2005

NDA 21-045/S-011

Duramed Research, Inc.
Attention: Joseph A. Carrado, M.Sc., R.Ph.
Senior Director, Regulatory Affairs
One Belmont Ave, 11th floor
Bala Cynwyd, PA 19004

Dear Mr. Carrado:

Please refer to your supplemental new drug application dated April 16, 2003, received April 22, 2003, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act (the Act) for Plan B® (levonorgestrel) Tablets, 0.75 mg.

We acknowledge receipt of your submissions dated April 16, July 25 (3), and 31, August 8 (2), September 4, 8, 9, and 15, October 6, 10, 15 (2), 17, 21, 24, 29, 30, and 31, December 3, and 9, 2003, January 9, and 30, February 6, 10, 13, 20, and 24, March 11 and 26, May 6 and 11, June 30, July 21, 2004, and January 6, 12, 13, 14, 18, 19 and 21, 2005.

Your submission of July 21, 2004 constituted a complete response to our May 6, 2004 Not Approvable action letter.

The resubmitted supplemental new drug application provides for a switch from Rx only status to Over the Counter (OTC) status for women ages sixteen years and older. Plan B would remain Rx only for women under sixteen years of age. In addition, you have proposed that both the Rx and OTC version of Plan B be marketed in a single package.

The Center for Drug Evaluation and Research (CDER) has completed its review of this application, as amended, and has concluded that the available scientific data are sufficient to support the safe use of Plan B as an OTC product, but only for women who are 17 years of age and older. However, the Agency is unable at this time to reach a decision on the approvability of the application because of unresolved issues that relate to your NDA discussed below.

Your application has presented us with three difficult and novel issues. Specifically, you have proposed that Plan B be marketed in a single package, and sold either as Rx or OTC, depending on the age of the patient. While the Agency has allowed the same active ingredient to be marketed both Rx and OTC based on indication, strength, dosage form and route of administration, the Agency has never determined whether a drug may be both Rx and OTC based on the age of the individual using the drug. A related concern is how, as a practical matter, an age-based distinction could be enforced. In addition, we have never been confronted with whether the Rx and OTC versions of the same active ingredient may be marketed in a single package.

TUMMINO-10813

5

NDA 21-045/S-011
Page 2

As you may be aware, questions have arisen over the years about whether there are any conditions under which an active ingredient may be simultaneously marketed in both a prescription drug product and an OTC drug product. Notwithstanding our having allowed the practice in those rare instances where there is a meaningful difference in the indication, strength, dosage form or route of administration of the two products, we recognize that FDA's interpretation of section 503(b) of the Act has not been explicitly set forth in any of the regulations that discuss the process by which FDA classifies (or re-classifies) drugs as OTC or prescription. See 21 CFR 310.200 and 310.201.

In this case, we have decided that the appropriate course is to ask for public comments on whether we should initiate a rulemaking to codify our interpretation of section 503(b) regarding when an active ingredient can be simultaneously marketed in both a prescription drug product and an OTC drug product. To this end, we have decided to publish an advance notice of proposed rulemaking in the Federal Register. In addition, the notice will seek public comments on questions related to the marketing of Rx and OTC versions of the same active ingredient in a single package.

At this time, the drug product may not be legally marketed OTC. In the future, you will be notified in writing regarding changes in the status of your application.

Under 21 CFR 314.102(d), you may request an informal meeting or telephone conference to discuss what steps need to be taken before the application may be approved.

Sincerely,

Lester M. Crawford, DVM, PhD.
Commissioner of Food and Drugs

TUMMINO-10814

6

---

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

---

/s/

--------------------

Bronwyn Collier
8/26/2005 04:54:54 PM
This letter was signed and mailed in hard copy
with Dr. Lester Crawford's original signature. This letter
was scanned and is being checked into DFS
for archival purposes. My signature is for process
purposes only.

TUMMINO-10815

7

# Memorandum Addendum of Curtis J. Rosebraugh

## March 23, 2004

## AR 30745-746, 30757-759 (excerpts)

Division Director Memo-Addendum
NDA #: 21-045
Drug Name: Plan B (Levonorgestrel 0.75 mg)
Sponsor: Women's Capital Corporation
Receipt Date: April 22, 2003
PDUFA Date: February 22, 2004
Type of Document: NDA supplement
Date: March 23, 2004

Introduction

Since my previous memo of January 9, 2004, upper management above the ODE level has expressed additional concerns regarding the possible Over-The-Counter (OTC) status of Plan B. This addendum is to summarize my interpretation of their concerns and also to summarize further analysis of existing data.

On January 15, 2004, Dr. Steven Galson, Acting Director of CDER convened a meeting and conveyed that he felt there was insufficient evidence, based on the actual use and label comprehension study, to demonstrate appropriate adolescent use to support approving Plan B for OTC marketing. He stated that the Plan B application would receive a non-approval action. He indicated that the actual use study did demonstrate that adolescents used the product correctly and did not exhibit changes in contraceptive behaviors. However, he felt the number of adolescent subjects was too small upon which to draw conclusions that could be extrapolated to the general population of adolescents. He outlined two key concerns, the first was adolescents timing of dose and the second being whether OTC access to Plan B would adversely affect contraceptive behaviors. Dr. Galson was unfamiliar with the data from the literature behavioral studies and suggested we summarize this data and present it to Commissioner McClellan. He also inquired whether any of the Plan B application reviews performed by the Divisions or ODEs had yet been finalized and placed into the DFS tracking system.

On February 18, 2004 a presentation of summary data was made to Commissioner McClellan (attachment 1) and attended by Janet Woodcock, John Jenkins, Steven Galson, Sandy Kweder and staff from the ODEs and divisions responsible for the review of the application. Included in the presentation were the Division's and ODE's recommendations for OTC marketing status without restriction. Dr. McClellan expressed concern about adolescent behavior, although he did not articulate the exact nature of his concern, what ages were included in his concern, what data was lacking or a path forward for the sponsor. Age restrictions on sales were briefly discussed, but the commissioner indicated that this type of program would probably require further public discussion.

The Divisions and ODE's subsequently met with Drs. Woodcock, Jenkins, Kweder and Galson on February 19, 2004. At this meeting, Dr. Woodcock expressed that she felt that the commissioner (and herself) was concerned with adolescents and stated that she felt we did not really know what behaviors adolescents would exhibit. As an example, she stated that we could not anticipate, or prevent extreme promiscuous behaviors such as the

TUMMINO-30745

8

2

medication taking on an "urban legend" status that would lead adolescents to form sex based cults centered around the use of Plan B. Dr. Galson indicated that he shared Dr. Woodcock's concerns.

In preparation for the Commissioner briefing, previous data has been reevaluated and new data, submitted by the sponsor and lead authors of various behavioral studies, was reviewed. This memo provides a summary of these new analyses. It also contains an exploration of Washington State epidemiologic data trends regarding STD's and pregnancy/abortion from 1997 to the most recent year for which data is available. Washington State data is examined because in 1997 programs were initiated which allowed consumers of all ages to obtain Plan B directly from a pharmacy without first going to a clinic. There are five states with similar programs, but Washington State has the oldest program and has more epidemiologic data available for review.

## Background

### Abortion Ratio

In considering the benefits of OTC access to plan B for various age groups, it is important to understand the abortion ratio for different age demographics. The abortion ratio is the number of abortions per 1,000 live births. In 2000, the abortion ratio was highest in adolescents as illustrated in Graph 1. This data was collected from 46 States, the District of Columbia, and New York City[1]. For adolescents less than 15 years of age, there are approximately 700 abortions for every 1000 live births. The next highest abortion ratio is in the 15-19 year old age group with almost 400 abortions for every 1000 liver births. This data is not surprising in that most of the pregnancies in the < 15 years of age group and many in the 15 to 19 year age group are unintended. Because many of these women are unmarried, are not prepared to care for children on their own, are attending school, do not have support systems in place to care for children, abortion becomes an important option in this younger age group. Granting OTC marketing to Plan B would improve access which should lead to increase use of Plan B resulting in decreased unwanted pregnancies and decreased abortions.

[1] MMWR, November 28, 2003

TUMMINO-30746

13

ranking over this time period for two common STD's. Also during the six plus years that Plan B has had pharmacy availability, there have no reports from Washington State that Plan B has led to an increase in promiscuity among teenagers. In regard to the possible abuse of Plan B, it must also be remembered that Plan B does not have any significant CNS effects and has a high rate of non-serious adverse events, such as nausea in over 23% of subjects and menstrual irregularities that would prohibit recreational use of this drug. Finally, as noted earlier, in Washington State, health care provider (pharmacist) input into women's decisions regarding Plan B use is minimal and consists of initialing a check list that highlights labeling concepts. This demonstrates that all ages of females seem able to use this drug with minimal health provider intervention.

## Conclusions

As I described in my previous Divisional Memo, I feel Plan B adequately meets criteria for OTC marketing without restriction. The benefits of timely access include earlier dosing for greater efficacy to avoid unplanned pregnancy and possible abortion. The data indicates that benefits outweigh the risks. The data reviewed above is quite compelling to dispel any potential concerns regarding adolescent use or changes in sexually behaviors associated with plan B use. Additionally, there is no evidence supporting the possible exclusion of any demographic group from the benefits of this drug. The data demonstrate that adolescents are a subgroup that would derive great benefit from this product as they are poor contraceptors, do not plan ahead and tend to avoid health care providers. Any system that creates barriers to access, including restricted distribution or age restrictions, would defeat the purpose of this drug and lessen its public health potential. Additionally, placing age restrictions on this product may place a legal burden on pharmacies that they may not accept which would have the undesired effect of limiting access even more than is presently in place.

It should also be noted that emergency contraception is available in 33 countries without a prescription, five States in the United States with pharmacy access and there is an abundance of domestic literature where the drug has been available without a prescription and limited barriers to access to over 11,000 women including over 1900 adolescents. Washington State has had a pharmacy access program since 1997 allowing an evaluation of over six years of data. In terms of OTC switch applications, this drug has more information available to allow us to predict consumer behaviors than any drug the Division has approved for switch in recent memory. If this is not enough data upon which to base a decision, it is unclear what would constitute enough data or even if that is an obtainable goal.

A decision by the Agency to withhold OTC marketing of Plan B for reasons of theoretical abuse by a very small segment of the population despite the great benefit that could be derived from easier access could have ramifications for how we regulate other OTC drugs. To assure consistency of regulation, a natural progression of this line of regulatory reasoning would require that the Agency remove OTC marketing status for many drugs with known abuses including dextromethorphan because of reports of adolescent abuse, laxatives because of abuse by people suffering from bulimia, analgesics

14

because of abuse with subsequent health ramifications, or acetaminophen because of its use in suicides. This would be in spite of the great benefit derived from these drugs for the vast majority of users. Plan B falls into this category. The benefit to be derived from easier access outweighs the theoretical risk of a small percentage of users misusing the drug. Also, consideration must be given that the concerns of possible adolescent abuse have not been borne out by any studies or any worldwide safety or literature reports despite significant use.

At the Advisory Committee Meeting for Plan B, Dr. Galson asked the panel members, "If members of the committee feel that this drug should be restricted according to age, we'd like to know it". In response to this, three panel members specifically voiced favoring age restrictions, nine panel members specifically voiced not having age restrictions, and 14 members did not comment specifically regarding age restrictions although 13 of these members voted for full OTC approval. The fourteenth person in this group did not vote for approval because of concerns regarding informed consent and relaying effectiveness data, although he stated at the meeting and in a subsequent e-mail to the Agency that he thought with appropriate labeling he would change his vote to approval. One panel member felt that there should be post-marketing studies on consumers < 18 years of age. This is an overwhelming response by the committee that there should not be age restrictions.

A summary of the data reviewed demonstrates that:
- The Actual Use study demonstrated that users not receiving previous health care provider counseling had similar timing of dose and contraceptive behaviors compared to those users having had received prior health care provider counseling.
- The Dial study demonstrated that females 18 y/o and younger used ECP for the same reasons and had similar timing of medication and repeat use frequency as older females.
- The Gold study demonstrated that 15-17 y/o had the same sexual and contraceptive behaviors as older females, 15-17 y/o with advanced provision had the same sexual behaviors as 15-17 y/o obtaining the medication from a clinic and the advanced provision group started the medication 10 hours sooner on average.
- The Raines study demonstrated similar contraceptive behaviors between 15-17 y/o compared to 18-24 y/o and similar sexual behaviors in adolescents obtaining advanced provisions compared to adolescents using pharmacy access.
- The Washington State data demonstrated that since pharmacy access has been granted to Plan B in 1997:
  - Adolescents pregnancy rates have decreased
  - Adolescent abortion rates have decreased
  - The total number of adolescent abortions have decreased
  - STD rates have remained below national averages
  - The national ranking for Chlamydia has decreased from 31st to 35th
  - The national ranking for gonorrhea has decreased from 39th to 40th

TUMMINO-30758

11

15

There is compelling data evidencing that Plan B fulfills regulatory requirements for OTC marketing. An overwhelming majority of members comprising two advisory committees, with 12 out of 13 NDAC members and 12 out of 15 ACRHD members, voted for full OTC approval. There is a rich body of literature demonstrating appropriate and safe use of Plan B under decreased restrictions to access conditions. This memorandum reaffirms my previous recommendation that Plan B should be approval for OTC marketing without restriction.

Curtis J. Rosebraugh, MD, MPH

cc:    orig.

HFD-560 /frazier /cothran/solbeck/chen/leonard segal/ganley
HFD-580/griebel/beitz

TUMMINO-30759

12

Case 1:05-cv-00366-ERK-VVP   Document 80-2   Filed 01/06/06   Page 19 of 127 PageID #: 1313

# Summary Review by Donna J. Griebel

# April 1, 2004

# AR 30829-831, 30876-877 (excerpts)

sNDA 21-045                        Plan B (Levonorgestrel)

### Deputy Division Director Summary Review of New Drug Application

**NDA 21-045**
**Drug:**                  **Plan B (levonorgestrel)**
**Dosage:**                **0.75 mg tablet for oral administration**
**Proposed Indication:**   **Emergency contraception**
**Applicant:**             **Women's Capital Corporation**
**Submission Date:**       **April 16, 2003**
**Review Complete**        **April 1, 2004**

This new drug application proposes over the counter marketing of Plan B (levonorgestrel) for emergency contraception. The prescription product was originally approved in July 1999. The proposed nonprescription dose and administration schedule is identical to that found to be safe and effective for prescription use. The two major clinical trials submitted in support of this application were a single label comprehension study and a single actual use study. A literature review was submitted to address questions of important potential behavioral changes associated with availability of an emergency contraceptive, e.g., substitution of the product for routine and more effective contraception. A pharmacokinetic study in menstruating females aged ≤ 16 was also submitted.

At the December 16, 2003 Joint Session of the Nonprescription Drug Advisory Committee and the Advisory Committee for Reproductive Health Drugs the committees voted in overwhelmingly support of approval of the nonprescription switch. However, in a January 15, 2004 meeting, senior CDER management informed the Divisions and Offices that this application is not approvable. The reason for nonapproval that was conveyed at that meeting and in subsequent meetings was that there were inadequate data to support adolescent use in the over the counter setting. The Divisions and Offices were told that the Commissioner and senior CDER management believed that the number of adolescents in the actual use study was inadequate, that there were inadequate data to show that adolescents could dose the product correctly, and that adolescents needed a learned intermediary involved in their access to emergency contraception. The Divisions presented adolescent data in an effort to address these concerns in a meeting with the Commissioner on February 18, 2004. These data, however, were considered inadequate to establish that there would be no potential for negative impact from non-prescription access to emergency contraception in the adolescent population.

This review will focus on the issues raised by senior FDA and CDER management to support their decision for nonapproval of this product for over the counter marketing and the public comments by individual advisory committee members that echoed these very same concerns. The reviewing divisions and offices have carefully examined these concerns and do not believe that scientific evidence supports nonapproval of this application. The Divisions and Offices have concluded that the risk-benefit ratio for this product supports its approval for nonprescription marketing, without an age restriction.

This review is organized as follows:

1. Summary of Label Comprehension Study Review Findings
2. Summary of Actual Use Study Review Findings
3. Summary of Studies of Impact of Access to Emergency Contraception on Behavior
4. Safety Overview
5. Summary of Pharmacokinetic Study Review Findings

1

TUMMINO-30829

13

sNDA 21-045                          Plan B (Levonorgestrel)

6.  Summary of Joint Session of the Nonprescription Drugs Advisory Committee and the
    Advisory Committee for Reproductive Health Drugs
7.  Summary Discussion of Adolescent OTC Access Issues
8.  Deputy Director's Recommended Regulatory Action

**1.0    Summary of Label Comprehension Study Review Findings**

Label comprehension studies allow sponsors to modify product labels to enhance consumer
understanding of the label prior to its ultimate test in an actual use study setting. It is the actual
use study that evaluates how the consumer **acts** upon the information they read in the label. The
label comprehension study presented in this NDA tested 11 communication objectives in 656
females aged 12 – 50. Twelve percent (n=79) were in the 12-16 year old age group. Fifty-four
percent were aged 17-25. Data analyses by literacy level are based on the 395 women whose
literacy level was tested with the REALM (Rapid Estimate of Adult Literacy in Medicine) in the
study – those women who were 18 years of age or older who had not completed a college
education. The REALM was not administered to participants younger than 18 because it was not
considered validated in that age group. Approximately 4% (n=14) of the women tested (n=395)
were found to be reading at the 6th grade level or less, while approximately a third (n=122) were
reading at the 7th – 8th grade level. The ages of untested participants less than 18 in the study
correlated to 7th to 12th grade levels, but it is possible that the youngest participants were reading
either above or below their actual grade level.

The fact that the literacy level of these younger women was not evaluated is a concern expressed
by one advisory committee member, Dr. W. David Hager, M.D., in a letter to Dr. McClellan,
M.D., FDA Commissioner, dated December 18, 2003. He stated that this group would be at the
greatest risk for not understanding the label. "Unfortunately, literacy evaluations were not done
in women 18 years of age and younger. This is the group of young women who would be
greatest at risk for not understanding the package insert and directions." Dr. Hagar also
expressed this concern in his public comments at the Joint Meeting of the Non-Prescription Drug
Advisory and the Reproductive Health Drug Advisory Committees (afternoon of December 16) in
response to FDA Question #2 to the Committees "Are the actual use study data generalizable to
the overall population of potential non-Rx users of Plan B?" He stated "My answer is yes,
although I still am concerned about the younger adolescent, the low numbers included in the
actual use study, and the literacy information. This is a very high risk group of young women
who deserve our attention as much as those who would attend family planning clinics and have
college degrees. And so I'm concerned that there is not as much information both as to ability to
follow the directions, effectiveness and follow-up among that population."

*Reviewer Comment:  The specific cause of Dr. Hager's concern about the lack of literacy testing
in the younger age group of this study is not stated. The general good performance of the
younger age participants in this study and the actual use study suggests that the younger age
group can read and understand the label. The label comprehension study included females as
young as age 12, and the literacy testing identified 395 older women who read at the 6th grade
level.*

It is the <u>actual use study</u> that ultimately tests label performance, by evaluating how accurately the
consumer implements the intended label message. Label comprehension studies are used by
sponsors to optimize consumer performance in the subsequent actual use study by identifying
where the label can be strengthened for that study. Nevertheless, Dr. McClellan and members of
senior CDER management have informed both review divisions that the literacy testing
limitations of the label comprehension study, and the data from that study are sources of concern

2

TUMMINO-30830

they have factored into their decision regarding approvability of the nonprescription switch. Because of these concerns, in this section I will review the communication objectives of the label comprehension study, discussing the relevance of these objectives, with a focus on performance of the lower literacy group and the younger age group relative to the rest of the study population.

*Reviewer Comment: Placing a greater than usual emphasis on the label comprehension study for this product compared to the actual use study is not appropriate or usual review practice in evaluating a prescription to non-prescription switch, and is hampered by the relative strengths of the two study designs. The actual use study is a straight-forward and objective assessment of use performance, whereas the label comprehension study inserts another level of comprehension testing that is not informative to product label performance, since participants also had to understand the questions posed to them. Many of the questions used to assess label comprehension were poorly written and were easily misinterpreted. Some questions were of a higher level of complexity, and required an additional level of problem solving.*

### 1.1    Label Comprehension Study Communication Objectives.

There were 11 communication objectives identified in the study. Of those, two (Objectives #1 and #2) related to communication of the indication. Objective #1 was that the product is indicated for prevention of pregnancy after unprotected sex. Objective #2 was that the product is a backup method, not for use as a regular contraceptive.

Three objectives (Objectives #4, #5 and #6) dealt with dosing. Two of the 3 dosing objectives focused on timing of the first dose – Objective #4 on taking the product as soon as possible after intercourse and Objective #5 that the first dose should be taken within 72 hours after intercourse.

The remaining objectives were primarily related to safety issues. Objective #3 focused on the message that the product doesn't prevent sexually transmitted infections. Objective #11 evaluated whether women understood to seek immediate medical care for severe abdominal pain (a sign of possible ectopic pregnancy). Objective #9 evaluated the message that women with allergy to product ingredients should not take the product. Among the remaining objectives, one focused on side effects (Objective #10 – nausea and vomiting) and one (Objectives #8) wasn't considered a relevant safety objective by the DRUDP reviewers.

Objective 8 evaluated instructions to not use Plan B in the presence of unexplained vaginal bleeding, a component of labeling that the DRUDP reviewers don't believe is medically warranted. Its inclusion in the prescription product labeling reflects class labeling for progestin-only contraceptives that are taken on a daily basis for months to years. The medically relevant conditions that unexplained vaginal bleeding could signal in the population of women who would take Plan B include pregnancy, cervical disease, or endometrial neoplasia (in this reproductive age group endometrial polyp or myoma). There is no evidence that Plan B would have an adverse affect on an established pregnancy, including ectopic pregnancy. There is no medically plausible affect that treatment with Plan B would have on cervical or endometrial disease, nor that it would cause a meaningful delay in its diagnosis. The merits of inclusion of this concept in labeling were weighed in discussions at the advisory committee meeting. Dr.'s Hager, Guidice and Montgomery-Rice favored retaining it in the label. Dr. Hager stated it could be a sign of ectopic pregnancy or "a symptom of other gynecological conditions that would warrant investigation", and Dr. Guidice and Dr. Cantilena concurred. Dr.'s Hewitt, Greene, Clapp and Wood all disagreed. Dr. Greene said "..it's hard for me to imagine any problem that would preclude the use of this medication or that this medication would exacerbate."

3

TUMMINO-30831

sNDA 21-045                    Plan B (Levonorgestrel)

recommendations for frequent follow-up to optimize compliance with contraception (quarterly appointments) and to screen for risk-taking behaviors and STIs (STI screen every 6 months).[44] A 2003 report published by the CDC in the journal Pediatrics cites the AMA Guidelines for Adolescent Preventive Services, the US Preventive Services Task Force Guide to Clinical Preventive Service, the National Center for Education in Maternal and Child Health Guidelines for Health Supervision of Infants, Children and Adolescents and the American Academy of Pediatrics Committee on Practice and Ambulatory Medicine Recommendations for Preventive Pediatric Health Care to support a statement that in their primary care visits, adolescents should be screened for sexual activity. (Emphasis added.) They recommend that sexually active patients should in turn be offered contraception and STI screening[45].

The latter study's authors evaluated the data from the 1999 Youth Risk Behavior Surveillance survey to determine the proportion of high school aged adolescents who actually have an annual health care visit. They then assessed whether those visits were utilized to provide the counseling and screening recommended by the various professional groups. The survey questions used to explore these issues were 1) "When was the last time you saw a doctor or nurse for a check-up or physical examination when you were not sick or injured?" and 2) "During your last check-up, did your doctor or nurse discuss ways to prevent pregnancy, acquired immune deficiency syndrome (AIDS), or other STDs?" Sixty percent of females indicated that they had had a "preventative" health care visit in the prior 12 months. Sexual experience was positively associated with having had such a visit (OR=1.3). Sixty-four percent of sexually experienced females had had a preventive health visit in the past 12 months. Forty-three percent of all female students who had had a preventive health visit reported that they had discussed STIs or pregnancy prevention in those visits. Sixty-one percent of the sexually experienced females who reported having had a preventive health care visit in the past 12 months reported that they had discussed STIs or pregnancy prevention during the visit.

Another study by Newacheck, et. al.[46] examined data from the 1995 National Health Interview Survey supplemental questionnaires on access to health care to determine whether adolescents had access to and were receiving primary healthcare. They reported that 92% of adolescents had a usual source or site of health care, and among those adolescents, 86% identified a regular physician. Most (77%) were seen in physician's offices or HMOs. Sixteen percent went to community health centers for their care. Urgent care centers or ERs were identified as the primary source of health care by only 2%. Fourteen percent of adolescent females had no health insurance or other public coverage of health care costs. Uninsured adolescents in the survey were more likely to get their care in community health centers (26%) or urgent care centers (6%). Nearly ¾ of adolescents had had at least one physician contact in the year prior to the survey. The average number of contacts reported was 2.5/year. The average number of physician contacts per year for the uninsured adolescents was 1.5/year. Seventy five percent of uninsured adolescents had at least one physician contact in the prior year. The authors of the 2003 CDC report in Pediatrics cited Newacheck's study and concluded that since the vast majority of adolescents in the U.S. have a source of primary health care, these primary care providers have the opportunity to provide STI prevention counseling and screening, as well as pregnancy prevention counseling and contraception services.

*7.3.4   Summary of Senior Management Recommendation to Address Adolescent Issues*
The data and literature review discussed in this review were presented by the Divisions and Offices to CDER Senior management and Commissioner McClellan on February 18, 2004 to address the adolescent concerns that had been conveyed to us. The Divisions and Offices in that meeting shared their conclusions that the non-prescription switch of Plan B should be approved without age restriction because the benefit of this product outweighs risk in all age groups. We

48

TUMMINO-30876

sNDA 21-045                    Plan B (Levonorgestrel)

were informed that Commissioner McClellan and CDER Senior management do not concur with this risk benefit assessment and cannot support the non-prescription switch of Plan B. They have asked the sponsor to provide a restricted distribution plan that will exclude access of adolescents to the product without a prescription.

Dr. McClellan indicated on February 18th that any restricted distribution program would need to be reviewed in an open public hearing. In response to Division and Office review staff concerns that the Advisory Committees had already clearly stated that the Committees did not support restricted distribution, including on the basis of age, Senior CDER management indicated that the committee assembled to discuss distribution restrictions would not have to consist of the same members as those who considered this NDA at the December meeting. Barr Pharmaceuticals has responded to the age restricted distribution plan request and has submitted that plan for review, presumably with the belief that this would be incorporated into a first cycle approval of this NDA.

## 9.0 Deputy Director's Recommended Regulatory Action

After thorough review of the label comprehension and actual use study data submitted in this NDA, the data from the large randomized controlled trials on advance provision of emergency contraception, the large single arm telephone access study from North Carolina (DIAL EC), the levonorgestrel safety database, the vote and the minutes of the December Joint Session of the Nonprescription, and the literature addressing the public health issues surrounding the impact of improved access on sexual health and behaviors, I conclude that the risk benefit ratio of the non-prescription access to Plan B supports its approval for switch to non-prescription status. I have also concluded that it is unjustified to restrict access to the benefit of this product on the basis of age.

Donna J. Griebel, M.D.
Deputy Division Director
Division of Reproductive and Urologic Drug Products
Office of Drug Evaluation III

---

[1] Fattore C, et. al. Induction of ethinylestradiol and levonorgestrel metabolism by oxcarbazepine in healthy women. Epilepsia June 1999; 40(6):783-7.

[2] Crawford P, et. al. The interaction of phenytoin and carbamazepine with combine oral contraceptive steroids. Br J Clin Pharmacol. December 1990; 39(6):P892-6.

[33] Haukkamaa M. Contraception by Norplant subdermal capsules is not reliable in epileptic patients on anticonvulsant treatment. Contraception; 1986; 33(6):559-65.

[4] Belzer, et al. J Adolesc Health. 2003 (abstract)

[5] Raine T, et al. Obstet Gynecol 2000; 96: 1-7.

[6] Jackson R, et al. Advance Supply of Emergency Contraception: Effect on Use and Usual Contraception – A Randomized Trial. Obstet Gynecol 2003; 102: 8-16.

[7] Data provided to FDA in personal correspondence.

[8] Blassone ML. Risk of contraceptive discontinuation among adolescents. J Adolesc Health Care. 1989; 10:527-533.

49

TUMMINO-30877

# Memorandum of Julie Beitz

## April 2, 2004

## AR 30881-882
## (excerpt)

MEMORANDUM

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PUBLIC HEALTH SERVICE**
**FOOD AND DRUG ADMINISTRATION**
**CENTER FOR DRUG EVALUATION AND RESEARCH**

DATE:       April 2, 2004

FROM:       Julie Beitz, MD
            Deputy Office Director,
            Office of Drug Evaluation III

SUBJECT:    NDA 21-045 Levonorgestrel; Plan B
            Barr Research (on behalf of Women's Capital Corporation)

This memo documents my concurrence with the Division of Reproductive and Urologic Drug Product's (DRUDP) recommendation to approve Plan B for use as an emergency contraceptive in the over-the-counter (OTC) setting. Plan B consists of a single levonorgestrel 0.75 mg tablet that is taken within 72 hours of unprotected sex followed by a second tablet twelve hours later.

The Plan B regimen was originally approved on July 28, 1999, with an extensive safety database that included controlled trials and an extensive literature on over 15,000 women. On April 22, 2003, the sponsor submitted an application for the OTC switch of Plan B. There are no efficacy concerns raised in this application since the proposed OTC dose is the same as that for the prescription product. In my view, this application provides adequate evidence that Plan B is "safe and effective for use in self-medication as directed in proposed labeling"[1]. This, in fact, was also the conclusion reached by an overwhelming majority of experts convened to discuss the merits of a switch at the December 16, 2003, Joint Meeting of the Nonprescription Drugs Advisory Committee and the Reproductive Health Drugs Advisory Committee. This conclusion is based upon consideration of 1) levonorgestrel's clinical trial and postmarketing safety profile, 2) the sponsor's Labeling Comprehension and Actual Use studies, and 3) findings from several studies evaluating use of emergency contraception in a variety of clinical settings (see Table 1).

### Postmarketing Safety Profile
Levonorgestrel has been available as an oral contraceptive for over 25 years and has had an acceptable safety profile. Since approval of the Plan B regimen, FDA has received 116 adverse event reports, including ten reports of allergic reactions (none requiring hospitalization), 28 reports of ectopic pregnancy and 3 reports of congenital anomalies. There have been no reports of death, cardiovascular events or overdoses. Considering that there have been approximately 2.4 million uses of Plan B in the US since approval, these postmarketing reports represent a very small number of events. In order to place the reports of ectopic pregnancy in perspective, randomized clinical trial data were reviewed. These data demonstrated an incidence of 1.5% (2 ectopic pregnancies reported out of a total of 135 pregnancies) among users of Plan B, which is consistent with the rate in the general female population.

### Pharmacokinetics of Levonorgestrel
The sponsor has submitted the results of two pharmacokinetic studies, one conducted in healthy adolescents aged 13-16 years, and the other conducted in healthy adults aged 19-44 years. Cross-study comparisons show that adolescents had lower $C_{max}$ and AUC values compared to adults. Several reviewers have discussed the limitations of performing such comparisons, given differences in subjects' ethnicity and weight, in sample collection times, and in duration of fasting and dosing times. These differences are further compounded by the high intra-individual variability (23-80%) and inter-individual variability (2- to 4-fold) in pharmacokinetic parameters that have been reported following levonorgestrel administration.

---

[1]     See 21 CFR 310.200(b)

TUMMINO-30881

18

Available data from the original Plan B NDA and from submitted NDAs for levonorgestrel-containing contraceptives suggest similar safety and effectiveness in adolescent and adult women.[2]

<u>Reasons for Using Plan B</u>
The sponsor's Labeling Comprehension study assessed whether subjects understood that Plan B was to be used for prevention of pregnancy after unprotected sex and not as regular contraception. Eighty-six percent of 76 subjects aged $\leq$ 16 years replied that Plan B was to be used for pregnancy prevention compared with 93% of 355 subjects aged 17-25. When asked whether Plan B was to be used as backup contraception, 57% of subjects aged $\leq$ 16 years replied correctly compared with 67% of subjects aged 17-25.

The sponsor's Actual Use study assessed how subjects seeking emergency contraception used Plan B, which could be purchased only one course at a time. Among enrolled subjects who actually used Plan B, reasons for use were similar among the 22 subjects aged $\leq$ 16 years and the 518 subjects aged $\geq$ 17 years. The most commonly given reasons were: condom broke or slipped; no contraception was used; or missed oral contraceptive pills. Reasons given for using Plan B were similar for women using Plan B for the first time and for those who had used EC previously under supervision of a healthcare provider.

In Raymond et al.'s Dial EC Project, 7756 women across the state of North Carolina called a hotline to obtain EC, including 2065 women aged 18 or less (613 were aged $\leq$ 16 years). Reasons given for requesting EC were similar for adolescents and for older women, and were identical to those noted in the sponsor's Actual Use study: condom broke, no contraception was used, or oral contraceptive pills were missed (see Figure 1).[3]

Taken together, these data support the conclusion that women regardless of age understand Plan B's intended use. First time users were similar to users who had used the drug previously under a healthcare provider's supervision, suggesting that supervision prior to use is not critical for proper self-selection. Labeling and educational messages should emphasize that Plan B is a back-up form of contraception.

<u>Timing of Dosing</u>
The sponsor's Labeling Comprehension study assessed whether subjects understood that the first pill of the Plan B regimen should be taken within 72 hours or ASAP after sex. Ninety-four percent of subjects aged $\leq$ 16 years replied correctly on this point compared with 97% of subjects aged 17-25 years. Regarding the need to take the second pill 12 hours after the first, 77% of subjects aged $\leq$16 years replied correctly compared with 90% of subjects aged 17-25.

The sponsor's Actual Use study assessed how subjects seeking emergency contraception timed the dosing of Plan B. In the Actual Use study, 37% of subjects began a course of Plan B within 24 hours of sex and 98% took the first dose within 72 hours. This compares favorably to the results of the WHO 92908 study upon which approval of the original NDA was based.[4] In that study, 46% of users took the first dose within 24 hours and all but 0.2% within 72 hours. The interval between the first and second pill was 12 hours or less for 84% of women in the Actual Use study versus 83% in the WHO 92908 study.[5] Timing of EC dosing was similar for women using Plan B for the first time and for those who had used EC previously under supervision of a healthcare provider, suggesting that supervision prior to use is not critical for correct timing of dosing.

---

[2]     *See e.g.*, pediatric class labeling in the package insert for Alesse-28 tablets: "Safety and efficacy of Alesse tablets have been established in women of reproductive age. Safety and efficacy are expected to be the same for postpubertal adolescents under the age of 16 and for users 16 years and older. Use of this product before menarche is not indicated."

[3]     Raymond EG, Spruyt A, Bley K, Colm J, Gross S, and LA Robbins. The North Carolina DIAL EC Project: Increasing Access to Emergency Contraceptive Pills by Telephone. *Contraception* 2004, *submitted for publication.*

[4]     Sponsor's analysis, Slide 42, December 16, 2003, Advisory Committee Meeting

[5]     Sponsor's analysis, Slide 43, December 16, 2003, Advisory Committee Meeting

2

TUMMINO-30882

19

# Memorandum of John K. Jenkins

# April 22, 2004

# AR 30897-900

MEMORANDUM

DATE:          April 22, 2004

FROM:          John K. Jenkins, MD
               Director, Office of New Drugs

TO:            NDA 21-045

SUBJECT:       Review of NDA for Rx to OTC Switch for Plan B

This memorandum is intended to summarize my review, conclusions, and recommendations regarding the pending application submitted by Barr Laboratories proposing a switch to non-prescription status for Plan B (levonorgestrel) for emergency contraception. I have read and carefully considered the reviews in the action package written by Dr. Jonca Bull, Dr. Julie Beitz, Dr. Donna Griebel, and Dr. Curtis Rosebraugh. I also attended the December 16, 2003, joint meeting of the Non-Prescription Drugs Advisory Committee and the Reproductive Health Drugs Advisory Committee at which this application was presented for discussion and public input.

The drug product and indication proposed by the sponsor for non-prescription marketing (also known as over-the-counter or OTC) are identical to the approved prescription product. Plan B has previously been proven to be effective for emergency contraception, and has a well-documented safety profile. Therefore, the primary regulatory issue in considering the potential non-prescription use of this product is whether it can be used safely, effectively, and appropriately by women of child-bearing potential without need for a learned intermediary (e.g., counseling from a physician). In support of this application the sponsor submitted a label comprehension study and an actual use study, both of which have been extensively reviewed by the staff in the two divisions. In my opinion, these studies provide adequate evidence that women of childbearing potential can use Plan B safely, effectively, and appropriately for emergency contraception in the non-prescription setting. The data submitted by the sponsor in support of non-prescription use of Plan B are fully consistent with the Agency's usual standards for meeting the criteria for determining that a product is appropriate for such use. This conclusion is supported by the fact that both divisions and offices responsible for the review of this application have recommended approval and the fact that the joint Advisory Committee voted 23 to 4 in favor of recommending that Plan B be switched to non-prescription status.

Other senior officials within the Agency, including the former Commissioner (Dr. McClellan) and the Acting Center Director (Dr. Galson), have expressed concerns about the potential for unsafe, ineffective, or inappropriate use of Plan B by adolescents if it were to be made available without a prescription. These concerns appear to have been based primarily on the limited number of adolescent women included in the sponsor's label comprehension and actual use studies. While it is true that the number of

TUMMINO-30897

20

adolescents enrolled in the sponsor's studies was relatively small, these studies did not exclude adolescent women from enrollment and were conducted in settings that would be expected to capture a representative population of women who currently seek emergency contraception. Therefore, it is likely that the percentage of patients enrolled in these studies is an accurate reflection of the potential users of Plan B in an OTC setting. Furthermore, the data from these studies do not suggest that adolescent women are significantly different from older women in their comprehension of the labeling or appropriate use of the product in the OTC setting, and for some analyses the adolescent women actually performed better than older women. I, therefore, believe that the data from the studies submitted by the sponsor are sufficient and adequate on which to base a regulatory decision on whether Plan B can be used safely, effectively, and appropriately by women of childbearing potential, regardless of age, in the OTC setting. The Agency has not heretofore distinguished the safety and efficacy of Plan B and other forms of hormonal contraception among different ages of women of childbearing potential and I am not aware of any compelling scientific reason for such a distinction in this case. I would also note that the Agency has a long history of extrapolating findings from clinical trials in older patients to adolescents in both prescription and non-prescription approvals, and this practice was recently incorporated into the Pediatric Research and Equity Act (PREA).

As detailed in the reviews prepared by Drs. Griebel and Rosebraugh, in addition to the studies submitted by the sponsor there exists a substantial body of data from recently completed published and unpublished studies on emergency contraception that have enrolled a substantial number of adolescent women. While none of the studies directly mimic the OTC setting for access to Plan B, I believe that these data are relevant and help to address whether adolescents can use Plan B in the OTC setting. Taken together, these additional studies do not support a concern that adolescent women are less able to understand the label directions or less likely to appropriately use the product than older women. Further, these studies found that increased access for adolescents to emergency contraception did not result in inappropriate use of Plan B as a routine form of contraception, an increase in the number of sexual partners, an increase in the frequency of unprotected intercourse, or an increase in the frequency of sexually transmitted diseases.

In summary, I concur with the recommendations from the review divisions and offices that the sponsor has provided adequate data to demonstrate that Plan B can be safely, effectively, and appropriately used by women of childbearing potential for the indication of emergency contraception without a prescription. I, therefore, recommend that this application be approved to permit availability of Plan B without a prescription and without restrictions regarding the availability of the product to adolescent women.

I am sensitive to and respect the concerns that some may have regarding non-prescription access to Plan B by adolescents. Products that are indicated for uses related to sexual activity in adolescents raise concerns for some people that go beyond a finding based on clinical trial data that the product is safe and effective for its intended use in adolescents. These concerns are derived from individual views and attitudes about the morality of

TUMMINO-30898

21

adolescent sexual behavior and also overlap with concerns about the role for parents and health care professionals in decisions about contraceptive use in adolescents. While acknowledging these concerns, I believe that the available data clearly support a conclusion that Plan B meets the statutory and regulatory requirements for availability without a prescription for all age groups. Such a conclusion is consistent with how the Agency has made determinations for other OTC products, including other forms of contraception available without a prescription. Further, I believe that greater access to this drug will have a significant positive impact on the public health by reducing the number of unplanned pregnancies and the number of abortions. While OTC access to Plan B for adolescents may be controversial from a societal perspective, I cannot think of any age group where the benefit of preventing unplanned pregnancies and abortion is more important and more compelling.

The sponsor is aware of the societal issues related to OTC access for Plan B, particularly to adolescents. They initially proposed a voluntary marketing plan called CARE (Convenient Access Responsible Education), which was designed to increase awareness of appropriate use of Plan B through education while increasing availability through OTC access. The joint Advisory Committee voted 22 to 5 (with one abstention) that this program was adequate for introduction of Plan B into the OTC setting. Subsequently, in response to concerns raised by upper management within the Agency about OTC access to plan B for adolescents, the sponsor submitted a preliminary proposal for voluntary dual Rx (for women under 16 years) and OTC marketing (for women 16 and above) of Plan B. This proposal has undergone preliminary review by the Office of Regulatory Policy in CDER and it appears that it may be feasible under the current statute and regulations, however, a formal review by the Office of Chief Counsel has not be completed. While I do not believe that restrictions on OTC availability to adolescents are warranted, and I believe that such restrictions could be counterproductive to improving access to contraceptive options for this age group, this voluntary proposal from the sponsor deserves further consideration. It may serve to responsibly address the societal concerns that have been raised by some about OTC access to Plan B for adolescents while simultaneously greatly expanding access to Plan B to the vast majority of women of childbearing potential who may greatly benefit from such access.

TUMMINO-30899

22

---

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

---

/s/
-----------------------
John Jenkins
4/28/04 08:23:43 AM
MEDICAL OFFICER
Concurrence with division and ODE recommendations that application should be approved for non-prescription marketing without restriction based on age.

TUMMINO-30900

# Email exchange between
# Steven Galson and Dianne Murphy

## May 2-9, 2005

## AR 30908-911



**MEMORANDUM**    DEPARTMENT OF HEALTH AND HUMAN SERVICES
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
CENTER FOR DRUG EVALUATION AND RESEARCH

DATE:    May 10, 2004

TO:    NDA 21-045/S-011

FROM:    Bronwyn Collier, ADRA ODE III

SUBJECT:    Pediatric Team Consultation

Dr. Galson provided the attached documentation of his consultation with the Pediatric Team (OCTAP).

TUMMINO-30908

24

## Collier, Bronwyn E

From:           Houn, Florence
ent:            Monday, May 10, 2004 7:36 AM
To:             Collier, Bronwyn E
Cc:             Griebel, Donna J; Beltz, Julie G; Bull, Jonca
Subject:        FW: confidential

Bronnie, pls put this into DFS for archival purposes under the Plan B OTC NDA. Thx.

F

-----Original Message-----
From: Galson, Steven
Sent: Sunday, May 09, 2004 9:07 PM
To: Houn, Florence
Cc: Murphy, Dianne; Jenkins, John K; Kweder, Sandra L; Throckmorton, Douglas C; Bull,
Jonca; Cummins, Susan
Subject: FW: confidential


Hi Flo,
This is the documentation of my consultation with Dianne. We had a short conversation
referred to in the earliest email at bottom. I want to be sure you realize that I had made
up my mind concerning the essential contents of the letter & memo before I spoke to
Dianne, but she and Susan did help me with the citation and helped flesh out the thought.
Feel free to add this or a summary of it to the file if you believe it's needed.
Thanks
Steven

-----Original Message-----
From: Murphy, Dianne
ent: Monday, May 03, 2004 5:24 PM
To: Galson, Steven
Cc: Cummins, Susan; Murphy, Dianne; Murphy, Shirley
Subject: RE: confidential


  Brain development and higher order thinking matures throughout the entire adolescent
period of 10-21 years. During mid-adolescence (14-16) youth begin to develop the capacity
to think abstractly. However, their ability to integrate their emerging cognitive skills
into their real life experiences is immature and incomplete. During early adolescence (10-
13) there is an emergence of impulsive behavior without the cognitive ability to
understand the etiology of the behavior.(1)The capacity to understand complex concepts,
which develops during middle adolescence, allows the adolescent to modulate their
impulsive behavior.

Additional facts for you Steve:

Adolescence is usually considered to evolve in three maturational stages; early
adolescence is 10-13, middle is 14-16 and late is 17-21.

Cognition is concrete in early adolescence. Abstraction begins in the middle period and is
complete in late adolescence.

Sexually active adolescence occurs most often in youth 15 and older. By age 15, 24% of
females and 27% of males had been sexually active. Thus limiting access to younger
adolescence will probably focus on those who are in exploitive, non-voluntary first sex
situations and who would most benefit and are in need of adult intervention. 7 in 10 of
those who had sex before age 13 had a nonvoluntary 1st sex experience (2)

(1)Rudolph's Pediatrics -21st edition. Chapter 3.1 Growth and Development, Psychological
Development during adolescence.

1

TUMMINO-30909

25

(2) The Allen Guttmacher Institute: http://www.agi-usa.org/pubs/fb_teen_sex.html   the underscore is subsumed in the underling: 5-3-2004   The Guttmacher Institute focus of research is reproductive health.

Let us know if you need more or something different.

Dianne and Susan

-----Original Message-----
From: Galson, Steven
Sent: Monday, May 03, 2004 4:36 PM
To: Murphy, Dianne
Subject: RE: confidential


I need to finalize my document in the next 24 hrs. Thanks

-----Original Message-----
From: Murphy, Dianne
Sent: Sunday, May 02, 2004 11:36 PM
To: Galson, Steven
Cc: Cummins, Susan
Subject: Re: confidential


Steve,
I will speak with Susan Cummins whose background is developmental pediatrics and we will provide 2 or 3 sentences that focus on the differences in behavior and judgement between the early and late adolescent period. In other words, behavioral science information as to why one cannot extrapolate decision making on  safety issues from the older adolescent to the younger one.
Dianne
-------------------------------
Dianne Murphy, MD
Director
CTAP, CDER, FDA
301-827-7777
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Galson, Steven <GalsonS@cder.fda.gov>
To: Murphy, Dianne <MURPHYD@cder.fda.gov>
Sent: Sun May 02 20:51:36 2004
Subject: confidential

Dianne,
Below is one sentence from the memo I briefly discussed with you. I would appreciate your assistance is reforming the sentence if you think it's not accurate, and elaborating on it slightly. I don't have space for more than 2 or 3 sentences and don't want to get too technical  Just want to make sure I'm accurate. The underlying issue is whether studies of adult behavior can be extrapolated to adolescent behavior. I think not, but want to make sure my statements in this regard are correct. Thanks.


The period of early adolescence is known to be a time of rapid and profound physical and emotional change

2

TUMMINO-30910

26



This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.

/s/
- - - - - - - - - - - - - - - - - - - - -
Bronwyn Collier
5/10/04 10:13:02 AM
CSO

TUMMINO-30911

27

# Review of Complete Response by Daniel Davis

## January 12, 2005

## AR 31020
## (excerpt)

**Division of Reproductive and Urological Drug Products**

**Medical Officer Review of Complete Response**

| | |
|---|---|
| **Type of Submission** | Complete response to Not Approvable action for prescription to OTC switch |
| **NDA Number** | 21-045/S-011, [SE6] |
| **Applicant** | Duramed Pharmaceuticals, Inc (a Subsidiary of Barr) |
| **Date of Submission** | July 21, 2004 |
| **Primary Medical Reviewer** | Daniel Davis, MD |
| **Date of Review** | January 12, 2005 |

## 1. RECOMMENDATION REGARDING APPROVAL AND POSTMARKETING COMMITMENTS

### 1.1 Recommendation regarding Approval

There are no new safety findings that would preclude the approval of changing Plan B® from prescription status to over-the-counter (OTC) status for preventing pregnancy (i.e., emergency contraception) following unprotected intercourse or a known or suspected contraceptive failure in women of any age who are at risk of becoming pregnant. Data submitted by the Applicant during the original review cycle have shown that Plan B is sufficiently safe and efficacious when used in accordance with proposed labeling that it can be distributed over-the-counter without any age or distribution restrictions and without the need for any further clinical studies.

The Applicant, however, has requested that the product remain as a prescription-only product for adolescents under age 16 years. This reviewer does not believe that this request is warranted or desirable.

Final labeling will need to be agreed to by the Applicant and the OTC Division of the FDA prior to approval. The Applicant's marketing plan and postmarketing CARE[SM] (Convenient Access, Responsible Education) Program are designed to limit the availability of Plan B to pharmacies and clinics, and to educate health-care providers and consumers regarding the responsible use of emergency contraception, methods of routine contraception, and prevention of sexually transmitted infections (STIs).

### 1.2 Postmarketing Commitments

This reviewer has no specific recommendations for postmarketing studies or risk management steps.

## 2. REGULATORY BACKGROUND:

The Applicant submitted Supplement 011 to NDA 21-045 on April 22, 2003 for the switch from prescription status to OTC status for Plan B for the indication for emergency contraception. The original PDUFA date was February 22, 2004 and a 3-month extension was granted extending the date to May 22, 2004. On May 6, 2004 the Applicant received a Not Approvable letter from the

TUMMINO-31020

28

Case 1:05-cv-00366-ERK-VVP   Document 80-2   Filed 01/06/06   Page 40 of 127 PageID #: 1334

# Memorandum Addendum of Curtis J. Rosebraugh

## January 12, 2005

## AR 31026-030

| Division Director Memo-Addendum |
| --- |
| NDA #: 21-045/S-011 |
| Drug Name: Plan B (Levonorgestrel 0.75 mg) |
| Sponsor: Women's Capital Corporation |
| Receipt Date: July 22, 2004 |
| PDUFA Date: January 22, 2005 |
| Type of Document: Response to NA letter |
| Date: January 12, 2005 |

### Introduction

The original application for this product was reviewed by both the Division of Reproductive and Urologic Drug Products and the Division of Over-The-Counter (OTC) Drug Products (the Division), with the delegated authority for the final regulatory decision resting within the Offices of Drug Evaluation III and V as typically practiced under the current CDER procedure governing the review of a proposed Rx-to-OTC switch (MaPP 6020.5). In the initial review of this application, both Divisions, both Offices, and the Director of the Office of New Drugs recommended approval of the application (see January 15, 2004 Rosebraugh review; January 21, 2004 Bull review; March 30, 2004, Rosebraugh/Bull review; April 1, 2004, Griebel review; April 2, 2004, Beitz review; and April 28, 2004, Jenkins review). However, the Center of Drug Evaluation and Research Immediate Office did not concur with these recommendations, removed the delegated authority, and issued a Not Approvable action to the applicant on May 6, 2004 (see May 6, 2004, Galson review). Please refer to the action letter for all the deficiencies identified by Dr. Galson, but the main concern expressed by him was that he felt there was insufficient data to support a conclusion that Plan B could be used safely by adolescent women under 16 years of age.

The applicant has responded to these deficiencies in a July 21, 2004 submission with a proposal that would allow the product to be sold OTC to consumers over the age of 16 and to be sold by prescription only to consumers under the age of 16. This amendment is the subject of the current review and pending decision.

### Recommendations

In my memorandum during initial review cycle, I concluded the following:

1) Plan B adequately meets the Durham-Humphrey Amendment criteria for OTC marketing without restriction;
2) Any system placing barriers to access would defeat the purpose of the drug and lessen its public health potential; and
3) Placing age restrictions for theoretical abuse by a small segment of the population would have ramifications for how we regulate other OTC drugs where there is known abuse by the population and by adolescents such as dextromethorphan, laxatives and analgesics.

TUMMINO-31026

2

I have not been presented with data that would dissuade me from my original conclusion. I also continue to believe that adequate data was submitted to allow Plan B to be marketed without regard to age. I also believe that the sponsor's original proposal for the CARE program would ensure proper use of Plan B by women of all ages, including adolescents.

In regard to the proposal submitted by the sponsor, I have many concerns regarding the regulatory precedent that approval of this plan would set and possible unintended consequences. I am concerned that the regulatory precedent that would be set by requiring adolescents to obtain a prescription to access an otherwise OTC contraceptive product may have implications for other OTC contraceptive products that are currently marketed which do not bear age restrictions and have not submitted adolescent data for OTC marketing.

In the past when the Division has felt that there was insufficient data to warrant labeling for a particular age group, we have labeled the product with language that reflects that under a certain age, a physician should be consulted, but an age restriction for sale of the product was not part of the labeling. We have handled age restrictions by placing them in the **Do Not Use** and **Ask a Doctor Before Use If** sections of the Drug Facts Labeling. These warnings may be bolded to highlight the age restrictions (such as with stomach acid modifying agents). It should be noted that almost all OTC products are restricted from some group of the general population because of safety or efficacy concerns (e.g., restrictions by age, concomitant medications or disease severity). In previous cases, we have addressed these restrictions in labeling using the **Warnings** section of Drug Facts, but have not restricted sale of the product from these populations.

The labeling proposed for this product would include a statement to the effect that it can not be sold to anyone under the age of 16. We have not done this for other OTC products except for nicotine products, a case not applicable to Plan B because this is a requirement placed on nicotine delivery systems by the DEA. Placing an age restriction for sale may place an unacceptable legal burden on pharmacies which would have the undesired effect of limiting access. It is also unclear how an age restriction would be enforced in a pharmacy setting. Additionally, it is unclear what this new precedent would mean for those products that have statements regarding contacting a physician if under a certain age. Would they also be eligible to be prescription only for those age groups?

Finally, it is unclear what additional data could be provided on adolescent use that would be sufficient to lift the age restriction in the future.

For these reasons, I do not support a recommendation for an age restriction.

Having said the above, we have been asked to comment on the adequacy of the proposed labeling to assure that the age restriction is followed. Comments have been sent to the sponsor and to date, the applicant has not proposed new labeling in response to the

TUMMINO-31027

30

3

December 22, 2004 labeling comments. The legal and regulatory acceptability of the applicant's proposal is currently under review in the FDA Office of Chief Counsel.

## Summary

I continue to believe an age restriction is not appropriate for this product for all the reasons stated above and in my previous reviews.

Curtis J. Rosebraugh, MD, MPH

cc:    orig.

HFD-560 /frazier /cothran/solbeck/chen/leonard segal/ganley/bull
HFD-580/griebel/beitz

TUMMINO-31028

4

Attachment 1

TUMMINO-31029

32

--------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

--------------------------------------------------------------------------------------

/s/

----------------------

Curtis Rosebraugh
1/12/05 10:57:35 AM
MEDICAL OFFICER


Charles Ganley
1/12/05 11:30:34 AM
MEDICAL OFFICER


Jonca Bull
1/12/05 12:27:05 PM
MEDICAL OFFICER

TUMMINO-31030

33

Case 1:05-cv-00366-ERK-VVP    Document 80-2    Filed 01/06/06    Page 46 of 127 PageID #: 1340

# Memorandum of Donna J. Griebel

# January 12, 2005

# AR 31031-033
# (excerpt)

**Deputy Division Director Memorandum**

To:                          Julie Beitz, M.D.,  Deputy Director ODE III
Re:                          Approvability of NDA 21-045  SE6, N-011
Drug:                        Plan B (levonorgestrel)
Dosage:                      0.75 mg tablet for oral administration
Type of Submission:          Response to Not Approvable action
Submission Date:             July 21, 2004
Memo Date:                   January 12, 2005

**Recommendation Regarding Approval**

In my April 2004 Deputy Division Directory Summary Review of NDA 21-045, I concluded that the risk benefit ratio of non-prescription access to Plan B supported its switch to non-prescription status without restricted access on the basis of age. This recommendation was made after reviewing the label comprehension and actual use study data submitted by the applicant in the NDA, the data from large controlled trials on advance provision of emergency contraception, summary data from the large single arm telephone access study from North Carolina (DIAL EC) submitted by that studies investigators, the levonorgestrel safety database, the vote and minutes from the December 2003 Joint Session of the Nonprescription Advisory Committee, and medical literature addressing public health issues surrounding the impact of improved access on sexual health and behaviors. (See this document's Appendix for a copy of my Deputy Division Director Summary Review from April 2004, which documents the regulatory review history of the original Plan B NDA submission for non-prescription status.)

No new safety and efficacy data has been presented in this NDA submission or in the Division's updated review of the medical literature and post-marketing safety reports for levonorgestrel that alters my original recommendation that the risk benefit ratio of non-prescription access to Plan B supports its switch to non-prescription status without age restriction. I continue to support Plan B's switch to nonprescription status without age restrictions. I cannot support the Applicant's proposal in the current NDA submission (which was made in response to the CDER Center Director's May 6, 2004 Not Approvable letter that informed the applicant that provision of information in support of marketing Plan B as a prescription-only product for women under the age of 16 years and as a nonprescription product for women 16 years of age and older was one of two pathways to obtain approval) to restrict access to the non-prescription product through a mechanism that requires that the product be sold by prescription-only to consumers under the age of 16. I do not support this approach for two reasons:

1) Labeling the product to only be sold with a prescription to consumers under the age of 16 sets a precedent that could have negative consequences on current products sold as non-prescription products, including contraceptive products like condoms and spermicidal products. In instances where it has been believed that insufficient data exist to warrant labeling for a particular age group, the Division of Over the Counter Drug

1

TUMMINO-31031

34

Products has labeled the product with an age under which a physician should be consulted, using language in the package Drug Facts labeling such as "Do Not Use" or "Ask a Doctor Before Use If". (See Division of Over the Counter Drug Products Review by Dr. Curtis Rosebraugh.)

2) Labeling the product to only be sold without a prescription on the basis of age criteria could have the unintended public health consequence of limiting access to women of all ages. Enforcing the age restriction for a reproductive health drug could be considered an undesirable legal burden for pharmacies that prompts pharmacies that already carry the prescription-only product to cease carrying the product altogether. Additionally, there are multiple reported instances in the media and in the medical literature of pharmacists who refuse to fill prescriptions for the current prescription product because they believe it causes medical abortion. The public health goal of improving access of women to emergency contraception will not be achieved by the proposed age restriction if those pharmacists who object to the product on the basis of their personal beliefs remain in a position of controlling access to the product, even for those women 16 and older given that they will need to check age to allow access to the nonprescription product.

I concur with the reviews of Dr. Dan Davis and Dr. Scott Monroe from the Division of Reproductive and Urologic Drug Products that the sponsor's CARE$^{SM}$ (Convenient Access, Responsible Education) Program is reasonable. We have discussed with the Applicant that monitoring of the adequacy of the program could be further improved by collecting and analyzing the questions consumers ask of the pharmacist in their queries to the 1-800 information call line along with demographic data collected from those consumers who request information. This information could be used to refine labeling messages, if the analyses suggest changes could be helpful. The Applicant's response is pending.

In summary, I do not recommend that this application be approved with the Applicant's proposed age restrictions for reasons listed above. I believe that the product should be approved for switch to non-prescription status without age restriction.

Donna J. Griebel, MD
Deputy Director of the Division of Reproductive and Urologic Drug Products

**APPENDIX:** Deputy Division Director Summary Review of New Drug Application (Dated April 1, 2004 – from first review cycle) is attached.

2

TUMMINO-31032

sNDA 21-045                    Plan B (Levonorgestrel)

## Deputy Division Director Summary Review of New Drug Application

| | |
|---|---|
| NDA 21-045 | |
| Drug: | Plan B (levonorgestrel) |
| Dosage: | 0.75 mg tablet for oral administration |
| Proposed Indication: | Emergency contraception |
| Applicant: | Women's Capital Corporation |
| Submission Date: | April 16, 2003 |
| Review Complete | April 1, 2004 |

This new drug application proposes over the counter marketing of Plan B (levonorgestrel) for emergency contraception. The prescription product was originally approved in July 1999. The proposed nonprescription dose and administration schedule is identical to that found to be safe and effective for prescription use. The two major clinical trials submitted in support of this application were a single label comprehension study and a single actual use study. A literature review was submitted to address questions of important potential behavioral changes associated with availability of an emergency contraceptive, e.g., substitution of the product for routine and more effective contraception. A pharmacokinetic study in menstruating females aged ≤ 16 was also submitted.

At the December 16, 2003 Joint Session of the Nonprescription Drug Advisory Committee and the Advisory Committee for Reproductive Health Drugs the committees voted in overwhelmingly support of approval of the nonprescription switch. However, in a January 15, 2004 meeting, senior CDER management informed the Divisions and Offices that this application is not approvable. The reason for nonapproval that was conveyed at that meeting and in subsequent meetings was that there were inadequate data to support adolescent use in the over the counter setting. The Divisions and Offices were told that the Commissioner and senior CDER management believed that the number of adolescents in the actual use study was inadequate, that there were inadequate data to show that adolescents could dose the product correctly, and that adolescents needed a learned intermediary involved in their access to emergency contraception. The Divisions presented adolescent data in an effort to address these concerns in a meeting with the Commissioner on February 18, 2004. These data, however, were considered inadequate to establish that there would be no potential for negative impact from non-prescription access to emergency contraception in the adolescent population.

This review will focus on the issues raised by senior FDA and CDER management to support their decision for nonapproval of this product for over the counter marketing and the public comments by individual advisory committee members that echoed these very same concerns. The reviewing divisions and offices have carefully examined these concerns and do not believe that scientific evidence supports nonapproval of this application. The Divisions and Offices have concluded that the risk-benefit ratio for this product supports its approval for nonprescription marketing, without an age restriction.

This review is organized as follows:

1. Summary of Label Comprehension Study Review Findings
2. Summary of Actual Use Study Review Findings
3. Summary of Studies of Impact of Access to Emergency Contraception on Behavior
4. Safety Overview
5. Summary of Pharmacokinetic Study Review Findings

1

TUMMINO-31033

36

# Memorandum of John K. Jenkins

# January 14, 2005

# AR 31096-098
# (excerpt)

how such an approach complied with all relevant statutory and regulatory requirements for prescription and non-prescription products.

In its response to the not-approvable letter, the sponsor requested that Plan B be approved as a non-prescription product for women 16 years and older and as a non-prescription product for women under 16 years. The sponsor proposed that the product be sold in a single package configuration for both the prescription and non-prescription age groups and provided their analysis of how such a single package meets the relevant statutory and regulatory requirements for prescription and non-prescription products.

I have read and carefully considered the reviews in the action package generated during this second review cycle written by Drs. Dan Davis, Donna Griebel, and Julie Bietz of the Office of Drug Evaluation III and the review written by Dr. Curtis Rosebraugh and co-signed by Drs. Charles Ganley and Jonca Bull of the Office of Drug Evaluation V. I have also carefully reviewed Dr. Galson's May 6, 2004, review and the not-approvable letter.

I continue to believe that the sponsor has provided adequate information to support a conclusion that Plan B can be used safely and effectively by women of child-bearing potential for emergency contraception in the OTC setting without the need for intervention by a healthcare profession. I do not concur with Dr. Galson's conclusion that the data from the label comprehension and actual use studies conducted by the sponsor, taken together with data from published and unpublished literature, are inadequate to support the same conclusion for women less than 16 years of age. I therefore support approval of Plan B as an OTC emergency contraceptive without an age restriction and believe that the sponsor's proposal for "dual marketing" of Plan B as both a prescription and non-prescription drug should not be approved. I note that the FDA's Office of Chief Counsel is currently actively reviewing the legal issues associated with the sponsor's proposal for "dual marketing." Even if the sponsor's proposal is determined to be consistent with current statutes and regulations I believe the proposal should not be approved since there is, in my opinion, no scientific basis for the differentiation in prescription and non-prescription status based on age and such an approach is inconsistent with well established FDA precedent with regard to labeling OTC products for use in adult and pediatric populations.

I will briefly expand on the bases for my conclusions.

Dr. Galson is correct in noting that a relatively small number of subjects less than 16 years of age were included in the label comprehension and actual use studies conducted by the sponsor. As I noted in my previous memorandum, given the setting in which these studies were performed it is likely that the observed age distribution is reflective of the age distribution of the population of women who will use Plan B if approved for non-prescription marketing. Further, I believe that it is entirely reasonable to extrapolate the findings from the older women in these trials to adolescents given well established agency precedent for extrapolating data from studies in adults and older adolescents to younger adolescents and the fact that there was no suggestion based on the data from the sponsor's studies that younger women were less able to use the product correctly in a

TUMMINO-31096

37

simulated OTC setting than older women. There is no pharmacologic or safety issue for the use of levonorgestrel at the dose found in Plan B in younger adolescents compared to older women, and the approved prescription labeling for Plan B and other oral contraceptives that contain levonorgestrel make no distinction based on age.

Dr. Galson has cited developmental differences between adolescents and older women in support of his concern about extrapolation of findings from older to younger women. In my opinion, the concerns Dr. Galson raises are more applicable to the ability of adolescents to make reasoned decisions about engaging in sexual intercourse, not their ability to understand how to use Plan B safely and effectively as an emergency contraceptive should they engage in unprotected sexual intercourse. The Plan B regimen is very simple (one tablet as soon as possible after unprotected intercourse and another tablet 12 hours after the first) and in many ways easier to follow than many other OTC products that are labeled for use by adolescents and younger children (e.g., some OTC products require a decision about the proper dose to be taken based on age or weight, require frequent repeat dosing, and contain multiple warnings and "Do not use if" statements). Further, levonorgestrel, the active ingredient in Plan B, has a very high margin of safety. This high margin of safety combined with the packaging configuration, which only includes two tablets per package, makes it very unlikely that a serious adverse event would occur if an adolescent incorrectly dosed the product.

With regard to the policy precedent, the agency has not to my knowledge previously approved marketing of a drug product as both prescription and non-prescription for the same indication based solely on an age distinction. Products that are currently marketed as OTC products generally contain dosing information for a defined age range; e.g., children 6 years an older, and for children younger than the defined age range the labeling instructs the user to seek advice from a physician before using. It is not clear why a similar approach, which has been effectively utilized for many years by the agency, could not also be applied to Plan B. A decision to approve Plan B as a prescription and non-prescription product for the same indication with the only difference being the patient's age sets an important policy precedent that must be carefully considered and justified. In my opinion, such an approval for Plan B cannot be justified based on scientific data (e.g., there is no unique safety concern for the drug in women under age 16 and in my opinion the data presented by the sponsor support a conclusion that younger adolescent women can use the product safely in the OTC setting) and such an approval has the potential to raise other serious scientific and policy issues. For example, other OTC contraceptive products are not marketed under such "dual" prescription and non-prescription status. Approval of Plan B as a "dual" product based on age is likely to lead to petitions to the agency that other OTC contraceptives be similarly restricted, which could significantly alter the availability of contraceptives to sexually active adolescents, a group where pregnancy leads to serious short and long-term risks to the mother and the child. The potential policy implications on the OTC monographs, which do not currently distinguish between prescription and non-prescription status based on age, must also be carefully considered prior to approval of Plan B as a "dual" product.

TUMMINO-31097

38

As I noted in my prior memorandum on this application, I am sensitive to and respectful of the concerns that some may have regarding non-prescription access to Plan B by adolescents. Products that are indicated for uses related to sexual activity in adolescents raise concerns for some people that go beyond a finding based on clinical trial data that the product is safe and effective for its intended use in adolescents. These concerns are derived from individual views and attitudes about the morality of adolescent sexual behavior and also overlap with concerns about the role for parents and health care professionals in decisions about contraceptive use in adolescents. While acknowledging these concerns, I believe that the available data clearly support a conclusion that Plan B meets the statutory and regulatory requirements for availability without a prescription for all age groups. Such a conclusion is consistent with how the Agency has made determinations for other OTC products, including other forms of contraception available without a prescription. Further, I believe that greater access to this drug will have a significant positive impact on the public health by reducing the number of unplanned pregnancies and the number of abortions. While OTC access to Plan B for adolescents may be controversial from a societal perspective, I cannot think of any age group where the benefit of preventing unplanned pregnancies and abortion is more important and more compelling. An agency decision to approve Plan B as a "dual" product may have the paradoxical effect of decreasing access to and use of the product if pharmacies and pharmacists choose not to stock the product due to an unwillingness to participate in verifying the age of women who present to the pharmacy requesting Plan B or based on liability concerns. The age restriction will also be difficult to enforce and easy to bypass (e.g., an adolescent girl can simply have an older friend purchase the product for her) and in the end is not likely to serve its apparent intended purpose of ensuring that younger adolescent women be guided in the use of the product by a healthcare professional.

For the reasons stated above, I believe that the proposed "dual" marketing strategy for Plan B should not be approved, and instead, the sponsor's original proposal for non-prescription marketing without restrictions based on age supported by their CARE program should be approved.

TUMMINO-31098

# Page from Calendar of Lester M. Crawford

# August 24, 2005

# AR 31212



# August 24, 2005
Wednesday

| August 2005 | September 2005 |
|---|---|
| S M T W T F S | S M T W T F S |
| 1 2 3 4 5 6 | 1 2 3 |
| 7 8 9 10 11 12 13 | 4 5 6 7 8 9 10 |
| 14 15 16 17 18 19 20 | 11 12 13 14 15 16 17 |
| 21 22 23 24 25 26 27 | 18 19 20 21 22 23 24 |
| 28 29 30 31 | 25 26 27 28 29 30 |

**7** am

**8** 00

**9** 00

**10** 00

**11** 00

**12** pm  Barr Labs (LMC/Ronan/Bradshaw/Galson) (PKLN 14-71)

**1** 00

**2** 00

**3** 00

**4** 00

**5** 00

**6** 00

Crawford, Lester, D.V.M.                                    1                                    9/6/2005 1:27 PM

TUMMINO-31212

# Page from Calendar of Pat Ronan

## August 24, 2005

## AR 31213

# August 24, 2005
## Wednesday

| August 2005 | September 2005 |
|---|---|
| S M T W T F S | S M T W T F S |
| 1 2 3 4 5 6 | 1 2 3 |
| 7 8 9 10 11 12 13 | 4 5 6 7 8 9 10 |
| 14 15 16 17 18 19 20 | 11 12 13 14 15 16 17 |
| 21 22 23 24 25 26 27 | 18 19 20 21 22 23 24 |
| 28 29 30 31 | 25 26 27 28 29 30 |

**Congressional Recess**

**7 am**

**8 00**
8:40am-9:30am Senior Staff Meeting (14-68)

**9 00**

**10 00** CANCELLED - Weekly SPC Teleconference (800-988-9363 [71250])     HOLD - Interview

**11 00** FDA Weekly Meeting w/Wiley, Agnew, Leggit, Downs, etc. [may vary] (Conf. Call NUMBER: 1-877-818-2192   CODE: 353215)

**12 pm** Mtg on Barr Laboratories (Dr. Crawford's office)

**1 00** Mtw: Kari Barrett (Pat Ronan's Office)

Senate HELP Committee Vaccine Briefing (632 Hart Senate Office Building)

**2 00**

**3 00**

**4 00** 4:00pm-4:15pm COS Telecon w/ Dr. Crawford, Rich McKeown & Laura Lawlor

Mtw Laura Lawlor on FDA Issues (1-888-322-7309 passcode: 24430)

**5 00**

**6 00**

### TaskPad

- ☑ TaskPad
- ☐ Talk with Steve Niedleman in re: Mentor
- ☑ ~~Talk to Jason/Suzanne in re: Weekly~~
- ☐ David Bowen in re: Vision '06
- ☐ Ray Shepherd meeting with Randy and ...
- ☐ Clean out e-mails
- ☐ Cell Phone and Blackberry
- ☐ CDER Org Chart

### Notes

Ronan, Pat                                   1                    9/6/2005 1:18 PM

**TUMMINO-31213**

41

Case 1:05-cv-00366-ERK-VVP   Document 80-2   Filed 01/06/06   Page 58 of 127 PageID #: 1352

# Memorandum of Steven Galson

# August 26, 2005

# AR 31214-226

MEMORANDUM

DATE:       8/26/05

FROM:       Steven Galson, MD, MPH
            Director, Center for Drug Evaluation and Research

TO:         NDA 21-045, S-011

SUBJECT:    Plan B

## I.    Introduction

Barr previously filed a supplement seeking OTC status for all post-menarche women on April 22, 2003. I issued a not approvable letter for that supplement on May 6, 2004, because the supplement did not contain data demonstrating that the product was safe and effective for OTC use by women under age 16.

On July 21, 2004, Barr Laboratories (Barr or the sponsor) resubmitted its supplement to NDA 21-045, S-011 seeking to switch Plan B's prescription (Rx) status to non-prescription (OTC) for women 16 years of age and older, and to have Plan B remain Rx for women under 16 years of age. I find that the data provided support approval for OTC use for women 17 and older, but I am unable to conclude based on the data presented that women age 16 or less can use OTC Plan B safely and effectively. The data analyses submitted with S-011 stratify the data by age groups as follows: 12-16, 17-25, and older. Because the 16 year olds are grouped in these analyses with the younger adolescents, I would approve Plan B for OTC use for women 17 and older, not 16 and older as Barr requests.

Although Barr did not propose to switch the Rx status of Plan B for women under 16 years of age in its July 21, 2004 resubmission, the CDER reviewers in the Divisions of Reproductive and Urologic Drug Products and the Division of Over-the- Counter Drug Products (the review divisions), the Deputy Directors of the Offices of Drug Evaluation (ODE) III and V, and the Director of the Office of New Drugs recommended that Plan B should be switched OTC for the entire population of women who might use the product, including women under age 16. For the reasons described below, I do not agree with these recommendations.

Two citizen petitions have been submitted to FDA regarding the Rx status of emergency contraception. One petition, submitted on February 14, 2001, by the Center for Reproductive Law and Policy (CRLP) (now the Center for Reproductive Rights) on behalf of several organizations and supplemented August 7, 2001 and February 13, 2002, urged FDA to exempt from the Rx dispensing requirement both Plan B and Preven, an emergency contraceptive marketed by Gynetics, as well as any equivalent drugs (Docket 01P-0075/CP1). The second petition, submitted by the Pharmacists Planning Service, Inc. on May 12, 2004, urged FDA, by regulation, to switch Plan B from Rx to a "pharmacist-only" status (Docket 01P-0075/CP2) (i.e., to allow sales by pharmacists to consumers without a prescription, but not to allow the product to be sold by retail outlets on the shelves for consumers to pick up and purchase). To the extent these petitions raise issues that are relevant to this review, my views on these issues at this point in time are addressed below.

TUMMINO-31214

In addition, my office has received many calls, letters, and e-mails from interested members of the public both supporting and opposing the switch to OTC status of Plan B, and some of which have supported Barr's July 2004 proposal to market Plan B OTC for women 16 and over, and Rx for women under 16. While these calls and e-mails have not raised arguments not already raised in the reviews and the petitions, they are indicative of the high level and divided nature of public interest in FDA's decision on this matter.

## II. Approval Standards

FDA must require Rx dispensing of any drug that is not safe for use "except under the supervision of a practitioner licensed by law to administer such drug."[1] A drug sponsor may submit a supplemental application to "switch" a drug that FDA has already approved for Rx use to OTC status. FDA will grant a supplemental application to "switch" when it finds that Rx dispensing is:

> not necessary for the protection of the public health by reason of the drug's toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, and . . . the drug is safe and effective for use in self-medication as directed in proposed labeling.[2]

Such switch applications include data from actual use and labeling comprehension studies to demonstrate that the product can be safely and effectively used without the supervision of a practitioner licensed by law to administer the drug. FDA may approve an NDA application only when, among other things, the investigations submitted in the application include adequate tests showing whether or not the drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling and when there is sufficient information to determine from the application whether the drug is safe for use.[3]

## III.    Findings

### A.  Data on Plan B Use by Women 17 and Older

Plan B provided pursuant to a prescription has previously been proven to be effective for emergency contraception and has a well-documented safety profile. In a label comprehension study and in an actual use study submitted with the supplemental NDA, the sponsor has demonstrated that women of childbearing-potential age 17 and older can use Plan B safely and effectively for emergency contraception in the OTC setting. The data submitted by Barr demonstrate that Plan B is safe and effective without the supervision of a practitioner licensed by law for women ages 17 and older in self-medication as directed in the proposed labeling. The CRLP petition and many of the comments on that petition also support this view.

---

[1] 21 U.S.C. § 353(b)(1).
[2] 21 C.F.R. § 310.200(b).
[3] See 21 U.S.C. § 355(d).

2

TUMMINO-31215

43

B. Data on Plan B use by Women 16 and Younger

In reviewing a proposed switch from Rx to OTC status, FDA assesses the actual use and labeling comprehension studies submitted by the applicant to support the switch. As described in my May 6, 2004 Not Approvable letter, the April 2003 supplement contained very limited actual use data on women ages 14 and 15, and no actual use data on women under age 14. Similarly, the label comprehension study also included few women ages 16 and under (n=76).[4] Moreover, as described below, what little data were in the supplement raised questions about whether the product can be used safely and effectively by younger adolescents.

Although in NDA 21-045, supplement S-011 Barr proposed to switch Plan B to OTC for women 16 years and older, the data in S-011 are stratified by age in the following categories: 12-16 years, 17-25 years, and 26 years and older. There were no analyses in the supplement that distinguished 16 year olds from younger women in the 12-15 year old category. Accordingly, I find that although the safety and efficacy of Plan B as an OTC drug product in women 17 years of age and older have been established by data submitted by Barr in NDA 21-045, S-O11. Barr has not met the statutory burden of demonstrating that the product is safe for use without the supervision of a practitioner licensed by law for women under age 17.

First, when compared to older adolescents (>17 years) and adults, early adolescents (ages 12-16 years) were less likely to specifically comprehend Plan B's labeling instructions. In the label comprehension study (N=656), adolescents (ages 12-16 years, n=76) did not understand certain key directions in the labeling. For example, women ages 12-16 did not understand as often as women 17 years and older that Plan B's indication is to prevent pregnancy after unprotected sex (86% for ages 12-16, 93% for ages 17-25, 95% for ages 26-50), that Plan B is not for routine use (57% for ages 12-16, 67% for ages 17-25, 71% for ages 26-50), that the first pill should be taken within 72 hours after intercourse (77% for ages 12-16, 86% for ages 17-25, 87% for ages 26-50), and that the second pill should be taken 12 hours after the first pill (77% for ages 12-16, 90% for ages 17-25, and 82% for ages 26-50).[5]

Second, the data from the actual use study, which enrolled very few women under 17 years, also raise concern about the safety of OTC Plan B for young women. For instance, they show that adolescents under age 17 were less compliant with the 4 week follow-up period specified in the study protocol when compared to the older women (ages ≥17 years). Fifty-five percent of the subjects aged 14-16 had two or more follow-up contacts, while 89% of the older subjects (ages 17-44) had two or more follow-up contacts.[6] These differences in follow-up undermine the ability of the actual use study to support safe use of OTC Plan B in this age group.[7] Furthermore, of the 29 14-16 year olds enrolled, most of them were 16 year olds (20 of 29 or 69%).[8]

---

[4] Plan B, Label Comprehension Study, Table 9, page 31
[5] Id.
[6] Plan B, Actual Use Study, Final Report Tables, Table 1.4c, page. 16.
[7] See also, page 23 of January 12, 2004 sNDA review by OTC Division (Jin Chen).
[8] January 11, 2005 email from Joseph Carrado to Tia Frazier.

3

TUMMINO-31216

44

The OND reviews both before and after issuance of the not approvable letter state that the safety and efficacy of Plan B as an OTC drug product have been established for women of all ages. Several of the Office of New Drugs reviews cite studies that they believe demonstrate that Plan B can be used safely and effectively in women under 16.

First, some of the reviews discuss the literature review submitted by the applicant, which included studies that addressed questions of important potential behavioral changes associated with the availability of an emergency contraceptive (e.g., substitution of the product for routine and more effective contraception, or increased medically risky behavior).[9] One reviewer cites studies evaluating the use of emergency contraception in a variety of clinical settings that enrolled over 1,000 adolescent women age 16 years or less.[10] Although these studies are relevant, they do not, in my view, sufficiently approximate actual OTC use by adolescents under age 17 enough to support OTC approval. None test the hypothesis that typical adolescent consumers will use the product correctly without physician intervention, as the studies either were not conducted in the general population or provided product education assistance beyond what adolescents would receive in an OTC situation, where no contact with a heath care professional is expected. One review states that there was no suggestion based on the data from the sponsor's studies that younger women were less able to use the product correctly in a simulated OTC setting than older women.[11] Based on the data cited previously from the actual use and label comprehension studies, I disagree with this assessment.

Furthermore, neither the CRLP petition nor the comments supporting that petition have provided any additional data on which I could rely to make the finding that Plan B will be used safely and effectively by adolescents under the age of 17. Some of the outside comments opposing the petition also noted the lack of data about what effect switching Plan B to OTC status would have on the sexual behavior of adolescents and the impact on adolescent health (such as increasing the incidence of sexually transmitted diseases).[12]

In conclusion, neither the original supplement nor the resubmission contain adequate data to demonstrate that prescription dispensing is no longer necessary for women under age 17. The data submitted do not demonstrate that women under age 17 can be expected to use Plan B appropriately in self-medication as directed in the proposed labeling. As discussed above, the inappropriate use of Plan B can have several significant adverse clinical consequences. In the absence of these data, and absent persuasive data from other relevant patient populations (see below), the statutory and regulatory standards for approving a supplement to switch Plan B from Rx to OTC for this population are not met.

      C. Inability to Extrapolate From Adult Data

---

[9] See e.g., Jenkins review, dated April 22, 2004, signed April 18, 2004, at 2; Rosebraugh review, dated March 23, 2004, signed March 30, 2004, at 4.

[10] Beitz review, January 12, 2005, at 1.

[11] Jenkins review, dated January 14, 2005, signed January 18, 2005, at 2 3.

[12] The commenters themselves failed to provide data to support their other concerns about, for example, whether OTC availability would increase the potential for misuse and adolescent promiscuity.

TUMMINO-31217

45

In making decisions about pediatric pharmaceutical use, it is often possible to extrapolate data from one age group to another. For example, we have extrapolated safety and efficacy data from adults to children for the approval of drugs to treat seasonal allergic rhinitis and symptomatic gastroesophagial reflux disease, where the disease course and pathophysiology, as well as the drugs' effects, are similar in adult and pediatric populations.

In this instance, it would be inappropriate to extrapolate the existing data from the 17 and older population to the under 17 population based on the nature of the product itself (i.e., a hormonal contraceptive), the risks associated with its inappropriate use, and the characteristics of the population of young women to whom the data would be extrapolated.

With regard to the risks associated with inappropriate use of Plan B, if a young woman did not understand that Plan B was for emergency contraception and non-routine use, and instead, used the product routinely (a use inconsistent with the labeling), the well-known risks associated with hormonal contraceptives, such as blood clots and stroke, are likely to be higher than with use of other contraceptives. Reflecting these risks, non-emergency hormonal contraceptives are now available only by prescription because the intervention of a learned intermediary is thought to be necessary to minimize the risks of the serious side effects that may be associated with long-term regular use.

Further, younger adolescents may believe that Plan B could be substituted for other forms of birth control (e.g., barrier methods), placing them at greater risk of infection from HIV or other sexually transmitted diseases. This concern is heightened by the data from the label comprehension study (discussed above), which found that women ages 12-16 did not understand as often as women 17 years and older that Plan B is not for routine use (57% for ages 12-16, 67% for ages 17-25, 71% for ages 26-50).[13] The actual use study did not contain enough data to demonstrate that younger women would not engage in this form of dangerous substitution.

In addition, if a young adolescent does not understand that the first dose of Plan B should be taken within 72 hours of unprotected intercourse, and the second pill 12 hours later, the effectiveness of the product will be compromised, and she may be at greater risk of having an unwanted pregnancy. As previously discussed, younger women were less able to understand that the first pill should be taken within 72 hours after intercourse (77% for ages 12-16, 86%, for ages 17-25, 87% for ages 26-50), and that the second pill should be taken 12 hours after the first pill (77% for ages 12-16, 90% for ages 17-25, and 82% for ages 26-50).[14]

Finally, with regard to the characteristics of a younger population in general, extrapolation of the actual use and labeling comprehension data to this group could be inappropriate because data in the pediatric literature on younger age groups suggest potentially significant differences from older adolescents with regard to cognitive abilities and risk taking behaviors.[15] The less developed cognitive abilities of women under age 17 could

---

[13] Plan B Label Comprehension Study, Table 9, page 31.

[14] Id.

[15] Chambers R, Taylor J, Potenza MN. "Developmental Neurocircuitry of Motivation in Adolescence: A Critical Period of Addiction Vulnerability" Am J Psychiatry 160: 1041-1052, June 2003; Dahl R. "Adolescent Brain Development: A Period of Vulnerabilities and Opportunities Keynote Address" Ann NY Acad Sci Vol 1021: 2004; 1-22; Steinberg L. "Risk Taking in Adolescence" Ann NY Acad Sci Vol 1021: 2004. 51-58.

5

TUMMINO-31218

46

lead to inappropriate use of Plan B and the potential for younger women engaging in risky sexual behavior, behaviors which carry significant safety and efficacy concerns.

To conclude, it is inappropriate to extrapolate from adult data to younger women to support the safety of OTC Plan B. This, coupled with the lack of adequate data in the under 17 population demonstrating that these young women understand the indication and proper use of the product and the risks associated with having unprotected sexual intercourse, mean that safe use of OTC Plan B in this age group cannot be assured. I conclude that retaining the Rx status for Plan B for women under 17 years of age is appropriate. Such an outcome addresses the concerns about potential improper use by the under 17 population by providing for the involvement of a learned intermediary to counsel young women who may engage in sexual intercourse about how to use Plan B and other contraceptives appropriately, and about the risks associated with engaging in unprotected sexual intercourse.

> D. Effect of having both Rx and OTC versions of Plan B

The OND reviewers and the CRLP petition argue that labeling Plan B to be sold without a prescription to women 16 and over, and with a prescription for women under 16, could have the unintended public health consequence of limiting access to women of all ages.[16] This is not a factor FDA would normally consider in making a switch decision, as it is not in the criteria for non-prescription status in the statute or FDA's implementing regulations. FDA's approval decisions are based on whether products can be safely and effectively used by the population for whom they are indicated. In the case of Plan B, I have concluded that the Rx designation for women under age 17 is necessary for the safe and effective use of the drug by that age group. Furthermore, I believe that Plan B has been shown to be safe and effective without a prescription for women 17 and older. I believe that if Plan B is made available OTC to women 17 years and older, this will significantly expand access for most women and will enhance the public health by reducing the risks of unintended pregnancies and the number of abortions. However, my view with respect to Plan B's approvability for OTC use for women age 17 and older and for women under age 17 rest on whether the data demonstrate that the product is safe and effective for each group.

## IV.   Precedent

Decisions on whether a drug should be switched from Rx to OTC status involve a case-by-case risk/benefit analysis that considers the drug at issue, the indication, and the population for whom OTC use is proposed. As described below, my views regarding Plan B are readily distinguishable from prior decisions made about other contraceptive OTC products and non-contraceptive OTC products.

For example, some OND reviews question whether having both Rx and OTC versions of the same drug for different populations parts from precedent in that other non-prescription forms of birth control are available OTC to women of all ages. I do not dispute that such products are available OTC, but submit that both the inherent risks of Plan B as a systemically absorbed hormonal product, which carries significant risks if used improperly, and the absence of demonstrated safe OTC use distinguish Plan B from other contraceptives available OTC to women under age 17. Other forms of contraception such as condoms and spermicides, including Nonoxynol-9 (N-9), have been available OTC for

---

[16] These reviewers based their analysis on Barr's proposal which used age 16 as the cutoff for OTC use.

6

many years, and have a record of decades of safe use with OTC availability. In addition to their record of safe OTC use, they do not represent the same level of potential risk as oral hormonal contraceptive products because they do not involve systemic absorption of appreciable quantities of pharmacologically active substances. FDA recently proposed to add warnings to products containing N-9 to caution consumers that frequent use may increase the risk of transmission of sexually-transmitted diseases. FDA has determined that, with these warnings, such products remain generally recognized as safe and effective for OTC use. In contrast, however, Plan B does not have a record of safe OTC use, and the supplement did not provide the data necessary to support an OTC switch for women under age 17 (either with or without specific warnings on the label).

In addition, some of the OND reviews point out that other non-contraceptive OTC drug products have been approved as safe and effective for a wide range of ages in the absence of data in young people. These reviews also cite the lack of precedent for distinguishing between Rx and OTC status based on age. One reviewer raises the concern that keeping Plan B Rx for women ages 15 and under might have ramifications for how we regulate other OTC drugs where there is known abuse by adolescents, such as dextromethorphan, laxatives, and analgesics.[17]

In my judgment, all of these criticisms overlook several critical facts. First, FDA consistently considers age-related data (or the absence of such data) when making regulatory judgments about how OTC drug products should be labeled. The key distinction between Plan B and most other OTC drugs relates to the degree to which data submitted for one population may be extrapolated to another. Second, my request for more data related to women under the age of 17 is grounded in the previously described difficulties associated with trying to extrapolate safety and effectiveness for this population from data submitted about women 17 years of age and older. Finally as discussed above, adolescent women under the age of 17 are cognitively less mature than women 17 and older, and they are also prone to a higher incidence of risk-taking behavior. These realities raise important questions about whether women under the age of 17 can use Plan B safely and effectively without the involvement of a learned intermediary.

Third, the need for additional data is also compelled by the specific risks associated with Plan B, which differ from most other OTC drug products. Plan B is a form of oral hormonal contraceptive that is currently available Rx-only because of the serious side effects that may be associated with long-term regular use. The approved indication for Plan B is for use after unprotected sex, e.g., when other birth control was not used or when physical barrier methods have obviously failed. Other non-contraceptive, OTC products, such as antacids, are indicated for uses that are normally associated with risks much less serious than unprotected sexual intercourse, unwanted pregnancy, and the risk of stroke. Before approving a drug for OTC use, FDA has a statutory obligation to assess whether that drug is safe and effective when used as directed by its target population. More information are needed demonstrating whether OTC use of Plan B by women under the age of 17 would increase their potential for harm from already risky behavior (e.g., by increasing the frequency of unprotected sex) or present serious health risks (e.g., stroke and blood clots) from frequent use of a high-dose oral contraceptive. Non-hormonal contraceptive OTC products do not pose such risks.

---

[17] Rosebraugh, review, January 12, 2005, at 1.

7

TUMMINO-31220

48

The question has been raised whether it is more reasonable to limit the use of Plan B to young adolescents through OTC labeling. [18] For example, some OTC products contain dosing information for a defined age range and advise the user to seek advice from a physician before using in children younger than the defined age. Some suggest that this approach should be adopted for Plan B, asserting that the best way to address any lack of data for women under age 16 would be to make the product available OTC only and to label the product "not for use under age 16," or "for children under the age of 16, consult a physician."

I have considered this. However, while there are many such labels, most such warnings are the result of recommendations made by expert panels that were first convened when FDA began the OTC Drug Review in the early 1970s. Among other things, these panels helped FDA determine on a drug-by-drug basis what safety and effectiveness data, if any, could be extrapolated to children. These panels made recommendations to FDA about whether the adult doses were appropriate for children, how doses should be modified based on age, or whether the product should not be used at all (or only on the advice of a physician) for certain age groups. Based on these analyses, FDA promulgated OTC drug monographs that set forth the conditions under which certain OTC drugs are generally recognized as safe and effective for certain uses. Several of these monographs include age-related warnings to clarify that, based on what we know about the drugs, they are not generally recognized as safe and effective for OTC use for certain age groups (e.g., 21 CFR 332.30; 333.250; 341.72). This approach makes sense in the context of most OTC drugs because the populations to which the warnings generally apply -- children ages 6 and under -- do not self-diagnose and do not purchase OTC drug themselves. Instead, the warnings target adults who purchase the products and for whom the products are intended. Similarly, many such OTC products are also sold in child-proof packaging. In the case of Plan B, however, the population for whom the drug is Rx-only includes persons who are old enough to visit pharmacies and purchase OTC drug products for their own use. Because the data are not adequate to show that adolescents under the age of 17 are able to understand the instructions for use and would use the product as intended in the label, it would be inappropriate to rely solely on labeling to limit inappropriate use by younger women.

Finally, I do not believe that this position sets a precedent for requiring more data in younger age groups for prescription, non-emergency use, oral contraceptives. As indicated previously, these oral contraceptives are available at this time only by prescription. Experience has shown that with the involvement of a learned intermediary, prescription oral contraceptives can be used safely and effectively by women post-menarche under all conditions in the approved labeling.

## V.    Other Issues Raised in the Citizen Petitions

### A.  Whether Plan B is an abortifacient

Two of the comments on the CRLP petition allege that Plan B is an abortifacient. One of these comments suggests that marketing it as a contraceptive would be misleading. The second comment suggests that because it is an abortifacient, informed consent and the intervention of a physician are necessary.

---

[18] Rosebraugh, et. al. review, January 12, 2005, at 2.

8

There are three theoretical mechanisms by which progestin-only, emergency contraceptive, drug products (e.g., Plan B) may prevent pregnancy. These include (1) prevention of ovulation or disruption of the normal peri-ovulatory events resulting in ovulatory dysfunction, (2) interference with the actual process of fertilization by impeding the migration of sperm into the distal portion of the fallopian tubes/abdominal cavity or disrupting the processes that sperm undergo prior to fertilization of an ovum, and (3) prevention of implantation by a direct effect on the endometrium of the uterus. Data from studies in women on the mechanism of action of progestin-only drug products conclusively demonstrate that these products prevent ovulation and/or disrupt normal peri-ovulatory events resulting in ovulatory dysfunction. It is generally believed that this mechanism is responsible for most, if not all, instances in which emergency contraception prevents pregnancy. However, available clinical data do not exclude the possibility that these drug products, in a small percentage of women, also may prevent pregnancy by impeding fertilization of a released ovum or implantation. There are no clinical data that indicate that emergency contraceptive drug products will disrupt a fertilized egg that has already implanted.

Because of the possibility that Plan B may, in some instances, prevent pregnancy by a mechanism other than prevention of ovulation or disruption of the normal peri-ovulatory events, proposed product labeling for Plan B contains the following wording in the Section "How does plan B work?"

*"Plan B works like a birth control pill to prevent pregnancy mainly by stopping the release of an egg from the ovary. It is possible that Plan B may also work by preventing fertilization of an egg (the uniting of sperm with the egg) or by preventing attachment (implantation) to the uterus (womb), which usually occurs beginning 7 days after release of an egg from the ovary. Plan B will not do anything to a fertilized egg already attached to the uterus. The pregnancy will continue."*

This labeling adequately informs women that in some cases Plan B could prevent attachment of a fertilized egg to the uterus. Thus, women are provided appropriate information for making an informed choices about its use.

Under DHHS regulations, "Pregnancy encompasses the period of time from implantation until delivery."[19] Therefore, because the product does not work by interrupting an established pregnancy, it is not considered an abortifacient.

    B.  Whether OTC availability of Plan B would increase the risks of ectopic pregnancy

One of the comments opposing the petition raises the concern that OTC availability eliminates necessary clinical monitoring to address the risk of ectopic pregnancy. In the United States, ectopic pregnancies account for approximately 2% of reported pregnancies in the general population. Among women using progestin-only, oral contraceptives for routine contraception, 50 out of 1,000 women will get pregnant, and approximately 5 out of these 50 women (10%) will have an ectopic pregnancy over the course of one year for an

---

[19] 45 CFR 46 202(f).

9

TUMMINO-31222

50

overall rate of ectopic pregnancy in women using progestin-only, oral contraceptives for routine contraception of 0.5%. Therefore, the absolute risk of a woman having an ectopic pregnancy while using a progestin-only, oral contraceptive (approximately 0.5%) is less than the 2% overall ectopic pregancy rate reported for women in the U.S.

The issue of the risk of ectopic pregnancy in women using progestin-only, emergency, contraception (e.g., Plan B) was thoroughly reviewed by Dr. Davis in his March 25, 2004 safety review of the original submission for the change from prescription status to OTC status for Plan B. In his review, Dr. Davis noted that there were 28 unduplicated cases of ectopic pregnancy in the FDA's AERS database. None of the reports was from the U.S., and there were no deaths among these 28 reports. The absence of any reported ectopic pregnancies in U.S. users of Plan B is reassuring as to its safety in this regard. However, it is not possible to fully estimate the risk of an ectopic pregnancy in users of Plan B from these data because of under-reporting of post marketing safety data. The risk of ectopic pregnancy in users of Plan B can be better assessed from clinical trial data. In his review, Dr. Davis states the following:

> *"Six large randomized clinical trials (RCTs) published in the medical literature in which levonorgestrel was used for emergency contraception were reviewed (see Table 5). Among these 6 trials, there were 7,889 evaluable subjects for whom 133 pregnancies and 2 ectopic pregnancies were reported (an incidence of 1.5% ectopic pregnancies among total pregnancies). The 1.5% incidence is consistent with the reported national rates of 12.4 and 19.7 per 1000 pregnancies in the U.K. (1.24%) and the U.S. (2.0%), respectively. These 6 trials provide good clinical evidence that levonorgestrel-only emergency contraception does not increase the chance that a pregnancy will be ectopic. Moreover, because emergency contraception is at least 75% effective in preventing a pregnancy, emergency contraception also reduces a woman's absolute risk of an ectopic pregnancy."[20]*

Although ectopic pregnancies have been reported in women who have used progestin-only, emergency contraception, the available data do not indicate that these women are at a greater risk for an ectopic pregnancy should Plan B be ineffective in preventing a pregnancy. Consequently, it is not necessary to require a prescription for Plan B in order to have the topic of ectopic pregnancy discussed by a physician with a woman who may use the product.

C.   Whether FDA should establish a pharmacy or pharmacist-only class of drugs
The Pharmacists Planning Service petition urges FDA, by regulation, to switch Plan B from Rx to a "pharmacist-only" status. FDA has stated in the past that "
[T]he agency believes it is questionable whether the distribution of lawfully marketed OTC drugs can be restricted [to a pharmacist only class of drugs] under current statutory provisions. Under the Federal Food, Drug and Cosmetic Act (the act) there is no provision for an intermediate class of drugs between OTC and prescription products. The statutory requirement that a drug either be limited to prescription dispensing or available OTC with adequate directions for use seems to preclude the agency from establishing a class of drugs

---

[20] Davis and Monroe Review, dated March 17, 2004, signed March 25, 2004, at page 22.

10

TUMMINO-31223

51

whose labeling would need to be supplemented by a pharmacist's instructions."[21]  In addition, the GAO concluded in its report titled "Nonprescription Drugs: Value of a Pharmacist-Controlled Class Has Yet to Be Demonstrated" that "[l]ittle evidence supports the establishment of a pharmacy or pharmacist class of drugs in the United States at this time . . ."[22] The recommendation that I am making that Plan B be OTC for women 17 years and older and prescription for women under 17 does not establish a new class of drugs, but rather preserves the existing statutory distinction between OTC and prescription drugs.

## VI.   Proposed Labeling and Educational Program

In the July 21, 2004 resubmission, Barr has proposed to package Plan B in a single package for both the Rx and OTC indications. Barr proposed that the package would say, "Rx only for women age 16 and younger." Based on the data in the supplement, the labeling would need to be amended to say "Rx only for persons age 16 and younger." I find that the proposed labeling includes adequate directions for use in self medication for women ages 17 and older, and if amended to change age 16 to 17, would clearly convey that the product remains Rx for women under age 17.  Although FDA has not previously approved a product with a single package for both prescription and OTC use, I find this packaging configuration to be adequate.

Barr Laboratories' proposed labeling was reviewed by the Division of Over-The-Counter Drug Products on November 15, 2004, and the Division requested changes to the labeling on December 22, 2004, and January 14 and 19, 2005.  Barr submitted revised proposed draft labeling on January 12, 18, and 19, 2005.  The revised labeling was reviewed and found acceptable by the Division on February 7, 2005.

The proposed labeling includes a consumer information leaflet that elaborates on the information contained on the Plan B outer carton and inner packaging.  Among the important information that is included in the consumer information leaflet is information about how Plan B works, when it is appropriate to use Plan B, how often it should be used, side effects and warnings, and directions for use.  In addition, Barr Laboratories has proposed an educational program (Convenient Access Responsible Education Program, CARE) with the following elements:  (1) labeling, packaging, web site, and informational 24-hour toll-free number, (2) education initiatives for healthcare providers and pharmacists, (3) distribution plans, and (4) monitoring efforts to assess whether the Rx/OTC age distinction is understood and adhered to.

While Barr's proposed labeling and educational program provides additional information to help women ages 17 and older use Plan B safely and effectively, it does not serve as a substitute for the data necessary to support a switch to OTC use for women under age 17, and it does not constitute the same level of supervision that a learned intermediary provides when writing a prescription.

## VII.   Pediatric Research Equity Act of 2003 (PREA) Requirements

---

[21] Response to Citizen Petition submitted by D.C. Huffman, Jr., American College of Apothecaries, Dec. 3, 1984-page 3.

[22] GAO/PEMD-95-12

11

TUMMINO-31224

52

PREA requires that all applications for new active ingredients, new dosage forms, new indications, new routes of administration, and new dosing regimens contain an assessment of the safety and effectiveness of the product in pediatric patients unless this requirement is waived or deferred. The Division of Pediatric Drug Development (DPDD) conducted a review of the supplemental application to switch Plan B to OTC status for women 16 years and older and concluded the sponsor's submission meets PREA requirements for post-menarchal females, and that studies in males and premenarchal females should be waived.

I agree that the proposed switch meets the requirements of PREA but use a somewhat different analysis than DPDD. First, I believe that only the switch of Plan B to OTC status for women 17 and older triggers the PREA requirements. As the DPDD notes, the original NDA for prescription Plan B was submitted on January 29, 1999 and approved on July 28, 1999. Therefore, PREA did not apply to the original application because it was submitted before PREA's effective date of April 1, 1999. The only change from the original application proposed by Barr for Plan B is to switch Plan B to OTC status for women 16 years of age and older. I have found that the data only support switching Plan B to OTC status for women 17 years of age and older. Therefore, the only relevant pediatric population at issue is the population of women 17 to 18 years of age who would be using Plan B OTC.

The safety and effectiveness of Plan B in all women age 17 years of age and older has been demonstrated in the actual use and labeling comprehension studies submitted with this supplemental application. I find, therefore, as did DPDD, that the safety and effectiveness of Plan B in the relevant pediatric population (ages 17-18) has been demonstrated, and the requirements of PREA have been met.

## VIII. Conclusion

In conclusion, I find that as a matter of science, Barr's July 21, 2004 proposal to switch Plan B to OTC status meets the statutory standards for approval of an NDA supplement set forth in 21 U.S.C. 355(d) for women age 17 and older, but does not meet the statutory standards for women under age 17. If additional data on actual use and labeling comprehension in women under 17 are provided, or Barr is able to demonstrate that women age 16 can be differentiated from younger women in the actual use and label comprehension studies, I am prepared to reevaluate my conclusions.

12

TUMMINO-31225

---

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

---

/s/

----------------------

David Hilfiker
8/26/2005 11:01:36 AM
CSO
My assistance in the finalization of this memo does
not indicate my agreement with its content or
recommendations. I am participating at the request of
D.Throckmorton, CDER, and I am not acting on
behalf of the Office of Nonprescription Products or
OND.


Steven Galson
8/26/2005 02:36:45 PM
MEDICAL OFFICER

TUMMINO-31226

54

# Chart of Excerpts from FDA's Administrative Record Regarding OTC Application for Plan B

**Excerpts from FDA's Administrative Record**
**Regarding OTC Application for Plan B**

| Name, Position, Date, & Bates Numbers | Quoted Passages |
|---|---|
| Curtis J. Rosebraugh, MD, MPH<br><br>Deputy Director, Division of OTC Drug Products<br><br>3/23/04<br><br>30745-30746, 30758-30759 | "On February 18, 2004 a presentation of summary data was made to Commissioner McClellan (attachment 1) and attended by Janet Woodcock, John Jenkins, Steven Galson, Sandy Kweder and staff from the ODEs and divisions responsible for the review of the application. Included in the presentation were the Division's and ODE's recommendations for OTC marketing status without restriction. Dr. McClellan expressed concern about adolescent behavior, although he did not articulate the exact nature of his concern, what ages were included in his concern, what data was lacking or a path forward for the sponsor. Age restrictions on sales were briefly discussed, but the commissioner indicated that this type of program would probably require further public discussions.<br><br>The Divisions and Ode's subsequently met with Drs. Woodcock, Jenkins, Kweder and Galson on February 19, 2004. At this meeting, Dr. Woodcock expressed that she felt that the commissioner (and herself) was concerned with adolescents and stated that she felt we did not really know what behaviors adolescents would exhibit. As an example, she stated that we could not anticipate, or prevent extreme promiscuous behaviors such as the medication taking on an "urban legend" status that would lead adolescents to form sex based cults centered around the use of Plan B. Dr. Galson indicated that he shared Dr. Woodcock's concerns.<br><br>\*\*<br><br>"A summary of the data reviewed demonstrates that:<br>• The Actual Use study demonstrated that users not receiving previous health care provider counseling had similar timing of dose and contraceptive behaviors compared to those users having had received prior health care provider counseling.<br>• The Dial study demonstrated that females 18y/o and younger use ECP for the same reasons and had similar timing of medication |

1

55

|  |  |
|---|---|
|  | and repeat use frequency as older females.<br>• The Gold study demonstrated that 15-17 y/o had the same sexual and contraceptive behaviors as older females, 15-17 y/o with advanced provision had the same sexual behaviors as 15-17 y/o obtaining the medication from a clinic and the advanced provision group started the medication 10 hours sooner on average.<br>• The Raines study demonstrated similar contraceptive behaviors between 15-17 y/o compared to 18-24 y/o and similar sexual behaviors in adolescents obtaining advanced provisions compared to adolescents using pharmacy access.<br>• The Washington State data demonstrated that since pharmacy access has been granted to Plan B in 1997:<br>    -Adolescents pregnancy rates have decreased<br>    -Adolescent abortion rates have decreased<br>    -The total number of adolescent abortions have decreased<br>    -STD rates have remained below national averages<br>    -The national ranking for Chlamydia has decreased from 31st to 35th<br>    -The national ranking for gonorrhea has decreased from 39th to 40th<br><br>There is compelling data evidencing that Plan B fulfills regulatory requirements for OTC marketing. An overwhelming majority of members comprising two advisory committees, with 12 out of 13 NDAC members and 12 out of 15 ACRHD members, voted for full OTC approval. There is a rich body of literature demonstrating appropriate and safe use of Plan B under decreased restrictions to access conditions. This memorandum reaffirms my previous recommendation that Plan B should be approval [sic] for OTC marketing without restriction." |
| Daniel Davis, MD, MPH<br><br>Medical Officer, Division of | "Three members of the joint Advisory Committee did suggest the need for an age restriction and/or risk management steps to evaluate the impact of OTC |

2

56

| | |
|---|---|
| Reproductive and Urologic Drug Products<br><br>3/17/05<br><br>30788, 30789, 30791, 30807, 30810-30812 | availability of emergency contraceptive pills (ECPs) on sexual behavior, especially in the adolescent group (under age 18). Of concern was a potential increase in "risky" behavior such as decreased use of condoms, an increase in STIs, and a change to less reliable methods of contraception. This reviewer (DD) did an extensive review of the medical literature and unpublished primary data on adolescent behavior associated with increased availability of emergency contraception. The weight of the evidence does not support the concern that adolescents will engage in riskier behavior if emergency contraception is readily available OTC. The proposed label for the OTC product clearly states that Plan B is <u>not</u> for routine contraception and that it does <u>not</u> protect against STIs. The sponsor's proposed postmarketing CARE program is aimed at health-care provider and consumer education, especially in the areas of responsible behavior, reliable methods of regular contraception, and prevention of STIs. It is this reviewer's opinion that several investigator-initiated on-going EC studies will provide additional information about both potential public health risks and benefits for <u>women of all ages</u> associated with wider availability of emergency contraception."<br><br>**<br><br>"Clinical data that were the focus in this safety review were provided by the Applicant or were obtained from other sources and included the following: (1) postmarketing safety data for Plan B provided by the Applicant; (2) data provided by the Applicant from published studies in which levonorgestrel was used for emergency contraception or postcoital contraception; (3) Periodic Safety Reports and MedWatch reports for Plan B previously sent to the FDA; (4) other published and unpublished studies by individual investigators not provided by the Applicant; and (5) an open-label safety-only study in 60 adolescent girls ages 13-16 who took 0.75 mg levonorgestrel tablets. Data from 3 previously unreported clinical trials sponsored by the Applicant also were provided in the present submission and are reviewed primarily by other reviewers. These studies were: (1) Study 9728 – a label comprehension study that enrolled 656 women; (2) Study 9727 – an Actual Use Study in which 540 |

3

subjects, 14-44 yr. of age, received Plan B; (3) Study PK-002 00 a single-period pharmacokinetic study to determine the pharmacokinetics of oral levonorgestrel in healthy adolescent females, 13-16 yr. of age.

\*\*

"6. Adolescent use. Based on a limited amount of data from several studies, repeat use or reliance on emergency contraception for routine contraception does not appear to be common in adolescents and is comparable to that in older women."

\*\*

- "Studies show that women of all ages with easier access to emergency contraception are more likely to use it when needed, potentially reducing unintended pregnancies and the number of induced abortions.
- Guidelines from the World Health Organization, American College of Obstetricians and Gynecologists, and the American Society for Emergency Contraception clearly state that although frequent use of emergency contraception is not recommended, repeat use may be offered. In other words, there is no safety issue with the repeated use of emergency contraception."

\*\*

- "The above studies greatly expand the number of adolescents for whom we have data concerning the use of emergency contraception and its impact on "risky behavior." There were over 1,000 adolescents age ≤16 yr., and almost 2,000 age ≤17 yr. When possible, this group of young adolescent (17 yr. and younger) was compared to the older adolescents age 18-20 yr.
- The statewide DIAL EC Project in North Carolina mimicked an OTC setting in many ways. Women did not have to go to a clinic or health care provider to get a prescription; they had to self-determine that they needed emergency contraception, make a phone call to the coordinating center, and then pick up the ECPs at a local pharmacy or Planned Parenthood Clinic (PPC). As in the OTC setting, they had to pay for the

4

58

| | pills and more often chose to go to a local pharmacy than to a PPC. More than 8,700 prescriptions were issued to the 7,756 participants over a 29-month period." <br><br> ** |
|---|---|
| | • "These data show that the use of emergency contraception in the younger adolescent group is similar to that in the older adolescent group. Because condom use is known to be higher in the younger adolescent group, and a condom accident is a common reason to use emergency contraception, it is not surprising that the Jackson and Raine studies each showed a higher percentage of emergency contraception use in the younger age group, although he differences were not large. <br> • The DIAL EC data, which provides the largest single database on adolescent use of emergency contraception, shows virtually the same percentage of use for women 18 yr. and under (82%) compared to that in women over 18 yr. of age (84%)." <br><br> ** <br><br> • "The above findings clearly demonstrate that the younger adolescent group had no difficulty complying with the correct dosing regimen and compared favorably with the older adolescent group." <br><br> ** <br><br> • "The above findings demonstrate that the younger adolescent group did not change to a less effective method of contraception, use condoms significantly less, or behave in an inappropriate way due to "easy access" to emergency contraception because of advance provision. This suggests that ready access to OTC Plan B also would have little impact on sexual behavior and contraceptive practices in younger adolescents." |
| Donna Griebel, MD <br><br> Deputy Director, Division of Reproductive and Urologic | "Reviewer Comment: The specific cause of Dr. Hager's concern about the lack of literacy testing in the younger age group of this study is not stated. The general good performance of the younger age |

5

| Drug Products 4/1/04 30830-30831, 30833, 30835, 30876-30877 | participants in this study and the actual use study suggests that the younger age group can read and understand the label. The label comprehension study included females as young as age 12, and the literacy testing identified 395 older women who read at the 6th grade level. |
|---|---|
| | It is the <u>actual use study</u> that ultimately tests label performance, by evaluating how accurately the consumer implements the intended label message. Label comprehension studies are used by sponsors to optimize consumer performance in the subsequent actual use study by identifying where the label can be strengthened for that study. Nevertheless, Dr. McClellan and members of senior CDER management have informed both review divisions that the literacy testing limitations of the label comprehension study, and the data from that study are sources of concern they have factored into their decision regarding approvability of the nonprescription switch. Because of these concerns, in this section I will review the communication objectives of the label comprehension study, discussing the relevance of these objectives, with a focus on performance of the lower literacy group and the younger age group relative to the rest of the study population.<br><br>Reviewer Comment: Placing a greater than usual emphasis on the label comprehension study for this product compared to the actual use study is not appropriate or usual review practice in evaluating a prescription to non-prescription switch, and is hampered by the relative strengths of the two study designs. The actual use study is a straight-forward and objective assessment of use performance, whereas the label comprehension study inserts another level of comprehension testing that is not informative to product label performance, since participants also had to understand <u>the questions</u> posed to them. Many of the questions used to assess label comprehension were poorly written and were easily misinterpreted. Some questions were of a higher level of complexity, and required an additional level of problem solving."<br><br>** |

6

60

|  | "The youngest age group had scores that were reportedly statistically significant different from other age groups on 3 study objectives. These statistical analyses were <u>not</u> adjusted for multiple comparisons, however, and on one the youngest age group scored <u>significantly better</u> (side effects objective). On another (doesn't prevent HIV/AIDS), the youngest group scored similar to the oldest age group, but lower than the 17-25 year olds. In only one objective (#6), the youngest age group scored both lower than the other age groups and less than 86% -- the objective evaluating understanding of timing of the second dose at 12 hours post the first. The youngest age group scored 77% on this compared to 90% in the 17-25 year olds and 82% in the 26-50 year olds. This objective was assessed with a single question, a <u>direct question</u> that asked when a woman should take the second tablet. The score for the overall population on this question was 86%. The literacy analysis found 82% of the lower literate and 93% of the higher literate participants answered the question correctly. The division reviewers believe the youngest age groups 77% correct score for the 12 hours dose interval is still acceptable, and as will be discussed later in this review, the younger age group performed similarly to the older age group in taking the second dose at 12 hours in the <u>actual use</u> study." <br><br> ** <br><br> "The issues expressed by a minority of the advisory committee members have been reiterated in meetings by senior CDER management as concerns shared by them with the Commissioner. These will be addressed here – first addressing the "artificial" OTC setting and whether there was a potential for prompting correct and appropriate use from the actual use study, either through its design or from exposure to health professionals in the clinic setting. The issue of provision of a single pack to women on study will be addressed in the context of the "artificial" OTC setting. Subpopulation performance issues will be addressed last, in the context of the major study endpoint results." <br><br> ** |
|---|---|

7

61

"The data and literature review discussed in this review were presented by the Divisions and Offices to CDER Senior management and Commissioner McClellan on February 18, 2004 to address the adolescent concerns that had been conveyed to us. The Divisions and Offices in that meeting shared their conclusions that the non-prescription switch of Plan B should be approved without age restriction because the benefit of this product outweighs risk in all age groups. We were informed that Commissioner McClellan and CDER Senior management do not concur with this risk benefit assessment and cannot support the non-prescription switch of Plan B. They have asked the sponsor to provide a restricted distribution plan that will exclude access of adolescents to the product without a prescription.

[apparent redaction]

Dr. McClellan indicated on February 18th that any restricted distribution program would need to be reviewed in an open public hearing. In response to Division and Office review staff concerns that the Advisory Committees had already clearly stated that the Committees did not support restricted distribution, including on the basis of age, Senior CDER management indicated that the committee assembled to discuss distribution restrictions would not have to consist of the same members as those who considered this NDA at the December meeting. Barr Pharmaceuticals has responded to the age restricted distribution plan request and has submitted that plan for review, presumably with the belief that this would be incorporated into a first cycle approval of this NDA.

**9.0 Deputy Director's Recommended Regulatory Action**

After thorough review of the label comprehension and actual use study data submitted in this NDA, the data from the large randomized controlled trials on advance provision of emergency contraception, the large single arm telephone access study from North Carolina (DIAL EC), the levonorgestrel safety database, the

8

62

| | vote and the minutes of the December Joint Session of the Nonprescription, and the literature addressing the public health issues surrounding the impact of improved access on sexual health and behaviors, I conclude that the risk benefit ratio of the nonprescription access to Plan B supports its approval for switch to non-prescription status. I have also concluded that it is unjustified to restrict access to the benefit of this product on the basis of age." |
|---|---|
| Daniel Davis, MD

Division of Reproductive and Urologic Drug Products

*Also signed by* Scott Monroe, MD, Medical Team Leader, Division of Reproductive and Urologic Drug Products

1/12/05

31020 | "There are no new safety findings that would preclude the approval of changing Plan B® from prescription status to over-the-counter (OTC) status for preventing pregnancy (i.e., emergency contraception) following unprotected intercourse or a known or suspected contraceptive failure in women of any age who are at risk of becoming pregnant. Data submitted by the Applicant during the original review cycle have shown that Plan B is sufficiently safe and efficacious when used in accordance with proposed labeling that it can be distributed over-the-counter without any age of distribution restrictions and without the need for any further clinical studies.

The Applicant, however, has requested that the product remain as a prescription-only product for adolescents under age 16 years. This reviewer does not believe that this request is warranted or desirable." |
| Curtis J. Rosebraugh, MD

Deputy Director, Division of OTC Drug Products

*Also signed by* Charles Ganley, MD, Director, Division of Over the Counter Drug Products and Jonca Bull, MD, Director, Office of Drug Evaluation V

1/12/05

31026-31027 | "Please refer to the action letter for all the deficiencies identified by Dr. Galson, but the main concern expressed by him was that he felt there was insufficient data to support a conclusion that Plan B could be used safely by adolescent women under 16 years of age.

The applicant has responded to these deficiencies in a July 21, 2004 submission with a proposal that would allow the product to be sold OTC to consumers over the age of 16 and to be sold by prescription only to consumers under the age of 16. This amendment is the subject of the current review and pending decision.

**Recommendations**

In my memorandum during initial review cycle, I |

9

concluded the following:

1) Plan B adequately meets the Durham-Humphrey Amendment criteria for OTC marketing without restriction;
2) Any system placing barriers to access would defeat the purpose of the drug and lessen its public health potential; and
3) Placing age restrictions for theoretical abuse by a small segment of the population would have ramifications for how we regulate other OTC drugs where there is known abuse by the population and by adolescents such as dextromethorphan, laxatives and analgesics.

I have not been presented with data that would dissuade me from my original conclusion. I also continue to believe that adequate data was submitted to allow Plan B to be marketed without regard to age. I also believe that the sponsor's original proposal for the CARE program would ensure proper use of Plan B by women of all ages, including adolescents.

In regard to the proposal submitted by the sponsor, I have many concerns regarding the regulatory precedent that approval of this plan would set and possible unintended consequences. I am concerned that the regulatory precedent that would be set by requiring adolescents to obtain a prescription to access an otherwise OTC contraceptive product may have implications for other OTC contraceptive products that are currently marketed which do not bear age restrictions and have not submitted adolescent data for OTC marketing.

In the past when the Division has felt that there was insufficient data to warrant labeling for a particular age group, we have labeled the product with language that reflects that under a certain age, a physician should be consulted, but an age restriction for sale of the product was not part of the labeling. We have handled age restrictions by placing them in the **Do Not Use** and **Ask a Doctor Before Use If** sections of the Drug Facts labeling. These warnings may be bolded to highlight the age restrictions (such as with stomach acid modifying agents). It should be noted that almost

10

64

|  | all OTC products are restricted from some group of the general population because of safety or efficacy concerns (e.g., restrictions by age, concomitant medications or disease severity). In previous cases, we have addressed these restrictions in labeling using the **Warnings** section of Drug Facts, but have not restricted sale of the product from these populations.<br><br>The labeling proposed for this product would include a statement to the effect that it can not be sold to anyone under the age of 16. We have not done this for other OTC products except for nicotine products, a case not applicable to Plan B because this is a requirement placed on nicotine delivery systems by the DEA. Placing an age restriction for sale may place an unacceptable legal burden on pharmacies which would have the undesired effect of limiting access. It is also unclear how an age restriction would be enforced in a pharmacy setting. Additionally, it is unclear what this new precedent would mean for those products that have statements regarding contacting a physician if under a certain age. Would they also be eligible to be prescription only for those age groups?<br><br>Finally, it is unclear what additional data could be provided on adolescent use that would be sufficient to lift the age restriction in the future.<br><br>For these reasons, I do not support a recommendation for an age restriction." |
|---|---|
| Donna J. Griebel, MD<br><br>Deputy Director, Division of Reproductive and Urologic Drug Products<br><br>1/12/05<br><br>31031-31032, 31033 | "No new safety and efficacy data has been presented in this NDA submission or in the Division's updated review of the medical literature and post-marketing safety reports for levonorgestrel that alters my original recommendation that the risk benefit ratio of non-prescription access to Plan B supports its switch to non-prescription status without age restriction. I continue to support Plan B's switch to nonprescription status without age restrictions. I cannot support the Applicant's proposal in the current NDA submission (which was made in response to the CDER Center Director's May 6, 2004 Not Approvable letter that informed the applicant that provision of information in support of marketing Plan B as a prescription-only product for women under the age of 16 years and as a |

11

| | nonprescription product for women 16 years of age and older was one of two pathways to obtain approval) to restrict access to the non-prescription product through a mechanism that requires that the product be sold by prescription-only to consumers under the age of 16. I do not support this approach for two reasons: |
|---|---|
| | 1)  Labeling the product to only be sold with a prescription to consumers under the age of 16 sets a precedent that could have negative consequence on current products sold as non-prescription products, including contraception products like condoms and spermicidal products. In instances where it has been believed that insufficient data exist to warrant labeling for a particular age group, the Division of Over the Counter Drug Products has labeled the product with an age under which a physician should be consulted, using language in the package Drug Facts labeling such as "Do Not Use" or "Ask a Doctor Before Use If". (See Division of Over the Counter Drug Products Review by Dr. Curtis Rosebraugh.)<br><br>2)  Labeling the product to only be sold without a prescription on the basis of age criteria could have the unintended public health consequence of limiting access to women of all ages. Enforcing the age restriction for a reproductive health drug could be considered an undesirable legal burden for pharmacies that prompts pharmacies that already carry the prescription-only product to cease carrying the product altogether. Additionally, there are multiple reported instances in the media and in the medical literature of pharmacists who refuse to fill prescription for the current prescription product because they believe it causes medical abortion. The public health goal of improving access of women to emergency contraception will not be achieved by the proposed age restriction if those pharmacists who object to the product on the basis of their personal beliefs remain in a position of controlling access to the product, even for those women 16 and older given that they will need to check age to allow access to the nonprescription product.<br><br>I concur with the reviews of Dr. Dan Davis and Dr. Scott Monroe from the Division of Reproductive and |

12

66

Urologic Drug Products that the sponsor's CARE (Convenient Access, Responsible Education) Program is reasonable. We have discussed with the Applicant that monitoring the adequacy of the program could be further improved by collecting and analyzing the questions consumers ask of the pharmacist in their queries to the 1-800 information call line along with demographic data collected those consumers who request information. This information could be used to refine labeling messages, if the analyses suggest changes could be helpful. The Applicant's response is pending.

In summary, I do not recommend that this application be approved with the Applicant's proposed age restrictions for reasons listed above. I believe that the product should be approved for switch to non-prescription status without age restriction."

**

"At the December 16, 2003 Joint Session of the Nonprescription Drug Advisory Committee and the Advisory Committee for Reproductive Health Drugs the committees voted in overwhelmingly support of approval of the nonprescription switch. However, in a January 15, 2004 meeting, senior DCER management informed the Divisions and Offices that this application is not approvable. The reason for nonapproval that was conveyed at that meeting and in subsequent meetings was that there were inadequate data to support adolescent use in the over the counter setting. The Divisions and Offices were told that the Commissioner and senior CDER management believed that the number of adolescents in the actual use study was inadequate, that there were inadequate data to show that adolescents could dose the product correctly, and that adolescents needed a learned intermediary involved in their access to emergency contraception. The Divisions presented adolescent data in an efforts to address these concerns in a meeting with the Commissioner in February 18, 2004. These data, however, were considered inadequate to establish that there would be no potential for negative impact from non-prescription access to emergency contraception in the adolescent population.

13

67

| | This review will focus on the issues raised by senior FDA and CDER management to support their decision for nonapproval of this product for over the counter marketing and the public comments by individual advisory committee members that echoed these very same concerns. The reviewing divisions and offices have carefully examined these concerns and do not believe that scientific evidence supports nonapproval of this application. The Divisions and Offices have concluded that the risk-benefit ratio for this product supports its approval for nonprescription marketing, without an age restriction." |
|---|---|
| John K Jenkins, MD<br><br>Director, Office of New Drugs<br><br>1/14/05<br><br>31096-31098 | "I continue to believe that the sponsor has provided adequate information to support a conclusion that Plan B can be used safely and effectively by women of child-bearing potential for emergency contraception in the OTC setting without the need for intervention by a healthcare profession. I do not concur with Dr. Galson's conclusion that the data from the label comprehension and actual use studies conducted by the sponsor, taken together with data from published and unpublished literature, are inadequate to support the same conclusion for women less than 16 years of age. I therefore support approval of Plan B as an OTC emergency contraceptive without an age restriction and believe that the sponsor's proposal for "dual marketing" of Plan B as both a prescription and non-prescription drug should not be approved. I note that the FDA's Office of Chief Counsel is currently actively reviewing the legal issues associated with the sponsor's proposal for "dual marketing." Even if the sponsor's proposal is determined to be consistent with the current statutes and regulations I believe the proposal should be not be approved since there is, in my opinion, no scientific basis for the differentiation in prescription and non-prescription status based on age and such an approach is inconsistent with well established FDA precedent with regard to labeling OTC products for use in adult and pediatric populations.<br><br>I will briefly expand on the bases for my conclusions.<br><br>Dr. Galson is correct in noting that a relatively small |

14

68

number of subjects less than 16 years of age were included in the label comprehension and actual use studies conducted by the sponsor. As I noted in my previous memorandum, given the setting in which these studies were performed it is likely that the observed age distribution is reflective of the age distribution of the population of women who will use Plan B if approved for non-prescription marketing. Further, I believe that it is entirely reasonable to extrapolate the findings from the older women in these trials to adolescents given well established agency precedent for extrapolating date from studies in adults and older adolescents to younger adolescents and the fact that there was no suggestion based on the data from the sponsor's studies that younger women were less able to use the product correctly in a stimulated OTC setting than older women. There is no pharmacologic or safety issue for the use of levonorgestrel at the dose found in Plan B in younger adolescents compared to older women, and the approved prescription labeling for Plan B and other oral contraceptives that contain levonorgestrel make no distinction based on age.

Dr. Galson has cited developmental differences between adolescents and older women in support of his concern about extrapolation of findings from older to younger women. In my opinion, the concerns Dr. Galson raises are more applicable to the ability of adolescents to make reasoned decisions about engaging in sexual intercourse, not their ability to understand how to use Plan B safely and effectively as an emergency contraceptive should they engage in unprotected sexual intercourse. The Plan B regimen in very simple (one tablet as soon as possible after unprotected intercourse and another tablet 12 hours after the first) and in many ways easier to follow than many other OTC products that are labeled for use by adolescents and younger children (e.g., some OTC products require a decision about the proper dose to be taken based on age or weight, require frequent repeat dosing, and contain multiple warnings and "Do not use if" statements). Further, levonorgestrel, the active ingredient in Plan B, has a very high margin of safety. This high margin of safety combined with the packaging, makes it very unlikely that a serious

15

69

adverse event would occur if an adolescent incorrectly dosed the product.

With regard to the policy precedent, the agency has not to my knowledge previously approved marketing of a drug product as both prescription and non-prescription for the same indication based solely on an age distinction. Products that are currently marketed as OTC products generally contain dosing information for a defined age range; e.g., children 6 years and older, and for children younger than the defined age range the labeling instructs the user to seek advice from a physician before using. It is not clear why a similar approach, which has been effectively utilized for many years by the agency, could not also be applied to Plan B. A decision to approve Plan B as a prescription and non-prescription product for the same indication with the only difference being the patient's age sets an important policy precedent that must be carefully considered and justified. In my opinion, such an approval for Plan B cannot be justified based on scientific data (e.g., there is no unique safety concern for the drug in women under age 16 and in my opinion the data presented by the sponsor support a conclusion that younger adolescent women can use the product safely in the OTC setting) and such an approval has the potential to raise other serious scientific and policy issues. For example, other OTC contraceptive products are not marketed under such "dual" prescription and non-prescription status. Approval of plan B as a "dual" product based on age is likely to lead to petitions to the agency that other OTC contraceptives be similarly restricted, which could significantly alter the availability of contraceptives to sexually active adolescents, a group where pregnancy leads to serious short and long-term risks to the mother and the child. The potential policy implications on the OTC monographs, which do not currently distinguish between prescription and non-prescription status based on age, must also be carefully considered prior to approval of Plan B as a "dual" product.

As I noted in my prior memorandum on this application, I am sensitive to and respectful of the concerns that some may have regarding non-prescription access to Plan B by adolescents. Products

16

70

|  | that are indicated for uses related to sexual activity in adolescents raise concerns for some people that beyond a finding based on clinical trial data that the product is safe and effective its intended use in adolescents. These concerns are derived from individual views and attitudes about the morality of adolescent sexual behavior and also overlap with concerns about the role for parents and health care professionals in decisions about contraceptive use in adolescents. While acknowledging these concerns, I believe that the available data clearly support a conclusion that Plan B meets the statutory and regulatory requirements for availability without a prescription for all age groups. Such a conclusion is consistent with how the Agency has made determinations for other OTC products, including other forms of contraception available without a prescription. Further, I believe that greater access to this drug will have a significant positive impact on the public health by reducing the number of unplanned pregnancies and the number of abortions. While OTC access to Plan B for adolescents may be controversial from a societal perspective, I cannot think of any age group where the benefit of preventing unplanned pregnancies and abortion is more important and more compelling. An agency decision to approve Plan B as a "dual" product may have the paradoxical effect of decreasing access to and use of the product if pharmacies and pharmacists choose not to stock the product due to an unwillingness to participate In verifying the age of women who present to the pharmacy requesting Plan B or based on liability concerns. The age restriction will also be difficult to enforce and easy to bypass (e.g., an adolescent girl can simply have an older friend purchase the product for her) and in the end is not likely to serve its apparent intended purport of ensuring that younger adolescent women be guided in the use of the product by a healthcare professional.<br><br>For the reasons stated above, I believe that the proposed "dual" marketing strategy for Plan B should not be approved, and instead, the sponsor's original proposal for non-prescription marketing without restrictions based on age supported by their CARE program should be approved." |
|---|---|

17

71

| | |
|---|---|
| Steven Galson, MD, MPH<br><br>Director, Center for Drug Evaluation and Research<br><br>8/26/05<br><br>31214 | "Although Barr did not propose to switch the Rx status of Plan B for women under 16 years of age in its July 21, 2004 resubmission, the CDER reviewers in the Divisions of Reproductive and Urologic Drug Products and the Division of Over-the-Counter Drug Products (the review divisions), the Deputy Directors of the Offices of Drug Evaluation (ODE) III and V, and the Director of the Office of New drugs recommended that Plan B should be switched OTC for the entire population of women who might use the product, including women under age 16. For the reasons described below, I do not agree with these recommendations." |

18

72

# Memorandum of Jonca Bull, M.D.,

# January 21, 2004

Office Director Memorandum
Office of Drug Evaluation V
Office of New Drugs
Center for Drug Evaluation and Research

Subject :   NDA 21-045, Plan B (levonorgestrel) proposing Rx to OTC switch
Applicant: Barr Laboratories/Women's Capital Corporation
Date:       January 21, 2004

Purpose: This memorandum provides for concurrence with the reviews of Dr.
Rosebraugh and Dr. Leonard Segal and non concurrence with the recommended
regulatory action by Dr. Chen. This is not a summary but serves to articulate my
regulatory review concerns.

Regulatory History and Background
Over the Counter (OTC) availability of contraception is a well established and long
standing regulatory category of products. Monographs promulgated pursuant to the
provisions of 21CFR 330.5 provide for a category of "Contraceptive Products". The
Advisory Panel Report (published  45 FR 82014, December 12, 1980) on OTC
Contraceptives and Other Vaginal Drug Products (the Panel) placed nonoxynol 9 in
category I (safe and effective).

The panel noted strong consumer interest in labeling communicating product
effectiveness and clearly supported contraceptives as an appropriate category of product
for widespread availability. There were no concerns cited in the report as to use by
teenagers.

In addition, the current edition of the Code of Federal Regulations, 21 CFR 310.545(28),
lists OTC vaginal contraceptive drug products approved as of October 22, 1998. These
include dodecaethylene glycol monolaurate (polyethylene glycol 600 monolaurate),
Laureth 10S, methoxypolyoxyethyleneglycol 550 laurate, phenylmercuric acetate,
phenylmercuric nitrate, and approved as of  November 5, 2002, octoxynol 9.  These
additional regulatory examples are cited as evidence of a consistent and unquestioned
record of regulatory precedent of contraception as an appropriate and established OTC
product category.

Emergency Contraception Regulatory History
Based on extensive medical literature, on February 25, 1997, FDA announced in a
Federal Register (FR) notice that certain combined oral contraceptives are safe and
effective for emergency contraception and requested the submission of NDAs for this
use. Of relevance to the concerns of this memo, this FR notice by the agency did address
any need for data specific to use in teenagers. The agency has subsequently approved
New Drug Applications (NDAs) for Preven and for Plan B in 1998 and 1999,
respectively.

73

A citizen's petition requesting Rx to OTC switch of emergency contraception products was submitted to the Agency by the Center for Reproductive Law and Policy on February 14, 2001. The agency has not issued a final response to this petition.

NDA 21-045 for Plan B, is the first NDA submitted for an oral contraceptive product for the indication of emergency contraception for OTC marketing.

Overview of Submission
NDA 21-045, Plan B, Rx to OTC switch NDA application
Emergency contraception is defined as a method of pregnancy prevention to be started within 72 hours after a contraceptive failure or unprotected intercourse. Plan B (levonorgestrel) was approved in 1999 for this indication as an Rx product. For the purposes of this submission for the switch to OTC marketing, there are no outstanding efficacy concerns given that the proposed dose is the same as that approved for the prescription product. The labeling comprehension and actual use studies submitted have been extensively reviewed by FDA reviewers in the OTC and Reproductive Drugs divisions as well as in a public advisory committee in December 2003.

Regarding safety, the NDA database, ODS review, medical literature, as well as data from foreign marketing evidence a high level of safety for use of this product and that the product has an acceptable risk to benefit for its proposed OTC use.

Discussion
Concern has been raised by Dr. Chen of the following:
> 1. That the contraceptive behavior evaluation in the Plan B Actual Use Study is insufficient to assess whether OTC accessibility of Plan B may be associated with the risky (or unsafe) sexual behaviors over the long-term, particularly in the teenage population.

> 2. The behavior study literature does not provide strong evidence to address the inadequacy of the actual use study in assessment of risky sexual behaviors in the target OTC populations.

> 3. Some behavior studies in literature suggest that the advance provision of emergency contraception tends to prompt unsafe sexual behaviors in study populations.

The issues cited spuriously raise the review standard for approval of this product and indeed any contraceptive product. The issues are speculative and unbalanced in their proposition for the following reasons. The totality of data submitted has demonstrated an acceptable level of benefit to risk. There is no basis on which to assume that young women of child bearing potential would suddenly become promiscuous because of this product. Indeed, the data submitted evidenced a decrease in sexual activity short term. Conversely, there is also no basis on which to assume that minimizing available

74

contraceptive options will lead to a decrease in sexual activity by young women of child bearing potential.

The reviewer does not define what the risky sexual behaviors of concern are. Does the reviewer take into account that high risk sexual behavior could include sexual intercourse without recourse for pregnancy prevention? In this instance, the lack of emergency contraception as an option could conceivably be viewed as increasing the risk of high risk sexual activity.

The reviewer, particularly given the focus on teenagers, also does not take into account the following: the societal benefit based on the reduction of abortions and unwanted pregnancies as well as the societal cost of the higher morbidity associated with pregnancy at a young age to both the mother and the fetus, or more broadly, the costs to society due to parents who are not prepared for the responsibilities of child rearing.

I am unable to identify evidence in the medical literature to support the assertion that the availability of contraception directly increases high risk sexual behavior. It is however well documented that high risk sexual behavior is largely rooted in a history of child abuse, partner violence and abuse, and societal complexities of poverty and circumstances of inadequate parental involvement. Plan B nor any contraceptive can address these issues but clearly, from a public health perspective, do have a place in minimizing unplanned pregnancies and abortions resulting from these tragic circumstances. Indeed the agency's regulatory mandate is not to regulate behavior or morality but to serve the public by ensuring that safe and effective products are made available for prescriber and patient choice.

With regard to sexually transmitted infections (STIs), again, the logic is flawed and speculative. The reviewer fails to address relevant issues ranging from condom failure to drug resistance. Furthermore, from a public health perspective, there is far graver consequence to a lack of pregnancy prevention options, as evidenced by HIV fetal transmission during pregnancy, than the hypothetical concern proposed by the reviewer.

The reviewer has in effect proposed a new and unusual regulatory standard for contraceptive drug products. Based on this standard, should the agency undertake a call for data requesting that all contraceptive products, OTC and Rx, must demonstrate that use of their product does not increase high risk sexual behavior by teenagers or STIs? How the agency would credibly work with sponsors to develop a Phase 4 study to address these issues in light of privacy concerns, for the individual and legally, defies conceptualization.

As to the findings of the actual use study, it is noted that the actual use data submitted is consistent with prior Agency findings of acceptability for OTC switch determination. Specific to Agency concerns on teenagers, the findings of the study did provide a sufficient representation of subjects in the lower age groups of women of childbearing potential who are sexually active. It is noted that incorrect use was <u>lower</u> among subjects 16 years and younger (13.6%) than in those 17 years and older (26.4%). There was also a

75

higher percentage of subjects in this age group who changed to a more effective contraception (28.6% vs. 10.5%). Although a difference was found in taking of the protocol specified timing for the second dose (75.9% vs. 93%) there was no evidence that the difference in timing of the second dose adversely impacted efficacy and the reduction of the risk of pregnancy in the study population for this subgroup.

In conclusion, the sponsor has adequately demonstrated that women of reproductive potential across relevant age subgroups can use the product appropriately. The data submitted by the sponsor meets statutory requirements for safe and effective use in an OTC setting. Given that conditions of safe and effective use for this product optimally require ease of availability, there is a compelling rationale that OTC availability is imperative to better ensure proper use of the product.

I am in agreement with the overwhelmingly favorable assessment and the majority votes to agency questions by the Joint Advisory Committee (Reproductive Drug Products and the Non-Prescription Drug Products, December 2003) that adequate data has been submitted to approve Plan B for OTC marketing with product labeling modifications added to address concerns raised at this advisory committee meeting and in the Agency reviews.

76

This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.

/s/

Jonca Bull
1/21/04 01:07:44 PM
MEDICAL OFFICER

77

# Marc Kaufman,

*FDA Official Quits Over Delay on Plan B: Women's Health Chief Says Commissioner's Decision on Contraceptive Was Political*

## <u>The Washington Post</u>

## September 1, 2005

Case 1:05-cv-00366-ERK-VVP    Document 80-2    Filed 01/06/06    Page 98 of 127 PageID #: 1392

**washingtonpost.com**

# FDA Official Quits Over Delay on Plan B

Women's Health Chief Says Commissioner's Decision on Contraceptive Was Political


Advertisement

By Marc Kaufman
Washington Post Staff Writer
Thursday, September 1, 2005; A08

The top Food and Drug Administration official in charge of women's health issues resigned yesterday in protest against the agency's decision to further delay a final ruling on whether the "morning-after pill" should be made more easily accessible.

Susan F. Wood, assistant FDA commissioner for women's health and director of the Office of Women's Health, said she was leaving her position after five years because Commissioner Lester M. Crawford's announcement Friday amounted to unwarranted interference in agency decision-making.

"I can no longer serve as staff when scientific and clinical evidence, fully evaluated and recommended for approval by the professional staff here, has been overruled," she wrote in an e-mail to her staff and FDA colleagues.

Crawford said last week that unresolved regulatory issues made it impossible to approve expanded use of the emergency contraceptive. Wood said the decision was widely seen in the FDA as political.

"Many colleagues have made it known that they are deeply concerned about the direction of the agency," she said in an interview.

Wood also said other FDA officials who are typically involved in important matters were kept in the dark about the contraceptive, called Plan B, until Crawford announced his decision, which she believed was made at higher levels in the administration. Wood said that when she asked a colleague in the commissioner's office when the decision would be made, the answer was, "We're still awaiting a decision from above; it hasn't come down yet."

In a statement, the FDA said Wood's resignation "is unfortunate as we work toward solving the complex policy and regulatory issues related to Plan B. . . . The FDA is committed to protecting and advancing women's health, and under Susan Wood's leadership, the agency has made significant strides."

Before coming to the FDA in 2000 in a civil service position, Wood was the director for policy and program development at the Department of Health and Human Services' Office on Women's Health, where she led the development of policy for the office, and recommended initiatives for the secretary and assistant secretary for health. She has also worked as a research scientist specializing in the biochemistry of smell at Johns Hopkins University.

Her FDA job description was to "be a champion for women's health."

The Plan B issue has become an emotional one both for advocates who believe that the contraceptive will reduce the number of unwanted pregnancies and abortions, and for opponents who believe that it will encourage teenage promiscuity and that, in some cases, its mode of action constitutes abortion.

The FDA and mainstream medical associations say Plan B, which is generally effective in preventing pregnancy if taken within 72 hours of a contraceptive failure or unprotected sex, prevents a pregnancy rather than ends one.

Religious conservatives and some members of Congress say that pregnancy begins with the fertilizing of the egg. They argue that anything that harms the resulting embryo amounts to abortion. Although Plan B generally works by preventing fertilization, researchers believe that in some cases it might keep a fertilized egg from implanting in the uterus.

Wendy Wright, policy director for Concerned Women for America and a critic of easier access to Plan B, welcomed Wood's resignation.

"Thank goodness there is now one less political activist at the FDA who puts radical feminist ideology above women's health," she wrote in a statement. "Now that Susan Wood has some free time on her hands, she can look at the studies from countries that have made the morning-after pill available without a prescription. She'll find it creates a public health hazard, with no decrease in pregnancies, no decrease in abortion, but a substantial increase in sexually transmitted diseases."

Plan B has been available as a prescription-only drug since 1999, and distributor Barr Laboratories Inc. applied in 2003 for permission to sell it over the counter. An FDA expert advisory panel voted 23 to 4 in favor of the switch, which agency staff members believe would significantly cut the number of abortions and unintended pregnancies.

The FDA rejected the application last year, however, saying it did not have enough information about the possible consequences on teenagers younger than 16. At the suggestion of FDA officials, Barr Labs filed a new application that would allow over-the-counter sales for women 17 and older and prescription-only sales for those younger than 17. Crawford said Friday that the proposed division by age poses "unique" regulatory problems that cannot be resolved without a formal rule-making, which could take years.

Crawford also said FDA scientists and executives had concluded that the drug could be safely sold over the counter.

Many supporters of the Plan B application -- including Sens. Hillary Rodham Clinton (D-N.Y.) and Patty Murray (D-Wash.) -- accused Crawford of making a political decision that ignored science and public health. The two senators were especially angry at Crawford's ruling because they had lifted a hold on his pending nomination based on promises, relayed by HHS Secretary Mike Leavitt, that the Plan B issue would be resolved by Sept. 1.

Clinton and Murray have accused the administration of breaking its promise, but Leavitt has disagreed. "The commitment was they would act," he told Reuters on Monday. "Sometimes action isn't always yes and no. Sometimes it requires additional thought."

© 2005 The Washington Post Company

Advertising Links                                        What's this?

Save on All Your Calls with Vonage
When looking for local regional and long distance calling, use Vonage to make calls to all
50 states and Canada  Get voicemail, great international rates and more  Sign up today
www vonage com

Refinance Rates Fall Again
Get $150,000 loan for $720 per month  Refinance while rates are low
www lowermybills com

Compare Mortgage Offers
Up to four free mortgage, refinance or home equity offers - one easy form.
www nextag com

# "Nightline The Morning After"

# Interview with Susan F. Wood

# September 27, 2005

Case 1:05-cv-00366-ERK-VVP   Document 80-2   Filed 01/06/06   Page 101 of 127 PageID #: 1395

88 of 100 DOCUMENTS

Copyright 2005 American Broadcasting Companies, Inc
ABC News Transcripts

SHOW: NIGHTLINE (11:35 PM ET) - ABC

September 27, 2005 Tuesday

**LENGTH:** 3670 words

**HEADLINE:** NIGHTLINE THE MORNING AFTER

**BODY:**

TED KOPPEL, ABC NEWS

September 27th, 2005. I'm Ted Koppel and this is "Nightline." Tonight, a small pill sets off a big debate

DOCTOR, MALE

There's no doubt, there's no question about the safety of Plan-B

DOCTOR DAVID HAGER, FDA ADVISORY PANEL

My concern is for the women and unborn children in this country.

TED KOPPEL

In the battle over emergency contraception, did politics trump science?

DOCTOR

This is an example of political influence that's hijacked the FDA.

TED KOPPEL

At least one FDA official agrees   That's why she quit

DOCTOR SUSAN WOOD,

FORMER FDA DIRECTOR OF WOMEN'S HEALTH OFFICE

This is contraception  It is not abortion. The only connection it has with abortion is that it can prevent them

TED KOPPEL

Tonight, "the morning after," fighting over birth control

graphics: the morning after

TED KOPPEL

(Off Camera) Perhaps because it's been called the morning-after pill, there's some genuine confusion as to what it does and does not do. So, let's begin by explaining what Plan-B, the other name by which the pill is known, let's begin by explaining what it is not. It is not the same thing at all as RU-486. I can see some of your eyes glazing over already. But a few years back, RU-486, which was developed in Europe and ultimately approved only by prescription here in the United States, was a raging political debate. It was, quite simply, a chemical abortion pill. Plan-B is not. In reality, it works just like a high-test birth control pill  But if taken as soon as possible, within 72 hours after intercourse, it prevents pregnancy by stopping the release of an egg from the ovary, or -and this is the controversial part, by preventing the implantation of a fertilized egg in the uterus  Plan-B has actually been available by prescription since 1999  Controversy arose four years later in 2003, when the drug's distributor tried to get the Food and Drug Administration to approve Plan-B for sale over the counter. A few weeks ago, and the event got lost in the Hurricane Katrina story, back at the end of August, the director of the FDA's office of women's health, resigned over the agency's decision to keep Plan-

80

NIGHTLINE THE MORNING AFTER ABC News Transcripts September 27, 2005 Tues

B from being sold over the counter. Susan Wood will be giving her first television interview tonight. But first, some more background from ABC News correspondent Lisa Stark

LISA STARK, ABC NEWS

(Voice Over) In December 2003, two FDA advisory committees met to decide whether Plan-B, the morning-after pill, should be sold without a prescription. The vote was overwhelmingly in favor 23-4.

LISA STARK

(Voice Over) The pill must be taken within 72 hours after intercourse to be effective. That's why advocates say it's important it be made over the counter, so a woman doesn't have to wait for her doctor to prescribe it.

DOCTOR DAVID HAGER

I am opposed, vote no

LISA STARK

(Voice Over) Dr. David Hager is one of the four on the advisory panel who voted against Plan-B. An OB/GYN from Kentucky, Dr. Hager describes himself as pro-life

DOCTOR DAVID HAGER

I did not feel comfortable at the time indicating that I favored over- the-counter sale with no age limitation whatsoever. A nine, 10-year- old could purchase the medication as easily as a 25-year-old.

LISA STARK

(Voice Over) After the vote, Dr. Hager said he was asked, he won't say by whom, to write a letter to the head of the FDA.

DOCTOR DAVID HAGER

I wrote a letter to the commissioner, just explaining my --my concerns to make sure that those had been conveyed to the commissioner's office.

LISA STARK

(Off Camera) In May 2004, the FDA, in essence, sided with Hager. In a rare move, it rejected the advice of both its panel and senior staff, citing concerns about usage among younger girls. The FDA told the manufacturer, Barr Pharmaceuticals, to reapply. Barr did that, asking the drug be made available over the counter for females 16 or over. Those younger would still need a doctor's prescription

LISA STARK

(Voice Over) Five months later, speaking at a Christian college, Dr. Hager took some credit for that

DOCTOR DAVID HAGER

I argued it from a scientific perspective. And God took that information and he used it through this minority report to influence a decision. You don't have to wave your bible to have an effect as a Christian in the public arena

WENDY WRIGHT, CONCERNED WOMEN FOR AMERICA

I'm Wendy Wright with Concerned Women for America. And we're very disturbed by Plan-B's promoters emphasis on access, but not on women's safety.

LISA STARK

(Voice Over) Wendy Wright is with Concerned Women for America. Its mission is to bring "biblical principles into all levels of public policy." Her organization played a lead role in fighting to keep the drug prescription-only.

WENDY WRIGHT

This will end up making particularly minor girls more vulnerable to statutory rapists. A 40-year-old man can go in and buy this drug, give it to a 13-year-old girl in order to cover up and continue his sexual abuse of that girl

81

NIGHTLINE THE MORNING AFTER ABC News Transcripts September 27, 2005 Tues

LISA STARK

(Voice Over) The FDA promised it would make a decision by January 2005 The deadline passed At that point, Senators Hillary Rodham Clinton and Patty Murray decided to play hard-ball politics.

SENATOR PATTY MURRAY, DEMOCRAT, WASHINGTON

We said, the Senate will not approve Lester Crawford as FDA commissioner until he gives us a timeline for an answer on whether Plan-B will be approved as an over-the-counter drug.

SENATOR, MALE

The FDA has a very broad and critical mission in protecting the public health.

LISA STARK

(Voice Over) A deal was struck Crawford was confirmed as FDA commissioner in July, after the FDA promised a decision on Plan-B by September 1st, more than two years after the original application was submitted Meantime, Wendy Wright and her group kept up the pressure on the FDA.

WENDY WRIGHT

The FDA staff and the advisory committee did not look at the overall effect that making this drug easily available can end up having.

LISA STARK

(Off Camera) Is that their job? Or is their job to determine if a drug is safe and effective?

WENDY WRIGHT

When we are at an epidemic rate in the United States of STDs, we as a society need to be taking a more serious look at it

DOCTOR DAVID HAGER

If a young woman chose to use emergency contraception, then would she not come in to see her physician for regular contraception prescription, to be screened for sexually transmitted infections, to have her pap smear?

LISA STARK

(Voice Over) On the last Friday in August, at 4:00 PM, the FDA made its announcement It decided not to decide

LESTER CRAWFORD, FDA COMMISSIONER

The agency is unable at this time to reach a decision on the approvability of the application because of these unresolved regulatory and policy issues that relate to the application we were asked to evaluate.

LISA STARK

(Voice Over) The FDA asked for another 60 days for public comment. Senator Murray was furious.

SENATOR PATTY MURRAY

Rather, it's been delayed and delayed and delayed. We are only left to wonder why. And the only answer I can come up with is politics

WENDY WRIGHT

The FDA has shown that it's sensitive to the concerns of our society. And they have rightly looked beyond some ideologues within the medical community to see, how the public will be affected by this decision

LISA STARK

(Off Camera) The final decision on Plan-B will be in the hands of a new FDA commissioner Just last week, Lester Crawford resigned as head of the FDA This is Lisa Stark for "Nightline," in Washington

TED KOPPEL

82

NIGHTLINE THE MORNING AFTER ABC News Transcripts September 27, 2005 Tues

(Off Camera) When we come back, I'll talk with Dr. Susan Wood, who headed the FDA's office of women's health, and who resigned from that post in protest.

graphics: abc news: nightline

ANNOUNCER

This is ABC News "Nightline." Brought to you by ..

commercial break

TED KOPPEL

(Off Camera) Susan Wood headed the office of women's health at the Food and Drug Administration for five years, until her resignation just about a month ago. She previously worked as a biochemist at Johns Hopkins University. And just to be sure that there's no confusion, why did you quit?

DOCTOR SUSAN WOOD

I quit because I felt that science was being overruled at FDA and women's health was being damaged.

TED KOPPEL

(Off Camera) Let's start with the first part. You're saying science was being -overruled. By whose definition?

DOCTOR SUSAN WOOD

I think by the definition of all the ways we've always done business at FDA, where science and the scientists and medical professionals at FDA are the ones who review the evidence and make a decision about whether a drug should be approved or not approved.

TED KOPPEL

(Off Camera) What's the question? What's the issue that was resolved?

DOCTOR SUSAN WOOD

Right. Well, in that case, it was about emergency contraception. It has been approved by prescription use for women of all ages. And has been caught up in delay after delay, even though there's consensus at the -amongst the sci-entists and health professionals there that it should be approved. Not just for prescription status, but more importantly for over-the-counter the status -over-the-counter status, so that women can have access to it when it's most effective to prevent an -unintended pregnancy and ultimately to prevent abortions.

TED KOPPEL

(Off Camera) What would you say are the main reasons that - and you, you call it the consensus. So, clearly, there were some scientists who did not agree. But the preponderance of scientists who voted on this did agree.

DOCTOR SUSAN WOOD

Well -I would actually still call it a consensus. Because the scientists you're referring to who didn't agree were part -were the few of the advisory committee made up of outside experts. They voted, a preponderance, to bring it over the counter and that it was safe and effective for women to use over the counter. What then happened .

TED KOPPEL

(Off Camera) Do you remember what the vote was?

DOCTOR SUSAN WOOD

It was 23-4, I believe, in favor. And unanimous that it was safe for women to use over the counter.

TED KOPPEL

(Off Camera) And within the FDA?

DOCTOR SUSAN WOOD

83

NIGHTLINE THE MORNING AFTER ABC News Transcripts September 27, 2005 Tues

Within the FDA -FDA does overturn its advisory committees on occasion. And sometimes -and usually when they do so, it's for good reason. In this case, the FDA staff, at every level within the agency, multiple levels, agreed that it should be approved for over- the-counter status  And agreed that it was appropriate for women to have access in a timely manner, so it would actually work more effectively.

TED KOPPEL

(Off Camera) You keep saying women. I gather that some of the controversy has to do with girls  If I have to go or if my daughter has to go to our physician, to her physician and the physician has to write a prescription, there is at least a -a barrier between her using it recklessly and using it in the way that it should be used.

DOCTOR SUSAN WOOD

I don't -this product is very safe. There's not much concern that it will cause -as a safety issue  The question that was raised, by a very small part of the agency, was whether or not they could understand the label and use it properly. But we've never asked that question about any other product. We don't ask it about pain medication. We don't ask it about cold medication. We don't ask it about condoms or any other contraceptive method that's available over the counter. This is very, very safe. There's no question about its safety. There's no question that it's more effective if it's used within hours not within days.

TED KOPPEL

(Off Camera) Clearly, there is a -there is a distinction between a normal contraceptive, I mean, a pill that can be used as a contraceptive, which has to be taken before the act of sex and Plan-B, which is designed to be taken after.

DOCTOR SUSAN WOOD

And that's, that's really the central difference, is the timing  It works in a mechanism very similar to many other birth control pills. The mechanism is very similar, it just has to be taken after. And the sooner you take it after, the more effective. If you need it on Saturday morning, waiting until you get to a physician, either by phone or in person, to get a prescription by Monday morning, it's too late and it doesn't work  And the worst thing that can happen is that you would have an unintended pregnancy.

TED KOPPEL

(Off Camera) You can understand that those who are concerned about it on moral grounds would argue that by making a pill like this available to an underage teenager, 15, 16-year-old, you could be encouraging reckless sex  The knowledge that even after you've had sex, it is still possible, then, to take a pill that will prevent a pregnancy is likely to make the sexual act more not less likely.

DOCTOR SUSAN WOOD

Actually there's no evidence to that effect. And in fact, there's evidence to the contrary  That it doesn't change your contraceptive behavior. It doesn't change sexual behavior, even in teens.

TED KOPPEL

(Off Camera) How -how do we know?

DOCTOR SUSAN WOOD

There are studies that have been reviewed not just by me but by, again, all of the outside experts on the advisory committee and all of the staff within FDA. And they examined that issue very carefully and came to the conclusion that there is no good evidence to be concerned about that. And in fact, what you want to do is prevent an unintended pregnancy and prevent the abortions, which is, again, common ground  I think the issue around teens and sexual behavior, we have to look at what's already available  There are other contraceptive methods on the market. We know that increased access to contraception doesn't change behavior. What it does change is the risk of an unintended pregnancy

TED KOPPEL

(Off Camera) All right. There are political consequences to making this drug available over the counter. And I get the sense that political pressure may have been behind what happened or at least that you perceive it that way. Let's take a short break  When we come back, we'll talk about that. Back with Dr Wood in a moment.

84

Page 6

NIGHTLINE THE MORNING AFTER ABC News Transcripts September 27, 2005 Tues

commercial break

TED KOPPEL

(Off Camera) And I'm back again with Dr. Susan Wood. Would it be fair to say that you felt that the decision the FDA made was not on the basis of science, but made on the basis of political pressure?

DOCTOR SUSAN WOOD

I have to agree with the first half of your sentence. I can only tell you what I observed. And that was, it was not made on the basis of the scientific and medical evidence. And not just me but all of the scientific and professional staff who normally are the part of the decision-making at the agency, because they're the ones who review the evidence and evaluate it and make the recommendations, they also were cut out of the decision. People who should have known and should have been part of the decision-making, were not in the room and were not aware of what the decision was until very late in the process

TED KOPPEL

(Off Camera) Forgive me, I think you're being a little coy. If it - if it wasn't made on the basis of scientific evidence, other than political pressure, what can you think of as having been a reason that would have caused the FDA to make the decision it made?

DOCTOR SUSAN WOOD

And I'm -I'm really trying not to be coy. But my problem is, is I don't really understand why we couldn't see this as common ground. I honestly was very hopeful that this would get approved in one fashion or another Either through having prescription status for younger women and nonprescription for older. But some way it would be approved because the science was so compelling and the evidence is so clear. And it's common ground. This is contraception. It is not abortion. The only connection it has with abortion is that it can prevent them. So, honestly, and perhaps I'm na<ve, but honestly, I was hopeful that the science would win out and the health of women and families would win out And so, when it didn't, I can only say what I saw, which we were out of it And I'm - and I'm still surprised

TED KOPPEL

(Off Camera) No, I get that. I understand that What other possible reason can there have been then that someone brought pressure to bear, which I describe as political. But if you have some other description, tell me what it is.

DOCTOR SUSAN WOOD

Well, I won't disagree with you on that point. 'Cause I honestly don't know where it came from, either And so, it must have come from somewhere. But because I'm a scientist, I tend to try to say, what do I know? And I honestly don't know but I won't disagree with you that it must have come from somewhere else.

TED KOPPEL

(Off Camera) Wasn't there nearly -or indeed, I think that Senator Kennedy - I mean, Senator Clinton, in particular, believed that there was a deal, that a deal had been made? What was the nature of that deal? And do you have any, any understanding as to why that deal collapsed?

DOCTOR SUSAN WOOD

Well, it sounded like semantics to me. I mean, I know as much about the deal as -from what I read in the newspapers Was that Secretary Leavitt and Commissioner Crawford had agreed to take an action And they did take an action. So, technically, they were correct. They took an action, which was a delay.

TED KOPPEL

(Off Camera) Clearly not the action that Senator Clinton suspected

DOCTOR SUSAN WOOD

Not the action suspected, which was a decision. And there was no decision made here, technically But I would argue that the decision to delay approval of this product over-the-counter is, in fact, a denial. And this is, again, in part why I resigned Because by couching it as a delay and a non-decision, in fact denied women of all ages, not just teens but women of all ages access to timely use of this product

85

NIGHTLINE THE MORNING AFTER ABC News Transcripts September 27, 2005 Tues

TED KOPPEL

(Off Camera) If you had thought that it was a brief delay, in other words, if you thought it was only going to be a delay of a couple of months, you wouldn't have resigned.

DOCTOR SUSAN WOOD

Probably not.

TED KOPPEL

(Off Camera) So, you obviously think that what we're talking about here is not really a delay but a way of shelving it and not dealing with the issue

DOCTOR SUSAN WOOD

Right. The mechanism is a rather bureaucratic one to potentially open it up to rulemaking. Which, to make a long story short, means opening up to a process that usually takes many months to years, if in fact that's the way they go.

TED KOPPEL

(Off Camera) And you're saying that insofar as health is concerned, insofar as the impact of this physically and psychologically is concerned, there's no difference between this and a rubber condom?

DOCTOR SUSAN WOOD

It's -I would have to compare it to oral contraceptives or in terms of its availability, to a condom, or spermicides or the today sponge.

TED KOPPEL

(Off Camera) Right  Are oral contraceptives - just help me out, are they available over the counter?

DOCTOR SUSAN WOOD

No. And there's an ongoing debate about that. But they're not needed on an emergency basis. They're effective on chronic use, over long periods of time. For emergency contraception, we're talking about single use of a product that's very, very safe and needs to be taken very, very quickly. Within hours to make it most effective.

TED KOPPEL

(Off Camera) Else the young lady will be pregnant?

DOCTOR SUSAN WOOD

She certainly will be at-risk of that, yes

TED KOPPEL

(Off Camera) But you can understand how certain people who are worried about the moral impact of this will say, look, the next step then is going to be these same people who are pushing Plan-B are gonna also be pushing oral contraceptives as also being available over the counter because the same logic that apply applies, not exactly but the same logic, you want to prevent pregnancy, you want to prevent the consequences of unwanted pregnancy, let's have contraception all around

DOCTOR SUSAN WOOD

I think at this point, the focus is on emergency use  When you need it right away and can't wait for prescription. And there are many women and girls who don't have regular access to a physician or place of regular health care. Look at the uninsured, just as a start  And we have to make sure that they are not the ones put at-risk simply because of the barrier of getting to a physician, getting a prescription, and then getting it filled, all within a window of time that will be essentially closing on them, in terms of making sure it's effective.

TED KOPPEL

(Off Camera) What are you doing now?

DOCTOR SUSAN WOOD

NIGHTLINE THE MORNING AFTER ABC News Transcripts September 27, 2005 Tues

Well, when I left the agency, I didn't have a plan   And I certainly didn't expect this kind of attention from national and international media   So, what I'm doing now is, is thinking about talking to people.   Because I feel so strongly about the importance of science being what drives our health decisions.   It's so important to people in their everyday lives   So, I'm continuing to try and figure out a way to tell people about that, as well as to keep working in, in health policy, to help women and families.

TED KOPPEL

(Off Camera) Dr. Wood, good of you to come in   Enjoyed having you here, thank you.

DOCTOR SUSAN WOOD

Thank you

TED KOPPEL

(Off Camera) I'll be back in a moment with a word about tomorrow's "Nightline."

graphics: nightline: abcnews com

ANNOUNCER

To receive a daily e-mail about each evening's "Nightline" and a preview of special broadcasts, log on to the "Nightline" page at Abcnews com.

commercial break

TED KOPPEL

(Off Camera) Tomorrow on "Nightline," do you know what your kids are eating in school these days?  The naked chef puts on some clothes, crosses the Atlantic and starts another revolution.

CHEF, MALE

If you truly love your kid, it doesn't matter where I come from or who I am   Because, you know, you should be trying to do the best of your kids

TED KOPPEL

That's "Nightline" tomorrow.  And that's our report for tonight.  I'm Ted Koppel in Washington.  For all of us here at ABC News, good night

LANGUAGE: ENGLISH

LOAD-DATE: September 28, 2005

# A. J. J. Wood et al.,
## *A Sad Day for Science at the FDA*

# New England Journal of Medicine

# September 22, 2005



# The NEW ENGLAND JOURNAL of MEDICINE

HOME | SEARCH | CURRENT ISSUE | PAST ISSUES | COLLECTIONS | HELP

Access via PAY PER ARTICLE | Subscribe

PERSPECTIVE

◄ Previous     Volume 353:1197-1199     September 22, 2005     Number 12     Next ►

## A Sad Day for Science at the FDA

*Alastair J.J. Wood, M.D., Jeffrey M. Drazen, M.D., and Michael F. Greene, M.D.*

The Food and Drug Administration (FDA) has again postponed issuing a decision about making emergency contraception available to women without a prescription. This decision — or nondecision — deserves serious scrutiny, since it appears to reflect political meddling in the drug-approval process.

Emergency contraception in the form of Plan B has been available by prescription in the United States since 1999, but its manufacturer, Barr Laboratories, has proposed that it be sold over the counter. Plan B consists of two 0.75-mg levonorgestrel tablets to be taken 12 hours apart as soon as possible, and within 72 hours, after an act of unprotected or inadequately protected intercourse. Time is of the essence, since the contraceptive efficacy decreases over time even within the recommended 72 hours after intercourse. The risk of pregnancy increases from 0.4 percent if contraception is initiated within 24 hours to 2.7 percent if it is initiated 48 to 72 hours after intercourse.

Currently, after an episode of unprotected intercourse, contraceptive failure, or rape, a woman has to recognize the availability of emergency contraception, find and make contact with an available physician who is willing and able to prescribe Plan B, obtain a prescription for the drug, find a pharmacy that stocks and will dispense it (not a trivial consideration in some parts of the country), fill the prescription at the pharmacy, and ingest the drug — all while the time window for efficacy is closing. Unprotected intercourse may occur at times — for instance, weekends — when it is likely to be difficult to reach a physician, particularly for women who do not have an ongoing relationship with a particular doctor. It therefore seemed logical to consider making Plan B available over the counter, as it is in many other countries.

After the manufacturer requested over-the-counter status, the FDA convened an advisory committee meeting in December 2003. The committee, made up of experts both in obstetrics–gynecology and in over-the-counter drug availability, voted overwhelmingly (23 to 4) that emergency contraception should be made available to

**THIS ARTICLE**

► PDF
► PDA Full Text

**TOOLS & SERVICES**

► Add to Personal Archive
► Add to Citation Manager
► Notify a Friend
► E-mail When Cited
► E-mail When Letters Appear

**MORE INFORMATION**

► Find Similar Articles
► PubMed Citation

Women's Health and the FDA: Postponing the emergency contraception ..

http://content nejm org/cgi/content/full/353/12/1197

U.S. women over the counter. Even the small number who voted against over-the-counter status acknowledged at the time that they did so for reasons other than concern about its demonstrated efficacy or safety. Yet these are the only legitimate considerations for FDA approval. The committee reviewed the world literature, heard presentations of all points of view, and came to a conclusion, which under normal circumstances would have been accepted by the FDA. Subsequently, the FDA's own professional staff endorsed that conclusion and recommendation.

However, FDA management rejected the application in May 2004, citing concerns about the effects of over-the-counter availability on the sexual behavior of young teenagers. Data demonstrating that ready access to Plan B by adolescents as young as 15 did not lead to increased irresponsible sexual behavior were available in December 2003 and had been reviewed by the advisory committee. Moreover, the agency was conspicuously unable, then or later, to cite any data to support different safety or efficacy profiles in different age groups — a damning indictment of the basis for their disapproval.

After the May 2004 decision, a dual marketing plan was suggested: the drug could be made available over the counter to women over 16 and only by prescription below that age. In a surreal twist, however, the FDA commissioner seems to have belatedly discovered that the FDA has never before allowed two identical dosage formulations to be sold simultaneously over the counter and by prescription. Owing to his apparent ignorance of this problem, the approval has again been delayed to allow a 60-day comment period so that the dual-status issue can be addressed. It is, frankly, not credible to us that the commissioner and his staff did not recognize this problem when they initially floated the idea of age-restricted over-the-counter marketing. The problem was widely recognized and has been a major strategic issue for pharmaceutical companies that are switching drugs from prescription to over-the-counter status.

Why is the FDA considering age-based restrictions on the over-the-counter availability of emergency contraception? The stated reason is that there is uncertainty about the drug's safety in younger women. But the FDA has not pointed to any data to support that position, nor has the agency demanded such evidence in the case of other drugs that have been switched to over-the-counter status. All involved acknowledge that Plan B is extraordinarily safe. Even the advisory committee members who subsequently voted against its over-the-counter availability had acknowledged its appropriate safety earlier at the December 2003 meeting, when the committee voted 28 to 0 that the drug was safe.

In contrast, other over-the-counter drugs, such as acetaminophen and aspirin, can cause death when taken inappropriately. At a meeting of a similar FDA advisory committee, data were presented indicating that acetaminophen ingestion results in 56,680 emergency-department visits, 26,256 hospitalizations, and 458 deaths in the United States every year; a large number of these events affect persons younger than 17 years of age.[1] The FDA has shown no inclination to restrict the availability of these drugs to young people by requiring them to have a prescription. Why not?

Studies presented to the advisory committee at its meeting about Plan B and additional studies published more recently demonstrate clearly that women given ready access to emergency contraception do not

Women's Health and the FDA: Postponing the emergency contraception                              http://content.nejm.org/cgi/content/full/353/12/1197

routinely use less effective regular contraception, do not engage more often in high-risk sexual behavior, do not become more promiscuous, and do not have increased rates of pregnancy or sexually transmitted diseases — all findings that contradict claims made by those outside the FDA who oppose wider availability of emergency contraception.

Although the real reason behind the attempts to introduce an age restriction on Plan B are at best unclear, the effect would be to intimidate women of all ages. The only way to enforce such a restriction would be to insist that all those attempting to purchase emergency contraception provide proof of age — that they be "carded," or required to produce a driver's license or other government-issued identification. The provision of such identification to a store clerk, who might be the customer's peer, could be humiliating, and in destroying any semblance of privacy, such a requirement would deter women from purchasing emergency contraception.

Imagine the scene at the checkout counter: with a line of impatient customers waiting behind you, you must show an identification card to a sales clerk in order to purchase a product that clearly reveals your exposure to unprotected intercourse during the past few hours. If chain pharmacies followed the rules they have used for beer and cigarettes (whose sales are currently subject to similar age restrictions), only clerks over a certain age would be allowed to authorize sales — which would delay the purchase even longer and expose the purchaser to further embarrassment. Moreover, many potential users of all ages — particularly poor women and those from inner-city neighborhoods — have no driver's licenses. Such women would not be able to obtain emergency contraception even if they were older than the arbitrary age limit set by the FDA.

Finally, it is likely that because of the age restrictions, many pharmacies would choose to hold their entire stock of Plan B "behind the counter" to ensure that all purchasers had to document their eligibility. American women should not have to explain their need for such a product in public, in front of their neighbors and friends, at such a painful, frightening, and vulnerable time.

This is a sad day for American women and for the FDA. In the absence of data to support their original decision to reject the advice of their advisory committee and their own staff analysts, one can only speculate about the real reason for the actions of the agency's leadership. Their subsequent delays, dissembling, and shifting justifications of their regulatory maneuvering and manipulation have resulted in the resignation of Susan F. Wood, the assistant FDA commissioner for women's health and director of the agency's Office of Women's Health. Wood's departure is a statement of protest against the decision by the FDA management to bow to political pressure at the expense of women's health.

The FDA has, on occasion, been criticized for being too bureaucratic and slow to approve important new drugs, too quick to approve new drugs to please the corporate patrons who provide much of its budget, and too slow to withdraw drugs that seem to pose a danger to public health. But the agency has previously resisted political pressure to reflect a particular social policy or ideology. The recent actions of the FDA leadership have made a mockery of the process of evaluating scientific evidence, disillusioned many of the participating scientists both inside and outside the agency, squandered the public trust, and tarnished the agency's image. American women and the dedicated professionals at the FDA deserve better. Will we ever

again be able to believe in the FDA's independence?

## Source Information

Dr. Wood is a professor of medicine and pharmacology at Vanderbilt University School of Medicine, Nashville, and was a member of the FDA Advisory Committee on Nonprescription Drugs; Dr. Drazen is the editor-in-chief of the *Journal*; and Dr. Greene is an associate editor of the *Journal* and was a member of the FDA Advisory Committee on Reproductive Health Drugs.

## References

1   Nonprescription Drugs Advisory Committee. (Accessed September 1, 2005, at http://www.fda.gov/ohtms/dockets/ac/cder02.htm#NonprescriptionDrugs.)

# This article has been cited by other articles:

- Tanne, J. H. (2005). FDA official resigns over emergency contraception decision. *BMJ* 331: 532-532 [Full Text]

**THIS ARTICLE**

► PDF
► PDA Full Text

**TOOLS & SERVICES**

► Add to Personal Archive
► Add to Citation Manager
► Notify a Friend
► E-mail When Cited
► E-mail When Letters Appear

**MORE INFORMATION**

► Find Similar Articles
► PubMed Citation

HOME | SEARCH | CURRENT ISSUE | PAST ISSUES | COLLECTIONS | HELP

Comments and questions? Please contact us.

The New England Journal of Medicine is owned, published, and copyrighted © 2005 Massachusetts Medical Society. All rights reserved.

# *FDA's Decision Regarding Plan B: Questions and Answers*

## available at
## http://www.fda.gov/cder/drug/infopage/planB/planBQandA.htm



Search [          ] GO powered by Google™

## FDA's Decision Regarding Plan B: Questions and Answers

### 1. What is emergency contraception?

Emergency contraception is a method of preventing pregnancy to be used after a contraceptive fails or after unprotected sex. It is not for routine use. Drugs used for this purpose are called emergency contraceptive pills, post-coital pills, or morning after pills. Emergency contraceptives contain the hormones estrogen and progestin (levonorgestrel), either separately or in combination. FDA has approved two products for prescription use for emergency contraception – Preven (approved in 1998) and Plan B (approved in 1999).

### 2. What is Plan B?

Plan B is emergency contraception, a backup method to birth control. It is in the form of two levonorgestrel pills (0.75 mg in each pill) that are taken by mouth after unprotected sex. Levonorgestrel is a synthetic hormone used in birth control pills for over 35 years. Plan B can reduce a woman's risk of pregnancy when taken as directed if she has had unprotected sex. Plan B contains only progestin, levonorgestrel, a synthetic hormone used in birth control pills for over 35 years. It is currently available only by prescription

### 3. How does Plan B work?

Plan B works like other birth control pills to prevent pregnancy. Plan B acts primarily by stopping the release of an egg from the ovary (ovulation). It may prevent the union of sperm and egg (fertilization). If fertilization does occur, Plan B may prevent a fertilized egg from attaching to the womb (implantation). If a fertilized egg is implanted prior to taking Plan B, Plan B will not work

### 4. What steps did FDA take in considering switching Plan B from prescription to nonprescription (over-the-counter (OTC)) status?

FDA received an application to switch Plan B from prescription to nonprescription status. FDA staff reviewed the scientific data contained in the application which included among other data, an actual use study and a label comprehension study.

On December 16, 2003, we held a public advisory committee meeting with a panel of medical and scientific experts from outside the federal government. The members of the Nonprescription Drugs Advisory Committee and the Advisory Committee for Reproductive Health, met jointly to

Case 1:05-cv-00366-ERK-VVP    Document 80-2    Filed 01/06/06    Page 116 of 127
PageID #: 1410

consider the safety and effectiveness data of nonprescription use of Plan B. Although the joint committee recommended to FDA that this product be sold without a prescription, some members of the committee, including the Chair, raised questions concerning whether the actual use data were generalizable to the overall population of nonprescription users, chiefly because of inadequate sampling of younger age groups.

Following the advisory committee meeting, FDA requested additional information from the sponsor pertaining to adolescent use. The sponsor submitted this additional information to FDA in support of their pending application to change Plan B from a prescription to an over-the-counter product. This additional information was extensive enough to qualify as a major amendment to the NDA. Under the terms of the Prescription Drug User Fee Act (PDUFA) performance goals, major amendments such as this may trigger a 90-day extension of the original PDUFA deadline.

Now FDA has completed its review of the supplemental application and concluded that the application could not be approved at this time because 1) adequate data were not provided to support a conclusion that young adolescent women can safely use Plan B for emergency contraception without the professional supervision of a licensed practitioner and 2) a proposal from the sponsor to change the requested indication to allow for marketing of Plan B as a prescription-only product for women under 16 years of age and a nonprescription product for women 16 years and older was incomplete and inadequate for a full review. Therefore, FDA concluded that the application was not approvable.

### 5. Why didn't FDA follow the recommendation of the Advisory Committees?

The recommendations of FDA advisory committees are advisory in nature and the Agency is not bound to follow their recommendations. FDA makes a decision on whether a product should be approved after evaluating all data and considering the recommendations of the advisory committee.

### 6. Why did FDA issue a Not Approvable letter?

The agency issued a Not Approvable letter because the supplemental application did not meet the criteria for approval in that it did not demonstrate that Plan B could be used safely by young adolescent women for emergency contraception without the professional supervision of a licensed practitioner. The issuance of a Not Approvable letter does not mean that a supplemental application cannot be approved. The Not Approvable letter describes what the applicant would need to do to obtain approval for the supplemental application. In this case, the applicant would have to either provide additional data demonstrating that Plan B can be used safely by women under 16 years of age without the professional supervision of a practitioner licensed by law to administer the drug or provide additional support for the revised indication to allow for marketing Plan B as prescription-only for women under the age of 16 and as nonprescription for women 16 years of age and older. Not Approvable Letter.

### 7. Was there a difference of opinion within the Center for Drug Evaluation (CDER) and Research regarding the final decision?

Yes, there was a difference of opinion within CDER. The scientific interchange of ideas is widely encouraged during the review process to ensure a thorough vetting of the issues. However,

93

ultimately, a final decision must be made based on the evaluation of the data, taking into account all of the views expressed.

**8. Is this FDA's final decision regarding the availability of Plan B for OTC use?**

No. The Not Approvable letter to the sponsor outlines what the sponsor must do to obtain approval of the supplemental application

Wide availability of safe and effective contraceptives is important to public health. We look forward to working with the sponsor if they decide to pursue making this product available without a prescription.

**9. Oral contraceptives have been used for four decades, and this product has been approved and used safely since 1999. How could FDA turn it down?**

Oral contraceptives as a class of drugs are only available by prescription This product has been used safely by prescription only and for the reasons already stated, it is not being made available for OTC use at this time.

**10. The sponsor has talked about making the product over-the-counter for young women over a certain age and behind-the-counter for younger girls. Is there evidence to support such a scheme? Does FDA have the authority to carry it out?**

The sponsor has submitted a plan and the FDA is examining its regulatory authority to approve a product marketed in this manner.

**11. Did the FDA bow to political pressure in making this decision?**

No. This decision was made within the Center for Drug Evaluation and Research.

**12. Dr. Steven Galson signed the letter FDA sent to the sponsor. Does Dr. Galson usually sign such letters? Why did Dr. Galson sign the letter?**

No, Dr. Galson does not usually sign regulatory action letters. However, his opinion of the adequacy of the data in young adolescents differed from that of the review staff. He believes that additional data are needed and for that reason he made the decision to take final action within the Office of the Center Director.

⬆ Back to Top    ↖ Back to Plan B

Date created: May 7, 2004

CDER Home Page | CDER Site Info | Contact CDER | What's New @ CDER
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility | HHS Home Page

FDA/Center for Drug Evaluation and Research

94

# Letter of Congressman Waxman to Chairman of Committee on Government Reform

# November 15, 2005

TOM DAVIS, VIRGINIA,
CHAIRMAN

CHRISTOPHER SHAYS, CONNECTICUT
DAN BURTON, INDIANA
ILEANA ROS-LEHTINEN, FLORIDA
JOHN M. McHUGH, NEW YORK
JOHN L. MICA, FLORIDA
GIL GUTKNECHT, MINNESOTA
MARK E. SOUDER, INDIANA
STEVEN C. LATOURETTE, OHIO
TODD RUSSELL PLATTS, PENNSYLVANIA
CHRIS CANNON, UTAH
JOHN J. DUNCAN, JR., TENNESSEE
CANDICE MILLER, MICHIGAN
MICHAEL R. TURNER, OHIO
DARRELL ISSA, CALIFORNIA
VIRGINIA BROWN-WAITE, FLORIDA
JON C PORTER, NEVADA
KENNY MARCHANT, TEXAS
LYNN A. WESTMORELAND, GEORGIA
PATRICK T. McHENRY, NORTH CAROLINA
CHARLES W. DENT, PENNSYLVANIA
VIRGINIA FOXX, NORTH CAROLINA

ONE HUNDRED NINTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

HENRY A. WAXMAN, CALIFORNIA
RANKING MINORITY MEMBER

TOM LANTOS, CALIFORNIA
MAJOR R. OWENS, NEW YORK
EDOLPHUS TOWNS, NEW YORK
PAUL E. KANJORSKI, PENNSYLVANIA
CAROLYN B. MALONEY, NEW YORK
ELIJAH E. CUMMINGS, MARYLAND
DENNIS J. KUCINICH, OHIO
DANNY K. DAVIS, ILLINOIS
WM. LACY CLAY, MISSOURI
DIANE E. WATSON, CALIFORNIA
STEPHEN F. LYNCH, MASSACHUSETTS
CHRIS VAN HOLLEN, MARYLAND
LINDA T. SANCHEZ, CALIFORNIA
C.A. DUTCH RUPPERSBERGER,
MARYLAND
BRIAN HIGGINS, NEW YORK
ELEANOR HOLMES NORTON,
DISTRICT OF COLUMBIA

BERNARD SANDERS, VERMONT
INDEPENDENT

MAJORITY    (202) 225–5074
FACSIMILE   (202) 225–3974
MINORITY    (202) 225–5051
TTY         (202) 225–6852

http://reform.house.gov

November 15, 2005

The Honorable Tom Davis
Chairman
Committee on Government Reform
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

In February, I requested that the Committee investigate the growing problem of the manipulation of science by Administration officials for political purposes.[1]  I am writing today to renew this request and to urge the Committee to examine one particularly egregious example of the politicization of science:  the decision by the Food and Drug Administration to block over-the-counter sales of Plan B, the emergency contraceptive.

Yesterday the Government Accountability Office released a report on the Plan B decision.  GAO found that the views of federal scientists were disregarded, their analyses dismissed, and their recommendations ultimately overruled as the agency made what appears to be a preordained decision to reject Plan B.  GAO documented multiple ways in which what was supposed to have been an evidence-based decision diverged from standard procedure.  According to the GAO report:

- The FDA officials in charge of scientific review for over-the-counter drugs and reproductive drugs disagreed with the decision and did not sign the not-approvable letter as they typically would;

- Scientific review staff were told early in the process that the decision would be made by higher-level management;

- Evidence indicates that the decision not to approve the switch was made before scientific review was completed; and

---

[1] Letter from Henry A. Waxman to Chairman Tom Davis (Feb. 8, 2005) (online http://www.democrats.reform.house.gov/story.asp?ID=787).

95

The Honorable Tom Davis
November 15, 2005
Page 2

- The rationale for the decision deviated from typical FDA methodology by raising speculative concerns regarding behavioral implications and refusing to extrapolate safety data to younger adolescents.[2]

GAO's thorough investigation raises serious issues that the Government Reform Committee, the principal oversight committee in the House, should pursue. The failure of former FDA Commissioner Mark McClellan to cooperate with GAO investigators and the apparently illegal policy of destroying his emails and memoranda means that Congress does not know the full extent of the involvement of the FDA Commissioner in the decision. In addition, GAO did not examine whether officials at the Department of Health and Human Services or the White House played any role in this apparent subversion of science.

Moreover, GAO's investigation was limited to FDA's May 2004 decision to reject Plan B. After the manufacturer submitted additional information, FDA again failed to approve the application in August 2005. There have been allegations by former FDA officials, such as Dr. Susan Wood, formerly head of the Office of Women's Health, that this second decision was also motivated by politics, not science. These allegations have not been examined by GAO or any congressional committee.

The decisions made at FDA are crucial to the health and safety of our nation. Federal law requires — and the public expects — that these decisions will be based on the best available science, not politics or ideology. For these reasons, I am respectfully requesting that the Committee hold a hearing on FDA's Plan B decisions and the influence of political and ideological considerations on the FDA actions.

In addition to requesting a Committee hearing, I also ask that you join me in requesting documents from FDA, HHS, and the White House relating to the Plan B decisions. Specifically, we should request:

- All communications, written or electronic, and records of phone conversations and meetings, between FDA and other HHS officials, including the Office of the Secretary, regarding Plan B;

- All communications, written or electronic, and records of phone conversations and meetings, between FDA and the White House regarding Plan B;

- All communications, written or electronic, and records of phone conversations and meetings, between HHS and the White House regarding Plan B.

---

[2] Government Accountability Office, *Food and Drug Administration: Decision Process to Deny Initial Application for Over-the-Counter Marketing of the Emergency Contraceptive Drug Plan B Was Unusual* (GAO-06-109) (Nov. 14, 2005).

The Honorable Tom Davis
November 15, 2005
Page 3


I look forward to working with you in conducting thorough oversight of the Plan B
decisions and ensuring the integrity of the scientific process at the Food and Drug Administration
and other science-based agencies.

Sincerely,

Henry A. Waxman
Ranking Minority Member

97

Buck Rinker,
*Plan B Casualties*
(quoting letter of resignation of Dr.
Frank Davidoff from FDA
Nonprescription Drugs Advisory
Committee)

Hartford Courant

October 2, 2005

# PLAN B CASUALTIES
*[STATEWIDE Edition]*

Hartford Courant - Hartford, Conn.
Author:          RINKER BUCK
Date:            Oct 2, 2005
Start Page:      3
Section:         NORTHEAST
Text Word Count: 3145

**Document Text**

*(Copyright The Hartford Courant 2005)*

Dr. Frank Davidoff is a gray-haired and erudite internist who lives quietly in a modest Tudor-style house just off the historic district in Wethersfield. At 71, genial and fit, he would strike most people as central casting's choice for the role of editor emeritus of a distinguished medical journal, which in fact he is.

As he discusses his career -- Harvard College, Columbia Medical School, then teaching stints at Harvard and the University of Connecticut before becoming editor of the Annals of Internal Medicine -- a well-behaved corgi sits at the foot of the couch in his living room, which is as spotless and well-appointed as an Ethan Allen furniture ad. From the kitchen, the sweet scent of the bread he is baking wafts through the house.

A month ago, however, Davidoff joined that select if historic list of public servants who would rather rebel than stand by while their professional standards are violated by the government of the United States  If letters of resignation can be considered an art form, the spare, five-paragraph missive that Davidoff sent to the U S  Food and Drug Administration set a standard for minimalist impact.

"I can no longer associate myself with an organization that is capable of making such an important decision so flagrantly on the basis of political influence, rather than the scientific and clinical evidence," Davidoff wrote, resigning as a consultant and former member of the FDA's influential Nonprescription Drugs Advisory Committee. "I'm truly sorry it has come to this, since the agency serves an extraordinarily important function, and I generally respect the staff and the work they do."

The object of Davidoff's disappointment is the FDA's foot- dragging over Plan B, the emergency contraceptive that has been on the American market, by prescription only, since 1999. For the past 18 months, the FDA has repeatedly delayed a request by Plan B's manufacturer, Barr Laboratories, to make it available over-the- counter -- a move widely supported by a broad array of professional medical groups, two FDA advisory panels and even the agency's own staff.

The FDA's delay has nothing to do with practicality, safety or even common sense. Even critics of the drug concede it might cut down on the number of abortions by averting pregnancy after the failure of contraceptive devices or unprotected sex.

Instead, Plan B's tortuous path to over-the-counter approval has been obstructed by Bush administration policies substituting conservative morality for science -- politicizing an agency that Davidoff and other doctors had always revered for the impartiality of its proceedings.

Davidoff was pleased in 2001 when the FDA invited him to serve a four-year term on the Nonprescription Drugs Advisory Committee, an influential body that makes recommendations to the agency on a broad array of drugs  The manufacturers of a variety of antihistamines, antacids and analgesics that have enjoyed successful and safe runs as prescription drugs want to convert them to profitable over-the- counter brands. At the time, Davidoff was only a few months away from retirement after six years as the editor of the American College of Physicians' Annals of Internal Medicine, one of the nation's most influential medical journals

The FDA panel seemed like a productive if relatively undemanding way to keep an oar in medicine while he decided his future after the medical journal  Four or five times a year, Davidoff traveled to Washington to spend two days poring over research and listening to testimony with the 15 other members of the committee, most of them

distinguished pharmacologists or internists with postings at top medical schools.

Davidoff thrived on the FDA work because it required him to examine the record of clinical trials, the scientific record, and a prescription drug's history -- work that challenged his experience as an academician and teaching doctor.

"I learned a huge amount about drugs just being on the committee, because you don't often serve at that intersection of medicine, pharmacology and the public," Davidoff says. "It made me feel tremendously useful, but also blessed by a new learning curve."

For a doctor-writer like Davidoff, there were other joys, too.

"Our chief focus when considering a drug for conversion from prescription to over-the-counter wasn't simply safety, efficacy, or weighing the enormous amounts of scientific data we had to consider," Davidoff says. "We also spent an enormous amount of time on label comprehension, a very important dimension. What would the label say? Could we get it down to language that was straightforward to the consumer but accurately reflected the drug's benefits or possible drawbacks? This, too, was enormously rewarding because you were dealing with the borders of science and plain language. I loved it."

The work was satisfying, as well, because the FDA almost universally followed the committee's advice. During Davidoff's four years on the committee, the antihistamine Claritin and the antacid Prilosec were approved for over-the-counter sales. The statin class of cholesterol-lowering drugs, however, was not recommended for over-the-counter approval by the committee

Davidoff was impressed by the professionalism and collegiality of the FDA salaried staff, which worked months in advance of the advising committee, preparing scientific data, clinical literature and pharmacy studies as new drugs were proposed for over-the- counter conversion.

"The level of science was very high, and the FDA almost always followed the recommendations of the committee," Davidoff says. "There was a real satisfaction that staff and professional advisers were working very hard to assure that every possible angle was explored to protect the consumer and deliver to everyday users the best possible outcome."

Initially, in the fall of 2003, there was no intimation that anything would be different when the FDA scheduled hearings for December on the conversion of Barr's Plan B. Davidoff had received a huge file on the drug -- the complete record weighed 18 pounds on his bathroom scale -- and was notified that the drug's conversion would be considered jointly with another FDA expert panel, the Advisory Committee for Reproductive Health Drugs. That's standard procedure when a drug overlapped the assigned area of two committees

The joint committee hearings on Plan B that December followed the usual, exhaustive protocol of advisory panels, considering the history, safety and chemistry of the drug. Plan B, often confused with the French RU-486 abortion pill, is officially considered a contraceptive. Consisting of two doses of the synthetic hormone levonorgestrel taken orally after unprotected sex, the medication prevents ovulation or fertilization, and it may also deter implantation of a fertilized egg in the womb. The pill will not abort a pregnancy once a fertilized egg has implanted, and Barr Laboratories' literature states that Plan B is "not effective if the women is already pregnant."

"It's an important principle of medicine that we don't always know why a drug works, even highly common ones," Davidoff says. "So what you have to do on a panel of this nature is weigh the preponderance of evidence ... And the evidence was pretty strong that [Plan B] is a pill that prevents fertilization."

The committees also studied evidence that showed that Plan B is probably only effective within 72 hours of unprotected sex. The panel also considered the logic of arguments that Plan B be converted to over-the-counter status to enhance its availability and, hence, effectiveness for women.

"There are real medical reasons why Plan B should be over-the- counter," says Dr Alastair Wood, the assistant vice chancellor at the Vanderbilt University School of Medicine who served on the advisory committee with Davidoff. "A great deal of

unprotected sex happens on a Friday or a Saturday night, exactly when you can't reach a doctor for a prescription."

The joint committee also heard concerns that teenage girls would be more likely to engage in unprotected sex and then rely on Plan B as a regular backup if the "morning after" pill were readily available in drug stores. But both Wood and Davidoff say the committee was presented with studies showing that women did not engage in more promiscuous behavior simply because Plan B was available

And requiring a proof of age for the drug, Wood says, might simply subject all young women to the embarrassment of "carding" by a store clerk when they felt they needed Plan B.

"For the most part, all the feared behaviors [suggested by opponents of the drug] weren't happening," Davidoff says  "One of the standards that the committee takes very seriously is: 'will over- the-counter lead to abuse of the drug?' ... We didn't see any evidence that the availability of Plan B led to more unprotected sex."

At the conclusion of its December 2003 hearings, the joint committee voted 24-3 to approve the conversion of Plan B to over- the-counter status, concluding that the drug was both extremely safe and that it provided clear benefits if offered more widely.

This aroused conservative members of Congress and right-to-life groups, who labeled the drug an "abortion pill" and began lobbying the agency to reject both its advisory committees and staff advice.

FDA management did exactly that in May 2004 saying that Barr Labs had neglected to provide enough data about whether girls under 16 would engage in unprotected sex if the drug were more widely available. The agency's management also questioned whether girls 16 or younger could comprehend the labeling on the drug.

Barr was encouraged by the FDA to resubmit its application on a two-tier level that would make Plan B available to women 16 years and older as a non-prescription drug, while requiring younger women to receive the drug only under a doctor's prescription.

This lead to further complications at the FDA, which eventually concluded that it had never addressed the issue of approving dual uses for the same packaged drug -- a prescription-only for one age group, but over-the-counter status for another age group

On Aug. 26, in a press release remarkable for its confused language, FDA Commissioner Lester M. Crawford announced a 60-day comment period inviting "all interested parties" to weigh in on the question of whether a drug could be marketed as both a prescription and non-prescription product.

"What we are saying today is that the Agency is unable at this time to reach a decision on the approvability of the application because of these unresolved regulatory and policy issues that relate to the application we were asked to evaluate," the FDA press release stated

The confusing public signals being sent by the FDA, however, didn't seem mysterious to many advisory committee members, who had begun to get the point. Despite both committee and staff recommendations that Plan B be approved as an over-the-counter drug, the FDA management appeared to be using almost any stalling tactic to avoid making a decision, bowing to pressure to restrict use of the drug.

"Conservatives are doing the same thing to Plan B that they are doing on the issues of global climate change and evolution," says Kirsten Moore, the president of the Reproductive Health Technologies Project in Washington, D.C. "They are using uncertainty and confusion to prevent us moving forward. The evidence is overwhelming that Plan B is safe, but the opponents hold it up by saying that we haven't dotted all the I's and crossed all the T's yet, because they know they can't oppose the drug by ideology alone "

"We knew that political influence was being applied to the decision on Plan B," says Wood. "But the real issue here is not about the politics of Plan B itself but the dangers of politicizing the drug-approval process. You, as the consumer, have to know that this was the right decision-making based only on the data, the science, and the way

the law was set up. If that process isn't happening it's not a decision made in the best interest of patients."

But doctors who raised serious questions about Plan B at the FDA hearings deny that they went beyond science in opposing over-the- counter approval Dr. W. David Hager, a gynecologist who teaches at the University of Kentucky, served on the joint panel that reviewed Plan B in 2003.

"As a gynecologist, I was concerned that the major reason women come to us is for access to contraceptives, and then we can screen them for other diseases and other care," Hager says. "I felt that there wasn't enough evidence about whether young women who would come to rely on Plan B without a prescription would therefore not be visiting doctors and getting appropriate medical care. It wasn't a moral question for me so much as an issue of woman's health."

To Davidoff, the FDA's obstruction of Plan B's conversion doesn't seem to serve the interests of even the staunch pro-life groups.

"I keep trying to think about the opposition that came in after we voted on Plan B," he says. "Why would you oppose a pill that could dramatically cut back on abortions? It makes absolutely no sense "

The FDA's interminable delays on approving Plan B made little sense to others as well, and by early September, the agency had begun to implode. One week after Commissioner Crawford's call for the 60-day comment period, the FDA's assistant commissioner and director of its Office of Women's Health, Susan F. Wood, resigned in protest, causing an uproar within the agency and professional health community. In an e-mail message, Susan Wood told FDA staffers that she could not remain at the agency "when scientific and clinical evidence, fully evaluated and recommended for approval by the professional staff here, has been overruled."

Three weeks later, Crawford abruptly resigned, reportedly under pressure by a White House dismayed by his performance and plummeting morale at the FDA It is considered doubtful that a final decision on Plan B will be made this year as the FDA struggles to regain its stability and reputation.

Davidoff had considered resigning in May, 2004, when the FDA first disapproved the drug for over-the-counter distribution, but he felt strongly that he might be more effective continuing to work with the agency. He abandoned that thinking, however, when Crawford once more delayed action in August.

Davidoff says his decision to resign his FDA advisory position was not that difficult -- a 45-year professional career devoted to careful scientific evaluation obviously couldn't be squared with the politicization of the agency he had been asked to serve But the Plan B meltdown at the FDA has taken its casualties beyond the millions of women that Davidoff feels a compromised federal agency has failed to serve. The agency itself is in disarray, and Davidoff wonders how long it will take for it to recover its reputation.

"I can tell you quite definitely that the FDA staff is more than upset," he says "I got an e-mail today from a prominent FDA official saying that the staff is demoralized and depressed It's quite a benefit that the American people have, trusting the reliability and safety of their drugs But for that to continue, people have to believe in the FDA's science. The record of decisions on Plan B could well shred that credibility."

The history of the so-called "morning after pill" has been fraught with conflict and controversy Here are some points along the way to the most recent spate of resignations and disputes

Feb 24, 1997: The FDA declares common regimens of emergency contraception safe and effective. It also says it would accept applications to manufacture and market emergency contraceptives without requiring expensive new drug trials because the safety and efficacy of emergency contraception has already been demonstrated.

Sept 2, 1998: The FDA approves the application of Gynetics, Inc. of Belle Mead, N.J., to market America's first dedicated emergency contraceptive product, the PREVEN Emergency Contraceptive Kit

July 29, 1999: The FDA approves Plan B, the first progestin-only emergency

contraceptive available by prescription in the U S

December 1999: The French government makes the morning-after pill available to teenage girls at schools, triggering fierce debate in that predominantly Roman Catholic nation  A court eventually overturns the decision.

October 2000: The French Parliament approves a new amendment allowing school nurses to dispense emergency contraception. Also, NorLevo, an emergency contraceptive product, is made available over the counter in Norway  This is the first time that an emergency contraceptive is available to women without contact with a clinician or pharmacist.

Feb. 14, 2001: The Center for Reproductive Rights files a petition with the FDA to grant over-the-counter status to emergency contraceptives. No decision is ever issued

Feb  21, 2001: The Virginia Senate approves a measure to let women receive the "morning-after'" pill without a doctor's prescription.

Dec. 16, 2003: An FDA advisory panel votes 23-4 in favor of dropping the prescription requirement, but the one-sided vote does not reflect the heated disagreements among some panel members about whether the pill's action amounts to abortion and whether wider availability would encourage couples to engage in casual unprotected sex.

May 6, 2004: In a rare move, Dr  Steven K  Galson, director of the FDA's Center for Drug Evaluation and Research, signs a "not approvable" letter for Plan B, opposing the advisory panel's recommendations. The FDA typically follows the advice of its staff and committees.

July 23, 2004: Barr Pharmaceuticals Inc  reapplies to the FDA to sell Plan B over the counter for women age 16 and older, requiring younger girls to get a prescription.

Jan. 21, 2005: The FDA is scheduled to issue its ruling on Barr Pharmaceuticals, Inc.'s request over-the-counter status for Plan B for women 16 and older, but does not meet this deadline

June 17, 2005: New Hampshire Gov  John Lynch signs a bill allowing pharmacists to dispense emergency contraception without a doctor's prescription. The law will apply only to pharmacists who voluntarily participate in a training session sponsored by the state

June 24, 2005: The New York legislature approves a measure allowing over-the-counter dispensing of emergency contraception.

July 26, 2005: Massachusetts Gov  Mitt Romney vetoes a bill allowing over-the-counter distribution of emergency contraception, saying the so-called "morning after pill" can cause an abortion  The veto is subsequently overridden.

Aug. 26, 2005: The FDA defers any decision on Plan B, saying it needs more time to gauge public reaction and decide how to monitor Plan B sales in order to make sure that girls aged 16 and younger don't buy it without a prescription.

Aug. 31, 2005: Susan Wood, director of FDA's Office of Women's Health, resigns saying the August 26 ruling is "contrary to my core commitment to improving and advancing women's health "

Sept  23, 2005: FDA chief Lester Crawford resigns.

THE HARTFORD COURANT

[Illustration]
COVER ILLUSTRATION: COLOR, BY VADA CROSBY AND WES RAND PHOTO 1: COLOR, PHOTOGRAPH BY JOHN LONG PHOTO 2: (B&W) MUG; Caption: PHOTO 1: Dr. Frank Davidoff, a Wethersfield internist and former medical-journal editor, was so aghast at political influence exerted on the "morning-after pill" decision that he resigned in protest from a key FDA advisory position. PHOTO 2: Lester Crawford

Reproduced with permission of the copyright owner  Further reproduction or distribution is prohibited without permission