UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
--------------------------------X     Docket#
TUMMINO, et al,                   : 05-cv-366(ERK)(VVP)
              Plaintiff,          :
                                  :
   - versus -                     : U.S. Courthouse
                                  : Brooklyn, New York
ANDREW C. von ESCHENBACH,         :
              Defendant           : May 31, 2006
--------------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY CONFERENCE
BEFORE THE HONORABLE VIKTOR V. POHORELSKY
UNITED STATES MAGISTRATE JUDGE

A   P   P   E   A   R   A   N   C   E   S:


For the Plaintiff  :        Simon Heller, Esq.
                            Nan Strauss, Esq.


For the Defendant  :        Steven Warshawsky, Esq.
                            Franklin Amanat, Esq.
                            Erin Schifter, Esq.


Official Transcriber  :     Rosalie Lombardi
                               L.F.


Transcription Service  :    Transcription Plus II
                            823 Whittier Avenue

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

New Hyde Park, N.Y.  11040
(516) 358-7352

Proceedings recorded by electronic sound-recording, transcript produced by transcription service

Transcription Plus II          Rosalie Lombardi

3

**Proceedings**

THE CLERK:  Civil Cause for a Discovery Conference in 05-cv-366, Tummino v. von Eschenbach.

Counsel, please state your appearances for the record.

MR. HELLER:  Simon Heller for the plaintiffs.

MS. STRAUSS:  Nan Strauss for the plaintiffs.

MR. AMANAT:  Frank Amanat, assistant United States attorney for the government.

MR. WARSHAWSKY:  Steven Warshawsky, assistant United States attorney.

MS. SCHIFTER:  Erin Schifter from FDA.

THE COURT:  That's S-c-h-i-f-t-e-r.

MS. SCHIFTER:  Yes, your Honor.

THE COURT:  Well, the matter left open last time which has now been about three weeks ago, I guess, was to the extent there was extensive further papers on that, the matter left open was a question of e-mails; internal e-mails.

And the way I understand the issue is that -- well, there's two aspects to it.  There are internal

Transcription Plus II        Rosalie Lombardi

4

Proceedings

e-mails that may still reside on people's -- that haven't

yet been purged or deleted, I should say and then there's

the e-mails that exist only on back-up media.  That's --

and that's the two categories of e-mails that I see at

issue now, all being internal e-mails.  Let me make sure

I frame this properly for the record, so that I am on the

same page that all of you -- the request is for internal

e-mails as to seven individuals.  That is, e-mails that

they sent, received, or were cc'd on internally.  That is

within the -- from other people in the FDA.

Is that right, Mr. Heller?

MR. HELLER:  That's correct, your Honor.

THE COURT:  Okay.  And then certain of those

are -- may still reside on the servers, not having been -

- the servers that serve the e-mail, the daily e-mail

correspondence because I gather by and large it's --

whether those e-mails are deleted is up to the individual

recipient of the e-mail.  And I guess the sender, too, to

the extent that the sender -- that the e-mail is

automatically saved by the sender.

## Proceedings

5

And then the other category being those that have been deleted but nevertheless may exist somewhere on back-up media.  It strikes me that mostly those are the ones that are going to be on the monthly back-up because the daily back-ups are only for two weeks as I recall; is that correct?

MR. HELLER:  That's five weeks, your Honor.

THE COURT:  Five weeks. Okay.  But still the significant events here occurred some time ago, so that the last five weeks worth probably aren't likely to have much of anything on them.

But let me start with the things that haven't been purged.  I used the word purged, it's probably the wrong word but deleted let's say.  Mr. Amanat, from your papers which were supported by an affidavit or an affirmation by someone who, I guess headed up the effort to retrieve those e-mails when they were -- e-mails, I should say are correspondence when the request was for external correspondence, the effort to find a non-deleted e-mail would take some significant time.

Proceedings

MR. AMANAT: Yes, your Honor. Judge, the declarations which we submitted, both the original one and the supplemental were from Glenn Rogers who is here at table. We had him come up in case there were any questions.

THE COURT: Questions. That's probably wise. Very good.

MR. AMANAT: And --

THE COURT: No, I thought I saw another -- I thought somebody else submitted one.

MR. AMANAT: Well --

THE COURT: Was it Ms. Axelrad (phonetic)?

MR. AMANAT: Ms. Axelrad, your Honor, is not an IT person. She's a lawyer at FDA who is the director or I don't now her exact title but she's the head of the office of policy within CDER within the Center for Drug Evaluation and Research. And she coordinated the process by which the agency responded to the plaintiffs first set of document requests or at least when I say the agency, she coordinated by the process by which CDER collected

Transcription Plus II        Rosalie Lombardi

7

### Proceedings

the documents that were --

THE COURT:  Right.

MR. AMANAT:  -- sponsored to the plaintiffs for a set of document requests.

THE COURT:  Which would have included external e-mails.

MR. AMANAT:  That is correct.  And those were searched for, your Honor --

THE COURT:  Right.

MR. AMANAT:  -- in the manner that she describes in her declaration which is the manner that FDA searches for any documents that it is called upon to search for, whether in the context of a FOIA search or in the context of a discovery request or in any other context in which FDA or a GAO inquiry, for example, and any situation where FDA is called upon to search for documents which meet a particular description, the process which it follows is precisely the process that is described in Ms. Axelrad's declaration, by which I mean to emphasize, your Honor, that it is not and never has

8

## Proceedings

been the practice of FDA nor as far as any other federal agency that I have worked with to do with the plaintiffs seem to have expected the agency to do which is to have the IT component go through all of the informational assets and electronic IT infrastructure of the agency looking for potentially responsive documents.  That is not the practice that is followed in the FDA with regard to FOIA requests or any other requests for documents.

THE COURT:  Yes, right now I am not really trying to explore how broadly or how well you respond to the first set of requests.  I'm really interested right now in trying to understand the problems posed by having FDA personnel review their own e-mails that still reside in their systems to see what they have with respect to communications between the seven or among the seven or -- I shouldn't say that, internal e-mails involving Plan B that were received by or sent by the seven.

MR. AMANAT:  Well, your Honor, that's not what the plans are requesting. They're not asking us to have employees of FDA search their own e-mail directories for

Transcription Plus II        Rosalie Lombardi

9

**Proceedings**

--

THE COURT:  No, I didn't ask that question. That's why I asked you the question.  I asked you how hard it would be --

MR. AMANAT:  Yes.

THE COURT:  -- to search for e-mails concerning Plan B that still reside on the -- not going to back-up tapes or other media, still reside in the FDA that were sent by, received by or copied to those seven people identified by the plaintiffs?

MR. AMANAT:  One second.

THE COURT:  I mean, it seems like -- first you look at those seven people.  Right?  You get them to produce the stuff.  And then you may go to a level below them to see or a couple levels below, people with whom they ordinarily correspond about this and ask those people to look for their -- through their drives.

MR. AMANAT:  I just want to make sure I am understanding the Court's inquiry.  The Court is inquiring about sending out a directive similar to --

Transcription Plus II        Rosalie Lombardi

10
Proceedings

THE COURT:  Well, that's what you did last time, sent out a directive.

MR. AMANAT:  Similar to the directive attached to the actual declaration --

THE COURT:  right.

MR. AMANAT:  -- asking people within various components of FDA to search their own computers for e-mails relating to Plan B.  That's what you're --

THE COURT:  Right.  Will access their servers because I gather these e-mails are not contained even on their own hard drives.  They're contained on a server but the access to the server is through each individual's e-mail account, I gather.  Am I right about that, by the way?

MR. AMANAT:  Essentially.  I mean, as we explained in the first Rogers affidavit, FDA's e-mail system is a server centric system.

THE COURT:  Right.

MR. AMANAT:  The e-mails don't reside on individual employees' work stations.  They reside on

Transcription Plus II        Rosalie Lombardi

11

**Proceedings**

e-mail servers of which there are 60 throughout FDA which is --

THE COURT: Right. But again, not all 60 are going to be necessarily implicated in this exercise.

MR. AMANAT: No, but if you're talking about -- even if you restrict yourself to e-mail servers that belong to CDER or the officer of the Commissioner, you're still talking nine different servers which -- am I correct; nine servers? Nine e-mail servers that contain the data that is subsumed within those e-mails. Each individual employee will have -- will be able to access to through their own --

THE COURT: Right.

MR. AMANAT: -- in a Microsoft exchange software on their own work station. The e-mails assigned to them or to their mailbox that are mapped to their --

THE COURT: Right. That's what I am talking about. It seems to me you can send out a directive to people who are likely to have communicated internally with these seven people about -- and, you know, (a) you

12

## Proceedings

ask those seven and you ask the people who communicate internally with those seven, who are likely to have -- you know, that's going to be a group of 30 people maybe to search their e-mail accounts. Now, I am just trying to get a sense of that doesn't sound kind of particularly hard for them to do.

MR. AMANAT: Well --

THE COURT: And see what that turns up.

Alternatively, instead of having them search it, maybe -- and I don't know, I am glad you had Mr. Rogers here, maybe he can tell us whether they can do some kind of a search directly on the servers without having to get, you know, people involved and, in other words, search the servers with several key works likely to show up somewhere in a document or in an e-mail, let's say and limit it to people who are in the address fields of the -- you know, in those servers if you follow what I am saying. I am just spinning things out.

And maybe that's a nice quick way to just search existing data without going to back-ups, without

Transcription Plus II          Rosalie Lombardi

13

Proceedings

having to resurrect the back ups for what may reside there now.

MR. AMANAT:  Judge, let me address your inquiry in the fine way.  What's involved in doing what the Court suggests, basically there are two aspects to it.  There's a technical aspect which is --

THE COURT:  What part of this are you addressing, the directive part?  Because that doesn't --

MR. AMANAT:  Well, no.

THE COURT:  There's nothing technical about that.

MR. AMANAT:  No, I am -- once the directive is issued, the technical aspect of searching for and extracting potentially responsive e-mail.  And then --

THE COURT:  Well, I mean, each individual person goes into their e-mails and they look in their -- whatever, you know, their e-mail accounts and see if they -- I mean, I guess they could take a few hours of time for them to search through and see what they still have. They're not likely to have all of them.

14

### Proceedings

MR. AMANAT:  Well, but then the second step, your Honor --

THE COURT:  Yes.

MR. AMANAT:  -- okay, the second step, your Honor, is the process by which these documents while they need to be reviewed for responsiveness and for privilege, the vast majority of the documents that are potentially -- that exist and that are potentially responsive to this request are going to be privileged --

THE COURT:  No, they're not.  Not if you're going to assert the deliberative process.

MR. AMANAT:  Well, your Honor, we have a right to assert that.

THE COURT:  You can assert it and I will tell you right now it's denied.

MR. AMANAT:  Well --

THE COURT:  And you can appeal that ruling. So, right now I am telling you the deliberative process privilege does not apply.  It just does not apply to this situation.  That's the ruling.  You can appeal that to

Transcription Plus II        Rosalie Lombardi

15

Proceedings

Judge Korman but it does not apply.  So you can assert it but don't withhold anything on that without appealing the ruling.  Okay?  So, let's move on to the next issue.

MR. AMANAT:  Well, there will nevertheless be many documents that are attorney/client privilege and --

THE COURT:  That's going to be because it was sent to or sent by an attorney you're saying?

MR. AMANAT:  Exactly, your Honor.

THE COURT:  All right.

MR. AMANAT:  And --

THE COURT:  And that's easily determined though; isn't it?

MR. AMANAT:  Well, I mean --

THE COURT:  You've got to see if an attorney was the address here or what was cc'd.

MR. AMANAT:  It --

THE COURT:  And if they're cc'd, I'm not sure that that qualifies but you can assert an attorney/client privilege.

MR. AMANAT:  There are --

Transcription Plus II        Rosalie Lombardi

16

Proceedings

THE COURT:  And so you would have to prepare a log.

MR. AMANAT:  Your Honor, there's still going to be a significant amount of time required to prepare privilege logs and then to engage in the collateral litigation which will take place on the subject of those -- of the privileges that are asserted.

In addition, your Honor, there's the fact that two of the seven individuals who are listed on the plaintiff's list are no longer with the agency, the two former commissioners.  So, they're -- and the task of searching whatever residual e-mails may exist in the system that were addressed to them is complicated by the fact that people -- members of the general public will quite frequently send e-mails that are addressed directly to the commissioner which going to the commissioner's e-mail box and which may have commented on in some fashion the --

THE COURT:  We're talking about internal. We're not talking about things coming from outside.

17

## Proceedings

We're talking about internal e-mails.

MR. AMANAT:  Well, it's not -- your Honor, the technical process involved in identifying internal e-mails versus external e-mails and sorting through them in determining which e-mails, you first have to do a search for all e-mails in a given collection that meet certain search criteria.  And from there, if you're saying then you have to go through those e-mails and extract the ones which are external e-mails or e-mails from the members of the general public and that is still a process which takes a considerable amount of time, we have addressed --

THE COURT:  I don't follow this.  I don't follow it.

MR. AMANAT:  Well --

THE COURT:  I mean, you are not --

MR. AMANAT:  We've addressed in some detail, your Honor, and both of Mr. Rogers' declarations, the technical steps that would be involved in doing the kind of search for internal e-mails on the agency's current active servers that the plaintiffs are requesting.

Transcription Plus II          Rosalie Lombardi

18

Proceedings

THE COURT:  Okay.  Where is that because I missed that.  I didn't focus on that.

MR. AMANAT:  It's in paragraph --

THE COURT:  I thought that --

MR. AMANAT:  It's in paragraph 23, your Honor, of the --

THE COURT:  Of?

MR. AMANAT:  -- supplemental declaration.

THE COURT:  That's the May 19 submission?

MR. AMANAT:  That is correct, your Honor.  Actually -- yes, paragraphs 22 and 23 together.

THE COURT:  But that has to do with e-mail servers --

MR. AMANAT:  But this is what the plaintiffs have requested, your Honor.

THE COURT:  No, no, no.  This has to do with the first search; right?  This has to do with searching for all Plan B related correspondence; right?

MR. AMANAT:  That's what the plaintiff's are requesting.

19

## Proceedings

THE COURT: All right. So, this is not what we're talking about. We're talking about doing a search with parameters where you where you identify the people from whom and to whom items internally are sent. So, you can define your search parameters in a way that excludes all that other noise. I will call it all that other traffic that really isn't -- it's not being searched for here. We're talking about seven individuals and the e-mail they received from a subset of other people in the FDA, that's what I am talking about, or copied on a subset of information -- from a subset of people in the FDA. That's all I am talking about.

MR. AMANAT: Served during what time period?

THE COURT: Well, during -- look, right now I am trying to find a way to get some information from that set of -- let me -- I will give you the big picture here and I am going to give the plaintiffs a chance to address this but I am not going to really require, if that's what it does require, you to buy a bunch of hardware and load up a whole bunch of data that you're bringing in from

20

Proceedings

back-up that you estimate is going to cost a million dollars.  I'm not going to do it because we don't have any kind of a record here that aim at internal e-mails are going to give you -- give them anything.  I mean, we don't really have anything hard to go on that this enterprise or exercise is going to really dredge up much of anything.  At least I am not aware of it.  I'll give them a chance to deal with that.

But that said, there seems to be a -- (a), there's -- it's not at all inconceivable that internal e-mails would have addressed this and might have some useful information.  And certainly if there's some way of going at and retrieving form the information that's now stored on the servers, that that ought to be done.  And I am not hearing the prevailing case for not trying that. I just am not hearing it.  I'm hearing a bunch of gobeldy-gook from you.  You're telling me about all of the reasons it can't be done and I'm trying to find a way that it can be done without burdening you, too much.  So you're not helping me in the exercise.  Maybe I didn't

Transcription Plus II          Rosalie Lombardi

21

**Proceedings**

signal this clearly enough.  I was trying to -- I'm really trying to find some way to give them a taste of what's out there and if it turns out that there is a gold mine there, then we may end up having to dredge up back-up tapes.  But right now, I am not prepared to order you to do that unless they're willing to pay for it and then we've got another -- and I don't think they are.

And so, while you're sort of mulling over that, Mr. Heller --

MR. HELLER:  Yes.

THE COURT:  -- what is it -- is there any reason why I should consider imposing on the government the cost that they say is  required in order to retrieve this back-up material?

MR. HELLER:  I think the Court is referring ow to the back up -- the monthly back up tapes.

THE COURT:  Right.

MR. HELLER:  Is that right?

THE COURT:  Look, I am operating on some assumptions.  First of all, most of the important events

Transcription Plus II        Rosalie Lombardi

22

Proceedings

that are under review here, if not all of them, occurred

well over five weeks ago.  They occurred months ago and

there is only -- as I read the papers, there's really

basically available only about three or four months worth

of back up tapes that are even likely to have anything.

MR. HELLER:  That's right.

THE COURT:  My understanding is that those back

up tapes are not kept for the purpose of being a

searchable database to retrieve materials for use in any

ongoing functions of the FDA.  They are there to cure a

catastrophic failure of the system.  I'm operating on

that assumption.  Maybe I am wrong about that, maybe you

have reason to question that.

But because it's that way, you really have to

load up all of that data somewhere and then go about

searching.  And that data includes not only e-mails, I

think, it includes a lot of other stuff, too but maybe I

am wrong about that.

But anyway, so you know, I am operating on

those assumptions.  That's the way I understood the

Transcription Plus II          Rosalie Lombardi

23

Proceedings

papers.  And they say it's going to cost $1 million.  And they go into a fair amount of detail about how they come to that number.  Now, you may want to challenge that.  But even if it costs a half a million and it costs -- and the hours of individual's time that would be required here, I must say I have a great deal of reluctance on that based upon the scanty record that we have now that that search is going to come up with anything.

MR. HELLER:  I think the Court's suggested approach, which is to require the agency to conduct a search of the relevant e-mail servers, not all 60 of them but those that are likeliest to contain e-mails of -- received by or sent to these seven people, if that -- it may well be that that turns up nothing.  It may well turn out that it turns up a number of relevant documents or e-mails.  In fact, Ms. Axelrad's affidavit in paragraph 12 says --

THE COURT:  That's -- please tell me where --

MR. HELLER:  Sure, it was attached to the government's -- I think the government's May 10 letter --

24

## Proceedings

THE COURT: The first one; okay.

MR. HELLER: -- as Exhibit A.

THE COURT: Right.

MR. HELLER: The Axelrad declaration at paragraph 12.

THE COURT: Yes.

MR. HELLER: She starts by saying what is more in many of the internal e-mails called for by the second set of document requests, to the extent they are of a substantive nature, are likely to contain deliberative process material such as attached drafts of agency documents which the agency does not normally produce and will not produce in this case.

Now, understanding that the Court has rejected the --

THE COURT: Yes, let me --

MR. HELLER: This --

THE COURT: I will put this on the record right now. When -- once you get into examining what went on behind the scenes, once you've engaged in the process of

25

Proceedings

requiring the agency people to testify about things that they've considered, I mean, the whole -- I forget the seminal case by the supreme court, Overton Park or whatever --

MR. HELLER:  I believe so.

THE COURT:  -- it's a recognition of the fact that we are -- we don't easily go into the deliberative process.  We don't go behind the administrative record but when we do, that's what we're examining.  We're examining the deliberative process.

So, that deliberative process privilege is gone by virtue of the decision and that's why -- I am telling you why I have reached that decision.  The deliberative process privilege is no longer applicable.  Now it's a question of whether that deliberative process was a proper process.  That's the question that we're examining.

And the only way you can examine it is by examining what happened.

MR. HELLER:  But I also --

Transcription Plus II          Rosalie Lombardi

26

**Proceedings**

THE COURT:  So, I didn't -- I want to put that on the record, that they had something to appeal from. But go ahead.

MR. HELLER:  I want to say that it seems to me, at least, that individuals at the FDA who had lengthier substantive e-mails that might have had exactly these types of agency -- drafts of agency documents attached, those are in some sense, in my view, at least, just as a common sense matter, the most likely e-mails to have been preserved by the person.

You know, I am going to keep these six e-mails that have these five important documents attached, drafts of things, and there's a reasonable chance that even in a -- that in a search of the e-mail -- the relevant e-mail servers I think Mr. Amanat said there were nine of them, some of these e-mails from even a long time ago may have been preserved.

In fact, we have an e-mail that we received from a journalist that we never got from the agency in any discovery from May 14, 2004.  And I have no idea how

27

## Proceedings

the journalists got this e-mail but he got it from somewhere. It relates to Plan B from Dr. Jenkins. I don't -- it went to Dr. Golson, Dr. Woodcock (phonetic) and some others who have been redacted, that talks about the process or to some degree about the process.

Whether this journalist got this e-mail in May of 2004 or recently, I don't know. But it seems to me that there's some chance of that and we can then -- if it turns out there is, as the Court said, a gold mine of information, we can at that point revisit the question of back-up tapes.

I think within the -- I think the back-up tapes that would be relevant as the Court indicated are perhaps for a one or two month period around August of 2000 --

THE COURT: 5 --

MR. HELLER: -- 5 when this most recent FDA action was taken and unfortunately -- I do want to put on the record though that part of our reason for requesting these back-up tapes is that no one ever told us about their existence until extreme -- until the May -- I guess

28

Proceedings

the first Rogers' affidavit.  We didn't eve know they existed.  And although they are clearly designed for catastrophe or recovery, it's important that the other party at least know what exists, so that -- and what the Court knows what exists so that a determination like we're making here today can be made.

I think I just wanted to make one other small point which is that we would -- and this may well not be necessary because I think the August -- or these earlier back up tapes that are kept by the agency are written over, as I understand it, after about 12 months or reused, recycled.  And one of our concerns is if there is a gold mine of information, that these tapes -- that additional information not be written over.

Now, there's been in the second Rogers' affidavit, there's a statement that requiring the agency to purchase -- I guess to purchase these tapes, new tapes, so that they can preserve the old ones would cost $500,000.  And I don't know what kind of tapes they are using to keep their back-up information but we would ask

Transcription Plus II          Rosalie Lombardi

29

Proceedings

that the agency at least until -- perhaps until we go

through this initial process of the e-mail server search,

that the agency not continue to reuse the older tapes, so

that some of this information can be preserved in the

event that the Court or we persuade the Court that there

is a gold mind that justifies going to the back-up tapes.

I think it's the last paragraph of the

paragraph 25 of the second Rogers' declaration --

THE COURT:  I remember something about the cost

of --

MR. HELLER:  Of getting additional tapes.

THE COURT:  -- of getting new media or

additional media.

MR. HELLER:  And maybe it is half a million

dollars to do that.  Maybe they're being stored at a very

expensive location.  I don't know what's -- maybe it does

cost a half a million dollars to get a months worth of

tapes or two months worth of these tapes.

THE COURT:  What are the months that are

implicated here?

Transcription Plus II        Rosalie Lombardi

30

Proceedings

MR. HELLER: Well, I mean, I think the months that we are interested in are months proceeding September 2005 and back. More recent months are not going to be relevant.

THE COURT: Right.

MR. HELLER: And from what I understand, there would be a tape from August and September of 2005 from the Office of the Commissioner or a set of tapes that might be more accurate. And then sets of tapes, back up tapes for CDER beginning roughly May 2005 that still exist through about August or September of 2005.

The May 2005 one, for example, would presumably be reused any time now.

THE COURT: Right.

MR. HELLER: And then a month from now the June 2005 one would be reused. And I don't know -- it's hard for me tell from --

THE COURT: Remind me, I thought that at some point they started doing monthly back up for the whole --

MR. HELLER: I thought it was roughly August of

31

Proceedings

2005 when the Office of the Commissioner first instituted monthly back up tapes.  But I may have that date a little bit wrong.

But it seems to me that -- I am not sure what the $500,000 figure quoted refers to if that's -- it seems to be an amount related to keeping the back up tapes in existence until the close of discovery.  What I am suggesting is it may be kept in existence until we see what the search of e-mail servers produces which might just be a month.  I don't know how it will take the government to conduct such a search, if indeed it's willing to do that.

I mean, I don't know if we have a discovery cut-off date but it seems to me that --

THE COURT:  We don't but I am anxious to finish this up, frankly.

MR. HELLER:  As are we, your Honor, and so what I am suggesting is that what we may be talking about is keeping the May and/or June 2005 tapes preserved, so that we see the results of these searches of e-mail servers or

Transcription Plus II        Rosalie Lombardi

Proceedings

the search that's conducted by a directive to individuals and then assess whether anything further would be done or not.

MR. AMANAT:  Judge, may I be heard?

THE COURT:  Just a moment. I am trying to figure out what -- and maybe you can answer it quickly, more quickly.  Their monthly back-up tapes which are of just CDER or -- I mean, separate ones for CDER.  I know that there was some point where they started being all together.

MR. AMANAT:  In August of '05.

THE COURT:  In August of '05.

MR. AMANAT:  Yes.

THE COURT:  And then prior to that they were separately kept?

MR. AMANAT:  That is correct, your Honor.

THE COURT:  And how far back do each of them go from that point?

MR. AMANAT:  Only back to May, your Honor.  I mean, well -- each organization within FDA kept it -- you

Proceedings

know, had its own rotation schedule and retention schedule for the back-up tapes.  As I understand it, the longest the schedule provided for maintaining back-up tapes for one year.

THE COURT:  Okay.

MR. AMANAT:  And some of the organizations within FDA including CDER had that schedule in place prior to August of '05.  And then beginning in August of '05, it became an agency wide policy.

THE COURT:  Overseen by Mr. Rogers for backing-up.

MR. AMANAT:  And his office; that's correct.  I mean, Mr. Rogers heads a large component within the agency but it is within the office of the chief information officer.

THE COURT:  I see.

MR. AMANAT:  But, your Honor, the question with -- if I could just briefly address this question with regard to maintaining the back-up tapes. I have three things to say.

34

Proceedings

THE COURT:  Well, I am still just trying to get a handle on how far back they go.

MR. AMANAT:  Well, the --

THE COURT:  If the farthest back that they go is a year from now, that means it's May of 2005.

MR. AMANAT:  It would have been the back-up tape created at the end of May. And that may have already been overwritten by now, I don't know because it is already the end of May.  I don't know if that one is in existence.

THE COURT:  Okay.

MR. AMANAT:  And now --

THE COURT:  And that would be a separate one for CDER and a separate one for the Office of the Commissioner.

MR. AMANAT:  There was nothing for the Office of the Commissioner at that point in time, your Honor. Because at that point in time in May of '05, the Office of the Commissioner was maintaining -- did not keep monthly back-ups.

Transcription Plus II       Rosalie Lombardi

35

Proceedings

THE COURT: Okay.

MR. AMANAT: It kept daily back-ups for 16 weeks and then they would be recycled.

THE COURT: Got it. So, they had their own program and CDER had a yearly -- a monthly program that went back a year.

MR. AMANAT: Well, yes, it would make a daily back-up every day and then one of those daily back-ups each month would be taken out of the recyclable rotation and would be take off-site.

THE COURT: Okay. So that would go back and that would be kept for a year.

MR. AMANAT: That is correct.

THE COURT: And then it would be reinserted into the rotation.

MR. AMANAT: Yes, whichever of the daily back-ups from CDER that was created in May of '05 would have been kept for one year. It may have been overridden by now. I don't know if it has or not.

THE COURT: June, July and August. Okay.

Transcription Plus II        Rosalie Lombardi

36

Proceedings

MR. AMANAT:  So --

THE COURT:  But in August, all agency wide the retention system became -- it was all merged into one retention system.

MR. AMANAT:  Yes, well that became a new policy and then one by one the various components within FDA became complying with that policy.  So, the implementation of it didn't become agency-wide.

THE COURT:  All right.  Well, what --

MR. AMANAT:  But the application of it did.

THE COURT:  So, but maintainingly say, the only -- it sounds to me like the only office as to which media would have to be maintained back to May would be CDERs.

MR. AMANAT:  I mean, yes.

THE COURT:  And then, of course, once we get into August, then we would have to start maintaining the agency wide stuff.

MR. AMANAT:  But, your Honor, with regard to holding on to the back-up tapes during the pendency of this case, I would like to point out that there really

37

## Proceedings

isn't any point in maintaining those back-up tapes unless

the Court at some point anticipates requiring the FDA to

do precisely the type of back-up process, the back-up

restoration process that Mr. Rogers stated in his sworn

declaration which is unopposed, by the way, by any sworn

declaration by an IT expert submitted by the plaintiffs

was a process that was going to cost $1 million.

THE COURT:  Right.

MR. AMANAT:  And the Court has already said

that it is not inclined to require the agency to

undertake --

THE COURT:  On the present record, Mr. Amanat.

Let's not get -- right now there's two issues; one is --

and frankly, I am really puzzled by this.  I don't

understand why it's so hard to search your servers with

a, you know, pretty neatly confined search  limited to

what a group of seven people received from a group of

perhaps 35 people because they're not going to get

information -- I mean, to the extent that they're getting

communications from people farther down the line than say

Transcription Plus II        Rosalie Lombardi

Proceedings

one or two levels below them, I'm willing to forgo whatever information that might have -- whatever serious impact that might have had, at least at this point.

But, you know, search for people -- you search the seven and people who would be likely to have communicated with those seven, whatever that -- however you define that group of people, about Plan B, I am talking about, generally within the agency who would have, I can't imagine that it would be more than a total of 30 or 35 people.

So you confine your search to those names appearing in the send/receive box and maybe -- I don't know how searching through the e-mail system is. That's something I didn't get much of a feel for but you put in some key words that you search for to see if they appear in the text or in the subject line. And then you see what comes up there.

I understand you're still going to have to review them because they may not all be responsive. Somebody might mention Plan B while talking about

Transcription Plus II          Rosalie Lombardi

Proceedings                                    39

something completely different and not have communicated

any information.  So, you know, maybe that's not a

relevant one but, you know, there are some things that

the agency and the defendant has to -- some cost that the

defendant has to incur.  I just don't see that being such

a terribly expensive exercise.

MR. AMANAT:  Your Honor, what I -- if I may

propose an approach that I think is consistent with what

the Court is describing here that it's nonetheless going

to be a significant cost to the agency but I understand

your Honor is looking for a way out.  What the --

THE COURT:  I'm not looking for a way out.  I'm

looking for a way --

MR. AMANAT:  Well, for a solution.

THE COURT:  Well, yes.

MR. AMANAT:  For a solution.

THE COURT:  I mean, there's a request.  It's

not an unreasonable request.  It is -- it could be -- I

mean, if taken globally, if you have to search your back-

up tapes, it's going to impose a huge expense.  And I

Transcription Plus II        Rosalie Lombardi

40

## Proceedings

understand your point.  There's nothing to challenge the estimate made here.  It's going to cost $1 million.

Maybe they don't have -- they have enough information to challenge it.  But they're not even pushing for that right now.  They're saying sure, let's see what a limited search will turn up.  If it turns out that there's a lot information there, well then maybe we do have to go to the next step.

But if it turns out that there are very few nuggets there then I can justifiably say that based on the factors that courts have analyzed when they deal with these electronic mail situations, that the cost isn't worth -- I mean, that the benefit just isn't worth the cost.

MR. AMANAT:  But, Judge, just to clarify, what Mr. Heller described, the kind of search that Mr. Heller described a few moments ago was very different from what your Honor described.

THE COURT:  I know.  I am describing -- I don't know -- I don't really recall what Mr. Heller described.

41

## Proceedings

MR. AMANAT:  Well, what Mr. Heller described --

THE COURT:  Forget about what he's described.

MR. AMANAT:  Okay.

THE COURT:  Focus on what I --

MR. AMANAT:  Well, what I would suggest, your Honor, is -- and what I would suggest is that -- because this seems to be what your Honor is -- the direction which your Honor is heading would be to undertake a process similar to what was undertaken as described to him as Axelrad's declaration.  And call upon a relatively small universe of upper level people within CDER and the Office of the Commissioner to search their own e-mail -- their current e-mail mail boxes for e-mails relating to Plan B which are dated prior to September 1, 2005.

THE COURT:  Well, why do you want to limit it that way?

MR. AMANAT:  Well, because that's what the plaintiffs are requesting.

THE COURT:  Okay.

42

Proceedings

MR. AMANAT:  And I think --

THE COURT:  Is that what the request was?

MR. AMANAT:  And certainly there is no basis for seeking an e-mail more recent than that.  The actions that are addressed in the --

THE COURT:  Okay.  Well, why don't I --

MR. AMANAT:  -- third amended complaint --

THE COURT:  So, let's complete your thought. You're saying you would rather do it by way of a directive, send out to all of the individuals to search their own e-mails.  Okay?  Is that what you're suggesting?

MR. AMANAT:  That is what I am suggesting.

THE COURT:  Okay.

MR. AMANAT:  As opposed to --

THE COURT:  All right.  Let me ask you -- I made a different suggestion.  I made a suggestion that a search be done -- you don't even have to go to the individuals but you search the servers -- nine servers, eight servers, 12 servers, however many there are, based

Transcription Plus II        Rosalie Lombardi

43

Proceedings

on addressee, i.e., sent to, you know, mailer, and cc.  I

mean, there are usually several fields in an e-mail that,

you know, identify who it was sent to, who it was sent by

and who it is cc'd to, as well as a word search.  I don't

know.

MR. AMANAT:  Judge, that's --

THE COURT:  I mean, tell me if that's doable.

MR. AMANAT:  It's not feasible to do that from

a centralized IT location, given the way the FDA has its

-- given its IT infrastructure, it's not feasible to do

that from a centralized IT location, except that

substantial costs and substantial --

THE COURT:  And why is that?

MR. AMANAT:  -- investment of time?

THE COURT:  Why is that?

MR. AMANAT:  Because the agency's e-mail

servers are separate servers. There's no way to globally

search all of the different e-mail servers.  You would

have to search each server separately.  The amount of --

the number of terrabytes of data that you are dealing

Transcription Plus II        Rosalie Lombardi

44

Proceedings

with here in terms of the volume of information that is maintained on each of these servers is a substantial -- and there's no software capability.  The agency does not have software in its possession that would allow it to undertake from a centralized IT location, the type of search that your Honor is describing.

THE COURT:  Okay.

MR. AMANAT:  I am informed --

THE COURT:  So you don't have a search feature.

MR. AMANAT:  That's correct.  And it would cost -- it is estimated that the cost to return such software would be in excess of $200,000.  Simply to acquire software that would give FDA the capability to do that kind of centralized IT based search of the existing e-mail servers.

THE COURT:  Do you have any reason to doubt that, Mr. Heller?

MR. HELLER:  Well, the only reason I have to doubt it is paragraph 23 of the second Rogers affidavit. It says the following:  About the --

45

Proceedings

THE COURT:  Okay, the second one.

MR. HELLER:  This is the second one.  It says,

"Such a search can be conducted only by using specific

search terms or other specific search parameters that are

likely to result in both an over inclusive and under

inclusive set of documents.  The documents identified

through such search would then need to be carefully

reviewed to determine whether, in fact, they are

responsive to their request."

This makes it seem as though there is some -- I

mean, that there is some sort of search function perhaps

available out of these eight different servers where

essentially you instruct --

THE COURT:  Now paragraph what?

MR. HELLER:  23.  Where you essential instruct

the computer to conduct a search.  You let it sit.

People aren't working.  The computer is working.  And

some time later, the computer says here's what the search

produces.

MR. AMANAT:  Now, your Honor, Mr. Heller is --

Transcription Plus II        Rosalie Lombardi

46

Proceedings

MR. HELLER:  That's not what this --

THE COURT:  Okay.  Well, wait a minute.  But, I mean that is a -- just a moment.

MR. AMANAT:  All right.

THE COURT:  Just a moment.  And again, paragraph 23 only addresses the first initial discovery request.  I'm talking about something much more limited and that's -- I am talking about limited search parameters, you know, limited to that category of people who -- I mean, seven names have to appear in one of two or three fields and then specific set of words that could be agreed upon, hopefully among counsel as to, you know, to search for some specific terms appearing in that subset of e-mails.

Now, Mr. Heller makes an awfully good point. It's certainly -- paragraph 23 certainly suggests a search capability that deals with certain parameters.

MR. AMANAT:  No, your Honor, the paragraph 23 anticipates that the agency could acquire such search capability if it were to purchase the appropriate

47

Proceedings

software which is why the estimate set forth in paragraph

23 for doing the process that is described in the

paragraph is $600,000, which includes the cost of

acquiring the software, of training the personnel to use

it, of -- and then dedicating the personnel to do it to

undertake this search.

And if your Honor looks in paragraph 24(f) of

the second Rogers declaration, it explains that in order

to undertake a search of this nature, the agency would

have to purchase the software to do it at a cost of

$200,000.  Mr. Rogers' declaration is undisputed in the

record.

THE COURT:  Okay.

MR. AMANAT:  Mr. Heller --

THE COURT:  Okay.  Listen, Mr. Amanat, you have

a tendency to over argue your point; okay?  Right now, I

am just seeking information.  You've pointed out the

information that I think that answers Mr. Heller's

question; at least it does from my stand point.  So,

let's return to -- and I don't hear Mr. Rogers

48

Proceedings

challenging it.  So, I mean, Mr. Rogers is here.  I am

assuming that he's giving you the information you're

providing to me about costs or has in the past.

And if your representation on behalf of your

client is that you do not have searchable software that

will permit the search of the type that I am suggesting,

then I will accept that representation.

MR. AMANAT:  Now, if your Honor --  with regard

to --

THE COURT:  Which leaves us with the other

option.

MR. AMANAT:  Right.

THE COURT:  That is, it seems to me, of having

people do the work.

MR. AMANAT:  Which they could do using

Microsoft Exchange -- you know, Microsoft Outlook which

is the e-mail software that they use.  That certainly has

search capabilities which would allow an individual end

user to conduct a search within that particular end

user's own existing e-mail folder for e-mail meeting a

49

Proceedings

particular search criteria.  So, that can be done by the individual end users.

So, if your Honor, is looking for a way to try to provide the plaintiffs with some of the documents that they're requesting without conceding that it's not burdensome but that it will be burdensome, but I know your Honor is anxious to make progress in resolving this, we can issue a directive similar to the directive that was issued back in March with regard to the first set of discovery requests asking -- calling upon a small universe of FDA employees within CDER, within the upper management of CDER and OC, Office of Commissioner, to search their own individual e-mail folders using Microsoft Outlook or whatever other software they have on their work stations for e-mails from prior to 9/1/05 which relate to Plan B.

Now, that's a process which is still going to be time consuming and we would ask that the Court -- if that's what the Court wants the agency to do, we would ask that the Court give us 90 days to do that project.

Transcription Plus II        Rosalie Lombardi

50

## Proceedings

THE COURT: It seems like a little long -- you've got 35 people -- 30 or 35 people can -- let me ask Mr. Heller, do you know -- do you have a sense of the names or universe of employees who would likely have been communicating with the commissioner within CDER and within the OC that are -- I mean, any of the seven -- I shouldn't say the commissioner, with any of the seven within, you know, I guess it likely would be within CDER and OC.

MR. HELLER: That's right.

THE COURT: So, I mean, maybe you could sit down with Mr. Amanat and figure out which set of employees would have to be doing their own searches of their e-mail for the internal correspondence in the category that we've identified and -- but, you know, they search; they do their search. It may take an hour or two, right, for them using the search features. They pull up whatever e-mails they have, they forward them to Ms. Schifter. She -- I mean, why is that going to take 90 days?

51

Proceedings

MR. AMANAT:  Well, because of the time it's going to take to review them.  The time it is going to take to review them and --

THE COURT:  Do you expect to get that many?

MR. AMANAT:  I don't know how many there are, your Honor.

THE COURT:  If you expect to get that many, then maybe there is a gold mine here.  I just don't see that.  I mean, if there's that much communication going on internally that it's going to take you 90 days to review it, why don't you find -- look, I was worried about whether 30 days was going to be too long, frankly. But because look, I don't want this to go out 90 days. You're close to finishing the depositions; aren't you?

MR. AMANAT:  The depositions are scheduled to take place through almost the end of July.

THE COURT:  Yes.

MR. AMANAT:  So, we would --

THE COURT:  I would like to wrap this whole baby up by the end of the summer.

52

Proceedings

MR. AMANAT:  Can we have 60 days then to respond?

THE COURT:  No, why don't we get back -- why don't you do the first step?  You know, find out what the total universe of things that come up in the response to the directive, you know, by the group of employees that you can identify.

MR. HELLER:  Well, I think Ms. Axelrad identified both a group of employees who were -- on the prior round, a group of employees who were given a directive and I guess there were document managers of component offices who were also given the directive.  And it seems to me that putting together the names we know of and presumably many of which I am sure included among the names the people Ms. Axelrad was referring to plus others that she thinks are appropriate to have review or search for documents, we should be able to do that.  It seems to me that the Court's proposal of let's see how many -- you know, if they come up with 500,000 e-mails or are they going to come up with 200?  If it's 200, the document

Transcription Plus II        Rosalie Lombardi

53

Proceedings

review shouldn't take 60 days.

THE COURT: That's right. I mean, I don't have a sense at all of how much is going to be turned up. And if you say 60 days, well, I know what's going to happen. I mean, it's going to take 60 days even if there's five e-mails that show up. I'm being perhaps a little glib.

But why don't we see what happens when you ask for the search, what that turns up in terms of the number of documents and then we can get a sense of how long it's going to take for that review to occur.

MR. AMANAT: Your Honor, I am informed by my client that the first search that took place back in March in response to the first set of document requests actually involved hundreds of people within the agency who were called upon to search their file.

THE COURT: I have not -- I am not suggesting that the net be cast as wide. I am not suggesting that. I am suggesting -- we're talking about internal communications. We're talking about internal communications that were seen by seven people. There

54

Proceedings

were seven people identified and we're talking about

internal communications.  That is, communications with

somebody else within the agency to those seven people.

Now, I don't mean everybody -- you have to look

at everybody who may have communicated.  I'm talking

about upper level people who would have communicated

substantively with the commission or the other six -- the

seven includes the commissioner; right or the

commissioners.  There were a couple of commissioners.

You know, about those -- about the progress of the Plan B

review process.

so, I don't see why it would be more than 30

people or so.  Maybe I am wrong but that's why I am --

what I am asking is that you make your list between the

two of you and if you have a problem because their list

is over inclusive or their list is under inclusive, then

I guess I will have to resolve those.  But in terms of

the people who are to be searched, I don't see why it's

going to be more than 25 or 30 people.

MR. AMANAT:  Can we confine it to the people

Transcription Plus II       Rosalie Lombardi

55

Proceedings

whose depositions they've noticed?  This --

THE COURT:  No.

MR. AMANAT:  These five employees?

THE COURT:  Do you mean whether they communicated with the seven?

MR. AMANAT:  Yes.

THE COURT:  No.

MR. AMANAT:  I mean, those are the people whose -- with whose communication they seem primarily interested.

THE COURT:  What?

MR. AMANAT:  They see primarily interested in communications between the commissioner and Dr. Golson (phonetic) and --

THE COURT:  Well, sure, those are among them.

MR. AMANAT:  And the --

THE COURT:  And they're interested in those to be sure --

MR. AMANAT:  And their subordinate --

THE COURT:  But there may be people below --

56

Proceedings

look, I don't know the -- and I am not going to decide that realm. I am asking you to do that work and if you can't agree on it, I guess you'll have to bring that to me.

But I am envisioning that the internal communications are the communications that are likely to have been received by those seven from people who are basically immediate subordinates regarding Plan B. That's what I am talking about.

MR. HELLER: Your Honor, I think we would be prepared to by the end of business day tomorrow provide a list in the neighborhood of 20 names that -- as the Court has described and perhaps then Mr. Amanat could say fine, we'll go ahead or we object --

THE COURT: 20 names is even less than I thought. So, 20 doesn't seem like it's a terribly hard process. I mean, a terribly difficult matter.

Look, I will try to be specific and I'll be specific now. The defendant is required to conduct a search of or to make -- to conduct a search of the e-mail

Transcription Plus II        Rosalie Lombardi

57

Proceedings

accounts, if you want to call it that, of a list of -- a confined list of people who are likely to have communicated with the seven previously identified; that is either because they address something to them, something was addressed to the group by the seven or -- I'm sorry, I am not being articulate enough.

Focusing on the seven who have been identified by the plaintiffs, e-mails sent to the seven, sent by the seven, or e-mails on which the seven were copied. To the extent that these are communications sent to the seven, or sent -- on which they were copied, then the universe of people to be -- whose e-mail accounts need to be searched are -- is that a list to be drafted by the plaintiffs and submitted to the defendants and it is in the Court's view a list that is a relatively small number of people who are subordinates, you know; one or two levels below the seven, from whom they are likely to have received communications or that -- by whom they would be cc'd on communications regarding Plan B. That's the universe of e-mails presently existing on the servers and

58

Proceedings

I guess the way that I understand the defendants would do this is they would send a directive to those people and say search your e-mail accounts or search your e-mails for these kinds of documents.  And that's the kind of search that needs to be done.

And to the extent that the review process is going to take more than 30 days, we need to have a conference in 30 days to see how that is proceeding. Let's do it that way.

MR. AMANAT:  And just to clarify, these would be e-mails that would be cut off as of September 1, 2005?

THE COURT:  Well, if that's what the request was.

MR. HELLER:  That was not the request.  The request did not have a time date on it.  And I actually think it's better from the point of view of limiting possible repeat efforts here to have these people -- it's very --

THE COURT:  Yes, let's do it all.

MR. HELLER:  There's going to be very little

Transcription Plus II          Rosalie Lombardi

59

Proceedings

after September 1.

THE COURT:  Let's do it all.

MR. AMANAT:  Well, we would object, your Honor.
I mean, they would --

THE COURT:  I know you would object and the
objection is overruled.  I don't want to have to go
through -- let's do it once.

MR. AMANAT:  Your Honor, can I state the basis
for my objection on the record, your Honor?

THE COURT:  You sure can.

MR. AMANAT:  First of all, the plaintiff's
complaint only has allegations in it with regard to
events through the end of August of '05.  I am referring
to the third amended complaint.  There are no allegations
whatsoever in the complaint for the period after that.

Second of all, your Honor's lengthy and
detailed decision of February 24 of this year which
identified the facts and circumstances which warranted
the plaintiffs in taking discovery outside the
administrative record identified no events from after the

60

### Proceedings

period of August of '05, only identified events from prior to that period.

Third of all, the plaintiffs in their own submissions to the Court in connection with this motion, their submission of May 22 and their submission of May 19 -- I'm sorry, May 15, as well as their -- I'm sorry, May 15 and May 22, indicate certainly with regard to the tape back-ups that they were seeking that they were only interested in the period from May to September of '05.

Fourth of all, Mr. Heller 15 minutes ago himself made the statement on the record here today that the e-mails and the communications from the period since September of '05 are not relevant to this case. So, on those grounds, your Honor, we would ask that the Court cut off the production as of September 1 of '05.

THE COURT: Okay.

Mr. Heller?

MR. HELLER: Just briefly, your Honor, I think it's true that we don't have allegations about things that occurred after September 1, 2005 in our third

Transcription Plus II          Rosalie Lombardi

61

Proceedings

amended complaint.  However, it's been the agency's position consistently, I believe, that they are still considering -- they have made no final decision about Plan B, it's still under review.  Everything is still going on.

I think we are entitled to see internal correspondence from people, for example Dr. Golson writes hypothetically in October of 2005, I can't believe they're doing this rule making.  This is ridiculous.  We should have done this -- we're entitled to see those post August 26, 2005 documents that might, if they exist, contradict the agency's repeated position that they're engaged in some sort of meaningful process in which they have not yet made a final decision about Plan B.

And I would just add that our statement about back-up tapes was designed to limit the burden to the agency of searching the back-up tapes, not to state that nothing after September 1 would be relevant.  We don't know that unless we get a glimpse of what's contained in the post-September 1, 2005 record, if any.

62

Proceedings

THE COURT:  Okay.   I take it that what the --

since the request, if you say the request -- Mr. Heller,

you said the request was not confined by an end date.   It

was open ended.   Is that what you're saying?

MR. HELLER:   That's correct.

THE COURT:   So, basically the government's

application is an application for a protective order to

block the discovery of anything occurring -- at least any

e-mail traffic occurring after September 1.   That

application is denied.

Anything else?

MR. AMANAT:   Yes, your Honor, just to clarify

for the record your Honor's ruling with regard to

deliberative process privilege.   Am I correct in

understanding that your Honor has precluded the

government from asserting the deliberative process

privilege in regards to any document that may be

responsive to these discovery requests?

THE COURT:   No, you can assert any privilege

you want but the deliberative process privilege is not a

63

## Proceedings

basis to withhold production.  I am overruling that as a

basis on which to withhold production.  It's a qualified

privilege and the privilege in my view with respect to

deliberations concerning Plan B has been effectively

taken out of this case by the Court's prior ruling.  It

doesn't mean that the deliberative process privilege

doesn't apply with respect to communications about other

deliberations that the agency has engaged in.

     And so, for instance, if an e-mail concerns

more than just Plan B, and, in fact, concerns

deliberations about something else that's on the plate,

that qualifies for protection and that kind of assertion

of privilege would be upheld.  Is that clear enough?  I

am not sure --

     MR. AMANAT:  I just wanted to make sure for

purposes of our consideration --

     THE COURT:  Right.

     MR. AMANAT:  -- of next steps, I wanted to make

sure that I understood --

     THE COURT:  But you're right, to the extent

64

## Proceedings

that you're going to assert the deliberative process privilege with respect to matters involving Plan B, the Court has concluded that that is not a basis to withhold information in this case on Plan B.  You could assert it. I am not -- you can assert any privilege you want.  It's just that I won't uphold that as a basis to block production of discovery.

You can certainly appeal that ruling; okay? But now starts the point where you can appeal that ruling.  You know, you're entitled to it.  I mean, it's on the record here.  So if you're going to appeal it, you need to do that soon and get it before Judge Korman; okay?

MR. AMANAT:  Thank you, your Honor.

THE COURT:  All right.

**(Off the record)**

THE COURT:  -- 30 days to -- by then you should have -- you'll have some responses.  You'll have a sense on what's going on with this discovery directive.  We'll have a sense hopefully of the volume of materials that's

Transcription Plus II          Rosalie Lombardi

Proceedings

going to dredge up and how long the process is really going to take.

But I expect to have some details on that, so that we can really set an end date on when the production has to occur; okay? Is that reasonable to everybody?

MR. HELLER: Yes.

THE COURT: Okay. So, let me just give you a date and a time for that. How is the 29th? It's actually less than 30 days but the 30th is a Friday and the Friday before the July 4 weekend. And you don't want to be hanging around; 2 o'clock, telephone, Thursday?

MR. HELLER: That's fine for plaintiffs, your Honor.

MR. AMANAT: June 29?

THE COURT: Yes.

MR. AMANAT: That works for me, your Honor.

THE COURT: Okay.

MR. AMANAT: And your Honor would prefer to do that over the phone rather than in person?

THE COURT: That's what I said. Is there any

Proceedings

reason we need to be here in person on that?  It's just really sort of an information conveying --

MR. AMANAT:  We're just across the street, your Honor, it doesn't matter for us.

THE COURT:  For you it's an easy thing.

MR. HELLER:  Well, it's relatively easy for us, too, your Honor, but it seems to me it's basically going to be the volume of it and how long --

THE COURT:  Well, if you want to do it in person, if you think it's more effective to do it in person, we can do it in person.

MR. HELLER:  It doesn't matter to us.

THE COURT:  It doesn't matter.

MR. AMANAT:  I would prefer to do it in person but, you know --

THE COURT:  All right.  Well, then we'll do it in person.  Discovery -- I mean, status conference; okay.  See you at 2 o'clock on the 29th.

MR. HELLER:  Thank you, your Honor.

MR. AMANAT:  Thank you.

67

**Proceedings**

(Matter concluded)

-oOo-

68

C  E  R  T  I  F  I  C  A  T  E

I, ROSALIE LOMBARDI, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this __6th__ day of __June__ , 2006.

---------------------------

Transcription Plus II          Rosalie Lombardi