UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------X Docket#

TUMMINO, et al,
          Plaintiff,

  - versus -

ANDREW C. von ESCHENBACH,
          Defendant

---------------------------------X

: 05-cv-366(ERK)(VVP)
:
:
:
: U.S. Courthouse
: Brooklyn, New York
:
: July 26, 2006

TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY CONFERENCE
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES CHIEF DISTRICT JUDGE

**A    P    P    E    A    R    A    N    C    E    S:**

**For the Plaintiff**:         **Simon Heller, Esq.**
                          **Nan Strauss, Esq.**

**For the Defendant**:         **Steven Warshawsky, Esq.**
                          **Franklin Amanat, Esq.**
                          **Karen Schifter, Esq.**

FILED
IN CLERK'S OFFICE
U.S. DISTRIC͏͏ ͏͏N.Y.
★ AUG 0 8 2006 ×
BROOKLYN OFFICE

**Official Transcriber**:    **Rosalie Lombardi**
                            **L.F.**

**Transcription Service**:  **Transcription Plus II**
                            823 Whittier Avenue
                            New Hyde Park, N.Y.  11040
                            (516) 358-7352

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

## Proceedings

THE COURT:  Tummino v. von Eschenbach.

MR. HELLER:  Good afternoon, your Honor.

MR. AMANAT:  Good afternoon, your Honor.

Please state your appearances for the record.

MR. AMANAT:  F. Franklin Amanat, assistant United States attorney here for the defendant Andrew C. von Eschenbach, Commissioner of Food and Drugs.

MR. WARSHAWSKY:  Steven Warshawsky, assistant United States attorney for the defendant.

MR. HELLER:  Simon Heller for plaintiffs.

MS. STRAUSS:  Nan Strauss for the plaintiffs.

MS. LABATAN:  Vivian Labatan (phonetic).

MS. STRAUSS:  And I think there's also people on the phone.  Can you here us?  Who is on the phone?

MS. SCHIFTER:  This is Karen Schifter from FDA and I can hear most of what you're saying.

MS. COSTELLO:  And this is Andrea Costello for the individual plaintiffs.

THE COURT:  I just wanted to get together to see where we are here.  I have already granted the motion to file a fourth amended complaint, so we don't have to spend time on that.  You will get the order out in a short period of time.

MR. HELLER:  Thank you, your Honor.

THE COURT:  So, do you want to do the discovery

### Proceedings

3

issue first?

MR. AMANAT:  The appeal from the objection to the magistrate judge's decision?  Sure.

THE COURT:  May I ask you what is the -- let's get beyond the legal parts of that and let me ask you what the practical consequence is if the magistrate had to rule on a case by case basis as to whether a document came within the privilege.

I mean, it seems to me there is a lot of argument here and as I read through the papers, I didn't see anybody say well, if that has to happen, then the world will come to an end.

MR. HELLER:  Well, I think that it's a little bit difficult for us to say because we don't know at this stage for certain how many documents are in question. There hasn't been a privilege log produced yet.  And, in fact, the responsive documents that are not privileged have not, as I understand it, yet all been produced either, that are responsive to that request.

So, from our stand point, we don't know if we're talking about five documents that might have to be reviewed or hundreds.  And so, obviously one concern for us is that already the non-privileged documents are being produced in batches through September 8, I believe.

If then we have additional litigation about on

## Proceedings

4

a case by case basis about documents it may extend discovery beyond that.

THE COURT: Well, what do you have in mind? I mean, I like to deal with things on a practical basis, if I can because, you know, if there's no -- if it's not going to create havoc in the case, I might be more inclined to be sympathetic to your position. I don't know what do you have in mind? How many documents are we talking about?

MR. AMANAT: Well, the magistrate judge, as Mr. Heller suggested, directed us to make our production on a rolling basis over a period of time --

THE COURT: Right.

MR. AMANAT: -- of the portion of -- and he directed us to kind of front load the portion of our production that related to the witnesses who are being deposed.

THE COURT: Right.

MR. AMANAT: So, we have made that production to date. We have produced the documents that relate to the witnesses who have been deposed. And from that collection, we have withheld somewhere in the order of 15 to 20 percent of the total volume of responsive documents relating to those witnesses.

THE COURT: Well, how much is that? How many

5

## Proceedings

documents?

MR. AMANAT:  It's -- my client -- Ms. Schifter, do you have an approximate page count?  I think it's about 1,200 pages, but you can correct me if I am wrong.  Am I correct that it's about 1,200 pages that have been withheld so far?

MS. SCHIFTER:  I don't have a precise count but that sounds roughly correct.

MR. AMANAT:  We have -- I mean, we have produced thus far roughly about 5,000 pages in response to the magistrate judge's order.  And I believe at last count we held approximately somewhere on the order of 1,000 to 1,200 pages, give or take as to which we would intend to assert the deliberative process privilege.

THE COURT:  Yes, but what would the magistrate do upon looking at this?  He would say it's privileged, don't disclose it or is there more to it than that.

MR. AMANAT:  That's essentially it.  If given the opportunity to do so, we would formally invoke the deliberative process privilege in the manner that that privilege requires to an affidavit from the head of the agency or the appropriate agency official who would specify the basis for asserting --

THE COURT:  So, we agreed that this was a qualified privilege.

6

## Proceedings

MR. AMANAT:  I beg your pardon?

THE COURT:  I thought that there was an agreement that this was a qualified privilege.  It's not an absolute privilege.

MR. AMANAT:  Yes, but the --

THE COURT:  So, what would the magistrate do? He has to do something more than say if it's qualified privilege, he has to do something more than say yes, it's privileged, you don't have to disclose it.

MR. AMANAT:  Well, the way my understanding is that the deliberative process privilege normally works is that when the government invokes it, it has the initial burden to make a prima facia showing that the documents in question are predecisional and deliberative.

If that showing has been made, then the qualified privilege attaches and then the plaintiffs would then have an opportunity to overcome the privilege -- overcome the qualified nature of the privilege through a showing of sufficient need.  But that is a determination that needs to be made according to the case law, on a document by document basis.

And likewise, the showing -- the particularized showing of need that is sufficient to overcome the privilege, also has to be done on a document by document basis.

## Proceedings

THE COURT:  Well, do they get to see the document before they make their showing?

MR. AMANAT:  No, but what they would get from us --

THE COURT:  They're supposed to make the showing --

MR. AMANAT:  Well --

THE COURT:  -- the particularized need if they can't even see the document beforehand.

MR. AMANAT:  Well, they would do so based on a VON (sic) index or a detailed privilege log.  We would produce a detailed privilege log and an affidavit from the agency official asserting the privilege who would identify the grounds for each document for asserting the privilege.

And they would then --

THE COURT:  Well, even if there was a document that suggested that it was an inappropriate ground; that the agency was acting in bad faith, you would be privileged to withhold that?

MR. AMANAT:  Well, keep in mind, your Honor, we have produced a very large volume of materials already to the plaintiffs.

THE COURT:  I understand that.

MR. AMANAT:  And we have been extraordinarily

8

## Proceedings

judicious in our use of privileges so much so that to date, we have not actually asserted the privilege within the --

THE COURT:  They're judicial in your use of it because you've pulled out 1,200 documents.

MR. AMANAT:  Well --

THE COURT:  So you've used it.

MR. AMANAT:  Well, we would --

THE COURT:  And it's wrong to say you haven't used it when you just told me you haven't produced 1,200 documents in reliance on it.

MR. AMANAT:  This is the first time though.  I was referring in connection with our previous discovery productions.  We had not asserted the privilege in -- as to any document.  So, this -- what we would do if your Honor were to sustain our objections to the magistrate judge's ruling, we are not asking your Honor to rule that any documents are privileged.  We haven't formally made our case in that regard.  We would make our case --

THE COURT:  Well, I understand.  I just want to understand how -- you know, if you told me there were a half a dozen documents or 50 documents or 100 documents, okay, but -- and I am not sure at the end whether you're right about all of this because you know, there's an

9

## Proceedings

issue here.  This case wreaks with bad faith.  It wreaks with it, even the last -- the final letter in which they finally decide the petition -- their own individual petition, it rich with it.

MR. AMANAT:  Well, I would respectfully disagree.

THE COURT:  Well, I know you would disagree.

MR. AMANAT:  I know that's how the Court sees it but --

THE COURT:  You can't be blind as judges as to what we know (inaudible) men and women --

MR. AMANAT:  You know, I --

THE COURT:  (inaudible) said that.

MR. AMANAT:  I can tell your Honor that, you know, certainly this is -- our intention to invoke the privilege, the deliberative process privilege with regard to this subset of documents responsive to the discovery request is certainly not intended to delay or obfuscate. We have gone out of our way to allow the decision making process to be as transparent as possible.

But these documents are documents which really go to the core of the principles and policies which underlie why we have a deliberative process privilege. These are internal draft, internal intraagency discussions of the decisional process.

**Proceedings**

10

And the truth of the matter is is that with regard to the vast majority of the documents that are at issue here and perhaps all of them even, they relate to a document which eventually made its way into the record. In other words, they were kind of the predecisional or the early stages of a consultative process which ultimately culminated in a more formal, more polished, more advanced stage in the deliberative process which ultimately we did include in the administrative record or in the discovery production.

So, we are not -- I want to make it clear that our intention to invoke this privilege is certainly not calculated for delay or obfuscation. The policies and principles which underlie the deliberative process privilege are very important. And where we believe the magistrate judge went wrong is in his decision essentially preempting our assertion of the privilege in the first place and precluding us from even making our case.

If this were a situation where we had asserted the privilege and made our case and the magistrate judge had reviewed the record, had either decided to review the documents in camera or at least, you know, reviewed the parties' submissions on each document, and then ultimately made the determination that he was not

## Proceedings

persuaded by the government's presentation and that he was going to decide either that the privilege --

THE COURT:  Well, I am not -- you know, I don't think that's going to be hard.  It may very well involve the deliberative process.  That's what's -- one of the things that's in issue here is the legitimacy of the deliberative process.  The real issue is more a question of their need for it.

MR. AMANAT:  Well, I think --

THE COURT:  It's almost easier to refer to it in terms of relevance, not in the broad sense that civil discovery isn't -- its purpose is to obtain relevant evidence but whether it's directly relevant to the issue of whether they acted in good faith or not.

MR. AMANAT:  And we would submit that it not. And certainly relevance is --

THE COURT:  I understand that.

MR. AMANAT:  -- is a --

THE COURT:  -- is that the universe, 1,200 approximately?

MR. AMANAT:  Of the documents which have been produced thus far.  We have additional documents in response to --

THE COURT:  How many documents?

MR. AMANAT:  Karen, do you know the sense of

**Proceedings**

about what percentage of the production we have completed at this point?

MS. SCHIFTER: Well, we were working on the second production and I think it's going to be 8,000 documents total; that's including privileged and non-privileged documents.

THE COURT: Well, privileged -- how many privileged in the sense that -- you've disclosed, I assume some privileged information. So, the question is how much information that you assert the privilege as to, how many documents?

MR. AMANAT: Oh, we're still reviewing that but if you assume that we follow the same pattern that approximately 15 to 20 percent of the responsive documents fall in that category that we would withhold based on an anticipated assertion of privilege. That would be, I guess another 1,500 to 2,000 pages.

THE COURT: And is that the end or there's another -- there's more to go yet?

MR. AMANAT: Is that the -- I think that's it.

MS. SCHIFTER: That would be it for the second production. They have another request for documents relating to a contract and I have not started to number those documents. And I am not sure what percentage of those would be privileged.

Transcription Plus II          Rosalie Lombardi

13

## Proceedings

MR. AMANAT:  That relates to a different set of discovery requests.  With regard to the second set of discovery requests that are the subject of the magistrate judge's order, the remaining production as Mr. Schifter said if it's right, 1,000 pages.  And if we withhold at the same pace that we did for the first round, it would be I guess about another 1,200 to 1,500 pages.

THE COURT:  I am going to suggest this.  This is the only part of your objection that I have sympathy for, is that we -- why don't we start with the 1,200, see whether it proposes, you know, really a terrible burden.  I am not rejecting your arguments.  I am just saying we put off this and the instruction to the magistrate should be is that if in his judgment it is deliberative, these documents evidence bad faith, that they should be disclosed.  I mean, relevant in that sense.

MR. HELLER:  I think that's perfectly fair.  I do want to just mention, of course, that as Mr. Amanat said, numerous documents, and now we've done depositions as well, large portions of what I consider the deliberative process --

THE COURT:  I know.  I am not rejecting your argument that they waive --

MR. HELLER:  Understood.

THE COURT:  I am trying to, you know, sort of

14

**Proceedings**

like water going around an obstacle.

MR. HELLER:  No, I understand.

THE COURT:  I am not pushing the obstacle out of the way.  I'm just saying let's see if we can do it in this way and see how much problems --

MR. HELLER:  That seems practical to me.

MR. AMANAT:  So there would be that we would --

THE COURT:  Start with the first 1,200, give it to the magistrate, ask him to look at it and determine whether in my view it's really -- I mean, I think the issue is not going to be whether it's deliberative or not.  The issue is going to be does it demonstrate bad faith on the part of the agency.  I don't know what -- the degree to which he can put a burden on someone to establish particularized need when they can't see the very document that they're supposed to establish need for.

So, the magistrate's determination seems to me to turn on whether or not this evidence, is it cumulative, maybe or if it is, what difference does it make.  But principally, to determine whether or not it indicates the agency was acting in bad faith.

MR. AMANAT:  Well, we would -- so, if I understand what your Honor's saying, we would then -- we would be given an opportunity to invoke the privilege

15

## Proceedings

formally as to the documents which have been withheld so far.  The magistrate judge would decide if he wants to look at them in camera or decide the issue in some other fashion. And then he would make a -- he would be called upon to then make a ruling.

THE COURT:  Right.

MR. AMANAT:  As to whether or not --

THE COURT:  We'll see -- I'm not suggesting you're necessarily entitled to this.  They've got arguments that are not without merit here but I just as soon try to accommodate your concerns if it's not overly burdensome.

MR. AMANAT:  Thank you.

Now is that all your Honor wanted to hear with regard to the objection?

THE COURT:  Right.

MR. AMANAT:  With regard to the issues of the final agency decision which denied the Citizen petition, the June 9 decision, did your Honor want to hear our position on that?

THE COURT:  Well, I think you can make your position.  I want to know where we go from here, is what I want -- that's what I really want.  That's why I called this primarily.

MR. AMANAT:  Right.

16

**Proceedings**

THE COURT:  Where do we go from here in light of that?

MR. AMANAT:  We appreciate the opportunity to discuss that.

THE COURT:  So, you want to --

MR. AMANAT:  Yes.

THE COURT:  I question that.  It has nothing necessarily directly to do with where we go from here. There are instances in which certain products are made available to the general public without a prescription which are hazardous to the health of the purchaser in which the dissemination is controlled based on age; cigarettes are not available, they're sold to adults.  I don't know whether this is pursuant to -- does the FDA regulate tobacco?  I forgot.

MR. AMANAT:  No, FDA does not regulate it.

THE COURT:  Well, but whether it's the FDA or not, in New York, for example, it's -- the rules are you can't sell to people who are, I guess under the age of 18.  I have been to baseball games where alcohol is sold and before this guy was hawking beer, he's actually said to people, before I give you this beer, I want to see the ID.

Now, all of these things, whether you call them, you know, pharmaceutical or drugs in the strict

## Proceedings

sense deal with the sale of the substance to minors that -- to the general public which can be abused and which -- well, forget about being abused, even if not abused in the case of cigarettes, are dangerous to the health of the people involved.

So, what is this great problem, at least, that the FDA has with respect to the issue?  Is it 17 that they're talking about, of -- right now saying that you can't -- it's okay to sell over-the-counter to anyone over the age of 17 who shows adequate proof of age and not to someone who doesn't.  And instead of having this stuff on the shelves, you have it in back of the pharmacist.  I don't understand what the great mystery is here.  I'm just curious, if you could tell me.

MR. AMANAT:  Sure.

THE COURT:  I may not have exhausted the universe of products.  For all I know, there may be other products that fall into that category.

MR. AMANAT:  I understand that question, your Honor.

THE COURT:  And that assumes that they're right about everything they say about children and people under the age of 17 and the Barr Laboratories sample is too small but they're withholding this to people -- to a large number of people, adult women for no reason other

18

## Proceedings

than the fact well, we don't know whether it's safe to dispense it to children under the age of 17.

MR. AMANAT:  I understand your question.  The products that your Honor described --

THE COURT:  Right.

MR. AMANAT:  -- alcoholic beverages, tobacco products, are not regulated by the FDA, never have been.

THE COURT:  I understand.  Let's assume -- I'm not claiming any estoppel here.  What I am saying is is that these -- in society --

MR. AMANAT:  I understand.

THE COURT:  -- there are ceratin -- we figured out a way to deal with this problem and why isn't the way of alcohol and tobacco are dealt with -- even cars for heaven's sakes; you can't drive a car if you don't have a license and licenses are if you're of age.

MR. AMANAT:  Right.

THE COURT:  I don't understand this.

MR. AMANAT:  I wasn't trying to raise an estoppel argument.  The --

THE COURT:  No, I didn't say you were.  All I am saying was I wasn't.  You were telling me this is not the FDA.  Well, so what?

MR. AMANAT:  But that's what Ia m trying to get to your Honor.  The age restricted products that

Proceedings

your Honor described are products where the age restriction is regulated by under state law and it's regulated by state law enforcement entities --

THE COURT: I understand that.

MR. AMANAT: -- pursuant to state statutory schemes.

THE COURT: You are telling --

MR. AMANAT: Starting --

THE COURT: -- me the FDA couldn't do the same thing?

MR. AMANAT: Well, the Food, Drug and Cosmetics Act does not provide the agency -- at least it does not clearly provide the agency with the statutory authority to make that kind of aged based distinction.

THE COURT: That's the agency's position, that it doesn't -- the statute doesn't --

MR. AMANAT: Well, it has really never done that before.

THE COURT: Well --

MR. AMANAT: It's an issue of first impression and it -- the agency doesn't --

THE COURT: I don't know however it's done in this case before -- it's done before what it has done in this case.

MR. AMANAT: Well, but I can tell your Honor --

Transcription Plus II        Rosalie Lombardi

Proceedings

THE COURT:  But I don't know.  That's not answer that they haven't done it before.

MR. AMANAT:  Well, but your Honor asked what the issue is.  The issue is --

THE COURT:  What statute does not -- you claim is the source of this lack of authority?  Do you mean the authority to regulate the sale of medication doesn't include the authority to say you can only sell it to adults, and not to people under the age of 17, that the FDA's power is so limited?

MR. AMANAT:  Well, let me answer your question this way.  Your Honor suggested the possibility of what someone referred to as a behind the counter (inaudible).  There is no behind the counter option available under federal law.

THE COURT:  It's not available under federal law because?

MR. AMANAT:  Because congress has not made it available.  Under the Food, Drug and Cosmetics Act, a product is either RX only or non-prescription.  There's no -- now some states have imposed or have created various behind the counter mechanisms through their own state legislative function but congress has never done so.

THE COURT:  So your argument is that unless

**Proceedings**

it's safe for everybody, they haven't got an authority to limit it -- they haven't got the authority to authorize the sale to adult women because they are uncertain about its use as to --

MR. AMANAT:  That's not necessarily my position.

THE COURT:  But I don't know, do you want to state it differently?

MR. AMANAT:  My position is that the agency's statutory and regulatory authority to undertake such a split marketing approach --

THE COURT:  Right.

MR. AMANAT:  -- is not well established and it's not clear.  In addition, it is not --

THE COURT:  Well, there's only one way to find out.

MR. AMANAT:  Well, the agency elected to seek public comment, to seek advice and views and recommendations as to whether it has that authority and how that authority will deal with it.

THE COURT:  I mean, I find that to be a ridiculous way for an agency to operate.  Asking the whole public to say do you think we have the authority? I mean, the normal presumption is is the agency is the best source for the construction of its own authority

22

**Proceedings**

within certain constraints, its own interpretation of its authority or its statutes is entitled to some deference here.

MR. AMANAT: Understood, your Honor, but there's also a question as to how FDA would go about enforcing such an age restriction. It doesn't have an enforcement mechanism in place. Congress has not given it an enforcement mechanism that would provide it with an ability to enforce that kind of an age restriction.

Unlike tobacco or alcoholic beverage products where there is a law enforcement scheme created by state legislatures through alcohol beverage control boards and what have you, the enforcement agencies that enforce those kinds of age restrictions, the FDA's own statutory and regulatory scheme does not include a mechanism that would --

THE COURT: So your argument is that there is no way that they can impose any sanction, let's say for a pharmacist who violates it; is that it? I mean, I just --

MR. AMANAT: Yes, that is part of it. That is an issue that's --

THE COURT: Part of it. I mean, I can never get a straight answer from you.

MR. AMANAT: Well, that's --

23

## Proceedings

THE COURT:  One that makes -- at least has some degree of plausibility to me, other than the first half which is they don't know -- they need to ask hundreds of thousands of people whether they have authority to do something.

MR. AMANAT:  Well, the agency was motivated to invoke the advance notice proposed rule making process because of its -- because of both of these concerns about enforceability and how you would actively, as a practical matter, implement an age restriction and also concerns about its authority to do that and whether it needed to undertake notice incumbent rule making, for example, to interpret its operative statute to make its authority to adopt an aged-based restriction player or -- and what that would look like.  That was the agency's rationale to invoke the NPRM process.

And those regulatory issues and those enforcement issues as to how the agency as a practical matter could go about approving the kind of dual marketing arrangement that the manufacturer claimed he has proposed, those lingering issues are what the agency is still working on, is still considering, is still trying to find solutions to, so that it can ultimately reach a final decision on the drug application.

I don't know if I answered your Honor's

## Proceedings

24

question or not.  I tried.

MR. HELLER:  Your Honor, may I just say a few words just somewhat responsive.  I think first of all, the agency already regulates certain drugs and treats them as prescription for certain uses and over-the-counter for other uses.  We have testimony from, I believe, one of the FDA employees talking about aspirin in a prescription drug when it's used, I think for cardiovascular related preventative uses and being a non-prescription drug, over-the-counter for other uses.

Just as there is no prohibition in the Food, Drug and Cosmetic Act that would prevent the agency from doing dual marketing based on age, there's also no prohibition for dual marketing for different uses of the same compound.  In fact, that's their -- as I recall that deposition that we took, this deponent mentioned several drugs for which there's over-the-counter uses and prescription uses.  And, of course, no one -- people can buy aspirin over-the-counter and then presumably go to their own home and use it for one of the prescription uses without any enforcement going on.

And what strikes me is that this invocation of a protracted rule making process to clarify the agency's authority, to clarify enforcement mechanisms, arising out of this drug, why didn't this happen when they had

**Proceedings**

prescription uses for aspirin and non-prescription uses for aspirin? Why weren't they concerned about people enforcing prescription --

THE COURT: It's (inaudible) there are vitamins you know -- I know someone who is diagnosed with a Vitamin D deficiency and her doctor wrote a prescription for a particular Vitamin D supplement, which is presumably available over-the-counter.

MR. HELLER: Exactly. And, in fact, in particular with tobacco, products designed to treat tobacco addiction like nicotine patch and nicotine gum --

THE COURT: Right.

MR. HELLER: -- these are specifically treated, as I understand it, by the FDA as unavailable to people below a certain age, I guess in part because maybe of those people aren't supposed to be using that legally any way, but there are -- there's a significant body of dual use.

THE COURT: What about the last one? You're not familiar with it?

MR. AMANAT: Well, yes, I am familiar with it, your Honor. You know, there certainly are drugs for which the agency has approved an Rx only -- for which the agency has approved simultaneously as Rx only and as available without a prescription.

## Proceedings

But in the cases where that's happened, the difference between availability with a prescription and without a prescription, has been determined by the dosage, the strength, the indication, the --

THE COURT: Well, but in terms of --

MR. AMANAT: -- method of use.

THE COURT: Yes, but in terms of your -- I don't know what the relevance of any of that is but in terms of your ability, this second prong of your argument, to effectively enforce it, how do you enforce it?

MR. AMANAT: Well, I mean --

THE COURT: So you say what if - I mean, let's make it simple. Suppose a druggist dispenses the higher amount to somebody who is a minor, what do you do then?

MR. AMANAT: If a druggist -- you mean one of the drugs of the type that's --

THE COURT: He just described a nicotine patch, was it -- what did he just describe?

MR. AMANAT: Well, I would need to look into that. But I mean, you know --

THE COURT: Because I would like to know whether they had to go through -- they had to put out a general notice to the whole world saying do we have the authority to do this. And if we have the authority, we

Transcription Plus II        Rosalie Lombardi

### Proceedings

can now -- you know, all of this stuff that you claim that they don't know what to do here because of this --

MR. AMANAT:  Well, certainly --

THE COURT:  I mean, I don't quite understand it.

MR. AMANAT:  Well, ceratin off label uses of the --

THE COURT:  I'm not talking about off label anymore. We're talking about the one he just mentioned, his -- you know, it's restricted -- the sale is restricted based on age.

MR. AMANAT:  Well --

THE COURT:  You can only sell something to a minor and a different dose to someone else.  In this particular case, it would be you can only -- you can't sell it to a minor at all.  And you could sell it to an adult.

MR. AMANAT:  Well, but that's not an OTC drug. That's not an over-the-counter drug.  What he is describing is drugs which are available by prescription but are allowed to be prescribed only for individuals over a certain age.   And the -- you know, the pharmacies would -- you know, it's ultimately the physicians essentially to regulate the age of the consumer who uses the drug product.

Proceedings

MR. HELLER:  I can just add, I mean, I was in Target here in Brooklyn the other day and there was nicotine controlled products sitting on the shelf for anyone to buy and assuming what happens is the client smokes it himself.  But if he went up to pay for it and they say, let's see some I.D. the same way they do with beer when someone goes to the supermarket and buys it.

But I did want to mention one other thing, your Honor, which is that there are numerous products that are over-the-counter on the shelf that anyone could buy where my understanding is that the FDA felt that there was maybe no data submitted for younger persons for let's say under 12.

And the way the FDA typically handles that is there is something on the back of the carton itself, shouldn't be used by someone under 12 years old without supervision of a physician.  And in fact, many of the scientists within the FDA when claim -- when this disagreement arose about the sufficiency for studies for a number of people, many of the scientists said the way we do this traditionally, we put a warning on the box, on the label, on the carton, and say shouldn't be used by someone under such and such an age without a prescription.

I'm just pointing out that there are --

Transcription Plus II        Rosalie Lombardi

## Proceedings

THE COURT:  Well, I understand.

MR. HELLER:  -- are numerous ways in which the agency has done this that lack any notice, discernible enforcement mechanisms.

THE COURT:  Beyond that, relying on honorable pharmacists to impose --

MR. HELLER:  Well --

THE COURT:  -- to distribute.

MR. HELLER:  -- not even pharmacists, people who buy it not sort of saying here, kid, take this.  Have this Advil even though you're 11.

THE COURT:  Well, I don't --

MR. AMANAT:  Well, your Honor, if I can just say, I certainly don't think that the Court should base its decision on anecdotal evidence provided by counsel.

THE COURT:  No, I don't intend to.  I am just saying --

MR. AMANAT:  But --

THE COURT:  -- I am troubled in my own mind the whole position of the agency here --

MR. AMANAT:  If --

THE COURT:  -- and why it sort of befuddled --

MR. AMANAT:  And I --

THE COURT:  -- when there seems to be such an obvious way out of this at least to adult women.

30

### Proceedings

MR. AMANAT:  And I certainly understand the Court's concern but if I just may one other point on that which is ultimately the question that the Court raises while they recognize it as a certainly valid one is one that the government would submit is ultimately beyond the Court's jurisdiction to consider.

Because ultimately the question of whether the agency either has the authority to approve this kind of dual marketing approach, whether such a dual marketing approach in the age based restriction in Rx, non-Rx, can be enforced, those are questions which arise only in the context of the supplemental new drug applications filed by Barr Pharmaceutical.

THE COURT:  That's what you say.

MR. AMANAT:  Well, the plaintiffs have not requested an aged based bifurcation.  They have made it very clear.

THE COURT:  Well, I understand that but I don't think they would appeal from that portion of my order that said that you have to make it available to women who are over the age of 17 or 18, whatever the line is.  I am sure there won't be an appeal from that part of my order.

MR. AMANAT:  Well, the truth of the matter is, they have -- the only matter that the plaintiffs have standing to challenge if at all is the agency's actions

Transcription Plus II          Rosalie Lombardi

31

**Proceedings**

with regard to the Citizen petition which only requested that the drug be made available over-the-counter to people of all age groups and the plaintiffs have made --

THE COURT:  It wouldn't have matter if they -- we know that they could go back and amend it but that would be futile because we know that the agency won't grant such a -- if they went back and said, okay, you know, go through these hundred of thousands of pieces of mail that have been sent to you and decide you know, these grave questions about your authority, they would still -- they wouldn't grant them this relief.

MR. AMANAT:  Well, I don't think it's fair to make that prediction necessarily.

THE COURT:  Oh, well look at what they have done with Barr Laboratories. Why would it be any different if they now went back and said -- look, if I understand you correctly, say no, no you can't grant such relief because they didn't ask the agency for it.  They asked the agency for the right to have over-the-counter for everybody and so they're stuck with that.

MR. AMANAT:  Right.  Well, they have --

THE COURT:  But all I am saying is so if they went back to the agency we know if they went back to the agency what they would get which is what Barr has gotten, which is interminable delay.  They certainly wouldn't be

Transcription Plus II          Rosalie Lombardi

**Proceedings**

-- it certainly wouldn't be authorized.

MR. AMANAT:  Well, again, I don't know that that's a fair statement, your Honor.

THE COURT:  Certainly terminable delay.

MR. AMANAT:  The truth of the matter is the question ultimately whether the agency could have or should have decided Barr's application one way or the other to this juncture --

THE COURT:  Oh, it's not but I don't necessarily accept your notion that they can't rely on the record that is before the FDA in terms of all of the materials that are in the possession of the FDA.  I am at a loss to understand the letter from the FDA to the plaintiffs as to why the material that is already in the record and before the agency can't be considered.  I mean, even I could consider to take judicial notice of anything that's in the court file or in this court, even if it's not in the case front of me.

MR. AMANAT:  Well, but in a case under the APA, certainly this court, we would submit would be confined to a review of the matters that are in the administrative record.

THE COURT:  Well, that may be.  I shouldn't say yes so quickly because there's an element of whether everything you're telling me is really the real reason

**Proceedings**

for what the agency is doing.  But the -- if I understood the letter that the head of the FDA wrote to the plaintiffs to say well, you can't rely for your petition on anything that was submitted by Barr Laboratories. It's not entirely clear to me, particularly when they say in an earlier part of the petition we thought you understood from you know, what we were doing in Barr Laboratories that was the same for you.

MR. AMANAT:  Well, in our view, your Honor, the Citizen -- the denial of the Citizen petition which the agency entered on June 9, really kind of brings front and center the question of the standing issue that we discussed last December because at this juncture, it is certainly the government's view that -- continued view as we represented, as we argued in December, that the plaintiff certainly lack standing to --

THE COURT:  Well, I know your arguments.  This is just to helpful to me to understand.  Where do we go from here?  So they filed another complaint.  I am not cutting off discovery that's ongoing.  Is there anything more for me to do than what I have done here today?

MR. AMANAT:  Well, the proposal that I wanted to offer to the Court was that the Court has set an expedited schedule to consider the standing issue on its own right and allow the parties to --

Transcription Plus II          Rosalie Lombardi

34

**Proceedings**

THE COURT:   (inaudible) they have standing to appeal from the denial of their own filing.  I have already -- I mean, that's already been decided.

MR. AMANAT:  Right.

THE COURT:  So, what other standing?

MR. AMANAT:  Well, the standing -- whether the plaintiff plaintiffs have standing to challenge the aspects of the agency's decisional process which relate to Barr's application is a critical issue which needs to be determined sooner rather than later for the following reason.

The plaintiff's entitlement to discovery that the Court previously articulated both your Honor and Magistrate Judge Pohorelsky was essentially predicated on two factors.  One factor was the presence in the complaint of a claim asserting unreasonable delay in violation of Section 706(1) of the APA and that was the rationale that your Honor relied on in your own order of December 22 and the other factor which the magistrate judge relied on is the -- was his finding that the plaintiffs had shown -- had made a preliminary showing of bad faith.

Now with regard to the unreasonable delay claim, to the extent the unreasonable delay claim relates to the Citizen petition, it is now moot.  To the extent

**Proceedings**

that the unreasonable delay claim relates to the agency's handling of the Barr -- of Barr's drug application, if we are correct that the plaintiffs lack standing to contest that and to raise that claim and the Court lacks jurisdiction to hear it, then the unreasonable delay claim falls out of the picture all together.

THE COURT:  First of all, it seems to me, you have to draw a distinction between whether certain relief has been mooted by their claim that they have won a decision one way or another.

And the second issue it's still not irrelevant to whether or not the agency was horsing around.  That's still -- you know, that to me is -- it's still -- it's a relevant fact ultimately in determining whether or not the reasons that the agency has given are the real reasons.

MR. AMANAT:  I understand, your Honor, in that regard.  And that kind of takes me on my second point which was that with regard to the magistrate judge's finding that the plaintiffs had made a preliminary showing of bad faith sufficient to allow them to pierce the vail of the administrative record, all of the findings, the specific factual findings of bad faith which are identified and articulated by the magistrate judge relate exclusively to the agency's consideration of

36

**Proceedings**

Barr's drug application.

There is no evidence, there has not been any evidence to this date of any bad faith in the agency's consideration --

THE COURT:  You could have done the same thing years ago that you did just now in terms of their application.

MR. AMANAT:  Well, but there was --

THE COURT:  I mean, I think you deliberately didn't decide it because you didn't want it to be subject to judicial review.

MR. AMANAT:  Well, I don't think that there's anything to support the record for that.  I think the record of --

THE COURT:  The record -- I mean, there is support in the record.  It's a question of what inferences you want to draw from what went on here.

MR. AMANAT:  Well, but we would submit that all of the magistrate judge's findings with regard to bad faith related only to the SMDA and that there are no -- to this date, there has been no evidence of any bad faith in the agency's consideration of the Citizen petition.

THE COURT:  I don't think that that's true but go ahead.

MR. AMANAT:  Well, the plaintiffs certainly

**Proceedings**

haven't cited any such evidence nor did the magistrate judge.  So that if we are correct that the plaintiffs really do not have standing to challenge any aspect --

THE COURT:  Why did it take so long to decide the petition?

MR. AMANAT:  Well, as indicated in the agency's letter, the agency's normal practice is that when there is a citizen petition which is contemporaneous with a drug application that raises the same issues, the agency waits until the drug application is completed before deciding the Citizen petition.

Keep in mind, your Honor, that the Citizen petition is nothing more than a petition for rule making. It is a petition that asks the agency to undertake a process of notice and comment rule making to make a rule that governs a particular area of it regulatory authority.

On the other hand, the drug application such as what Barr submitted with regard to Plan B is an adjudication.  It's an agency adjudication process which has a set of procedures associated with it with regard to the collection of evidence and the gathering of information.

And so, very often it is far more efficient and reasonable for the agency to undertake its fact finding

Proceedings

process in the context of an agency adjudication than in the context of a petition for rule making.

And, in fact, in the specific context of emergency contraceptives, what happened was that the Citizen petition basically asked in a rather general and generic fashion, we want the agency to make a rule to undertake notice and comment rule making, to make a rule that dictates that all emergency contraceptives can be sold without a prescription.

There wasn't any scientific content. There was a public comment process that was triggered by that and lots of people submitted essentially political and ideological comments on that but there wasn't scientific comment.

THE COURT: I assume is the case right now with respect to the administrative agencies own solicitation about whether it should make a rule --

MR. AMANAT: Actually, people have submitted -- you would be surprised. People have submitted some very concrete ideas that the agency is considering.

But ultimately, the agency made the determination which strikes me as being a reasonable one that look, we're about to have this adjudicative proceeding that's going to be an initiated by the manufacturer of the drug and in the context of that

**Proceedings**

proceeding, we're going to have the opportunity to collect and marshal all of the scientific evidence relevant to this issue.  We'll have an opportunity --

THE COURT:  What was this reason first given?

MR. AMANAT:  With regard to the Citizen petition?

THE COURT:  As to the reason for the delay.

MR. AMANAT:  It was articulated back in 2001, just a few months after the Citizen petition was filed because at that point in time, the agency was already in discussions with Women's Council Corporation, the predecessor to Barr and the original manufacturer of the drug, was already in discussions with Women's Council's Corporation about that company's intentions to file a drug application and was already in discussions with regard to, you know, planning and designing the studies that would be necessary.

So, what the agency did here, your Honor, is that it said look, you know, we're taking the Citizen petition seriously.  We're going to get the public comments. But frankly, we don't expect to get the science that is going to be relevant to this issue in the context of the Citizen petition.  We do expect that we're going to get the science that's relevant to this decision in the context of the SMDA.  So, let's hold off on deciding

Proceedings

the Citizen petition until we have --

THE COURT:  So that the fate of their petition in this is inextricably tied to Barr's.

MR. AMANAT:  Well, except for the fact that their petition does request a larger --

THE COURT:  But aside from that, it's inextricably tied to Barr's.

MR. AMANAT:  Well, inextricable may be too strong a word.  But it is related.  I don't --

THE COURT:  I am using -- I am trying to understand.  I am trying to draw the right word to describe what you just said.

MR. AMANAT:  Well, is inextricable, Judge, in the sense that the agency as it indicated in its Citizen petition decision is not going to be equipped with the --

THE COURT:  Basically, the bottom line is is that if Barr wins, they win, and if Barr loses, they lose.  Isn't that the fact?

MR. AMANAT:  Yes, except, you know, taking into account the distinction between what Barr's requesting and what they're requesting.  So Barr wins.  They may not necessarily consider that a win since --

THE COURT:  Well, I don't know whether they do or they don't.  I am just trying to understand.

MR. AMANAT:  In a sense, yes.  In a sense --

41

Proceedings

well, I --

THE COURT:  If the fate of their petition turns on the fate of Barr's petition, they can't make any illusion to the record that Barr has made and they're without any standing to challenge what happened to Barr even though the fate of their petition essentially hinged on what happens to Barr's.

MR. AMANAT:  Well, here's where things get a bit jurisdictionally tricky because let's say hypothetically that the agency were to reach a final decision denying Barr's application, Barr would have -- Barr's only recourse in terms of obtaining judicial review of that decision would be to on a petition for review, either to the DC circuit or to the third circuit, as Barr is domiciled in Pennsylvania.  And so by statute they would have to bring their statute for review of the agency's decision in one of those two courts of appeals. That court would then have to consider --

THE COURT:  I know but I don't -- I know.  So, what does that -- how is that responsive to my question?

MR. AMANAT:  Well, it's responsive to your Honor's question because certainly it would be inappropriate for this court to essentially assert jurisdiction over the jurisdiction to conduct judicial review over the agency's consideration of Barr's

42

## Proceedings

application in the context of hearing their challenge to the Citizen petition denial --

THE COURT: I'm not sure I would be doing that but unfortunately, I could spend the whole evening if I had the time discussing that. I said I could spend the whole evening if I had the time discussing it but I promised (inaudible), who marks the Federal Magistrate's Association -- there's a meeting with the association of the bar, so we have to decide what we're doing here. I don't really have to decide anything substantive today. It's just useful for me to know these arguments made.

MR. AMANAT: Would your Honor be amenable to setting a schedule for dispositive briefing in the case or is it premature to do that in the Court's view at this time?

THE COURT: Dispositive? Before you were just talking about one issue.

MR. AMANAT: Well, you know, my proposal was that the Court hear briefing and argument on the standing issue specifically but I understand your Honor's previously communicated a displeasure for piecemeal briefing of dispositive issues.

THE COURT: Well, when is discovery going to be finished?

MR. HELLER: Well, I think the magistrate was

Transcription Plus II        Rosalie Lombardi

**Proceedings**

hoping that discovery would be finished by roughly September. And I think it depends in part on this review of document process and how long -- how time consuming that is.

THE COURT: I mean, I don't think it should be but we'll see.

MR. HELLER: Well, I would --

THE COURT: It's sort of like reading a 1,200 page transcript, I can do it pretty quickly if I know what I am looking for.

MR. AMANAT: Well, I can just say, your Honor, that I think it's unlikely that discovery will be finished by September, not because of the deliberative process issues that we were talking about earlier although you know, there will be some taken for that but the plaintiffs last week announced their desire to take the deposition of a former White House staffer and to issue a subpoena duces tecum to the White House calling upon the White House to produce several very broad categories of documents. This request on their part is certainly going to engender a significant amount of litigation and is ultimately going to eat up many, many more months which is what we communicated to them before they made their request.

You know, I frankly am not convinced that the

44

**Proceedings**

plaintiffs are really all that anxious to have the case get to the point where it's ready for the Court to hear dispositive briefing because they seem to continuously generate more and more discovery requests and going on more and more wild goose chases in different directions. And this latest one that they have announced just a few days ago is certainly likely to eat up several months time. I would be astonished if we're finished with discovery by September. You know, it wouldn't surprise me if discovery goes into next year, given what they have been asking for, how vigorously they have been pressing their claims, how broadly they have been phrasing their discovery requests and the amount of litigation which their requests have engendered.

MR. HELLER: Your Honor, if I could just comment briefly. I mean, we wouldn't issue that request lightly. Just last Thursday an employee of the FDA Testified that the acting deputy commissioner of the FDA told her this process was moving forward in the manner it was to appease the President's constituents. This same deputy commissioner testified under oath at her own deposition that there were no ideological or political factors in the process regarding the claim.

We also have the deposition of Dr. McClellan, who said he had several, what he called updates of the

45

## Proceedings

White House about the Plan B process, which he claims were for purposes of the press. I found his deposition on the whole not credible, but that's my own assessment.

We wouldn't issue it lightly. Our intention is not to delay this process. In fact, immediately after the magistrate authorized us to begin discovery, we tried to schedule depositions. And we weren't able to schedule a single deposition with the government for two months. Our effort is not to delay the case and I just want to state that. We would like to conclude as quickly as possible.

THE COURT: Well, where does that leave us? I guess it's --

MR. HELLER: Well, I don't know in what manner the government is going to resist this which is -- by the way, the magistrate directed us to tell him all the remaining discovery that we wanted to do last Friday and we've done that. That's the end of the request for discovery. So, there's not going to be an ongoing, what the government views as a wild goose chase.

But I think that the magistrate will resolve the remaining discovery requests. Discovery will be over hopefully by October 1, at least on our part. I think we will be able to file at least partial motions for summary judgment. There are some actual disputes that have

Transcription Plus II          Rosalie Lombardi

46

**Proceedings**

emerged.

I will say that the government had scheduled discovery of the plaintiffs for last week or rather this week, excuse me, and then on Friday evening abruptly canceled six or seven depositions without being able to provide any explanation but said that they might be rescheduling it for later. I don't know whether that's going to occur -- I don't know why the depositions didn't go forward as scheduled.

THE COURT: Why don't we just put this back on for status conference at the end of September.

MR. HELLER: I think by then we have almost all of the discovery completed.

THE COURT: My case manager isn't here but what I will do is I will have her call you, both of you, to set up a convenient schedule. Why don't you tell Magistrate Pohorelsky the great work that I give him to do.

MR. HELLER: Well, we have a meeting with him next week.

THE COURT: Okay.

MR. HELLER: Thank you, your Honor.

MR. AMANAT: Thank you, Judge.

(Matter concluded)

-oOo-

47

C E R T I F I C A T E

I, ROSALIE LOMBARDI, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **28th** day of **July** , 2006.

-------------------------

Rosalie Lombardi
Transcription Plus II

Transcription Plus II          Rosalie Lombardi