# Exhibit D

## Exhibit D
### Deposition Excerpts

### Index

Deposition testimony of Dr. Jonca C. Bull (June 21, 2006) 50-52

Deposition testimony of Dr. Lester M. Crawford (May 24, 2006) 46-49, 140-46

Deposition testimony of Dr. Steven Galson (April 26-27, 2006) 28, 35-36, 186-87, 202, 205-06

Deposition testimony of Dr. Donna Griebel (July 19, 2006) 14, 18-19

Deposition testimony of Dr. Florence Houn (July 20, 2006) 17, 20-22, 30-44, 49-50, 59-60, 120-121, 127-8, 134

Deposition testimony of Dr. John K. Jenkins (June 21, 2006 and August 14, 2006) 16-20, 27-30, 33, 51, 67-68, 86, 91, 94-95, 101, 103, 105-9, 111, 113-116, 118-19, 125-26, 143-47, 187-188, 192-193, 232, 258-60, 290

Deposition testimony of Dr. Sandra Kweder (December 11, 2006) 28-30, 35-37, 44-46, 48-9, 55-58

Deposition testimony of Dr. Mark McClellan (June 13, 2006) 35-36, 127, 131, 133, 138, 140-141

Deposition testimony of Dr. Curtis J. Rosebraugh (July 18, 2006) 47, 105-6, 190-191

Deposition testimony of Dr. Susan Wood (July 31, 2006) 13-14, 40, 177-80

Deposition testimony of Dr. Janet Woodcock (April 26-27, 2006) 68, 161-63

# Exhibit D-1

literature to support the assertion that the availability of contraception directly increases high-risk sexual behavior," and I'd like to know if at the time there was any evidence to the contrary.

A     The existing public health -- the existing literature, as my memo states, documents that high-risk sexual behavior is largely rooted in --

THE REPORTER:  Documents what?

THE WITNESS:  It's in my Memorandum, that high-risk sexual behavior in teenagers is largely rooted in a history of child abuse, partner violence and abuse, and societal complexities of poverty and circumstances of inadequate parental involvement.

BY MS. STRAUSS:

Q     At the end of that paragraph the memo states, "Indeed, the Agency's regulatory mandate is not to regulate behavior or morality but to serve the public by ensuring that safe and effective products are made available for

Page 51

prescriber and patient choice."

Do you believe that the regulation of behavior and morality played a role in the Agency's actions?

A    I, I don't know.  I -- for the point in Dr. Chen's review of the concern of promiscuity, which I guess you could go to the Samoan Islands and, you know, perhaps, you know, it's a fairly society or culturally based assessment of what it means to be promiscuous, and for standards in this country, you know, in terms of how, where one sets the bar and as well as what are largely issues that are not really regulatory issues are ones that -- for example, I'm not aware of a standard of looking at a diabetic drug as to whether or not, if someone takes a diabetic drug, does that mean they eat more cake.

You know, in terms of looking at medications and the implications for negative behaviors, does a hypertensive use more salt because they're taking their water pill and they'll be okay.  It's sort of a different

Page 52

approach of looking at the impact of approving the

product and the intended behavior of the intended

population.  I could expand beyond the realm of

speculation on promiscuity.

Q    And are those behavioral concerns, such

as the ones that you just mentioned, concerns that

you would usually look at in the drug-approving

process?

A    Not in my experience.

Q    Do you suspect that morality played a

role in the Agency's action on Plan B?

A    I don't know.

MR. WARSHAWSKY:  Objection; vague.

* * * * *

(The portion of the transcript from Page

52, Line 20, through Page 54, Line 9, has been

marked confidential and has been redacted and

included in a separate transcript called

"Protected Testimony" and designated Number 13.)

Page 46

Q     Did you review any parts of administrative record compiled by the agency for the Plan B SNDA prior to the issuance of the May 6th, 2004, nonapprovable letter?

A     The only thing I did was Dr. Galson, who was the acting director of CDER, briefed me on what his decision was going to be.  This is after the permanent commissioner left and I was acting commissioner again. And he, Dr. Galson, explained to me what his decision was going to be in a -- again, a routine update meeting.  I met with him once every two weeks at least.  And I asked him questions about the decision, and then I concurred in his decision.  And I mentioned that publicly, that I concurred in the decision.

Q     So this would have been a meeting -- was this a face-to-face meeting that you had with Mr. Galson?

A     Yes.

Q     Do you know when that took place?

A     It would have been about the time of the announcement, maybe a few days before, maybe even a day before.

Page 47

Q    I'm going to come back to that conversation. I just want to make sure I have the answer to my question about before May 6th, 2004, did you review any parts of the administrative record, any of the staff memos, any of the studies, anything at all in the administrative record related to the Plan B SNDA?

A    No.

Q    Okay, so you just met with Dr. Galson and discussed the matter with him?

A    Yes.

Q    Okay.  You said he presented to you his planned decision and you asked him some questions about it.  What questions did you ask him?

A    Well, you know, this was our -- the customary way that I dealt with the center directors is the center directors I held responsible for any and all decisions, and it was their obligation to bring to my attention the major decisions.  Some of them even brought minor decisions forward.

So essentially what they would do is they would say we're going to go this way, and I would ask them why, and then I might say, well, I don't -- I

Page 48

don't agree with that approach, why don't you go back

and give us -- you know, give me some more

information, I want you to put this off, or something

like that.  Or I would say I concur, and -- but I

would have asked them substantive questions about

these kinds of actions.

I don't remember precisely what I asked him,

but I -- we got into the substance of it at some -- in

some detail.

Q    Do you remember any of the topics that you

discussed with him?

A    No, you know, I can't say exactly what I

asked him.  I don't recall that.

Q    Do you remember anything at all about what

you might have discussed or what concerns might have

been raised in that conversation?

A    No.

Q    And again, that conversation would have

taken place a few days, couple days to a few days

before the decision was announced?

A    It could have been that late.  It may have

been a few -- you know, maybe a week or so before.

VIDEOTAPED DEPOSITION OF LESTER M. CRAWFORD, D.V.M., PH.D.
CONDUCTED ON WEDNESDAY, MAY 24, 2006

Page 49

Q    But very close to the decision announcement?

A    Yes.

Q    Other than that meeting with him, did you have any other communications with him about what the agency's decision would be on the Plan B SNDA?

A    No.

Q    It was just that one communication?

A    Mm-hmm.

Q    Okay.  No other written communications, either?

A    No.

Q    And during that meeting when you asked him whatever questions you asked him and he answered, in the end of the meeting you concurred with his decision; is that right?

A    I did concur, yes.

Q    Do you remember why you concurred?

A    Well, he convinced me, you know, that that was the right decision after I asked him some questions.

Q    But you don't remember right now why you thought it was the right decision?

Page 140

Q    On what matter?

MR. AMANAT:  Objection.  Instruct the witness not to answer that question.

BY MS. JONES:

Q    Did Dr. Galson make a recommendation to you at this meeting of what he thought the action should be on the Plan B SNDA?

THE WITNESS:  Is that all right?

MR. AMANAT:  Mm-hmm, you can answer that.

THE WITNESS:  Sorry.

MS. JONES:  It's okay.

A    Yes, Dr. Galson, he said I want to tell you about, you asked me some time back about the science, and he said I want you to know that I am comfortable with the science and the demarcation of the 17-year-old and up.  And so I said or I asked him, tell me why you're comfortable with it going over the counter to 17 years and up.  And he, you know, told me, basically summarized the scientific literature and, you know, told me why under the statutes and so forth as he understood them that it -- you know, it should be approved over the counter for 17 and up.

VIDEOTAPED DEPOSITION OF LESTER M. CRAWFORD, D.V.M., PH.D.
CONDUCTED ON WEDNESDAY, MAY 24, 2006

Page 141

And then I said, what about 16 and under,

and he said that he felt comfortable that this

required a physician prescription, and it should stay

on a prescription order basis.

And I said are you -- I said, fine, and so

that is what you've concluded.  And I said, is

there -- basically, I said the science, how would you

describe it, is it significant, is there significant

scientific agreement?  And he said, well, he

would -- he'd like to see more scientific papers, but

he felt comfortable that you can make that distinction

based on the science.  And he said beyond that he was

not prepared to go.

And I said -- I said, you know, I've raised

the question of enforceability, do you think this can

be enforced, and how would it be enforced.  So he

talked about, you know, the behind-the-counter aspect.

And he did say that he believed that most pharmacy

laws would allow this dual kind of thing, and I said

who would enforce it, would it be FDA, would it be the

states, and what would be the penalties in case this

kind of thing happened, and how serious would it be.

Page 142

He said, well, we made the decision based on public health. We think that for women in this category of 16 and under it should be on a prescription basis, and that's for health reasons.

And I said fine, I said, I'm not going to challenge that determination, but I am sufficiently concerned about enforceability that I think we're going to have to have a notice and comment period.

And so that was about it.

Q     All right.

Was anyone else at that meeting other than yourself, Dr. Galson, Mr. Bradshaw, and Mr. Ronan?

A     Yes.

Q     Who else was there?

A     Dr. Scott Gottlieb.

Q     Who is that?

A     He is deputy commissioner for medical affairs. He was in and out of the meeting, but he was there.

Q     So would it be fair to say by the close of this meeting you had made your final decision?

A     Yes.

VIDEOTAPED DEPOSITION OF LESTER M. CRAWFORD, D.V.M., PH.D.
CONDUCTED ON WEDNESDAY, MAY 24, 2006

Page 143

MR. AMANAT:  I'm sorry, Counsel, what document was that, the August 24th, calendar?  I'm not finding it in the book.

MS. JONES:  I didn't refer him to any document.

MR. AMANAT:  Oh, okay.

BY MS. JONES:

Q   Could you take a look at document 3151 in the notebook.

A   Not D, but 3151.

Q   Exactly, which is Tummino 31214 through 31226.

A   Okay.

Q   Are you familiar with that document?

A   Let me just be sure.

I am familiar with it, yes.

Q   Before we get to this document I want to back up for one second.

You said the other person who attended the August 24th '05 meeting was Dr. Scott Gottlieb?

A   Mm-hmm.

Q   Why was he there?

Page 144

A    He's the relevant deputy commissioner.  We have three deputy commissioners, and he's the one over medical affairs.  One is for international affairs and one is for operations.

Q    Did he play any role in the agency's decision on the Plan B SNDA?

A    No, I did that.  He was, you know, the relevant deputy commissioner, and he's a medical doctor and has a specialty in internal medicine.  And, you know, that's why he was -- he's in that position.

Q    Did he give you any input on the decision, on the Plan B SNDA?

A    Yes, we discussed it, yes.

Q    What was his input?

A    He basically concurred with the need for the notice and comment.

Q    Did he give you any input on the science?

A    No, that came from the center.

Q    So his only input would have been related to enforceability?

A    Yes.

Q    And at that same meeting Dr. Galson

VIDEOTAPED DEPOSITION OF LESTER M. CRAWFORD, D.V.M., PH.D.
CONDUCTED ON WEDNESDAY, MAY 24, 2006

Page 145

obviously, well, I won't say obviously. Am I correct that Dr. Galson at that meeting recommended granting the Plan B SNDA that was for dual status?

A   Not all together. He -- as you know from reading this document, he basically left the door open for a further decision under his -- under Section VIII, conclusion, and, you know, if additional data comes in. And then the other thing was that he -- you know, he was careful in the meeting to say that he's comfortable with the science and he's -- you know, this is his position, he doesn't -- and I said, well, I'm not arguing with the science, I said, we're basically going to declare that we consider this safe for women 17 and older and we're going to say that we think it should be prescription basis for those that are younger, but I am concerned about enforceability. And that was basically it.

Q   So is it your understanding -- well, what is your understanding of what his recommendation was as to how the agency should act on the Plan B SNDA?

A   Well, I mean, he's saying that it's safe to be used if it can be enforced, and I told him we were

VIDEOTAPED DEPOSITION OF LESTER M. CRAWFORD, D.V.M., PH.D.
CONDUCTED ON WEDNESDAY, MAY 24, 2006

Page 146

going to go for this notice and comment rulemaking

thing in order to get more information, give it a

60-day comment period, and he was fine with that.

Q    So it's your understanding that he agreed

with that decision, your decision?

A    Yes.  Now, if I had said, I mean, to him

that I don't believe -- don't agree with the science,

I think he would -- he would not have agreed with

that.  But I didn't challenge that.

Q    So you were not under the impression that he

was recommending to you that the agency go ahead and

approve this dual-status application?

A    No, not really.  He -- I was careful to say

to him that after reading this and after discussing it

with him that I still had problems with

enforceability.  So he -- you know, he just didn't

challenge that.  You know, I don't -- he -- that was

about it.

Q    Okay.  So looking back at this memo,

21031214 through 31226, did you receive this

memorandum?  It's dated August 26th '05.  Do you know

if at some point you received this memorandum?

Q    I think I have a record of one meeting about the citizens' petition that I can recall at the moment.  Do you know if there were?

A    You mean the citizens' petition, as opposed the application?

Q    Yeah, just the citizens' petition.

A    Yeah.  I don't, I don't really recall specific interactions just about the citizens' petition.  In my mind, the issue is mixed of the citizens' petition and the application, similar issues were raised, so I can't really tell you about specific meetings or discussions going back that many years ago.

Q    And then with respect to the Plan B SNDA, the one you indicated was mixed?

A    Right.

Q    How -- before the May 6th, 2004 nonapprovable letter, were you involved in the Plan B SNDA, for example, in the same way you were involved in all the other new drug applications you were -- CDER was considering?

MR. AMANAT:  Object to the form of the

MR. AMANAT:  I object to the form of the question.  You asked like three questions there all in one.

MR. HELLER:  Okay.

BY MR. HELLER:

Q    Are you typically involved in signing approvable or nonapprovable --

A    Let me just make a point.  There really is no such thing as typical in CDER.  Every single drug is different.  Every drug has a different risk benefit assessment, and you never know what's going to happen.  When there are high-profile policy or specific drug approval decisions or high-profile issues that arise after a drug is approved, I'm involved.

I typically would involve with the Commissioner's office as well, in making sure they knew what was going on.  So there's really no definition of typical.

Q    Okay.  So I'll be more specific.

A    Yeah.

Q    Have you ever, other than with Plan B,

Page 36

with respect to an application, an over-the-counter switch application, have you ever signed an approval letter for that?

A    No.

Q    Have you ever signed a nonapproval letter for that?

A    No, but that doesn't mean very much.  One, I haven't been in the Agency very long.

Q    Yeah, I know.  I'm not saying -- I'm not asking you what it means.

A    Yeah.

Q    Have you done it before?  Have you ever --

A    No.

Q    No.  Have you ever signed a nonapprovable letter for an OTC application?

A    No.

Q    Have you ever signed an approvable letter for an OTC application?

A    No.

Q    Who typically does sign those letters?

A    It's delegated down a couple levels in the organization.

Page 186

of sort of memos from medical reviewers again, and then as I saw it, leading up to, I think, a January 2005 memo from Dr. Jenkins?

A    January 2005, okay.

Q    Recommending, I think, approval without age restriction, do you recall that?

A    Yes.

Q    And then would you have received that back in January of 2005, the Jenkins memo?

A    Sure.

Q    As well as the prior, the other medical review, medical review memos?

A    That were done contemporaneously with that, yes.

Q    In January of 2005, were you planning to issue an approval for the Barr application?

A    We don't make regulatory decisions until all the documentation is together, so planning to make -- I don't think like that.  It's -- I was tending that direction.  What happened around that time frame is that Dr. Crawford, who was the Acting Commissioner then, told me that he was concerned

Page 187

about where we were heading because he knew that I was heading towards this recommendation, and he told me that he was going to make the decision on what to do with the application.

Q   So he removed your authority to make the decision?

A   Right, right.

Q   Had that ever happened before?

A   Not to me.

Q   Do you know if it's ever happened -- do you know of it happening to anyone else who was in your position?

A   No.

Q   When did he tell you that he was going to remove that authority?

A   I don't remember the exact time, but it was, it was winter, you know, January, February time frame.  That's the closest I can come to it.

Q   Did you respond to that in any way?  Did you tell him what you thought of his decision to do that?

A   I don't -- I'm trying to remember the

Page 202

B?

A    I don't know.

Q    Have you ever --

A    I don't know for sure.  I'm speculating that he had -- that his concerns were informed by discussions, but since I wasn't in those discussions, I didn't hear about them, I don't, you know, I don't know, I don't know for sure that I was excluded from anything.

Q    Isn't it -- don't you find it remarkable and strange that the head of CDER, you --

A    Yeah.

Q    -- who had under active consideration this OTC switch application, was not included in every discussion about it that was being held?

A    I may have been, I may have been included in every discussion for all I know.  I certainly, I have to -- this would get into discussions that I had with --

Q    You certainly -- what is the nature of what you're going to say?

A    The nature is my communications with the

Case 1:05-cv-00366-ERK-VVP    Document 235-8    Filed 03/31/07    Page 24 of 77 PageID #: 6090

Page 205

A    I wouldn't say that.  I don't remember.  I probably was, I mean, I had, as I told you, I had regular meetings with Dr. Crawford.  And so --

Q    It might have come up?

A    It would have come up.  It definitely would have come up.  So I'm sure I talked to them.  I don't recall any formal meetings about it.

Q    Did he give you sort of regular or intermittent updates about whatever it was he was doing, now that he had taken the decision away from you?

A    No, no.  He knew that I was working on finalizing my decision memo, and he wanted to make it really clear that he wanted me to do that.  So he, you know, asked me to go ahead and finalize that.  He didn't want to be involved in the details of it and that I needed to forward that to him when it was done.  That was, that was the only way we --

Q    Was he waiting, I mean, there's this time -- date coincidence on August 26th.  August 26th is the date of your memo?

A    Right.

Page 206

Q    And it's also the date on which Dr. Crawford sent his letter to the manufacturer?

A    Yeah, it's not a coincidence.

Q    Was he waiting for your memo, or was it the other way around?

A    No, he was waiting for my memo.  I didn't know what he was going to do, so he didn't make -- what he told me is that he didn't know what he was going to do either.  He was just, he was communicating to me that he was, he was going to make the decision, and I didn't know whether he was going to go ahead and accept my recommendation.

I talked to him about, you know, the fact that he's making the decision, what format should my decision make -- take, and he asked me to have it take the form of a recommendation to him.  And I didn't know what his decision was going to be until just before he made it.  So, you know, my hope was that he would accept it, and the drug would be approved.

MR. AMANAT:  Is this a good time to break for lunch, Mr. Heller?

VIDEOTAPED DEPOSITION OF DONNA GRIEBEL, M.D.
CONDUCTED ON WEDNESDAY, JULY 19, 2006

Page 14

I'll leave it at that.

A    So you're asking me if there's anything -- could I ask you to ask it again?  I know you're asking about the review process and what -- whether I was surprised by anything during the review process?

BY MS. STRAUSS:

Q    If there was anything atypical about the over-the-counter switch process for Plan B?

MR. WARSHAWSKY:  Same objection to use of the term "atypical".

THE WITNESS:  Atypical.  So I can answer this, correct?

MR. WARSHAWSKY:  Uh-huh.

A    Okay.  So it did seem atypical to me that the level of involvement from upper level management during this, including the preparation for the Advisory Committee Meeting, but also during the initial review process in getting instructions in what we needed to be doing and obtaining from the company.  So there seemed to be an unusual amount of involvement from upper level management.

BY MS. STRAUSS:

Page 18

MR. AMANAT:  No.

MR. WARSHAWSKY:  I'm identifying an ambiguous term in the question.  It's the form of the question that I'm objecting to.

MR. HELLER:  Which word don't you understand?

MR. WARSHAWSKY:  Upper level management.

MR. AMANAT:  It's an objection to the form of the question.  She can answer the question but --

BY MS. STRAUSS:

Q   You can go ahead and answer the question.

A   So was the question -- can I ask you to repeat the question?

Q   Sure.  Do you recall if what you described as an unusual degree of involvement by upper level management, do you recall that occurring -- if that began prior to the Advisory Committee Meeting?

A   Yes.

Q   And what was that involvement?

A   What I remember as seeming unusual to me before the Advisory Committee Meeting was we had -- we had a meeting with the applicant that was attended

Page 19

by John Jenkins, who was the head of Office of New Drugs.  I had never had that happen before in Advisory Committee Meeting.

And in addition, in preparation for the Advisory Committee Meeting, I had involvement from Dr. Galson and his Acting Deputy at the time, Dr. Goldberg, and going over the members that would be asked to participate -- the scientific professionals, SGEs, that would be asked to participate in the Advisory Committee on the panel.

And Dr. Galson was involved in reviewing the questions that would be asked of the Committee.  I had never had that happen before.  Dr. Galson was involved in discussions with the Committee chair, discussing the meeting.  I had never had the head of CDER be involved in discussions with the Advisory Committee chair about the Advisory Committee that was coming up.  And there were discussions of the Advisory Committee questions that he was involved in in that meeting, which was not something that I was accustomed to.

Q    Do you remember what happened during the

Page 17

Ms. Maureen Hess.  Those folks and perhaps others.

Q    Were there several such meetings or was it -- do you know roughly sort of -- what I'm trying to get a sense of is sort of when those types of meetings occur and how many --

A    Usually in the context of discussing the Plan B OTC switch, there was also in addition we have to, if we're doing an action, we must consider the petition.

Q    So sort of that in most -- in some of the meetings in which the Barr application was being considered, the citizen petition would also be mentioned?

A    Yes.

Q    I've reviewed big portions of the Administrative Record that's been provided by the Agency, and I did not find myself review memos, medical review memos, that you yourself wrote.  Is that correct that you yourself didn't write some sort of even a summary review of -- related to the Plan B?

A    That's correct.

Q    Was there someone who would have been sort

Page 20

A    Yes.

Q    Can you tell me -- I don't know if there were one or many, but can you tell me whichever -- whatever things that were departures that you recall?

A    Well, I think that there were a number of events that I felt were questionable.  And I think the most striking event was related to our January 15th meeting with Steven Galson in which he conveyed that the data for age group 14 to 16 was insufficient to support approval for OTC switch; that either the company would have to conduct a study in that age group or they could propose restricted marketing to 18-year-olds or older.  And he described this decision as sincere, not ideologic.  But that begged the question of should we complete our reviews or not.

And so I asked that question at the meeting.  And we were instructed to complete our reviews.  But I think that by conveying that this decision was a concern of the Commissioner's, it might have made our further evaluation superfluous.  So I do know that some of the reviewers finished their reviews soon

Page 21

after that meeting.  But in the Office of Drug

Evaluation 3, in order to try to capture all the data

that the reviewers were aware of that supported the

OTC switch, they continued working with the principal

investigators, Melanie Gold and others to obtain the

data and document it for the record.

Q    At that January 15th meeting did Dr. Galson

convey that the Commissioner's Office believed that

the SNDA could not be approved?

MR. AMANAT:  Objection.  You can answer the

question.

A    I believe so.

BY MR. HELLER:

Q    Why was what Dr. Galson said at that meeting

or -- why was it as you said sort of the most

striking of the questionable things you noticed?

MR. AMANAT:  Object to the form of the

question.  You can answer the question.

THE WITNESS:  Could you repeat it?

BY MR. HELLER:

Q    Yes.  Let me ask it a little bit

differently.  Why was it striking at all that the

Page 22

head of CDER was coming to tell people that the data was insufficient?  Why would that be striking?

A   Well, I think what was very unusual is that we had not finished the evaluation process, and we were in the middle of getting data on the question of adolescent use of emergency contraception.  So if we were to continue an evidence-based approach, we would hope to have all the evidence in hand before an evaluation and decision was made.

Q   So was it your sense that at that meeting a decision had been made, in essence?

MR. AMANAT:  Objection.  You can answer the question.

A   It was my sense that a decision had been made, and that I also sensed within the room and then subsequent discussions that we should meet with Dr. McClellan, present him with new information and perhaps it could be altered.  Some people had that view.

BY MR. HELLER:

Q   Did you have that view?

A   I think I had that hope.

VIDEOTAPED DEPOSITION OF FLORENCE HOUN, M.D.
CONDUCTED ON THURSDAY, JULY 20, 2006

Page 30

Q    Continuing on with other things that may have occurred that you viewed as questionable, are there any others that come to mind?

MR. AMANAT:  Object to the word "questionable" once again.  You can answer the question.

A    Well, going back further, I guess the December -- let me get the dates right -- it was December 2002, appointments of the Reproductive Health Drugs Advisory Committee members was also very unusual.

BY MR. HELLER:

Q    In what way?

A    Usually nominations received from the Division, received by the Division from different sources, Division members put together a panel of nominees and send those names up for clearance.  In this case names were sent down, and this was in 2002, because we were --

MR. WARSHAWSKY:  I'm sorry, can I ask you to speak up?  I'm having a hard time hearing you.

A    Okay.  This was in 2002 because I remember

we wanted to try to constitute the Advisory Committee

to discuss the findings with estrogen and

hydroxyprogesterone acetate on cardiovascular risks

that became known in July 2002, because we wanted to

hold an Advisory Committee in the fall of 2002 to

deal with the cardiovascular risks of the

post-menopausal estrogen agents.

And so in trying to constitute that

committee, a compromise was reached which some of the

members were names that the Division had put forward

and others were not. And that --

MR. AMANAT: Go ahead.

A And that full committee was signed off by

Associate Commissioner Linda Skladany late December

in 2002.

MR. AMANAT: I'm going to object and move to

strike the entire answer as being nonresponsive to

the question posed.

MR. HELLER: I thought it was completely

responsive.

MR. AMANAT: Well, it doesn't have anything

to do with Plan B, which is why it was not

Page 32

responsive.

A    Well, I think that in --

BY MR. HELLER:

Q    Please explain further.

A    I think that everybody knew the application would be coming in either late 2002, which I think the company made public announcements.  The Washington Post -- or was it the New York Times had a summer article about the impending application.

Q    And certainly within the Agency you knew that the application was coming?

A    Yes.  Yes.  And so I think that the constitution of the panel was important, and that these OTC switch applications are heard before advisory committees.  So I thought it was irrelevant.

MR. AMANAT:  I'm going to renew my objection and my motion.  You may proceed.

BY MR. HELLER:

Q    Have you -- have there been other times during your tenure at the FDA where you have been involved in the formation of an Advisory Committee?

MR. AMANAT:  Objection.  You can answer the

Page 33

question.

     A    Yes.

BY MR. HELLER:

     Q    Have you ever in any of those other instances had nominations come from above down?

          MR. AMANAT:   Objection.   You can answer the question.

     A    In my experience in constituting Advisory Committee members, this has not happened.

BY MR. HELLER:

     Q    Do you -- I'm just sort of wondering how this happened.   Did you at some point receive a list of proposed -- of the individuals who were proposed to be put on the Advisory Committee for in, I guess, late 2002?

          MR. AMANAT:   I'm going to object to this whole line of questioning.   The witness can answer the question.

     A    Yes.   I believe we received a list of names in July or August of 2002.   And of particular contention was who would be the chair of that committee.   And I do know that there was a lot of

Page 34

discussion with Dr. Sandy Kweder, who was the Deputy

Director for Office of New Drugs under John Jenkins.

She had a lot of discussions with the Associate

Commissioner on the constitution of the panel and who

would be chair.

And we received an e-mail, I believe it was

in October of 2002, stating that Dr. Skladany had

asked Dr. W. David Hager to be chair and he had

accepted.  And when I got that e-mail, I called Dr.

Woodcock asking her to see if this issue could be

revisited.  And I believe she was able to intervene,

and Dr. Hager became a member of the Committee but

not the chair.

BY MR. HELLER:

    Q    Was Dr. Hager --

        MR. AMANAT:  I'm going to object again to

the answer and move to strike as nonresponsive.

BY MR. HELLER:

    Q    Was Dr. Hager one of the names of

individuals to be put on the Committee that was

received from higher up in the Agency?

        MR. AMANAT:  Objection.

Page 35

BY MR. HELLER:

Q    You can answer.

A    Yes.

Q    Do you recall any of the other names of individuals who people higher up in the Agency wanted to have put on the Committee?

MR. AMANAT:  Objection.  You can answer question.

A    I recall a couple of names.  Yes.

BY MR. HELLER:

Q    Can you tell me what they were, who they were rather?

MR. AMANAT:  Objection.  You can answer the question.

A    Dr. Susan Crockett, Dr. Joseph Stanford, I recall those.

MR. WARSHAWSKY:  Can you please speak up?

A    Dr. Joseph Stanford and Dr. Susan Crawford (sic), I recall those names, as well as Dr. Hager's name.

MR. AMANAT:  Actually, Dr. Houn, it might be helpful if you face the camera when you testify

Page 36

instead of facing Mr. Heller, because that way the camera will get you and all sides of the table can hear you better perhaps.

THE WITNESS:  Okay.

BY MR. HELLER:

Q   Did you keep any -- do you have any written records of the sort of proposed names that were given from higher up in the agency?

MR. AMANAT:  Objection.  You can answer the question.

A   I have a -- I have an e-mail -- I think I have e-mails related to that.  And I think I did produce them in response to -- yeah, I think I did respond to your first request for records.

BY MR. HELLER:

Q   Were there any members -- well, were there any nominees for the Advisory Committee -- and just to be clear, which Advisory Committee are we talking about throughout this whole --

A   Reproductive Health Drugs Advisory Committee.

Q   Were there any nominations for that

Page 37

committee from within the office, your office, that were rejected by people higher up in the agency?

MR. AMANAT: Objection. Object to the form of the question. And I also object to this continuing line of questioning.

BY MR. HELLER:

Q You can go ahead and answer.

MR. AMANAT: You can answer the question.

A Your question was whether there were nominees put forward by the Office or the Division that were not signed on as members?

BY MR. HELLER:

Q Let me ask a different question because yesterday I did -- no, I guess my colleague conducted the deposition of Dr. Griebel, who you know. And she talked about there being contention around the composition of this Advisory Committee.

And what I'm trying to get a sense of is, was the contention about some of the names that were nominated from higher up in the Agency, or was the contention also about people who were nominated from sort of the more normal process for nominations?

Page 38

MR. AMANAT:  I'm going to object to the word "contention" and object to the characterization of the testimony of the witness who testified yesterday, and object to the form of the question as compound, vague and ambiguous.

BY MR. HELLER:

Q   You can answer the question.

A   Well, from my perspective, the contention was over the constitution of the panel, the type of experts needed, and the lack of expertise in some of the nominees relevant to the function of the Reproductive Health Drugs Advisory Committee.

MR. AMANAT:  Object to the response.  Move to strike as nonresponsive to the question posed.

BY MR. HELLER:

Q   Which of the nominees did you view as having a lack of expertise relevant to the function of the Committee?

A   Well, I was concerned that the appointment of Dr. Susan Crawford -- Crockett was not reflective of the desire to have expertise recognized on a --

MR. WARSHAWSKY:  I'm sorry, expertise what?

A    Expertise recognized on a regional or national level or specialty field that would help our deliberations.

BY MR. HELLER:

Q    Anyone else you were concerned about?

A    I was concerned about the expertise of Dr. Joseph Stanford, being that of natural family planning as you don't have any drugs being developed in that area, and we don't use natural family planning as a control arm in our trials.  So I wasn't sure about his expertise being, again, relevant to the functions of the Advisory Committee.

Q    Do you know who makes the final decision about the composition of the Advisory Committee?

A    The Secretary or Assistant Secretary or delegate.

Q    In this case, in the case of the composition of the Committee that you're talking about in 2002, do you know who made -- was there someone --

A    The deciding official was Dr. Linda Skladany in this case.

MR. WARSHAWSKY:  I'm sorry?

Page 40

MR. AMANAT:  Dr. Linda Skladany, Assistant Secretary of the Agency.

THE WITNESS:  No, she is the Associate Commissioner.

BY MR. HELLER:

Q   How long do people serve on the Advisory Committee?  Is it sort of constituted when it's needed or do people get appointed for ten years?  How is that done?

A   Four-year -- maximum membership is four-year and would have to be renewed.  And then you can have shorter membership appointments.  So I think in this case we tried to come up with a compromise that Dr. Kweder and Dr. Skladany negotiate in terms of length of time, who would be on it.

Q   And so Dr. Kweder might know even more about these negotiations and the constitution of the Committee than you do?

A   Dr. Kweder would know more, and Dr. Igor Cerny, who's head of the Advisory Committee staff for CDER, also has knowledge.

Q   Do you know if Dr. Crockett -- I hope I have

Page 41

the name right -- Dr. Susan Crockett, wound up being on the Committee?

A    Yes.

Q    She was on the Committee?

A    Yes.

Q    And what about Dr. Stanford?

A    Yes.

Q    And Dr. Hager?

A    Dr. Hager, yes.

Q    Were there any other names that were proposed from higher up in the Agency that you can recall, or was it just those three?

MR. AMANAT:  I object to the question.  You can answer.

A    I don't recall, but like I said, they were in e-mails responsive to your request.

BY MR. HELLER:

Q    Do you know who outside the Office was communicating these proposed nominees or conveying that these people were proposed for the Committee?

MR. AMANAT:  Objection.  You can answer.

A    Well, we interacted with the Advisory

Page 42

Committee staff, and they provided us with the latest news. We interacted with Dr. Kweder and she would provide us with feedback. So we were not the direct recipients of interactions. We were the recipients of names. And our job was to look at the name, research their credentials, their publications. And we felt if there was a question of qualification, we should raise it with our senior managers, which we did.

BY MR. HELLER:

Q   Do you recall receiving or seeing the names of any individuals proposed for the Advisory Committee from outside the Office, like sort of in the way you saw Dr. Hager, Dr. Stanford and Dr. Crockett's names? Do you recall seeing any other names of individuals whose expertise you didn't question or didn't doubt?

MR. AMANAT:  Objection. You can answer the question. I'm going to object. I want to make clear I object that your question assumes facts not in evidence because not all of the names -- the witness did not testify that she questioned the expertise of

Page 43

all the names that you mentioned. But your question is objectionable for other reasons as well.

BY MR. HELLER:

Q   Didn't you say that you questioned the expertise of Dr. Hager, Dr. -- I'm sorry, maybe you didn't -- did you question the expertise of Dr. Hager?

A   No, I did not. I questioned whether he was the -- well, no, I didn't actually tell you why.

Q   Well, go ahead.

MR. AMANAT: My objection was well taken.

A   I think Dr. Hager got his training in the Center for Disease Control, Sexually Transmitted Disease. Drugs that treat, prevent sexually transmitted disease are not handled in the Reproductive Drugs Advisory Committee. They're handled in the anti-infectives or antiviral drugs committee. And they approve like vaginal antifungals, STD treatments for chlamydia.

But so that's why I objected for his appointment as chair. I thought it was not the right expertise.

Page 44

BY MR. HELLER:

Q    Putting aside Dr. Hager, Dr. Crockett and Dr. Stanford --

A    And I didn't tell you about Dr. Crockett.  I just said I was concerned that I think in the last maybe four or three and a half out of five years prior to her appointment, she had not been in active practice.  It might have been even longer.  And that was unusual.

Q    So putting aside those three individuals, were there other individuals whose names were communicated as coming from outside the Office who you thought, well, this is an appropriate person for the Committee?

A    Well, I think in the end we heard in December that Dr. Linda Guidice from Stanford, a fertility expert, was being asked to be chair.  And we were very pleased to have her be considered.  And so that is an example of where I think we were satisfied.

MR. AMANAT:  Do you know how to spell that name?

Page 49

MR. AMANAT:  The very tail end, like the last two sentences.

(Record read.)

MR. AMANAT:  I remind you again, please try to speak up if you can.

THE WITNESS:  Okay.  I'm so bad.

MR. AMANAT:  I know you're a little bit nervous perhaps, but try to speak up.

BY MR. HELLER:

Q   If there's anything I can do to help you be less nervous, please let me know.

Do you remember after the January 15th meeting that Dr. Galson chaired or ran, there was a subsequent meeting with Dr. McClellan where you actually did try to present information to him that might -- in the hope that it would change his position?  Do you recall that?

A   Yes, I recall that meeting.

Q   And were you at that meeting, also?

A   Yes.

Q   I recall someone testifying that during the course of that meeting Dr. McClellan left for a

Page 50

little while.

A    Yes.  He was called away on a telephone call.

Q    Do you know how long he was gone from the meeting?

A    Maybe five minutes.  Maybe longer.  I -- I do know it was not an in-and-out absence.

Q    Was that a successful meeting from your viewpoint?

A    It was informative.

Q    In what way was it informative?

A    I personally got from the meeting that it would be unlikely that we would get -- that we, meaning myself or the Division, would get any specific answers resolved with Dr. McClellan at that time.  I think I felt at that meeting he was distracted, and that these matters would have to be then resolved promptly without -- without hearing resolution at that meeting.

Q    After -- well, did you come away from that meeting believing that you had persuaded Dr. McClellan to change his view on the view

decision about the application?

MR. AMANAT:  I'm sorry.  What were the dates in your question?

MR. HELLER:  Between the dates when she first learned that ODE-3 and ODE-5 would not be making the decision, and May of 2004 when Dr. Galson issued the letter.

A    I didn't talk with Dr. Galson.

BY MR. HELLER:

Q    Was there anyone else you did talk to about that subject?

A    I talked to Dr. Woodcock.  She called me at home, either the afternoon of the 15th, or more likely the afternoon of the 16th of January, 2004, to review the impact of the January 15th meeting with me, to find out what did the -- what was the reaction to the team.  And she conveyed to me her assurance that this was the only way to go to issue a non-approval letter to appease the administration's constituents, and then later this could be approved.

Q    Which administration, the Food and Drug Administration?

A    I didn't take it as that.

Q    So she told you, if I understand you correctly, that this was the only action that could be taken to appease the constituents of the presidential administration?

A    That's what was conveyed.

Q    And this was a call you received at home?

A    Yes.

Q    May I ask where you reside, just the town or city where you reside?

A    Potomac, Maryland.

Q    Do you know where Dr. Woodcock was calling you from?

A    No.

Q    Was there anyone else on the phone call?

A    No.

Q    Did you keep any notes about that phone call or write anything down about it?

A    No, I don't think I wrote anything down. But I do know, I recall this very well because we had to discuss another controversial issue that was happening the next day, Friday.  And so I took that

non-approval for the opposite reason.

Q   Was there staff or is there staff in CDER that views the Agency's process regarding Plan B as involving or as having factors that are non-medical or political?

MR. AMANAT:  As of the date of this document you're asking?

BY MR. HELLER:

Q   Let's start with as of the date of this document, were there people within CDER who believed that there were non-medical and political views that factored into the Agency's decision?

MR. AMANAT:  Objection.

BY MR. HELLER:

Q   You can answer.

A   Yes.

Q   How widespread was that view?

MR. AMANAT:  Objection.  You can answer the question.

A   I think it was fairly widespread.

Q   Is it still a widespread view within CDER?

MR. AMANAT:  Objection.

Page 102

A    I think so.

BY MR. HELLER:

Q    Were Dr. Galson's statements disavowing non-medical and political factors persuasive to you?

A    No.

Q    Can you tell me why not?

A    I think at the time there was concern on -- there was concern about if Dr. Galson did not issue a non-approval letter, the leadership of CDER would be placed in a difficult position and may not be in the interest of CDER.

Q    Can you --

MR. AMANAT:  I object and move to strike as not responsive to the question posed.

BY MR. HELLER:

Q    Can you explain that a little bit more?  In what way would an action other than non-approvable have affected the leadership of CDER?

A    It was told to me that perhaps if there was a contrary decision, meaning if it was an approval decision, that the leadership that was involved in that decision may not be able to stay on.

Page 120

that correct?

A    Yes.

Q    Okay.  I'd like to begin with the last bit of testimony that you gave the plaintiffs.  Mr. Heller asked you a question along the lines of in your professional scientific judgment, did you believe that the OTC application for Plan B should have been approved in May 2004.

And your answer, as I recall it, was to the -- was along the lines of, yes, the application submitted by the sponsor met the requirements for approval.  Is that a fair characterization of your last bit of testimony?

A    Yes.

Q    I'd like to begin by asking you what those requirements for approval of an OTC switch application are?

A    First, we must look at toxicity.  With reference to toxicity, this is levonorgestrel 0.75 milligrams, approved for decades, and which the Agency doesn't require any pharmacologic or toxicological studies for new drug applications.

Page 121

Second, with respect to toxicity, there is no established cardiovascular risk with progesterone-only contraception.  And this is also documented in the post-marketing review of over a million and a half uses of Plan B.

Also, with respect to toxicity, the Advisory Committee had over -- had seven clinical pharmacologists at the meeting, including Dr. Benowitz, who is a clinical pharmacologist with expertise in the third or fourth leading Poison Control Center.  And there was no concern raised in the discussion about toxicity with levonorgestrel.  In fact, during the vote on whether there was any safety concern, it was unanimous that there wasn't a safety concern.  So toxicity is one aspect that the regulations require us to review.  And there is not a concern for toxicity.

The second concern -- the second part of the regulation requires us to look at other potential harm.  Dr. Galson raised two concerns about other potential harm.  The first concern he raised was that it may be taken incorrectly.  I don't know if -- I'm

sorry, he was not convinced that younger adolescents

(Page 122 Lines 2 through 9 were bound separately and marked "Protected Testimony")

Q    That's okay.

A    With respect to potential harm in taking it wrong, there's actually some benefits for taking it -- taking the two tablets together in terms of more efficacy.  And that was raised during the review by the scientists.  And publications in 2002 from Contraception and Lancet show there is more efficacy if you take two pills together as soon as possible after unprotected coitus.

So the other aspect of taking it incorrectly might refer to taking it after 72 hours, whether it's less effectiveness.  But we're not talking about harm.  We're talking about less effectiveness.  So

Page 123

taking it incorrectly might have more efficacy or less, but I'm not sure there is any harm.

I think the second thing Dr. Galson was concerned about relates to the substitution of Plan B inappropriately for either regular contraception or barrier methods of contraception which protect against sexually transmitted diseases. So in the effort to try to address that concern, the reviewers presented data from the Actual Use Study, Dr. Melanie Gold's study, Dr. Raine's study, which looked at outcomes of unprotected sex with respect to access for emergency contraception, as well as other outcomes such as STDs.

And, in fact, Dr. Gold was at the Advisory Committee during the open public hearing and presented her data to the Committee members. And she gave us permission for her unpublished study at that time to reference the findings in the reviews of staff from Drug Evaluation 3.

So finally with respect to potential harm and substitution, there was a vote in the Advisory Committee on was there evidence that substitution,

can answer it.

A    There are adverse events reported for the Plan B NDA post-marketing.  I can review them with you.  They are, by my judgment, incredibly unremarkable.

BY MR. WARSHAWSKY:

Q    What do you mean by incredibly unremarkable?

A    For a drug with that much use and especially -- for a drug with that much use, the types of reports that were received, including nausea, dizziness, are very mild.  There are no deaths reported with this.

Q    Now, in evaluating whether the adverse events associated with Plan B or any other drug are, quote, incredibly unremarkable, end quote, or something else, what standard or measure do you apply to reach that, as you called it, judgment?

A    Well, you look at adverse events as they happen in the general population.  You compare that background rate to what is reported, and you also anticipate an under-reporting.  And then you see if there's a concern, a signal raised in the

Page 128

post-marketing reports.  And there are none.

Q   Now, when you say that you look at the background rates of adverse events, rates can mean anything from zero to a hundred, correct, or perhaps a different number?

A   Or more, yeah.

Q   So my question then is, in looking at those rates, how do you decide whether a particular rate is a high rate, a low rate, an in-between rate or something else?

A   The comparison is to background, to general population that doesn't take the drug, and then you look at what happens with drug.

Q   So you're saying --

A   If there is no difference, that doesn't -- if there is no difference versus if there is a difference, that is what we were looking at.

Q   Okay.  I understand now.  So you're comparing the adverse events reported for a particular drug to the -- or I should say you're comparing the rates or incidence of adverse events reported for a particular drug to the rates or

Page 134

A    Well, Dr. Griebel here in her review brings out that the Office of Drug Safety identified three spontaneous abortions, one missed abortion, one inevitable abortion, three European cases of congenital anomalies in women who have used levonorgestrel for emergency contraception.  And she states that this Division has previously reviewed these teratogenic effects of contraceptive hormones in early pregnancy and have concluded there is no association between accidental use of these hormones and adverse fetal outcomes.

Q    So is your testimony then that the only adverse events associated with Plan B are nausea, vomiting and ectopic pregnancy?

A    That's described in the post-marketing safety database.  There was an additional, one foreign report of phlebitis.  There was no evidence of thrombotic events.  That's what the written record shows from Dr. Griebel.

Q    All right.  Well, let's move on to the next element.  You said the next element for requirements for OTC switch were other potential harm.  And the

Page 230

Q    Thank you.  At the beginning of his
questioning, Mr. Warshawsky reassured you that
nothing you said here today would be the basis of
retaliation or repercussions for you.  Do you have
any -- do you still have any concerns about that?

Page 16

approval or a Non-Approval Letter.

Q    And would the same be true -- I realize "rarely" doesn't maybe mean very much in this context, but in the OTC Switch Applications --

A    Uh-huh.

Q    -- would it also be the norm that that would, that the Action Letters on those would be at the Division or Office Director level?

A    Yes. Most over-the-counter actions occur at the Division level. There are certain Actions; for example, novel switches or first in class switches are signed at the Office Director level, and we actually have a policy in place where it's a dual sign-off between the Office Director overseeing non-prescription products and the Office Director overseeing that therapeutic area. So in the case of Plan B, for example, the Office Director overseeing reproductive products and the Office Director overseeing non-prescription products had joint sign-off responsibility in our normal schema.

Q    As you probably know, that normal schema

Page 17

did not occur with respect to Plan B.

A    Correct.

Q    And so just following up on your question, do you know why that normal scheme did not take place with Plan B?

A    It didn't take place in the normal pathway because we were directed that the decision be made at a higher level within the Center or within the Agency.  So the direction was given to us by Dr. Galson that the decision would be made at his level or at the Commissioner's level.

Q    Do you recall when you received that information?

A    Yes.

Q    When?

A    It was at a meeting.  I don't know the exact date.  It was sometime after the Advisory Committee meeting, which I think was in December of 2003 if my memory is correct.  It was sometime between the Advisory Committee meeting in December and early January, it may have even been during the week between Christmas and New Year's,

Page 18

Dr. Galson, Dr. Woodcock, myself and Dr. Kweder

had lunch together and it was at that meeting that

Dr. Galson and Dr. Woodcock told us about the

decision.

Q    Did Dr. Galson, in telling you about

that decision, explain why the decision -- tell

me -- please tell me if I'm mischaracterizing what

you said, but did he explain why the decision

would be made either by him or even higher up than

he was?

A    As I recall, Dr. Woodcock and Dr. Galson

were explaining the decision and the path forward

essentially together.  They described that

Dr. McClellan, the Commissioner at the time, was

not in favor of approving the Application and felt

that the Application should not be approved on

that cycle, so that's how they explained it.

Q    So attending this meeting was yourself,

Dr. Galson, Dr. Woodcock and Dr. Kweder; is that

right?

A    Dr. Kweder.

Q    This was a sort of informal lunch

Page 19

meeting?

A    Right.  We had lunch at a restaurant near our office.

Q    Do you remember what, which restaurant it was at?

A    I remember the restaurant.  I can't recall the name off the top of my head.  It's an Italian restaurant near the Parkline building that's fairly frequent for FDA staff to go to for lunch, but I don't remember the name.

Q    When we were up at -- was that in Rockville?

A    Yeah.

Q    When we were up in Rockville for one of the depositions, I would have loved to have known about a good Italian restaurant nearby, but we can come back to that later.

A    I don't know if I can characterize this as a "good" Italian restaurant.

Q    Well, an Italian restaurant.

Okay.  Would it surprise you to know -- and I'm not going to try to characterize someone

else's testimony, but suppose you found out that

Dr. McClellan testified under oath that he never

expressed a view about whether Plan B should be

approved or not, would that surprise you?

A    Yes.

Q    Why?

A    Because my memory of the meeting that

I'm describing, the luncheon meeting, it was very

clear that Dr. Woodcock and Dr. Galson were

conveying Dr. McClellan's view on the Application.

Q    Is it -- I'm trying to sort of

understand how this decision came to be, and it

sounds as if I guess maybe Dr. McClellan, the

Commissioner of the FDA, convey to you about how

the Application should be handled and that his

view was then implemented by his subordinates

essentially, is that right?  Am I being, saying it

too strongly?

A    Well, the decision was implemented by

some of the subordinates.  I think you're well

aware that many of the subordinates did not agree

with the decision.

Page 27

to take place, I wrote a memo, a summary review, as it were, stating my conclusions about the Application and my conclusions that it should be approved without age restrictions.

Q    I want to go back to, if I can, to the point at which Dr. Woodcock and Dr. Galson conveyed Dr. McClellan's view of the Application.

A    Uh-huh.

Q    Did they convey to you why Dr. McClellan believed that it should not be approved?

A    As I recall, the primary reason they conveyed was concern about use in young women.  I don't recall if at that point they identified an age range, but the primary concern was the availability of the product over the counter for use in that younger age group.

Q    Was there an opportunity, after you heard about Dr. McClellan's view, for you and the other scientists who work for you to go back to Dr. McClellan and say, look, your concern is unfounded?

A    Yes.  There was a subsequent briefing

Page 28

from Dr. McClellan, I think it was probably in February of 2004, and the specific focus of that briefing was to go over what was available in the Application about use in younger age women and also what the staff had been able to uncover from literature reports and studies that they had gained access to about use of Plan B in that younger age set.

Q    Was Dr. McClellan at that meeting?

A    Yes.

Q    Did he have a response to the information that was presented to him?

A    I recall that he, you know, engaged in discussion about the data and the scientific merits of the data.  I do not recall that he gave a definitive opinion by the end of the meeting.

Q    At that meeting where the staff was presenting information to him, did they already -- they already knew that his view was that it should not be approved?

A    Right.  After Dr. Woodcock and Dr. Galson conveyed to me that the Action was

Page 29

going to be non-approval, I suggested that they needed to meet with the Team, the Review Team, and convey that information so that they could explain to the Review Team the rationale and the path forward.

They did that sometime in January of 2004, and as part of that meeting, obviously the scientific staff were not pleased with the pathway this Application was taking, because it was not the usual path that before the reviews were completed and before lower level reviewers had reached their conclusions and made their recommendations, that we would get a direction that the Application was not to be approved. So they expressed frustration and concern that the decision was being made before the reviews were completed and before they had had a chance to try to address the basis for the non-approval, which was the use in underage women. I think that's the reason we subsequently had the briefing from Dr. McClellan in February was to give the staff a chance to present in more detail their analyses of

Page 30

the data and to try to make the case that the data were adequate.

Q     Do you have any idea how it would have been possible for Dr. McClellan to come to a view that the Application should not be approved before the scientific reviews were completed?

A     I do not.

Q     At this February meeting where the staff presented information to him, did you believe at the time that there was any realistic chance that he would change his view based on that information?

A     I was not optimistic, no.

Q     Are there particular reasons that you wouldn't have been optimistic?  Seems to me like you felt strong -- maybe this is not right.  Did you feel strongly that the scientific evidence supported over-the-counter approval for women of all ages?

A     Yes.

Q     And so I'm wondering why -- wouldn't that ordinarily make you feel optimistic that you

Q    It seems to me -- and tell me if this is fair to say -- that if the Advisory Committee has voted fairly strongly majority to make it over-the-counter without restriction, that the Commissioner would at least want to very carefully review everything possible before conveying a sort of determination to staff.  Does that --

A    That would seem reasonable.  I think it's important to explain that for most applications the Commissioner's not directly involved in the decision-making of the Application, so for the Commissioner to convey through Dr. Galson a definitive opinion on the Application and an Action before the reviews were completed and before it had gone up through the subsequent levels of the organization is something I've never encountered before.

Q    Do you have any idea why that happened?

A    I don't have -- I only have speculation. I don't have any direct information other than what Dr. Galson and Dr. Woodcock told us at that meeting and at subsequent meetings where we

Page 51

science and Dr. Galson was persuaded by the science. Do you have any sense of what it was that moved him from maybe the initial non-concurrence with Dr. McClellan's view to the very sort of public concurrence with Dr. McClellan's view in the May 6th letter?

A     Uh-huh. I got the sense that he didn't feel he had a voice.

Q     In the ordinary course of events, if you had been involved in this particular OTC switch -- would you be involved in most OTC switches? You said there were only about five, but . . .

A     There's generally about five to ten a year.

Q     Okay. Would you be involved in all of those?

A     Almost never, because, as I described earlier, the delegation of responsibility for signatory authority for almost all applications -- well, I should say all applications, the delegation is to my Division Directors or my Office Directors. The sign-off actually only

Page 61

manuscripts that had been submitted or

publications that they were aware of, but

Dr. Raines' name is the only one that comes to

mind, and I have to say I think it comes to mind

because I saw it in the transcript of one of the

other depositions.  It's not something that I

normally would have remembered.

Q    Okay, thank you.

If you wouldn't mind turning to the

second page of your Memorandum --

A    Uh-huh.

Q    -- the second or I guess the first full

paragraph, last sentence, I think you're

describing some additional studies that staff

reviewed, and I think your last sentence is,

"Further, these studies found that increased

access for adolescents to emergency contraception

did not result in inappropriate use of Plan B as a

routine form of contraception, an increase in the

number of sexual partners, an increase in the

frequency of unprotected intercourse, or an

increase in the frequency of sexually transmitted

Page 62

diseases."

Do I understand correctly that in this sentence you're referring to studies that were gathered by the staff in your office other than the ones that were submitted by the sponsor, or is it studies that -- is it studies submitted by the sponsor and other studies?

A    Right.  I would go back to the earlier part of the paragraph where I say, "In addition to the studies submitted by the sponsor, there exists a substantial body of data from recently completed published and unpublished studies on emergency contraception that have enrolled a substantial number of adolescent women."  So I think I was saying that the sponsor had submitted the studies they conducted, but in addition there were other data that the staff had reviewed, specifically Drs. Griebel and Rosebraugh in their reviews, that addressed this issue.

Q    Did you review any of those studies yourself; do you recall?

A    No.

VIDEOTAPED DEPOSITION OF JOHN K. JENKINS, M.D.
CONDUCTED ON WEDNESDAY, JUNE 21, 2006

Page 63

Q    So you reviewed the summaries of studies that they might have provided to you?

A    I heard presentations by them in meetings where they describe the studies, and we had a scientific give-and-take about the study designs and the findings and conclusions, and then I read the review of the studies that they included in their actual reviews, so I -- but I don't think I personally read the manuscripts myself.

Q    Do you know of any contrary studies; in other words, of any studies, for example, showing that increased access for adolescents to emergency contraception does result in inappropriate use as a routine form of contraception or does result in an increase in frequency of unprotected intercourse and so forth?

A    I'm not aware of any studies that demonstrate that.

Q    After you wrote this memo, did you continue to sort of keep yourself aware of the literature on Plan B at all?

Page 67

clinical trial data that the product is safe and

effective for its intended use in adolescents, but

it goes on further, but my first question about

this is:   In talking about concerns that some

people might have, are you talking about people

outside FDA, inside FDA or both?

A      Probably both.   We heard these types of

questions raised at the Advisory Committee.   These

types of questions were raised in the various

letters we received, including letters from

Congress.   You know, they were the subject of

discussions that we had internally trying to

understand what the concerns were about access for

younger women.   So I would say it was both

internal and external individuals who raised these

concerns.

Q     Were any of the internal people who

raised these concerns sort of upper management

people above you?

A      I know that there was a comment that

Dr. Woodcock made at one of the meetings where she

expressed a concern about Plan B potentially

Page 68

becoming a cult drug among teenagers where it might be abused and lead to inappropriate behavior. I don't recall if Dr. Galson ever expressed similar concerns or not. I also do not recall that Dr. McClellan ever expressed those in the two meetings that we had with him.

Q   Were you at that meeting or at a meeting where Dr. Woodcock expressed what you just described?

A   Yes.

Q   You then go on to say that "these concerns are derived from individual views and attitudes about the morality of adolescent sexual behavior and also overlap with concerns about the role for parents and health care professionals in decisions about contraceptive use in adolescents." Do you know if there were -- if people who had a role in the decision making about it, about Plan B, were making decisions in part on the basis of their attitudes about morality of adolescent sexual behavior?

A   I do not know if that factored into