# Exhibit D-2

Page 86

small, but the developmental differences that

exist between adolescents and adults, that's a

factor that comes into play for access to all

drugs for adolescents in some sense; is that

right?

A    Yes, and I actually address that later

in the Memo where I express some of my concerns

about the dual approach pathway and the policy

issues that raises for other products.

Q    With respect to Dr. Galson's comment

about "given these developmental differences," he

thinks it's "very difficult to extrapolate data,"

doesn't the FDA, and in particular your office,

often extrapolate from one age group to another

when the data, for one reason or another, is not

there for the other age group?

A    We do.

Q    And in particular are there

over-the-counter switches that have been approved

even though there was a complete absence of data

for young adolescents, for example?

A    I can't speak to that directly, because

to consider the implications of that for all

subsequent OTC switches, particularly until we get

a better understanding of how the Plan B situation

resolves itself.

BY MR. HELLER:

Q    Would you have raised the issue you're

just talking about if there had not been the Plan

B "precedent," so to speak?

A    Hard to answer that question.

MR. WARSHAWSKY:  Objection.

THE WITNESS:  What I would say is that

we had not raised this issue prior to Plan B for

any other over-the-counter switch that I'm aware

of, so prior to Plan B we did not have this policy

or this precedent that we needed to take into

consideration.  As you're probably familiar, there

are lots of over-the-counter products that have on

their labeling "under a certain age, ask a doctor"

or "not for use under a certain age."

BY MR. HELLER:

Q    Okay.  If you'd turn to the second page

of your memo, the paragraph starting, "I continue

VIDEOTAPED DEPOSITION OF JOHN K. JENKINS, M.D.
CONDUCTED ON WEDNESDAY, JUNE 21, 2006

* * * * *

BY MR. HELLER:

Q   Further down on the same page, I guess the last sentence that starts on that page, says, "Further, I believe that it is entirely reasonable to extrapolate the findings from the older women in these trials to adolescents, given well-established Agency precedent for extrapolating

Page 95

data from studies in adults and older adolescents to young adolescents, and there was no fact-based data that younger women were less able to use the product correctly in a simulated OTC setting than older women."

A    Right.

Q    And that's still your view?

A    Yes.   The standard as we apply to review an OTC Switch Application is, can -- is the product safe and effective for use in the over-the-counter setting without a learned intermediary, so turning that around, can consumers use the product safely and effectively based on the information that's on the labeling without need to interface with a physician or a pharmacist, and I believe they can.   The data I saw from the Actual Use Study and the Label Comprehension Study did not suggest to me that there was any substantial difference between the older women and the younger women, and I continue to hold that view.

*  *  *  *  *

Page 101

Very simple regimen.  We have lots of other over-the-counter products that are labeled in children as young as 12 that have much more complicated dosing instructions.

I personally happen to take an Ibuprofen tablet this morning, and just out of curiosity I read the labeling, and the instructions are much more complicated for how to take Ibuprofen for a 12-year-old than it is for a 12-year-old attempting to take Plan B.  You had to make decisions in the Ibuprofen labeling about whether you should take one tablet or two, whether you should take it every four to six hours, how many you could take in a 24-hour period, much more complicated instructions, so I was focusing on can people understand what it's for, read the directions, follow the directions, use it properly.

And I don't see how the developmental issues that Dr. Galson raised have any impact on the ability of a 13-, 14-, 15-year-old girl to follow the instructions appropriately.  So that's

Page 103

implying that that's what's going on in this case?

MR. HELLER:  I didn't imply anything.

MR. WARSHAWSKY:  Well, when you said "any other instances."

MR. HELLER:  That's why I changed it to say "any."

MR. WARSHAWSKY:  Okay.

THE WITNESS:  I am not aware of any situations where FDA has tried to regulate whether people choose to engage in sexual intercourse or not, no.

* * * * *

(The portion of the transcript from Page 103, Line 18, through Page 105, Line 2, has been marked confidential and has been redacted and included in a separate transcript called "Protected Testimony" and designated Number 7.)

Page 105

* * * * *

BY MR. HELLER:

Q    I'm going to make up an analogy here, but I will be astounded if the analogy is apt.  So for example, with Ibuprofen, which is available over the counter, would you say it's not within the FDA's purview to, for example, address this question; are people going to have more fist fights, because they know that if they do and they hurt each other, they can take Ibuprofen later and it won't hurt so much?

A    We would not be considering that question in our review of an over-the-counter application for Ibuprofen.  We would be focusing on can the patient appropriately self-select that they are candidates for using Ibuprofen for the approved indications, and if they select themselves as being appropriate candidates, can they then follow the directions to use it appropriately and also follow the directions not

Page 106

to use it if they are not good candidates.  For example, if they had kidney disease or high blood pressure, they might not be good candidates to take Ibuprofen unless they spoke to their doctor, but we wouldn't be concerned -- I think the analogy you're trying to come up with is we wouldn't be concerned about the source of their pain, but if they had pain, we would want to make sure that they understood how Ibuprofen would be used appropriately to treat that pain.

Q    So another analogy -- and I think this came up in the deposition earlier today -- for a drug like Prilosec, which is available over the counter, as I understand it, for digestive, a digestive problem, the Agency would not be concerned about whether the availability of that drug over the counter would cause people to eat more foods that cause indigestion, because they knew that they could then just fix it with Prilosec.

A    That would not be the basis for our review.  There was a legitimate issue with those

Page 107

products about whether having that available over

the counter might lead people to delay seeking

appropriate medical care for their repeated

episodes of heartburn, which might be a more

serious condition, but the question of whether

people might use the product as a way to overeat

or overindulge, we were focusing on, if they had

heartburn and they had frequent heartburn, could

they use it appropriately, and also could they

understand that they should not use it for a

longer duration of time without checking with

their physician, because it might be covering up a

more serious condition.

        Q    Other than the case of Plan B or the OTC

switch of Plan B, are you aware of any other OTC

switch in which the Agency has taken within its

purview a question of the source of the problem

that would lead a person to use the product?

            MR. WARSHAWSKY:  Object to that

question.

BY MR. HELLER:

        Q    If you understand, as you've described

Page 108

it, the source of the pain, the source of the risk of pregnancy in the case of Plan B.

MR. WARSHAWSKY:  I'm going to object.  I think the question is vague.  I think it's assuming certain facts that aren't in evidence about the Plan B approval process.

BY MR. HELLER:

Q    Well, I'm just saying, putting Plan B aside for the moment, are there OTC switches where the Agency has taken something like that into account?

A    I have trouble answering that question, because I don't think Dr. Galson raised this issue as part of the basis for his decision.  What we're talking about here is that I read his explanation about his concern about developmental differences in adolescents, and as I thought through the consequences of those issues, I couldn't see how they related to decisions about appropriately using Plan B.  They seemed to be more applicable to the question of making appropriate decisions about engaging in sexual intercourse, so I don't

know that Dr. Galson stated that as a basis for his decision. It's just that I concluded, from looking at his First Cycle Memo and his raising issues about developmental differences, that I didn't see those as relevant for the ability of adolescents to safely and effectively use Plan B without a doctor's involvement.

Q And if I've understood your previous answers, essentially you had difficulty seeing the connection between the developmental differences he pointed out and the result he reached, given that the regime for actually using Plan B properly was very simple?

MR. WARSHAWSKY: I'm going to object to that question. I just think that at this point you're really not explaining Dr. Galson's analysis or where in his analysis the issue of adolescent development came in. That was an issue of whether you could extrapolate from one set of data to another set of data. That's where that analysis fit into his May 2004 memo.

MR. HELLER: I know.

VIDEOTAPED DEPOSITION OF JOHN K. JENKINS, M.D.
CONDUCTED ON WEDNESDAY, JUNE 21, 2006

Page 111

MR. WARSHAWSKY:  Asked and answered.

THE WITNESS:  You know, what I'm trying to say again is that the data that we had available from the Application, I felt and others felt, had adequately demonstrated that the adolescent age group could safely and effectively use the product without a physician's intervention in the over-the-counter setting.

We did not see any evidence that their behavior or their ability to use the product correctly and safely and effectively was different from the older age group, so bringing in the developmental differences, I didn't understand its relevance, because we had data in front of us that seemed to refute that those developmental differences were consequential.

And we also have a long-standing Agency precedent of extrapolating information from older age groups to younger age groups, so I simply did not agree with the conclusion that this was a concern that would stand in the way of approving the Application.

VIDEOTAPED DEPOSITION OF JOHN K. JENKINS, M.D.
CONDUCTED ON WEDNESDAY, JUNE 21, 2006

Page 112

BY MR. HELLER:

Q    Thank you.  Further on on that page -- and I think you alluded to this earlier -- I guess the second sentence from the bottom, "Approval of Plan B as a dual product based on age is likely to lead to petitions to the Agency that other OTC contraceptives be similarly restricted."  And just referring to the first part of that sentence that I just read, do you continue to believe that such a dual status, if approved, would lead to requests to the Agency that other OTC contraceptives be restricted by age?

A    I think it's a possibility.  As I stated here, it is likely to lead to petitions.  You know, currently available over-the-counter contraceptives do not have an age restriction, so they are not prescription-only for certain age groups in over the counter, and my concern in this area was that there might be groups who would want to seize on this distinction for Plan B and expand it to other contraceptive agents, but my concern is also broader in this paragraph about the

Page 113

implication of this policy precedent on

over-the-counter products in general, because we

have, to date, not reached a conclusion in a

situation where we needed to distinguish between

prescription and over-the-counter simply based on

age.

And we have thousands of

over-the-counter products that are out there with

labeling that say, as we described earlier, "under

12, ask a doctor," "under six, ask a doctor," or

"not for use in children under six" or whatever

they might say. That's been our long-standing way

of handling instructing consumers whether they

should or should not use a product in a young age

group, and this would be a substantial deviation

from that practice, and I think it raised

significant concerns for many of us about how it

would play out on the broader OTC arena but also

specifically the contraceptives.

Q    You -- if you'd turn to the last page of

your memo, the one before your signature, that is.

A    Uh-huh.

Page 114

Q    If you'd read to yourself the last two sentences of that paragraph, and I'm going to ask you to just expand upon I think two things, two separate points you make there. Maybe there are more.

A    Uh-huh. All right.

Q    So is it still your view that approval of Plan B as a dual product might decrease access to use of the product?

A    Yes.

Q    And can you explain why a little bit more.

A    The dual pathway would essentially put the pharmacist in the decision-making loop for whether the consumer/patient can access the Plan B with or without a prescription, so you're actually putting the pharmacist in a position of having to check I.D. and, you know, verify that someone is at a certain age level. We don't currently have that situation in place for other products that I'm aware of, and it might lead pharmacies not to want to be engaged in that responsibility, so they

Page 115

might choose not to carry the product, which would

mean that they might choose not only not to carry

it as an over-the-counter product, but also not as

a prescription product, so even those underage

women who had a legitimate prescription might have

difficulty finding a pharmacy that carried the

product, because the pharmacist or the pharmacy

would choose not to want to get in the middle of

this issue.

Q    So I mean, for example, you could have a

woman who looks like she might be underage come

in, ask for Plan B from the pharmacist, the Plan

B -- the pharmacist is for whatever reason

unconvinced of her age, doesn't give it to her,

and liability might result; is that sort of one of

the scenarios you had in mind?

A    That's a possibility.  I think we're

also aware from media reports about, you know,

pharmacists who have objected on moral grounds

from dispensing emergency contraception, so it's

the broader issue that it would be the first time

where the pharmacist would be the gatekeeper on

deciding whether someone is above or below a certain age and could have access to this with or without a prescription. It would be a new paradigm for our system that might paradoxically lead to decreased access.

One of the stated goals, I think, of the sponsor of over-the-counter access is to expand the availability of the product, because this product works best when it's used rapidly after unprotected sexual intercourse, so it would be paradoxical for us to approve it under this dual pathway and actually see access decrease, because pharmacies choose not to carry it.

Q There's a second issue you raise in the second sentence about enforceability of the age restriction and how easy it would be to bypass that.

A Right.

Q Do you know if in the dual status -- dual marketing plan -- or I shouldn't say "plan" -- proposal for Plan B, there is any element of enforcing or preventing an adult who

Page 118

than we applied before, and in a sense it is more demanding, because asking for this demonstration in the younger age group is a very high hurdle, and in particular for this product it would be a very high hurdle to achieve, given some of the difficulties in conducting studies in that younger age group for an emergency contraceptive.

Q    Would another way in which it's more demanding is that the usual precedent of extrapolation from one age group to another in some sense was excluded for Plan B or limited for Plan B?

A    Well, the decision that Dr. Galson made was that he was not able to extrapolate.  I think that's different from most other, if not all other, OTC situations where we have felt comfortable in many cases extrapolating, or we have felt comfortable, if we didn't feel we had enough data, that the product could be labeled "not for use for children under a certain age" or "under a certain age, ask your doctor," so it is in many ways a different standard to make the age

VIDEOTAPED DEPOSITION OF JOHN K. JENKINS, M.D.
CONDUCTED ON WEDNESDAY, JUNE 21, 2006

Page 119

distinction the critical feature of this

Application, particularly I would have to say

given the product itself, which has a very good

safety profile -- going back to my Ibuprofen

example, this product probably has a better safety

profile than Ibuprofen would in a adolescent age

group.  I'd probably have more concerns about the

safety issues in the adolescents using Ibuprofen

than I would using Plan B.

Q    Was the data assembled by your staff,

the reviewers in your staff, of the type that

previously would have been held to be adequate to

justify an OTC switch?

A    Yes.

MR. WARSHAWSKY:  Object to that

question.  I think that by definition the data

provided in the Plan B context is not the same

data that was provided in Prilosec or in any

other, any other Application, so this is a unique

product.  I'm just objecting.

MR. HELLER:  In what way is it unique?

MR. WARSHAWSKY:  It's the first time an

Case 1:05-cv-00366-ERK-VVP    Document 235-9    Filed 03/31/07    Page 21 of 85 PageID
# 6796
VIDEOTAPED DEPOSITION OF JOHN K. JENKINS, M.D.
CONDUCTED ON WEDNESDAY, JUNE 21, 2006

Page 125

written request for Plan B.

BY MR. HELLER:

Q    Did you have any involvement or do you know -- I don't know when this happened, because I don't remember -- when Viagra was approved as a prescription drug?

A    I was not directly involved in that approval, no.

Q    Was -- did it happen while you were at the Office of New Drugs, at the head of the Office of New Drugs?

A    I think that -- I'm sure that that predated my current position, so I would not have had any involvement in that approval.

Q    Are there similar drugs that have been approved since you've been at the Office of New Drugs?

A    There have been other drugs for erectile dysfunction that have been approved since I became the Director of the Office of New Drugs, yes.

Q    Do you know if, if the Agency examined whether approval of such drugs would influence

Page 126

people's decision to have sex, like cause people to decide we're going to have sex?  Do you know if that was examined or data about that was submitted for those drugs?

A    That's a bit of a complex question, because the desired effect of an erectile dysfunction drug is to enable the patient to have sex.  I don't think we examined the question of whether it might lead them to, you know, having inappropriate amounts of sex, however you might define that.  It's a bit of a different scenario, I would say, from Plan B.

Q    Forgive me if I've asked you this already once.

A    Uh-huh.

                    *   *   *   *   *

          (The portion of the transcript on Page 127, Lines 1 - 9, has been marked confidential and has been redacted and included in a separate transcript called "Protected Testimony" and designated Number 9.)

Page 143

older age group, so that would indicate to me that he was not persuaded.

Q    I also have a document that talks about a February 19th meeting that included yourself, Dr. Woodcock, Dr. Kweder, Dr. Galson and I think others, at which Dr. Woodcock stated her concern about Plan B taking on an "urban legend status" that would lead adolescents to form "sex-based cults" around the use of Plan B.  You, I think, testified about something similar earlier.  Is the February 19th meeting, is that where she said that?

A    Yes.

Q    Do you have any idea if she had evidence, scientific evidence, about sex-based cults centered around the use of Plan B?

A    She did not present it as something she had scientific evidence of.  She presented it as someone who had teenage daughters and she knew how teenagers behaved.  She characterized it in those terms, that she knew how teenagers behaved, and we couldn't predict how this might be utilized in

Page 144

that setting.

Q    In January of 2005, sort of at the end of your involvement, at the point you wrote your memo in the second cycle --

A    Uh-huh.

Q    -- do you know if around that time Dr. Galson was planning to issue an approval of Plan B as a dual status drug?

A    I know that we had drafted approval letters for his consideration, at his direction.

                    * * * * *

(The portion of the transcript from Page 144, Line 17, through Page 146, Line 15, has been marked confidential and has been redacted and included in a separate transcript called "Protected Testimony" and designated Number 12.)

Page 145

* * * * *

BY MR. HELLER:

Q    So at some point around January -- maybe December of 2004, January of 2005, Dr. Galson directed you to draft an Approval Letter for dual status?

A    I believe so.  Let me say, to be very

Page 146

clear, I know that we were directed to draft

Approval Letters during the second cycle.  It's a

bit fuzzy in my memory when exactly that occurred,

but I know that throughout the second cycle and

even up until the very end of the second cycle, we

were working on Approval Letters, and we were led

to believe that approval was a very possible

outcome of the cycle.

Q    Who led you to believe that?

A    Dr. Galson.

Q    And were there sort of different

versions of this draft Approval Letter?  When you

say "Approval Letters," I'm wondering if there

were sort of three different types of letters

or --

A    Well, we have standard templates for

letters, so we would have taken the standard

template for an approval letter for on OTC switch,

and we would have, you know, put in the

appropriate information for Plan B, the sponsor,

the product, the proposal, et cetera.  Any

conditions of the approval we would have

incorporated into the draft.  I cannot recall how many drafts might have been prepared, but I know that Approval Letters were prepared, and we were still expecting and led to believe that that was a possible Action up until Dr. Crawford made the announcement in August of 2005 about the rule-making.

Q    Did Dr. Galson also direct you to draft Action Letters that would point in the other direction?  In other words, did he say, oh, by the way, also draft non-approvable letter, approvable letter, non-approvable letter, sort of the whole range, or was it just an Approval Letter?

A    In the second cycle it was only an Approval Letter.

Q    Do you still have those draft Approval Letters?

A    I personally do not have those.  I can't say if they exist somewhere in the Agency.  I personally do not have them, or they would have been in whatever I turned over as part of the document request.  There was recently a document

Page 187

on.

Now, the Regulation that's quoted here cites a number of different factors that go into the OTC switch decision process. I'd like to ask you about a few of those factors. The first one listed in the Regulation is the drug's "toxicity or other potentiality for harmful effect." Can you give a general explanation what that is intended to refer to.

MR. HELLER: Objection.

THE WITNESS: Well, all drugs have toxicity. That's by definition. So when we're looking at drugs for use over the counter where you won't have a physician or a health care provider between the patient or the consumer and the product, we're looking for drugs that have very low rates of serious toxicity so that consumers can more readily judge the balance between the toxicity of the drug and the condition that they have that they're looking to treat.

So by "toxicity" we're referring to physiologic adverse effects, pharmacologic adverse

CONTINUED VIDEOTAPED DEPOSITION OF JOHN K. JENKINS, M.D., VOL. 2
CONDUCTED ON MONDAY, AUGUST 14, 2006

Page 188

effects, and that kind of leads into the end of that phrase which talks about "potentiality for harmful effects," so we're primarily looking at the serious toxicities that may be associated with the drug, how likely those are to occur, what patient population they may occur in, various situations, so those are all things that come into play in thinking about whether a drug's toxicity or potentiality for harmful effect are such that they require that they be by prescription only.

BY MR. WARSHAWSKY:

Q    Now, let me ask you just a quick, a few quick follow-up questions.  You referred to the FDA looking for, quote, "low rates of serious toxicity."  You also used the word "likelihood."  My question to you is:  With respect to let's say the idea of serious toxicity, are there any statutory or regulatory rules or guidelines that define specifically what constitutes "serious toxicity" and how to determine whether such serious toxicity exists in a given situation?

A    There are regulatory definitions of what

Page 192

section of the prescription drug labeling, and

that guidance does comment about rates of adverse

reactions.  We actually generally like to try to

avoid using descriptive terms about "rare," "very

rare," because those aren't very well defined, but

I think that document may actually go into some

of, some of those ranges of definitions for

adverse events.

Q    Now I'd like to direct your attention to

the series of bullet points that are underneath

the quoted Regulation, and the heading for these

bullet points reads, "Non-prescription Use

Criteria."  Do you see where I'm looking at?

A    Yes.

Q    My first question is:  Where do these

non-prescription use criteria come from?

A    Uh-huh.  My best understanding is that

these were derived during the time that Carl Peck

was the Director of the Center for Drugs back in

the late eighties, early nineties, and they're

commonly referred to as "The Peck Criteria."  I

think there may have been a memo or some

Page 193

presentation or some documentation at the time that Dr. Peck created that, laid out general criteria.  I'm not aware that these are in the Regulations anywhere or in the Statute.  I think these were interpretations of the Regulation that we had been discussing earlier, so these may be paraphrased to some degree from what Dr. Peck envisioned back in the early nineties, but I think that's the derivation of these.

Q    And do you understand the criteria listed on this document to be the criteria or the standards that CDER applies in making OTC switch application decisions?

A    Yes.  These are the benchmarks.  These are the questions we expect to consider when we're looking at a proposal for an over-the-counter product.

Q    I'd like to ask you some more specific questions about each of these.  Please look at the first bullet point, which reads, "Does the product have an acceptable margin of safety based on prior prescription marketing experience?"  Can you first

Page 232

without age restriction, so nothing in their communications with me ever led me to think that they were thinking that this should not be approved or should not be available.

Over the course of the time after the lunch meeting that occurred sometime around the end of December 2003, early January 2004 that we talked about earlier and then the subsequent meeting with the Review Division in January and with Dr. McClellan in February, as we were working through the Application, getting towards the Action, there were occasions where, in conversations with Dr. Galson, that he told me that he felt he didn't have a choice, and he characterized that in a sense that he wasn't sure that he would be allowed to remain as Center Director if he didn't agree with the Action.

Q    And did he make these comments to you expressly?

A    Yes.

Q    Now, did he give you any explanation for why he may have felt that he could not have stayed

Q    Do you have any idea why the Office of the Commissioner became involved in nominating anyone to the Advisory Committees in the case of Plan B?

A    I do not know.  I mean clearly it's within their prerogative.  They are the ones who actually appoint the members to the Advisory Committee, and it may have happened in the past. It just had not happened in the past in this manner, that persons were nominated essentially with the presumption that they were going to be on the Committee.  It wasn't as if names were being floated for internal vetting.  These names were being sent down as these are new people who will be on the Committee.

Q    How did the -- well, okay.  I guess while we're on the subject of the Advisory Committee, if I can find anything I have here, I wanted to show you something.

This is a document marked Tummino 7509, and on the back is 7510.  It's two-sided.  And at the top it indicates that Charles Ganley sent

Page 259

this, forwarded this to you, and it appears to be

a letter to the Editor of the "New York Times"

from Dr. Frank Davidoff.  Do you recall seeing

this letter at some point?

    A    Yes.

    Q    And Dr. Davidoff was one of the Advisory

Committee members that considered Plan B?

    A    Yes.

    Q    Do you know if he was one of the ones

who was -- well, at the end of the first page

he -- there's this question:  "What will it take

for the citizens of this country to restore

rational science-based decision-making to the

FDA?"  Do you see that?

    A    Yes.

    Q    Do you -- had you in your prior work

with Advisory Committees, first let me ask, ever

had a resignation from an Advisory Committee

because -- as this person seems to be talking

about -- the lack of "rational science-based

decision-making"?

            MR. WARSHAWSKY:  Object to that

Page 260

question.

You can answer.

THE WITNESS:  I would just say I don't recall an Advisory Committee member resigning, in essence, in protest of an Action that the Agency took after the Advisory Committee meeting.  We had people who resigned from Advisory Committees on an occasional basis for personal reasons or career change reasons or whatever, but I don't recall, prior to this one, an advisor resigning essentially in protest.

BY MR. HELLER:

Q    That was the only question I had about that.  Thank you.

Also in terms of the Advisory Committee or regarding the Advisory Committee, were any of the people who were nominated I think by the Review Divisions rejected by the Commissioner's Office, that you know of?

A    You'd have to be more specific.  Some of the nominees from the Commissioner's Office were appointed, so I suspect -- although I don't have a

Page 291

(REDACTED PORTION)

Q     Thank you.

Do you know if the drug -- if there are nicotine-related drugs that are available over the counter?

A     Yes, there are.

Q     And are they available over the counter only for certain age ranges?

A     There are restrictions on purchasing those nicotine replacement products.  I believe the age cutoff is 18.  I've actually been involved in the past in researching how that age restriction came about, and I believe that it was a voluntary agreement on the part of the company,

Page 28

Q    Uh-huh.

A    Now I've forgotten the question.

Q    You answered the question.

A    Okay.

Q    It was, you know, what's the standard process.

So was the process for nominating individuals to this Advisory Committee unusual in any way?

A    From the standpoint of CDER, the process -- our staff did what they would normally do.  What was unusual was when their package went up to the Office of the Commissioner, it was rejected.

Q    And do you know why it was rejected?

A    We were told that it was just the wrong people, and there wasn't enough balance on the committee.

Q    And did they -- did the Office of the Commissioner explain what was meant by the term "wrong people"?

A    There was -- the explanation was that

Page 29

there wasn't enough balance on the committee, and we tried mightily to understand what balance was of concern.  Some of the things that we have to take into account are geographics across the country.  Institutions.  Similarly, we don't have more than one person from the same institution.  Ethnicity.  Gender.  We try to have a good mix, balance in the way of various -- varying expertise, scientific expertise, as well as people who have experience with clinical trials, understand that, and also clinical, clinical care.

And we also look for just -- we look for people -- because these are committees making important recommendations, we look for people who have stature in the field, among academics, among professional societies or whatever it might be.

Q    Uh-huh.

A    Okay.  In this case we tried to work through all those issues with the Office of the Commissioner.  It was Linda Skladany at the time, and she was the -- I forget what her position was, but she was basically placed in charge of

oversight of Advisory Committees.

Q    And did she work in the Office of the Commissioner?

A    Yes, yes.  She kept telling us that there wasn't enough balance of opinion, and we kept saying help us with what balance -- I can hear her saying "balance of opinion."  Well, opinion?  What opinion?  We're asking people to review scientific data, and we need people who have experience, scientific experience in thinking about difficult scientific problems, data problems, and people's opinions have to be derived from the data.  Explain what you -- we're not necessarily looking for people who have an opinion coming in.  That's exactly what we don't want.  We want people who can look at what's before them and render an assessment and recommendation on the basis of that.

So we struggled with that.  We didn't understand what -- you know, it was kind of bring me another brick.  We kept bringing people, and they say no.  So, for example, one of the people

Page 35

THE WITNESS:  I think "as qualified" is kind of a relative term.  I would say with the exception of Dr. Guidice, they were not people who we would normally have considered as the kind of people we would be looking for to be on the panel.

BY MS. LABATON:

Q    Why, why is that?

A    Their experience in -- they have very limited experience in product development, clinical trials.  They were not well-published. They were not people who had the kind of stature in the community that we were seeking.  I mean we'd get a mix of people.  We'd try to include people who have varying levels -- if it's someone who's young, they can't have as much stature and experience, and we have to take that into consideration, but they were not people -- again with the exception of Dr. Guidice, these were not individuals who we would normally have recommended.

Q    I want to go back to something you said earlier.  You said that -- I think I keep

Page 36

misprononouncing her name.  Is it --

A    Skladany, S-K-L-A-D-A-N-Y.

Q    Thank you.  You said that Ms. Skladany said to you -- it sounds like several different occasions -- that there was not balance of opinion.

A    Right.

Q    And I'm wondering if -- and I know that you also said that you struggled with what was meant by "opinion."

A    Right.

Q    Did you have the sense that it was about sort of ideological opinions?

MR. WARSHAWSKY:  Objection.  Calls for speculation, and the question's been asked and answered at least two or three times.

THE WITNESS:  That was all that we could come up with, because there was nothing else articulated to suggest that it was scientific experience or expertise that was at issue, and that was all we could surmise.

Case 1:05-cv-00366-ERK-VVP    Document 235-9    Filed 03/31/07    Page 42 of 85 PageID #: 6817

BY MS. LABATON:

Q     That it was ideological opinions?

A     Right, and particularly the background of -- the backgrounds of many of the candidates that were forwarded, that were provided, had an ideological commonality.

Q     Could you describe that.

A     They were -- these were people who were very active in the Right to Life antiabortion world, again with the exception of Dr. Guidice, who was highly qualified.

Q     During your tenure at the FDA have you been involved in the formation of any other advisory committees?

A     Oh, yes.  Many.

Q     Have -- in any of those other instances, have nominations come from the Office of the Commissioner?

A     There were several others around the same time as this, but not before or really since.

Q     And were those other advisory committee processes similar to this one?

Page 44

explained.

Q    Okay.  Thank you.

Do you recall a lunch meeting you had in late 2003 with Dr. Woodcock, Dr. Galson and Dr. Jenkins?

A    Yes.

Q    Where did that meeting take place?

A    Amalfi Restaurant.

Q    And that's a restaurant --

A    It's right down the street, yeah.

Q    And was it just the four of you?

A    Yes.

Q    And what happened at that meeting?

A    They had asked to -- they had asked for Janet and Steven and us -- John and I -- to have lunch with them.  We were expecting to discuss the outcome -- I'm not sure.  We weren't clear.  It was clear that they wanted to talk to us about something.  We were just -- we saw it as an opportunity to share with them some of the details of the discussion at the Reproductive and OTC Advisory Committee meeting that had occurred a few

weeks before.

And when we began -- it was during the course of that discussion that -- we never even really got much into the detail of the Advisory Committee meeting itself, but they informed us that the Plan B could not be approved on this round, and that, that phrase was used, "on this round."

Q    What does that mean, "on this round"?

A    That meant that if there were another round of review, another resubmission or "cycle" of review, we call it, there could be approved, it might be able to be approved at some point, but not this time, not on this clock, as we had our deadline.  So it couldn't be approved on this round, and that the reason was really rooted in the concern about two things:  One, that the -- there was concern about adolescents, its availability to adolescents, and also that it, it takes -- we, society -- the public is not ready to have this kind of contraceptive so widely available over the counter, and that it's going to

Page 46

take time for the public to adjust to this idea.

They also told us that they were -- this was part -- that it had to be a Non-Approvable Action and not an Approvable, which -- and the reason for that was because the NA Action sent a stronger message to the public that FDA was being tough on safety and concerns about reproductive issues in adolescents.

Q    At the time of this meeting, the reviews of the Plan B Application, had they been completed?

A    No.  However, the general findings of the review staff had been shared and were -- at the Advisory Committee meeting a few weeks before and had been presented.

Q    And those -- what were those findings?

A    The Division of Reproductive Products review staff was going to recommend approval. They believed that the concerns -- they, too, were concerned about the adolescent issue but did not see a reason, did not see cause to distinguish over-the-counter availability on the basis of age,

Page 48

concluding that teenagers could use these products, certainly could follow directions, and there were no safety concerns about their use.

Q    So going back to this lunch, when you said that Plan B -- when you said that you and Dr. Jenkins were told that Plan B could be approved on this round, based on the reasons given --

A    Right.

Q    -- who, who had made that decision?

A    We were told that they had talked to Dr. McClellan about it, that Dr. McClellan had informed them of this.

Q    And do you know when he had made that decision?

A    I don't.  They did tell us that it was part of -- that it was, you know, the non-approval, and -- non-approvable, and this was, you know, the goal, everyone's goal was ultimately to see this approved.

Q    "Everyone" meaning including Dr. McClellan or "everyone" meaning Dr. Woodcock

Page 49

and --

A    Dr. Woodcock and Dr. Galson, and that they had been assured by Dr. McClellan that in the long run that would likely be the case, but it wasn't -- couldn't happen on this round.

Q    You said that, that one of the reasons given was that the public is not ready to have this kind of contraceptive so widely available?

A    Right.

Q    Is that something that is considered when reviewing an OTC Switch Application?

A    Well, what is considered in OTC Switch Applications are the nature of the product, you know.  Are there things about the product that is the indication, something that we think warrants an over-the-counter availability of a product?  Can the condition be self-diagnosed?  And then are there safety issues, safety concerns inherent to the product itself that would cause concern about its availability without the, without the interface with the health care provider?  Usually those are things -- when I say about the product

Case 1:05-cv-00366-ERK-VVP   Document 235-9   Filed 03/31/07   Page 48 of 85 PageID #: 6825

A    I learned of it both from Dr. Houn and from Dr. Galson and from Dr. Woodcock independently.

Q    In three separate conversations?

A    Separate conversations.

Q    In person?

A    Yes, yes.

Q    And what was communicated to you about the content of that conversation?

MR. WARSHAWSKY:  Objection.  By which of these people that she spoke to?

BY MS. LABATON:

Q    Let's start with Dr. Houn.

A    Dr. Houn simply told me that she had had a conversation with Dr. Woodcock and who had tried to -- you know, I don't remember very much of what Flo told me specifically, other than that Janet had called her and tried to help her put in perspective why we were doing things this way at this time.

Q    And did she say why they were doing things that way at that time?

Page 56

A    It was pretty much -- when I talked to Flo, it was for the most part a discussion similar -- you know, the reasons were pretty much the, the same as Janet had communicated to me and John, which I've already --

Q    At the lunch?

A    Yes, yes.

Q    Did either Dr. Houn or Dr. Woodcock communicate to you that during the course of that phone call, a statement was made about appeasing the constituents of the Presidential Administration?

A    I don't recall being told that that was part of the conversation, but that was certainly implied in the lunch meeting that I had with Janet and Steven was that Dr. McClellan -- you know, this recommendation had -- was not one that Dr. McClellan had made on his own but was in -- the White House was involved is what we were told, and that it was made very clear that there were a lot of constituents who would be very unhappy with the, an over-the-counter Plan B, and those were

Page 57

part of -- in addition to the public, that was

part of the public that needed to have the message

that we were taking adolescents and reproductive

issues seriously.  I don't know who those were or

anything more about it.

Q    Did the suggestion that, that the Agency

would handle the Plan B Application the way it did

in order to appease the constituents of the

Presidential Administration come as a surprise to

you?

MR. WARSHAWSKY:  Objection.  I don't

think that that's quite what the witness testified

to.  Why don't you just ask her more

straightforward question rather than trying to

testify as to what her testimony was.

BY MS. LABATON:

Q    Does that sound like a

mischaracterization of your testimony?

A    Say it again.

Q    Did the suggestion that the FDA was

handling the Plan B Application the way it was in

order to appease the constituents of the

Presidential Administration come as a surprise to you?

MR. WARSHAWSKY:  Object to the form of the question.

THE WITNESS:  You know, I'm not sure if it was a surprise.  I'm not sure "surprise" is the right -- is a term I would choose.  I think I would better say that it was the first time I had been faced with making a decision on an Application where that was part of the consideration.

BY MS. LABATON:

Q    Have you heard anyone else express the proposition that the Application was handled the way in which it was in order to appease the constituents of the Presidential Administration?

A    No, that was all just -- my conversations were really only with Dr. Woodcock, Dr. Galson, and others in the Center below them.

Q    Uh-huh.  Does the FDA typically consider the satisfaction of the constituents of the President's Administration when evaluating Drug

Page 35

Q    Yeah, the exhibit you have in front of you?

A    (Witness complied.)

Q    This appears to a letter to you from Senator Carl Levin.  Is this a letter you received?

A    Hang on one second (perusing.)

Yes; it's I letter that came to my office. When you say received, it was formally delivered to the Centers for Medicare and Medicaid Services on my behalf.

Q    And sometime after it was received, did you ever read this letter?

A    At some point after it was received I did. The way that we handle congressional correspondence is it usually goes into a clearance process and given that we get hundreds of congressional requests every month, it may be some time before a particular request gets to me.

Q    Do you know if you responded in writing to this letter?

A    I know we have not responded in writing to this letter as of this time.  I know there has always

Page 36

been some effort to develop a response to this letter, because this letter pertains to, even though it's directed to me at CMS, it pertains to matters at the FDA, and it also pertains to matters that are involved in ongoing litigation as you well know.

What that means from my standpoint and my Agency is that there is a more sensitive review process and clearance process to handle any kind of response to the letter.

So in addition to the usual time that's required to respond to a congressional inquiry, because this one involved matters of litigation and matters going across multiple agencies, there are simple a lot of people who need the clear and sign off on any official response.

Q    I believe the letter requests that you make yourself available for an interview with Senator Levin's staff.  Have you made yourself available for such an interview up to this date?

A    As I said, we haven't responded to the letter yet, and I have not made myself available for an interview yet.  The letter, it appears, asks the

Page 127

interactions.

Q    Let's talk about now interactions outside the FDA if you've had any.  During the time you were at the FDA, did you have any interactions with people outside the FDA about Plan B?

MR. AMANAT:  When you say outside the FDA, you mean anyone in the world?

MR. HELLER:  Yes, in the world.

MR. AMANAT:  Okay.

A    Well, let me start with the ones that might be of most interest or relevance to you.  I had occasional updates, informational updates, on what was going on in the Agency with some of the staff in the department and relevant policy staff at the White House.

And I had probably some interactions or, I definitely had some, at least one meeting with members of Congress about this and probably heard occasionally -- I'd have to go back and look at the hearing transcripts -- but, you know, this issue may have well come up in one of my numerous appearances from Congress.

Page 128

There may have been others through casual conversations or interactions with reporters, but those would probably be the main ones.

BY MR. HELLER:

Q    Who did do you have interactions with at department.  I assume you mean the Department of Health and Human Services?

A    Department of Health and Human Services, yes.  It would have been Ladd Wiley who was kind of the department liaison or I think his former title was Counselor who was overseeing FDA and other public health issues; Scott Whittaker, who was the Chief of Staff at the time.  At least a basic brief update on Plan B probably came up in one or few of my briefings with the Secretary.  I met with him from time to time about important issues at the Agency.

We were really focussed on some major regulatory actions like taking ephedra off the market as the first time ever that anyone had used the Dietary Supplement Act to premove a product from the market on safety grounds.

And it was another issue where there's

Page 129

some very interesting points that come up about how you reach conclusions about safety and effectiveness based on limited available evidence.

So in the course of updating him on those other major issues, where we were in the process of making some real -- and we made some real policy decisions that the Department certainly got asked about, I may have provided a brief update on this.

I don't have a specific recollections of it but it would be in keeping with my usual course of doing business with the Department of HHS.

Q    So would the update have been something like this:  "We're reviewing the evidence?"

MR. AMANAT:  Object to the form of the question.  You can answer the question.

A    Let me maybe characterize the updates a little bit more.

BY MR. HELLER:

Q    That will be helpful.

A    When the application came in to the Agency and there were some press around that, I would have let the Department know, if they had asked, and I

Page 130

expect they did, that we're reviewing the

application.

And since they were not experts

necessarily on what exactly the processes were at the

FDA, I would have let them know that it was going to

be reviewed by a number of relevant offices inside

the Agency, that there would, in all likelihood, be

eye advisory committee meeting on it; that the Agency

would take the information from that advisory

committee meeting and the internal staff review and

use it to make a conclusion about the action on the

product based on the scientific evidence available

and that would take place over some course of time,

maybe a year or close to a year or something like

that.

And then later on in the process, might

give them an update if something significant

happened; like we scheduled a advisory committee

meeting.  There will probably be some press attention

around it.  Or the advisory committee met; here's

what some of their main findings and issues were;

something like that.

Page 131

Q    Did you ever indicate to one of these people at the Department of HHS, did you ever indicate to them, "Well, the direction we're heading in is this" or similar direction?

A    I indicated very clearly that the direction we were heading in was a scientific review of the evidence, and that would determine the Agency's ultimate action and that there were, you know, as the review proceeded, would have probably given them a little bit of an update about what kinds of scientific issues were coming up, that, you know, the evidence seemed very strong for adults.  There were some questions and extrapolating to younger age groups, things like that.

Q    What about at the White House?  Who did you have contact with there?

A    The domestic policy staff would have been, I think Jay Lefkowitz initially and then Kristen Silverberg, and it would have been in the same nature of occasional updates when there was something new happening with the application, and just to let them know that we were handling it and how we were

Page 132

handling it.

Q    Let's start with Jay Lefkowkitz.  What other FDA processes were you updating him about?

MR. AMANAT:  Object.  You can answer the question as long as it does not reveal any trade secret or confidential or commercial information about unapproved products.

A    There were are very number of very important FDA initiatives ongoing at the time, in early 2003; it was just after I had gotten to the Agency.  The Agency had been without a confirm, a senate-confirmed full Commissioner for, you know, two and-a-half years, three years at that point.

And so there was a lot of business that we needed to start really moving forward on.  That's not to take anything away from the leadership staff that had been there before.  It's just easier to get things done when you're the Commissioner, when you've gone that process of confirmation by the Senate and in that confirmation process I highlighted a number of areas I think I thought were very important for the Agency, such as implementing a new level of food

Page 133

security in the United States.  We just got some funding to do that and needed to put it in place effectively, such as implementing some important reform in our premarket review process, some important reforms in collecting more comprehensive information routinely in the post-market setting.

And then from time to time there would be issues that come up, because this is the FDA, that are going to be of major importance to the public.

It was later on in the year but we experienced the first case of bovine spongiform encephalopathy or "mad cow disease" in this country late in the year 2004 -- early, late 2002 and early 2003 -- you know, it's funny, I guess not funny, but being Commissioner you kind of hope that at some point there's going to be a break in the action, a little bit of a break, and the first holiday season I was there around the end of 2002, that's when the Iranians announced they cloned a human, so that led to a lot of Agency meetings and updates for the White House and what was going on here.  Is there -- is this true?  Are the regulatory implications in this

Page 138

the Department of Agriculture has important regulatory oversight responsibilities for meat, and with other agencies, Commerce and others, that would be feeling some of the fallout of the potential market or economic implications of the decisions we were making and the actions we were taking.

We can do a much better job of serving the public when we were well coordinated, when the leadership of the executive branch knows what we're doing.

Q    With respect to Plan B were there other federal agencies or entities that would be involved in the Plan B OTC switch other than FDA in the way you just described these others?

A    No.  That was a single-Agency issue.  But, yeah, there were a lot of Agency issues that pertained just to HHS or just to the FDA where the -- where regular updates for the White House were appropriate.  Giving you another example was --

Q    I want to us to get to lunch.

A    Okay.

Q    Were there any other OTC switches that you

Page 140

any other issues or any other reasons that we might have for meeting.

Because there were so many regulatory activities ongoing at the Agency that were in the public eye, there was on a fairly regular basis, I'd say ever several weeks or so, a reason for me to let them know about the Agency status of a particular issue.

Q    So with respect to Prilosec that you just mentioned, when you gave them that update, it had over been switched over-the-counter by the Agency; is that right?

A    Well, the Agency was about to announce the switch.  And, again, let me tell you, this is just an example.  I don't have a specific recollection of that conversation.  I'm just trying to give you a flavor for the kinds of interactions that I had with the White House.

Q    How many updates did you give the White House about Plan B?

A    I don't recall more than -- I don't recall any conversations specifically.  I don't recall more

Page 141

than several updates.  There would have been one around the time when the application came in, maybe in response to a press report or something like that.

There would have been probably another one around the time of the advisory committee meeting and then maybe after the advisory committee meetings of several of so.  It's conceivable, though again I don't have any recollection of it, that sometime along the way there, Jay or subsequently Kristen may have asked, you know, "are things still moving forward on the Plan B application?"

It would have been, "Yes.  Here's where we are in the process"; something like that.

Q    During these updates in general when you would give the White House updates, would the people you're talking to at the White House ever express a view about the updates sort of, "Oh, that's great." Or "I don't like the way that sounds?"

MR. AMANAT:  Object to the form of the question.  You can answer the question if you understand it.

A    Not so much.  I don't think it would have

Page 47

to get the time.  I'm having trouble remembering
what the time flow was.  Somewhere in January we
met with Dr. Galson.  I actually was on the phone,
and he met with people in Park Lawn, and at that
meeting he said this will be -- at least my
recollection of what he said was this will be a
Non-Approvable Action.

Q     Okay.

A     And there's different levels of Action.
There's Non-approvable, there's Approvable and
then there is Approved, and we asked several
questions about why this wasn't an Approvable
Action and really couldn't get an answer from
Dr. Galson.  And so then he said this would be a
non-approval, and when we asked what it would take
for the sponsor to go forward, we really couldn't
get a sense of what it was that he wanted or what
he needed or what sort of studies were needed.  I
just can't remember whether that -- how that
happened around where this review went in.

Q     I think the meeting that you're
referring to occurred on January 15th, and I'm

Page 105

what the reasoning was.

Q    And do you also believe that there would be great benefits derived from easier access to Plan B?

A    Yes.

Q    And then you go on to say, "To ensure consistency of regulation and natural progression of this line of regulatory reasoning would require that the Agency remove OTC marketing status for many drugs with known abuses, including Dextromethorphan, and because of reports of adolescent abuse; laxatives because of abuse by people suffering from bulimia; analgesics because of abuse with subsequent health ramifications; or Acetaminophen because of its use in suicides." Aren't you just comparing apples and oranges there?

A    Well, I think you have to look at these from a regulatory perspective, and so if part of your reasoning for not allowing something on -- there's actually two points to be considered.  If part of your reasoning for not allowing something

Page 106

onto the market is because there is a theoretical concern that it may be abused, you are never allowing it on the market to see if it is going to be abused. That's the first concern, so you're kind of in a Catch 22 with that sort of reasoning.

The second is that we do have drugs out there that we know are being abused, so if your reasoning for not allowing this out on the market is because it may be abused or misused by a segment of the population, well, we have drugs out there that we know are abused or misused. And so if you're holding this off the market, what is your regulatory reason for not removing these?

Q    Do you know if the Agency has used its reason for withholding OTC status for Plan B as a precedent for other OTC switches in any way?

A    I'm not sure what you're asking me.

Q    I'll withdraw the question.

If, um, if you would turn to Page 30759, the last page of the text of this document, the first sentence says, "There is compelling data evidencing that Plan B fulfills regulatory

VIDEOTAPED DEPOSITION OF CURTIS ROSEBRAUGH, M.D.
CONDUCTED ON TUESDAY, JULY 18, 2006

Page 190

what?

Q    From 154, Line 8 --

A    Uh-huh.

Q    -- to 156, Line 15.  Thanks.

Now, taking a look at this lengthier passage in which Dr. Woodcock provides a little more detailed description of this February 19, 2004, meeting, can you tell me what, if anything, of this description you disagreed with or you disagree with?

A    Well, again if you look at this, the things that she's citing, OxyContin and Dextromethorphan, all have CNS effects, so you can say to yourself that they do have abuse potential because of their CNS effects, whereas Plan B doesn't have CNS effects, so it is a little confusing if she's directly comparing that these are drugs of abuse and therefore we don't know whether Plan B will or not; that's comparing something that has a CNS effect to something that doesn't have a CNS effect.  So it's a little difficult to know if she -- and additionally,

Page 191

Dextromethorphan's CNS effects are LSD type effects, so they cause disassociation, so if she's comparing it to that, I'm not sure what the analogy is she's getting at.

Q    Well, let me ask you this:  The, the comparisons to OxyContin, Dextromethorphan and so forth, were these comparisons that came up specifically in the February 19, 2004, meeting?

A    I don't recall.

(Page 191 - Lines 10 through Page 192 - Lines 13 were bound separately and marked "Protected Testimony")

Q    And what was your position at the FDA?

A    Assistant Commissioner for Women's Health and Director of the FDA Office of Women's Health.

Q    What were your responsibilities in that position?

A    Um, managed and directed the Office of Women's Health, which was part of the Office of the Commissioner, and the budget and the programs therein.  I was also to be involved in relevant policy discussions within the Office of the Commissioner on behalf of women's health issues across the Agency.

Q    Okay.  And do you currently work at the FDA?

A    No, I do not.

Q    When do you leave the FDA?

A    August 31st, 2005.

Q    Okay.  I'm handing you what has been marked Exhibit 2.

A    Yes.  Did I get the date right?  Good.

Q    What is that document?

Page 14

A    That's the Letter of Resignation I submitted on August 31st of 2005.

Q    And did you prepare that letter?

A    I did.

Q    And who did you give that letter to?

A    Dr. Woodcock.

Q    So that's a true and accurate copy of the letter you gave to Dr. Woodcock?

A    Yes, it is.

Q    Okay.  Why did you leave the FDA?

A    It was in response to the decision announced the few days before to not approve Plan B emergency contraception over-the-counter, due to the stated need to put it into rule-making, and I disagreed with that and felt that I could not continue on in my position as head of Women's Health, and so I resigned.

Q    And have you been working since you left the FDA?

A    Yes.

Q    What type of work have you been doing?

A    Well, currently I'm on the faculty of

VIDEOTAPED DEPOSITION OF SUSAN WOOD, PH.D.
CONDUCTED ON MONDAY, JULY 31, 2006

Page 24

Q    Do you have any understanding of why Dr. Galson thought that denial of the SNDA was, was necessary to be an effective leader?

MR. AMANAT:  Objection.

You can answer the question.

THE WITNESS:  Can you ask that question again.

BY MS. LABATON:

Q    Sure.  Do you have any understanding of why Dr. Galson thought that denial of the SNDA was necessary to be an effective leader?

A    I don't remember the exact words that he said, but my understanding of it was that he felt that he would not be able to work with the leadership of the Agency in an effective manner if this letter -- if this denial did not go through. My understanding from that meeting was that he, he felt that this was necessary if he was going to be, um, an integral part of the leadership of the Agency in terms of being able to work with, um, uh, his supervisors, uh, in, in managing, uh, the Center for Drugs.

Page 40

BY MS. LABATON:

Q    Sure.  When you resigned to Dr. Woodcock, what did she tell you about her own feelings about staying at the Agency?

A    Um, she said that she, um, was actually very understanding as to why I felt I needed to resign in order to maintain my credibility as someone working in women's health policy and women's health science and research.  She was just very, um -- she was very understanding.  She asked me if I would reconsider, and she said that she understood the need to maintain your credibility in the outside world and that, um, she, um, wasn't sure, um -- and I have to say I'm very uncomfortable in revealing private conversations of this nature.  She wasn't sure how long, you know, that she would be able to feel credible at the FDA herself, and -- but she was certainly understanding how I had reached that point.

MS. LABATON:  Thank you, Dr. Wood.  I have no further questions.

VIDEOTAPED DEPOSITION OF SUSAN WOOD, PH.D.
CONDUCTED ON MONDAY, JULY 31, 2006

Page 177

happened at FDA, but sometimes it was they were inquiring of me directly.  It depended on the situation.

Q     And when they inquired of you, in what manner did they make those inquiries?

A     Well, I have to point out I have had no contact with anybody in Congress -- staff, members or otherwise -- prior to my resignation at all on the subject.

Q     I'm focusing on subsequent.

A     Which is -- which I don't necessarily see the relevance of, but in any case, subsequent the first call I got was from a Majority Committee staff who were considering doing an investigation, and they asked me to -- they wanted to interview me on, on what happened and my resignation, and that occurred.  And then other -- you know, other times I've contacted or other aspects of communications with Congress have been on things unrelated to Plan B.

I have to point out I've worked as a consultant in a couple of different capacities

VIDEOTAPED DEPOSITION OF SUSAN WOOD, PH.D.
CONDUCTED ON MONDAY, JULY 31, 2006

Page 178

where we contacted the Hill and different Congress people or senators who are interested in women's health broadly, and I was communicating with them on those subjects, and then other communications were about Plan B specifically.

Q    When you were getting these requests for information from members of Congress or their staffers when they wanted to get information from you about Plan B, were they requesting this information from you by sending you e-mails, by writing you letters, by faxing you?  How did they --

A    Sometimes they sent e-mails, sometimes they called me, sometimes, um -- I don't think I got any faxes or letters, although I got one -- that's not true.  I got one thing sent to me by mail, but otherwise it's, you know, just routine types of contacts.

Q    And when you provided this information to them, did you typically provide it in writing or did you pick up the phone and call or did you testify, or --

Page 179

A    I typically spoke on the phone or went to their offices and met with them in person.

Q    And how many -- so how many such meetings would you say took place since you've left the Agency?

A    Specifically about Plan B?

Q    Yes.

A    Roughly 15 or 20.

MS. JONES:  Can we take a short break?

MR. AMANAT:  Yeah.

THE VIDEOGRAPHER:  Going off the record, the time is 4:02 p.m.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER:  We're back on the record.  The time is 4:16 p.m.

BY MR. AMANAT:

Q    Dr. Wood, I appreciate your patience with me.  I have had a lot of questions for you. I apologize for having so many.  I just have a couple more.

We were talking before the break about any contacts or communications you may have had

Page 180

with members of Congress or their staff.  As a corollary to that, I want to ask you whether you had any contact or communication with the government accountability office with regard to the, uh, their examination of the Agency's decision-making process with regard to Plan B.

A    This is for the report that came out in November of 2005?

Q    Yes.

A    Yes.  I was on the interview list provided by FDA or to the GAO, and so the GAO -- or I don't know how many -- anyway, I was one of the people who was interviewed by the GAO when they were doing their investigation.

Q    Do you recall approximately when that interview took place?

A    Um, winter 2005, something like that.

Q    Did you give them any documents?

A    No.

Q    And do you recall what exactly you told the investigators?

A    Not specifically, no.

Page 68

Q   Okay.  Do you know if a decision was made by someone at some point in time to delay action on the SNDA beyond that target date?

A   All I know is what Steven told me, is that he could not approve the application.  That's all I know.

Q   Did he tell you why he could not approve the application?

A   He didn't, I mean, he didn't.

Q   Did you have some understanding of why he couldn't?

A   Well, I assumed that Dr. Crawford, and if he was consulting anyone else or himself, had decided that these legal and regulatory issues had not been satisfactorily resolved.

Q   Did Dr. Crawford talk to you about the decision to postpone action beyond the January target deadline?

A   No.

Q   Do you know what the Agency was doing on the Plan B SNDA between January 2005 and August 2005?

A   No.

teenagers and their behaviors.  For example, we have very proudly approved many drugs in the past that have become cult drugs in certain populations, for example, OxyContin, that staff had approved that, felt very good about that approval for cancer patients who suffer from severe pain.  And they thought it was a wonderful new option.

They -- although that obviously had abuse potential.  They never imagined it would reach this cult status of abuse and misuse in rural areas, which is actually what happened to OxyContin.  Similarly, dextromethorphan, which is an ingredient in over the counter cough and cold remedies is particularly used as a recreational drug in the 13 to 16-year-old age group.  And I, in my wildest dreams, could not imagine misusing cough and cold medicines, but these young teenagers call them skittles, they use the internet to disseminate this sort of cult status of using, misusing this drug.

And I was telling them, you know, we don't have any data and we really need to think about these behavior al consequences, because we do not have

Page 161

Q    To the best of your recollection, are the comments attributed to you a fair and correct characterization of your statements at that meeting?

A    Well, certainly a highly incomplete characterization.

Q    Could you elaborate on that?  Explain what you mean by that?

A    I went through, as I did here, a number of examples of the fact that we have great difficulty in understanding consequences of behavior in the absence of data.  And as I said earlier in this deposition, that has led us to refuse to switch or discourage sponsors from switching quite a few over the counter potential switches, because we were concerned about adverse health consequences of the OTC availability of the product.

We had data that was fairly good on OTC availability and the consequences of OTC availability for the older age groups.  But what I was talking about in this meeting or what could be various health consequences of the availability in the younger age group for which we did not have data.  And of course,

VIDEOTAPED DEPOSITION OF JANET WOODCOCK, M.D., VOLUME 2
CONDUCTED ON THURSDAY, APRIL 27, 2006

Page 162

of particular concern is failure to be under proper health care for women who are sexually active at a young age.

Q    Now, at the very bottom line of this, it says, "as an example, she stated that we could not anticipate or prevent extreme promiscuous behaviors." To what extent did you comment on a fear about extreme promiscuous behaviors?

A    I think, to my recollection, I shared with the group the fact that I was the mother of two teenage girls.  And that they had shared with me a number of behaviors of their classmates or colleagues.  And some of that, you know, would alarm most health professionals, although I think they're aware of it as a statistic.  And some of it involves sexual activity.

And I said that I was -- we could not predict that.  I wasn't trying to imply that Plan B would cause this, okay?  I was concerned that it would get caught up in this type of behavior that is already occurring out there in some pockets, especially of the early adolescence.  And if that

Page 163

were to occur, I was saying then we would have a terrible problem on our hands as far as availability of this product at all which --

Q    Was your -- go ahead, please.

A    Well, we have countered that with other products that are extremely desirable products for a certain part of the population.  But if abuse occurs in a subpopulation, the pressure to make those products unavailable becomes very strong.  And so we have to balance the ability to make sure that the product remains, you know, an overall positive benefit/risk ratio, and we can't simply focus on the good it's going to do.  For example, the OxyContin example is a very good example.

I mean, for people with cancer, that is a really important drug.  All the long acting narcotics are.  But there's a countervailing force that would like us to remove that drug from the market because of the harm that is being caused by abuse of the drug.

Q    Now, when you were thinking about the, when you were thinking about the possible

Page 177

(This concludes the "PROTECTED TESTIMONY".)

MR. AMANAT:  I have one question that's inspired by some questions Ms. Jones just asked you, Dr. Woodcock.

EXAMINATION BY COUNSEL FOR DEFENDANT (RESUMED)

BY MR. AMANAT:

Q   The agency's regulations, namely 21 CFR section 310.200(b), with regard to -- is that the regulation that applies to OTC switches as far as you know?

A   I don't know.

Q   Are you aware of the regulation which talks about "any drug limited to prescription use shall be exempted from prescription dispensing requirements when the Commissioner finds such requirements are not necessary for the protection of the public health by reason of the drug's toxicity or other potentiality for harmful effect"?

A   Yes.

Q   The reference to other potentiality for

Page 178

harmful effect, to your knowledge, is that limited to

addictive properties that a drug may have?

MS. JONES:  Objection, outside the scope

of redirect.

MR. AMANAT:  You asked numerous questions

about whether the various examples she gave were

addictive or not.  It is within the scope of what you

had asked.  Does --

MS. JONES:  My objection stands.

BY MR. AMANAT:

Q    Please answer the question.  The term

other potentiality for other harmful effect, is that

limited to the consideration of whether the drug has

addictive properties?

A    No.  In fact, when we did our part 15

hearing in 2000, we specifically asked about

preventives in general.  And we asked, could the

presence in the OTC market without a learned

intermediary of a preventive lead to ill-advised

actions, behavioral actions by people who are taking

the over the counter product.

And the example used was cholesterol

Page 179

lowering drug, which then the ill-advised behaviors we mentioned in the notice included continuing smoking, continuing having improper diet, failure to exercise, all the interventions that presumably a learned intermediary would advise a patient who had high cholesterol to have as their first steps.

Q   Okay.  And so those types of behavioral changes would, in your view, be subsumed within the term other potentiality for harmful effect?

A   Yes, that is not the only -- we had many examples of this, all right?  Where potential switches were floated by different companies to the agency.  And the concern really was not about the pharmacologic safety of the agent, but about the consequences of the consumer self-medicating, especially in a preventive mode.  And then perhaps they would progress to a cancer or they wouldn't have the health care professional oversight, and they would perhaps engage in other health related activities that were negative as a consequence of having the OTC availability.

Q   Okay.  And do you believe there are such

Page 180

potentialities for harmful effect of that nature that are implicated with the Plan B OTC switch application?

A   Well, the specific concern is about health related behaviors around sexual activity, and the availability in the younger age group.

MR. AMANAT:   Thank you very much, Dr. Woodcock.

EXAMINATION BY COUNSEL FOR PLAINTIFFS (RESUMED)

BY MS. JONES:

Q   Are any cholesterol lowering drugs available over the counter?

A   No.

MS. JONES:   No further questions.

MR. AMANAT:   Thank you, Dr. Woodcock.

THE VIDEOGRAPHER:   This marks the end of the deposition of Dr. Woodcock.   The total number of tapes used today was one.   We are going off the record.   The time is 12:33 p.m.

(Signature having been not waived, the deposition of JANET WOODCOCK, M.D., was concluded at 12:33 p.m.)